## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

STEPHEN KERSHNAR,

       *Plaintiff,*

    v.

STEPHEN H. KOLISON, JR, in his individual capacity and his official capacity as the President of the State University of New York at Fredonia, and

DAVID STARRETT, in his individual capacity and official capacity as Executive Vice President and Provost of the State University of New York at Fredonia,

       *Defendants.*

Case No.:

**VERIFIED COMPLAINT
FOR CIVIL-RIGHTS VIOLATIONS**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1.    Stephen Kershnar is a renowned philosopher whose meditations on what morality means were long celebrated by SUNY Fredonia, where he is a Distinguished Teaching Professor—the SUNY system's highest academic rank. But when Professor Kershnar discussed challenging questions regarding the moral analysis of sexual conduct involving minors on a philosophy podcast, his decades of scholarly research on this topic was met with a barrage of angry Tweets and demands that he be terminated. Within hours, SUNY Fredonia president Stephen Kolison gave in to the Twitter mob, and, ignoring Kershnar's First Amendment rights, banished him from the classroom, from the campus, and from any contact with the "campus community."

2.    Over the course of his long career as a public intellectual, Professor Stephen Kershnar has become renowned for his thoughts on the philosophical

underpinnings of morality and law. As an author, a public speaker, a columnist, and Distinguished Teaching Professor of philosophy at SUNY Fredonia, Kershnar uses a traditional philosophical method of Socratic inquiry, staking out provocative positions to question the core assumptions society makes about the role of morality and law.

3.     SUNY Fredonia celebrated Professor Kershnar's scholarly examination of our society's moral commitments on a host of challenging issues, including abortion, slavery, and torture. In recognition of his stature in the field, the SUNY system named him SUNY Distinguished Teaching Professor, "SUNY's highest academic honor," and awarded Kershnar the "Chancellor's Award of Excellence in Teaching," noting his "superior professional achievement." Boasting about its award-winning professor, SUNY Fredonia issued a press release lauding Kershnar for his iron-sharpens-iron approach:

> Dr. Kershnar has established a reputation as one of the most prolific authors on campus, having published four books and written dozens of articles for highly selective journals and book chapters and also presented in numerous conferences and philosophical forums. His works cover a wide spectrum, including politics, ethics, religion, law and sports. He is known for promoting unpopular or previously ignored positions that often leads those who disagree with him to sharpen their own views when reacting to his reasoning.

4.     SUNY Fredonia was proud of Professor Kershnar's willingness to stake out unpopular positions—including his thought-provoking explorations of the moral status of adult-child sex, including when and why it should be criminalized. Proud, that is, until minute-long clips of his commentary on the subject, excerpted—without

any context—from hours-long philosophy podcasts unrelated to the university, went viral on Twitter.

5.     Within hours, SUNY Fredonia President Kolison denounced Kershnar and assured angry social media users that Kershnar would "not have contact with students" while university officials mounted an investigation. Kolison directed campus police to bar Kershnar from campus, to search his office, and to seize his computer and send it to an unknown third party for "analysis."

6.     Four hundred and ninety-one days later (and counting), and long after the social-media tempest subsided, Kershnar remains exiled from the classroom on President Kolison's orders. He periodically receives an emailed letter from the university's provost, David Starrett, barring him from campus or teaching "due to ongoing concerns regarding your safety and the safety of others on campus should you return to the campus."

7.     SUNY Fredonia has never said what the alleged threats to Professor Kershnar's safety are (and its daily crime log reflects no reported threats at all), what measures its purported "investigation" entailed, or whether the investigation ever concluded. If it is still ongoing, SUNY Fredonia's investigation has now outlasted the Warren Commission's investigation into the assassination of JFK, the U.S. Senate inquiry into the sinking of the *Titanic*, the Iran hostage crisis, and the federal government's investigation into the *Challenger* disaster.

8.      SUNY Fredonia's investigation and claimed safety concerns were mere pretexts to mothball a professor whose questions earned the ire of state legislators, donors, the public, and the university's president.

9.      Meanwhile, SUNY Fredonia continues to offer the classes Professor Kershnar normally teaches but is struggling to find an instructor to teach them. And although the pandemic showed the university is perfectly capable of online teaching, SUNY Fredonia flatly refused Kershnar's offer to teach online, where any legitimate safety concerns would be nonexistent.

10.     Stephen Kershnar files this lawsuit to compel SUNY Fredonia to reject the heckler's veto—anathema to academia's special role in questioning the unquestionable—by restoring the First Amendment's protection on this public university campus.

## PARTIES

### *Professor Kershnar*

11.     Plaintiff Stephen Kershnar, a Distinguished Teaching Professor at SUNY Fredonia, earned his undergraduate degree at Cornell University, his Juris Doctor degree at the University of Pennsylvania, and his Ph.D. in Philosophy from the University of Nebraska, Lincoln. In 1998, Kershnar joined the faculty of SUNY Fredonia, which awarded him tenure in 2002.

12.     Kershnar's academic record at SUNY Fredonia is sterling. In the classroom, his teaching earned him the SUNY Chancellor's Award for Excellence in Teaching (in 2002) and the appointment of Distinguished Teaching Professor—the SUNY System's highest academic honor and rank.

13.    Outside of the classroom, Kershnar is a prolific writer. He has published ten books, over one hundred articles and book chapters, and frequently gives presentations on complex philosophical questions in public appearances.

14.    Despite this long record of distinguished scholarship, SUNY Fredonia's president and provost have exiled Distinguished Teaching Professor Kershnar from the classroom, banned him from campus, and forbidden him from speaking to members of the campus community on any subject.

### The Defendants

15.    Defendant Stephen Kolison is the President of the State University of New York at Fredonia, a governmental entity under the laws of the State of New York. As President, Kolison is the chief administrative officer of SUNY Fredonia, responsible for supervising the university's professional and nonacademic staff. President Kolison issued a directive barring Kershnar from the classroom, from campus, and from communicating with the community. President Kolison is being sued in his individual and official capacities.

16.    Defendant David Starrett is the Executive Vice President and Provost of SUNY Fredonia. In this role, Starrett is delegated the powers, duties and responsibilities assigned to him by President Kolison. Starrett has repeatedly enforced President Kolison's directive barring Kershnar from campus. Provost Starrett is sued in his individual and official capacities.

17.    At all times relevant to the actions in the Complaint, Defendants acted under color of state law.

## JURISDICTION AND VENUE

18.     This action arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202. Thus, this Court has subject matter jurisdiction over these federal causes of action under 28 U.S.C. §§ 1331 and 1343.

19.     This Court has personal jurisdiction over all defendants because they reside in the State of New York.

20.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because at least one defendant resides in this district, and all defendants are residents of the State of New York.

21.     Venue is also proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred and continue to occur in the Western District of New York.

## FACTUAL ALLEGATIONS

***Professor Stephen Kershnar's long history of provocative philosophical inquiry and teaching.***

22.     Kershnar is a public intellectual. He not only teaches philosophy at SUNY Fredonia, but publishes books, makes speaking appearances, engages in public debates, and publishes columns on a range of public concerns.

23.     At SUNY Fredonia, Kershnar has taught a range of undergraduate courses, including:

a)      "Introduction to Philosophy" as recently as Fall 2021;

b)      "Justice, Law, and Economics" as recently as Fall 2021;

6

    c)    "[Special Topics]: People: Key Issues" as recently as Fall 2020, including online;

    d)    Capstone seminars (a senior thesis course); and

    e)    "Sex and Love," a course he taught during Spring 2022 until Defendants removed him from teaching. This course covered "sexual ethics" and invited students to consider "[w]hat kinds of sexual activity are morally permissible under what sort of circumstances?"

24.    Outside of the classroom, Kershnar has frequently written or spoken on matters of public concern; he has published books, engaged in public debates, and published a newspaper column.

25.    Kershnar has published ten books, including:

    a)    *For Torture: A Rights-Based Defense*, Lexington Books (2011);

    b)    *Gratitude Toward Veterans: Why Americans Should Not Be Very Grateful to Veterans*, Lexington Books (2014);

    c)    *Pedophilia and Adult-Child Sex: A Philosophical Analysis*, Lexington Books (2015);

    d)    *Does the Pro-Life Worldview Make Sense? Abortion, Hell, and Violence Against Abortion Doctors*, Routledge (2017);

    e)    *Total Collapse: The Case Against Responsibility and Morality*, Springer Verlag (2018); and

    f)    *Desert Collapses: Why No One Deserves Anything*, Routledge (2021).

26.    Kershnar has also published dozens of scholarly articles on a wide range of topics, including:

    a)    *Objections to the Systematic Imposition of Punitive Torture*, 13 INT'L J. OF APPLIED PHIL. 47, 47–56 (1999);

    b)    *The Moral Status of Harmless Adult-Child Sex*, 15 PUBLIC AFFAIRS QUARTERLY 111, 111–132 (2001);

7

c)    *The inheritance-based claim to reparations*, 8 LEGAL THEORY 243, 243–267 (2002);

d)    *A Liberal Argument for Slavery*, 34 J. OF SOCIAL PHIL. 510, 510–536 (2003);

e)    *Respect for Persons and the Harsh Treatment of Criminals*, 18 INT'L J. OF APPLIED PHIL. 103, 103–121 (2004);

f)    *A Promissory Theory of the Duty to Tip*, 119 BUS. & SOC'Y REV. 2, 247–76 (2014); and

g)    *The Paradox of Consent*, 33 INT'L J. OF APPLIED PHIL. 305, 305–318 (2019).

27.    Under the State University of New York Policies of the Board of Trustees, the "professional obligation of an employee" is that consistent with their "academic rank or professional title" and "shall include teaching, research, University service, and other duties and responsibilities required of the employee[.]"

28.    Kershnar's professional title is Distinguished Teaching Professor.

29.    Professor Kershnar does not manage or supervise SUNY Fredonia employees, nor is he responsible for establishing SUNY Fredonia policy.

30.    SUNY Fredonia does not require Kershnar to conduct off-campus speaking engagements or podcasts.

31.    SUNY Fredonia has never directed Kershnar to appear on any podcast or other broadcast.

32.    SUNY Fredonia has never facilitated Kershnar's appearances on any podcast or other broadcast.

33.    SUNY Fredonia has never publicized Kershnar's appearances on any podcast or other broadcast.

34.    SUNY policy differentiates between "inquiry, teaching and research" (in which faculty have "full freedom, within the law") and faculty members' "role as citizens," in which they "have the same freedoms as other citizens."

***SUNY Fredonia and the SUNY system praise, reward, and promote Kershnar for his provocative philosophical inquiry.***

35.    Professor Kershnar joined SUNY Fredonia's Department of Philosophy as an Assistant Professor in 1998.

36.    In 2005, SUNY Fredonia promoted Kershnar to full professor.

37.    On June 3, 2011, SUNY Fredonia issued a press release announcing that Professor Kershnar had been bestowed with the Chancellor's Award of Excellence in Scholarship and Creative Activities, a "statewide honor that recognizes superior professional achievement throughout the State University of New York system."

38.    The June 3, 2011 press release highlighted Kershnar's "prolific" work and the important role his pedagogical approach plays in the university's sifting-and-winnowing of ideas:

> His works cover a wide spectrum, including politics, ethics, religion, law and sports. He is known for promoting unpopular or previously ignored positions that often leads those who disagree with him to sharpen their own views when reacting to his reasoning.

39.    In 2013 SUNY Fredonia promoted Kershnar to Chair of the Department of Philosophy, a position he held until 2019.

40.    In a June 12, 2014 press release, SUNY Fredonia announced that Kershnar was one of only nineteen professors in the university system selected by the

SUNY Board of Trustees to be named SUNY Distinguished Teaching Professor, "SUNY's highest academic honor."

41.    The 2014 press release again touted Kershnar's Socratic approach to philosophy:

> Dr. Kershnar is renowned on campus for his unique and effective style of teaching that combines the Socratic method of questioning employed by law school professors with a philosophical technique of vigorously defending conflicting conclusions.

42.    Kershnar's Socratic approach is in keeping with SUNY policy, which is to "maintain and encourage full freedom, within the law, of inquiry, teaching and research," including the right of faculty to, "without limitation, discuss their own subject in the classroom."

43.    SUNY policy also recognizes the rights of faculty "as citizens" to hold the same expressive freedoms as "other citizens" in their speech outside of the classroom.

44.    Students, too, understood that Kershnar's approach in the classroom is to raise challenging arguments in order to fully explore philosophical concepts.

45.    One student told the campus newspaper that in the three courses he had taken with Kershnar, "it was almost impossible to tell what he actually believed and what he didn't."

46.    SUNY's press releases lauding Professor Kershnar's provocative inquiries are consistent with its online biography of Kershnar, which states that he "focuses on applied ethics" and has "written one hundred articles and book chapters on such diverse topics as abortion, adult-child sex, hell, most valuable player, pornography, punishment, sexual fantasies, slavery, and torture."

*Kershnar questions the moral status of adult-child sex.*

47.   For decades, Professor Kershnar has written and spoken extensively on the moral and legal issues implicated by sexual conduct involving adolescents and children.

48.   For example, before SUNY Fredonia awarded him tenure, Kershnar's article, entitled *The Moral Status of Harmless Adult-Child Sex,* was published by Public Affairs Quarterly in 2001.

49.   Kershnar argues that as a legal matter, adult-child sex should always be criminalized. He analyzes whether, as a moral matter, adult-child sex is always wrong, and why we should criminalize it. In analyzing the moral issues, he discusses consent, exploitation, harm, rights, and viciousness.

50.   Kershnar argues that it is important that the arguments favoring criminalization of child sexual abuse be scrutinized so that they are defensible, writing that "if incorrect reasons are given recognition in support of morally legitimate laws," like those against child sexual abuse, "then these reasons may then be used to support morally *illegitimate*" laws.

51.   Kershnar expounded on these arguments in his 2015 book, *Pedophilia and Adult-Child Sex: A Philosophical Analysis.*

52.   SUNY Fredonia's online biography of Kershnar references these works.

53.   The legal and moral status of sexuality as it pertains to adolescents is a matter of profound public concern, driving debates over such topics as teenage sexuality, birth control, which books are appropriate in school settings, and child sex abuse in the Catholic Church and elsewhere. *See, e.g.*, *Roth v. United States*, 354 U.S.

476, 487 (1957) ("Sex is . . . one of the vital problems of human interest and public concern.")

***Kershnar appears on philosophy podcasts to debate philosophy.***

54.    On December 5, 2020, Kershnar appeared on a two-hour episode of the *Unregistered* podcast.

55.    *Unregistered* is a podcast hosted by author and Occidental College professor Thaddeus Russell, promoted as featuring interviews with "people who break the rules of conventional discourse and expand the realm of the possible."

56.    *Unregistered* has no affiliation with SUNY Fredonia.

57.    Kershnar's appearance on *Unregistered* was recorded outside of his regular working hours.

58.    Kershnar prepared for the *Unregistered* podcast, as he does for similar discussions, at home on his own time.

59.    During the *Unregistered* podcast, Kershnar provided an analysis of the traditional philosophical justifications of age of consent laws in the United States.

60.    During the *Unregistered* podcast, Kershnar stated that he became interested in researching and writing about the morality of adult-child sex and "whether or not an act is wrong because it's harmful," after he read some studies that suggested that some sexual conduct involving minors is not always harmful.

61.    Kershnar commented that "it's not obvious to me why" all instances of adult-child sex are unlawful because, among other things, humans are designed by evolution to begin reproduction below the age of 18.

62.    On January 30, 2022, Kershnar appeared on the *Brain in a Vat* podcast.

63.     *Brain in a Vat* is a podcast promoted as a "philosophy smorgasbord," with its hosts—Mark Oppenheimer, a South African civil-rights barrister, and Dr. Jason Werbeloff, an author who holds a Ph.D. in philosophy—interviewing "experts about ethics, aesthetics, and epistemology."

64.     *Brain in a Vat* is described as "[t]hought experiments and conversations with philosophers."

65.     Kershnar's appearance on *Brain in a Vat* was recorded outside of his regular working hours.

66.     Kershnar prepared for the *Brain in a Vat* podcast, as he does for similar discussions, at home on his own time.

67.     Kershnar's appearance on *Brain in a Vat* was recorded at home using his own computer.

68.     During the *Brain in a Vat* podcast, Kershnar stated:

> Imagine that an adult male wants to have sex with a 12-year-old girl. Imagine that she's a willing participant. A very standard, very widely held view is that there's something deeply wrong about this, and it's wrong independent of being criminalized. It's not obvious to me that it is in fact wrong.

69.     After the *Brain in a Vat* podcast, its hosts described Kershnar's approach:

> Kershnar believes that one of the tasks of an ethicist is to scrutinize the moral justifications for societal taboos. It is insufficient to merely *assert* that a kind of behavior is wrong—we ought to try to understand *why* it is wrong.

13

70.     Kershnar's appearances on the podcasts were not part of his official duties.

71.     Kershnar did not list the podcast appearances in his annual report concerning his research, publications, and academic presentations.

72.     Kershnar did not distribute links to the podcasts to the broader campus community.

***As viral Twitter clips lead to calls for Kershnar's termination and arrest, President Kolison denounces and suspends Kershnar, pending investigation.***

73.     On February 1, 2022, a Twitter account shared a 28-second video clip from Kershnar's *Brain in a Vat* appearance, captioned: "SUNY Fredonia Professor questions the widely held sociteal [*sic*] belief that it's deeply wrong for an adult man to want to have sex year [*sic*] with a 12-year-old girl."

74.     Within six minutes, the video clip was also shared by a popular Twitter user, "Libs of Tik Tok," which then had some 500,000 Twitter followers.

75.     "Libs of Tik Tok" then tagged President Kolison's Twitter account, tweeting: "Hi @DrKolison, it appears you have a problem at your university."

76.     After "Libs of Tik Tok" shared it, the video clip garnered some 1.5 million views.

77.     The "Libs of Tik Tok" account shared eight additional video clips—each between eighteen seconds and two minutes long—of Kershnar's appearances on *Brain in a Vat* and *Unregistered*, condemning Kershnar's comments as "truly horrifying."

78.     The "Libs of Tik Tok" account also shared screenshots about Kershnar's published works regarding whether veterans are owed gratitude, discrimination in the workplace, and slavery. For example:



79.     About three hours after the video was first posted, SUNY Fredonia tweeted a "message from SUNY Fredonia President Stephen H. Kolison":

> SUNY Fredonia is aware of a video posted online involving one of its professors. The views expressed by the professor are reprehensible and do not represent the values of SUNY Fredonia in any way, shape or form. They are solely the professor's views. The matter is being reviewed.

80.     That evening, a dispatcher in SUNY Fredonia's police department spoke to Chief of University Police Brent Isaacson and told two members of the public that the university's police were aware of the video and were conducting an investigation.

81.     Over the next twenty-four hours, clips of Kershnar's commentaries continued to generate negative media coverage for SUNY Fredonia, with articles and broadcasts from Fox News, radio station WBLK, online conservative media outlets, and local TV news stations WIVB, WKBW, and WGRZ.

82.     In a primetime broadcast on the evening of February 2, 2022, a Fox News host denounced Kershnar, a libertarian conservative, as part of a "new movement forming . . . to normalize one of the most depraved and sickening acts a human can commit: pedophilia. It starts, as most bad ideas do, in the minds of university professors."

83.     On his broadcast the same day, conspiracy theorist Alex Jones showed a photograph of Kershnar, comparing his "greedy, hateful, selfish look" to Jeffrey Epstein.

84.     In a letter to SUNY Chancellor Deborah Stanley, six members of the New York State Assembly—each serving on the Assembly's Higher Education Committee—wrote that Kershnar's speech was "appalling" and called for his "immediate removal . . . and the reporting of your former employee to the New York State Police[.]"

***President Kolison removes Kershnar from campus and bars him from speaking to the campus community.***

85.    On the morning of February 3, 2022, Kershnar spoke by phone with SUNY Fredonia's Chief of University Police Isaacson at Isaacson's request.

86.    Chief Isaacson, at President Kolison's direction, ordered Kershnar not to come to the SUNY Fredonia campus.

87.    Chief Isaacson told Kershnar that he had concerns about security, but declined to describe the nature, extent, or source of those concerns. Kershnar asked Chief Isaacson for specific information about any threats concerning Kershnar or his students, but Isaacson offered no information regarding any threats or any other safety concerns.

88.    Instead, Chief Isaacson told Kershnar he was barred from campus until further notice.

89.    In an email following their conversation, Kershnar explained to Chief Isaacson that removing him from the classroom was "an instance of a heckler's veto," requested that SUNY Fredonia use the "least restrictive" means of addressing any safety concerns and inquired about the length of his removal from campus.

90.    Kershnar asked Chief Isaacson to permit him to teach "today's classes and any future classes" via Zoom.

91.    Kershnar asked Chief Isaacson for the "rationale for the order" barring him from campus.

92.    Chief Isaacson did not respond to Kershnar's email.

93.    Chief Isaacson never provided Kershnar with any information about specific threats.

94.    On the morning of February 3, 2022, at the direction of President Kolison, campus police and university staff—including Chief Isaacson, along with a lieutenant of the SUNY Fredonia Police and several information technology staff members—searched Professor Kershnar's office.

95.    At the direction of President Kolison and Chief Isaacson, the campus police seized Kershnar's desktop computer for "analysis" by an unidentified third party.

96.    On February 3, 2022, at the direction of President Kolison, SUNY Fredonia's Director of Human Resources, Maria Carroll, sent Kershnar a letter stating that "[e]ffective immediately and until further notice, pursuant to Article 19.11(c) of" the university's collective bargaining agreement, Kershnar was "to perform an alternate work assignment from an alternate location."

97.    Article 19.11(c) authorizes President Kolison to reassign faculty pending potential disciplinary action.

98.    H.R. Director Carroll's letter directed Kershnar "not to be on college property, or have contact with the campus community" without her permission.

99.    In a February 3, 2022 email, H.R. Director Carroll told Kershnar that SUNY Fredonia was "not able to compile the list of specific threats at this time due to the volume involved, but we remain concerned for your safety and that of the campus community."

100.   H.R. Director Carroll also told Kershnar that the "duration of the directive and alternate assignment is unknown, because the safety concerns . . . remain ongoing."

101.   In the afternoon of February 3, 2022, SUNY Fredonia tweeted a second "message to the SUNY Fredonia Community from President Stephen H. Kolison, Jr.":

> I am writing to provide you with an update on the matter involving one of our professors interviewed in a widely shared video podcast. We will continue to investigate this situation. In the meantime, effective immediately and until further notice, the professor is being assigned to duties that do not include his physical presence on campus and will not have contact with students while the investigation is ongoing.
>
> Please allow me to reiterate my earlier statement that I view the content of the video as absolutely abhorrent. I cannot stress strongly enough that the independent viewpoints of this individual professor are in no way representative of the values of the SUNY Fredonia campus.
>
> I appreciate your patience as we make every effort to resolve this matter as expeditiously as possible.

102.   President Kolison's decision to remove Kershnar from teaching, to separate Kershnar from students, to direct campus police to seize and search Kershnar's computer, and to announce an investigation into Kershnar was motivated by his disapproval of Kershnar's viewpoint.

103.   When President Kolison separated Kershnar from the campus community, he had no basis to believe that Kershnar was a danger to any member of the campus community.

104.  When President Kolison separated Kershnar from the campus community, no student, faculty member, or staff member had, to Kershnar's knowledge, reported that Kershnar had engaged in misconduct.

***President Kolison ignores admonitory letters from academic freedom groups and faculty members.***

105.  On February 3, 2022, the Foundation for Individual Rights in Expression (FIRE),[1] now counsel for Kershnar, sent President Kolison a letter explaining that Kershnar's extramural statements were protected by the First Amendment and SUNY Fredonia's commitment to academic freedom.

106.  On the same day, the Academic Freedom Alliance, a coalition of faculty members from across the ideological spectrum committed to upholding the principles of academic freedom, sent a letter to President Kolison.

107.  The Academic Freedom Alliance's letter cautioned that Kershnar's extramural speech was protected expression and that the university's responsibility is to "shelter" its faculty from harassment "and not add to it."

108.  On February 4, 2022, some 158 university professors from around the world and across disciplines sent President Kolison a joint letter warning that the "philosophical enterprise" and the "scholarly enterprise broadly" require the "freedom to ask uncomfortable questions and explore unpopular arguments," and that if Kershnar's "ideas are wrong, then we all benefit from seeing those errors exposed through intellectual engagement."

---

[1] Formerly known as the Foundation of Individual Rights in Education, FIRE expanded its mission in June 2022 beyond campus to protect the First Amendment rights of all Americans.

109.    The February 4, 2022 letter warned:

> The tradition of Western philosophy famously begins with the example of Socrates being silenced and put to death for asking questions and pursuing arguments that his fellow citizens found discomforting.

110.    President Kolison did not respond to the faculty members' letter.

111.    On March 3, 2022, SUNY Fredonia, through SUNY's Office of General Counsel, sent a letter to FIRE concerning SUNY Fredonia's "handling of the public attention on Dr. Kershnar's views," acknowledging that Kershnar's speech "enjoys protection under the First Amendment" and stating that SUNY Fredonia "will not violate his rights."

112.    Despite these admonitory letters, President Kolison never assured Kershnar he was not subject to discipline for his statements outside the classroom.

***Kershnar's removal from teaching, banishment from campus, and prohibition on communicating with the campus community continues for sixteen months and counting.***

113.    SUNY Fredonia did not, as President Kolison had committed, resolve the matter "expeditiously." Sixteen months later, Kershnar remains barred from the classroom, banished from campus, and prohibited from communicating with the "campus community" at Kolison's direction.

114.    To the extent SUNY Fredonia has resolved the matter at all, President Kolison has resolved to indefinitely exile Kershnar from the campus community.

115.    Kershnar had been scheduled to teach three courses during the Fall 2022 semester, including Introduction to Philosophy (PHIL-115), Crime and Punishment (PHIL-303), and Metaphysics (PHIL-351).

116.   The first day of classes for the Fall 2022 semester at SUNY Fredonia began on August 22, 2022.

117.   On August 24, 2022, Provost Starrett sent Kershnar a letter continuing Kershnar's banishment from campus and classes.

118.   The August 24, 2022 letter stated that Kershnar's removal from "teaching or service obligations" for the semester was "due to ongoing concerns regarding your safety and the safety of others on campus should you return to the campus."

119.   When students enrolled in these courses showed up for their first day of Kershnar's classes, they found a sign—falsely attributed to the "Philosophy Department"—affixed to the classroom door informing them that the class had been cancelled.

120.   Defendants did not make the decision to renew Kershnar's suspension from teaching until August 24, 2022, after classes had already started.

121.   SUNY Fredonia's administration did not inform the Philosophy Department of the classes' cancellation until ten minutes before the classes were scheduled to begin.

122.   Just before midnight on August 26, 2022 (after the beginning of the fall semester), SUNY Fredonia's administration emailed students notifying them that their classes were "being cancelled," recognizing that this was "more than a minor inconvenience and requires you to rethink the composition of your fall schedule," and apologizing for the "last-minute notices you have found on the classroom's doors."

123.   President Kolison told the campus newspaper that Kershnar's classes were canceled because "we are having difficulties in . . . finding adequate instructors to cover" those classes.

124.   At President Kolison's direction, Provost Starrett likewise barred Kershnar from teaching the following semester for the same reasons.

125.   On September 9, 2022, Provost Starrett sent a letter to Kershnar stating that the University "has not made a final decision as to whether you will be assigned to teach classes for the Spring semester" due to "ongoing concerns regarding your safety and the safety of others on campus should you return to the campus."

126.   Provost Starrett's September 9, 2022 letter said the University expected to make a decision about Kershnar's teaching duties "prior to the opening of enrollment for the Spring semester" on October 31, 2022.

127.   On November 1, 2022, Provost Starrett sent a letter to Kershnar barring Kershnar from teaching courses in the Spring 2023 semester.

128.   Provost Starrett's November 1, 2022 letter again stated that Kershnar would not be permitted to teach classes "due to ongoing concerns regarding your safety and the safety of others on campus should you return to the campus."

129.   Provost Starrett's November 1, 2022 letter did not identify any basis for the "ongoing concerns regarding your safety[.]"

130.   Instead of teaching, Kershnar was instructed to conduct off-campus research consisting of a review of the philosophy curricula at each of SUNY's 64

regional campuses and at least twelve other public universities, purportedly in order to consider what courses should be offered at SUNY Fredonia.

131.   Kershnar has also been instructed to complete training required for instructors to teach online so that he could develop course materials for other instructors to teach two Philosophy courses (PHIL 115-04: Introduction to Philosophy; and PHIL 364-01: Justice, Law, and Economics) in an online format.

***Kershnar's removal from teaching does not serve any disciplinary need or investigation***

132.   On information and belief, Defendants' choice to remove Kershnar from teaching is not because they are contemplating disciplinary action against him.

133.   While the university's collective bargaining agreement authorizes temporary reassignment in anticipation of disciplinary action where the faculty member's "continued presence on the job represents a potential danger to persons . . . or would severely interfere with its operations," the university must serve a notice of discipline within ten days of the reassignment.

134.   SUNY Fredonia has never served Kershnar with a notice of discipline.

135.   Defendants' letters have abandoned the pretense of reassignment pending an investigation.

136.   Unlike the February 3, 2022 letter removing Kershnar from campus, the August 24, 2022, September 9, 2022, and November 1, 2022 letters did not invoke the collective bargaining agreement provision concerning contemplation of disciplinary action.

137.   As authority, the August 24, 2022, September 9, 2022, and November 1, 2022 letters invoked a provision of the SUNY Policies of the Board of Trustees. That provision requires that the "professional obligation[s] of" a faculty member, consistent with their "rank or professional title shall include teaching, research, University service, and other duties and responsibilities required of the" faculty member.

***Law enforcement and SUNY Fredonia records do not reflect reports of threats of violence.***

138.   SUNY Fredonia's assertions that public safety compels Kershnar's ostracism are not supported by its own records or those of law enforcement agencies.

139.   On January 4, 2023, Kershnar received an email from an agent of the Federal Bureau of Investigation informing Kershnar that the FBI was "aware of information which identified you as a potential target of criminal activity, to include the possibility of violence," but that the FBI was "not aware of any specific credible threat to you[.]"

140.   On January 9, 2023, the Fredonia Village Police Department responded to a request under New York's Freedom of Information Law (FOIL), stating that it had no records concerning Kershnar or communications with SUNY Fredonia since January 30, 2022.

141.   On January 9, 2023, the New York State Police responded to a FOIL request, stating that it had no records concerning Kershnar or communications with SUNY Fredonia since January 30, 2022.

142.   On April 27, 2023, the Chautauqua County Sheriff's Office responded to a FOIL request, stating that it had no records concerning Kershnar or communications with SUNY Fredonia since January 30, 2022.

143.   The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, also known as the Clery Act, requires public universities to maintain a daily log of reports of any crime reported to campus police. 34 CFR 668.46(f)(1).

144.   In the month after January 30, 2022 (when the *Brain in a Vat* episode featuring Kershnar was posted online), SUNY Fredonia's daily crime log does not reflect any reported threats.

145.   During that period, SUNY Fredonia's daily crime log lists two reports of harassment, both listed as "[c]losed by investigation."

146.   SUNY Fredonia's daily crime log does not list any reports of threats plausibly related to Kershnar.

147.   The daily crime log lists only one reported threat at any time after January 30, 2022.

148.   That threat, reported on November 2, 2022, was unrelated to Kershnar.

149.   Around noon on November 2, 2022, a student posted anonymously on social media, threatening to shoot others in an academic building on campus.

150.   In response to the November 2, 2022 threat, SUNY Fredonia's campus police increased their presence on campus, conducted an investigation, determined

the threat was not credible, identified the anonymous student, and arrested him that evening.

151.   Despite the November 2, 2022 threat of violence, SUNY Fredonia did not cancel any classes that afternoon.

***Public attention to Kershnar's comments has waned and cannot justify his continued exile.***

152.   Although Kershnar initially received emails and other messages condemning him, those emails have slowed to a trickle.

153.   Google data on the rate of searches for "Kershnar" (in blue) and "SUNY Fredonia" (in red) show that searches for "Kershnar" and "SUNY Fredonia" have dropped precipitously since the initial controversy over his comments. Google Trends, *"Kershnar" and "SUNY Fredonia,"* https://bit.ly/3HNFpus:



154.   It is not reasonably likely that public opposition to Kershnar's speech will cause disruption 16 months after the controversy.

*SUNY Fredonia's sixteen-month investigation yields no charges or disciplinary action.*

155.   On February 3, 2022, President Kolison publicly announced that Kershnar would be barred from "contact with students while [an] investigation is ongoing."

156.   During an August 29, 2022 appearance before the SUNY Fredonia University Senate, a philosophy professor asked President Kolison whether his publicly-announced investigation into Kershnar was still ongoing.

157.   President Kolison refused to answer the philosophy professor's question, citing the need for privacy and due process.

158.   During the same meeting, Provost Starrett confirmed that SUNY Fredonia had been considering whether to allow Kershnar to resume teaching as late as Wednesday, August 24, 2022—two days into the Fall 2022 semester.

159.   During the meeting, Provost Starrett refused to state whether safety concerns were involved in the decision to continue Kershnar's suspension.

160.   Although SUNY Fredonia's February 3, 2022 letter suspending Kershnar cited the potential for disciplinary action, its subsequent letters reassigning him have only cited safety considerations.

161.   SUNY Fredonia has never notified Kershnar of the institution of formal disciplinary measures.

162.   In responding to FOIL requests, the New York State Police, Chautauqua County Sheriff's Department, and Fredonia Village Police Department have each stated they have no records concerning Kershnar since the controversy.

163.    Although FOIL permits a law enforcement agency to deny access to records that, if disclosed, would interfere with an investigation, none of these agencies (*i.e.*, the New York State Police, Chautauqua County Sheriff's Department, and Fredonia Village Police Department) stated that they were denying access to any responsive record.

164.    On this information and belief, no report concerning Kershnar or threats concerning Kershnar has been made to the New York State Police, Chautauqua County Sheriff's Department, or Fredonia Village Police Department.

165.    Save for traffic infractions, Kershnar has never been cited, charged, or arrested by any law enforcement agency.

***Kershnar turns down public speaking engagements and communication with campus community due to ongoing investigation, prior restraint.***

166.    President Kolison's public announcement that SUNY Fredonia was investigating Kershnar's extramural speech and the actions he took consistent with that announcement have chilled Kershnar's speech.

167.    Kershnar has declined speaking engagements on subjects that may be controversial out of concern that his remarks will contribute to—or renew—the investigation into his January 2022 remarks.

168.    Kershnar did not respond to media inquiries about the *Brain in a Vat* controversy out of concern that his arguments were under investigation by SUNY Fredonia.

169.    Kershnar also did not personally respond to media inquiries from *The Leader*, SUNY Fredonia's campus newspaper, because SUNY Fredonia prohibited him from communicating with the university community.

170.    SUNY Fredonia's directive against communicating with the university community also prevented Kershnar from responding to faculty resolutions and emails, including those on an email discussion list open to all SUNY Fredonia faculty (including Kershnar), criticizing Kershnar and his argument.

171.    Because President Kolison announced Kershnar was under investigation, but has not informed him as to the conclusion of that investigation in the sixteen months since it was initiated, Kershnar has been unable to defend himself against an onslaught of public condemnation—including that by President Kolison.

***Kershnar is able to teach courses offered by SUNY Fredonia in the Fall of 2023 that do not have an assigned instructor.***

172.    Registration for the Fall 2023 semester began on April 3, 2023.

173.    In the Fall 2023 semester, SUNY Fredonia is offering—but does not have faculty member assigned to teach—several sections of Philosophy courses, all of which Kershnar has recently taught (*see* ¶ 23), including::

      a)     Introduction to Philosophy;

      b)     Justice, Law, and Economics; and

      c)     [Special Topics]: People: Key Issues, also offered as a Capstone Seminar.

174.    On April 3, 2023, Kershnar's department chair informed faculty that the administration has determined that Kershnar won't be teaching any courses in the

Fall 2023 semester and has instead been asking faculty whether to reassign Kershnar's classes.

175.   As of the date of this Complaint, the classes continued to be offered for registration.

## INJURIES TO PLAINTIFF

176.   Kershnar, a Distinguished Teaching Professor, has been constructively terminated as a teacher because President Kolison personally objects to Kershnar's expression. Kershnar—whose title is Distinguished *Teaching* Professor—has been exiled from the classroom for sixteen months after Kolison publicly announced an "investigation" into Kershnar.

177.   Plaintiff Kershnar has been and continues to be injured because President Kolison and Provost Starrett are effectuating a social media heckler's veto, allowing momentary public and political reactions to dictate who may teach at a public university.

178.   Defendants' repeated assertions that Kershnar's exile is mandated by safety concerns are purely pretextual. Although SUNY Fredonia claims it received threats, its police incident reports are barren of reports of threats, it has not reported them to local law enforcement, and the FBI says it is unaware of any specific threats to Kershnar. While SUNY Fredonia claims it was motivated by concern for Kershnar's safety, it refuses to tell him anything specific about any purported threats.

179.   Kershnar has, since the first day he was removed from campus, been ready and able to teach his classes online, thus obviating any alleged potential threat, but SUNY Fredonia has refused to consider this narrower measure.

31

180.   Yet, instead of allowing Kershnar to teach online—let alone in a classroom, where he belongs—Defendants are requiring him to design online teaching modules, adding insult to injury.

181.   In addition to being expressly prohibited from teaching on campus, Kershnar has curtailed his extramural speech—his public speaking appearances and publications—because of concern that his speech will be used against him. President Kolison's sixteen-month investigation into Kershnar has placed him under a cloud, and to the extent that the "investigation" has been secretly concluded without informing Kershnar of its conclusion, he is reasonably concerned that further speech by him will trigger a new investigation.

182.   Defendants'   ongoing   directive   prohibiting   Kershnar   from communicating with the "campus community" has prevented him from responding to President Kolison's repeated public condemnations.

183.   The directive has also frustrated Kershnar's ability to respond to faculty members' criticism of his views, including faculty members' discussion of his views on a community listserv and two faculty resolutions that affirmed his expressive freedom while criticizing his expression.

184.   President Kolison, by raising the specter of disciplinary actions and law enforcement action for advancing an argument and by prohibiting Kershnar from speaking to a "community," has intentionally sidelined Kershnar from participating in a debate about his own views.

**FIRST CAUSE OF ACTION**
**First Amendment Violation (Injunctive and Declaratory Relief)**
**Freedom of Speech— Content and Viewpoint Discrimination**
**(42 U.S.C. § 1983)**
**(Against President Kolison and Provost Starrett**
**in their official capacities only)**

185.   Plaintiff Kershnar re-alleges and re-incorporates paragraphs 1–184 as though fully set forth here.

186.   In his appearances on the *Unregistered* and *Brain in a Vat* podcasts, Kershnar spoke as a private citizen.

187.   Kershnar's comments on *Unregistered* and *Brain in a Vat* addressed matters of public concern.

188.   Kershnar's interest in speaking as a private citizen on matters of public concern outweighs the public university's interests in advancing content- or viewpoint-discrimination.

189.   Kershnar's interest in speaking as a private citizen on matters of public concern outweighs the public university's interests in imposing a heckler's veto.

190.   Defendants suspended Kershnar from teaching his classes, from entering the Fredonia campus, and from communicating with the university community, because of President Kolison's opposition to Kershnar's message, or because of public reactions to Kershnar's message, or both.

191.   Frustrating a faculty member's classroom teaching in the absence of a legitimate educational interest violates the First Amendment. *Levin v. Harleston*, 966 F.2d 85, 88 (2d. Cir. 1992).

192.   Neither reason serves a legitimate educational interest.

193.   Kershnar's speech did not materially disrupt SUNY Fredonia's operations.

194.   On each date that Defendants decided to prevent Kershnar from teaching (including February 1–3, 2022, August 24, 2022, September 9, 2022, November 1, 2022, and when Defendants decided not to permit Kershnar to teach during the Fall 2023 semester), it was not reasonable to predict future disruption from Kershnar's speech.

195.   SUNY Fredonia's invocation of safety is predicated on speech by outsiders—that is, people with little or no relationship to SUNY Fredonia—and imposes a heckler's veto. *Melzer v. Bd. of Educ.*, 336 F.3d 185, 199 (2d Cir. 2003).

196.   Public reaction to speech is never a content-neutral basis for regulation. *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992). A heckler's veto is a viewpoint-based limitation on expression and is impermissible under the First Amendment.

197.   On each date that Defendants decided to prevent Kershnar from teaching (including February 1–3, 2022, August 24, 2022, September 9, 2022, November 1, 2022, and when Defendants decided not to permit Kershnar to teach during the Fall 2023 semester), any potential disruption was outweighed by the value of Kershnar's speech.

198.   The "essentiality of freedom" of public university faculty "to inquire, to study and to evaluate" is "self-evident," particularly "in the social sciences, where few,

34

if any, principles are accepted as absolutes." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

199.    Viewpoint discrimination is antithetical to the public university's interest in freedom of inquiry unfettered by the "pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

200.    The First Amendment prohibits government officials from discriminating against speech "based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–30 (1995) (action taken against a speaker because of "its message" is viewpoint discrimination).  Viewpoint discrimination is an "egregious form of content discrimination" and is "presumptively unconstitutional." *Rosenberger*, 515 U.S. at 829–30.

201.    President Kolison's decision to remove Kershnar from the classroom is the product of viewpoint discrimination and is in retaliation for Kershnar's speech.

202.    President Kolison's directive to remove Kershnar from the classroom and otherwise to limit his speech was motivated by President Kolison's opposition to Kershnar's viewpoint, which Kolison labeled in public statements as "absolutely abhorrent," "reprehensible," and inconsistent with "the values of the SUNY Fredonia campus."

203.    Even if SUNY Fredonia had any legitimate safety concerns, its suspension of Professor Kershnar was imposed reflexively, and without regard to

measures that would address any safety interest without burdening Kershnar's expression.

204.    On information and belief, the narrower measures ignored or rejected by Defendants include, but are not limited to:

   a)    Permitting Kershnar to teach remotely;

   b)    Increasing police presence in the immediate vicinity;

   c)    Soliciting backup from external law enforcement agencies;

   d)    Reporting threats to external law enforcement; and

   e)    Seeking the arrest or prosecution of persons, if any, who made threats of violence.

205.    Executive Vice President and Provost Starrett engaged in unconstitutional viewpoint discrimination by enforcing President Kolison's viewpoint-driven directive.

206.    SUNY Fredonia is offering the classes Kershnar teaches to undergraduate students in the Fall 2023 semester.

207.    SUNY Fredonia has no faculty member to teach these courses.

208.    Kershnar has been summarily excluded from teaching these courses solely because of Fredonia's opposition to his protected extramural expression.

209.    Kershnar is likely to succeed on the merits of his claims.

210.    There is substantial public interest in ensuring Defendants cease engaging in viewpoint-based restriction and censorship of speech on New York's college campuses, where "the vigilant protection of constitutional freedoms is

nowhere more vital[.]" *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).

211. Kershnar has no adequate legal, administrative, or other remedy by which to prevent or minimize the immediate, irreparable, and ongoing harm to his First Amendment rights from Defendants' unconstitutional viewpoint discrimination.

212. Absent preliminary and permanent injunctive relief enjoining Defendants from removing Kershnar from teaching due to his protected expression, the public university will continue to violate Kershnar's First Amendment rights.

213. Because a justiciable controversy exists over Defendants' viewpoint-based discrimination against Kershnar's protected expression, Kershnar also seeks declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.

## SECOND CAUSE OF ACTION
**First Amendment Violation (Injunctive and Declaratory Relief)**
**Freedom of Speech—Retaliation**
**(42 U.S.C. § 1983)**
**(Against President Kolison and Provost Starrett**
**in their official capacities only)**

214. Plaintiff Kershnar re-alleges and re-incorporates paragraphs 1–184 as though fully set forth here.

215. Kershnar engaged in extramural expression protected by the First and Fourteenth Amendments. *See* ¶¶ 186–205, which are re-alleged and re-incorporated as though fully set forth here.

216. Defendants took adverse action against Kershnar, including:

a)      Barring Kershnar from campus for sixteen months;

b)      Prohibiting Kershnar from communicating with the campus community without basis;

c)      Removing Kershnar, a distinguished lecturer, from teaching;

d)      Publicly announcing an investigation into Kershnar's protected expression;

e)      Initiating an investigation into Kershnar's protected expression, implying the threat of disciplinary action;

f)      Assigning Kershnar, a Distinguished Teaching Professor, to menial research about what courses should be offered, while struggling to find an instructor for the courses it presently offers;

g)      Directing law enforcement officers to search his office; and

h)      Directing law enforcement officers to seize and search his computer.

217.   In total, the actions taken by President Kolison and Provost Starrett carry an implicit—if not explicit—threat of disciplinary action against Kershnar for protected expression.

218.   President Kolison has the authority to bring disciplinary charges against Kershnar.

219.   The February 3, 2022 suspension letter issued at President Kolison's direction, commensurate with his statement announcing Kershnar's suspension pending an investigation, invoked President Kolison's authority to initiate disciplinary action against faculty.

220.   President Kolison and Provost Starrett have never withdrawn or disclaimed the implicit threat of disciplinary action.

221. President Kolison's and Provost Starrett's actions directly deprived Kershnar of his First Amendment rights.

222. Defendants' adverse action was in response to Kershnar's protected speech.

223. Kershnar's message was the motivating factor in President Kolison's decision to take retaliatory action against Kershnar. President Kolison immediately suspended Professor Kershnar and subjected him to a protracted banishment and investigation because of his extramural remarks on a matter of public importance.

224. President Kolison's and Provost Starrett's response to Kershnar's expression are sufficient to deter a person of ordinary firmness from continuing to engage in expressive activity.

225. Defendants' actions have, in fact, chilled Kershnar's speech.

226. Kershnar has no adequate legal, administrative, or other remedy by which to prevent or minimize the immediate, irreparable, and ongoing harm to his First Amendment rights from Defendants' retaliatory conduct.

227. Absent preliminary and permanent injunctive relief enjoining Defendants from retaliating against Kershnar due to his protected expression, the public university will continue to violate Kershnar's First Amendment rights.

228. Because a justiciable controversy exists over Defendants' retaliation against Kershnar's protected expression, Kershnar also seeks declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.

**THIRD CAUSE OF ACTION**
**First Amendment Violation (Injunctive and Declaratory Relief)**
**Freedom of Speech—Prior Restraint**
**(42 U.S.C. § 1983)**
**(Against President Kolison and Provost Starrett**
**in their individual capacities only)**

229.   Plaintiff Kershnar re-alleges and re-incorporates paragraphs 1–184 as though fully set forth here.

230.   Defendants issued a written directive prohibiting Kershnar from having any "contact with the campus community" without the advance permission of a designated official.

231.   Defendants' directive is a prior restraint on Kershnar's speech.

232.   "[P]rior restraints on speech . . . are the most serious and the least tolerable infringement on First Amendment rights," *Neb. Press Ass'n v.  Stuart*, 427 U.S. 539, 559 (1976).

233.   Prior restraints are presumptively unconstitutional. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).

234.   Defendants' directive reaches Kershnar's speech as a private citizen.

235.   Defendants' directive bars Kershnar from speaking to any member of a broad audience, including any faculty member, staff member, student, alumnus, or other "member of the campus community."

236.   Defendants' directive is not limited in time, ending only when Defendants give Kershnar "further notice."

237.   Defendants' directive has been in place for sixteen months.

238.   Defendants' directive remains in place.

239.   Defendants' directive is not limited in subject matter, restraining Kershnar's speech even if it addresses matters of public concern.

240.   Kershnar desires and has a strong interest in continuing to speak on matters of public concern, including defending, explaining, or elaborating on the comments he made in public debates.

241.   The members of the public who make up the Fredonia "community" have a constitutionally recognized interest in having the opportunity to hear from a faculty member whose provocative views have caused controversy, even if they ultimately disagree with him.

242.   Defendants' directive has prevented Kershnar from responding to criticisms of his remarks by colleagues, including on email discussion lists open to SUNY Fredonia faculty.

243.   Defendants' directive has also inhibited Kershnar's ability to respond to inquiries from SUNY Fredonia's student newspaper, *The Leader*.

244.   SUNY Fredonia has no interest sufficient to justify restraining a tenured faculty member from speaking on any subject to any member of a community of thousands for sixteen months.

245.   Kershnar is likely to succeed on the merits of his claims.

246.   Kershnar has no adequate legal, administrative, or other remedy by which to prevent or minimize the immediate, irreparable, and ongoing harm to his First Amendment rights from Defendants' prior restraint.

247.    Absent preliminary and permanent injunctive relief enjoining Defendants from enforcing their prior restraint on Kershnar's speech, the public university will continue to violate Kershnar's First Amendment rights.

248.    Because a justiciable controversy exists over Defendants' imposition of a prior restraint on Kershnar's protected speech, Kershnar also seeks declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.

**FOURTH CAUSE OF ACTION**
**First Amendment Violation (Damages)**
**Direct and Retaliatory Infringements of Freedom of Speech**
**(42 U.S.C. § 1983)**
**(Against President Kolison in his individual capacity only)**

249.    Plaintiff Kershnar re-alleges and re-incorporates paragraphs 1–184 as though fully set forth here.

250.    Kershnar engaged in extramural expression protected by the First and Fourteenth Amendments. *See* ¶¶ 186–205, which are re-alleged and re-incorporated as though fully set forth here.

251.    It is clearly established that public employees retain a First Amendment right to freedom of expression and may not face retaliation for its exercise. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 572–75 (1968).

252.    Due to objections to Kershnar's views, President Kolison removed Kershnar from teaching. *See* ¶¶ 190, 194–195, 197, and 201–202, which are re-alleged and re-incorporated as though fully set forth here.

253.   It is clearly established that a public university administrator may not burden a philosophy professor's ability to teach in the classroom due to his protected extramural expression. *Levin*, 966 F.2d at 88.

254.   It would have been apparent to a reasonable public university president that he may not remove a professor from teaching due to objections to the professor's views. *Id.*; *Keyishian*, 385 U.S. at 599–604.

255.   Due to his personal opposition to Kershnar's expression, President Kolison deliberately violated Kershnar's First Amendment rights. *See* ¶¶ 190–204, which are re-alleged and re-incorporated as though fully set forth here.

256.   It is clearly established that an official acting under the color of state law cannot censor or restrict speech based on "its message" or the viewpoint expressed. *Rosenberger*, 515 U.S. at 828–30; *R.A.V. v. St. Paul,* 505 U.S. 377, 391–92 (1992).

257.   Kershnar is entitled to compensatory and nominal damages against President Kolison in his individual capacity for violating Kershnar's clearly established First Amendment rights.

258.   President Kolison's deliberate violation of the Constitution was and remains malicious, oppressive, and in reckless and callous disregard of Kershnar's well-established rights.

259.   Kershnar is therefore entitled to punitive damages against President Kolison in his individual capacity.

260.    Accordingly,  punitive  damages  against  President  Kolison  are appropriate and necessary to punish President Kolison for violating Kershnar's First Amendment rights and to deter similar violations in the future.


## JURY DEMAND

Under Fed. R. Civ. P. 38, Kershnar demands a jury trial on all issues triable to a jury.


## PRAYER FOR RELIEF

Kershnar  respectfully  requests  that  the  Court  enter  judgment  against  all Defendants and issue the following forms of relief:

1.      Declare that Kershnar's extramural statements are protected by the First Amendment to the United States Constitution;

2.      Declare that Defendants violated the First Amendment in removing Kershnar from the classroom due to his extramural statements;

3.      Enter preliminary and permanent injunctions enjoining Defendants and their employees, agents, servants, officers, and persons in concert with Defendants, from  barring  Kershnar  from  teaching,  entering  campus,  communicating  with members of the university community, or otherwise engaging in speech on matters of public interest and concern;

4.      Award Kershnar nominal, compensatory, and punitive damages against Kolison in his individual capacity;

5.      Award Kershnar his attorneys' fees under 42 U.S.C. § 1988;

6.      Award Kershnar his costs; and

7.      Award such other relief as the Court may deem just and proper.

Dated: June 9, 2023

Respectfully submitted,

/s/ Barry N. Covert
Barry N. Covert, Esq.
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue – Suite 120
Buffalo, New York 14202
Phone: (716) 849-1333
Email: bcovert@lglaw.com

Adam B. Steinbaugh*
CA Bar No. 304829
FOUNDATION FOR INDIVIDUAL RIGHTS
   & EXPRESSION
510 Walnut St.; Ste. 1250
Philadelphia, PA 19106
Tel:     (215) 717-3473
Fax:    (267) 573-3073
Email:  adam@thefire.org

Joshua T. Bleisch*
IN Bar No. 35859-53
FOUNDATION FOR INDIVIDUAL RIGHTS
   & EXPRESSION
700 Pennsylvania Avenue SE
Suite 340
Washington, DC 20003
Tel:     (215) 717-3473
Fax:    (267) 573-3073
Email:  josh.bleisch@thefire.org

*Applications for admission
pro hac vice admission forthcoming.

Counsel for Plaintiff

## VERIFICATION OF STEPHEN KERSHNAR

Pursuant to 28 U.S.C. § 1746, I, STEPHEN KERSHNAR, declare as follows:

1.     I am the Plaintiff in the present case and a citizen of the United States of America.

2.     I have read the foregoing Verified Complaint for Civil Rights Violations.

3.     I have personal knowledge of the factual allegations in paragraphs 1–14, 22–79, 81–85, 87–93, 9–101, 104–109, 112–118, 125–139, 144–147, 152, 155, 160–162, 165–172, 175–177, and 179-184 of the Verified Complaint and know them to be true.

4.     I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed on June 8, 2023.

Stephen Kershnar