## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN KERSHNAR, | |
| *Plaintiff*, | Case No.: 1:23-cv-00525 |
| v. | |
| STEPHEN H. KOLISON, JR, in his individual capacity and his official capacity as the President of the State University of New York at Fredonia, and | |
| DAVID STARRETT, in his individual capacity and official capacity as Executive Vice President and Provost of the State University of New York at Fredonia, | |
| *Defendants*. | |

## MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION
## <u>ON FIRST, SECOND, AND THIRD CAUSES OF ACTION</u>

Adam B. Steinbaugh*
CA Bar No. 304829
FOUNDATION FOR INDIVIDUAL
RIGHTS & EXPRESSION
510 Walnut St.; Ste. 1250
Philadelphia, PA 19106
Tel:     (215) 717-3473
Fax:     (267) 573-3073
Email: adam@thefire.org

Barry N. Covert, Esq.
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue – Suite 120
Buffalo, New York 14202
Phone: (716) 849-1333
Email: bcovert@lglaw.com

Joshua T. Bleisch*
IN Bar No. 35859-53
FOUNDATION FOR INDIVIDUAL
RIGHTS & EXPRESSION
700 Pennsylvania Avenue SE; Ste. 340
Washington, DC 20003
Tel:     (215) 717-3473
Fax:     (267) 573-3073
Email: josh.bleisch@thefire.org

* Motions for *pro hac vice* admission forthcoming

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

    Professor Kershnar's long history of provocative philosophical inquiry is rewarded by SUNY and praised by SUNY Fredonia. ........................................ 2

    After brief clips of Kershnar's off-campus podcast debates go viral, SUNY Fredonia reverses course and joins the Twitter condemnations. .......... 3

    President Kolison denounces Kershnar, initiates a campus police investigation, bars him from teaching and from campus, and silences him. ........................................................................................................ 4

    Sixteen months later, Kershnar remains barred from teaching and campus while SUNY Fredonia struggles to find lecturers for his classes. ........................................................................................................ 5

ARGUMENT ........................................................................................................... 7

    I.    Kershnar Is Likely to Succeed in Challenging SUNY Fredonia's Content and Viewpoint Discrimination. .................................................. 8

        A.    Kershnar Spoke as a Private Citizen on Matters of Public Concern. ............................................................................................. 9

            1.    Kershnar's off-campus speech, removed from his official duties, was that of a private citizen. ..................... 9

            2.    Kershnar's speech addressed the legal and moral status of sex, which are matters of public concern. ......... 11

        B.    Defendants cannot show their restrictions serve a legitimate educational interest. ................................................. 12

            1.    Public condemnation cannot outweigh the value of provocative opinions in the context of a public university. ....................................................................... 13

            2.    Defendants did not, could not, and cannot now reasonably predict disruption from Kershnar's speech. ............................................................................... 16

i

3.      President Kolison took action because he objected to Kershnar's views, not because of disruption...................20

II.     Kershnar Is Likely to Succeed on His Retaliation Claim. ....................21

A.      Defendants' adverse responses to Kershnar's protected expression exceed those taken in *Levin*. .....................................22

B.      Kolison's immediate denunciation of Kershnar shows causation. ......................................................................................23

III.    Kershnar Is Likely to Succeed on His Prior Restraint Claim. .............23

IV.     The Remaining Factors All Favor Injunctive Relief. ...........................25

CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

## Cases

*Agudath Israel of Am. v. Cuomo,*
    983 F.3d 620 (2d Cir. 2020) ............................................................ 7, 25

*Berger v. Battaglia,*
    779 F.2d 992 (4th Cir. 1985) ................................................................ 15

*Bible Believers v. Wayne Cnty.,*
    805 F.3d 228 (6th Cir. 2015) ........................................................... 16, 20

*Brown v. Louisiana,*
    383 U.S. 131 (1966) ............................................................................. 16

*Connick v. Myers,*
    461 U.S. 138 (1983) ............................................................................. 11

*Cross v. Cooper,*
    197 Cal. App. 4th 357 (2011) .............................................................. 11

*DeJohn v. Temple Univ.,*
    537 F.3d 301 (3d Cir. 2008) ................................................................ 19

*DeJong v. Pembrook,*
    No. 3:22-CV-01124-NJR, 2023 U.S. Dist. LEXIS 46763 (S.D. Ill. Mar. 20,
    2023) ..................................................................................................... 23

*Elrod v. Burns,*
    427 U.S. 347 (1976) ............................................................................... 7

*Flanagan v. Munger,*
    890 F.2d 1557 (10th Cir. 1989) ........................................................... 15

*Gala v. City of N.Y.,*
    525 F. Supp. 3d 425 (E.D.N.Y. 2021) ................................................. 15

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) ........................................................................... 9, 10

*Goza v. Memphis Light, Gas & Water Div.,*
    398 F. Supp. 3d 303 (W.D. Tenn. 2019) ................................... 16, 18, 19

*Harman v. City of N.Y.,*
    140 F.3d 111 (2d Cir. 1998) ................................................................ 24

*Healy v. James*,
    408 U.S. 169 (1972) ................................................................................. 14

*Jeffries v. Harleston*,
    52 F.3d 9 (2d Cir. 1995) .......................................................................... 17

*Johnson v. Ganim*,
    342 F.3d 105 (2d Cir. 2003) ...................................................................... 8

*Lane v. Franks*,
    573 U.S. 228 (2014) ................................................................................... 9

*Levin v. Harleston*,
    770 F. Supp. 895 (S.D.N.Y. 1991) .................................................... 14, 23

*Levin v. Harleston*,
    966 F.2d 85 (2d Cir. 1992) ............................................................... passim

*Locurto v. Giuliani*,
    447 F.3d 159 (2d Cir. 2006) .................................................................... 12

*Melzer v. Bd. of Educ.*,
    336 F.3d 185 (2d Cir. 2003) ............................................................ passim

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ..................................................................... 9

*Montero v. City of Yonkers*,
    890 F.3d 386 (2d Cir. 2018) ...................................................................... 9

*Near v. Minnesota*,
    283 U.S. 697 (1931) ................................................................................. 24

*Nebraska Press Ass'n v. Stuart*,
    427 U.S. 539 (1976) ................................................................................. 24

*Pickering v. Bd. of Educ.*,
    391 U.S. 563 (1968) ................................................................................... 8

*Rankin v. McPherson*,
    483 U.S. 378 (1987) ................................................................................. 11

*Roth v. United States*,
    354 U.S. 476 (1957) ................................................................................. 11

*Satter v. Wash. State Dep't of Ecology*,
  No. C09-5645 BHS, 2010 U.S. Dist. LEXIS 57062 (W.D. Wash. June 8,
  2010) ............................................................................................................ 23

*Shelton v. Tucker*,
  364 U.S. 479 (1960) ...................................................................................... 14

*Smith v. Cnty. of Suffolk*,
  776 F.3d 114 (2d Cir. 2015) ............................................................... 8, 22, 23

*Specht v. City of New York*,
  15 F.4th 594 (2d Cir. 2021) .......................................................................... 22

*Sweezy v. New Hampshire*,
  354 U.S. 234 (1957) .................................................................................. 1, 13

*Terminiello v. Chicago*,
  337 U.S. 1 (1949) .......................................................................................... 13

*Weintraub v. Bd. of Educ.*,
  593 F.3d 196 (2d Cir. 2010) .......................................................................... 10

## Other Authorities

Chloe Kowalyk, *The threats made on Thompson Hall: One semester later*,
  THE LEADER (May 3, 2023), https://perma.cc/9QWQ-MQ4Q .......................... 21

## Regulations

34 CFR 668.46(f)(1) ................................................................................................ 19

## INTRODUCTION

Distinguished Teaching Professor Stephen Kershnar is a philosopher and public intellectual. His role is to question the unquestionable, challenging fellow scholars and students to sharpen their own logical arguments about morality—including the moral issues implicated by sexual conduct involving adolescents and children. These are the well-traveled paths of philosophical inquiry among the "social sciences, where few, if any, principles are accepted as absolutes." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Renowned for his ability to engage with challenging ideas, SUNY showered him with accolades touting his Socratic skill.

But when Prof. Kershnar's comments on a philosophy podcast caused a passing storm on Twitter, SUNY Fredonia President Stephen Kolison leapt onto the online dogpile. He reflexively decided that Kershnar's comments—off-campus, unrelated to his job duties, and making arguments he had made for decades—outweighed decades of scholarship. President Kolison immediately joined in denouncing Kershnar on Twitter, then summarily barred him from teaching, exiled him from campus, directed campus police to search his office, and prohibited him from communicating with the "campus community." For sixteen months, President Kolison and Provost Starrett have continued Kershnar's exile, citing unnamed "safety concerns" that the university cannot describe and refuses to identify. Meanwhile, SUNY Fredonia struggles to find an instructor to fill the classes that Kershnar mastered.

It is time to end SUNY Fredonia's apparent imposition of a social media "heckler's veto," which is anathema to scholars' ability to offer ideas unpopular with administrators, lawmakers, and the public.

## STATEMENT OF FACTS[1]

***Professor Kershnar's long history of provocative philosophical inquiry is rewarded by SUNY and praised by SUNY Fredonia.***

Dr. Stephen Kershnar is an award-winning Distinguished Teaching Professor at SUNY Fredonia, where he has taught philosophy courses since 1998. (Verif. Compl. ¶¶ 35–41.) Kershnar is renowned for his thoughts on the philosophical underpinnings of morality. (Verif. Compl. ¶¶ 12–13, 22, 24–26, 37–41, 45–48.; Decl. Adam Steinbaugh ("Steinbaugh Decl.") ¶¶ 6–8, Exs. 3–5.) In keeping with the intellectual tradition of Socratic inquiry, Kershnar stakes out provocative positions to question the assumptions society makes about morality. (*Id.*; Decl. Neil Feit ("Feit Decl.") ¶ 5.)

SUNY Fredonia praised Kershnar's scholarly examinations of our society's moral commitments on a host of issues, including abortion, slavery, and torture. (Decl. Steinbaugh ¶¶ 6–8, Exs. 3–5.) When SUNY named Kershnar a Distinguished Teaching Professor (its "highest academic honor" and rank) and awarded him the "Chancellor's Award of Excellence" in teaching, SUNY Fredonia issued press releases lauding his iron-sharpens-iron approach, boasting:

> Dr. Kershnar has established a reputation as one of the most prolific authors on campus . . . . His works cover a wide spectrum, including politics, ethics, religion, law and sports. He is known for promoting unpopular or previously ignored positions that often leads those who disagree with him to sharpen their own views when reacting to his reasoning.

---

[1] All facts are from the Verified Complaint ("Verif. Compl.") (Doc. 1) or the declarations supporting this motion. Plaintiff incorporates the verified allegations from the Verified Complaint and the declarations supporting this motion.

(Steinbaugh Decl. ¶¶ 7–8, Exs. 4–5.) And SUNY Fredonia praised Kershnar's willingness to engage in challenging explorations on the moral questions involved in sexual conduct between adults and adolescents, referencing it even in his prominent bio on the university's website. (Steinbaugh Decl. ¶ 6, Ex. 3.)

***After brief clips of Kershnar's off-campus podcast debates go viral, SUNY Fredonia reverses course and joins the Twitter condemnations.***

SUNY Fredonia's support for Kershnar's freedom of inquiry ended abruptly when strident online critics came calling. On December 5, 2020, Kershnar had appeared on *Unregistered*, a podcast featuring interviews with "people who break the rules of conventional discourse and expand the realm of the possible," discussing— again—the moral assumptions underlying age-of-consent laws and prohibitions on adult-minor sexual contact. (Steinbaugh Decl. ¶¶ 9–10, Exs. 6–7.) These are matters upon which Kershnar had published books and articles over the years. (Verif. Compl. ¶¶ 24–26; Decl. Stephen Kershnar ("Kershnar Decl.") ¶ 4, Ex. 34.)

Then, on January 30, 2022, Kershnar appeared on *Brain in a Vat*, a "philosophy smorgasbord" podcast offering "[t]hought experiments and conversations with philosophers" like Kershnar. (Steinbaugh Decl. ¶¶ 11–13, Exs. 8–10.) Neither podcast had any relationship with SUNY Fredonia, neither was promoted to the SUNY Fredonia community, and the university did not ask Kershnar to appear on these (or any) podcasts. (Verif. Compl. ¶¶ 30–33, 55–58, 63–67, 70–72.)

On February 1, 2022, a 28-second video clip of Kershnar's hourlong *Brain in a Vat* discussion—coupled with other excerpts of his philosophic inquiry—went viral on Twitter. (Steinbaugh Decl. ¶¶ 14–15, Exs. 11–12.)

***President Kolison denounces Kershnar, initiates a campus police investigation, bars him from teaching and from campus, and silences him.***

Just three hours after the first tweet, SUNY Fredonia President Stephen Kolison issued a statement condemning Kershnar's "reprehensible" views as unrepresentative of "the values of SUNY Fredonia in any way, shape or form" and stating that the "matter is being reviewed." (Steinbaugh Decl. ¶ 16, Ex. 13.) That evening, a campus police dispatcher told two callers, who called to complain about Kershnar, that they were investigating Kershnar. (Steinbaugh Decl. ¶ 20(a), Ex. 15.)

The next evening, as media coverage continued, Kolison directed SUNY Fredonia University Police Chief Brent Isaacson to seize Kershnar's computer for "analysis" and bar him from campus. (Verif. Compl. ¶¶ 82–83, 85–88, 94–98; Steinbaugh Decl. ¶¶ 20(c)–(e), Exs. 17–19.)

On the morning of February 3, Chief Isaacson directed Kershnar to avoid campus. (Verif. Compl. ¶¶ 85–86; Steinbaugh Decl. ¶ 20(e), Ex. 19.) Chief Isaacson told Kershnar that there were safety concerns, but did not specify their nature. (Verif. Compl. ¶ 87.) Kershnar asked Chief Isaacson for information about any threats and the anticipated length of his banishment. (Verif. Compl. ¶ 87, 89; Kershnar Decl. ¶ 5, Ex. 35.) Kershnar also offered to teach remotely to mitigate any plausible safety concerns, while pointing out that barring him from teaching altogether effected a "heckler's veto." (*Id.*). Isaacson did not respond. (Verif. Compl. ¶ 93.)

By mid-day on February 3, 2022, SUNY Fredonia's director of human resources, Maria Carroll, emailed Kershnar, barring him from campus "until further notice" and prohibiting any "contact with the campus community" without her

4

permission. (Kershnar Decl. ¶¶ 6–7, Exs. 36–37.) Carroll's letter invoked a disciplinary provision of SUNY's collective bargaining agreement authorizing President Kolison to reassign faculty to alternative duties in advance of disciplinary action. (Kershnar Decl. ¶ 6, Ex. 36; Steinbaugh Decl. ¶ 5, Ex. 2 at Art. 19.11(c).)

That afternoon, President Kolison issued a second statement announcing that Kershnar was to have no "physical presence on campus and will not have contact with students while" an "expeditious" investigation "is ongoing." (Steinbaugh Decl. ¶ 17, Ex. 14.) Kolison again publicly denounced Kershnar's "abhorrent" views, urging that he could not "stress strongly enough that the independent viewpoints" of Kershnar "are in no way representative of the values of the SUNY Fredonia campus." (*Id.*)

On February 4, Carroll declined to provide any information about the "specific threats" because of what she called the "volume involved." (Kershnar Decl. ¶ 7, Ex. 37.) Carroll told Kershnar that the "duration" of his removal "is unknown, because the safety concerns . . . for now, remain ongoing." (*Id.*)  Carroll did not disclose the nature or number of any purported "threats," citing their "volume." (*Id.*)

**Sixteen months later, Kershnar remains barred from teaching and campus while SUNY Fredonia struggles to find lecturers for his classes.**

In the sixteen months that followed, SUNY Fredonia has not told Kershnar what the "specific threats" are. (Verif. Compl. ¶¶ 93, 99–100, 118, 125, 128–129, 178; Kershnar Decl. ¶ 7, Ex. 37.) The FBI says it is unaware of any specific threats. (Kershnar Decl. ¶ 11, Ex. 41.) The local, county, and state police have no records of any threats or investigations that appear to be related to Kershnar. (Steinbaugh Decl. ¶¶ 25–30, Exs. 24–28.) And SUNY Fredonia's own daily crime log—required by the

Clery Act—does not reference any reported threats. (Steinbaugh Decl. ¶ 31, Ex. 29.) The momentary public reaction has long since waned and critical emails to Kershnar have slowed to a trickle. (Steinbaugh Decl. ¶ 33, Ex. 31; Verif. Compl. ¶ 152.) And, in response to outcry from academic freedom organizations and faculty around the world, SUNY Fredonia acknowledged that Kershnar's speech was protected by the First Amendment. (Steinbaugh Decl. ¶¶ 21–24, Exs. 20–23.)

Yet Kershnar remains barred from teaching, from campus, and from communicating with the "campus community," without permission. (Verif. Compl. ¶ 113.) On August 24, 2022, Executive Vice President and Provost David Starrett sent Kershnar a letter renewing his exile "due to ongoing concerns regarding your safety and the safety of others on campus should you return[.]" (Kershnar Decl. ¶ 8, Ex. 38.) On September 9, 2022, Starrett wrote to Kershnar again, stating that the university had not decided whether to allow Kershnar to teach "due to ongoing concerns regarding your safety and the safety of others on campus should you return to the campus." (Kershnar Decl. ¶ 9, Ex. 39.) And on November 1, 2022, Provost Starrett sent Kershnar a third letter, barring him from teaching during the Spring 2023 semester. (Kershnar Decl. ¶ 10, Ex. 40.)

None of these describes the nature of, or basis for, any safety concerns. Each cites the same unidentified "your safety" language; none cites the possibility of disciplinary action relied on in the February 2022 suspension letter. (*Cf.* Kershnar Decl. ¶¶ 6–10, Exs. 36–40.) When confronted by a faculty member, President Kolison refused to say whether the publicly announced investigation had concluded, citing

privacy interests. (Feit Decl. ¶¶ 14–16, 23, Ex. 42 at 6.) Starrett refused to tell faculty whether there were any safety concerns. (Feit Decl. ¶¶ 17–20, Ex. 42 at 8.)

This fall, SUNY Fredonia is offering multiple sections of classes Kershnar teaches. (Verif. Compl. ¶¶ 173; Steinbaugh Decl. ¶ 35, Ex. 33.) It has not assigned an instructor and has struggled to find lecturers. (Feit Decl. ¶¶ 6–13, 21–25, Exs. 42–43; Steinbaugh Decl. ¶ 34–35, Exs. 32–33.) It will not permit Kershnar to teach these classes. (Feit Decl. ¶ 28, Ex. 44.)

## ARGUMENT

To obtain a preliminary injunction, Kershnar must establish "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (granting preliminary injunction against COVID-19 restrictions on houses of worship).

Prof. Kershnar meets each factor. The first factor requires little elucidation: The loss of First Amendment freedoms "for even minimal periods of time" is always irreparable harm, *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and nothing suggests SUNY Fredonia will stop, absent a court order, exiling Kershnar from the classroom due to his protected expression. Additionally, as the Second Circuit's decision in *Levin* establishes, removing a professor from teaching due to public controversy over his views violates the First Amendment. *Levin v. Harleston*, 966 F.2d 85, 88 (2d Cir. 1992). *Levin*, too, shows that the cardinal public interest in academic freedom means administrators cannot allow public anger—or even serious threats of violence, as in *Levin*—to dictate what ideas may be expressed by faculty. Thus, Kershnar is likely

to succeed on the merits of his claims under the First Amendment alleging content and viewpoint discrimination (Claim No. 1), retaliation (Claim No. 2), and prior restraint (Claim No. 3).

## I. Kershnar Is Likely to Succeed in Challenging SUNY Fredonia's Content and Viewpoint Discrimination.

Public employment "does not result in the evisceration of an employee's First Amendment rights." *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003). Instead, public employees are citizens with the right "to comment on matters of public interest" without fear of adverse action by their state employer. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) (public school teacher's letter to the editor criticizing his employer was protected by the First Amendment).

Where, as here, a public university professor speaks as a private citizen on matters of public concern, the burden shifts to his university employer to show that the professor's speech itself is likely to disrupt the educational environment and that the "harm caused by the disruption outweighs the value" of his expression. *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 119 (2d Cir. 2015); *see also Melzer v. Bd. of Educ.*, 336 F.3d 185, 197 (2d Cir. 2003) (employer must show employee's speech "is disruptive to the internal operations of the governmental unit in question"), *Levin*, 966 F.2d at 88 (public university had no "legitimate educational interest" in disciplining philosophy professor for protected speech outside the classroom).

Defendants cannot meet their burden. Brief social media opposition to a professor's views cannot outweigh the fundamental public interest in unfettered discourse by university faculty. The character and length of the Defendants' actions

reveal—as President Kolison's public denunciations of Kershnar made clear enough—that they acted not to thwart potential disruption, but to retaliate.

### A.   Kershnar Spoke as a Private Citizen on Matters of Public Concern.

Kershnar's speech—on two podcasts with no relationship to SUNY Fredonia— was that of a private citizen addressing matters of public concern, namely thorny questions of the relationship between sex, morals, and law. Because he spoke as a private citizen on matters of public concern, the burden shifts to Defendants to prove that each of their actions in response were intended to avoid reasonable predictions of disruption.

> 1.   Kershnar's off-campus speech, removed from his official duties, was that of a private citizen.

Kershnar spoke as a private citizen during both podcasts because his speech was outside [his] official responsibilities" and because podcasts are a form of speech widely available to non-employee citizens. *See Montero v. City of Yonkers*, 890 F.3d 386, 397 (2d Cir. 2018).

First, Kershnar's podcast appearances are not "speech that owes its existence to [his] professional responsibilities[.]" *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).[2] The "critical question . . . is whether the speech at issue is ordinarily within the scope of an employee's duties[.]" *Lane v. Franks*, 573 U.S. 228, 240 (2014). Appearing on

---

[2] Even if Kershnar spoke pursuant to his academic duties, his speech would still be analyzed under *Pickering*'s balancing test. *See, e.g.*, *Meriwether v. Hartop*, 992 F.3d 492, 505–09 (6th Cir. 2021) (university professor's speech while "engaged in core academic functions, such as teaching and scholarship" is not subject to *Garcetti* due to the "robust tradition of academic freedom" in universities).

extramural podcasts is not "ordinarily" among Kershnar's duties. Duties of SUNY faculty are those "consistent with" their "academic rank" or "title," specifically including "teaching" and responsibilities "required" of the faculty member. (Steinbaugh Decl. ¶ 4, Ex. 1 at Art. XI, Title H, § 2.) Appearing on podcasts is neither teaching nor required of Kershnar, who prepares for and appears on podcasts on his own time—and, indeed, recorded the *Brain in a Vat* podcast in his home. (Verif. Compl. ¶¶ 30–33, 57–58, 65–67, 70–72.) SUNY Fredonia pays its faculty—as Kershnar's "Distinguished Teaching Professor" title and academic rank reflects—to teach, not to do podcasts. Nor has SUNY Fredonia ever "required" Kershnar to appear on any podcast, facilitated his appearances, or publicized his appearances. (Verif. Compl. ¶ 30–33.)

Put differently, Kershnar's podcast appearances are not speech that the university "itself has commissioned or created." *Garcetti*, 547 U.S. 410 at 422. To the contrary, SUNY policy recognizes that extramural speech—that is, expression outside of the classroom—is citizen speech, distinguishing between "inquiry, teaching and research" from faculty members' "role as citizens," in which they "have the same freedoms as other citizens." (Steinbaugh Decl. ¶ 4, Ex. 1 at Art. XI, Title I, § 1.)

Second, podcast appearances are not an avenue of expression reserved to university faculty—it's a nascent medium used by millions of people. That speech occurs in a "form or channel of discourse available to non-employee citizens," like a "letter to the editor," is a strong indication that the speech is that of citizen, not employee. *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 204 (2d Cir. 2010).

10

2.   <u>Kershnar's speech addressed the legal and moral status of sex,
which are matters of public concern.</u>

Kershnar's speech addressed matters of public concern, however objectionable others might find his line of inquiry.

Whether speech addresses a matter of public concern is a question of law considering the "content, form, and context of a given statement." *Melzer*, 336 F.3d at 196. What qualifies as a matter of "public concern" is broadly construed, reaching "any matter of political, social, or other concern to the community," rather than that of pure "personal interest." *Connick v. Myers*, 461 U.S. 138, 146–47 (1983). Kershnar need only establish that his speech may be "fairly characterized" as addressing matters of public concern. *Id*. at 146.

Kershnar's speech, directed to an audience interested in thinking through difficult questions of ethics and morality, concerns complex questions around the proper relationship between sex and the law. Sex "has indisputably been a subject of absorbing interest to mankind through the ages" as "one of the vital problems of human interest and public concern." *Roth v. United States*, 354 U.S. 476, 487 (1957). So, too, is "child sex abuse" an "obvious" matter of "widespread public interest." *Cross v. Cooper*, 197 Cal. App. 4th 357, 375 (2011); *see also, e.g.*, *Melzer*, 336 F.3d at 198 ("[A]ttitudes and laws regarding age of consent" are matters of public concern). That the speech may be "inappropriate or controversial" is irrelevant to whether it addresses a matter of public concern. *Rankin v. McPherson*, 483 U.S. 378, 387 (1987) (police staff comments hoping President Reagan would be assassinated addressed a matter of public concern).

11

**B.** **Defendants cannot show their restrictions serve a legitimate educational interest.**

To overcome Kershnar's interest in speaking on matters of public concern, Defendants bear the burden to show that his speech "is disruptive to the internal operations of the governmental unit in question." *Melzer*, 336 F.3d at 197. In the context of higher education, that requires the university to establish that its actions serve a "legitimate educational interest." *Levin*, 966 F.2d at 88 (university's interference with philosophy professor's classes due to student protests over his views violated the First Amendment).

To meet their burden, the Defendants must establish that: (1) the potential disruptiveness outweighs the value of the speech; (2) their prediction of disruption is reasonable; and (3) SUNY Fredonia's actions were intended to address "this disruption and not in retaliation for the speech." *Locurto v. Giuliani*, 447 F.3d 159, 172–73 (2d Cir. 2006). The Defendants cannot satisfy that burden: exploring challenging ideas is not disruptive to a university—it is the *purpose* of a university, where the ability to question the unquestionable is central to the academic enterprise. This purpose cannot be subordinated to a social media veto. The restrictions on Kershnar's speech were never justified, not even at the outset, and their continuation long after public interest faded is unrelated to any possible disruption. Instead, President Kolison's words and conduct demonstrate that he took immediate action—and continued Kershnar's exile—in reaction to Kershnar's viewpoint, not to prevent disruption.

1.  <u>Public condemnation cannot outweigh the value of provocative opinions in the context of a public university.</u>

Defendants cannot make their initial showing because the unfettered exchange of ideas by faculty members—including Kershnar, as SUNY Fredonia's years of praise illustrate—is central to the university's purpose. And, as *Levin* establishes, opposition to a faculty member's views cannot overcome the value of open inquiry or a professor's interest in advancing controversial views. To do otherwise would impose a heckler's veto over the marketplace of ideas.

Defendants will no doubt charge that the value of Kershnar's allegedly "reprehensible" speech is beneath the university's "values." (Steinbaugh Decl. ¶¶ 16–17, Exs. 13–14.) But speech does not derive its constitutional protection based on popularity, correctness, or conformity with a university president's personal values. The value of speech doesn't depend on whether we find it agreeable—sometimes its value is best served by sparking dissension. To the contrary, speech may "best serve its high purpose" when it angers others, as speech "is often provocative and challenging" and may "have profound unsettling effects as it presses for acceptance of an idea." *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949).

SUNY's long praise for Kershnar's "iron-sharpens-iron" method of inquiry and debate reflects these principles, which the First Amendment zealously guards in higher education. (Steinbaugh Decl. ¶¶ 6–8, Exs. 3–5.) University faculty, our Supreme Court has warned, must "always remain free to inquire," particularly "in the social sciences, where few, if any, principles are accepted as absolutes." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). That national interest in the unfettered

13

exchange of ideas does not genuflect to the hostile mob, real or imagined, online or off. The "acknowledged need for order" on university campuses cannot justify diluting the potent protections of the First Amendment. *Healy v. James*, 408 U.S. 169, 180 (1972). Rather, the "vigilant protection of constitutional freedoms is nowhere more vital" than on America's college campuses. *Id.* (quoting, in part, *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).

These principles animated the Second Circuit's ruling in *Levin*, which established that a public university president can neither interfere with a faculty member's classes nor initiate disciplinary action based on opposition to a professor's extramural speech. *Levin*, 966 F.2d at 88–90.

In *Levin*, a philosophy professor's extramural remarks on race spurred public furor and roiled the City College of the City University of New York campus. *Id.* at 87. Unlike SUNY Fredonia's nonspecific allusions to potential "safety" concerns, the risk of violence and disruption in *Levin* was manifest and immediate, not conjectural. The district court recounted death threats left in the professor's mailbox and on his office door ("We know where you live you Jewish bastard your time is going to come"), a death threat to his dean, student protests outside and inside his classrooms, and a "melee with security" outside his class. *Levin v. Harleston*, 770 F. Supp. 895, 903–05 (S.D.N.Y. 1991). Officials opted against sanctioning disruptive student protesters, fearing "chaos on the campus." *Id.* at 906.

In response to these ongoing safety threats, the *Levin* defendants imposed less drastic measures than those taken by SUNY Fredonia's leadership. The president in

*Levin*, invoking his disciplinary authority, publicly announced an investigation into the philosophy professor. *Levin*, 966 F.2d at 89. And while still allowing the professor to teach, administrators created alternate, "shadow" course sections to allow students to avoid interaction with the professor. *Id.* at 87–88.

Despite the considerable safety concerns and actual disruption, the Second Circuit said it would not hesitate to correct the university administrators' abridgement of "basic constitutional values." *Id.* at 88. Administrators' "encouragement of the continued erosion in the size of Professor Levin's class" (through offering "shadow" classes) was itself "an infringement on Professor Levin's First Amendment rights." *Id.* So, too, was the implicit threat of disciplinary proceedings engendered through maintenance of a long investigation—even though the investigation ultimately vindicated the professor. *Id.* at 88, 90.

SUNY Fredonia's actions here are less justifiable than those in *Levin*, where pressure was from student protesters interrupting classes. *Id.* at 90. In this case, neither Kershnar nor members of the campus community are responsible for any disruptive speech, which instead came from outside social media critics. *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985) (holding disruption "caused not by the speech itself but by threatened reaction to it by offended segments of the public" cannot satisfy *Pickering*); *accord Flanagan v. Munger*, 890 F.2d 1557, 1566 (10th Cir. 1989) ("reaction by offended members of the public" insufficient to satisfy *Pickering* balancing), *Gala v. City of N.Y.*, 525 F. Supp. 3d 425, 431 (E.D.N.Y. 2021) ("the balancing test evaluates internal disruptions; it does not generally permit the public

to curtail unpopular ideas with the government's help"). Such "community reaction cannot dictate whether an employee's constitutional rights are protected[,]" and "allowing the public, with the government's help, to shout down unpopular ideas that stir anger" is inconsistent with constitutional values. *Melzer*, 336 F.3d at 199.

Our constitutional system has long held that peaceful speakers are "not chargeable with the danger, unprovoked except by . . . the constitutionally protected [expression] itself, that their critics might react with disorder or violence." *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966) (plurality op.); *see also, e.g.*, *Goza v. Memphis Light, Gas & Water Div.*, 398 F. Supp. 3d 303, 320 (W.D. Tenn. 2019) (public utility's concern for its "reputation is not sufficient to outweigh" employee rights, as "[v]oters cannot use the ballot box to make the government silence their opponents; the public cannot use social media to do so either").

To allow the loudest, least tolerant, and most illiberal segments of society to dictate by tweet who can teach at a university openly invites censorship. If the president in *Levin* could not limit a philosophy professor's First Amendment rights to staunch public anger, President Kolison cannot do so now. 966 F.2d at 91; *see also Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 252–53 (6th Cir. 2015) (en banc) (police cannot, as an "expedient alternative" to preventing disruption "destroy the right to free speech by indefinitely silencing the speaker").

      2.    <u>Defendants did not, could not, and cannot now reasonably predict disruption from Kershnar's speech.</u>

The "closer the employee's speech reflects on matters of public concern," as here, "the greater must be the employer's showing that the speech is likely to be

disruptive[.]" *Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir. 1995). Defendants cannot make this "substantial" showing. *Id.* Kershnar's speech presented no basis to believe he was a danger to anyone and Fredonia's reaction to it was an act of retaliation,[3] not an effort to prevent disruption. While others' reactions can never justify silencing a scholar, Defendants' decisions to extend Kershnar's exile, even as those reactions waned, reveal that their professed concern for public safety was purely pretextual.

From the outset, President Kolison's statements made clear that he viewed *Kershnar*—not his detractors—as the problem. Kolison's actions directly targeted Kershnar as an individual, and had nothing to do with any possible disruption. President Kolison barred Kershnar from speaking to the "campus community"—an action that served *only* to prevent Kershnar from speaking. Rather than investigate alleged threats,[4] President Kolison immediately directed campus police to seize and search Kershnar's computer. Kolison's public statements pledged not that he was taking steps to protect students from disruption, but to protect students *from Kershnar*.

Kolison's unreasonable speculation that Kershnar posed a risk because he expressed an idea is diametrically opposed to a university's raison d'etre. Imagine dispatching drug-sniffing dogs when a political science professor says marijuana

[3] As discussed in I(B)(3) below (at pp. 20-21), President Kolison's retaliatory motive alone means his immediate decisions to remove Kershnar from campus and launch a police investigation into him cannot pass constitutional muster.

[4] That SUNY Fredonia did not catalog reported threats as criminal incidents is a strong indication that officials didn't believe the public response to be disruptive.

should be legalized, or ransacking a law professor's office for "TOP SECRET" files after suggesting our nation's classification system is too broad. Kolison's extreme overreaction was unreasonable because he conflated ideas with actions.

*Goza* illustrates the danger of making assumptions about unpopular speech. In 2017, a public utility employee commented on Facebook appearing to condone white nationalist violence in Charlottesville, adding: "Amen, brother." *Goza*, 398 F. Supp. 3d at 322. When social media users drew attention to his post, the utility indefinitely suspended the employee pending an investigation, fearing his comments reflected propensity for violence or bigoted conduct. *Id.* at 319–20, 323. The court found the prediction of danger to be "unreasonable" because the employee had consistently "received favorable reviews" during his employment, had never received a complaint of "violent behavior or racial animus," and his Facebook comment was not a clear endorsement of violence. *Id.* at 322–23.

In *Goza*, there was at least some plausible argument that the employee harbored sympathy for racist violence. In contrast, Kershnar is a university professor whose scholarly work explores transgressive ideas. That much would have been obvious had President Kolison reviewed SUNY Fredonia's own website biography of Kershnar. And, as with the employee in *Goza*, no student had complained about Kershnar when President Kolison separated him from campus and initiated an investigation.

If the concern was instead with social media reaction to Kershnar's speech, *Goza* also shows—again—that the unpopularity of ideas cannot legitimize a heckler's

18

veto. *Goza*, 398 F. Supp. 3d at 320–21. If "going viral" were a "reasonable justification" for suppressing speech, officials could "censor certain viewpoints based on the whims of the public — or, worse, based on a government official's speculation as to the public's eventual reaction." *Id.* at 321. That risk is especially pernicious in higher education, where "free speech is of critical importance because it is the lifeblood of academic freedom." *DeJohn v. Temple Univ.*, 537 F.3d 301, 314 (3d Cir. 2008).

Yet even if interim measures might have been warranted initially, speculation of disruption became even less reasonable as public attention waned. (Verif. Compl. ¶ 152; Steinbaugh Decl. ¶ 33, Ex. 31). Although the Clery Act requires SUNY Fredonia to log any incident in its daily crime log (34 CFR 668.46(f)(1)), the university's log reflects *no* threats directed at Kershnar. (Steinbaugh Decl. ¶ 31, Ex. 29). If the university was aware of threats, it would have had to log them. Nor did SUNY Fredonia alert local, county, or state police of any threats, and the FBI is unaware of any credible threats to his safety. (Steinbaugh Decl. ¶¶ 25–30, Exs. 24–28; Kershnar Decl. ¶ 11, Ex. 41).

Given that disruption never materialized and public attention dissipated, Defendants' decisions in August, September, and November of 2022—nearly a year after the controversy—lacked any plausible support. And their continued refusal to reconsider Kershnar's banishment is wholly unreasonable now.

3.   President Kolison took action because he objected to Kershnar's views, not because of disruption.

Even if Defendants could otherwise "prevail[] in the balancing test," Kershnar "may still carry the day" because Defendants' "motivation . . . was retaliation for the speech itself, rather than for any resulting disruption." *Melzer*, 336 F.3d at 193.

President Kolison's retaliatory intent is apparent in both word and deed. His denunciations of Kershnar ("abhorrent" and inconsistent with campus "values") alone show retaliatory intent. And, as above, Kolison's actions speak louder than his words, manifesting a belief that Kershnar's ideas made him dangerous.

Skepticism is critical when officials claim censorship serves public order. The need for a heckler's veto "will nearly always be susceptible to being reimagined and repackaged as a means for protecting the public, or the speaker himself, from actual or impending harm." *Bible Believers*, 805 F.3d 228 at 255. That's why officials' reactions must be scrutinized to determine whether they first took bona fide efforts to prevent disruption—or, instead, sacrificed the rights of the speaker as an "expedient alternative to" addressing others' disruptive conduct. *Id.* at 252.

If any actual safety issues arose from opposition to Kershnar's views, SUNY Fredonia made no effort to address *those* concerns instead of silencing Kershnar. It could have taken narrower measures: increasing police presence, posting an officer outside the class, reporting threats to law enforcement, seeking prosecution for any threats, or—if these alternatives failed—permitting Kershnar to teach remotely. *See, e.g.*, *Bible Believers*, 805 F.3d at 254 (listing "easily identifiable measures that could

have been taken short of removing the speaker" in the face of mob violence).[5] Kershnar offered from the outset to teach remotely, which would significantly reduce the possibility of physical violence.

Rather than explore ways to protect safety without exiling Kershnar from the classroom, President Kolison decreed that *Kershnar* would "not have contact with students." (Steinbaugh Decl. ¶ 17, Ex. 14.) President Kolison's actions revealed that the university's concern was not—as it pretends—concern for Kershnar's safety, but was instead President Kolison's irrational belief that because Kershnar raised a moral question, he must be immoral himself. Yet people regularly offer ideas not to advance their own interests, but because they find the question worth exploring. That's *the purpose* of philosophy professors and a reasonable university president would recognize as much.

Shorn of the public safety pretext, what's left? Only President Kolison's disdain for Kershnar's views. Yet both the public safety fig leaf and President Kolison's opposition are two sides of the same coin: viewpoint discrimination.

## II.    Kershnar Is Likely to Succeed on His Retaliation Claim.

Kershnar can show First Amendment retaliation on his second cause of action, for retaliation, because "[1] he has engaged in protected [speech], [2] he suffered an

---

[5] In contrast, SUNY Fredonia recently demonstrated how it responds to actual threats. Following an online threat of gun violence, campus police launched an investigation, identified the sender, increased on-campus security, and decided not to cancel classes. Chloe Kowalyk, *The threats made on Thompson Hall: One semester later*, THE LEADER (May 3, 2023), https://fredonialeader.org/news/2023/05/03/threats-made-on-thompson-hall [perma.cc/9QWQ-MQ4Q].

adverse employment action, and [3] there was a causal connection" between his speech and the action. *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015).

### A. Defendants' adverse responses to Kershnar's protected expression exceed those taken in *Levin*.

Because Defendants' responses surpass the unconstitutional steps taken in *Levin*, they are adverse employment actions—that is, any action sufficient to "deter a similarly situated individual of ordinary firmness from exercising" constitutional rights. *Specht v. City of N.Y.*, 15 F.4th 594, 604 (2d Cir. 2021).

Defendants' actions here exceed *Levin* in several respects. First, the philosophy professor in *Levin* was permitted to continue teaching, and administrators' actions to *encourage* the dilution of his class size by offering "shadow" classes was the "antithesis of freedom of expression." *Levin*, 966 F.2d at 88. President Kolison and Provost Starrett, in contrast, have reduced Kershnar's class size to *zero*.

Second, like the president in *Levin*, Kolison publicly denounced Kershnar and announced an investigation into his extramural speech, invoking possible disciplinary sanctions. *See Levin*, 966 F.2d at 89. And, as in *Levin*, President Kolison disregarded "admonitory letters" raising concerns about free expression. *Id.*; (Steinbaugh Decl. ¶¶ 21–24, Exs. 20–23.) But here, President Kolison and Provost Starrett have gone even further. They publicly removed Kershnar from campus (a step never taken in *Levin*) and directed law-enforcement officers to carry out their investigation by searching his office and his computer, raising the specter of *criminal* consequences for his speech. Third, while the *Levin* investigation ultimately

concluded in the professor's favor after a ten-month investigation, SUNY Fredonia's alleged investigation has carried on for sixteen months.[6]

### B. Kolison's immediate denunciation of Kershnar shows causation.

Kershnar can demonstrate a causal connection between his speech and the adverse action. The causal connection may be established "either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith*, 776 F.3d at 118. President Kolison's statements denouncing Kershnar's views show both retaliatory animus and temporal proximity: each statement expressly condemned Kershnar's speech and the first statement was issued within hours of the initial tweets condemning Kershnar.

## III. Kershnar Is Likely to Succeed on His Prior Restraint Claim.

Kershnar is also likely to succeed in his third cause of action, challenging Defendants' imposition of a prior restraint on his speech.

For sixteen months, Kershnar has been forbidden from speaking to anyone in the "campus community" without permission of a human resources director. No-contact directives are an obvious form of prior restraint, prohibiting future speech before it occurs. *See, e.g., DeJong v. Pembrook*, No. 3:22-CV-01124-NJR, 2023 U.S. Dist. LEXIS 46763, at *37–39 (S.D. Ill. Mar. 20, 2023) ("a no-contact directive can qualify as a prior restraint"); *Satter v. Wash. State Dep't of Ecology*, No. C09-5645 BHS, 2010 U.S. Dist. LEXIS 57062, at *15 (W.D. Wash. June 8, 2010) (directive to

---

[6] The *Levin* investigation began in March 1990 and concluded in February 1991. *Levin*, 966 F.2d at 89; *Levin v. Harleston*, 770 F. Supp. 895, 912 (S.D.N.Y. 1991).

not contact any other employee "constitutes a prior restraint of possible matters of public concern").

Prior restraints are "the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). The gravity of harm posed by prior restraints is such that the "chief purpose" of the First Amendment was to prevent their use. *Near v. Minnesota*, 283 U.S. 697, 713 (1931). The weighty concerns implicated by prior restraints "may be considered as factors in balancing the relevant interests under *Pickering*" as applied to limits on employee speech. *Harman v. City of N.Y.*, 140 F.3d 111, 118 (2d Cir. 1998).

Defendants' limit on Kershnar's speech is broad. Because it is not limited by subject matter, it reaches *all* speech on matters of public concern. And the potential audience is large, including thousands of faculty, students, or staff—or anyone else President Kolison might in retrospect deem member of the "community." Because Fredonia is a college town, the directive limits Kershnar's speech not just in his workplace, but to members of his residential community—including people he may not *know* to be faculty, staff, students, or other members of the "campus community."

The breadth of this restraint has meaningful adverse effects on Kershnar. The president of his institution repeatedly denounced him in statements to the very community Kershnar is forbidden from contacting. (Steinbaugh Decl. ¶¶ 16–17, Exs. 13–14.) His colleagues have debated his comments, yet Kershnar cannot respond. (Verif. Compl. ¶¶ 170–71.) No legitimate purpose is served by a restriction of this scope.

24

## IV.    The Remaining Factors All Favor Injunctive Relief.

Each of the remaining considerations favor injunctive relief. First, injunctive relief serves the public interest. On top of the weighty public interest in academic freedom, safety concerns can be addressed through narrower measures. "No public interest is served" through unconstitutional measures "when constitutional alternatives are available to achieve the same goal." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020). Second, Kershnar is not asking this court to compel a university to offer courses it does not want to offer, nor displace another instructor. He seeks only eligibility to resume his normal teaching duties.

## <u>CONCLUSION</u>

Plaintiff's motion should be granted. Academic freedom and freedom of expression require the ability to offer unpopular views without fear of censorship.

Dated: June 12, 2023                    Respectfully submitted,

                                        /s/ Barry N. Covert
Adam B. Steinbaugh*                     Barry N. Covert, Esq.
CA Bar No. 304829                       LIPSITZ GREEN SCIME CAMBRIA LLP
FOUNDATION FOR INDIVIDUAL               42 Delaware Avenue – Suite 120
RIGHTS & EXPRESSION                     Buffalo, New York 14202
510 Walnut St.; Ste. 1250               Phone: (716) 849-1333
Philadelphia, PA 19106                  Email: bcovert@lglaw.com
Tel:    (215) 717-3473
Email:  adam@thefire.org


Joshua T. Bleisch*                      * Motions for admission
IN Bar No. 35859-53                     *pro hac vice* admission forthcoming.
FOUNDATION FOR INDIVIDUAL
RIGHTS & EXPRESSION                     *Counsel for Plaintiff*
700 Pennsylvania Ave. SE; Ste. 340
Washington, DC 20003
Tel:    (215) 717-3473
Email:  josh.bleisch@thefire.org