*Kershnar v. Kolison*
Motion for Preliminary Injunction

Decl. Adam Steinbaugh

# EXHIBIT 2



# AGREEMENT

*between the*

# STATE
# OF NEW YORK

*and*

# UNITED
# UNIVERSITY
# PROFESSIONS

*July 2, 2016 – July 1, 2022*

# TABLE OF CONTENTS

**ARTICLE NUMBER**                                                                                                              **Page**

1   Recognition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
2   Unchallenged Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
3   Exclusive Negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
4   Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
5   Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
6   Benefits Preserved . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
7   Grievance Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
    7.1   Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
    7.2   Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
    7.3   Requirements for Filing Grievances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
    7.4   Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8
    7.5   Procedures for Processing Grievances and Grievance Appeals . . . . . . . . . . . . . . . .8
    7.6   Procedures Applicable to Grievance Steps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
    7.7   Procedures Applicable to Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
    7.8   Miscellaneous Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
    7.9   Applicability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
8   Labor-Management Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
9   Academic Freedom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12
10   No Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
11   Employee Organization Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
    11.1   UUP Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
    11.2   Grievances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
    11.3   Negotiations with the State . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
    11.4   Labor-Management Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
    11.5   Leaves for Union Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
    11.6   Leaves for Chapter Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
    11.7   General Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
12   College Meeting Space . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
13   Bulletin Boards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
14   Mail Distribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
15   Payroll Deduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15
16   Lists . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
17   Information and Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
18   Board of Trustees' Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
19   Discipline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
    19.1   Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
    19.2   Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
    19.3   Applicability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18
    19.4   Disciplinary Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18
    19.5   Settlements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
    19.6   Effect of Settlement and Arbitrator's Award . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
    19.7   Suspension Before Notice of Discipline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19
    19.8   Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

**ARTICLE NUMBER** **Page**

|  |  |  |
|---|---|---|
| 19.9 | Limitation | 21 |
| 19.10 | Resignation in Lieu of Notice of Discipline | 21 |
| 19.11 | Miscellaneous Provisions | 22 |
| 20 | Direct Compensation | 22 |
| 21 | Statewide Joint Labor-Management Committees | 33 |
| 22 | Travel Allowances and Relocation Expenses | 34 |
| 22.1 | Per Diem, Meal and Lodging Expenses | 34 |
| 22.2 | Mileage Allowance | 34 |
| 22.3 | Relocation Expenses | 34 |
| 23 | Leaves | 34 |
| 23.1 | Definitions | 34 |
| 23.2 | Vacation Leave: Calendar Year Employees and College Year Employees | 35 |
| 23.3 | Vacation Leave: Academic Year Employees | 37 |
| 23.4 | Sick Leave | 37 |
| 23.5 | Holiday Leave | 40 |
| 23.6 | Sabbatical Leave | 41 |
| 23.7a. | Other Leaves for Academic Employees | 42 |
| 23.7b. | Leaves of Absence for Professional Employees | 42 |
| 23.8 | Disability Leave | 42 |
| 23.9 | Attendance Records | 43 |
| 23.10 | Unauthorized Absence | 44 |
| 23.11 | Absence—Extraordinary Circumstances | 44 |
| 23.12 | Limitations Term Appointments | 44 |
| 23.13 | Seven-Month Child Care Leave | 44 |
| 23.14 | Paid Family Leave Benefits Law | 44 |
| 24 | Access to Employees | 45 |
| 25 | Compensation of Department Chairpersons | 45 |
| 26 | Jury Service | 46 |
| 27 | Professional Meetings | 46 |
| 28 | Medical Assistance | 46 |
| 29 | Clinical Practice | 46 |
| 30 | Appointment, Evaluation and Promotion | 46 |
| 31 | Personnel Files | 47 |
| 32 | Notice of Non-Renewal | 48 |
| 33 | Job Security Review Procedures | 49 |
| 33.1 | Definitions | 49 |
| 33.2 | Request for Reasons | 49 |
| 33.3 | Response of College President | 49 |
| 33.4 | Procedure for Review | 50 |
| 33.5 | College Panel | 51 |
| 34 | Transfer Rights | 52 |
| 35 | Retrenchment | 53 |
| 36 | Contracting Out | 58 |
| 37 | Retirement Income Supplementation Programs | 59 |
| 38 | Parking | 59 |

**ARTICLE NUMBER**                                                                                **Page**

39   Health Insurance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .59
      39.1    Premium Contributions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .59
      39.2    Benefits Management Program  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .61
      39.3    Hospital Coverage—Network  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .62
      39.4    Hospital Coverage—Non Network  . . . . . . . . . . . . . . . . . . . . . . . . . .62
      39.5    Medical Coverage—Participating Provider  . . . . . . . . . . . . . . . . . . .63
      39.6    Medical Coverage—Basic Medical  . . . . . . . . . . . . . . . . . . . . . . . . . .64
      39.7    Centers of Excellence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .66
      39.8    Home Care Advocacy Program  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .66
      39.9    Eligibility  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .67
      39.10   Retiree/Dependents Coverage  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .68
      39.11   Mental Health and Substance Abuse Treatment Services  . . . . . . .69
      39.12   Prescription Drug Coverage  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .70
      39.13   Medical Flexible Spending Accounts  . . . . . . . . . . . . . . . . . . . . . . . .71
      39.14   UUP Empire Plan Enhancements  . . . . . . . . . . . . . . . . . . . . . . . . . . .71
40   UUP Benefit Trust Fund  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .71
41   Joint Committee on Health Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .72
42   Professional Development Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .74
43   Safety and Health Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .74
44   This Article Intentionally Left Blank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .74
45   Campus Grants Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .74
46   Work-Life Services Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .75
47   This Article Intentionally Left Blank  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .75
48   Housing and Meal Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .75
49   Program for Tuition Assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .76
50   Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .76
51   Savings Clause  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .76
52   Management Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .77
53   Conclusion of Collective Negotiations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .77
54   Legislative Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .77
55   Duration  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .77


**APPENDICES**                                                                                     **Page**

Appendix A-1      Reopening Negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .79
Appendix A-2      Employees' Addresses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .79
Appendix A-3      Parking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .79
Appendix A-4      Consultation re: Article XI  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .80
Appendix A-5      Clery Act and Title IX Reporting Obligations . . . . . . . . . . . . . . . . . .80
Appendix A-6      Retrenchment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .81
Appendix A-7      Step 3 Grievances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .82
Appendix A-8      Information and Data from SUNY . . . . . . . . . . . . . . . . . . . . . . . . . . .82
Appendix A-9      Clinical Practice Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .82
Appendix A-10     Clinical Practice Negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83
Appendix A-11     Grievances Concerning Health Benefits Eligibility . . . . . . . . . . . . . .83
Appendix A-12     Academic Review Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83

**APPENDICES**                                                                            **Page**

Appendix A-13    Executive Level Review of Online Education  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84
Appendix A-14    Categories of Similar Colleges  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .84
Appendix A-15    Day After Thanksgiving . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .85
Appendix A-16    Recall Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .85
Appendix A-17    Health Benefits Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .88
Appendix A-18    Reference Compendium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .88
Appendix A-19    Research Associates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .89
Appendix A-20    Parking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .89
Appendix A-21    Travel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .90
Appendix A-22    Reallocation of Joint Committee Funds  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .90
Appendix A-23    Copyright . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .90
Appendix A-24    Union Access to E-mail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .91
Appendix A-25    Domestic Partner Health Insurance Eligibility  . . . . . . . . . . . . . . . . . . . . . . . . . . . .92
Appendix A-26    Productivity Enhancement Program  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .92
Appendix A-27    Memorandum of Understanding on Contracting Out  . . . . . . . . . . . . . . . . . . . . . .94
Appendix A-28    Memoranda of Understanding Relating to Evaluation
                 and Promotion for Professional Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . .106
Appendix A-29    Compensatory Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .114
Appendix A-30    Part-Time Academic Issues  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .115
Appendix A-31    Executive Level Review of Salary Issues  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .116
Appendix A-32    Executive Level Review of Professional Issues  . . . . . . . . . . . . . . . . . . . . . . . . . .116
Appendix A-33    Designation of Essential Employees in Weather or Other Emergencies . . . . . . .116
Appendix A-34    Executive Level Review of Dedicated Recognition Devices . . . . . . . . . . . . . . . .117
Appendix A-35    Personnel Files—Notice of Interrogation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .117
Appendix A-36    Counseling Memoranda . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .118
Appendix A-37    Executive Level Review of SUNY Hospital Structure  . . . . . . . . . . . . . . . . . . . . .118
Appendix A-38    Part-Time Leave Accrual Computation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .118
Appendix A-39    Clinical Practice Plan Audits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .119
Appendix A-40    Memorandum of Understanding on Clinical Practice Centralized Billing  . . . . . . .119
Appendix A-41    Development of Guidelines and Methodology for Salary Equity Study . . . . . . .120
Appendix A-42    Family Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .121
Appendix A-43    Offsets for Back Salary Arbitration Awards . . . . . . . . . . . . . . . . . . . . . . . . . . . . .125
Appendix A-44    Pre-Tax Transportation Program  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .125
Appendix A-45    Leave Donation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .126
Appendix A-46    Voluntary Reduction in Work Schedule (VRWS) Program . . . . . . . . . . . . . . . . . .128
Appendix A-47    Executive Level Review of Part-Time Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . .133
Appendix A-48    Executive Level Review of Librarian Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . .133
Appendix A-49    Labor-Management Funds Extension . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .134
Appendix A-50    Work-Life Services Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .134
Appendix A-51    Parking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .135
Appendix A-52    Pre-tax Adoption Assistance Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .135
Appendix A-53    Hospital Scheduling  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .136

Appendix B-1     Seasonal/Temporary Part-Time Lifeguard Employees . . . . . . . . . . . . . . . . . . . .137
Appendix B-2     Annual Salaried Lifeguard Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .140

# STATE UNIVERSITY
# PROFESSIONAL SERVICES NEGOTIATING UNIT
# AGREEMENT

Agreement made by and between the Executive Branch of the State of New York ("State") and United University Professions ("UUP").

## ARTICLE 1
### Recognition

The State, pursuant to the certification of the Public Employment Relations Board, recognizes UUP as the exclusive representative for collective negotiations with respect to salaries, wages, hours and other terms and conditions of employment of employees serving in positions in the State University Professional Services Negotiating Unit.

## ARTICLE 2
### Unchallenged Representation

The State and UUP agree, pursuant to Section 208 of the Civil Service Law, that UUP shall have unchallenged representation status for the maximum period permitted by law.

## ARTICLE 3
### Exclusive Negotiations

The State will not negotiate under the Public Employees' Fair Employment Act with any other employee organization concerning the terms and conditions of employment of employees in the State University Professional Services Negotiating Unit.

## ARTICLE 4
### Definitions

§4.1 "Academic employee" shall mean an employee serving in a position of academic rank or qualified academic rank.

§4.2 "Academic year employee," when used in Article 23, shall mean any employee having an academic year professional obligation.

§4.3 "Calendar year employee," when used in Article 23, shall mean any employee having a 12-month professional obligation.

§4.4 "Chancellor" shall mean Chancellor of the State University of New York.

§4.5 "College" shall mean a State-operated institution of the State University of New York. The central office of the University shall be deemed a "College."

§4.6 "College President" shall mean the chief administrative officer of a College, whether called a president, dean, provost, director or otherwise.

§4.7 "College year employee," when used in Article 23, shall mean any professional employee, or any academic employee holding a librarian title, having an annual professional obligation of less than 12 months, except an academic employee holding a librarian title having an academic year professional obligation.

§4.8 "Days," when used in Article 19, shall mean working days, Monday through Friday, excluding holidays.

§4.9 "Designee," when used in conjunction with the terms "Chancellor," "Director of the Governor's Office of Employee Relations," "College President," or "UUP President," shall mean an individual designated to act on behalf of that official.

§4.10 "Discipline," when used in Article 19, shall be defined as the imposition of a penalty by means of

the procedure specified in Section 19.4.

§4.11 "Employee" shall mean a person serving in a position in the State University Professional Services Negotiating Unit; provided, however, when used in Article 40 shall mean any person holding a position in this negotiating unit who is eligible for enrollment in the New York State Health Insurance Program in accordance with the provisions contained in Part 73 of the Rules and Regulations of the Department of Civil Service (4 NYCRR Part 73).

§4.12 "Grievance," when used in Article 7, shall mean a dispute concerning the interpretation, application or claimed violation of a specific term or provision of this Agreement; provided, however, that with respect to matters involving appointment, evaluation and promotion of employees a grievance shall be deemed to mean a claimed failure by the State to follow the procedural steps relating to appointment, evaluation and promotion of employees contained in the Policies of the Board of Trustees in Article XI, Title A, Section 1; Article XI, Title D, Section 5; Article XII, Title A, Section 3; Article XII, Title B, Section 1; and Article XII, Title C, Sections 3 and 4.

§4.13 "Party," when used in Article 19, shall mean the State and either the employee upon whom discipline is sought to be imposed, or the employee's representative, selected pursuant to Section 19.8 of this Article.

§4.14 "Pass Day" shall mean a day on which an employee who normally works on a schedule other than Monday through Friday is not usually required to work.

§4.15 "Policies" shall mean the Policies of the Board of Trustees of the University.

§4.16 "Professional" or "professional employee" shall mean an employee other than an academic employee.

§4.17 "Professional staff" shall mean all persons occupying positions designated by the Chancellor as being in the unclassified service.

§4.18 "Retrenchment," when used in Article 35, shall mean the termination of the employment of any academic or professional employee during any appointment, other than a temporary appointment which may be terminated at any time, as a result of financial exigency, reallocation of resources, reorganization of degree or curriculum offerings or requirements,
reorganization of academic or administrative structures, programs or functions or curtailment of one or more programs or functions University-wide or at such level of organization of the University as a College, department, unit, program or such other level of organization of the University as the Chancellor, or designee, deems appropriate.

§4.19 "Service," when used in Article 19, shall mean the act of delivering, in accordance with provisions of that Article, a notice of discipline. Service shall be effective three days from the time of personal service or, in the event of mailing, which shall be by certified or registered mail, return receipt requested, three days from the date the employee or any other person accepting delivery has signed the return receipt or the date the notice is returned to the College President, or designee, undelivered.

§4.20 "State" shall mean the Executive Branch of the State of New York.

§4.21 "United University Professions" ("UUP") shall mean the union designated as Local 2190 of the American Federation of Teachers (AFL-CIO) and affiliated with the New York State United Teachers and the National Education Association. Where notification to UUP is provided for in this Agreement, "UUP" shall mean the central administrative office of the Union.

§4.22 "UUP Chapter" shall mean the members of UUP at a College and their representatives, provided, however, that the membership at the Health Science Centers at Stony Brook and Buffalo shall continue to be recognized as separate "Chapters."

§4.23 "UUP President" shall mean the chief administrative officer of UUP, as elected under the provisions of the Constitution of UUP.

§4.24 "University" shall mean the State University of New York.

§4.25 "Working days," when used in Article 7 and Section 23.10, shall mean Monday through Friday, excluding holidays.

## ARTICLE 5
### Policies

In the event of any inconsistency or conflict between provisions of this Agreement and the Policies or College by-laws, the provisions of this Agreement shall apply.

## ARTICLE 6
### Benefits Preserved

With respect to matters not covered by this Agreement, the State will not seek to diminish or impair during the term of this Agreement any benefit or privilege provided by law, rule or regulation for employees without prior notice to UUP, and when appropriate, without negotiations with UUP. Negotiations as used in this Section shall not be deemed a reopener to which Section 209 of the Civil Service Law shall be applicable.

## ARTICLE 7
### Grievance Procedure

§7.1 Purpose

The purpose of this Article is to provide a prompt and efficient procedure for the investigation and resolution of grievances. The orderly process hereinafter set forth shall be the sole method for the resolution of grievances. Previously existing grievance resolution programs shall be discontinued absent mutual agreement to the contrary at the local level. Programs continued may be discontinued by either party at any time.

§7.2 Definition

a. A grievance is a dispute concerning the interpretation, application or claimed violation of a specific term or provision of this Agreement; provided, however, that with respect to matters involving appointment, evaluation and promotion of employees a grievance shall be deemed to mean a claimed failure by the State to follow the procedural steps relating to appointment, evaluation and promotion of employees contained in the Policies of the Board of Trustees in Article XI, Title A, Section 1; Article XI, Title D, Section 5; Article XII, Title A, Section 3; Article XII, Title B, Section 1; and Article XII, Title C, Sections 3 and 4. With regard to the latter, the specific procedural steps are as follows:

i. the following subdivisions shall not apply where the employee is serving a final year in the University following notice of non-renewal.

ii. each employee shall have his or her performance evaluated by the employee's immediate supervisor formally, in writing, once each year during the term of appointment and as changing conditions warrant.

iii. the written performance evaluation referred to in subdivision ii above shall be based on a performance program determined by the immediate supervisor after consultation with the employee, a copy of which shall be given to the employee.

iv. in the written performance evaluation referred to in subdivision ii above, performance shall be characterized, in summary, as either satisfactory or unsatisfactory. A professional employee whose performance is characterized as "unsatisfactory

in a written report resulting from a formal evaluation may seek review of such report by the appropriate professional staff committee established for such purpose.

b. A grievance shall also be a claimed failure by the State to follow the procedural steps contained in the Memorandum of Understanding on Contracting Out; however, review of such grievances shall end at Step 3 and shall not proceed to arbitration.

c. A claim of unjust discipline shall be processed in accordance with Article 19, Discipline, of this Agree-

ment and shall not be subject to the grievance procedure contained in this Article. However, a claim that the procedures of Article 19, Discipline, have been violated, except for issues of timeliness arising under that Article, shall be processed in accordance with the grievance procedure contained in this Article. Such claim may be filed initially at Step 2. Where it is determined that the procedures of Article 19, Discipline, have been violated and where a College President, or designee, elects to proceed with disciplinary action, such action must be initiated within 10 working days from the date of receipt of the determination.

§7.3 Requirements for Filing Grievances

a. A grievance must be submitted in writing on forms to be provided by the State.

b. Each grievance shall identify the specific term or provision of the Agreement claimed to have been violated and shall contain a short, plain statement of the grievance, the facts surrounding it and the remedy sought.

c. A grievance appeal shall be regarded as filed even if copies of the appeal are not simultaneously sent to the College President, or designee, and the Chancellor, or designee, as required by grievance Steps 2, 3 and 4 of this Article. However, no grievance shall be reviewed unless all of the information required by the grievance form or otherwise required by grievance steps of this Article has been provided.

§7.4 Representation

a. UUP shall have the exclusive right to represent any employee, upon the employee's request, at any step of this grievance procedure; provided, however, that individual employees may, upon notice to UUP, initiate and represent themselves in processing their own individual grievances at Step 1; provided further, however, no resolution of an individually processed grievance shall be inconsistent with this Agreement and for this purpose UUP shall receive prior notice and a reasonable opportunity to be heard on the resolution of any grievance so processed at Step 1.

b. UUP shall have the right, but not the obligation, to initiate at Step 2 a grievance which directly involves employees at more than one campus.

c. UUP shall have the right, but not the obligation, to initiate at Step 1 a grievance which directly involves multiple employees at a single campus. The Step 1 Grievance form must identify by name all aggrieved employees and shall be submitted with the signature of the Statewide President of UUP as the signature of the aggrieved employee.

§7.5 Procedures for Processing Grievances and Grievance Appeals

a. Step 1. A grievance shall be filed by an employee, or UUP upon an employee's request, with the College President, or designee, within 45 calendar days following the act or omission giving rise thereto, or within 45 calendar days of the date on which the employee first knew or reasonably should have known of such act or omission if that date is later. The employee's selection of a representative as indicated on the Contract Grievance Form when filed is final and not subject to change. Where practicable, the grievant may be required to meet with the department or division chairperson, dean or other appropriate administrator with a representative of the employee's choice in an effort to resolve the grievance informally. The College President, or designee, shall schedule a meeting within 10 calendar days after receipt of the grievance and shall issue a written response to the grievant and UUP within 10 working days after the meeting.

b. Step 2.

1. If the response at Step 1 does not resolve the grievance, UUP, upon grievant's request, may appeal the Step 1 response by filing an appeal with the Chancellor, or designee, within 10 working days after receipt of the Step 1 response. Such appeal shall be in writing and shall include a copy of the grievance filed at Step 1, a copy of the Step 1 response and a short, plain statement of the reasons for disagreement with the Step 1 response. A copy of the appeal shall be sent simultaneously to the College President, or designee. The Chancellor, or designee, shall issue a written response to the grievant and UUP within 20 working days after receipt of the appeal, unless the appeal to Step 2 contains a request for a meeting with

the Chancellor, or designee. If such meeting has been requested, the Chancellor, or designee, shall schedule a meeting with UUP and the grievant within 10 calendar days after receipt of the appeal. The Step 2 response shall be issued within 20 working days after the meeting.

2. A grievance involving a claim that the procedures of Article 19, Discipline, have been violated, except for issues of timeliness arising under that Article, may be filed initially at Step 2 by UUP, upon grievant's request. Such grievance shall meet the requirements specified in Section 7.3, Requirements for Filing Grievances, of this Article. Such grievances shall be filed within 45 calendar days following the act or omission giving rise thereto, or within 45 calendar days of the date on which the employee first knew or reasonably should have known of such act or omission if that date is later. A copy of the appeal shall be sent simultaneously to the College President, or designee. The Chancellor, or designee, shall schedule a review with UUP and the grievant within 10 calendar days after receipt of the grievance and shall issue a written response within 20 working days after the meeting.

3. A grievance involving employees at more than one College may be filed by UUP initially at Step 2. In such case, UUP shall be deemed to be the grievant. Such grievance shall meet the requirements specified in Section 7.3, Requirements for Filing Grievances, of this Article. The time limit for filing such grievance shall be as specified in Step 1. A copy of the appeal shall be sent simultaneously to the College President, or designee. The Chancellor, or designee, shall issue a written response to UUP within 20 working days after receipt of the grievance unless the grievance contains a request for a meeting with the Chancellor, or designee. If such meeting has been requested by UUP, the Chancellor, or designee, shall schedule a meeting with UUP within 10 calendar days after receipt of the grievance and shall issue a response within 20 working days after completion of the meeting.

c. Step 3. If the response at Step 2 does not resolve the grievance, UUP, upon grievant's request, through its President, or designee, may appeal the Step 2 response by filing an appeal with the Director of the Governor's Office of Employee Relations, or designee, within 10 working days after receipt of the Step 2 response. Such appeal shall be in writing and shall include a copy of the grievance filed at Step 1, or Step 2, in the case of grievances filed initially at Step 2; all prior responses and appeals; and a short, plain statement of the reasons for disagreement with the Step 2 response. A copy of the appeal shall be sent simultaneously to the College President, or designee, and the Chancellor, or designee. The Director of the Governor's Office of Employee Relations, or designee, shall issue a written response to the grievant and UUP within 20 working days after receipt of the Step 3 appeal.

d. Step 4.

1. If the response at Step 3 does not resolve the grievance, UUP, upon grievant's request, through its President, or designee, may proceed to arbitration by filing with the Director of the Governor's Office of Employee Relations, within 10 working days after receipt of the Step 3 response, written notice of intent to proceed to arbitration. A copy of such written notice shall be sent simultaneously to the College President, or designee, and the Chancellor, or designee.

2. Notices of intent to proceed to arbitration must include a proposed statement of the issue to be decided.

§7.6 Procedures Applicable to Grievance Steps

a. Step 1 shall be informal but the grievant, and the grievant's representative upon grievant's request, shall meet with the College President, or designee, for the purpose of discussing the grievance.

b. Steps 2 and 3 are intended primarily to be reviews of the existing grievance file; however, additional evidence may be submitted. If a meeting at Step 2 has not been requested or if a meeting at Step 3 has not been scheduled, any additional evidence at such steps must be submitted in writing. If meetings at Steps 2 and 3 have been scheduled, any additional evidence may be submitted at such meetings in writing or by means of testimony. Presence of grievants at such meetings may be waived by mutual agreement of the parties.

c. Notwithstanding any other provision of this Article, neither the grievant nor UUP, as grievant's repre-

sentative, shall be permitted to allege violations other than those specified in writing in the grievance filed at Step 1 or initially filed at Step 2.

d. A grievance may be withdrawn at any time by the grievant or UUP as grievant's representative.

§7.7 Procedures Applicable to Arbitration

a. Selection of Arbitrators

The State and UUP shall jointly agree as soon as feasible after the execution of this Agreement on a panel of at least ten (10) contract arbitrators. Each party shall rank the next five members of the panel in rotation and the member with the highest ranking shall serve as the arbitrator. In the event of a tie, selection shall be by lot. The State agrees to take the necessary steps to administer the panel including, but not limited to, identifying arbitrators' availability, notifying them of their appointment and assisting in arranging for hearing rooms.

b. Authority of the Arbitrator

1. The arbitrator shall neither add to, subtract from, nor modify the terms or provisions of this Agreement or the procedural steps of the Policies specified in Section 7.2, Definition, of this Article. The arbitrator shall confine the decision and award solely to the application and/or interpretation of this Agreement or whether such procedural steps of the Policies have been followed. Where provisions of this Agreement or the procedural steps of the Policies referred to in this paragraph call for the exercise of judgment, the arbitrator shall not substitute the arbitrator's judgment for that of the official making such judgment, but shall be confined to a determination as to whether this Agreement or such procedural steps of the Policies have been followed. If the arbitrator determines that this Agreement or the procedural steps of the Policies referred to in this paragraph have not been followed, the arbitrator may fashion an appropriate remedy. In matters involving appointment or reappointment, if the arbitrator determines that the failure to follow this Agreement or the procedural steps of the Policies referred to in this paragraph has been significant, the remedy may provide for an appointment not to exceed one year. The arbitrator shall not have the authority to grant a continuing or permanent appointment. Under Article XI of the Policies, continuing or permanent appointment may be granted only by the State University Chancellor. The arbitrator shall not have authority to consider issues arising from the Memorandum of Understanding on Contracting Out or otherwise interpret provisions contained therein.

2. The arbitrator shall be confined to the precise issue submitted for arbitration and shall have no authority to determine any other issue.

c. Arbitrability

In the event a disagreement exists regarding the arbitrability of an issue, the arbitrator shall determine initially whether the issue in dispute is arbitrable under the express terms of this Agreement. At the request of either party, such determination shall be made by a written decision and award. Once the arbitrator has determined that the issue is arbitrable in accordance with provisions of this subdivision, the arbitrator shall proceed to determine the merits of the issue.

d. Time and Place of Meeting

The arbitrator shall hold the hearing in Albany, unless otherwise agreed to by the parties, within 15 working days of the acceptance of the arbitrator's selection or as soon thereafter as is practicable. Two consecutive hearing days shall be scheduled, where practicable. The arbitrator shall issue a decision and award upon an issue within 30 calendar days of the hearing, unless additional time is agreed to by the parties. Copies of the arbitrator's decision and award shall be sent simultaneously to the Governor's Office of Employee Relations, UUP, the Chancellor's designee and the College President.

e. Effect of Decision and Award

The decision and award of the arbitrator shall be final and binding upon the State, UUP and the grievant to the extent permitted by provisions of this Agreement and applicable law.

f. Fees and Expenses

All fees and expenses of the arbitrator shall be divided equally between the parties. Each party shall be responsible for the cost of preparing and presenting its own case.

§7.8 Miscellaneous Provisions

a. Time Limits

All of the time limits contained in this Article may be extended by mutual agreement of the parties. Extensions shall be confirmed in writing by the party requesting the extension. Upon failure of the State or its representatives to provide a response within the time limits provided in this Article, UUP, upon grievant's request, may appeal to the next step. Upon failure of the grievant, or UUP as the grievant's representative, to file a grievance or grievance appeal within the time limits provided in this Article, the grievance shall be deemed to have been withdrawn.

b. Mailing

1. All grievances, grievance appeals and responses shall be transmitted by certified or registered mail, return receipt requested, or by personal service on the grievant or grievant's representative or on the individual responsible for conducting the review. Upon personal service the recipient of such documents, upon request, shall acknowledge, in writing, the receipt thereof. Proof of personal service shall specify the person who was served and the date, place and manner of service.

2. All time limits set forth in this Article shall be measured from the date of receipt. Where service is by registered or certified mail, the date of receipt shall be that date appearing on the return receipt, provided, however, that the time limits for the submission of a grievance or the filing of an appeal or demand for arbitration or issuance of a Step response shall be determined from the date of personal service or mailing by certified or registered mail, return receipt requested, as evidenced by the official postmark appearing on the receipt for certified or registered mail.

c. Precedent

Grievances resolved at either Steps 1, 2, or 3 shall not constitute a precedent in any arbitration proceeding unless agreed to in writing by the Director of the Governor's Office of Employee Relations and UUP, acting through its President.

d. Retroactivity

A settlement of, or an arbitrator's decision and award upon, a grievance may or may not be retroactive as the equities of each case may demand, but in no case shall such resolution be retroactive to a date earlier than 45 calendar days prior to the date the grievance was first filed.

e. "Working days" as used in this Article shall mean Monday through Friday, excluding holidays.

§7.9 Applicability

This Article shall not apply to any matter which relates to College by-laws, policies, operating procedures, or any other form of guideline by whatsoever name, whether pertaining to a unit, department, division, school or any other level of organization of a College and whether appearing in a College handbook or any other document, which are developed by professional staff at a College for the conduct of the affairs of the College or its sublevels of organization.

## ARTICLE 8
### Labor-Management Meetings

§8.1 The purpose of this Article shall be to provide a forum to discuss, consider and attempt to resolve, where appropriate and consistent with the terms of this Agreement, matters of interest to either or both parties identified below.

§8.2 Representatives of the Governor's Office of Employee Relations shall meet with UUP representatives at mutually agreed-upon times to discuss matters of interest raised by either party. If desired by the other party, the party requesting the meeting shall submit a written agenda in advance of the meeting.

§8.3 The Chancellor, or designee, shall meet with UUP representatives twice each semester for the

purpose of discussing matters of interest raised by either party, including those matters necessary to the implementation and administration of this Agreement which are University-wide in nature. A written agenda shall be submitted by UUP to the Chancellor no less than five days before the scheduled date of the meeting. At the discretion of the Chancellor, additional matters for discussion may be placed on the agenda. Nothing contained herein shall prevent the Chancellor, or designee, and UUP representatives from meeting on a less frequent basis upon mutual agreement.

§8.4 College Labor-Management Meetings

a. A College President, or designee, shall meet with local UUP representatives once each month to discuss matters of interest raised by either party, including those matters necessary to the implementation and administration of this Agreement which are local in nature. The College President shall attend these meetings at least once each semester. A written agenda shall be submitted by UUP to the College President ten working days before the scheduled date of the meeting, whenever feasible. In no event shall the agenda be submitted less than five working days before the scheduled date of the meeting. At the discretion of the College President, or designee, additional matters for discussion may be placed on the agenda with five working days' notice to the local UUP chapter, whenever feasible. In no event shall the College President, or designee, place additional matters on the agenda with less than two working days' notice to the local UUP chapter. Nothing contained herein shall prevent the College President, or designee, and local UUP representatives from meeting on a less frequent basis upon mutual agreement.

b. A College President, or designee, shall meet with local UUP representatives once each month to discuss matters of interest pertaining exclusively to part-time employees raised by either party, including those matters necessary to the implementation and administration of this Agreement which are local in nature. A written agenda shall be submitted by UUP to the College President ten working days before the scheduled date of the meeting, whenever feasible. In no event shall the agenda be submitted less than five working days before the scheduled date of the meeting. At the discretion of the College President, or designee, additional matters for discussion may be placed on the agenda with five working days' notice to the local UUP chapter, whenever feasible. In no event shall the College President, or designee, place additional matters on the agenda with less than two working days' notice to the local UUP chapter. Nothing contained herein shall prevent the College President, or designee, and local UUP representatives from meeting on a less frequent basis upon mutual agreement.

§8.5 In addition to the meetings specified in Sections 8.3 and 8.4, UUP and the Chancellor, or designee, may meet at mutually agreed-upon times other than those set forth above if matters of immediate interest to either party arise. If desired by the other party, the party requesting the meeting shall submit a written agenda in advance of the meeting.

# ARTICLE 9
## Academic Freedom

§9.1 It is the policy of the University to maintain and encourage full freedom, within the law, of inquiry, teaching and research. In the exercise of this freedom faculty members may, without limitation, discuss their own subject in the classroom; they may not, however, claim as their right the privilege of discussing in their classroom controversial matter which has no relation to their subject.

§9.2 The principle of academic freedom shall be accompanied by a corresponding principle of responsibility.

§9.3 In their role as citizens, employees have the same freedoms as other citizens. However, in their extramural utterances employees have an obligation to indicate that they are not institutional spokespersons.

## ARTICLE 10
## No Discrimination

§10.1 The State agrees to continue its established policy prohibiting discrimination on the basis of sexual orientation and all forms of illegal discrimination, including but not limited to discrimination with regard to race, creed, color, religion, national origin, sex, age, disability or marital status.

§10.2 UUP agrees to continue its established policy prohibiting discrimination on the basis of sexual orientation and all forms of illegal discrimination, including but not limited to discrimination with regard to race, creed, color, religion, national origin, sex, age, disability or marital status.

§10.3 Neither the State nor UUP shall deliberately discriminate against an employee as a result of the proper exercise of the employee's rights guaranteed by the Public Employees' Fair Employment Act.

§10.4 Claims of discrimination under Sections 10.1 and 10.2 shall, at the election of the employee, be subject to review in accordance with State and Federal procedures established for such purpose, but shall not be subject to review under provisions of Article 7, Grievance Procedure, of this Agreement.

§10.5 Claims of illegal discrimination under Section 10.3 shall be subject to review under either provisions of Article 7, Grievance Procedure, of this Agreement, or provisions of the Public Employees' Fair Employment Act at the election of the employee, but in no event shall the employee be permitted to elect review in both forums.

§10.6 A joint State-UUP Affirmative Action/Diversity Committee shall be established, consisting of four members appointed by the State and four members appointed by UUP, to review and develop recommendations on matters of mutual interest in the areas of equal employment and affirmative action concerning minorities, women, persons with disabilities and persons with military status.

a. Mutually agreed-upon activities of the State-UUP Affirmative Action/Diversity Committee shall be funded pursuant to Section 21.2 of this Agreement.

b. The Affirmative Action/Diversity Committee will make recommendations to the Director of the Governor's Office of Employee Relations and the President of United University Professions concerning the matters enumerated above.

c. Recommendations made by the Committee will not be binding on either the State or UUP, although they may form the basis for future negotiations and/or such agreements as the parties may enter into.


## ARTICLE 11
## Employee Organization Leave

§11.1 UUP Meetings

a. Delegate Assembly—UUP delegates, State employee members of its Executive Board, the Parliamentarian, and chairpersons of its standing committees required by UUP's constitution and by-laws to attend meetings of the Delegate Assembly shall be granted up to three days of employee organization leave per Agreement year, including travel time, for attendance at delegate meetings. Under special circumstances and upon advance request, additional employee organization leave for additional delegate meetings may be granted by the Director of the Governor's Office of Employee Relations.

b. Executive Board—Each State employee member of UUP's Executive Board and the Parliamentarian shall be granted up to eight days of employee organization leave per Agreement year, including travel time, for attendance at Executive Board meetings. An employee who succeeds a member of such Board or succeeds as the Parliamentarian shall be granted the balance of employee organization leave available to such member or the Parliamentarian for the Agreement year for attendance at Board meetings.

c. Standing and Ad Hoc Committees—There shall be available a total of 304 employee organization leave days per Agreement year for use by State employee members of UUP's Standing and Ad Hoc Committees.

d. Empire State College Executive Board—Each State employee member of UUP's Empire State College Executive Board shall be granted up to three days of employee organization leave per Agreement year,

including travel time, for attendance at meetings of the Board. An employee who succeeds a member of such Board shall be granted the balance of the employee organization leave available to such member for the Agreement year for attendance at Board meetings.

§11.2 Grievances

a. UUP Chapter Grievance Chairpersons shall be granted reasonable and necessary employee organization leave, including travel time, for the purpose of processing grievances in accordance with Article 7, Grievance Procedure, and Article 19, Discipline, of this Agreement.

b. Employees who file grievances under Article 7, Grievance Procedure, or Article 19, Discipline, of this Agreement shall be granted reasonable and necessary employee organization leave, including travel time, to attend meetings, reviews or hearings which are scheduled by the State, or its representatives, in accordance with the procedures established in Article 7, Grievance Procedure, and Article 19, Discipline, of this Agreement.

§11.3 Negotiations with the State

A reasonable number of employees serving on UUP's negotiating team shall be granted reasonable and necessary employee organization leave, including travel time, for the purpose of negotiating with representatives of the State.

§11.4 Labor-Management Meetings

A reasonable number of employees shall be granted reasonable and necessary employee organization leave, including travel time, for the purpose of participating in mutually scheduled labor-management meetings pursuant to Article 8 of this Agreement.

§11.5 Leaves for Union Activity

Employees elected or appointed to office in UUP as President, Vice President for Academics, Vice President for Professionals, Secretary-Treasurer and Membership Development Officer and one employee elected to full-time office in an affiliate of UUP may be granted, upon their request, leaves of absence with full salary from their regular positions for the purpose of serving as elected officials in UUP or as an elected official in an affiliate of UUP. In addition, upon UUP's request, leaves of absence from their regular positions may be approved for employees who are performing responsibilities for UUP for up to the equivalent of four full-time positions. UUP shall reimburse the home campus for the cost occasioned by the leave consistent with provisions promulgated by the Department of Audit and Control. These leaves shall be administered in accordance with the provisions of Section 46 of Chapter 283 of the Laws of 1972.

§11.6 Leaves for Chapter Officers

Up to the equivalent of five and one-half full-time positions may be requested by the President of UUP for employees who are elected officials in local UUP chapters. In addition, the balance of leave not utilized by the Membership Development Officer may be utilized for employees who are elected officials in local UUP Chapters as provided herein. The leaves shall be, at a minimum, one-half of a full-time position. UUP shall reimburse the home campus for the costs occasioned by the leave consistent with provisions promulgated by the Department of Audit and Control. These leaves shall be administered in accordance with the provisions of Section 46 of Chapter 283 of the Laws of 1972.

§11.7 General Provisions

a. Employee organization leave shall be leave with pay and without charge to the employee's leave credits.

b. When such activities extend beyond the employee's normal business hours such time shall not be considered as in paid status.

c. For the purpose of determining whether an employee is eligible to receive travel time credit, travel time as used in this Article shall mean actual and necessary time spent in travel during normal business hours only.

d. Requests for employee organization leave shall be made to the College President, or designee, with reasonable advance notice. Employee organization leave for UUP meetings as provided above in Section

14

11.1 shall not be granted unless UUP provides the Director of the Governor's Office of Employee Relations, or designee, wherever practicable, with 20 days' advance notice of the purpose, location, times, and dates for which leave is requested and the names, times, dates and College work locations of employees for whom such leave is requested.

e. UUP shall provide to the Director of the Governor's Office of Employee Relations within 30 days after the execution of this Agreement, and quarterly thereafter, a list of UUP officers, chapter officers, and other employees eligible for employee organization leave pursuant to Sections 11.1, 11.2, 11.3, 11.5 and 11.6 of this Article, together with the College work locations of such employees. Only employees so designated shall be entitled to authorized employee organization leave as required above. UUP shall notify the Director of the Governor's Office of Employee Relations in writing of any additions or deletions of offices, committees or boards and/or employees assigned to those offices, committees or boards.

f. Failure to designate employees in advance for employee organization leave as provided in this Article may result in the forfeiture of employee organization leave for those employees for the desired purpose at the State's discretion.

g. UUP recognizes that use of all employee organization leave shall not unreasonably interfere with a campus's operations. The State recognizes that employee organization leave shall not be unreasonably withheld.

## ARTICLE 12
## College Meeting Space

Where there is appropriate meeting space at a College, it shall be made available to UUP for specific meetings provided that (a) UUP agrees to reimburse the State for any additional expense incurred in the furnishing of such space, (b) request for use of such space is made in advance pursuant to rules of the College concerned, and (c) there is no conflict with prior scheduled uses of such space.

## ARTICLE 13
## Bulletin Boards

§13.1 UUP shall be permitted to post notices of its activities and matters of UUP concern on one bulletin board in each department at a College. Such material shall be signed by a designated official of UUP or its appropriate chapter. No material shall be posted which is derogatory of any person or organization, or which constitutes election campaign material for or against any person, organization, or faction thereof, except that election material relating to internal UUP elections may be posted on such bulletin boards.

§13.2 Any bulletin board material objected to by the State or its representatives as being in violation of this Article shall be promptly removed. Within two working days after such removal, the local UUP chapter president will be provided with a written statement of the reasons. Such removal may be contested pursuant to the grievance procedure contained in Article 7 of this Agreement.

## ARTICLE 14
## Mail Distribution

UUP shall have the right to use intra-College mail distribution services and mailboxes for distribution at a College of addressed UUP printed matter. Methods for implementing this provision at a College shall be consistent with the College's operating needs.

## ARTICLE 15
## Payroll Deduction

§15.1 UUP shall have the exclusive right to the payroll deduction of employee organization membership dues for employees and no other employee organization shall be accorded any such membership dues

payroll deduction privilege.

§15.2 The State shall prepare, secure introduction and recommend passage by the Legislature of such legislation as may be appropriate and necessary to provide to UUP exclusive payroll deduction for employees who elect to participate in the UUP program known as VOTE-COPE, consistent with Section 201(a) of the Finance Law.

§15.3 UUP shall have exclusive payroll deductions of membership dues and premiums for group insurance and mass-merchandised automobile and homeowners' and other insurance policies offered by UUP for employees, and no other employee organization shall be accorded any such payroll deduction privilege.

## ARTICLE 16
### Lists

§16.1 a. The State shall provide UUP, on a quarterly basis, with two lists of employees in the State University Professional Services Negotiating Unit which shall include employees' names, addresses of record, institutions, departments, line numbers, titles, professional ranks, salaries, appointment type, continuing/permanent appointment effective date, obligation code, term duration and retirement system participation. Where available, an employee's date of initial appointment and current type of appointment, e.g., term, permanent, continuing, temporary, will also be provided.

b. The State shall provide UUP, on a bi-annual basis, with a list which shall not personally identify employees in the State University Professional Services Negotiating Unit but which shall include sex, race, year of birth, institution, department and salary.

§16.2 The State shall include UUP on its mailing lists for distributions to all employees on a University-wide or College-wide basis. The College President, or designee, shall include UUP and its UUP Chapter on the mailing list for distributions to all employees on a College-wide basis and on the list for telephone book distribution. UUP shall include the State, the Chancellor, or designee, and the College Presidents on its mailing lists for distributions to employees. A UUP Chapter shall include the College President on its mailing list for distributions to all employees on a college-wide basis. Each party shall designate its address or addresses for these purposes.

§16.3 UUP shall provide the State, on a bi-annual basis, with a list of the names, College work locations, UUP titles and University titles of each of its statewide and chapter officers, Executive Board members, Delegate Assembly members, Standing Committee members and Chapter Grievance Chairpersons. As UUP Ad Hoc Committees are established, UUP shall also provide the State with the information described herein relative to Ad Hoc Committee members.

§16.4 a. At the beginning of each semester, each College shall provide UUP the names of employees who were separated from the State University Professional Services Negotiating Unit at the College during the previous semester, and a list of new employees at the College, which list shall contain the information described in Section 16.1.

b. Every pay period, the State shall provide UUP with the names of employees in the State University Professional Services Negotiating Unit who have commenced leaves of absence without pay or returned from such leaves.

## ARTICLE 17
### Information and Data

§17.1 The State shall make available to UUP, upon its reasonable request and within a reasonable time thereafter, such statistics and financial information related to the collective negotiating unit and in the possession of the State as are necessary for the preparation for collective negotiations and the processing of grievances. It is understood that this shall not be construed to require the State to compile information and statistics in any specific form unless mutually agreeable.

§17.2 Each employee shall be responsible for providing the College President, or a designee, with the employee's current home address and telephone number and for keeping such information current. Such information shall be maintained for official College use only.

## ARTICLE 18
### Board of Trustees' Meetings

§18.1 Chancellor, or designee, will furnish UUP with copies of all proposed changes in Policies affecting terms and conditions of employment prior to action thereon by the Board.

§18.2 The Chancellor, or designee, will furnish UUP with a copy of the tentative advance agenda of each meeting of the Board at the same time it is made available to the members of the Board. Additionally, following approval by the Board of Trustees of the minutes of its meetings, the Chancellor, or designee, will furnish UUP with a copy of those minutes the Board makes public.

§18.3 UUP may request to meet with the Chancellor, or designee, in order to discuss matters described in Section 18.1 which appear on the Board's agenda. Such discussion shall take place prior to the Board meeting. The Chancellor will recommend, where the Chancellor believes it to be appropriate, that the Board or its representatives meet with UUP for the purpose of discussing such issues. This shall not preclude UUP from directly requesting a meeting with the Board of Trustees or its appropriate committee.

§18.4 The Board of Trustees of the University shall have the right in its judgment to change its Policies from time to time hereafter, after consultation pursuant to this Article. Nothing contained in this Agreement or actions pursuant thereto shall be deemed a waiver by the State or UUP of their right to assert, at any time thereafter, that the subjects of the Policies may or may not be appropriate subjects of collective negotiations.

## ARTICLE 19
### Discipline

§19.1 Purpose

The purpose of this Article is to provide a prompt, equitable and efficient procedure for the imposition of discipline for just cause. Both parties to this Agreement recognize the importance of counseling and the principle of corrective discipline. Prior to initiating formal disciplinary action pursuant to this Article, the College President, or designee, is encouraged to resolve matters of discipline informally; provided, however, such informal action shall not be construed to be a part of the disciplinary procedure contained in this Article and shall not restrict the right of the College President, or designee, to consult with or otherwise counsel employees regarding their conduct or to initiate disciplinary action.

§19.2 Definitions

a. "Discipline" shall be defined as the imposition of a penalty by means of the procedure specified in Section 19.4.

b. "Days" shall mean working days, Monday through Friday, excluding holidays.

c. "Service" shall mean the act of delivering, in accordance with provisions of this Article, a notice of discipline. For purposes of determining time limits for the service of a notice of discipline, service shall be effective on the date of personal service or mailing by certified or registered mail, return receipt requested, as evidenced by the official postmark appearing on the receipt for certified or registered mail. For purposes of determining time limits for the filing of a disciplinary grievance, service shall be effective three days from the time of personal service or, in the event of mailing, which shall be by certified or registered mail, return receipt requested, three days from the date the employee or any other person accepting delivery has signed the return receipt or the date the notice is returned to the College President, or designee, undelivered.

d. "Party" shall mean the State and either the employee upon whom discipline is sought to be imposed

17

or the employee's representative selected pursuant to Section 19.8 of this Article.

§19.3 Applicability

Discipline shall be imposed upon employees only pursuant to this Article; provided, however, that provisions of this Article shall not apply to the termination of employees serving on temporary or probationary appointments, which may be terminated at any time in accordance with provisions of Article XI of the Policies, and provided further that provisions of this Article shall not apply to non-renewal of term appointments pursuant to Article XI of the Policies, terminations of employees due to mental or physical incapacity pursuant to Article XV of the Policies or terminations of employees pursuant to Article 35, Retrenchment, of this Agreement.

§19.4 Disciplinary Procedure

a. Discipline shall be imposed only for just cause. Where the College President, or designee, seeks to impose discipline, notice of such discipline shall be made in writing and served upon the employee in person or by registered or certified mail, return receipt requested, to the employee's address of record. The conduct for which discipline is being imposed and the penalty proposed shall be specified in the notice. The notice served on the employee shall contain a detailed description of the alleged acts and conduct including reference to dates, times and places.

b. The penalty proposed may not be implemented until the employee (1) fails to file a disciplinary grievance within 10 days of service of the notice of discipline, or (2) having filed a disciplinary grievance, fails to file a timely appeal to disciplinary arbitration, or (3) having appealed to disciplinary arbitration, until and to the extent that it is upheld by the disciplinary arbitrator, or (4) until the matter is settled.

c. The notice of discipline may be the subject of a disciplinary grievance which shall be filed with the Chancellor, or designee, in person or by registered or certified mail, return receipt requested, by the employee, or the employee's representative, on a disciplinary grievance form to be provided by the State, within 10 days of the date of service of notice of discipline. The employee's selection of a representative as indicated on the Disciplinary Grievance Form when filed is final and not subject to change. A copy of the notice of discipline must be attached to the disciplinary grievance form. A disciplinary grievance shall be regarded as filed even if it does not contain a copy of the Notice of Discipline, required by subdivision 19.4(c). However, such grievance shall not be reviewed unless all of the information required by the grievance form or otherwise required by grievance steps of Article 19 has been provided. The employee, or the employee's representative, shall be entitled to a meeting to present the employee's position to the Chancellor, or designee, within 10 days of the date of filing of the disciplinary grievance.

The purpose of the meeting shall be the possible adjustment of the matter and need not involve the presentation of evidence or specification of particulars by either party. The meeting provided for herein may be waived by the employee, in writing, on the grievance form, only in accordance with provisions of Section 19.7(b). If the meeting has not been waived but cannot be held within 10 working days of the date of filing of the disciplinary grievance by reason of the unavailability of the employee, or the employee's representative, or on such other date as may be mutually agreed upon, the Chancellor, or designee, may, at the option of the Chancellor, or designee, review the disciplinary grievance on the basis of the existing record. The Chancellor, or designee, shall provide the employee, or the employee's representative, with a response in writing by registered or certified mail, return receipt requested, or by personal service within twenty days of the meeting or review, or within five days of the meeting or review if the employee has been suspended without pay under Section 19.7 of this Article.

d. If the disciplinary grievance is not settled or otherwise resolved, it may be appealed to disciplinary arbitration by the employee, or the employee's representative, within 10 days of receipt of the response of the Chancellor, or designee. Notice of appeal to disciplinary arbitration shall be filed by registered or certified mail, return receipt requested, or by personal service upon the Director of the Governor's Office of Employee Relations, or designee. A copy of the appeal shall be sent simultaneously to the College Presi-

dent and the Chancellor's designee.

e. The State and UUP shall jointly agree, within 15 days of the execution of this Agreement, on a 25-member panel of disciplinary arbitrators. Each member of the panel shall be assigned a number in rotation. In the event of a disciplinary arbitration, each party shall rank the next five members of the panel in rotation and the member with the highest ranking shall serve as the arbitrator. In the event of a tie, selection shall be by lot. The State agrees to perform activities necessary to appropriate administration of the panel including, but not limited to, identifying arbitrators' availability, notifying them of their appointment and assisting in arranging for hearing rooms.

f. The disciplinary arbitrator shall hold a hearing within 10 days of appointment, or as soon thereafter as practical, or within such other period as may be mutually agreed upon by the parties, recognizing, however, that except in unusual circumstances a hearing should be concluded within 30 days of the appointment of the arbitrator. The disciplinary arbitrator shall render a decision within five days of the close of the hearing, or within five days after receipt of the transcript, if either party elects a transcript, or within such other time as may be mutually agreed upon by the parties.

g. Either party wishing a transcript of a disciplinary arbitration hearing may provide for one at its expense and shall provide a copy to the arbitrator and the other party; provided, however, the decision to make a transcript must be announced at the beginning of the hearing and the transcript must cover the entire hearing, not just a portion thereof. Delays in the preparation of a transcript shall not constitute a basis for delays in scheduling hearing dates.

h. The disciplinary arbitrator shall be confined to determinations of guilt or innocence, the appropriateness of proposed penalties, and shall have exclusive jurisdiction over issues of timeliness arising under the procedures of this Article including those arising pursuant to Section 19.9, but shall not consider alleged violations of other provisions of this Agreement, which shall be subject only to the provisions of Article 7, Grievance Procedure, of this Agreement. The disciplinary arbitrator shall neither add to, subtract from nor modify the provisions of this Agreement. The disciplinary arbitrator's decision with respect to guilt or innocence, penalty, timeliness or probable cause for suspension, or temporary reassignment, pursuant to Section 19.7 of this Article, shall be final and binding upon the parties, and the disciplinary arbitrator may approve, disapprove or take any other appropriate action warranted under the circumstances, including ordering reinstatement and back pay for all or part of the period of suspension, or return to the employee's assignment if temporarily reassigned. If the disciplinary arbitrator, upon review, finds probable cause for the suspension, the arbitrator may consider such suspension in determining the penalty to be imposed.

i. All fees and expenses of the arbitrator, if any, shall be divided equally between the State and UUP or the employee if not represented by UUP. Each party shall bear the cost of preparing and presenting its own case. The estimated arbitrator's fee and expenses and estimated expenses of the arbitration may be collected in advance of the hearing.

§19.5 Settlements

A disciplinary grievance may be settled at any time following the service of a notice of discipline. The terms of the settlement shall be reduced to writing on the disciplinary grievance form to be provided by the State. An employee offered such a settlement shall be offered a reasonable opportunity to have a representative present before the employee is required to execute it.

§19.6 Effect of Settlement and Arbitrator's Award

All settlements and arbitrators' awards shall be final and binding upon the State, UUP, the employee and the employee's representative if other than UUP.

§19.7 Suspension Before Notice of Discipline

a. Prior to issuing a notice of discipline or the completion of the disciplinary grievance procedure provided for in this Article, an employee may be suspended, without pay, by the appointing authority only

pursuant to paragraphs (1) or (2) of this Section. As an alternative to such suspension, the employee may be temporarily reassigned.

1. The appointing authority, or its designee, may suspend without pay or temporarily reassign an employee when the appointing authority, or its designee, determines that there is probable cause that such employee's continued presence on the job represents a potential danger to persons or property or would severely interfere with its operations. Such determination shall be reviewable by the disciplinary arbitrator.  A notice of discipline shall be served no later than 10 days following any such suspension or temporary reassignment.

2. The appointing authority, or its designee, may suspend without pay or temporarily reassign an employee charged with the commission of a crime. Such employee shall notify the appointing authority in writing of the disposition of any criminal charge including a certified copy of such disposition within five days thereof. Within 30 calendar days following such suspension under this paragraph, or within five days from receipt by the appointing authority of notice of disposition of the charge from the employee, whichever occurs first, a notice of discipline shall be served on such employee or the employee shall be reinstated with back pay if suspended or returned to the employee's assignment if temporarily reassigned. Nothing in this paragraph shall limit the right of the appointing authority, or its designee, to take disciplinary action during the pendency of criminal proceedings.

3. Where the appointing authority, or its designee, elects to temporarily reassign an employee pursuant to this Article, the employee shall be notified in writing of the location, the effective date and nature of such temporary reassignment and that the employee may elect in writing to refuse such temporary reassignment and may be suspended without pay. The employee's election must be made in writing before commencement of the temporary reassignment. An election by the employee to refuse such temporary reassignment is final and may not thereafter be withdrawn. No election by the employee is permitted once the employee commences the temporary reassignment.

4. The State may rescind a notice of discipline and issue a revised notice of discipline no later than 20 working days prior to the commencement of a disciplinary arbitration. Such action shall not affect a suspension without pay or a temporary reassignment.

5. The fact that the appointing authority, or its designee, has temporarily reassigned an employee rather than suspending the employee without pay shall not be considered by the disciplinary arbitrator for any purpose.

b. During the period of any suspension without pay pursuant to this Article, the State shall continue the employee's and eligible dependents' health insurance coverage which is otherwise available to unit employees, and the State shall pay the employer's share of any premiums to maintain such coverage. Any such suspended employee shall be responsible for paying the employee's share of premium for such health insurance coverage. The State shall not be liable for payment of the employer's share of the health insurance premium for any period of time during which the suspended employee fails to pay the employee's share of the health insurance premium. Also, an employee suspended pursuant to the provisions of this Article shall be counted for the purpose of calculating the amount of any periodic deposit to the UUP Benefit Trust Fund.

c. Where an employee has been suspended without pay pursuant to this Article, an employee's absence(s) shall, upon the employee's written request, be charged against vacation leave, holiday leave, or FLSA compensatory leave provided sufficient accruals exist in such leave categories.

d. Suspension without pay or temporary reassignment:

1. Where an employee has been suspended without pay or temporarily reassigned pursuant to this Article, the employee may, in writing, waive the meeting with the Chancellor, or designee, at the time of filing a disciplinary grievance. In the event of such waiver, the employee shall file the disciplinary grievance form, within the prescribed time limits for filing a grievance with the Chancellor, or designee, directly with

the Director of the Governor's Office of Employee Relations, or designee, in accordance with the provisions of Section 19.4(d).

2. Where an employee has been suspended without pay pursuant to this Article, the employee may file the disciplinary grievance form, within the prescribed time limits for filing a grievance with the Chancellor, or designee, directly with the Director of the Governor's Office of Employee Relations, or designee, in accordance with the provisions of Section 19.4(d) and concurrently file a copy of such grievance with the Chancellor, or designee, in accordance with the provisions of Section 19.4(c).

e. Where a disciplinary arbitration proceeding does not commence within 60 calendar days of an appeal made pursuant to Section 19.4(d) or Section 19.7(d) due solely to the unavailability of the State, an employee suspended without pay shall be returned to the payroll, or temporarily reassigned, until such time that the disciplinary arbitrator renders a decision in the matter, or the matter is otherwise resolved.

§19.8 Representation

a. Employees may represent themselves or be accompanied for purposes of representation by UUP or counsel, consistent with their selection of a representative pursuant to subsection 19.4(c), at any stage of the disciplinary procedure

contained in this Article; provided, however, an employee's representative may only act on the employee's behalf, in the absence of the employee, upon mutual agreement of the parties.

b. An employee shall be provided the opportunity to have representation at an interrogation if at the time such interrogation is commenced it is contemplated by management that such employee will be served a Notice of Discipline pursuant to Article 19 of this Agreement. The employee shall be provided with notification of such opportunity prior to the commencement of such interrogation. In the event such interrogation were to be conducted without having provided the employee with such notification, any statements or admissions made by the employee during such an interrogation may not be subsequently used in a disciplinary proceeding against that employee. If representation is requested by the employee, and such representation is not available six hours' time following such request, the State may proceed with the interrogation and there shall be no limitation on the use of statements or admissions made by the employee.

c. An employee shall be provided the opportunity to have representation present when questioned in any equal employment or Title IX investigatory process conducted by the employer if, at the time of the questioning, the employee is the target of the investigation. Such employee shall be provided with notice and opportunity to obtain representation as provided in subsections (a) and (b) above.

§19.9 Limitation

An employee shall not be disciplined for acts, except those which would constitute a crime, which occurred more than one year prior to the service of the notice of discipline or those which occurred more than seven years prior to the service of the notice of discipline where such acts would constitute a violation of sexual harassment law, rule, regulation or university or campus policy. The employee's whole record of employment, however, may be considered with respect to the appropriateness of the penalty to be imposed, if any.

§19.10 Resignation in Lieu of Notice of Discipline

Employees who are advised that they are alleged to be guilty of misconduct or incompetency and who are therefore requested to resign shall be given a statement written on the resignation form that:

a. They have a right to consult with a representative of UUP or private counsel selected at their expense or the right to decline such representation before executing the resignation, and a reasonable period of time to obtain such representation, if requested, will be afforded for such purpose;

b. They may decline the request to resign and that in lieu thereof, a notice of discipline must be served on them before any disciplinary action or penalty may be imposed pursuant to the procedure provided in Article 19 of the Agreement between the State and UUP;

21

c. In the event a notice of discipline is served, they have the right to object to such notice by filing a grievance;

d. The disciplinary grievance procedure terminates in binding arbitration;

e. They would have the right to representation by UUP or by private counsel selected at their expense at every step of the procedure; and

f. They have the right to refuse to sign the resignation and their refusal in this regard cannot be used against them in any subsequent proceeding.

A resignation which is requested and secured in a manner which fails to comply with this procedure shall be null and void.

§19.11 Miscellaneous Provisions

a. All grievances, grievance appeals and responses shall be transmitted by certified or registered mail, return receipt requested, or by personal service on the grievant or grievant's representative or on the individual responsible for conducting the review. Upon personal service the recipient of such documents, upon request, shall acknowledge, in writing, the receipt thereof. Proof of personal service shall specify the person who was served and the date, place and manner of service.

b. The time limits for the service of a notice of discipline or the submission of a grievance or the filing of an appeal or demand for arbitration or issuance of a step response shall be determined from the date of personal service or mailing by certified or registered mail, return receipt requested, as evidenced by the official postmark appearing on the receipt for certified or registered mail. All other time limits set forth in this Article, except as otherwise described in subsection 19.2(c), shall be measured from the date of receipt. Where service is by registered or certified mail, the date of receipt shall be that date appearing on the return receipt.

c. Prior to an interrogation pursuant to Section 19.8, the College President or designee may direct the employee to perform an alternate assignment, which may be at an alternate work location. Such alternate assignment shall not be regarded as discipline nor a temporary reassignment as referred to in this Article.

d. The College President or designee shall provide written notification to the campus UUP Chapter President that a Notice of Discipline has been issued to a specific employee at that campus. Such written notification shall be sent within five days of the issuance of such Notice of Discipline.

## ARTICLE 20
### Direct Compensation

§20.1 The State shall prepare, secure introduction and recommend passage by the Legislature of appropriate legislation in order to provide the benefits described in this Article.

§20.2 a. The basic annual salaries, as of June 30, 2016, of incumbents of positions in the State University in the Professional Services Negotiating Unit shall be increased by two percent commencing the first day of the payroll period closest to (1) July 2, 2016, for employees having a calendar-year or college-year professional obligation, or (2) September 1, 2016, for employees having an academic-year professional obligation, except that certain incumbents at the State University of New York at Binghamton, the Colleges of Technology and the Colleges of Agriculture and Technology heretofore specifically identified by the Department of Audit and Control for the purpose of establishing the effective date of eligibility for salary increases shall be granted said salary increase on July 2, 2016. Such increases will be added to basic annual salaries as soon as practicable after ratification to eligible employees on the payroll on the date of ratification and who retired on or after the effective date of the increase.

b. Notwithstanding the provisions of subdivision (a) of this section, an employee in service on April 30, 2016, whose employment expires prior to July 2, 2016, who would have been eligible for the salary increase provided for in subdivision (a) of this section if employment had continued through July 2, 2016, shall be eligible for the salary increase provided for in subdivision (a) of this section if the employee is

reemployed in an equivalent position for at least one semester or equivalent of the 12-month period commencing on July 2, 2016.

c. Notwithstanding the provisions of subdivision (a) of this section, an employee in service during a portion of the 12-month period commencing on July 1, 2015, for at least a semester or equivalent, but whose employment expires prior to July 2, 2016, shall be eligible for the salary increase provided for in subdivision (a) of this section if the employee is reemployed in an equivalent position for at least one semester or equivalent of the 12-month period commencing on July 2, 2016.

d. An employee who is not on payroll on the date of ratification shall be eligible for the retroactive payment resulting from this increase if the employee is reemployed in an equivalent position for at least one semester or equivalent of the 12-month period commencing July 1, 2018.

e.1. Salary minimums shall be established for the following ranks or grades or positions equated to them and shall be effective on the dates of the salary increases provided pursuant to subdivision (a) of this section:

| | Academic Employees Academic Year | Professional Obligation Calendar Year |
|---|---|---|
| Professor Librarian | $58,667 | $70,177 |
| Associate Professor Associate Librarian | $47,338 | $56,577 |
| Assistant Professor Lecturer Sr. Assistant Librarian | $40,014 | $47,861 |
| Instructor Assistant Librarian | $34,962 | $41,759 |

| | Professional Employees Calendar Year | Professional Obligation College Year |
|---|---|---|
| Salary Level VI | $76,799 | $64,245 |
| V | $62,853 | $52,568 |
| IV | $52,393 | $43,848 |
| III | $45,421 | $38,098 |
| II | $40,191 | $33,738 |
| I | $34,962 | $29,380 |

2. The salary minimums established in paragraph (a) of this subdivision shall not apply to employees who are not paid on the basis of a basic annual salary. A part-time employee who is paid on the basis of a prorated basic annual salary and who is eligible to be paid a minimum basic annual salary shall be paid a minimum basic annual salary which shall be the appropriately prorated amount of the minimum basic annual salary that would have been paid to the employee had the employee been employed on a full-time basis.

3. An incumbent promoted on or after the effective dates, appropriate to that incumbent's professional obligation shall receive not less than the minimum basic annual salary for the rank or grade to which that incumbent has been promoted.

4. An employee hired on or after the effective dates, appropriate to that employee's professional obligation shall receive not less than the minimum basic annual salary for that employee's rank or grade on the date the employee is placed in payroll status.

§20.3 a. The basic annual salaries, as of June 30, 2017, of incumbents of positions in the State University in the Professional Services Negotiating Unit shall be increased by two percent commencing the first day

of the payroll period closest to (1) July 1, 2017, for employees having a calendar-year or college-year professional obligation, or (2) September 1, 2017, for employees having an academic-year professional obligation, except that certain incumbents at the State University of New York at Binghamton, the Colleges of Technology and the Colleges of Agriculture and Technology heretofore specifically identified by the Department of Audit and Control for the purpose of establishing the effective date of eligibility for salary increases shall be granted said salary increase on July 1, 2017. Such increases will be added to basic annual salaries as soon as practicable after ratification to eligible employees on the payroll on the date of ratification and who retired on or after the effective date of the increase.

b. Notwithstanding the provisions of subdivision (a) of this section, an employee in service on April 30, 2017, whose employment expires prior to July 1, 2017, who would have been eligible for the salary increase provided for in subdivision (a) of this section if employment had continued through July 1, 2017, shall be eligible for the salary increase provided for in subdivision (a) of this section if the employee is reemployed in an equivalent position for at least one semester or equivalent of the 12-month period commencing on July 1, 2017.

c. Notwithstanding the provisions of subdivision (a) of this section, an employee in service during a portion of the 12-month period commencing on July 1, 2016, for at least a semester or equivalent, but whose employment expires prior to July 1, 2017, shall be eligible for the salary increase provided for in subdivision (a) of this section if the employee is reemployed in an equivalent position for at least one semester or equivalent of the 12-month period commencing on July 1, 2017.

d. An employee who is not on payroll on the date of ratification shall be eligible for the retroactive payment resulting from this increase if the employee is reemployed in an equivalent position for at least one semester or equivalent of the 12-month period commencing on July 1, 2018.

e. The retroactive increases in Section 20.2 (a) effective July 2 or September 1, 2016, and in section 20.3 (a) effective July 1 or September 1, 2017, shall be processed as soon as practicable after ratification of the Agreement to eligible employees. The retroactive payment resulting from these increases shall be aggregated in the form of a lump sum payment which shall be made to employees in two equal payments. The first payment shall be paid as soon as practicable after ratification and the second payment shall be paid on the first day of the payroll period following July 1, 2019.

f.1. Salary minimums shall be established for the following ranks or grades or positions equated to them and shall be effective on the dates of the salary increases provided pursuant to subdivision (a) of this section:

|  | Academic Employees<br>Academic Year | Professional Obligation<br>Calendar Year |
|---|---|---|
| Professor<br>Librarian | $59,840 | $71,581 |
| Associate Professor<br>Associate Librarian | $48,285 | $57,709 |
| Assistant Professor<br>Lecturer<br>Sr. Assistant Librarian | $40,814 | $48,818 |
| Instructor<br>Assistant Librarian | $35,661 | $42,594 |

|  | Professional Employees<br>Calendar Year | Professional Obligation<br>College Year |
|---|---|---|
| Salary Level VI | $78,335 | $65,530 |
| V | $64,110 | $53,619 |
| IV | $53,441 | $44,725 |

III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$46,329 . . . . . . . . . . . . . . . . . . . . . . . . . . . .$38,860

II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$40,995 . . . . . . . . . . . . . . . . . . . . . . . . . . . .$34,413

I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$35,661 . . . . . . . . . . . . . . . . . . . . . . . . . . . .$29,968

2. The salary minimums established in paragraph (a) of this subdivision shall not apply to employees who are not paid on the basis of a basic annual salary. A part-time employee who is paid on the basis of a pro-rated basic annual salary and who is eligible to be paid a minimum basic annual salary shall be paid a minimum basic annual salary which shall be the appropriately prorated amount of the minimum basic annual salary that would have been paid to the employee had the employee been employed on a full-time basis.

3. An incumbent promoted on or after the effective dates, appropriate to that incumbent's professional obligation or the date of eligibility for salary increases, of the salary increase provided for in subdivision (a) shall receive not less than the minimum basic annual salary for the rank or grade to which that incumbent has been promoted.

4. An employee hired on or after the effective dates, appropriate to that employee's professional obligation or date of

eligibility for salary increases, of the salary increase provided for in subdivision (a), shall receive not less than the minimum basic annual salary for that employee's rank or grade on the date the employee is placed in payroll status.

§20.4 Effective July 1, 2017, there shall be an amount made available on a University-wide basis, for distribution by the State University Trustees in their discretion to incumbents on the payroll on June 30, 2017 and at the time of payment. The distribution will be made to full-time employees as of June 30, 2017 in the form of a lump-sum payment of $600 not added to basic annual salary. The $600 shall be pro-rated for part-time employees based on a formula mutually agreed to by the parties. The lump-sum payment shall be made as soon as practicable after ratification. The eligible employees on June 30, 2017 shall include part-time employees in service on April 30, 2017 but whose employment expires prior to July 1, 2017.

§20.5  a. The basic annual salaries, as of June 30, 2018, of incumbents of positions in the State University in the Professional Services Negotiating Unit shall be increased by two percent commencing the first day of the payroll period closest to (1) July 1, 2018, for employees having a calendar-year or college-year professional obligation, or (2) September 1, 2018, for employees having an academic-year professional obligation, except that certain incumbents at the State University of New York at Binghamton, the Colleges of Technology and the Colleges of Agriculture and Technology heretofore specifically identified by the Department of Audit and Control for the purpose of establishing the effective date of eligibility for salary increases shall be granted said salary increase on July 1, 2018.

b. Notwithstanding the provisions of subdivision (a) of this section, an employee in service on April 30, 2018, whose employment expires prior to July 1, 2018, who would have been eligible for the salary increase provided for in subdivision (a) of this section if employment had continued through July 1, 2018, shall be eligible for the salary increase provided for in subdivision (a) of this section if the employee is reemployed in an equivalent position for at least one semester or equivalent of the 12-month period commencing on July 1, 2018.

c. Notwithstanding the provisions of subdivision (a) of this section, an employee in service during a portion of the 12-month period commencing on July 1, 2017, for at least a semester or equivalent, but whose employment expires prior to July 1, 2018, shall be eligible for the salary increase provided for in subdivision (a) of this section if the employee is reemployed in an equivalent position for at least one semester or equivalent of the 12-month period commencing on July 1, 2018.

d.1. Salary minimums shall be established for the following ranks or grades or positions equated to them and shall be effective on the dates of the salary increases provided pursuant to subdivision (a) of this section:

| | Academic Employees<br>Academic Year | Professional Obligation<br>Calendar Year |
|---|---|---|
| Professor | $61,037 | $73,013 |
| Librarian | | |
| Associate Professor | $49,251 | $58,863 |
| Associate Librarian | | |
| Assistant Professor | $41,630 | $49,794 |
| Lecturer | | |
| Sr. Assistant Librarian | | |
| Instructor | $36,374 | $43,446 |
| Assistant Librarian | | |

| | Professional Employees<br>Calendar Year | Professional Obligation<br>College Year |
|---|---|---|
| Salary Level VI | $79,902 | $66,841 |
| V | $65,392 | $54,691 |
| IV | $54,510 | $45,620 |
| III | $47,256 | $39,637 |
| II | $41,815 | $35,101 |
| I | $36,374 | $30,567 |

2. The salary minimums established in paragraph (a) of this subdivision shall not apply to employees who are not paid on the basis of a basic annual salary. A part-time employee who is paid on the basis of a pro-rated basic annual salary and who is eligible to be paid a minimum basic annual salary shall be paid a minimum basic annual salary which shall be the appropriately prorated amount of the minimum basic annual salary that would have been paid to the employee had the employee been employed on a full-time basis.

3. An incumbent promoted on or after the effective dates, appropriate to that incumbent's professional obligation or the date of eligibility for salary increases, of the salary increase provided for in subdivision (a) shall receive not less than the minimum basic annual salary for the rank or grade to which that incumbent has been promoted.

4. An employee hired on or after the effective dates, appropriate to that employee's professional obligation or date of eligibility for salary increases, of the salary increase provided for in subdivision (a), shall receive not less than the minimum basic annual salary for that employee's rank or grade on the date the employee is placed in payroll status.

§20.6 Effective July 1, 2018, there shall be available an amount equal to one percent of the total of the basic annual salaries on June 30, 2018, for distribution by the State University Trustees in their discretion to incumbents on the payroll on June 30, 2018 and at the time of payment. The distribution shall be made to incumbents in the form of a lump-sum payment not added to basic annual salary and shall occur not later than December 31, 2018. The total of the basic annual salaries on June 30, 2018 shall include the total salaries of part-time employees in service on April 30, 2018, but whose employment expires prior to July 1, 2018. If the part-time employee is employed prior to the distribution of the pool, the employee will be eligible for a discretionary payment at the discretion of the State University Trustees.

§20.7 a. The basic annual salaries, as of June 30, 2019, of incumbents of positions in the State University in the Professional Services Negotiating Unit shall be increased by two percent commencing the first day of the payroll period closest to (1) July 1, 2019, for employees having a calendar-year or college-year professional obligation, or (2) September 1, 2019, for employees having an academic-year professional obligation, except that certain incumbents at the State University of New York at Binghamton, the Colleges of Technology and the Colleges of Agriculture and Technology heretofore specifically identified by the De-

partment of Audit and Control for the purpose of establishing the effective date of eligibility for salary increases shall be granted said salary increase on July 1, 2019.

b. Notwithstanding the provisions of subdivision (a) of this section, an employee in service on April 30, 2019, whose employment expires prior to July 1, 2019, who would have been eligible for the salary increase provided for in subdivision (a) of this section if employment had continued through July 1, 2019, shall be eligible for the salary increase provided for in subdivision (a) of this section if the employee is reemployed in an equivalent position for at least one semester or equivalent of the 12-month period commencing on July 1, 2019.

c. Notwithstanding the provisions of subdivision (a) of this section, an employee in service during a portion of the 12-month period commencing on July 1, 2018, for at least a semester or equivalent, but whose employment expires prior to July 1, 2019, shall be eligible for the salary increase provided for in subdivision (a) of this section if the employee is reemployed in an equivalent position for at least one semester or equivalent of the 12-month period commencing on July 1, 2019.

d.1. Salary minimums shall be established for the following ranks or grades or positions equated to them and shall be effective on the dates of the salary increases provided pursuant to subdivision (a) of this section:

| | Academic Employees<br>Academic Year | Professional Obligation<br>Calendar Year |
| --- | --- | --- |
| Professor | $62,258 | $74,473 |
| Librarian | | |
| Associate Professor | $50,236 | $60,040 |
| Associate Librarian | | |
| Assistant Professor | $42,463 | $50,790 |
| Lecturer | | |
| Sr. Assistant Librarian | | |
| Instructor | $37,101 | $44,315 |
| Assistant Librarian | | |

| | Professional Employees<br>Calendar Year | Professional Obligation<br>College Year |
| --- | --- | --- |
| Salary Level VI | $81,500 | $68,178 |
| V | $66,700 | $55,785 |
| IV | $55,600 | $46,532 |
| III | $48,201 | $40,430 |
| II | $42,651 | $35,803 |
| I | $37,101 | $31,178 |

2. The salary minimums established in paragraph (1) of this subdivision shall not apply to employees who are not paid on the basis of a basic annual salary. A part-time employee who is paid on the basis of a prorated basic annual salary and who is eligible to be paid a minimum basic annual salary shall be paid a minimum basic annual salary which shall be the appropriately prorated amount of the minimum basic annual salary that would have been paid to the employee had the employee been employed on a full-time basis.

3. An incumbent promoted on or after the effective dates, appropriate to that incumbent's professional obligation or the date of eligibility for salary increases, of the salary increase provided for in subdivision (a) shall receive not less than the minimum basic annual salary for the rank or grade to which that incumbent has been promoted.

4. An employee hired on or after the effective dates, appropriate to that employee's professional obligation or date of eligibility for salary increases, of the salary increase provided for in subdivision (a), shall

receive not less than the minimum basic annual salary for that employee's rank or grade on the date the employee is placed in payroll status.

§20.8 Effective July 1, 2019, there shall be available an amount equal to one-half percent of the total of the basic annual salaries on June 30, 2019, for distribution by the State University Trustees in their discretion to incumbents on the payroll on June 30, 2019 and at the time of payment and one-half percent of the total of the basic annual salaries on June 30, 2019, for distribution to incumbents on the payroll on June 30, 2019 and at the time of payment to address equity, compression and inversion. The distribution shall be added to incumbents' basic annual salary and shall occur not later than December 31, 2019, and shall be retroactive to (1) July 1, 2019, or (2) September 1, 2019, as appropriate to professional obligation. The total of the basic annual salaries on June 30, 2019 shall include the total salaries of part-time employees in service on April 30, 2019 but whose employment expires prior to July 1, 2019. If the part-time employee is employed prior to the distribution of the pool, the employee will be eligible for an increase at the discretion of the State University Trustees.

§20.9 a. The basic annual salaries, as of June 30, 2020, of incumbents of positions in the State University Professional Services Negotiating Unit shall be increased by two percent commencing the first day of the payroll period closest to (1) July 1, 2020, for employees having a calendar-year or college-year professional obligation, or (2) September 1, 2020, for employees having an academic-year professional obligation, except that certain incumbents at the State University of New York at Binghamton, the Colleges of Technology and the Colleges of Agriculture and Technology heretofore specifically identified by the Department of Audit and Control for the purpose of establishing the effective date of eligibility for salary increases shall be granted said salary increase on July 1, 2020.

b. Notwithstanding the provisions of subdivision (a) of this section, an employee in service on April 30, 2020, whose employment expires prior to July 1, 2020, who would have been eligible for the salary increase provided for in subdivision (a) of this section if employment had continued through July 1, 2020, shall be eligible for the salary increase provided for in subdivision (a) of this section if the employee is reemployed in an equivalent position for at least one semester or equivalent of the 12-month period commencing on July 1, 2020.

c. Notwithstanding the provisions of subdivision (a) of this section, an employee in service during a portion of the 12-month period commencing on July 1, 2019, for at least a semester or equivalent, but whose employment expires prior to July 1, 2020, shall be eligible for the salary increase provided for in subdivision (a) of this section if the employee is reemployed in an equivalent position for at least one semester or equivalent of the 12-month period commencing on July 1, 2020.

d.1. Salary minimums shall be established for the following ranks or grades or positions equated to them and shall be effective on the dates of the salary increases provided pursuant to subdivision (a) of this section:

| | Academic Employees<br>Academic Year | Professional Obligation<br>Calendar Year |
|---|---|---|
| Professor<br>Librarian | $63,503 | $75,962 |
| Associate Professor<br>Associate Librarian | $51,241 | $61,241 |
| Assistant Professor<br>Lecturer<br>Sr. Assistant Librarian | $43,312 | $51,806 |
| Instructor<br>Assistant Librarian | $37,843 | $45,201 |

|  | Professional Employees Calendar Year | Professional Obligation College Year |
|---|---|---|
| Salary Level VI | $83,130 | $69,542 |
| V | $68,034 | $56,901 |
| IV | $56,712 | $47,463 |
| III | $49,165 | $41,239 |
| II | $43,504 | $36,519 |
| I | $37,843 | $31,802 |

2. The salary minimums established in paragraph (1) of this subdivision shall not apply to employees who are not paid on the basis of a basic annual salary. A part-time employee who is paid on the basis of a prorated basic annual salary and who is eligible to be paid a minimum basic annual salary shall be paid a minimum basic annual salary which shall be the appropriately prorated amount of the minimum basic annual salary that would have been paid to the employee had the employee been employed on a full-time basis.

3. An incumbent promoted on or after the effective dates, appropriate to that incumbent's professional obligation or the date of eligibility for salary increases, of the salary increase provided for in subdivision (a) shall receive not less than the minimum basic annual salary for the rank or grade to which that incumbent has been promoted.

4. An employee hired on or after the effective dates, appropriate to that employee's professional obligation or date of eligibility for salary increases, of the salary increase provided for in subdivision (a), shall receive not less than the minimum basic annual salary for that employee's rank or grade on the date the employee is placed in payroll status.

§20.10 Effective July 1, 2020, there shall be available an amount equal to one-half percent of the total of the basic annual salaries on June 30, 2020, for distribution by the State University Trustees in their discretion to incumbents on the payroll on June 30, 2020 and at the time of payment and one-half percent of the total of the basic annual salaries on June 30, 2020, for distribution to incumbents on the payroll on June 30, 2020 and at the time of payment to address equity, compression and inversion. The distribution shall be added to incumbents' basic annual salary and shall occur not later than December 31, 2020, and shall be retroactive to (1) July 1, 2020, or (2) September 1, 2020, as appropriate to professional obligation. The total of the basic annual salaries on June 30, 2020 shall include the total salaries of part-time employees in service on April 30, 2020 but whose employment expires prior to July 1, 2020. If the part-time employee is employed prior to the distribution of the pool, the employee will be eligible for an increase at the discretion of the State University Trustees.

§20.11 a. The basic annual salaries, as of June 30, 2021, of incumbents of positions in the State University Professional Services Negotiating Unit shall be increased by two percent commencing the first day of the payroll period closest to (1) July 1, 2021, for employees having a calendar-year or college-year professional obligation, or (2) September 1, 2021, for employees having an academic-year professional obligation, except that certain incumbents at the State University of New York at Binghamton, the Colleges of Technology and the Colleges of Agriculture and Technology heretofore specifically identified by the Department of Audit and Control for the purpose of establishing the effective date of eligibility for salary increases shall be granted said salary increase on July 1, 2021.

b. Notwithstanding the provisions of subdivision (a) of this section, an employee in service on April 30, 2021, whose employment expires prior to July 1, 2021, who would have been eligible for the salary increase provided for in subdivision (a) of this section if employment had continued through July 1, 2021, shall be eligible for the salary increase provided for in subdivision (a) of this section if the employee is reemployed in an equivalent position for at least one semester or equivalent of the 12-month period

commencing on July 1, 2021.

c. Notwithstanding the provisions of subdivision (a) of this section, an employee in service during a portion of the 12-month period commencing on July 1, 2020, for at least a semester or equivalent, but whose employment expires prior to July 1, 2021, shall be eligible for the salary increase provided for in subdivision (a) of this section if the employee is reemployed in an equivalent position for at least one semester or equivalent of the 12-month period commencing on July 1, 2021.

d.1. Salary minimums shall be established for the following ranks or grades or positions equated to them and shall be effective on the dates of the salary increases provided pursuant to subdivision (a) of this section:

| | Academic Employees<br>Academic Year | Professional Obligation<br>Calendar Year |
|---|---|---|
| Professor | $64,773 | $77,481 |
| Librarian | | |
| Associate Professor | $52,266 | $62,466 |
| Associate Librarian | | |
| Assistant Professor | $44,178 | $52,842 |
| Lecturer | | |
| Sr. Assistant Librarian | | |
| Instructor | $38,600 | $46,105 |
| Assistant Librarian | | |

| | Professional Employees<br>Calendar Year | Professional Obligation<br>College Year |
|---|---|---|
| Salary Level VI | $84,793 | $70,933 |
| V | $69,395 | $58,039 |
| IV | $57,846 | $48,412 |
| III | $50,148 | $42,064 |
| II | $44,374 | $37,249 |
| I | $38,600 | $32,438 |

2. The salary minimums established in paragraph (1) of this subdivision shall not apply to employees who are not paid on the basis of a basic annual salary. A part-time employee who is paid on the basis of a prorated basic annual salary and who is eligible to be paid a minimum basic annual salary shall be paid a minimum basic annual salary which shall be the appropriately prorated amount of the minimum basic annual salary that would have been paid to the employee had the employee been employed on a full-time basis.

3. An incumbent promoted on or after the effective dates, appropriate to that incumbent's professional obligation or the date of eligibility for salary increases, of the salary increase provided for in subdivision (a) shall receive not less than the minimum basic annual salary for the rank or grade to which that incumbent has been promoted.

4. An employee hired on or after the effective dates, appropriate to that employee's professional obligation or date of eligibility for salary increases, of the salary increase provided for in subdivision (a), shall receive not less than the minimum basic annual salary for that employee's rank or grade on the date the employee is placed in payroll status.

§20.12 Effective July 1, 2021, there shall be available an amount equal to one-half percent of the total of the basic annual salaries on June 30, 2021, for distribution by the State University Trustees in their discretion to incumbents on the payroll on June 30, 2021 and at the time of payment and one-half percent of the total of the basic annual salaries on June 30, 2021, for distribution to incumbents on the payroll on June 30, 2021 and at the time of payment to address equity, compression and inversion. The distribution

shall be added to incumbents' basic annual salary and shall occur not later than December 31, 2021, and shall be retroactive to (1) July 1, 2021, or (2) September 1, 2021 as appropriate to professional obligation. The total of the basic annual salaries on June 30, 2021 shall include the total salaries of part-time employees in service on April 30, 2021, but whose employment expires prior to July 1, 2021. If the part-time employee is employed prior to the distribution of the pool, the employee will be eligible for an increase at the discretion of the State University Trustees.

§20.13 Effective July 1, 2022, there shall be available an amount equal to one-half percent of the total of the basic annual salaries on June 30, 2022, for distribution by the State University Trustees in their discretion to incumbents on the payroll on June 30, 2022 and at the time of payment and one-half percent of the total of the basic annual salaries on June 30, 2022, for distribution to incumbents on the payroll on June 30, 2022 and at the time of payment to address equity, compression and inversion. The distribution shall be added to incumbents' basic annual salary and shall occur not later than December 31, 2022, and shall be retroactive to (1) July 1, 2022, or (2) September 1, 2022 as appropriate to professional obligation. The total of the basic annual salaries on June 30, 2022 shall include the total salaries of part-time employees in service on April 30, 2022, but whose employment expires prior to July 1, 2022. If the part-time employee is employed prior to the distribution of the pool, the employee will be eligible for an increase at the discretion of the State University Trustees.

§20.14 a. Full-time employees who have been granted permanent or continuing appointment by the Chancellor, at the campus at which they are currently employed, or a second five-year term appointment, at the campus at which they are currently employed in titles listed in Article Xl, Appendix A of the Policies, shall receive a one-time advance to basic annual salary of $500. Employees who have completed seven consecutive years of full-time service at the campus at which they are currently employed in the title of Lecturer or in any of the titles listed in Article XI, Appendix B, Section 4—Division III Sports, or Article XI, Appendix C shall receive a one-time advance to basic annual salary of $500.

b. Part-time employees who have completed at least eight years of consecutive service at the campus at which they are currently employed shall receive a lump-sum payment in the amount of $500 as soon as practicable. Part-time employees are eligible to receive this payment every eight years thereafter of consecutive service at the campus at which they are
currently employed. Individual employees are eligible for only one service award every eight years.

§20.15 Part-time Academic Faculty Minimum Salary

a. Salary minimums per three-credit course per semester shall be established for part-time academic employees not paid on an hourly or basic annual salary basis. The credit hour equivalent for contact hours and other credit equivalencies will be determined by management based on the practices at each individual campus.

b. Salary minimums shall be effective on the dates pursuant to this section:

    1. Effective the semester beginning after July 1, 2019:

      University Centers and Health Science Centers .........................................................................$3,000

      Comprehensive and Technology Colleges.................................................................................$2,500

    2. Effective the semester beginning after July 1, 2020:

      University Centers and Health Science Centers .........................................................................$3,250

      Comprehensive and Technology Colleges.................................................................................$2,750

    3. Effective the semester beginning after July 1, 2021:

      University Centers and Health Science Centers .........................................................................$3,500

      Comprehensive and Technology Colleges.................................................................................$3,000

    4. Effective the semester beginning after July 1, 2022:

      University Centers and Health Science Centers .........................................................................$3,750

      Comprehensive and Technology Colleges.................................................................................$3,250

c. Eligible part-time academic faculty members shall receive salary increases in each year of the Agreement by either receiving a two percent increase or the applicable part-time minimum salary, whichever is greater.

§20.16 The increases in salary payable pursuant to this Article shall apply on a prorated basis to incumbents otherwise eligible to receive an increase in salary pursuant to this Article who are paid on an hourly or per diem basis, or who serve on a part-time basis, or who are paid on any basis other than at an annual salary rate. (Excluding those employees deemed to be casual pursuant to resolution of IP charge U-5724.)

§20.17 Nothing contained herein shall prevent the University, in its discretion, from granting further upward salary adjustments of individual employees.

§20.18 "Basic annual salary" is the amount of annual compensation payable to an employee for the performance of the employee's professional obligation, as such obligation is set forth under Appointment Year in Article XI of the Policies of the State University Trustees, from State monies appropriated for such purpose.

§20.19 The payroll cycle of employees which had been extended by up to one full payroll period during the 1982-85 Agreement shall continue to be so extended. When employees leave State service, their final salary check shall be issued at the end of the payroll period next following the payroll period in which their service discontinued. This final salary check shall be paid at the employee's then current-salary rate.

§20.20 a. The present inconvenience pay program provided to employees in the classified service of the Executive Branch of State service shall be extended to professional employees in the Professional Services Negotiating Unit.

b. The annual rate of inconvenience pay shall be $575 per year, effective July 2, 2007.

§20.21 a. Recall. Full-time professional employees in a hospital or clinic who are overtime eligible and are assigned to areas indicated on the list in subdivision (d) and have titles listed in Appendix A-16 or are specifically identified by the College President as subject to recall shall be eligible for recall pay. Those individuals who are assigned to the areas indicated in the list in subdivision (d) and who are not overtime eligible may, by mutual agreement between the State and UUP, be deemed eligible for recall pay.

b. In addition to full-time professional employees otherwise eligible for recall pay pursuant to the provisions of this article, the College President has discretion to designate other specific positions at the campus as eligible for recall pay. Such discretion may be exercised annually on or before a date determined by the College President. The College President, or designee, shall provide the local UUP chapter advance notice of the date such determination will be made and shall provide the local UUP chapter such determination when completed. The affected employees shall be provided 30 calendar days advance notice of eligibility for recall pay or the termination of such eligibility. Such determinations shall be wholly within the discretion of the College President.

c. In the event that such an eligible professional employee is directed to return to work after having completed the professional obligation and left the scheduled work station, the employee shall be entitled to a minimum of one-half day's pay at the rate of time and a half, or compensation for actual time worked at the rate of time and a half if that period is longer, for the purpose of computing recall compensation.

d. The areas of assignment eligible for recall pay are anesthesiology, biomedical engineering, cardiovascular medicine, clinical laboratories, clinical technical services, dialysis, emergency medical services, histocompatibility/transplant, hospital information technology, infection control, midwifery, nursing, operating room, perfusion, pharmacy, radiology, respiratory therapy, and social work.

§20.22 On-Call

a. Full-time professional employees who work regularly scheduled shifts in a hospital or clinic and are assigned to areas indicated on the list in subdivision (d) and have titles listed in Appendix A-16, or are specifically identified by the College President as subject to on-call, shall be eligible for on-call pay.

b. In addition to full-time professional employees otherwise eligible for on-call pay pursuant to the provisions of this article, the College President has discretion to designate other specific positions at the cam-

pus as eligible for on-call pay. Such discretion may be exercised annually on or before a date determined by the College President. The College President, or designee, shall provide the local UUP chapter advance notice of the date such determination will be made and shall provide the local UUP chapter such determination when completed. The affected employees shall be provided 30 calendar days advance notice of eligibility for on-call pay or the termination of such eligibility. Such determinations shall be wholly within the discretion of the College President.

c. The rate of pay for on-call services will be based on the time during which the employee's movement is restricted. An employee eligible to receive on-call pay shall be paid $4.35 per hour or part thereof that the employee actually remains available for immediate recall and is prepared to return to duty within a reasonable amount of time; provided, however, in the event the employee is actually recalled to work, the employee will receive the appropriate recall compensation instead of the per hour. Effective July 1, 2019, an employee eligible to receive on-call pay shall be paid $6.00 per hour or part thereof, except in Long Island and New York City where an employee eligible to receive on-call pay shall be paid $8.00 per hour or part thereof that the employee actually remains available for immediate recall and is prepared to return to duty within a reasonable amount of time; provided, however, in the event the employee is actually recalled to work, the employee will receive the appropriate recall compensation instead of the per hour. No additional on-call payments shall be made for any time when the employee receives recall compensation. On-call payments will be made on a biweekly basis.

d. The areas of assignment eligible for on-call pay are anesthesiology, biomedical engineering, clinical laboratories, clinical technical services, dialysis, emergency medical services, histocompatibility/transplant, infection control, midwifery, nursing, operating room, perfusion, pharmacy, radiology, respiratory therapy, and social work.

§20.23 Full-time employees at health sciences centers who are overtime eligible, work regularly scheduled shifts, and who are required to work one or more extra shifts in a week in which a scheduled holiday is observed, shall receive straight time for the extra shift in accordance with the applicable rate as determined by the Department of Audit and Control.

§20.24 Location Stipend—Downstate Adjustment

a. Effective January 1, 2009, full-time employees, including geographic full-time employees, whose work site is in New York City, Suffolk, Nassau, Rockland or Westchester counties will receive a location stipend while on payroll, at the rate of $3,026 per year; paid biweekly. This stipend will be in addition to the basic annual salary.

b. Full-time eligible employees on authorized leaves with part-time salary at the time the above payments are made shall receive location stipends on a prorated basis consistent with their part-time salary status.

§20.25 Location Stipend—Mid Hudson Adjustment

a. Effective January 1, 2009, full-time employees, including geographic full-time employees, whose work site is in Dutchess, Putnam or Orange counties will receive a location stipend while on the payroll, at a rate of $1,513 per year; paid biweekly. This stipend will be in addition to the basic annual salary.

b. Full-time eligible employees on authorized leaves with part-time salary at the time the above payments are made shall receive location stipends on a prorated basis consistent with their part-time salary status.


## ARTICLE 21
### Statewide Joint Labor-Management Committees

§21.1 The parties shall review and discuss the mission of the statewide labor-management Affirmative Action/Diversity Committee (Article 10), Employment Committee (Article 35), Joint Committee on Health Benefits (Article 41), Professional Development Committee (Article 42), Safety and Health Committee

(Article 43), and Campus Grants Committee (Article 45) to ensure that program objectives effectively meet the needs of the State University and members of the Professional Services Negotiating Unit.

§21.2 The State shall prepare, secure introduction and recommend passage of legislation for appropriations in the amounts of $3,562,475 for the 2016-2017 Agreement year, $3,633,725 for the 2017-2018 Agreement year, $3,706,399 for the 2018-2019 Agreement year, $3,780,527 for the 2019-2020 Agreement year, $3,856,137 for the 2020-2021 Agreement year, and $3,933,260 for the 2021-2022 Agreement year for the purpose of funding statewide joint labor-management committee programs as mutually agreed upon by the parties. The parties shall meet within 90 days following the execution of this Agreement to mutually agree upon appropriate funding levels for each statewide joint labor-management committee. The unexpended portions of each year's appropriation shall be carried over into the succeeding year and added to the appropriation for the succeeding year.


## ARTICLE 22
### Travel Allowances and Relocation Expenses

§22.1 Per Diem, Meal and Lodging Expenses

The State agrees to reimburse, on a per diem basis as established by Rules and Regulations of the Comptroller, employees who are eligible for travel expenses for their actual and necessary expenses incurred while in travel status in the performance of their official duties for hotel lodging, meals and incidental expenses related thereto (hotel tips, etc.), for a full day at the rates generally available to State Managerial and Confidential employees.

§22.2 Mileage Allowance

The State agrees to provide, subject to the Rules and Regulations of the Comptroller, a mileage allowance rate equal to the Internal Revenue Service's standard mileage allowance for the use of personal vehicles for those persons eligible for such allowance in connection with official travel.

§22.3 Relocation Expenses

During the term of this Agreement, employees in this Unit who are eligible for reimbursement for travel and moving expenses upon transfer, reassignment or promotion (under Section 202 of the State Finance Law and the regulations thereunder) or for reimbursement for travel and moving expenses upon initial appointment to State service (under Section 204 of the State Finance Law and the regulations thereunder), may be eligible for payment up to the rates permitted in the rules of the Director of the Budget (9 New York Code Rules and Regulations, Part 155).


## ARTICLE 23
### Leaves

§23.1 Definitions. Whenever used in this Article:

a. The term "calendar year employee" shall mean any employee having a 12-month professional obligation.

b. The term "academic year employee" shall mean any academic employee having an academic year professional obligation.

c. The term "college year employee" shall mean any professional employee, or any academic employee holding a librarian title, having an annual professional obligation of less than 12 months, except an academic employee holding a librarian title having an academic year professional obligation.

§23.2 Vacation Leave: Calendar Year Employees and College Year Employees

a. Accrual of Vacation Leave—Employees hired prior to July 1, 1982:

1. Full-time calendar year and college year employees shall be eligible to accrue credits for vacation leave at the rate of one and three-quarter days a month for each month or major fraction thereof during

the term of their professional obligation. On January 2 of each year, one vacation day shall be added to the accrual balance of all full-time employees eligible to accrue vacation leave.

2. To accrue credits for vacation leave during each month, eligible full-time employees must be in full-pay status for such month, or major fraction thereof.

b. Accrual of Vacation Leave—Employees hired on or after July 1, 1982:

1. Commencing December 1, 1982, calendar year and college year employees who serve on a full-time basis and are appointed effective on or after July 1, 1982, shall be eligible to accrue credits for vacation leave for each month or major fraction thereof during the term of their professional obligation according to the following schedule. On January 2 of each year, one vacation day shall be added to the accrual balance of all employees eligible to accrue vacation leave.

| Years of Service | Vacation Accrual Rate in Days |
|---|---|
| 0-1 | 1¼ a month (15 days) |
| 2 | 1⅓ a month (16 days) |
| 3, 4, 5 | 1½ a month (18 days) |
| 6 | 1⅔ a month (20 days) |
| 7 | 1¾ a month (21 days) |

2. To accrue credits for vacation leave during each month, eligible full-time employees must be in full-pay status for such month, or major fraction thereof.

c. Part-time calendar year and college year employees shall be eligible to accrue credits for vacation leave as follows:

| Academic employees who teach: | receive: |
|---|---|
| 1 course | ¼ day per month |
| 2 courses | ½ day per month |
| 3 courses | 1 day per month |

Part-time academic employees whose professional obligations, as determined by the College President, are primarily other than teaching classes shall be eligible to accrue vacation leave in accordance with the compensation requirements for part-time professional employees as specified below:

Effective July 1, 2016,

| Professional employees who earn: | receive: |
|---|---|
| Up to $13,778 | ¼ day per month |
| $13,779 to $20,789 | ½ day per month |
| $20,790 to $27,797 | 1 day per month |
| $27,798 or higher | 1¼ day per month |

Effective July 1, 2017,

| Professional employees who earn: | receive: |
|---|---|
| Up to $14,054 | ¼ day per month |
| $14,055 to $21,205 | ½ day per month |
| $21,206 to $28,353 | 1 day per month |
| $28,354 or higher | 1¼ day per month |

Effective July 1, 2018,

Professional employees who earn: receive:

Up to $14,335 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .¼ day per month

$14,336 to $21,629 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .½ day per month

$21,630 to $28,920 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1 day per month

$28,921 or higher . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1 ¼ day per month

Effective July 1, 2019,

Professional employees who earn: receive:

Up to $14,622 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .¼ day per month

$14,623 to $22,062 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .½ day per month

$22,063 to $29,498 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1 day per month

$29,499 or higher . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1¼ day per month

Effective July 1, 2020,

Professional employees who earn: receive:

Up to $14,914 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .¼ day per month

$14,915 to $22,503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .½ day per month

$22,504 to $30,088 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1 day per month

$30,089 or higher . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1¼ day per month

Effective July 1, 2021,

Professional employees who earn: receive:

Up to $15,212 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .¼ day per month

$15,213 to $22,953 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .½ day per month

$22,954 to $30,690 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1 day per month

$30,691 or higher . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1¼ day per month

Employees who serve on a part-time basis and are initially appointed or commence part-time service on or after July 1, 2018 shall be eligible to accrue vacation leave for each month or major fraction thereof during the term of their professional obligation according to the following schedule.

Part-time calendar year and college year employees shall be eligible to accrue vacation leave as follows:

Academic employees who teach: receive:

1 course . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .¼ day per month

2 courses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .½ day per month

3 courses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1 day per month

Part-time academic employees whose professional obligations, as determined by the College President, are primarily other than teaching classes shall be eligible to accrue vacation leave in accordance with the requirements for part-time professional employees as specified below:

Employees who work: receive:

.20 to < .40 FTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .¼ day per month

.40 to < .60 FTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .½ day per month

.60 to < .80 FTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1 day per month

.80 to < 1.00 FTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1¼ day per month

To accrue credits for vacation leave during each month, eligible part-time employees must be in pay status consistent with their part-time service for such month, or major fraction thereof. A part-time

employee who is employed on a fee-for-service, per-diem, or hourly basis, whose professional obligation is less than a day of work per week, shall not be considered an eligible employee for purposes of accrual of vacation leave.

d. Maximum Accumulation. On January 1 of each calendar year, an employee's accrued vacation leave credits shall not exceed 40 days. An employee's total vacation leave credits may exceed 40 days during the calendar year but the employee must use the amount over 40 days or forfeit it on the last day of the calendar year. In the event of death, retirement, resignation or other non-disciplinary separation from University service, or change of the period of professional obligation from calendar year or college year to academic year, an employee shall be compensated for such accumulated and unused vacation leave credits not to exceed a maximum of 30 days, such payment to be computed on the basis of the basic annual salary otherwise payable. In the case of death while in service, such payment shall be made to the deceased employee's estate or as provided pursuant to the Estates, Powers and Trust Law. No payment pursuant to this subdivision shall be made if the employee moves to a position in another State agency which is covered by the Attendance Rules for employees in the State classified service.

e. Authorization for Use. Vacation shall be taken at such times as shall be approved by the College President. Where the College President, or designee, denies an employee's request for vacation the employee, upon request, shall be given the reasons for such denial in writing.

f. Charges. When an employee is on vacation, the employee shall not be required to charge vacation leave for any day upon which the employee would not have been required to be available to work had the employee not been on vacation.

§23.3 Vacation Leave: Academic Year Employees Accrual of Vacation Credit: Academic year employees shall not accrue credit for vacation leave and shall not be granted any such leave.

§23.4 Sick Leave

a. Accrual: Employees hired prior to July 1, 1982: Full-time employees shall be eligible to accrue credits for sick leave at the rate of 1 3/4 days a month for each month, or major fraction thereof, during the term of their professional obligation. To accrue credit for sick leave during each month, full-time employees must be in full-pay status for such month or major fraction thereof.

b. Accrual: Employees hired on or after July 1, 1982: Commencing December 1, 1982, employees who serve on a full-time basis and are appointed effective on or after July 1, 1982, shall be eligible to accrue credits for sick leave for each month, or major fraction thereof, during the term of their professional obligation as follows:

| Years of Service | Sick Leave Accrual Rate in Days |
|---|---|
| 0-1 | 1¼ a month (15 days) |
| 2 | 1⅓ a month (16 days) |
| 3, 4, 5 | 1½ a month (18 days) |
| 6 | 1⅔ a month (20 days) |
| 7 | 1¾ a month (21 days) |

To accrue credit for sick leave during each month, full-time employees must be in full-pay status for such month or major fraction thereof.

c. Part-time employees shall be eligible to accrue credits for sick leave as follows:

| Academic employees who teach: | receive: |
|---|---|
| 1 course | ¼ day per month |
| 2 courses | ½ day per month |
| 3 courses | 1 day per month |

Part-time academic employees whose professional obligations, as determined by the College President, are primarily other than teaching classes shall be eligible to accrue sick leave in accordance with the compensation requirements for part-time professional employees as specified below:

Effective July 1, 2016,

| Professional employees who earn: | receive: |
|---|---|
| Up to $13,778 | ¼ day per month |
| $13,779 to $20,789 | ½ day per month |
| $20,790 to $27,797 | 1 day per month |
| $27,798 or higher | 1¼ day per month |

Effective July 1, 2017,

| Professional employees who earn: | receive: |
|---|---|
| Up to $14,054 | ¼ day per month |
| $14,055 to $21,205 | ½ day per month |
| $21,206 to $28,353 | 1 day per month |
| $28,354 or higher | 1¼ day per month |

Effective July 1, 2018,

| Professional employees who earn: | receive: |
|---|---|
| Up to $14,335 | ¼ day per month |
| $14,336 to $21,629 | ½ day per month |
| $21,630 to $28,920 | 1 day per month |
| $28,921 or higher | 1¼ day per month |

Effective July 1, 2019,

| Professional employees who earn: | receive: |
|---|---|
| Up to $14,622 | ¼ day per month |
| $14,623 to $22,062 | ½ day per month |
| $22,063 to $29,498 | 1 day per month |
| $29,499 or higher | 1¼ day per month |

Effective July 1, 2020,

| Professional employees who earn: | receive: |
|---|---|
| Up to $14,914 | ¼ day per month |
| $14,915 to $22,503 | ½ day per month |
| $22,504 to $30,088 | 1 day per month |
| $30,089 or higher | 1¼ day per month |

Effective July 1, 2021,

| Professional employees who earn: | receive: |
|---|---|
| Up to $15,212 | ¼ day per month |
| $15,213 to $22,953 | ½ day per month |
| $22,954 to $30,690 | 1 day per month |
| $30,691 or higher | 1¼ day per month |

Employees who serve on a part-time basis and are initially appointed or commence part-time service on or after July 1, 2018 shall be eligible to accrue sick leave for each month or major fraction thereof during the term of their professional obligation according to the following schedule.

Part-time calendar year and college year employees shall be eligible to accrue sick leave as follows:

Academic employees who teach:                                                              receive:

1 course . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .¼ day per month

2 courses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .½ day per month

3 courses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1 day per month

Part-time academic employees whose professional obligations, as determined by the College President, are primarily other than teaching classes shall be eligible to accrue sick leave in accordance with the requirements for part-time professional employees as specified below:

Employees who work:                                                                      receive:

.20 to < .40 FTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .¼ day per month

.40 to < .60 FTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .½ day per month

.60 to < .80 FTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1 day per month

.80 to < 1.00 FTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1¼ day per month

   To accrue credit for such leave during each month, eligible part-time employees must be in pay status consistent with their part-time service for such month or major fraction thereof. A part-time employee who is employed on a fee-for-service, per-diem, or hourly basis, whose professional obligation is less than a day of work per week, shall not be considered an eligible employee for purposes of accrual of sick leave.

   d. Other Sick Leave Credit. Upon appointment to a position in the unclassified service, an employee shall be credited with any sick leave credits accrued pursuant to the Attendance Rules for the classified service.

   e. Maximum Accumulation. Accumulation of sick leave credits pursuant to subdivisions (a), (b) and (c) of this Section shall not exceed 200 days.

   f. Authorization for Use.

   1. For purposes of this Section 23.4, "temporary disability" shall be defined as any temporary mental or physical impairment of health, including such an impairment resulting from pregnancy, which disables an employee from the full performance of duty.

   2. The College President or designee shall permit employees who are unable to perform their duties because of claimed temporary disability to use any and all sick leave credits which they have accumulated pursuant to subdivisions (a), (b), (c) and (d) of this Section 23.4.

   3. The College President or designee may at any time require an employee to furnish suitable medical evidence from the employee's physician to substantiate a claimed temporary disability. In the absence of such suitable medical evidence, the College President may require an employee to be examined by a physician selected by the College at its expense. In the event medical evidence does not substantiate a claimed temporary disability, use of sick leave credits shall be disallowed and the employee shall be placed on leave without pay.

   4. Subject to prior approval of the College President or designee, an employee shall be allowed to use, in each year of this Agreement, up to a maximum of thirty days of sick leave accumulated pursuant to subdivisions (a), (b), (c), and (d) of this Section 23.4 for absences from work necessitated by a death or illness in the employee's immediate family. The College President's approval of requests for sick leave for purposes described in this paragraph shall not be unreasonably withheld.

   5. Subject to prior approval of the College President, an employee shall be allowed to use, in each year of this Agreement, up to a maximum of fifteen days of sick leave accumulated pursuant to subdivisions (a), (b), (c), and (d) of Section 23.4 for absences from work to remain at home immediately following the arrival of such employee's newly adopted child or new foster care child in the family home. The College President's approval of requests for sick leave for purposes described in this paragraph shall not be unreasonably withheld.

g. Additional Sick Leave.

1. The College President may grant an employee sick leave in addition to that provided by subdivisions (a), (b), (c), and (d) of this Section 23.4. Such additional sick leave may be at full salary, or such part thereof as the College President may determine, or without salary. Additional sick leave at full or partial salary, together with use of any sick leave provided by subdivisions (a), (b), (c) and (d) of this Section 23.4, shall not exceed a total of six calendar months. Additional sick leave without salary shall not exceed one calendar year. Additional sick leave at full or partial salary pursuant to this paragraph shall not be approved until all sick leave credits accumulated pursuant to subdivisions (a), (b), (c) and (d) of this Section 23.4 have been exhausted.

2. The College President may grant an employee sick leave in addition to that provided by paragraph (1) of this subdivision. Such additional sick leave may be at full salary or such part thereof as the College President may determine, or without salary. The Chancellor may require submission of such leave requests by an institution for approval when the Chancellor deems it to be in the best interests of the University.

3. Prior to being granted additional sick leave provided by this subdivision, an employee may be required to furnish such medical evidence from the employee's physician as may be requested or submit to medical examination by a physician selected by the College or University at its expense.

h. Charges. When an employee is on sick leave, the employee shall not be required to charge sick leave credit for any day upon which the employee would not have been required to be available to work had the employee not been on sick leave.

i. The College President or designee may require an employee who has been absent due to a temporary disability, prior to and as a condition of the employee's return to work, to be examined, at the expense of the College, by a physician selected by the College, to establish that the employee is no longer disabled and that the employee's return to work will not jeopardize the health of other employees. Such examination may not be regularly required.

j. During the term of this Agreement, the State or UUP shall have the right to reopen negotiations on demand with respect to the issue of a disability income protection plan.

§23.5 Holiday Leave

a. A calendar year or college year employee shall be eligible to observe the following days prescribed by law as holidays: New Year's Day, Martin Luther King Jr. Day, Lincoln's Birthday, Washington's Birthday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Election Day, Thanksgiving Day and Christmas Day. A part-time employee who is employed on a fee-for-service, per-diem, or hourly basis, whose professional obligation is less than a day of work per week, shall not be considered an eligible employee for purposes of holiday leave. For the term of this Agreement, the College President may designate two holidays as floating holidays in lieu of two holidays set forth above. The College President may designate an alternate date upon which one of the holidays is to be observed. If a second holiday is designated, the employee may select a date on which to observe the second holiday, with the approval of the employee's supervisor and consistent with the operating needs of the campus. The employee must observe such second holiday before the beginning of the next academic year. The College President's designation shall be announced following consultation with UUP in September of the academic year.

b. An employee who is eligible to observe holidays shall be granted a compensatory day off when any holiday specified in subdivision (a) falls on a Saturday, a Sunday, or a pass day.

c. An employee who is eligible to observe holidays who is required to work on a holiday shall be granted a compensatory day off. An employee who is eligible to observe Thanksgiving or Christmas, and who is required to work on such holiday, shall be granted one and one-half compensatory days off. Effective July 1, 2019, an employee who is eligible to observe holidays who is required to work on New Year's Day shall be granted a compensatory day off or, at the employee's election, additional compensation at the rate of 1/10 of the employee's biweekly rate for each such full day worked in lieu of the compensatory day off. An

employee who is eligible to observe Thanksgiving or Christmas, and who is required to work on such holiday, shall be granted one and one-half compensatory days off or, at the employee's election, additional compensation at the rate of 3/20 of the employee's biweekly rate for each such full day worked in lieu of compensatory time off.

d. Compensatory time or additional compensation shall be pro-rated for less than a full day of work. Compensatory time or additional compensation shall be pro-rated for regularly scheduled work in excess of the standard workday worked on a holiday. The additional compensation rate shall include all payments normally included in biweekly gross salary.

e. An employee electing to take additional compensation in lieu of compensatory time off shall notify the appropriate campus payroll office in writing between July 1 and August 15, 2019 of the employee's intention to do so with the understanding that such notice constitutes a waiver for the term of this Agreement of the employee's right to receive compensatory time off for the holidays on which additional compensation is an option; provided, however, that an employee shall have the opportunity to revoke such waiver, or file a waiver if the employee has not already done so, by notifying the appropriate campus payroll office in writing between April 1 and May 15 in each year of the Agreement thereafter of the employee's revocation or waiver, in which event such revocation or waiver shall remain in effect for the remainder of the term of this Agreement.

f. Compensatory days off shall be scheduled at times mutually convenient to the employee and the University, and used within one year of accrual or forfeited.

§23.6 Sabbatical Leave

a. Policy. Sabbatical leaves for professional development may be made available to academic employees who meet the requirements set forth below. The objective of such leave is to increase an employee's value to the University and thereby improve and enrich its program. Such leave shall not be regarded as a reward for service nor as a vacation or rest period occurring automatically at stated intervals.

b. Purpose. Sabbatical leaves may be granted for planned travel, study, formal education, research, writing or other experience of professional value.

c. Eligibility. Academic employees who have completed at least six consecutive years of service within the University or who, if they previously have had a sabbatical leave, have completed at least six consecutive years of service within the University from the date of return from their last sabbatical leave, shall be eligible for sabbatical leave. In computing consecutive years of service for the purpose of this subdivision, periods of vacation leave and periods of sick leave with salary shall be included; periods of leaves of absence, other than vacation and sick leave with salary, and periods of part-time service shall not be included but shall not be deemed an interruption of otherwise consecutive service.

d. Terms and Conditions. Sabbatical leaves may be granted for periods of one year at rates not to exceed one-half basic annual salary or for periods of one-half year at rates not to exceed full basic annual salary. Academic employees on sabbatical leave may, with the prior approval of the College President, accept fellowships, grants-in-aid, or earned income to assist in accomplishing the purposes of their leaves. In such cases, the College President may adjust the sabbatical leave salaries to reflect such income, either prior to or during the periods of such leaves, provided, however, that in no case shall sabbatical leave salary be reduced if total earnings are less than full salary.

e. Applications. Applications for sabbatical leaves shall be submitted to the College President as far in advance as possible of the requested effective date of the leave, but in no event later than six months in advance of such date unless such requirement is expressly waived by the College President. Each application shall include a statement outlining the program to be followed while on sabbatical leave, indicating any prospective income, stating that the applicant will continue as an academic employee for a minimum of one year upon the employee's return and stating that upon return the applicant will submit to the College President a detailed report of professional activities and accomplishments while on sabbatical leave.

f. Approval. Consistent with the provisions of subdivision (d), the College President may approve such sabbatical leave as the College President deems appropriate and such leave shall be reported to the Chancellor.

g. Leave Credits. Vacation leave and sick leave credits shall not be accrued or used during sabbatical leave.

§23.7 a. Other Leaves for Academic Employees

1. Approval. The College President may grant other leaves of absence for employees at full salary or reduced salary, or may grant employees leaves of absence without salary, for the purpose of professional development, acceptance of assignments of limited duration with other universities and colleges, governmental agencies, foreign nations, private foundations, corporations and similar agencies, as a faculty member, expert, consultant or in a similar capacity, or for other appropriate purposes consistent with the needs and interests of the University. Leaves of absence without salary may also be granted under appropriate circumstances for the purpose of child care. Leaves of absence at full or reduced salary pursuant to provisions of this Section shall be reported to the Chancellor. The Chancellor may require submission of such leave requests by an institution for approval when the Chancellor deems it in the best interests of the University.

2. Application. Applications for such leaves of absence shall be made to the College President. Each such application shall include a statement of the purpose for which the leave is requested, its anticipated duration and its value to the applicant and the University.

3. Leave Credits. Vacation leave and sick leave credits shall not be accrued or used during a period of leave pursuant to provisions of this Section.

b. Leaves of Absence for Professional Employees

1. Approval. The College President may grant other leaves of absence for employees at full salary or reduced salary, or may grant employees leaves of absence without salary, for the purpose of professional development, acceptance of assignments of limited duration with other universities and colleges, governmental agencies, foreign nations, private foundations, corporations and similar agencies, as a faculty member, expert, consultant or in a similar capacity, or for other appropriate purposes consistent with the needs and interests of the University. Leaves of absence without salary may also be granted under appropriate circumstances for the purpose of child care. Leaves of absence at full or reduced salary pursuant to provisions of this Section shall be reported to the Chancellor. The Chancellor may require submission of such leave requests by an institution for approval when the Chancellor deems it in the best interests of the University.

2. Application. Applications for such leaves of absence shall be made to the College President. Each such application shall include a statement of the purpose for which the leave is requested, its anticipated duration and its value to the applicant and the University.

3. Leave Credits. Vacation leave and sick leave credits shall not be accrued or used during a period of leave pursuant to provisions of this Section.

§23.8 Disability Leave

a. Upon being discontinued from service in accordance with provisions of the State University Group Disability Insurance Program, an employee shall be granted a leave without pay for disability and shall be continued on such leave without pay until the disability ceases, the disability benefits would cease under the terms outlined in the Group Long Term Disability Insurance Certificate, regardless of eligibility, or death, whichever event occurs first. Notwithstanding the foregoing, after five calendar years on such leave, an employee shall not have any right or entitlement to be restored to regular employment status. For purposes of the State University Group Disability Insurance Program, the College President may require an employee to be examined by a physician selected by the College at its expense. Determination that a disability exists may be made by the College President upon the advice of the College's examining physician. Notwithstanding the failure of an employee to cooperate with the College's examining physician, a determination that a disability exists may be made by the College President upon advice of the College's examining physician

that there are reasonable grounds to assume that a disability benefit would be payable in accordance with the State University Group Disability Insurance Program. If the College President determines, in accordance with the provisions of this Section, that a disability exists, the employee must apply for disability benefits under the State University Group Disability Insurance Program. In the event the employee does not apply for disability benefits, the employee shall be placed on disability leave without pay. If, upon a finding that an employee is not disabled, the disability insurance carrier disapproves an employee's application for benefits, the employee shall be restored to regular employment status.

b. Discontinuation from Service of Employees not Covered by the State University Group Disability Insurance Program.

Upon being discontinued from service as a result of a disability which prevents performance of the employee's duties, an employee shall be granted a leave without pay until the disability ceases, the disability benefits would cease under the terms outlined in the Group Long Term Disability Insurance Certificate, regardless of eligibility, or death, whichever event occurs first. Notwithstanding the foregoing, after five calendar years on such leave, an employee shall not have any right or entitlement to be restored to regular employment status. For purposes of determining the existence of such a disability, the College President may require an employee to be examined by a physician selected by the College at its expense. Determination that a disability exists may be made by the College President upon the advice of the College's examining physician. Notwithstanding the failure of an employee to cooperate with the College's examining physician, a determination that a disability exists may be made by the College President upon advice of the College's examining physician that there are reasonable grounds to assume that a disability exists which would prevent an employee from performing the employee's duties. If the College President determines, in accordance with the provisions of is Section, that such a disability exists, the employee shall be placed on a disability leave without pay. Where appropriate, the College President, after consulting with the College's examining physician, may refer the employee to an Employee Assistance Program or to other service agencies. The employee, however, shall be permitted to use any and all sick leave credits which have been accumulated pursuant to subdivisions (a), (b), (c) and (d) of Section 23.4, and may request additional sick leave pursuant to Subdivision (g) of Section 23.4. An employee who has been placed on disability leave without pay pursuant to this Section may subsequently request to be restored to regular employment status. Such request must be submitted in writing to the College President accompanied by suitable medical evidence from the employee's physician that the employee no longer has a disability which would prevent performance of the employee's duties. Following receipt of such submissions, the College President may require the employee to be examined by a physician selected by the College at its expense prior to making a determination whether to restore the employee to regular employment status. Upon a finding by the College's examining physician that the employee no longer has a disability which would prevent performance of the employee's duties, the employee shall be restored to regular employment status. Upon a finding by the College's examining physician that the employee continues to have a disability which prevents performance of the employee's duties, the College President may require the employee to be examined by a physician from the New York State Department of Civil Service Employee Health Service at the College's expense prior to making a determination whether to restore the employee to regular employment status. The determination of whether to restore the employment status may be made by the College President upon the advice of the physician from the Employee Health Service concerning the existence of a disability which would prevent the employee from performing the employee's duties.

§23.9 Attendance Records

Employees shall be required to certify their presence and record any absences on forms to be provided by the State. Employees shall also be required to record on such forms any charges to or accruals of vacation or sick leave credits. Such forms shall be submitted to the College President, or designee, for review on a monthly basis.

§23.10 Unauthorized Absence

a. Any employee absent from work without authorization shall be placed on leave without pay. In the event an employee's unauthorized absence continues for ten consecutive working days and the employee has not provided a written explanation for such absence to the College President by the close of business on the tenth working day following the commencement of such unauthorized absence, the employee's leave without pay status shall continue for the remainder of the semester in effect on the tenth consecutive working day of absence where the College has hired a replacement for the employee.

b. If the unauthorized absence without written explanation continues for a total of 30 consecutive working days, the employee shall be deemed to have resigned.

c. If, prior to being deemed to have resigned, an employee provides suitable medical evidence in accordance with Section 23.4(f)(3) of this Article which substantiates a claim of temporary disability, the employee may be placed on sick leave. Any sick leave under this subdivision shall commence upon substantiation of a claim of temporary disability by suitable medical evidence.

§23.11 Absence—Extraordinary Circumstances

An employee who has reported for work and, because of extraordinary circumstances beyond the employee's control, for example, extreme weather conditions or physical plant breakdown, is directed by the College President, or designee, to leave work, shall not be required to charge such directed absence during such day against leave accruals. Any such release of employees shall not create any right to equivalent time off by employees who are not directed to leave work.

§23.12 Limitations Term Appointments. Nothing contained herein shall be deemed to extend the term of appointment of employees, and all leaves of absence shall, in any event, terminate upon the expiration of such appointment.

§23.13 Seven-Month Child Care Leave

Child Care Leave following birth or adoption shall be granted as provided in Appendix A-42, Part V. However, where the child is required to remain in the hospital following birth, the seven-month mandatory child care leave shall, upon employee request, commence when the child is released from the hospital. If a child is required to be admitted to a hospital for treatment after child care leave has commenced, upon employee request, child care leave shall be suspended during a single continuous period of such hospitalization and that period shall not count toward calculation of the seven-month period. In such cases, any entitlement to mandatory child care leave expires one year from the date of birth or adoption of the child.

§23.14 Paid Family Leave Law

1. Effective January 1, 2019, all employees who meet the eligibility criteria shall be covered by the provisions of the NYS Paid Family Leave Benefits Law (PFL).

a. A professional employee or academic employee (whose regular professional obligation, as determined by the College President, is primarily other than teaching classes) whose regular professional obligation is at least 20 hours per week based on the percentage of full-time equivalent is eligible for PFL once they have completed 26 consecutive workweeks of such employment. The benefit payable upon submission of a qualifying claim will be based upon the employee's regular professional obligation.

b. A professional employee or academic employee (whose regular professional obligation, as determined by the College President, is primarily other than teaching classes) whose regular professional obligation is less than 20 hours per week based on the percentage of full-time equivalent is eligible for PFL once they have completed 175 workdays of such employment. For eligibility purposes workdays include days that the employee reports to the work location. The benefit payable upon submission of a qualifying claim will be based upon the employee's regular professional obligation.

c. An academic employee who teaches at least two courses per semester is eligible for PFL once they have completed 26 consecutive workweeks of such employment. An academic employee who teaches less than two courses per semester is eligible for PFL once they have completed 175 workdays of such

employment. For eligibility purposes workdays include days the employee is scheduled to teach and/or student contact plus one day per week. The benefits payable upon submission of a qualifying claim will be based on the number of days routinely scheduled for teaching and student contact per workweek that such employee is absent for.

2. Employees eligible for paid leave under the PFL shall have the option to charge accruals to the extent appropriate and approved in accordance with this Article, or utilize PFL for covered bonding leave, leave to care for a family member with a serious health condition, or leave to assist a family member when deployed abroad for military service. Family leave absences charged to accrued leave will not count against an individual's PFL entitlement.

3. Claim-related disputes such as statutory eligibility, benefit rate and duration of paid family leave arising under PFL shall be subject to the dispute resolution process included in the PFL and shall not be subject to the grievance procedure contained in Article 7 of the Agreement.

## ARTICLE 24
### Access to Employees

§24.1 UUP representatives shall, on an exclusive basis, have access to employees at a College during working and/or non-working hours to explain UUP membership, services, programs and activities. UUP representatives not employed at a College must give notice to a College President in connection with access under the provisions of this Article. UUP agrees that access under this Article shall not interfere with College operations or performance by employees of their duties and responsibilities.

§24.2 The exclusive access provisions of this Article shall not be effective during organizational campaign periods or during periods following the expiration of unchallenged representation status as defined in the Civil Service Law, Section 208.

## ARTICLE 25
### Compensation of Department Chairpersons

§25.1 Members of the academic staff designated as department chairpersons may be paid a stipend for duties and responsibilities of that function subject to the following limitations:

a. The stipend may not exceed 10 percent of basic annual salary when paid for duties as department chairperson during the term of professional obligation. Payment of such stipend as well as any extra service earned during the same time period shall not exceed 20 percent of basic annual salary.

b. A further stipend, not to exceed 10 percent of basic annual salary, may be paid to faculty having academic year professional obligations for duties as department chairperson which are performed solely during the summer after completion of the academic year professional obligation. Payment of such stipend shall be included in the earnings calculations under the summer employment policy.

c. The stipend shall not be added to basic annual salary. The stipend shall be removed upon termination of the employee's designation as department chairperson, whose salary thereafter shall be at the rate due as a regular member of the academic staff.

§25.2 Members of the academic staff designated as department chairperson may perform extra service and may be employed during the summer under the usual rules and procedures applicable to such employment.

§25.3 The provisions of Section 25.1 pertaining to stipends shall not apply to employees in the medical and dental schools of University medical centers or health sciences centers whose budget certificate titles are "Professor and Department Chairman"; provided, however, the provisions of such Section pertaining to extra service and summer employment shall apply.

## ARTICLE 26
## Jury Service

On proof of necessity of jury service, an employee shall be granted leave with pay without charge to leave credits. Leave with pay for jury service shall mean leave at the rate of pay the employee would have received had the employee not been on such leave.

## ARTICLE 27
## Professional Meetings

The State and UUP recognize the importance of attendance at professional meetings to professional growth and development and, accordingly, departments are encouraged to make funds available for attendance at such meetings. Where funds are made available, the employee shall not be required to charge leave accruals for such attendance.

## ARTICLE 28
## Medical Assistance

Each College shall promulgate procedures to be followed in the event of a medical emergency involving an employee of the College while on the College premises.

## ARTICLE 29
## Clinical Practice

§29.1 The provisions of Article XVI of the Policies shall be subject to review in the grievance procedure.

§29.2 It is the express understanding of the parties that Section 17 of the Public Officers' Law does not cover any malpractice claims that arise from the conduct of or participation in the clinical practice plan.

## ARTICLE 30
## Appointment, Evaluation and Promotion

§30.1 Appointments

Appointments of employees shall be made in accordance with Article XI of the Policies. After three consecutive years of full-time service on the basis of a temporary appointment, a full-time employee whose employment is continued on the basis of a temporary appointment shall be given the reasons for such appointment. The appropriate remedy for failure to receive such reasons shall be to have them provided.

§30.2 Evaluation and Promotion

a. Evaluation and promotion of employees shall be made in accordance with Article XII of the Policies.

b. Subject to provisions of this Agreement, the system of evaluation for professional employees shall be as specified in the Memorandum of Understanding dated September 30, 1981, between the University and UUP relating to a system of evaluation for professional employees, and the system of promotion for professional employees shall be as specified in the Memorandum of Understanding dated August 8, 1989, between the University and UUP relating to a system of promotion for professional employees. Such Memoranda of Understanding shall be statements of mutual intentions and shall not constitute agreements under Article 14 of the Civil Service Law or for any other purpose.

§30.3 a. All employees shall, upon appointment, receive a notice of appointment or reappointment containing the following information:

1. Academic or professional rank, if applicable, and official State title;
2. Type of appointment, i.e., Term, Continuing, Permanent or Temporary;
3. Duration of appointment if a term, or expected duration if a temporary appointment;
4. Basic annual salary, if appropriate, or rate of compensation; and
5. Effective date of appointment.

46

b. In addition, part-time employees shall receive an appointment letter which includes the following information on required assignments if applicable:

1. Teaching;

2. Advisement and/or governance; and

3. Research and/or community service.

c. In addition, part-time employees shall receive an appointment letter which identifies the benefits for which they are eligible:

1. Health;

2. Leave; and

3. Other (specify).

## ARTICLE 31
### Personnel Files

§31.1 a. Each College shall maintain, for official University purposes, an official personnel file for each employee who is subject to this Agreement. Such file shall contain copies of personnel transactions, official correspondence with the employee and formal, written evaluation reports prepared in accordance with provisions of Article XII, Title A, Section 3 and Article XII, Title C, Section 4 of the Policies and such other written evaluations and/or recommendations as may be prepared by an immediate supervisor, Department Chairperson, Dean, Vice President, or other persons serving in a supervisory capacity in a direct line, as appropriate, in connection with matters of appointment, evaluation, reappointment or promotion. With respect to the latter written evaluations and/or recommendations, those which pertain to reappointment shall be sent to the employee at the time they are prepared. All materials referred to in this Section shall be available to an employee for review and response. In no event shall statements which are both unsolicited and unsigned be placed in the official personnel file. Statements that are unsolicited and signed shall be placed in the official personnel file and shall be available to an employee for review and response.

b. Upon receipt of the "other written evaluations and/or recommendations" referred to in subdivision (a) which pertain to reappointment, an employee who has completed three or more consecutive years of service in a position of academic or qualified academic rank or in a professional title shall, upon written request, be entitled to a meeting with the person who prepared a written evaluation and/or recommendation described in this subdivision to discuss the basis for such written evaluation and/or recommendation. The employee shall not be entitled to representation during such meeting. No part of the discussion held pursuant to provisions of this subdivision shall be subject to review in the grievance procedure. However, an employee may respond to information obtained during such discussion and may place in the employee's official personnel file or evaluative file any such response which is in writing.

§31.2 a. An employee shall have the right to examine the employee's personnel file during normal business hours. Statements solicited in connection with the employee's appointment, evaluation, reappointment or promotion, with the exception of the written evaluations or recommendations referred to in Section 31.1 above, shall not be available to that employee.

b. When a statement is solicited pursuant to Article 31.2(a) such statement shall be made available to that employee according to the respondent's reply to the following:

1. May the candidate read this recommendation? yes/no

2. May the candidate read this recommendation if all identification as to its source is deleted? yes/no

If the respondent does not reply to the above, or if the respondent's reply is negative, the statement shall not be available to the employee.

c. Upon an employee's request to review the official personnel file, the College shall prepare, or update as appropriate, a log of those materials in the official personnel file which are available to both the employee for review and response pursuant to this Section. Such log shall be retained in the employee's

official personnel file. If upon review in the grievance procedure it is determined that such a log has not been prepared, retained, or updated, the sole remedy shall be a direction to the college to, as appropriate, prepare, retain, or update such log in conformity with this Section.

§31.3 A designated representative of UUP, having written authorization from the employee concerned, and in the presence of a representative of the University, may examine the official personnel file of the employee, except for the limitation provided above, if the examination relates to a filed grievance, a grievance in preparation, or written notice of discipline served upon the employee by the University.

§31.4 Copies of materials in an employee's official personnel file to which the employee is permitted access pursuant to provisions of this Article shall be made available to the employee upon request and at the employee's expense and the employee may file a statement in response to any such item.

§31.5 Unless prohibited by law, an employee shall be notified of any request for access to the employee's official file other than related to official University purposes.

§31.6 a. Where, in connection with consideration of an academic employee for appointment, reappointment, or promotion, a file of evaluative material is developed by a committee or committees of academic employees which may exist to evaluate and make recommendations with respect to appointment, reappointment, or promotion of an academic employee, and where such file is first submitted to the last management administrative officer of the College for consideration, the academic employee to whom the file pertains shall, subject to subdivision (d), have at least five (5) working days to both examine such file and file a statement in response to any item contained therein; provided, however, statements solicited in connection with the employee's appointment, reappointment, or promotion and any documents which would identify the source of the statements, shall not be available to the employee.

b. Where, in connection with consideration of a professional employee for appointment, reappointment, or promotion, a file of evaluative material is developed by a committee or committees of professional employees which may exist to evaluate and make recommendations with respect to appointment, reappointment, or promotion of a professional employee, and where such file, or the personnel file, or part thereof, if that is the file that is used, is first submitted to the last management administrative officer of the College for consideration, the professional employee to whom the evaluative or personnel file, or part thereof, pertains shall, subject to subdivision (d), have at least five (5) working days to both examine such file and file a statement in response to any item contained therein; provided, however, statements solicited in connection with the employee's appointment, reappointment, or promotion and any documents which would identify the source of the statements shall not be available to the employee.

c. Examination of the file and response to material contained therein to which the employee has access pursuant to subdivision 31.6(a) or subdivision 31.6(b) shall take place after the file has been submitted to the management administrative officer of the College, but prior to this officer's consideration of its content. The management administrative officer of the College, or designee, shall notify the employee as to the specific place, dates and times when the file will be available for purposes of subdivision 31.6(a) or subdivision 31.6(b), as appropriate. Following expiration of the period allotted for employee's examination and response, the management administrative officer of the College may proceed to consider the content of such file.

d. Nothing contained herein shall prevent the management administrative officer of the College referred to in subdivision (c) or the College President from taking such action as the College President may deem necessary to meet notice requirements in the event of nonrenewal of term appointments.

## ARTICLE 32
### Notice of Non-Renewal

§32.1 Written notice that a term appointment is not to be renewed upon expiration is to be given to the employee by the College President, or designee, not less than:

a. 45 calendar days prior to the end of a part-time service term appointment;

b. Three months prior to the end of a term expiring at the end of an appointee's first year of uninterrupted service within the University. For such employees serving on the basis of an academic year professional obligation and academic employees at the Empire State College whose terms end in June, July or August, notice shall be given no later than March 31.

c. Six months prior to the end of a term expiring after the completion of one, but not more than two years of an appointee's uninterrupted service within the University. For such employees serving on the basis of an academic year professional obligation and academic employees at the Empire State College whose terms end in June, July or August, notice shall be given no later than December 15;

d. Twelve months prior to the expiration of a term after two or more years of uninterrupted service within the University.

e. Notwithstanding the above provisions, full-time employees with titles in Appendix B-1 and B-2 of Article XI of the Policies of the Board of Trustees shall receive not less than six months' notice prior to the expiration of a term appointment.

§32.2 Employees who intend to leave the employ of the University shall give 30 days' notice to the President or designee. In the event an employee fails to provide the full 30 days' notice, it shall be within the discretion of the President or designee to withhold from such employee's final check an amount equal to the employee's daily rate of pay for each day less than the required 30 days. Such action shall not constitute discipline.

§32.3 In the event the University elects to terminate a term appointment before the expiration of the term, the University will pay such employee's balance of salary for up to the maximum of the time remaining on the term appointment at the time of such termination.

## ARTICLE 33
## Job Security Review Procedures

§33.1 Definitions

a. "Professional staff" shall mean all persons occupying positions designated by the Chancellor as being in the unclassified service.

b. "Initial academic review" shall mean a review and recommendation by a committee of academic employees at the departmental level or, in the event academic employees are not organized along departmental lines, at the division, school, college or other academic employee organizational level next higher than the departmental level, which may exist for the purpose of evaluating an academic employee for continuing appointment.

c. "Subsequent academic review" shall mean a review and recommendation by a committee of academic employees at the division, school, college or other academic employee organizational level next higher than the initial academic review committee which may exist for the purpose of evaluating an academic employee for continuing appointment.

d. "Immediate supervisor" shall mean the person designated by the College President for purposes of evaluating a professional employee pursuant to the Policies of the Board of Trustees.

e. "Working days" shall mean Monday through Friday, excluding holidays.

§33.2 Request for Reasons

An academic or professional employee, within 10 working days following receipt of written notice that the employee's term appointment will not be renewed upon its expiration, further employment following which expiration would be required by the Policies of the Board of Trustees to be on the basis of continuing or permanent appointment, as the case may be, may submit to the College President, in writing, a request that the employee be apprised of the reasons for the notice of non-renewal.

§33.3 Response of College President

Within 10 working days following receipt by the College President of the employee's request pursuant to

49

Section 33.2 of this Article, the College President shall respond thereto in writing.

Such response shall be as follows:

a. Academic Employees.

1. Where the initial academic review committee has recommended that the employee not be granted continuing appointment, the College President shall indicate that the notice of nonrenewal was provided in conformity with the recommendation of such committee and the employee shall receive no further consideration of the term appointment.

2. Where the initial academic review committee has recommended that the employee be granted continuing appointment and the subsequent academic review committee, if any, has not so recommended, the College President shall indicate the reasons for the notice of non-renewal and the employee shall receive no further consideration of the non-renewal of the term appointment.

3. Where the initial academic review committee has recommended that the employee be granted continuing appointment and a subsequent academic review committee, if any, has recommended that the employee be granted continuing appointment, the College President shall indicate the reasons for the notice of non-renewal and shall inform the employee of the right to a review.

b. Professional Employees.

1. Where the employee's immediate supervisor has recommended that the employee not be granted permanent appointment, the College President shall indicate that the notice of nonrenewal was provided in conformity with the recommendation of the appropriate member of the professional staff and the employee shall receive no further consideration of the non-renewal of the term appointment; provided, however, where, throughout the employee's employment, each of the employee's formal, written evaluation reports prepared in accordance with provisions of Article XII, Title C, Section 4 of the Policies have characterized the employee's performance as "satisfactory" and the employee's immediate supervisor has recommended that the employee not be granted permanent appointment, the College President shall indicate the reasons for the notice of non-renewal and shall inform the employee of the right to a review.

2. Where the employee's immediate supervisor has recommended that the employee be granted permanent appointment, the College President shall indicate the reasons for the notice of non-renewal and shall inform the employee of the right to a review.

§33.4 Procedure for Review

a. Within 10 working days following receipt by an employee of notification, in writing, by the College President of the right to a review of the reasons for non-renewal, such employee may submit to the Chancellor a request, in writing, that the Chancellor, or designee, review the reasons for such notice of non-renewal. It is recommended that the employee enclose a copy of the College President's letter providing the reasons for the non-renewal with the request to the Chancellor.

b. Within 10 working days following receipt by the Chancellor of the employee's request for review submitted pursuant to subdivision (a) of this Section, the Chancellor, or designee, shall acknowledge the employee's request and shall notify both the employee and the College President that a review of the matter shall take place by an ad hoc tripartite committee of members of the professional staff at the employee's campus, to be known as the Chancellor's Advisory Committee.

c. Within 10 working days following their receipt of the communication of the Chancellor, or designee, referred to in subdivision (b) of this Section, the College President and the employee each shall designate, in writing, a member of the professional staff of the College to serve on the Chancellor's Advisory Committee. Copies of the respective designations shall be provided to the employee, the College President and the Chancellor as appropriate.

d. Within 5 working days of their designation, the two members of the Chancellor's Advisory Committee shall designate, in writing, a third member from among a panel of members of the professional staff at the employee's College to be determined in accordance with provisions of Section 33.5 of this Article.

Upon designation of the third member, who shall be Chairperson, the Chancellor's Advisory Committee shall be deemed to be fully constituted. Copies of the Chairperson's designation shall be provided to the employee, the College President and the Chancellor. In the event the two members of the Chancellor's Advisory Committee cannot mutually agree upon a Chairperson, selection of the Chairperson shall be accomplished by alternately striking names from the College Panel until one name remains. The right of first choice to strike shall be determined by lot.

e. Within 5 working days following the designation of the Chairperson, the Chancellor's Advisory Committee shall convene to review the reasons upon which the employee was provided written notice that the term appointment would not be renewed upon its expiration. The scope of the review conducted by the Chancellor's Advisory Committee shall not exceed the following:

1. Where the reasons for the notice of non-renewal were the employee's performance or competence, the Chancellor's Advisory Committee may review the substance of the judgments relating to such performance or competence.

2. Where the reasons for the notice of non-renewal involved matters of program, the review conducted by the Chancellor's Advisory Committee shall be limited to the sole question of whether the notice of non-renewal was in fact based upon such considerations when issued. The Chancellor's Advisory Committee shall not be empowered to determine the correctness of determinations of the College President involving matters other than the employee's performance or competence, but shall satisfy itself that the matters of program were the reasons for the decision and shall so state to the Chancellor.

f. The Chancellor's Advisory Committee shall conclude its review within 45 calendar days following the designation of the Chairperson. Within 5 working days following conclusion of this review, the Chancellor's Advisory Committee shall forward its recommendations, in writing, to the Chancellor.

g. Following receipt of the Committee's recommendations, the Chancellor, pursuant to the Policies of the Board of Trustees, shall, within 60 calendar days, take such action as may, in the Chancellor's judgment, be appropriate and shall notify, in writing, the employee, the Committee, and the College President.

h. If a majority of the members of the Chancellor's Advisory Committee recommend in favor of according continuing or permanent appointment, and the Chancellor does not award continuing or permanent appointment, then, in the final year following the notice of non-renewal, the College President shall either:

1. Reconsider the non-renewal action in light of the recommendations of the Chancellor's Advisory Committee and take such action as may, in the College President's judgment, be appropriate and shall notify, in writing, the employee, the Committee, and the Chancellor of the result; or

2. May offer the employee a designated leave. Such designated leave may be granted by the Chancellor, or designee, pursuant to this Section at full salary or reduced salary. A designated leave granted pursuant to this Section may be for any period, but shall in any event cease upon the termination date contained in the written notice of non-renewal. The employee's election to accept such offer must be in writing and is final and binding and may not thereafter be withdrawn.

This subdivision shall not operate to change the effective date of non-renewal or result in any additional review under this Article.

§33.5 College Panel

The Chairperson of any ad hoc tripartite Chancellor's Advisory Committee shall be selected from a panel of members of the professional staff at an employee's college determined by mutual agreement of the College President and UUP Chapter President. Such panel shall consist of an odd number, not less than nine. In the event the College President and the UUP Chapter President do not agree upon a panel within 90 days from the execution of this Agreement, selection of the panel shall be completed by the Director of Employee Relations, or designee, and the UUP President, or designee.

§33.6 The provisions of this Article shall not be deemed to create any manner of legal right, interest, or expectancy in any appointment to continuing appointment or permanent appointment. Pursuant to

the Policies of the Board of Trustees, a term appointment shall automatically expire at the end of its specified period.

§33.7 Neither provisions of this Article nor any review conducted pursuant thereto shall be subject to the provisions of Article 7, Grievance Procedure, of this Agreement. Issues involving the timeliness of actions under this Article shall be referred by UUP, in writing, by certified mail, to the Governor's Office of Employee Relations for resolution. UUP shall be advised of the resolution within 15 calendar days from the date the issues of timeliness were received by the Governor's Office of Employee Relations.

## ARTICLE 34
### Transfer Rights

§34.1 Employees who desire to transfer to vacancies at other Colleges within the University shall be given consideration for academic and professional positions in the State University Professional Services Negotiating Unit.

§34.2 a. The University will provide UUP with copies of vacancy announcements pertaining to academic and professional positions in the State University Professional Services Negotiating Unit as such announcements are received from the Colleges in the University.

b. Each College will provide the local UUP chapter with copies of vacancy announcements pertaining to academic and professional positions in the State University Professional Services Negotiating Unit at the College as such announcements are prepared. Each College will also develop and maintain procedures for publicizing vacancy announcements pertaining to its positions, as well as vacancy announcements which it receives from other Colleges within the University.

c. The vacancy announcements referred to in (a) and (b) above may be provided to UUP either by paper or by electronic means. If electronic, notification that a particular vacancy announcement has been posted shall be provided by e-mail containing a copy of or link to the vacancy announcement in question.

§34.3 No employee shall be transferred to another College within the University without the employee's consent.

§34.4 No employee shall, because of transfer, lose rights as defined by this Agreement.

§34.5 When a department, program, or other unit is transferred from one College in the University to another College in the University, any employee who transfers with the department, program or unit shall receive the following benefits to the extent permitted by applicable law, rule, or regulation:

a. Title and Salary. The employee shall retain the same title and salary which the employee held on the date of transfer.

b. Seniority for Purposes of Retrenchment. The employee shall receive the seniority for purposes of retrenchment as held on the date of transfer.

c. Appointments. An academic employee who held a continuing appointment on the date of transfer shall retain continuing appointment. A professional employee who held a permanent appointment on the date of transfer shall retain permanent appointment.

d. Prior Service Credit. An employee who held a term appointment on the date of transfer shall be granted a new term appointment for a duration of not less than the unexpired time of the previous term appointment held on the date of transfer and shall be credited with all prior continuous service in the University up to a maximum of four years for purposes of eligibility for permanent or continuing appointment.

e. Sick Leave. An employee shall be credited with the sick leave accruals which the employee had on the date of transfer.

f. Vacation and Compensatory Time. An employee shall be credited with the vacation leave accruals and the compensatory days granted pursuant to Section 23.5 which the employee had on the date of transfer.

## ARTICLE 35
### Retrenchment

§35.1 Retrenchment shall be defined as the termination of the employment of any academic or professional employee during any appointment, other than a temporary appointment which may be terminated at any time, as a result of financial exigency, reallocation of resources, reorganization of degree or curriculum offerings or requirements, reorganization of academic or administrative structures, programs or functions or curtailment of one or more programs or functions University-wide or at such level of organization of the University as a College, department, unit, program or such other level of organization of the University as the Chancellor, or designee, deems appropriate.

§35.2 a. Consistent with the operating needs of the level of organization of the University deemed appropriate for retrenchment, the Chancellor, or designee, after such consultation as may, in the Chancellor's judgment, be appropriate, shall apply retrenchment among employees holding the positions subject to retrenchment at such level of organization in inverse order of appointment within each affected group of employees hereinafter referred to, as follows:

1. Part-time employees holding term appointments before full-time employees holding term appointments.

2. Full-time academic employees holding term appointments before academic employees holding continuing appointments.

3. Part-time academic employees holding continuing appointments before full-time academic employees holding continuing appointments.

4. Full-time professional employees holding term appointments before professional employees holding permanent appointments.

5. Part-time professional employees holding permanent appointments before full-time professional employees holding permanent appointments.

b. For purposes of determining order of appointment of employees, prior service on the basis of a temporary appointment, without interruption of employment, shall be counted.

c.1. In the case of a potential retrenchment of an academic employee serving in a position at a level of organization below the level of an academic department or its equivalent (hereinafter "academic department") who has seniority in the academic department (as determined by application of Section 35.2 (a) and (b) to the academic department), the following procedure is to be followed: The Chancellor, or designee, shall give consideration to the retention of such employee in such academic department; such consideration to consist of the judgment of the Chancellor, or designee, with respect to the ability of such employee to perform the required professional obligation of a position remaining in the academic department after retrenchment.

2. In the case of a potential retrenchment of an academic or professional employee serving in a position at a level of organization below the level of a professional program, unit or equivalent (hereinafter "professional program"), who has seniority in the professional program (as deter-mined by application of Section 35.2 (a) and (b) to the professional program), the following procedure is to be followed: The Chancellor, or designee, shall give consideration to the retention of such employee in such professional program; such consideration to consist of the judgment of the Chancellor, or designee, with respect to the ability of such employee to perform the required professional obligation of a position remaining in the professional program after retrenchment.

3. In the case of a potential retrenchment of an academic employee serving in a position which is not part of an academic department or professional program the following procedure is to be followed: (i) the seniority of the employee is to be determined by application of Section 35.2 (a) and (b) to other academic employees at the College serving in positions which are not part of an academic department or professional program and which remain after retrenchment; (ii) in the event the employee subject to retrench-

ment has seniority as determined in (i) above, the Chancellor, or designee, shall give consideration to the retention of such employee in a position described in (i) above; such consideration to consist of the judgment of the Chancellor, or designee, with respect to the ability of such employee to perform the required professional obligation of said position.

4. In the case of a potential retrenchment of a professional employee serving in a position which is not part of a professional program the following procedure is to be followed: (i) the seniority of the employee is to be determined by application of Section 35.2 (a) and (b) to other professional employees at the College serving in positions which are not part of a professional program and which remain after retrenchment, who hold the same professional title as the employee subject to retrenchment or who hold a lower level professional title in a direct promotion line; (ii) in the event the employee subject to retrenchment has seniority as determined in (i) above, the Chancellor, or designee, shall give consideration to the retention of such employee in a position described in (i) above; such consideration to consist of the judgment of the Chancellor, or designee, with respect to the ability of such employee to perform the required professional obligation of said position.

5. With due regard for the operating needs of the academic department, or the professional program, or the College with respect to positions not part of an academic department or professional program, the criteria for consideration for retention pursuant to this paragraph (c), as appropriate, may include but shall not be limited to demonstrated mastery of subject matter, teaching experience, professional experience, research, and University service.

6. If the Chancellor, or designee, pursuant to the provisions of this paragraph (c), makes a determination in favor of the retention of an employee having seniority, the following procedure shall apply: (i) where practical, the most junior employee performing a professional obligation which, in the judgment of the Chancellor, or designee, an employee having seniority has the ability to perform shall be subject to retrenchment; (ii) the Chancellor, or designee, shall give consideration for retention, pursuant to provisions of this paragraph (c), to employees subject to retrenchment under (i) above.

7. A professional employee retained in a professional title through operation of this paragraph (c) shall: (i) retain permanent appointment held at the time of retention; (ii) continue to receive the basic annual salary at the time of retention if that salary is at or below the normal maximum of the professional rank of the professional title in which the employee is retained; otherwise the basic annual salary shall be the normal maximum of the professional rank of the professional title in which the employee has been retained.

8. Review in the grievance procedure of the provisions of this paragraph (c) shall be limited to the procedural issue of whether consideration for retention was given. Such issue may be processed through Step 3 only.

§35.3 a. The State will notify, in writing, the persons affected by retrenchment as soon as practicable recognizing that, where circumstances permit, it is desirable to provide the following notice of termination:

1. For those holding a term appointment, at least six months.

2. For those holding a continuing or permanent appointment, at least one year.

b. Notice of termination shall be sent by certified mail and shall contain a statement of the reasons for retrenchment. If notice of termination is less than the notice provided for in subdivision (a), the reasons for the shorter notice shall also be provided. A copy of the notice shall be sent to the local UUP Chapter President.

c. Following the decision respecting the level of organization of the University appropriate for retrenchment at a College, the Chancellor, or designee, shall inform, in writing, UUP of the level of organization at which retrenchment at such College will occur and the reason for such retrenchment.

d. Prior to the issuance of the written notification referred to in subdivision (a) of this Section, where retrenchment is to be at a level of organization below the level of an academic department or its equivalent or below the level of a professional program, unit or equivalent:

1. The University, upon written request from UUP, will provide UUP with a briefing concerning the facts

and reasoning used to specify that such level of organization at which retrench-ment will occur exist. The briefing will also include an opportunity to discuss such rationale.

2. After such briefing, the Director of the Governor's Office of Employee Relations, or designee, upon written request from UUP, shall provide UUP with an opportunity to discuss the information received from the University during such briefing.

3. Nothing contained herein shall prevent the Chancellor, or designee, from implementing retrench-ment. Nothing contained herein shall abridge the union's or grievant's rights to grieve that retrenchment.

4. Review in the grievance procedure of the provisions of this paragraph (d) shall be limited to the proce-dural issues of whether UUP received advance notice and whether UUP received information concerning the facts and reasoning mentioned above. The substance and sufficiency of the briefing provided hereun-der shall not be reviewable in the grievance procedure.

e. Chancellor's Discretionary Designated Leave Program. At any time following issuance of the writ-ten notification referred to in subdivision (a) of this Section, the Chancellor, or designee, may offer the employee a designated leave. Such designated leave may be granted by the Chancellor, or designee, pursuant to this Section at full salary or reduced salary. A designated leave granted pursuant to this Section may be for any period, but shall in any event cease upon the termination date contained in the written notification of retrenchment. The employee's election to accept such offer must be in writ-ing and is final, and binding and may not thereafter be withdrawn.

§35.4 a. Prior to the effective date of either retrenchment or the commencement of a designated leave and for a period of six months following the effective date of either retrenchment or the commencement of a designated leave, whichever is sooner, the University shall give special consideration for placement within the University to an employee who has been notified that the employee's services will be termi-nated as a result of retrenchment, or whose services have been terminated as a result of retrenchment, provided that a suitable position for which the employee is qualified is available.

b. The procedure for University-wide special consideration shall be as follows:

1. The University, through its University-wide Human Resources, will send copies of vacancy announce-ments received from the Colleges in the University to each employee who is entitled to special considera-tion as provided in this Section.

2. Employees entitled to special consideration shall have the right to apply for any position described in a vacancy announcement for which they believe themselves to be qualified.

3. Applications submitted by employees entitled to special consideration will be acted upon before ap-plications submitted by other persons. To obtain such action, an employee must specify in the application that the application is being submitted in accordance with the special consideration procedure.

4. Qualified rank shall be used for academic employee appointments effected under this Section only in those cases where an employee had been serving on the basis of continuing appointment in a posi-tion at a College different from the position to which the employee is appointed at that College under this section, or where, due to an employee's length of service at a College, consideration for continuing appointment at that College would be required in less than two full academic years from the date of appointment under this section.

§35.5 a. Following the expiration of University-wide special consideration rights provided for in Section 35.4, an employee shall be entitled to an additional 18 months of special consideration for placement within the College at which the employee was employed at the time of retrenchment, provided that a suitable position for which the employee is qualified is available.

b. The procedure for College-wide special consideration shall be as follows:

1. The College President, or designee, will send copies of vacancy announcements pertaining to posi-tions at the College to each employee who is entitled to special consideration as provided in this Section.

2. Employees entitled to special consideration shall have the right to apply for any position described in

a vacancy announcement for which they believe themselves to be qualified.

3. Applications submitted by employees entitled to special consideration will be acted upon before applications submitted by other persons. To obtain such action, an employee must specify in the application that the application is being submitted in accordance with the special consideration procedure.

4. Qualified rank shall be used for academic employee appointments effected under this Section only in those cases where an employee had been serving on the basis of continuing appointment in a position at a College different from the position to which the employee is appointed at that College under this Section, or where, due to an employee's length of service at a College, consideration for continuing appointment at that College would be required in less than two full academic years from the date of appointment under this Section.

§35.6 a. For a period of four years following the effective date of either retrenchment or commencement of a designated leave, whichever is sooner, irrespective of the employee's acceptance of a temporary appointment within the University during the interim, an employee removed as a result of retrenchment shall be offered reemployment in the same position at the College at which the employee was employed at the time of retrenchment should an opportunity for such reemployment arise. The term "same position" shall mean a position at the College equivalent in its content, duties, responsibilities, requirements and obligations to that held by the employee at the time of retrenchment. To facilitate communication concerning reemployment, it shall be the employee's responsibility to ensure that the College's records reflect the employee's current address. Offers of reemployment pursuant to this Section shall be made in inverse order of retrenchment. Any such offer of reemployment must be accepted within 15 working days after the date of the offer, such acceptance to take effect not later than the beginning of the semester immediately following the date the offer was made. In the event such offer of reemployment is not accepted, the employee shall receive no further consideration pursuant to this Section. In the event such offer of reemployment is accepted, the employee, upon commencement of such reemployment, shall receive the following benefits to the extent permitted by applicable law, rule or regulation:

1. Seniority for Purposes of Retrenchment. The employee shall receive the same seniority for purposes of retrenchment as held on the effective date of either retrenchment or the commencement of a designated leave, whichever is sooner.

2. Appointments. An academic employee who held a continuing appointment on the effective date of either retrenchment or the commencement of a designated leave, whichever is sooner, shall resume continuing appointment. A professional employee who held a permanent appointment on the effective date of either retrenchment or the commencement of a designated leave, whichever is sooner, shall resume permanent appointment.

3. Prior Service Credit. An employee who held a term appointment on the effective date of either retrenchment or the commencement of a designated leave, whichever is sooner, shall be granted a new term appointment and shall be credited with all prior continuous service in the University up to a maximum of four years for purposes of eligibility for permanent and continuing appointment.

4. Sick Leave. An employee shall be credited with the sick leave accruals which the employee had on the effective date of either retrenchment or the commencement of a designated leave, whichever is sooner.

b. On a quarterly basis, the University will provide UUP with a list of employees to whom the provisions of this Section apply. UUP shall be provided with a copy of any offers of reemployment made pursuant to provisions of this Section.

§35.7 a. For a period of two years following the effective date of either retrenchment or the commencement of a designated leave, whichever is sooner, irrespective of the professional employee's acceptance of a temporary appointment within the University during the interim, a professional employee holding a permanent appointment or a term appointment with a balance of more than six months removed as a result of retrenchment shall be offered reemployment in the same position at a similar College from which

the employee was employed at the time of retrenchment should an opportunity for such reemployment arise. (See Appendix A-14 for a list of similar Colleges.) The term "same position" shall mean a position at a similar College equivalent in its content, duties, responsibilities, requirements and obligations to that held by the employee at the time of retrenchment. To facilitate communications concerning reappointment, it shall be the employee's responsibility to ensure that the College's records reflect the employee's current address. Offers of reemployment pursuant to this Section shall be made after offers of reemployment provided for in Section 35.6 of this Article. In addition, offers of reappointment made pursuant to this Section, should more than one retrenched employee apply for a position and if it is determined that the position to be filled is the same position for more than one employee, shall be determined by seniority. Any such offer of reemployment must be accepted within 15 working days after the date of the offer, such acceptance to take effect not later than the beginning of the semester immediately following the date the offer is made. In the event such offer of reemployment is not accepted, the employee shall receive no further consideration pursuant to this Section, provided, however, there shall be no loss of any rights under this Article if an employee does not accept a position which is more than 50 miles from either the employee's residence or work site. In the event such offer of employment is accepted, the employee, upon commencement of such reemployment shall receive the following benefits to the extent permitted by applicable law, rule or regulation:

1. Seniority for Purposes of Retrenchment. The employee shall receive the same seniority for purposes of retrenchment as held on the effective date of either retrenchment or the commencement of a designated leave, whichever is sooner.

2. Appointments. A professional employee who held a permanent appointment on the effective date of either retrenchment or the commencement of a designated leave, whichever is sooner, shall be granted a three-year term appointment with a review for permanent appointment prior to its expiration.

3. Prior Service Credit. An employee who held a term appointment on the date of termination by reason of retrenchment shall be granted a new term appointment for the balance of the term that was in effect on the effective date of either retrenchment or the commencement of a designated leave, whichever is sooner, and with all prior continuous service in the University up to a maximum of four years for purposes of eligibility for permanent appointment.

§35.8 Employees whose services are terminated as a result of retrenchment shall continue to be covered by the New York State Health Insurance Program for a period not to exceed one year as provided in 4 NYCRR 73.2 (a)(3)(iii).

§35.9 a. A single Statewide Continuity of Employment Fund shall be established which shall be administered by a Statewide Employment Committee consisting of four representatives appointed by the State and four representatives appointed by UUP.

b. The Employment Committee shall:

1. Study employee displacement problems arising from economy RIFs, programmatic reductions and curtailments, close-downs, relocations, reallocation of resources, consolidations and technological changes, relating to employees in the Professional Services Negotiating Unit.

2. Make recommendations for the solution of these problems, including but not limited to the use of normal and induced attrition, sharing available State job opportunities, transition to work in the labor market beyond State employment, placement within State employment, and the training or retraining of retrenched or high risk employees for other employment. Specifically, retraining funds will be available to employees whose services have been terminated due to retrenchment or who have been notified that their services will be terminated due to retrenchment and to those employees that the committee may deem to be in high risk categories. To administer the retraining funds, the committee shall develop procedures within 90 days following the execution of the Agreement and shall submit the procedures to the State and UUP for review and approval. Upon their approval the procedures shall be promulgated to employees.

c. Mutually agreed upon activities of the Employment Committee shall be funded pursuant to Section 21.2 of this Agreement.

d. Recommendations made by the Employment Committee will not be binding on either the State or UUP, although they may form the basis for future negotiations and such agreements as the parties may enter into.

# ARTICLE 36
## Contracting Out

§36.1 The State has the right to contract out for goods and/or services. If employees are affected as a result of the State's exercise of its right to contract out, such employees shall be entitled to redeployment consideration in accordance with Article A of the Memorandum of Understanding on Contracting Out.

§36.2 Where an affected employee does not obtain employment through the redeployment consideration process in accordance with Article A of the Memorandum of Understanding on Contracting Out, the affected employee shall be offered the opportunity to elect one of the following transition benefits:

a. A financial stipend for an identified retraining or educational opportunity as provided for in Article B of the Memorandum of Understanding; or

b. Severance pay as provided for in Article C of the Memorandum of Understanding; or

c. The employee opts for and obtains preferential employment with the contractor at the contractor's terms and conditions, if available.

§36.3 A Tripartite Redeployment Committee comprised of the Director of the Governor's Office of Employee Relations, the Executive Vice Chancellor of the State University, and the President of the United University Professions shall meet as needed to discuss open issues related to redeployment consideration. The intent of redeployment consideration shall be to facilitate the redeployment of employees affected by contracting out to the maximum extent possible. Issues to be discussed by the Committee shall include, but not be limited to: review of the contracting out campus' Work Force Impact Plan, compliance with the parties' understandings and expectations regarding the redeployment effort, vacancy availability, information sharing in hiring and redeployment, dispute resolution, and hardship claims from individual employees in the redeployment process. Mutually agreed upon activities of the Tripartite Redeployment Committee shall be funded pursuant to Section 21.2 of the Agreement.

§36.4 An "affected employee" or an "employee affected" by contracting out shall mean a current employee whose position will be eliminated as a result of the State's exercise of its right to contract out for goods and/or services provided by that position. An "affected employee" or an "employee affected" is also the least senior employee displaced in accordance with Article A, Section 3.2(f) of the Memorandum of Understanding on Contracting Out.

Employees subjected to the following actions shall not be regarded as affected employees or employees affected by contracting out:

a. Termination of employees serving on temporary or probationary appointments, which may be terminated at any time in accordance with the provisions of Article XI of the Policies of the Board of Trustees.

b. Non-renewal of term appointees where the RFP is issued after the last date on which the notice of non-renewal is required to be issued under Article 32 (Notice of Non Renewal) of the Agreement.

c. Termination of employees pursuant to Article 19, Discipline, of the Agreement.

d. Termination of employees due to mental or physical incapacity pursuant to Article XV of the Policies of the Board of Trustees.

e. Discontinuation from service under Sections 23.8 (a) and (b) of the Agreement.

f. Employees deemed to have resigned under Section 23.10 of the Agreement.

g. Termination of employees pursuant to Article 35 of the Agreement unless a Request for Proposal for contracting out of the specific position occupied by an employee is issued within the recommended period of notice of retrenchment as set forth in Article 35 of the Agreement.

**ARTICLE 37**

**Retirement Income Supplementation Programs**

§37.1 The TIAA-CREF supplemental retirement annuity program which is currently available to State University managerial employees shall continue to be made available to employees.

§37.2 An additional annuity contract may be provided through United University Professions pursuant to 28 United States Code, Section 403(b) from any "financial organization" (as defined in State Finance Law, Section 201.6(a)) in which employees may participate by voluntary payroll deductions to be transmitted directly to the financial organization by the State Comptroller.

§37.3 An individual retirement account plan may be provided, through United University Professions, by a "financial organization" (as defined in State Finance Law, Section 201.6) pursuant to the Economic Recovery Tax Act of 1981 (P.L. 97-34) in which employees may participate by voluntary payroll deductions.


**ARTICLE 38**

**Parking**

§38.1 UUP recognizes that the State may modify existing parking facilities for purposes including, but not limited to, construction of new buildings, roadways or other improvements. In the event that existing parking is impacted by such modifications, the State and UUP shall meet to consider alternatives for such parking. Such consideration shall include the issues of transportation to and from parking areas and parking for the handicapped.

§38.2 The parking fee structure for the parking lot adjoining SUNY Plaza in Albany shall be governed by the Memorandum of Understanding between the State and UUP dated June 21, 1988, concerning parking fees for employees who park in employee parking facilities operated in and around Albany by the Office of General Services, Bureau of Parking Services.

§38.3 The status quo will be maintained for parking facilities presently provided without charge and no existing charge for parking facilities shall be increased or decreased without negotiations pursuant to this Article. The State and UUP, upon the demand by either party, shall reopen negotiations concerning parking fees for employees in the unit, in any parking facility not covered by the aforementioned Memorandum of Understanding. Such negotiations shall be held at the appropriate level. The President of UUP and the Director of the Governor's Office of Employee Relations shall be notified prior to commencement of negotiations and either party shall have the option of participating in the negotiations. Disputes arising from such negotiations shall be submitted to binding arbitration through procedures developed by the parties.


**ARTICLE 39**

**Health Insurance**

§39.1 Premium Contributions

(a) The State shall continue to provide all the forms and extent of coverage as defined by the contracts in force on July 1, 2016 with the State's health insurance carriers unless specifically modified by this Agreement.

(b) Enrollees may change their health insurance option each year throughout the month of November, unless another period is mutually agreed upon by the State and the Joint Committee on Health Benefits.

(c) The State shall provide health insurance comparison information to employees, through State agencies, prior to the beginning of an option transfer period. If the comparison information is delayed for any reason, the transfer period shall be extended for a minimum of 30 calendar days beyond the date the information is distributed to the agencies.

(d) Effective September 1, 2013, Empire Plan premium contributions shall be adjusted on a going forward basis. Effective July 2, 2016, for employees with a full-time salary of less than $42,590, effective July 1, 2017, for employees with a full-time salary of less than $43,444, effective July 1, 2018, for employees with a full-time salary of less than $44,312,  effective July 1, 2019, for employees with a full-time salary of

less than $45,198, effective July 1, 2020, for employees with a full-time salary of less than $46,102, and effective July 1, 2021, for employees with a full-time salary of less than $47,024, the State agrees to pay 88 percent of the cost of individual coverage and 73 percent of the cost of dependent coverage. Effective July 2, 2016, for employees with a full-time salary of $42,590 or more, effective July 1, 2017, for employees with a full-time salary of $43,444 or more, effective July 1, 2018, for employees with a full-time salary of $44,312 or more, effective July 1, 2019, for employees with a full-time salary of $45,198 or more, effective July 1, 2020, for employees with a full-time salary of $46,102 or more, and effective July 1, 2021, for employees with a full-time salary of $47,024 or more the State agrees to pay 84 percent of the cost of individual coverage and 69 percent of the cost of dependent coverage.

(e) The State agrees to continue to provide alternative Health Maintenance Organization (HMO) coverage. Effective September 1, 2013, HMO premium contributions shall be adjusted on a going forward basis. Effective July 2, 2016, for employees with a full-time salary of less than $42,590, effective July 1, 2017, for employees with a full-time salary of less than $43,444, effective July 1, 2018, for employees with a full-time salary of less than $44,312, effective July 1, 2019, for employees with a full-time salary of less than $45,198, effective July 1, 2020, for employees with a full-time salary of less than $46,102, and effective July 1, 2021, for employees with a full-time salary of less than $47,024, the State agrees to pay 88 percent of the cost of individual coverage and 73 percent of the cost of dependent coverage toward the hospital/medical/mental health and substance abuse component of each HMO, not to exceed 100 percent of its dollar contribution for those components under the Empire Plan and the State agrees to pay 88 percent of the cost of individual prescription drug coverage and 73 percent of the cost of dependent prescription drug coverage under each participating HMO. Effective July 2, 2016, for employees with a full-time salary of $42,590 or more, effective July 1, 2017, for employees with a full-time salary of $43,444 or more, and effective July 1, 2018, for employees with a full-time salary of $44,312 or more, effective July 1, 2019, for employees with a full-time salary of $45,198 or more, effective July 1, 2020, for employees with a full-time salary of $46,102 or more, and effective July 1, 2021, for employees with a full-time salary of $47,024 or more the State agrees to pay 84 percent of the cost of individual coverage and 69 percent of the cost of dependent coverage toward the hospital/medical/mental health and substance abuse component of each HMO, not to exceed 100 percent of its dollar contribution for those components under the Empire Plan and the State agrees to pay 84 percent of the cost of individual prescription drug coverage and 69 percent of dependent prescription drug coverage under each participating HMO.

— Eligible employees in the State Health Insurance Plan may elect to enroll in a federally qualified or State certified Health Maintenance Organization that has been approved to participate in the State Health Insurance Program by the Joint Committee on Health Benefits.

— If more than one HMO services the same area, the Joint Committee on Health Benefits reserves the right to approve a contract with only one such organization.

(f)(1) Effective for the 2019 health insurance plan-year and for each plan-year thereafter, to determine the employee premium contribution percentage for the next following health insurance plan year for eligible part-time professional employees, other than new professional employees, and eligible part-time academic employees, on or about October 1 of each year of this Agreement, the employer will determine the part-time employee's prior 12 months of actual compensation.
The actual compensation shall be compared to the income amounts specified in Articles 39.1(d) and 39.1(e), with employee premium contributions assessed accordingly.

(2) The initial premium contribution percentage for part-time academic employees hired on or after January 1, 2019, (new academic employees) shall be determined by comparing the anticipated annual actual compensation pursuant to the employee's appointment letter against the income amounts specified in Articles 39.1(d) and 39.1(e), with employee premium contributions assessed accordingly. For each subsequent plan-year, the new employee's premium contribution percentage shall be determined in the same

manner as employees hired before January 1, 2019, as described above.

(3) The initial premium contribution percentage for part-time professional employees hired on or after January 1, 2019 (new professional employees) shall be determined by comparing the anticipated annual compensation pursuant to the employee's appointment letter annualized to a full-time equivalent salary against the income amounts specified in Articles 39.1(d) and 39.1(e), with employee premium contributions assessed accordingly.  For each subsequent plan-year, to determine the new employee's premium contribution percentage, on or about October 1 of each year of this Agreement, the employer will determine the part-time employee's prior 12 months of compensation annualized to a full-time equivalent salary. The full-time equivalent salary shall be compared to the income amounts specified in Articles 39.1(d) and 39.1(e), with employee premium contributions assessed accordingly.

(g) As soon as practicable following ratification, NYSHIP enrollees who can demonstrate and attest to having other coverage, provided by an employer other than New York State, may annually elect to opt-out of NYSHIP's Empire Plan or Health Maintenance Organizations. Employees who choose to opt-out of a NY-SHIP health insurance plan will receive an annual payment of $1,000 for not electing individual coverage or $3,000 for not electing family coverage. The Opt-out Program will allow for re-entry to NYSHIP upon a change in status qualifying event as provided in regulations under Internal Revenue Code §125 and during the annual option transfer period. The enrollee must be enrolled in NYSHIP prior to April first of the previous plan year in order to be eligible to opt-out, unless newly eligible to enroll. The Opt-out payment will be prorated over the number of payroll cycles for the plan year and appear as a credit to the employee's wages for each biweekly payroll period the eligible individual is qualified. Participation in the Opt-out Program shall be considered enrollment in NYSHIP for all purposes, including retiree health insurance coverage, use of sick leave credits toward health insurance premiums in retirement, and participation in UUP Benefit Trust Fund vision and dental as an active employee. Effective January 1, 2019, the NYSHIP Health Insurance Opt-out Program will no longer be available.

(h) The Pre-Tax Contribution Program will continue unless modified or exempted by the Federal Tax Code.

§39.2 Benefits Management Program

(a) The Benefits Management Program will continue. Precertification will be required for all inpatient confinements and prior to certain specified surgical or medical procedures, regardless of proposed inpatient or outpatient setting.

1. To provide an opportunity for a review of surgical and diagnostic procedures for appropriateness of setting and effectiveness of treatment alternative, precertification will be required for all inpatient elective admissions.

2. Precertification will be required prior to maternity admissions in order to highlight appropriate prenatal services and reduce costly and traumatic birthing complications.

3. A call to the Benefits Management Program will be required within 48 hours of admission for all emergency or urgent admissions to permit early identification of potential "case management" situations.

4. Precertification will be required prior to an admission to a skilled nursing facility.

5. The hospital deductible amount imposed for non-compliance with Program requirements will be $200. This deductible will be fully waived in instances where the medical record indicates that the patient was unable to make the call. In instances of non-compliance, a retroactive review of the necessity of services received shall be performed.

6. Any day deemed inappropriate for an inpatient setting and/or not medically necessary will be excluded from coverage under the Empire Plan.

7. The Prospective Procedure Review Program will screen for the medical necessity of certain specified surgical or diagnostic procedures that, based on Empire Plan experience, have been identified as potentially unnecessary or overutilized. Effective July 1, 2008, in addition to Magnetic Resonance Imaging (MRI), Computerized Axial Tomography (CAT scans), Positron Emission Tomography (PET scans), Magnetic Reso-

nance Angiography (MRAs) and Nuclear Medicine Examinations will be added to the Prospective Proce-dure Review Program.

8. Enrollees will be required to call the Benefits Management Program for precertification when a listed procedure subject to prospective review is recommended, regardless of setting.

Enrollees will be requested to call two weeks before the date of the procedure.

9. (a) The Empire Plan's Prospective Procedure Review penalties will apply for failure to comply with the requirements of the Prospective Procedure Review Program regardless of whether the expense is an out-patient hospital or medical program expense.

(b) The Voluntary Medical Case Management component of the Empire Plan's Benefits Management Program will continue. This voluntary program will review cases of illness or injury, provide patients an op-portunity for flexibility in Plan benefits, maximize rate of recovery, and maintain quality of care.

§39.3 Hospital Coverage—Network

(a) The copayment for emergency room services will be $70. Effective January 1, 2019, the copayment for emergency room services will be $100.

(b) The copayment for other outpatient services, including urgent care services covered by the hospital contract, will be $40. Effective January 1, 2019, outpatient services, including urgent care services covered by the hospital contract, will be $50.

(c) The copayment for hospital outpatient surgery will be $60. Effective January 1, 2019, the copayment for hospital outpatient surgery will be $95.

(d) Services provided in a hospital owned or operated extension clinic will be paid by the hospital carrier, subject to appropriate copayment.

(e) The hospital outpatient and emergency room copayments will be waived for persons admitted to the hospital as an inpatient directly from the outpatient setting, for pre-admission testing/pre-surgical testing prior to an inpatient admission or for the following covered chronic care outpatient services: chemother-apy, radiation therapy, or hemodialysis.

(f) Hospital outpatient physical therapy visits will be subject to the same copayment in effect for physical therapy visits under the Managed Physical Medicine Program.

(g) Covered inpatient hospital services at a network hospital shall be a paid-in-full benefit.

(h) Emergency room and other outpatient services covered by the hospital contract and rendered at a network hospital shall be paid-in-full except for the appropriate copayment.

(i) All professional component charges associated with ancillary services billed by the outpatient depart-ment of a hospital for emergency care for an accident or for sudden onset of an illness (medical emer-gency) will be a covered expense. Payment shall be made under the participating provider or the basic medical component of the Empire Plan, not subject to deductible or co-insurance, when such services are not otherwise included in the hospital facility charge covered by the hospital carrier.

(j) Non-participating provider charges for services rendered in a hospital emergency room will be consid-ered under the basic medical program subject to deductible, but not co-insurance.

(k) Effective January 1, 2019, admission to a skilled nursing facility will be covered for up to 120 days of care. Each day in a skilled nursing facility counts as one-half benefit day of care.

§39.4 Hospital Coverage—Non-Network

(a) Covered inpatient hospital services at a non-network hospital shall be reimbursed at 90 percent of charges.

(b) Outpatient services covered by the hospital contract and rendered at a non-network hospital are re-imbursed at billed charges minus the enrollee share. The enrollee's share of the charge for covered outpa-tient services shall be the larger of (a) the $75 non-network hospital outpatient copayment, or (b) 10 percent of billed charges. Once an enrollee, enrolled spouse/domestic partner, or all dependent children

combined, have met the annual co-insurance maximum, all subsequent eligible non-network outpatient services for that enrollee, enrolled spouse or domestic partner, or all dependent children combined, for the balance of the calendar year will be paid subject to the network level of benefits. Inpatient anesthesiology, pathology and radiology services received at a network hospital will become a paid-in-full (less any appropriate copayment) benefit. Effective September 1, 2013, covered enrollee expenses for non-network hospital services will be included in the combined co-insurance maximum set forth in Article 39.6(d) of the Agreement.

§39.5 Medical Coverage—Participating Provider

(a) The Empire Plan shall include medical/surgical coverage through a network of participating providers who will accept the Plan's schedule of allowances as payment in full for covered services. Except as noted below, benefits will be paid directly to the provider at 100 percent of the Plan's schedule not subject to deductible, co-insurance, or annual/lifetime maximums.

1. Office visit charges by participating providers will be subject to a $20 copayment by the enrollee, with the balance of covered scheduled allowances paid directly to the provider by the Plan. Effective January 1, 2019, office visit charges by participating providers will be subject to a $25 copayment.

2. All covered surgical procedures performed by participating providers will be subject to a $20 copayment by the enrollee. Effective January 1, 2019, covered surgical procedures performed by participating providers will be subject to a $25 copayment.

3. All covered radiology services performed by participating providers will be subject to a $20 copayment by the enrollee. Effective January 1, 2019, covered radiology services performed by participating providers will be subject to a $25 copayment.

4. All covered diagnostic/laboratory services performed by participating providers will be subject to a $20 copayment by the enrollee. Effective January 1, 2019, covered diagnostic/laboratory services performed by participating providers will be subject to a $25 copayment.

5. All covered services provided at a participating ambulatory surgery center are subject to a $30 copayment by the enrollee. Effective January 1, 2019, all covered services performed at a participating ambulatory surgery center will be subject to a $50 copayment.

6. Effective January 1, 2019, all covered services provided at a participating urgent care center will be subject to a $30 copayment by the enrollee.

7. The office visit, surgery, radiology and diagnostic/laboratory copayment amounts may be applied against the basic medical co-insurance out-of-pocket maximum, however, they will not be considered covered expenses for basic medical.

8. Office visit charges by participating providers for well childcare will be excluded from the office visit copay.

9. Charges by participating providers for professional services for allergy immunization or allergy serum will be excluded from the office visit copayment.

10. Chronic care services for chemotherapy, radiation therapy, or hemodialysis will be excluded from the office visit copayment.

11. In the event that there is both an office visit charge and an office surgery charge by a participating provider in any single visit, the covered individual will be subject to a single copayment.

12. Outpatient radiology services and diagnostic/laboratory services rendered during a single visit by the same participating provider will be subject to a single copayment.

13. Routine pediatric care, including the cost of all oral and injectable substances for routine preventive pediatric immunizations, shall be a covered benefit under the Empire Plan participating provider component and the basic medical component.

14. Influenza vaccine is included in the list of pediatric immunizations, subject to appropriate protocols, under the participating provider and basic medical components of the Empire Plan.

(b) The Empire Plan medical component shall include voluntary Disease Management Programs. Disease Management covers those illnesses identified to be chronic, high cost, impact quality of life, and rely considerably on the patient's compliance with treatment protocols.

The current Disease Management Programs will continue. As soon as practicable, additional Disease Management

Programs will be created including but not limited to Chronic Kidney Disease. As appropriate, Nutritional Counseling will be available through the Disease Management Programs.

(c) The medical component of the Empire Plan shall include a voluntary 24 hour day/7 day week nurse-line feature to provide both clinical and benefit information through a toll-free phone number.

(d) Employees 50 years of age or older and their covered spouses/domestic partners 50 years of age or older will be allowed up to $250 reimbursement once per year toward the cost of a routine physical examination. These benefits shall not be subject to deductible or co-insurance.

(e) The cost of certain injectable adult immunizations shall be a covered expense, subject to copayment(s), under the participating provider portion of the Empire Plan. The list of immunizations shall include Influenza, Pneumococcal Pneumonia, Measles, Mumps, Rubella, Varicella, Tetanus, Diphtheria, Pertussis (Td/Tdap), Hepatitis A, Hepatitis B, Human Papilloma Virus (HPV), Herpes Zoster (copay required for adults under age 60), and Meningococcal Meningitis. Effective September 1, 2013, as established by the 2010 Federal Patient Protection and Affordable Care Act, no copayment shall be required. All adult immunizations shall be subject to protocols developed by the medical program insurer.

(f) The Empire Plan's medical care component will continue to offer a comprehensive managed care network benefit for the provision of medically necessary physical medicine services, including physical therapy and chiropractic treatments. Authorized network care will be available, subject only to the Plan's participating provider office visit copayment(s).

Unauthorized medically necessary care, at enrollee choice, will also be available, subject to a $250 annual deductible and a maximum payment of 50 percent of the network allowance for the service(s) provided. Maximum benefits for non-network care will be limited to $1,500 in payments per calendar year. Deductible/co-insurance payments will not be applicable to the Plan's annual basic medical deductible/co-insurance maximums.

(g) Effective September 1, 2013, covered preventive care services as defined in the 2010 Federal Patient Protection and Affordable Care Act are paid-in-full (not subject to copayment) when received from a participating provider.

(h) Effective September 1, 2013, certified nurse practitioners and convenience care clinics will be available as participating providers in the Empire Plan subject to the applicable participating provider copayment(s).

(i) Effective September 1, 2013, the Empire Plan medical carrier will implement a Guaranteed Access Program for primary care physicians and core provider specialties. Under the Guaranteed Access Program, if there are no participating providers available within the access standards, enrollees will receive paid-in-full benefits (less any appropriate copay).

§39.6 Medical Coverage—Basic Medical

(a) The Empire Plan shall also include basic medical coverage to provide benefits when non-participating providers are used. These benefits will be paid directly to enrollees according to reasonable and customary charges and will be subject to deductible and co-insurance.

(b) Periodic evaluation and adjustment of basic medical Reasonable and Customary charges will be performed according to guidelines established by the basic medical plan insurer.

(c) Effective September 1, 2013, the annual basic medical component deductible shall equal $1,000 per enrollee, $1,000 per covered spouse/domestic partner, and $1,000 for all dependent children combined. Effective September 1, 2013, the annual basic medical component deductible for employees with a full-time salary of less than $34,318 shall equal $500 per enrollee, $500 per covered spouse/domestic part-

ner, and $500 for all dependent children combined. Effective January 1, 2019, the annual basic medical component deductible shall equal $1,250 per enrollee, $1,250 per covered spouse/domestic partner, and $1,250 for all dependent children combined. Effective January 1, 2019, the annual basic medical component deductible for employees with a full-time salary of less than $37,891 shall equal $625 per enrollee, $625 per covered spouse/domestic partner, and $625 for all dependent children combined. The salary amount triggering the reduced deductible shall be indexed to salary increases during the term of this Agreement. Effective September 1, 2013, covered expenses for basic medical services, mental health and/or substance abuse treatments and home care advocacy services will be included in determining the basic medical component deductible. A separate deductible for managed physical medicine services will continue on and after September 1, 2013.

(d) Effective September 1, 2013, the annual maximum enrollee co-insurance out-of-pocket expense under the basic medical component shall equal $3,000 for the enrollee, $3,000 for the covered spouse/domestic partner, and $3,000 for all dependent children combined. Effective September 1, 2013, for employees with a full-time annual salary of less than $34,318, the annual maximum co-insurance out-of-pocket expense shall equal $1,500 for the enrollee, $1,500 for the covered spouse/domestic partner, and $1,500 for all dependent children combined. Effective January 1, 2019, the annual maximum enrollee co-insurance out-of-pocket expense under the basic medical component shall equal $3,750 for the enrollee, $3,750 for the covered spouse/domestic partner, and $3,750 for all dependent children combined. Effective January 1, 2019, for employees with a full-time annual salary of less than $37,891, the annual maximum co-insurance out-of-pocket expense shall equal $1,875 for the enrollee, $1,875 for the covered spouse/domestic partner, and $1,875 for all dependent children combined. The salary amount triggering the reduced out-of-pocket maximum shall be indexed to salary increases during the term of this Agreement. Effective September 1, 2013, the co-insurance maximums will include out-of-pocket expenses for covered hospital, medical, mental health and substance abuse services. The co-insurance maximums will not include out-of-pocket expenses for covered home care advocacy program services as set forth in Section 39.8 of this Agreement nor covered managed physical medicine services as set forth in Section 39.5(f) of this Agreement.

(e) The Basic Medical Discount Provider Program is available through the basic medical component of the Empire Plan.

— Empire Plan enrollees will have access to an expanded network of providers through an additional provider network;

— Basic medical provisions will apply to the providers in the expanded network option (deductible and 20 percent of co-insurance);

— Payment will be made by the Plan directly to the discount providers, no balance billing of discounted rate will be permitted;

— This Program is offered as a pilot program and will terminate on December 31, 2013, unless extended by agreement of both parties.

(f) Covered charges for medically appropriate local commercial ambulance transportation will be a covered basic medical expense subject only to the $35 copayment. Effective January 1, 2019, the copayment for local commercial ambulance transportation will be $70. Volunteer ambulance transportation will continue to be reimbursed for donations at the current rate of $50 less than 50 miles and $75 for 50 miles or over. These amounts are not subject to deductible or co-insurance.

(g) The newborn routine childcare allowance under the basic medical component shall be $150, not subject to deductible or co-insurance.

(h) The annual and lifetime maximum for each covered member under the basic medical component is unlimited.

(i) Services for examinations and/or purchase of hearing aids shall be a covered basic medical benefit and shall be reimbursed up to a maximum of $1,500 per hearing aid, per ear, once every four years, not

subject to deductible or co-insurance. For children 12 years and under, the same benefits can be available after 24 months when it is demonstrated that a covered child's hearing has changed significantly and the existing hearing aid(s) can no longer compensate for the child's hearing impairment.

 (j) The Empire Plan medical carrier will have a network of prosthetic and orthotic providers. Prosthetics or orthotics obtained through an approved prosthetic/orthotic network provider will be paid under the participating provider component of the Empire Plan, not subject to copayment. For prosthetics or orthotics obtained other than through an approved prosthetic/orthotic network provider, reimbursement will be made under the basic medical component of the Empire Plan, subject to deductible and co-insurance.

(k) Mastectomy bras prescribed by a physician, including replacements when it is functionally necessary to do so, shall be a covered benefit under the Empire Plan.

§39.7 Centers of Excellence

(a) The Empire Plan "Centers of Excellence" Programs will continue. A travel allowance for transportation and lodging will be included as part of the Centers of Excellence Program. Effective July 1, 2008, the travel allowance for mileage will be consistent with the maximum mileage allowance permitted by the Internal Revenue Service; the meal and lodging allowance in each location will be equal to the rate provided by the Federal government to its employees in such locations.

1. The Centers of Excellence Program for organ and tissue transplants will provide pre-transplant evaluation, hospital and physician services (inpatient and outpatient), transplant procedures, follow-up care for transplant related services, as determined by the Centers, and any other services as identified during implementation as part of an all-inclusive global rate.

2. The Centers of Excellence Program for infertility shall offer enhanced benefits to include treatment of "couples" as long as both partners are covered either as an enrollee or dependent under the Empire Plan. The lifetime coverage limit is $50,000. Covered services include: patient education and counseling, diagnostic testing, ovulation induction/hormonal therapy, surgery to enhance reproductive capability, artificial insemination and Assisted Reproductive Technology procedures. Prior authorization will be required for certain procedures. Exclusions include: experimental procedures, fertility drugs dispensed at a licensed pharmacy, medical and other charges for surrogacy, donor services/compensation in connection with pregnancy.

3. The Cancer Resource Services (CRS) Program will provide direct nurse consultations, information and assistance in

locating appropriate care centers, connection with cancer experts at CRS Cancer Centers, and paid-in-full reimbursement for all services provided at a CRS Cancer Center.

§39.8 Home Care Advocacy Program

(a) The Home Care Advocacy Program (HCAP) will continue to provide services in the home for medically necessary private duty nursing, home infusion therapy and durable medical equipment under the participating provider component of the Empire Plan.

(b) Individuals who fail to have medically necessary designated HCAP services and supplies pre-certified by calling HCAP and/or individuals who use a non-network provider will receive reimbursement at 50 percent of the HCAP allowance for all services, equipment and supplies upon satisfying the basic medical annual deductible. In addition, the basic medical out-of-pocket maximum will not apply to HCAP designated services, equipment and supplies. All other HCAP non-network benefit provisions will remain.

(c) External mastectomy prostheses are a paid-in-full benefit, not subject to deductible or co-insurance. Coverage will be provided by the medical carrier as follows:

• Benefits are available for one single/double mastectomy prosthesis in a calendar year.

• Pre-certification through the HCAP is required for any single external prosthesis costing $1,000 or more. If a less expensive prosthesis can meet the individual's functional needs, benefits will be available for the most cost-effective alternative.

§39.9 Eligibility

There shall be a waiting period of forty-two (42) days after employment before a new employee shall be eligible for enrollment under the State's Health Insurance Program. Effective with the 1991-1992 academic year, the 42-day waiting period for otherwise eligible newly hired academic employees placed on the State payroll, effective September 1, will begin as of the employee's actual first day of professional obligation but in no event before August 15.

(a) Employees eligible to enroll in the State Health Insurance Program may select individual or individual and dependent (family) coverage.

(b) Those eligible and enrolling for family coverage must provide the names of all eligible dependents to the Plan administrator in order for family coverage to become effective.

(c) Employees enrolling without eligible dependents, or those who choose not to enroll their eligible dependents, will be provided individual coverage.

(d) When more than one family member is eligible to enroll for coverage under the State's Health Insurance Program, there shall be no more than one individual and dependent enrollment permitted in any family unit.

(1) All employees with full-time appointments shall be eligible to receive the benefits contained in Article 39.

(2) All part-time employees who received the benefits provided for under Article 39 any time during the period commencing January 1, 1988, and ending on the close of business June 30, 1988, shall continue to be eligible to receive such benefits for so long as they are consecutively re-employed in the same capacity at the same college. In the event of a break in consecutive service for such employees, eligibility for the benefits provided for under Article 39 shall be determined pursuant to paragraphs (3) or (4) below as applicable.

(3) Part-time academic employees who teach two or more courses in any one semester shall be eligible to receive the benefits contained in Article 39 during that semester. Effective January 1, 2019, part-time academic employees, whose professional obligation is primarily teaching classes, who teach six or more credits, contact hours, or credit equivalents shall be eligible for health insurance. (Excluding those employees deemed to be casual pursuant to resolution of IP Charge U-5724.)

(4) Part-time academic employees whose professional obligations, as determined by the College President, are primarily other than teaching classes shall be eligible to receive the benefits contained in Article 39 in accordance with the compensation requirements for part-time professional employees. (Excluding those employees deemed to be casual pursuant to the resolution of IP Charge U-5724.)

(5) Part-time professional employees shall be eligible to receive benefits if they are employed at a salary rate which would yield a total compensation of: $14,430 or more between July 2, 2015 and July 1, 2016; $14,718 or more between July 2, 2016 and July 1, 2017; $15,012 or more between July 2, 2017 and July 1, 2018; $15,312 or more between July 2, 2018 and July 1, 2019; $15,618 or more between July 2, 2019 and July 1, 2020; $15,930 or more between July 2, 2020 and July 1, 2021; and $16,249 or more after July 1, 2021. Effective for the 2019 plan year, part-time professionals, who are hired after January 1, 2019 shall be eligible to receive benefits if their professional obligation is at least one-half of full-time equivalent professional obligation. (Excluding those employees deemed to be casual pursuant to resolution of IP Charge U-5724.)

(6) Part-time employees eligible for health insurance who work in either the spring or fall semester shall be eligible to receive 26 weeks (13 pay periods) of health insurance coverage for each semester worked.

(a) If an eligible part-time employee teaches in consecutive spring and fall semesters, and elects to enroll for health insurance for both semesters, there will be no waiting period between semesters.

(b) If an eligible part-time employee works two consecutive fall semesters or two consecutive spring semesters, the waiting period will be waived in the third consecutive semester and thereafter, as long

as the employee is continually employed in either consecutive spring or fall semesters.

(7) Part-time employees who are not otherwise eligible for health insurance shall continue, during the term of this Agreement, to be permitted to participate on a full premium cost basis by the employee, in the State Health Insurance Program.

(8) Covered dependents of employees who are activated for military duty as a result of an action declared by the President of the United States or Congress shall continue health insurance coverage with no employee contribution for a period not to exceed 12 months from the date of activation, less any period the employee remains in full pay status. Contribution-free health insurance coverage will end at such time as the employee's active duty is terminated or the employee returns to State employment, whichever occurs first.

(9) A permanent full-time employee, who loses employment as a result of the abolition of a position on or after April 1, 1977, shall continue to be covered under the State Health Insurance Plan at the same contribution rate as an active employee for one year following such layoff or until re-employment by the State or employment by another employer, whichever first occurs.

(10) Domestic Partners who meet the definition of a partner and can provide acceptable proofs of financial interdependence as outlined in the Affidavit of Domestic Partnership and Affidavit of Financial Interdependence shall continue to be eligible for health care coverage.

§39.10 Retiree/Dependent Coverage

(a) Continued health insurance coverage will be provided for the unremarried spouse or domestic partner who has not acquired another domestic partner and other eligible dependents of employees who die in State service under circumstances for which they are eligible for the accidental death benefit or for weekly cash workers' compensation benefits under the conditions prescribed in Section 165 of the Civil Service Law.

(b) If an employee is granted a service-connected disability retirement by a retirement or pension plan or system administered and operated by the State of New York, the State will continue the health insurance of that employee on the same basis as any other retiring employee, regardless of the duration of the employee's service with the State.

(c) Covered dependent students shall be provided with a three-month extended benefit period upon graduation from a qualified course of study. Effective July 1, 2008, covered dependent students shall be provided with a three-month extended benefit period upon completion of each semester as a full-time student (or equivalent). The benefit extension will begin on the first day of the month following the month in which dependent student coverage would otherwise end and will last for three months or until such time as eligibility would otherwise be lost under existing plan rules.

(d) The unremarried spouse or domestic partner who has not acquired another domestic partner and otherwise eligible dependent children of an employee, who retires after April 1, 1979 with 10 or more years of active State service and subsequently dies, shall be permitted to continue coverage in the Health Insurance Program with payment at the same contribution rates as required of active employees for the same coverage.

(e) The unremarried spouse/domestic partner who has not acquired another domestic partner and otherwise eligible dependent children of an active employee, who dies after April 1, 1979 and who, at the date of death, was vested in the Employees' Retirement System (ERS), Teacher's Retirement System (TRS), or Optional Retirement Program (ORP), had 10 or more years of benefits eligible service, who was at least 45 years of age and was within 10 years of the minimum retirement age shall be permitted to continue coverage in the Health Insurance Program with payment at the same contribution rates as required of active employees for the same coverage.

(f) Employees on the payroll and covered by the State Health Insurance Program have the right to retain health insurance coverage after retirement, upon the completion of ten years of State service.

(g) An employee who is eligible to continue health insurance coverage upon retirement and who is enti-

68

tled to a sick leave credit to be used to defray any employee contribution toward the cost of the premium, may elect an alternative method of applying the basic monthly value of the sick leave credit. The basic monthly value of the sick leave credit shall be calculated according to the procedures in use on March 31, 1991. For retirements occurring on and after September 1, 2013, the actuarial table used to calculate the sick leave credit shall be the actuarial table in effect on the date of retirement. Employees selecting the basic sick leave credit may elect to apply up to 100 percent of the calculated basic monthly value of the credit toward defraying the required contribution to the monthly premium during their own lifetime. If employees who elect that method predecease their eligible covered dependents, the dependents may, if eligible, continue to be covered, but must pay the applicable dependent survivor share of the premium. Employees selecting the alternative method may elect to apply only up to 70 percent of the calculated basic monthly value of the credit toward the monthly premium during their own lifetime.

Upon the death of the employee, however, any eligible surviving dependents may also apply up to 70 percent of the basic monthly value of the sick leave credit toward the dependent survivor share of the monthly premium for the duration of the dependents' eligibility. The State has the right to make prospective changes to the percentage of credit to be available under this alternative method for future retirees as required to maintain the cost neutrality of this feature of the Plan. The selection of the method of sick leave credit application must be made at the time of retirement, and is irrevocable. In the absence of a selection by the employee, the basic method shall be applied. An employee retiring from State service may delay commencement or suspend his/her retiree health coverage and the use of the employee's sick leave conversion credits indefinitely, provided that the employee applies for the delay or suspension, and furnishes proof of continued coverage under the health care plan of the employee's spouse or domestic partner, or from post retirement employment.

§39.11 Mental Health and Substance Abuse Treatment Services

(a) The program for managed care of mental health services and alcohol and other substance abuse treatment shall continue. The Joint Committee on Health Benefits will work with the State on the ongoing review of this program. The Empire Plan shall continue to provide comprehensive coverage for medically necessary mental health and substance abuse treatment services through a managed care network of preferred mental health and substance abuse care providers. In addition to the network care, non-network care will also be available.

Benefits shall be as follows:

**NETWORK BENEFIT**

Mental Health Coverage

• Paid-in-full medically necessary hospitalization services and inpatient physician charges when provided by or arranged through the network.

• Outpatient care provided by or arranged through the network will be covered subject to a $20 per visit copay. Effective January 1, 2019, the outpatient visit copayment will be $25.

• The copayment for emergency room services will be $70. Effective January 1, 2019, the copayment for emergency room services will be $100.

• Up to three visits for crisis intervention provided by, or arranged through, the network will be covered without copay.

Alcohol and Other Substance Abuse Coverage

• Paid-in-full medically necessary care for hospitalization or alcohol/substance abuse facilities when provided by or arranged through the network;

• Outpatient care provided by or arranged through the network will be subject to the participating provider office visit copay.

**NON-NETWORK BENEFIT**

Medically necessary care rendered outside of the network will be subject to the following provisions:

• Non-network Mental Health inpatient and outpatient treatment services shall be subject to the same but separate non-network hospital component benefits and the same but separate non-participating provider basic medical benefits including deductible, co-insurance and reimbursement schedule. Expenses applied against the deductible and co-insurance levels indicated above will not apply against any deductible or co-insurance levels maximums under the Basic Medical portion of the Plan. Effective September 1, 2013, covered expenses for non-network mental health and substance abuse treatment will be included in the combined deductible and combined co-insurance maximum as set forth in Article 39.6 (c) and (d) of the Agreement.

§39.12 Prescription Drug Coverage

(a) Eligible UUP Unit employees enrolled in the Empire Plan will be provided with prescription drug coverage through the Empire Plan Prescription Drug Program. The benefits provided shall consist of the following:

1. The Prescription Drug Program will cover medically necessary drugs requiring a physician's prescription and dispensed by a licensed pharmacist.

2. Mandatory Generic Substitution will be required for all brand-name multi-source prescription drugs (a brand-name drug with a generic equivalent) covered by the Prescription Drug Program.

3. When a brand-name multi-source drug is dispensed, the Program will reimburse the pharmacy (or enrollee) for the cost of the drug's generic equivalent. The enrollee is responsible for the cost difference between the brand-name drug and its generic equivalent, plus the non-preferred brand name copayment.

• The copayment for up to a 30-day supply at either the retail or mail service pharmacy, will be $5 for generic/Level One drugs, $15 for preferred brand/Level Two drugs, and $40 for non-preferred brand/Level Three drugs. Effective September 1, 2013, the copayment for up to a 30-day supply at either the retail or mail service pharmacy will be $25 for preferred brand/Level Two drugs and $45 for non-preferred brand/Level Three drugs. Effective January 1, 2019, the copayment for up to a 30-day supply at either the retail or mail service pharmacy will be $5 for generic/Level One drugs, $30 for preferred brand/Level Two drugs and $60 for non-preferred brand/Level Three drugs.

• The copayment for a 31-90 day supply at the retail pharmacy will be $10 for generic/Level One drugs, $30 for preferred brand/Level Two drugs, and $70 for non-preferred brand/Level Three drugs. Effective September 1, 2013, the copayment for a 31-90 day supply at the retail pharmacy will be $50 for preferred brand/Level Two drugs and $90 for non-preferred brand/Level Three drugs. Effective January 1, 2019, the copayment for a 31-90 day supply at the retail pharmacy will be $10 for generic/Level One drugs, $60 for preferred brand/Level Two drugs and $120 for non-preferred brand/Level Three drugs.

• The copayment for a 31-90 day supply at the mail service pharmacy will be $5 for generic/Level One drugs, $20 for preferred brand/Level Two drugs, and $65 for non-preferred brand/Level Three drugs. Effective September 1, 2013, the copayment for a 31-90 day supply at the mail service pharmacy will be $50 for preferred brand/Level Two drugs and $90 for non-preferred/Level Three drugs. Effective January 1, 2019, the copayment for a 31-90 day supply at the mail service pharmacy will be $5 for generic/Level One drugs, $55 for preferred brand/Level Two drugs and $110 for non-preferred brand/Level Three drugs.

Effective September 1, 2013, Level One may include brand name medications that are determined by the Prescription Drug Insurer/Administrator to be a "best value" and/or generic drugs that are determined not to add value to the Plan or the enrollee may be placed in Level Two or Level Three.

Coverage will be provided under the Empire Plan Prescription Drug Program for prescription vitamins, contraceptive drugs, and contraceptive devices purchased at a pharmacy.

Effective September 1, 2013, "new to you" prescriptions will require two 30-day fills at a retail pharmacy prior to being able to obtain a 90-day fill through either a retail or mail service pharmacy. Effective January

1, 2019, the "new to you" program will be discontinued.

§39.13 Medical Flexible Spending Account

(a) The Medical Flexible Spending Account (MFSA) shall continue. The UUP Joint Committee on Health Benefits shall work with the State in the ongoing review of the MFSA. Eligible expenses under the Medical Flexible Spending Account will include over-the-counter medications according to guidelines developed by the Medical Flexible Spending Account Administrator. Effective January 1, 2019, or as soon as practicable thereafter, the MFSA shall provide a direct debit vehicle or electronic submission option to all enrollees as permitted pursuant to Internal Revenue Code §125 and related regulations.

§39.14 UUP Empire Plan Enhancements

• Prosthetic wigs shall be a covered basic medical benefit and shall be reimbursed up to a lifetime maximum of $1,500 not subject to deductible or co-insurance.

• The Empire Plan medical carrier shall contract with Diabetes Education Centers accredited by the American Diabetes Education Recognition Program.

• The lifetime maximum for travel and lodging expenses for the CRS program is eliminated.

• An annual diabetic shoe benefit will be available through the Home Care Advocacy Program under the medical carrier as follows:

— Network Coverage—benefits paid at 100 percent with no out-of-pocket cost up to a $500 maximum per year.

— Non-network Coverage—For diabetic shoes obtained other than through the HCAP, reimbursement will be made under the basic medical component of the Empire Plan, subject to deductible and the remainder paid at 75 percent of the network allowance up to a maximum of $500.

## ARTICLE 40
### UUP Benefit Trust Fund

§40.1 The State and UUP agree that they shall hereinafter enter into a contract to provide for the continuation of the UUP Benefit Trust Fund, in accordance with such terms as shall be jointly agreed upon by the parties and subject to the approval of the Comptroller, to be administered by UUP to provide certain health and welfare benefits for "employees" to be defined hereinafter. Quarterly payments to the UUP Benefit Trust Fund shall not include payments for  prescription drug coverage for eligible UUP-represented employees. Prescription drug coverage for eligible UUP-represented employees will be provided through either the Empire Plan Prescription Drug Program or a Health Maintenance Organization.

§40.2 The State shall contribute an amount to the UUP Benefit Trust Fund that shall equal the maximum payment per eligible employee as described below:

• The State shall deposit in the UUP Benefit Trust Fund an amount equal to $275 per employee per quarter for the period beginning July 1, 2016 and ending June 30, 2018.

• The State shall deposit in the UUP Benefit Trust Fund an amount equal to $285 per employee per quarter for the year beginning July 1, 2018 and ending June 30, 2019.

• The State shall deposit in the UUP Benefit Trust Fund an amount equal to $296 per employee per quarter for the year beginning July 1, 2019 and ending June 30, 2020.

• The State shall deposit in the UUP Benefit Trust Fund an amount equal to $308 per employee per quarter for the year beginning July 1, 2020 and ending June 30, 2021.

• The State shall deposit in the UUP Benefit Trust Fund an amount equal to $314.25 per employee per quarter for the year beginning July 1, 2021 and thereafter.

Payments shall be deposited as soon as practicable after the first day of each quarter.

§40.3 For the purpose of determining the amount to be deposited in accordance with Section 40.2 above, the number of employees shall be determined to be the number of employees on the payroll on the payroll date closest to 21 days before the first day of the quarter for which the deposit is to be made.

In the case of persons in positions which are on an appointment cycle which does not place them on the payroll at such times, the number of such additional employees shall be determined using the payroll date closest to the following: November 15 for the October 1 to December 31 quarter.

§40.4 For purposes of this Article, the term "employee" shall mean any person holding a position in this negotiating unit who is eligible for enrollment in the State Health Insurance Program in accordance with the provisions contained in Part 73 of the Rules and Regulations of the Department of Civil Service (4 NYCRR Part 73).

§40.5 The UUP Benefit Trust Fund shall implement a system of internal controls consistent with the guidelines contained in the Framework for Employee Benefit Fund Administration (Attachment B of the Memorandum of Understanding dated June 17, 1992) to safeguard assets, check accuracy and reliability of data, promote operational efficiency and encourage adherence to established management policies of the Fund.

§40.6 Within 15 days from the end of each quarter, the Fund will provide the Governor's Office of Employee Relations with written reports showing the Fund's expenditure activity for the previous quarter. These reports shall include expenditures for benefit administration and claims in a format agreed to by the parties. These reports are in addition to the annual Financial Statement and any other annual reports which are necessary to evaluate the financial status of the Fund.

## ARTICLE 41
### Joint Committee on Health Benefits

§41.1 a. The State and UUP agree to continue a Joint Committee on Health Benefits. The Committee shall consist of no more than five representatives selected by UUP and no more than five representatives selected by the State.

b. The Joint Committee on Health Benefits shall meet within 14 days after a request to meet has been made by either side.

c. The State shall seek the appropriation of funds by the Legislature to support committee initiatives and to carry out the administrative responsibilities of the Joint Committee in the following amounts: $185,711 for the 2016-2017 agreement year, $189,425 for the 2017-2018 agreement year, $193,214 for the 2018-2019 agreement year, $197,078 for the 2019-2020 agreement year, $201,020 for the 2020-2021 agreement year, and $205,040 for the 2021-2022 agreement year.

d. The Joint Committee shall work with appropriate State agencies to review and oversee the various health plans available to employees represented by UUP. This review shall include, but not be limited to:

1. The review of access to providers and coverage under these plans;

2. The development of Health Benefit Communication Programs related to the consumption of health care services provided under the plans;

3. The development of appropriate Health Insurance Training Programs;

4. The development, in conjunction with the carriers, of revised benefit booklets, descriptive literature and claim forms;

5. The study of recurring subscriber complaints and recommendations for the resolution of those complaints; and

6. The investigation and examination of other successful programs involving wellness, cost containment and alternative health care delivery systems.

e. The Joint Committee on Health Benefits shall review established methods and procedures for review of disputed medical claims.

f. The Joint Committee on Health Benefits shall work with appropriate State agencies to monitor future employer and employee health plan cost adjustments.

g. The Joint Committee shall be provided with each carrier rate renewal request upon submission and be briefed in detail periodically on the status of the development of each rate renewal.

h. The State shall require that the insurance carriers for the New York State Health Insurance Program (NYSHIP) submit claims and experience data reports directly to the Joint Committee on Health Benefits in the format and with such frequency as the Committee shall determine.

i. The Joint Committee on Health Benefits shall work with appropriate State agencies to make mutually agreed upon changes in the Plan benefit structure through such initiatives as:

1. The annual HMO Review Process.

2. The ongoing review of the Managed Mental Health and Substance Abuse Program.

3. The development, along with the State prior to the expiration of this contract, of a proposal to modify the manner in which employer contributions to retiree premiums are calculated in order to recognize and underscore the value of the services rendered to the State by its long-term employees.

4. Ongoing review of the Managed Physical Medicine Program.

5. Ongoing review of the Home Care Advocacy Program (HCAP).

6. Review of certain administrative practices to ensure that the eligibility criteria for NYSHIP and Employee Benefit Fund coverage are being applied consistently and correctly.

7. A direct debit vehicle or electronic submission process to be utilized under the Medical Flexible Spending Account by January 1, 2019, or as soon as practicable thereafter.

8. Ongoing review of Disease Management Programs. The Joint Committee on Health Benefits will work with the State to implement and oversee a Healthy Back Disease Management Program.

9. Review of the Empire Plan Prescription Drug Program to address prescription drug costs and access issues with regard to individuals with chronic conditions requiring maintenance medications.

10. Ongoing review of Prospective Procedure Review (PPR) requirements and role/responsibility of medical providers in PPR process. The Joint Committee on Health Benefits will evaluate the current pre-notification of radiology services and review the viability of pre-authorizing non-emergent cardiologic procedures and testing.

11. The UUP Joint Committee on Health Benefits will work with the State to conduct an extensive analysis of the current New York State Health Insurance Program (NYSHIP) prescription drug benefit designs (Empire Plan and HMOs) and associated costs.

12. The Joint Committee on Health Benefits shall work with the State to develop a voluntary Value Based Insurance Design pilot program with the goal of improving health outcomes while lowering overall costs through copayment waivers or reductions.

13. The Joint Committee on Health Benefits shall work with the State to develop a voluntary Telemedicine Pilot Program. The purpose of the Telemedicine Pilot Program will be to increase access to health care services through use of telecommunication to provide health care services.

14. The UUP Joint Committee on Health Benefits will work with the State and the medical carrier to develop an enhanced network of urgent care facilities.

15. The UUP Joint Committee on Health Benefits will work with the State to review benefits eligibility for full and part-time academic employees.

16. Study copayment waivers of medical and drug copays for chronic conditions.

17. Implement additional Disease Management and COE programs, and discuss coverage for nutritional therapy when clinically appropriate.

18. Monitor utilization of duplicate Durable Medical Equipment.

19. Basic review of the Empire Plan Medical Provider Discount Program.

20. Implement and oversee a Bariatric Surgery Management Program.

21. Work with the State to solicit a Health Risk Assessment Program and implement voluntary participation, and to consider an incentivized program and development of educational materials to influence healthy lifestyles.

## ARTICLE 42
## Professional Development Committee

§42.1 For the term of this Agreement, there shall be a Statewide Professional Development Committee consisting of three representatives appointed by the State and three representatives appointed by UUP.

§42.2 The Committee shall:

a. Review, make recommendations and implement programs for professional development and training programs which will improve job performance and assist employees in developing their full professional potential and in preparing for advancement.

b. Make recommendations and implement professional development programs responsive to the needs of part-time academic and professional employees.

c. Review recommended programs and implement programs intended for the benefit of employees in this unit.

d. Mutually agreed upon activities of the Statewide Professional Development Committee shall be funded pursuant to Section 21.2 of this Agreement.


## ARTICLE 43
## Safety and Health Committee

§43.1 a. A joint State/UUP Safety and Health Committee shall be established consisting of three members appointed by the State and three members appointed by UUP to identify and review safety-related issues affecting employees and to recommend plans for the correction of such matters.

b. Mutually agreed upon activities of the State/UUP Safety and Health Committee shall be funded pursuant to Section 21.2 of this Agreement.

c. The Committee shall study and make recommendations to the Director of the Governor's Office of Employee Relations and the President of United University Professions concerning the issues.

d. Recommendations made by the Committee will not be binding on either the State or UUP, although they may form the basis for future negotiations and/or such agreements as the parties may enter into.

§43.2 Where campus-wide committees exist to discuss matters of workplace health and safety, the President of UUP or designee may appoint one representative to serve on each campus health and safety committee.

§43.3 a. All matters relating to safety and health shall also be considered appropriate matters for discussion and recommended resolution consistent with the Agreement by campus and University-level labor-management committees. A labor-management committee or the State/UUP Safety and Health Committee considering a safety issue may refer the matter in whole or in part to a labor-management committee at any level or the State/UUP Safety and Health Committee for assistance in resolving the matter.

b. In recognition that safety is a workplace issue which transcends negotiating units, the parties agree to foster a safety coalition involving all employee groups in the State to address common safety concerns.


## ARTICLE 44
## (This Article is intentionally left blank.)


## ARTICLE 45
## Campus Grants Committee

§45.1 For the term of the Agreement, there shall be a Campus Grants Committee consisting of an equal number of representatives appointed by the State and by UUP. Such representatives shall be drawn from each of the State Joint Labor-Management Committees.

§45.2 The Committee shall:

a. Review, recommend and implement programs which will benefit groups of employees at one or more Colleges.

b. Make recommendations for and implement programs responsive to the needs of academic and professional employees.

c. Identify and review technology issues affecting employees' terms and conditions of employment and explore issues of mutual concern pertaining to the application of technology to work performed by academic and professional employees.

d. Mutually agreed upon activities of the Statewide Campus Grants Committee shall be funded pursuant to Section 21.2 of this Agreement.

## ARTICLE 46
### Work-Life Services Programs

§46.1 In recognition of the mutual benefits that will accrue to both the State and its employees, the State and UUP agree to provide Work-Life Services Programs set forth below to assist employees with balancing work and family responsibilities. A Joint Labor-Management Advisory Board, which recognizes the need for combined representation of all employee negotiating units and the State, will monitor and evaluate the Work-Life Services Programs.

§46.2 Employee Assistance Program

The State and UUP shall continue to provide an Employee Assistance Program to provide information, resources and confidential assessment and referral services to assist employees to be more productive at work, and to assist campuses in maintaining a healthy and productive workplace.

§46.3 Flexible Spending Program—Dependent Care Advantage Account

Effective January 1, 2009, the State shall provide a contribution per Dependent Care Advantage Account as follows:

| Employee Gross Annual Salary | Employer Contribution |
|---|---|
| Up to $30,000 | $800 |
| $30,001 to $40,000 | $700 |
| $40,001 to $50,000 | $600 |
| $50,001 to $60,000 | $500 |
| $60,001 to $70,000 | $400 |
| Over $70,000 | $300 |

In subsequent years, the employer contribution may be increased or reduced so as to fully expend available funds for this purpose, while maintaining salary sensitive differentials. In no event shall the aggregate employer contribution exceed the amounts provided for this purpose.

§46.4 In the interest of providing greater availability of dependent care and other services to UUP-represented employees and maximizing resources available, the Work-Life Services Programs may support additional initiatives as recommended by the Advisory Board.

§46.5 Mutually agreed to activities of the Work-Life Services Programs shall be funded pursuant to Section 21.2 of this Agreement.

## ARTICLE 47
### (This Article is intentionally left blank.)

## ARTICLE 48
### Housing and Meal Charges

§48.1 Increases in current meal charges and housing charges as provided in the Budget Policy and Reporting Manual Item B-300 for employees in the Professional Services Negotiating Unit shall be applied as follows:

Meals

The rate employees pay for meals shall be adjusted each July 1 by the CPI-U, United States, "Food Away from Home" component, for the period October-September, published by the Bureau of Labor Statistics, U.S. Department of Labor.

Housing

The rate employees pay for housing shall be adjusted each July 1 by the CPI-U, United States, "Rent of Primary Residence" component, for the period October-September, published by the Bureau of Labor Statistics, U.S. Department of Labor.

§48.2 Such adjustments shall be determined as the percentage change in the above mentioned indexes during each twelve-month period ending September 30 of the year immediately preceding the July 1 effective date.

§48.3 The above indexes shall be subject to review one time during the term of this Agreement upon the request of either party.

## ARTICLE 49
### Program for Tuition Assistance

The State agrees to continue the existing tuition assistance program using a "space available" concept. When space is available, employees may enroll in a course on a tuition-free basis subject to the following requirements:

1. The University determines when space is available, recognizing that such determination must be made in sufficient time to permit enrollment by employees;

2. Employees must meet course prerequisites;

3. All fees other than tuition shall be paid by employees;

4. Employees may enroll in a maximum of one course per semester and special session, for example, summer session and intersession;

5. Minimum enrollment requirements established by the University as a necessary condition for offering a course shall not be affected by students interested in enrolling in a course on a space available basis; and

6. The program shall continue for the term of the Agreement.

## ARTICLE 50
### Indemnification

Employees in the Professional Services Negotiating Unit shall be covered by the provisions of Section 19 of the Public Officers Law during the term of this Agreement.

## ARTICLE 51
### Savings Clause

In the event that any article, section or portion of this Agreement is found to be invalid or unenforceable by a final decision of a tribunal of competent jurisdiction or shall be in conflict with a national policy of wages and prices or shall have the effect of a loss to the State of funds or property or services made available through federal law then such specific article, section or portion specified in such decision or which is in such conflict or having such effect shall be of no force and effect, but the remainder of this Agreement shall continue in full force and effect. In such an event, either party shall have the right to immediately reopen negotiations with respect to the article, section or portion of this Agreement involved. The parties agree to use their best efforts to avoid any situation which might threaten such loss, and to contest any action which might result in such a loss to the State.

## ARTICLE 52
### Management Rights

Except as expressly limited by other provisions of this Agreement, all of the authority, rights and responsibilities possessed by the State are retained by it.

## ARTICLE 53
### Conclusion of Collective Negotiations

This Agreement is the entire agreement between the State and UUP, terminates all prior agreements and understandings and concludes all collective negotiations during its term, except as expressly otherwise provided in this Agreement. During the term of this Agreement, neither party will unilaterally seek to modify its terms through legislation or any other means. The parties agree to support jointly any legislation or administrative action necessary to implement the provisions of this Agreement. Where reopened negotiations are provided for, the subject of such reopened negotiations shall be solely limited to the subjects specified and all other provisions of this Agreement shall remain in full force and effect during the course of such reopened negotiations.

## ARTICLE 54
### Legislative Action

IT IS AGREED BY AND BETWEEN THE PARTIES THAT ANY PROVISION OF THIS AGREEMENT REQUIRING LEGISLATIVE ACTION TO PERMIT ITS IMPLEMENTATION BY AMENDMENT OF LAW OR BY PROVIDING THE ADDITIONAL FUNDS THEREFORE SHALL NOT BECOME EFFECTIVE UNTIL THE APPROPRIATE LEGISLATIVE BODY HAS GIVEN APPROVAL.

## ARTICLE 55
### Duration

This Agreement shall be effective on the date it is signed by the parties, but not earlier than July 2, 2016, and shall continue through July 1, 2022, except as specified otherwise in the Agreement or by mutual agreement of the parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their respective representatives on October 9, 2018.

**NEW YORK STATE GOVERNOR'S OFFICE OF EMPLOYEE RELATIONS**

Joseph M. Bress
Chief Negotiator

Michael N. Volforte
Director,
Governor's Office of Employee Relations

Phyllis A. Volpe
Assistant Director,
Governor's Office of Employee Relations

**State Negotiating Team**
Liesl Zwicklbauer
Chief University Negotiator
Associate Vice Chancellor, Employee Relations, SUNY System Administration

David Boland
Darryl Decker
Abbie Ferreira
Steve Hallock
Gail Kilmartin

Ronald Kuiken
Marcella Luongo
Melissa Pearson-Strain
Amy Petragnani
Julie Petti
Brian Quinlan


**UNITED UNIVERSITY PROFESSIONS**

Frederick E. Kowal, Ph.D.
President

Michael C. Smiles
Chief Negotiator

Elizabeth S. Hough
Counsel to the President
United University Professions

Pamela J. Malone
Assistant Chief Negotiator

Jason Torre
Assistant Chief Negotiator

**UUP Negotiations Team**
Bret E. Benjamin
Douglas S. Cody
Raymond P. Dannenhoffer
Jennifer L. Drake
Patricia D. Ghee
Carolyn S. Kube
Michael J. Lyon

Idalia Torres
Thomas J. Tucker
William J. Tusang
Paula S. White
Anne Wiegard
Beth E. Wilson
Ezra Zubrow

## APPENDICES

The Appendices are explanatory statements of mutual intent. While the Appendices are not part of the collective bargaining agreement, the State and UUP are fully committed to observing the concepts articulated in these documents.

### APPENDIX A-1

Dr. Frederick E. Kowal, President
United University Professions

Dear Dr. Kowal:

Effective upon ratification of the 2016-2022 UUP/State Agreement ("Agreement"), UUP shall have the right to reopen negotiations during the term of the Agreement with respect to the sole issues of a general salary increase for agreement years 2016-2017, 2017-2018, 2018-2019, 2019-2020, 2020-2021 and/or 2021-2022 if any other state bargaining unit agrees to and ratifies a general salary increase exceeding two percent in any of the corresponding State fiscal years.

This right to reopen negotiations is conditioned on taking into account the value of any concessions obtained by the State contained in the collective bargaining agreement used as justification by UUP to demand such reopening.

Sincerely,
s/Michael N. Volforte, Director                    s/Frederick E. Kowal, President
Governor's Office of Employee Relations            United University Professions

### APPENDIX A-2

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

This will confirm that the intent of Section 17.2 of this collective Agreement is to ensure that a College has each employee's current address and telephone number for purposes of communicating with the employee in connection with official College, University or State purposes. It is not our intent to make such information public, without an employee's consent, either by printing it in directories or by any other means.

Sincerely,
s/Linda Angello, Director                          s/William E. Scheuerman, President
Governor's Office of Employee Relations            United University Professions

### APPENDIX A-3

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

This will confirm that, in the negotiations for this collective agreement on the subject of parking, the State made the commitment that, subject to the results of reopened negotiations, existing free employee parking would not be converted to paid employee parking in the future.

In addition, both parties recognized that certain modifications to parking areas were currently in progress at several State University institutions and that neither the new collective agreement nor the State's commitment respecting parking described in this letter would affect those modifications.

The parties recognized further, however, that to the extent modifications in progress impacted current parking, UUP would have the right to meet with representatives of the State to discuss alternatives to limit that impact, and that issues such as transportation and parking for the handicapped would be appropriate for such discussions.

Furthermore, this will confirm our mutual understanding that, when a College is considered the appropriate level for parking negotiations, such negotiations will involve the College President and the local UUP Chapter President or their respective representatives.

Finally, this will confirm our understanding that a parking fee, as referred to in Article 38, represents a charge for use of College parking facilities. A registration fee is a separate and distinct charge which represents the modest costs associated with implementing and maintaining a system for registering those motor vehicles operated on campus. Such costs generally include printing, distribution, fee collection, and record keeping.

Sincerely,

s/Linda Angello, Director                                               s/William E. Scheuerman, President
Governor's Office of Employee Relations                    United University Professions


## APPENDIX A-4

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

This will confirm that the sole obligation arising from the term "consultation" as defined in Article XI, Title A of the Policies of the State University Trustees shall be consideration by a College President of recommendations of academic or professional employees, including the committees, if any, of the appropriate academic department or professional area, and other appropriate sources submitted to the College President in connection with appointment or reappointment of a specific employee.

Sincerely,

s/Linda Angello, Director                                               s/William E. Scheuerman, President
Governor's Office of Employee Relations                    United University Professions


## APPENDIX A-5

Dr. Frederick E. Kowal, President
United University Professions

Dear Dr. Kowal:

This is to confirm our understanding regarding the scope of obligation of certain bargaining unit members to report witnessed or reported incidents potentially covered under the Clery Act or prohibited by Title IX.

### Clery Act and Title IX Reporting Obligations

In addition to the obligations of Bargaining Unit Members who are identified as Campus Security Authorities and/or Responsible Employees under federal law, regulation, and guidance, all Bargaining Unit Members serving in academic rank or qualified academic rank, and all professional employees working in academic advisement, career services, continuing education, financial aid, instructional support, athletics, residential life, or student activities/affairs shall report instances where the Bargaining Unit Member witnesses, or an undergraduate and/or graduate student discloses to the Bargaining Unit Member, a crime

covered under the Clery Act, 20 U.S.C. §1092(f) (identified below) and/or discloses sexual or interpersonal violence or harassment on the basis of sex or gender as prohibited by Title IX of the Education Amendments of 1972. Bargaining Unit Members who witness or receive a report of such an incident must, as soon as practicable, notify University Police, Student Affairs, and/or the Title IX Office and follow campus policy in cooperation with the investigation.

Bargaining Unit members who maintain confidentiality as defined by federal or state law (e.g., pastoral counselors and professional mental health counselors) may elect not to report disclosures as governed by law and their professional code of ethics. This policy does not lessen other existing disclosure obligations that are tied to a specific position.

Covered Clery Act Crimes:

Criminal Offenses—Criminal Homicide, including Murder, Non-negligent Manslaughter, and Manslaughter by Negligence; Sexual Assault, including Rape, Fondling, Incest and Statutory Rape; Robbery; Aggravated Assault; Burglary; Motor Vehicle Theft; and Arson.

Hate Crimes—Any of the above-mentioned offenses, and any incidents of Larceny-Theft, Simple Assault, Intimidation, or Destruction/Damage/Vandalism of Property that were motivated by bias based on race, religion, sexual orientation, gender, gender identity, ethnicity, national origin, or disability.

Violence Against Women Act (VAWA) Offenses—Any incidents of Domestic Violence, Dating Violence and Stalking.

The reporting obligation shall not apply until individual Bargaining Unit Members have received training provided by management on the scope of the obligation to report, including the types of alleged criminal conduct and/or harassment which must be reported and the process for reporting, which includes the opportunity to ask and receive answers to any questions that individual Bargaining Unit Members may have.

Sincerely,

s/Michael N. Volforte, Director                                          s/Frederick E. Kowal, President
Governor's Office of Employee Relations                          United University Professions


## APPENDIX A-6

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

This will confirm that, under provisions of Section 35.2 of this Agreement, temporary employees holding positions at a level of organization at which retrenchment will occur will be terminated before application of retrenchment to other employees at such level of organization.

With respect to the Chancellor's Discretionary Designated Leave option described in Section 35.3 (e), when the President or designee intends to request a waiver of the retrenched employee's potential contract grievances or a discontinuance of pending contract grievances, the President or designee shall inform such employee of the ability to request union representation during any discussions concerning such waiver or discontinuance. Any such request for union representation shall be in writing and shall be directed to the President or designee. The President, or designee, may grant or deny such request in writing. When such employee is informed about all aspects of the designated leave proposal, such employee shall receive five calendar days to consider and review such designated leave proposal.

Any waiver or discontinuance signed by such employee as part of a designated leave shall state that such employee:

1. has been informed about the ability to request union representation;
2. understands all conditions of the designated leave proposal; and

3. has received five calendar days to consider the designated leave proposal.

If a retrenched employee agrees to the designated leave proposal, such employee shall receive the designated leave payment biweekly.

Where any employee utilizing the designated leave option is thereafter employed in a full-time capacity by the State during the designated leave period, the designated leave shall be deemed to cease upon commencement of such employment.

Sincerely,

s/Linda Angello, Director                                          s/William E. Scheuerman, President
Governor's Office of Employee Relations              United University Professions

## APPENDIX A-7

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

With respect to subdivision 7.5(c), this is to confirm our understanding that, although Step 3 reviews will be held on the record, a Step 3 meeting may be scheduled by mutual agreement between the State and UUP. If a Step 3 meeting is scheduled, it shall be held within 10 calendar days after receipt of the appeal.

Sincerely,

s/Linda Angello, Director                                          s/William E. Scheuerman, President
Governor's Office of Employee Relations              United University Professions

## APPENDIX A-8

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

This will confirm our mutual understanding that data provided to UUP by either the State or a College President, or designee, pursuant to Articles 16 and 17 of the Agreement shall be in computer-readable form if it exists in that format and if it is requested in that format by UUP. Notwithstanding the above, neither the State nor the College shall be required to provide data in a format requested by UUP if it does not already exist in that format. Further, it is understood that nothing in this letter will require the State or the College to reprogram to meet a specific format request. Finally, should any additional costs be associated with providing the data in computer-readable form over and above what it currently costs the State or the College to provide the data, these costs will be borne by UUP. Furthermore, this letter shall confirm that, where the State acts favorably on requests for information and data submitted by UUP pursuant to Article 17, the State shall encourage the campuses to act promptly in making such information available to UUP.

Sincerely,

s/Linda Angello, Director                                          s/William E. Scheuerman, President
Governor's Office of Employee Relations              United University Professions

## APPENDIX A-9

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

In developing supplementary guidelines for expending clinical practice income, the Governing Boards of clinical practice management plans may be guided by Appendix II of the January 3, 1974, Agreement be-

tween the State and the Senate Professional Association, Inc. (predecessor in interest to UUP). Any supplementary guidelines which are developed, however, must be consistent with the requirements contained in Section 4 of Article XVI of the Policies of the Board of Trustees.

  Sincerely,

s/Linda Angello, Director                               s/William E. Scheuerman, President
Governor's Office of Employee Relations           United University Professions

### APPENDIX A-10

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

  This is to confirm our understanding that the management of clinical practice income is an appropriate subject to collective negotiations. Accordingly, no change shall be made in the Trustees' Article XVI without prior negotiation with the certified representative of employees in the Professional Services Negotiating Unit.

  Sincerely,

s/Linda Angello, Director                               s/William E. Scheuerman, President
Governor's Office of Employee Relations           United University Professions

### APPENDIX A-11

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

  Grievances concerning eligibility for the benefits provided for under Article 39 shall receive expedited treatment at Step 2 of the Grievance Procedure.

  Sincerely,

s/Linda Angello, Director                               s/William E. Scheuerman, President
Governor's Office of Employee Relations           United University Professions

### APPENDIX A-12

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

  This is to confirm our understanding with respect to Article 33 reviews of continuing or permanent appointment decisions. On those campuses where there are two academic review committees beyond the initial academic review committee, a positive decision by the initial academic review committee and a positive decision by either of the two subsequent academic review committees shall entitle the employee to a review pursuant to subsection 33.3(a)(3).

  Sincerely,

s/Linda Angello, Director                               s/William E. Scheuerman, President
Governor's Office of Employee Relations           United University Professions

**APPENDIX A-13**

Dr. Frederick E. Kowal, President
United University Professions

Dear Dr. Kowal:

   During the course of negotiations, certain issues related to online education were raised by UUP that were of such significant concern that review at the Executive Level is required.

   As soon as practicable after a fully executed agreement, appropriate GOER, SUNY and UUP designees shall meet to discuss and review issues of mutual concern related to the impact of online education initiatives on bargaining unit employees.

   The agreement to review these issues in the labor-management forum does not constitute a waiver of any management or union right or prerogative.

   Sincerely,

s/Michael N. Volforte, Director                                s/Frederick E. Kowal, President
Governor's Office of Employee Relations                        United University Professions


**APPENDIX A-14**
**CATEGORIES OF SIMILAR COLLEGES**

**UNIVERSITY CENTERS**

State University of New York at Albany
State University of New York at Binghamton
State University of New York at Buffalo
State University of New York at Stony Brook


**COLLEGES OF ARTS AND SCIENCE AND SPECIALIZED COLLEGES**

State University College at Brockport
State University College at Buffalo
State University College at Cortland
State University College at Fredonia
State University College at Geneseo
State University College at New Paltz
State University College at Old Westbury
State University College at Oneonta
State University College at Oswego
State University College at Plattsburgh
State University College at Potsdam
State University College at Purchase
State University College of Environmental Science and Forestry
State University College of Technology at Farmingdale
State University of New York Empire State College
State University of New York Maritime College
State University of New York Polytechnic Institute
State University of New York System Administration


**COLLEGES AND CENTERS FOR THE HEALTH SCIENCES**

State University of New York College of Optometry
State University of New York Downstate Health Sciences University

State University of New York Health Science Center at Syracuse
Stony Brook University Health Sciences Center
University at Buffalo Academic Health Center

**TECHNOLOGY SECTOR COLLEGES**

State University of New York College of Agriculture and Technology at Cobleskill
State University of New York College of Agriculture and Technology at Morrisville
State University of New York College of Technology at Alfred
State University of New York College of Technology at Canton
State University of New York College of Technology at Delhi

## APPENDIX A-15

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

   This is to confirm our mutual understanding that the State University will not direct employees to absent themselves and charge such absence to leave accruals or leave without pay on the day after Thanksgiving. Such day may, however, either be designated by the College President or selected by an employee as the date on which a floating holiday is observed, pursuant to the terms and conditions set forth in Section 23.5 of this Agreement.

   Sincerely,

s/Linda Angello, Director                                   s/William E. Scheuerman, President
Governor's Office of Employee Relations         United University Professions

## APPENDIX A-16

Dr. Phillip H. Smith, President
United University Professions

Dear Dr. Smith:

   This is to confirm our mutual understanding that employees in the titles and services on the following list shall be eligible for recall and on-call pay as provided in Section 20.18 and 20.19 of the Agreement. Upon mutual agreement between the State and UUP, changes to the titles on the list may be made; provided, however, that matters of reclassification and carrying out mandates of Federal Law with respect to the Fair Labor Standards Act shall not be subject to approval by UUP.

*Anesthesiology*
   T.H. C.T.S. Anesthesia Specialist
   T.H. C.T.S. Anesthesia Associate
*Biomedical Engineering*
   T.H. Medical Instrumentation Specialist
   T.H. Medical Instrumentation Associate
   T.H. Medical Instrumentation Sr. Specialist
   T.H. Associate Director Biomedical Engineering
   T.H. Senior Biomedical Engineer
   T.H. Biomedical Engineer
   T.H. Biomedical Engineering Service Manager
   T.H. Biomedical Engineering Senior Technician

T.H. Biomedical Engineering Technician

*Cardiovascular Medicine*

T.H. C.T.S. Cardiology Specialist

Clinical Laboratories

T.H. Associate Technical Director Clinical Laboratory

T.H. Clinical Laboratory Technologist I, II, III, IV

Clinical Technical Services

T.H. C.T.S. EEG Senior Specialist

T.H. C.T.S. EEG Specialist

T.H. C.T.S. EEG Associate

*Dialysis*

T.H. Administrator for Pediatric Hemodialysis

T.H. Senior Biomedical Engineer

T.H. Biomedical Engineer

T.H. Biomedical Engineer, Senior Technician

T.H. Biomedical Engineering Technician

T.H. C.T.S. Vascular Specialist

T.H. C.T.S. Vascular Assistant

T.H. C.T.S. Vascular Associate

T.H. Medical Instrumentation Specialist

T.H. Medical Instrumentation Senior Specialist

T.H. Medical Instrumentation Associate

*Emergency Medical Services*

T.H. C.T.S. Emergency Medical Services Specialist

T.H. C.T.S. Emergency Medical Service Associate

*Histocompatibility/Transplant*

T.H. C.T.S. Transplant Specialist

T.H. C.T.S. Senior Transplant Specialist

T.H. Associate Technical Director of Clinical Laboratory

T.H. Clinical Laboratory Technologist I, II, III

*Hospital Information Technology*

Supervising Programmer/Analyst

Assistant Director of Computing Services

Lead Programmer/Analyst

T.H. Senior Instructional Support Specialist

Sr. Programmer/Analyst

University Data Base Administrator

*Infection Control*

T.H. Nurse Epidemiologist

Midwifery

T.H. Clinical Nurse Specialist

T.H. Assistant Director of Nursing

T.H. Midwifery Director

T.H. Midwife I, II

*Department of Nursing*
  T.H. Nurse Administrator
  T.H. Assistant Director of Nursing
  T.H. Associate Director of Nursing
  T.H. Clinical Nurse Specialist

*Operating Room*
  T.H. Associate Nursing Director
  T.H. Assistant Nursing Director
  T.H. Nurse Administrator
  T.H. C.T.S. Burn Specialist
  T.H. C.T.S. Burn Associate
  T.H. Operating Room Specialist
  T.H. Operating Room Associate

*Perfusion*
  T.H. Assistant Open Heart Perfusionist
  T.H. Open Heart Perfusionist
  T.H. Chief Open Heart Perfusionist
  T.H. C.T.S. Cardiology Specialist
  T.H. C.T.S. Cardiology Associate
  T.H. C.T.S. Cardiology Assistant
  T.H. C.T.S. Chief Transplant Organ Perfusionist
  T.H. C.T.S. Transplant Organ Perfusionist

*Pharmacy*
  T.H. Associate Director of Pharmacy
  T.H. Senior Pharmacist
  T.H. Pharmacist
  T.H. Pharmacy Assistant
  T.H. Senior Staff Associate

*Physician's Assistant*
  T.H. Physician Assistant I, II

*Radiology*
  T.H. Radiation Therapy Senior Dosimetrist
  T.H. Radiation Therapy Dosimetrist
  T.H. Radiation Therapy Assistant Dosimetrist
  T.H. Medical Radiography Associate Director
  T.H. Medical Radiography Assistant Director
  T.H. Medical Radiographer I, II, III
  T.H. Radiation Therapist I, II
  T.H. Associate Director Radiation Therapy
  T.H. Assistant Director Radiation Therapy
  T.H. Medical Instrumentation Technician
  T.H. Senior Biomedical Engineer
  T.H. Biomedical Engineer

*Respiratory Therapy*
  T.H. Senior Staff Associate
  T.H. Associate Director Respiratory Therapy
  T.H. Respiratory Therapist I, II, III

*Social Work*
  T.H. Senior Staff Associate
  T.H. Associate Director of Social Services
  T.H. Social Worker I, II, III
  T.H. Social Worker Assistant
*Other*
  C.T.S. Pulmonary Function Specialist Associate
  C.T.S. Pulmonary Function Assistant
  Nurse Practitioner


  Sincerely,
  s/Gary Johnson, Director                                    s/Phillip H. Smith, President
  Governor's Office of Employee Relations          United University Professions


## APPENDIX A-17

Dr. William E. Scheuerman, President
United University Professions


Dear Dr. Scheuerman:

  Article 41 of this Agreement specifies that the State shall seek the appropriation of funds by the Legislature for the purpose of funding mutually agreed upon activities of the Joint Committee on Health Benefits, including the administrative responsibilities of the Joint Committee. The Comptroller requires a formal agreement on how these funds will be allocated in order to approve their disbursement. Therefore, the State and UUP agree that these appropriations will be allocated to fund either activities of the State or UUP which directly support the responsibilities of the Joint Committee. In no case, however, will more than 50% of these appropriations be allocated either to the State or UUP, individually.
Sincerely,
s/Linda Angello, Director                                    s/William E. Scheuerman, President
Governor's Office of Employee Relations          United University Professions


## APPENDIX A-18

Dr. Phillip H. Smith, President
United University Professions


Dear Dr. Smith:

  This is to confirm our understanding that the State shall compile the following documents and make them electronically available to employees in one location on each campus:
  1. Appendix A-14, a listing of the Categories of Similar Colleges, State/UUP Agreement.
  2. The State's policy regarding sexual orientation under New York State Human Rights Law (Executive Law, Article 15) at http://www.dhr.ny.gov/law.
  3. The "State University of New York Internal Discrimination Grievance Procedure."
  4. Article 39.11, Mental Health Treatment Services, (including outpatient mental health care), State/UUP Agreement.
  5. Current State University Group Disability Program.
  6. State policy on alcohol and controlled substances in the workplace.

7. Article 23, Leaves, State/UUP Agreement.

8. Appendix A-42, Family Leave, State/UUP Agreement.

9. Appendix A-45, Leave Donation Program, State/UUP Agreement.

10. Article XIII, Leave of Absence for Employees in the Professional Services, Board of Trustees Policies.

11. Appendix A-46, Voluntary Reduction in Work Schedule (VRWS) Program Guidelines, State/UUP Agreement.

In addition, the State shall also provide copies of the above documents to the UUP Central Office electronically.

Sincerely,

s/Gary Johnson, Director                                                      s/Phillip H. Smith, President
Governor's Office of Employee Relations                          United University Professions

## APPENDIX A-19

Dr. Frederick E. Kowal, President
United University Professions

Dear Dr. Kowal:

This is to confirm our understanding that the minimum salaries for employees in research titles who are paid on the basis of a basic annual salary are as follows:

| Sr. Research Associate | Research Associate | Research Assistant |
|---|---|---|
| 7/2/16 - $55,554 | 7/2/16 - $43,184 | 7/2/16 - $35,111 |
| 7/1/17 - $56,665 | 7/1/17 - $44,050 | 7/1/17 - $35,813 |
| 7/1/18 - $57,798 | 7/1/18 - $44,931 | 7/1/18 - $36,529 |
| 7/1/19 - $58,954 | 7/1/19 - $45,830 | 7/1/19 - $37,260 |
| 7/1/20 - $60,133 | 7/1/20 - $46,747 | 7/1/20 - $38,005 |
| 7/1/21 - $61,336 | 7/1/21 - $47,682 | 7/1/21 - $38,765 |

Sincerely,

s/Michael N. Volforte, Director                                          s/Frederick E. Kowal, President
Governor's Office of Employee Relations                          United University Professions

## APPENDIX A-20

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

This will confirm our mutual understanding that Section 38.3 of the Agreement means either party may demand reopened negotiations concerning parking fees for facilities/lots presently provided with charge as well as those presently provided without charge. The parties acknowledge an obligation to participate in such negotiations pertaining to facilities/lots presently provided with charge at the appropriate level upon receipt of such demand.

The Last Offer Binding Arbitration (LOBA) dispute resolution procedure referenced in Section 38.3 of the 1988-91 Agreement and discussed by the parties in these negotiations shall be applicable only to any such reopened negotiations pertaining to facilities/lots presently provided with charge. Commencing July 1, 1994, the parties affirm an additional obligation to participate in such negotiations at the appropriate

level upon receipt of such demand concerning parking fees for facilities/lots presently provided without charge.

Commencing July 1, 1994, the sole resolution procedure for disputes arising from negotiations reopened on or after July 1, 1994, whether pertaining to parking fees for facilities/lots then presently provided with or without charge, shall be by a mutually agreed upon interest arbitration procedure.


Sincerely,
s/Linda Angello, Director                                     s/William E. Scheuerman, President
Governor's Office of Employee Relations          United University Professions


## APPENDIX A-21

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:
This will confirm our mutual understanding reached during discussions on Article 22, Travel Allowances and Relocation Expenses, in the 1991-95 State/UUP Agreement with respect to the concept of a centralized travel management system. Within the overall context of Article 22, UUP acknowledges that the State retains the right to establish a centralized reservation system for employee lodging and transportation arrangements, and to designate specific lodging facilities and transportation modes for locations within and outside of New York State.
Sincerely,
s/Linda Angello, Director                                     s/William E. Scheuerman, President
Governor's Office of Employee Relations          United University Professions


## APPENDIX A-22

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:
This is to confirm our mutual understanding that Joint labor-management Committee funds may be reallocated for use by other joint committees upon mutual agreement of the Director of the Governor's Office of Employee Relations and the President of United University Professions.
Sincerely,
s/Linda Angello, Director                                     s/William E. Scheuerman, President
Governor's Office of Employee Relations          United University Professions


## APPENDIX A-23

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:
This will confirm our mutual understanding that Article XI, Title J of the Policies of the Board of Trustees apply, irrespective of the medium of storage, to all literary works as defined by copyright law, including,

but not limited to, literary, instructional, dramatic, musical and artistic works, except for software, which is covered by a separate policy.

Sincerely,

s/John Ryan, Chancellor                                    s/William E. Scheuerman, President
State University of New York                              United University Professions

### APPENDIX A-24
### (Revised 2011)

To: Presidents, State-operated Campuses
From: Donald G. Dunn
Subject: Union Use of E-Mail

In this round of negotiations, UUP demanded access to e-mail and other communications media at the campuses. The State did not accede to this demand, but responded to UUP that this was an appropriate subject for labor-management discussions at the campus. This is to advise you of the standards to be applied in the course of those discussions.

The State's policy is that the State facilities, including e-mail, should be used for State purposes.

Nevertheless, campuses are able to authorize union access to the campus e-mail for communication purposes within certain limitations. At the bargaining table, the State reserved the right to terminate these arrangements at any time. The State is concerned that given the dynamic development of electronic communication technology, campuses should ensure that the permission to use e-mail be revocable within the discretion of the President. Factors that should be taken into account in determining whether to enter into such an arrangement are the campus's operating needs, volume of anticipated activity and any impact on the system. If email is used for posting schedules similar to bulletin boards, the standards for paper postings on bulletin boards as found in Article 13 of the State-UUP Agreement should be observed.

This article provides:

13.1 UUP shall be permitted to post notices of its activities and matters of UUP concern on one bulletin board in each department at a College. Such material shall be signed by a designated official of UUP or its appropriate chapter. No material shall be posted which is derogatory of any person or organization, or faction thereof, except that election material relating to internal UUP elections may be posted on such bulletin boards.

13.2 Any bulletin board material objected to by the State or its representatives as being in violation of the Article shall be promptly removed. Within two working days after such removal, the local UUP chapter president will be provided with a written statement of the reasons. Such removal may be contested pursuant to the grievance procedure contained in Article 7 of this Agreement.

In all cases, the establishment of such an arrangement shall be between the College President, or designee and the UUP Chapter. Such arrangement shall in all events be subject to adjustment or termination at the discretion of the College President or designee.

Please call if you have any questions regarding access to e-mail.

cc: Dr. Ryan
Executive Council
Vice Presidents for Finance & Business
Human Resource Directors

### APPENDIX A-25
### MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding between the Governor's Office of Employee Relations (GOER) and United University Professions (UUP) provides for the continuation of the current New York State Health Insurance Program (NYSHIP) dependent eligibility criteria, utilizing the eligibility/certification requirements described below to include eligibility for the domestic partners of UUP-represented State employees effective thirty days after the execution of the 1995-99 collective bargaining agreement or as soon as practicable thereafter.

**Definition:**

• A domestic partnership is defined as one in which the partners must be 18 years of age or older, unmarried and not related by marriage or blood in a way that would bar marriage; reside together; and are involved in a committed (lifetime) rather than casual relationship and mutually interdependent financially. The partners must be each other's sole domestic partner and must have been involved in the domestic partnership for a period of not less than six months. The State employee domestic partner may not have a spouse covered under his or her NYSHIP enrollment and still be eligible to cover a domestic partner.

**Certification**:

• In order to establish that a domestic partnership exists for purposes of obtaining coverage under the NYSHIP, the domestic partners must execute a Domestic Partner Affidavit to be developed by the State in accordance with the guidelines developed by the New York State Insurance Department, provide proof of cohabitation and provide evidence that an economically interdependent relationship exists between the employee and the domestic partner dependent. Proof of cohabitation and economic interdependency shall be required according to the guidelines established by the State Insurance Department and shall verify the existence of the domestic partnership for at least six months prior to the date of application for enrollment in the NYSHIP. Satisfaction of these requirements shall constitute the certification of the domestic partnership for purposes of eligibility for dependent coverage in the NYSHIP.

• If employees fraudulently enroll or continue coverage as domestic partners, they shall be held financially and legally responsible for any benefits paid from the NYSHIP to the domestic partner and may be subject to disciplinary action. Further, any such employee shall forfeit eligibility for future domestic partner coverage.

• A Termination of Domestic Partnership document shall be required should a domestic partner relationship cease. A one-year waiting period shall be required from the date a covered domestic partner dependent is deemed no longer eligible, as evidenced by the filing date of the Termination of Domestic Partnership document, until a new domestic partner can be deemed eligible for coverage.

Sincerely,

s/Linda Angello, Director                              s/William E. Scheuerman, President
Governor's Office of Employee Relations               United University Professions


### APPENDIX A-26
### PRODUCTIVITY ENHANCEMENT PROGRAM
### (Formerly Productivity Improvement Program)

The following describes the Productivity Enhancement Program available to employees in the United University Professions Unit. Detailed guidelines on program administration will be issued by the Department of Civil Service.

**Program Overview**

Eligible employees may elect to participate in the Productivity Enhancement Program.

As detailed below, this program allows eligible employees to exchange previously accrued leave in return for a credit to be applied toward their employee share of NYSHIP premiums on a biweekly basis.

The Productivity Enhancement Program will be available for six months in calendar year 2018 and in calendar

years 2019, 2020, 2021 and 2022. During any year in which an employee participates, the credit will be divided evenly among the State paydays that fall between January 1 and December 31 (July 1 and December 31 for 2018).

Once enrolled, employees continue to participate unless they separate from State service or cease to be NYSHIP contract holders. Leave forfeited in association with the program will not be returned, in whole or in part, to employees who cease to be eligible for participation in the program.

During any calendar year in which an employee participates, the credit established upon enrollment in the program will be adjusted only if the employee moves between individual and family coverage under NYSHIP during that calendar year.

Open enrollment will be offered during the month of October preceding each year the Productivity Enhancement Program is offered. The exact dates of open enrollment will be established by the Department of Civil Service. Employees will be required to submit a separate enrollment for each calendar year in which they wish to participate. For the 2018 Productivity Enhancement Program open enrollment will begin as soon as practicable after ratification.

Disputes arising from this program are not subject to the grievance procedure contained in this Agreement.

**Eligibility**

At the time of enrollment, an employee must:
 • Be employed on a Calendar Year or College Year basis;
 • Be a full-time employee with an annual salary within the applicable salary range, at the time of enrollment, for each calendar year of the program OR a part-time employee whose biweekly salary is within the salary range, at the time of enrollment, for each calendar year of the program;
 • Be an employee covered by the 2016-2022 New York State/United University Professions Collective Bargaining Agreement;
 • Be a NYSHIP enrollee (contract holder) in either the Empire Plan or an HMO;
 • Be eligible to receive an employer contribution toward NYSHIP premiums (or be on leave without pay from a position in which the employee is normally eligible for an employer share contribution toward NYSHIP premiums); and
 • Have a sufficient annual leave balance to make the full leave forfeiture without bringing their annual leave balance below eight days or a prorated balance for part-time employees respectively.

**Calendar Year 2018**

Full-time employees with an annual salary at or below $66,885 who enroll in this portion of the program for 2018 will forfeit a total of either one and one-half days or three days of annual leave standing to their credit at the time of enrollment in return for a credit of up to $250 or $500 to be applied toward the employee share of NYSHIP premiums deducted from biweekly paychecks issued between July 1, 2018 (or as soon as practicable thereafter) and December 31, 2018.

Full-time employees with an annual salary above $66,885 and below $95,534 who enroll in this portion of the program for 2018 will forfeit a total of either one day or two days of annual leave standing to their credit at the time of enrollment in return for a credit of up to $250 or $500 to be applied toward the employee share of NYSHIP premiums deducted from biweekly paychecks issued between July 1, 2018 (or as soon as practicable thereafter) and December 31, 2018.

**Calendar Year 2019**

Full-time employees with an annual salary at or below $68,192 who enroll in this portion of the program for 2019 will forfeit a total of three days or six days of annual leave standing to their credit at the time of enrollment in return for a credit of up to $600 or $1,200 to be applied toward the employee share of NYSHIP premiums deducted from biweekly paychecks issued between January 1, 2019 and December 31, 2019.

Full-time employees with an annual salary above $68,192 and below $97,448 who enroll in this portion of the program for 2019 will forfeit a total of two days or four days of annual leave standing to their credit at the time of enrollment in return for a credit of up to $600 or $1,200 to be applied toward the employee share of NYSHIP premiums deducted from biweekly paychecks issued between January 1, 2019 and December 31, 2019.

**Calendar Year 2020**

Full-time employees with an annual salary at or below $69,556 who enroll in this portion of the program for 2020 will forfeit a total of three days or six days of annual leave standing to their credit at the time of enrollment in return for a credit of up to $600 or $1,200 to be applied toward the employee share of NYSHIP premiums deducted from biweekly paychecks issued between January 1, 2020 and December 31, 2020.

Full-time employees with an annual salary above $69,556 and below $99,397 who enroll in this portion of the program for 2020 will forfeit a total of two days or four days of annual leave standing to their credit at the time of enrollment in return for a credit of up to $600 or $1,200 to be applied toward the employee share of NYSHIP premiums deducted from biweekly paychecks issued between January 1, 2020 and December 31, 2020.

**Calendar Year 2021**

Full-time employees with an annual salary at or below $70,947 who enroll in this portion of the program for 2021 will forfeit a total of three days or six days of annual leave standing to their credit at the time of enrollment in return for a credit of up to $600 or $1,200 to be applied toward the employee share of NYSHIP premiums deducted from biweekly paychecks issued between January 1, 2021 and December 31, 2021.

Full-time employees with an annual salary above $70,947 and below $101,385 who enroll in this portion of the program for 2021 will forfeit a total of two days or four days of annual leave standing to their credit at the time of enrollment in return for a credit of up to $600 or $1,200 to be applied toward the employee share of NYSHIP premiums deducted from biweekly paychecks issued between January 1, 2021 and December 31, 2021.

**Calendar Year 2022**

Full-time employees with an annual salary at or below $72,366 who enroll in this portion of the program for 2022 will forfeit a total of three days or six days of annual leave standing to their credit at the time of enrollment in return for a credit of up to $600 or $1,200 to be applied toward the employee share of NYSHIP premiums deducted from biweekly paychecks issued between January 1, 2022 and December 31, 2022.

Full-time employees with an annual salary above $72,366 and below $103,413 who enroll in this portion of the program for 2022 will forfeit a total of two days or four days of annual leave standing to their credit at the time of enrollment in return for a credit of up to $600 or $1,200 to be applied toward the employee share of NYSHIP premiums deducted from biweekly paychecks issued between January 1, 2022 and December 31, 2022.

Eligible part-time employees who participate will forfeit prorated days of annual leave per year of participation and receive a prorated credit toward the employee share of their health insurance premiums based on their payroll percentage.

**APPENDIX A-27**
**MEMORANDUM OF UNDERSTANDING ON CONTRACTING OUT**
**ARTICLE A. REDEPLOYMENT CONSIDERATION: PROCESS AND PROCEDURES**

The process and procedures contained herein were developed to support the provisions of Article 36 regarding the redeployment of employees affected by the State's right to contract out for goods and/or

services. It is the State's intent to redeploy employees to the maximum extent possible in instances where positions will be eliminated as a result of the contracting out for goods and/or services. All campuses will work cooperatively to ensure that every opportunity to redeploy is explored. Employees will be flexible in considering redeployment alternatives.

## Section 1. Definitions

§1.1 An "affected employee" or an "employee affected" by contracting out shall mean a current employee whose position will be eliminated as a result of the State's exercise of its right to contract out for goods and/or services provided by that position. An "affected employee" or "an employee affected" is also the least senior employee displaced in accordance with Section 3.2(f) of Article A of this Memorandum of Understanding.

Employees subjected to the following actions shall not be regarded as affected employees or employees affected by contracting out:

a. Termination of employees serving on temporary or probationary appointments, which may be terminated at any time in accordance with the provisions of Article XI of the Policies of the Board of Trustees.

b. Non-renewal of term appointees where the RFP is issued after the last date on which the notice of non-renewal is required to be issued under Article 32 (Notice of Non-Renewal) of the Agreement.

c. Termination of employees pursuant to Article 19 (Disciplinary Procedures) of the Agreement.

d. Termination of employees due to mental or physical incapacity pursuant to Article XV of the Policies of the Board of Trustees.

e. Discontinuation from service under Sections 23.8(a) and (b) of the Agreement.

f. Employees deemed to have resigned under Section 23.10 of the Agreement.

g. Termination of employees pursuant to Article 35 of the Agreement unless a Request for Proposal for contracting out of the specific position occupied by an employee is issued within the recommended period of notice of retrenchment as set forth in Article 35 of the Agreement.

§1.2 A "fillable vacancy" is a vacant position that the campus has decided to fill, subject to available funding.

§1.3 An "employee separates from employment" when an employee voluntarily resigns employment with the State University or when employment with the State University ceases in accordance with Article A of this Memorandum of Understanding.

§1.4 The term "same position" shall mean a position that is equivalent in its content, duties, responsibilities, requirements and obligations as the position which had been held by the affected employee at the time a Request for Proposal for contracting out was issued.

The determination of whether a position in the same job title is the "same position" for purposes of this Memorandum of Understanding shall be based upon an examination of the employee's most recent position description and performance program as compared to the most recent position description and performance program for the position vacancy under review. In the event the vacancy under review is a new or substantially modified position, such comparison shall be with the new position description and proposed performance program.

§1.5 An employee "meets the qualifications" of the position when:

a. an employee meets the campus' requirements, including but not limited to, educational degree attainment, professional certification, and/or licensure for a particular position; and

b. an employee has the ability, as determined by the campus, to perform the content, duties, responsibilities, requirements and obligations of a position as a result of the employee's job experience, education, and training.

§1.6 The "date a Request for Proposal for contracting out is issued" shall, for all purposes, be regarded as the date a copy of the Request for Proposal is received by UUP. Such copy to UUP shall be transmitted by certified or registered mail, return receipt requested, or by personal service at the time it is sent to poten-

tial contractors. Upon personal service, the recipient of such documents, upon request, shall acknowledge, in writing, the receipt thereof. Proof of personal service shall specify the person who was served and the date, place and manner of service.

Concurrent written notification shall be provided by the campus to employees whose positions are likely to be contracted out under such Request for Proposal.

**Section 2. Redeployment List Procedures: General Provisions**

§2.1 This section shall apply to the following categories of employees who are affected by contracting out:

a. Professional employees with permanent appointments;

b. Professional employees in titles listed in Appendix A to Article XI of the Policies of the Board of Trustees who are serving in five-year term appointments;

c. Academic term employees with three or more years consecutive service;

d. Professional term employees with three or more years consecutive service; and

e. Employees who receive notice of non-renewal following first redeployment.

§2.2 Employees in the above listed categories shall be placed on a redeployment list and shall remain on such list until one of the following occurs:

a. the employee is appointed to a position;

b. the employee is removed from a redeployment list in accordance with the provisions of Article A of this Memorandum of Understanding; or,

c. the employee separates from employment.

§2.3 Where a fillable vacancy exists and an employee on a redeployment list meets the qualifications for that vacancy, the campus shall offer the position to the employee. In the event that more than one employee meets the qualifications for the position, the campus shall offer the position to the employee who the campus, in its discretion, deems most qualified. However, in such instances, qualified professional employees holding permanent appointments shall be offered positions before professional employees holding term appointments. If the employee deemed most qualified declines the offer, the campus shall offer the position to the next employee who the campus, in its discretion, deems most qualified. The campus may fill the vacancy through other means where no one on a redeployment list meets the qualifications for a vacancy, or where all employees on a redeployment list who were deemed qualified decline offers.

Academic employees on term appointments shall be considered for any fillable academic vacancy. Professional employees shall be considered for any fillable professional vacancy.

§2.4 Offers of redeployment shall be in writing and must be accepted in writing within ten working days after receipt of such offer by the employee. An employee who accepts an offer of redeployment shall be appointed to such position. In the event that the position the employee is offered is over 50 miles from either the employee's residence or the work site at the contracting out campus, the employee may decline the offer and remain on a redeployment list until appointed to a position or otherwise separated from employment, whichever occurs first. In the event that the position the employee is offered is 50 miles or less from either the employee's residence or the work site at the contracting out campus, the employee who declines such offer or fails to accept such offer in writing within ten working days shall be removed from a redeployment list and no further redeployment consideration shall be accorded such employee. However, upon expiration of an affected employee's right to remain employed at the contracting-out campus as set forth in Sections 3.1, 4.2 (a), or 4.3 (a) of Article A of the Memorandum of Understanding, as appropriate to the employee's term or permanent appointment status, such employee may elect one of the transition benefits in accordance with Article 36.2 of the Agreement.

**Section 3. Professional Employees with Permanent Appointments and Professional Employees in Titles Listed in Appendix A to Article XI of the Policies of the Board of Trustees who are Serving in Five-Year Term Appointments**

§3.1 A professional employee with a permanent appointment, or a professional employee in a title listed in Appendix A to Article XI of the Policies of the Board of Trustees who is serving in a five-year term appointment, shall have the right to remain employed at the contracting-out campus and shall continue to receive the same basic annual salary for a period of two years from the date the Request for Proposal for contracting out is issued. In addition, these employees shall have the following rights and/or entitlements:

a. The right to be placed on a redeployment list in accordance with Section 2 of Article A of this Memorandum of Understanding.

b. An entitlement to displace the least senior employee in the same job title performing the same position at the contracting-out campus in accordance with Section 3.2 of Article A of this Memorandum of Understanding.

c. An entitlement to the same position at the contracting out campus in accordance with Section 3.3 of Article A of this Memorandum of Understanding.

d. An entitlement to the same position at any campus in accordance with Section 3.4 of Article A of this Memorandum of Understanding.

e. Additional rights in accordance with Section 3.5 of Article A of this Memorandum of Understanding if redeployed in a different position at the same campus.

f. Eligibility to be offered a President's Discretionary Redeployment Leave in accordance with Section 6.5 of Article A of this Memorandum of Understanding.

In any event, all the above listed rights and entitlements shall cease two years from the date the Request for Proposal for contracting out is issued, unless otherwise specified in Article A of this Memorandum of Understanding.

§3.2 Using the inverse order of appointment within each affected group of employees as set forth in Article 35.2 (a) and (b) of the Agreement, an employee shall be entitled to displace the least senior employee in the same job title performing the same position at the contracting out campus. Where an employee is entitled to displace as set forth herein, the following shall apply:

a. An employee with permanent appointment redeployed to the same position at the same campus shall retain permanent appointment.

b. An employee in a title listed in Appendix A of Article XI of the Policies of the Board of Trustees who is serving in a five-year term appointment, redeployed in the same position at the same campus, shall retain the balance of the employee's term appointment at the time of redeployment or shall receive a two-year term appointment, whichever is longer.

c. An employee redeployed under this provision shall continue to receive the same basic annual salary that such employee was receiving immediately prior to the time of redeployment.

In the event such basic annual salary exceeds the normal maximum of the salary level for the professional title in which the employee is redeployed, such employee shall be ineligible for any general salary increases until such time the employee's basic annual salary is equal to or less than the normal maximum of the salary level for the employee's professional title.

d. Notice of right to displace shall be provided by the contracting-out campus in writing to the employee. Following the employee's receipt of such notice, the employee shall have ten working days to accept or decline, in writing, such right of displacement.

e. In the event an employee declines to displace the least senior employee or fails to accept in writing within ten working days, such employee shall have no further displacement right, but shall be placed on a redeployment list in accordance with Section 2 of Article A of this Memorandum of Understanding and shall be subject to the provisions thereof.

f. The least senior employee displaced as a consequence of this provision shall be considered the affected employee for purposes of Article 36 of the Agreement and this Memorandum of Understanding.

§3.3 An employee shall be entitled to be redeployed to the same position at the same campus, where a fillable vacancy exists. Such redeployment shall be in accordance with Section 2 of Article A of this Memorandum of Understanding. Where an employee is redeployed to the same position at the same campus, the following shall apply:

a. An employee with permanent appointment redeployed to the same position at the same campus shall retain permanent appointment.

b. An employee in a title listed in Appendix A of Article XI of the Policies of the Board of Trustees who is serving in a five-year term appointment, redeployed to the same position at the same campus, shall retain the balance of the employee's term appointment at the time of redeployment or shall receive a two-year term appointment, whichever is longer.

c. An employee redeployed under this provision shall continue to receive the same basic annual salary that such employee was receiving immediately prior to the time of redeployment.

In the event such basic annual salary exceeds the normal maximum of the salary level for the professional title in which the employee is redeployed, such employee shall be ineligible for any general salary increases until such time the employee's basic annual salary is equal to or less than the normal maximum of the salary level for the employee's professional title.

d. Notice of right to a fillable vacancy shall be provided by the contracting-out campus in writing to the employee. Following the employee's receipt of such notice, the employee shall have ten working days to accept or decline, in writing, such fillable vacancy.

e. In the event an employee declines the fillable vacancy or fails to accept in writing within ten working days, such employee shall be placed on a redeployment list in accordance with Section 2 of Article A of this Memorandum of Understanding and shall be subject to the provisions thereof.

§3.4 An employee shall be entitled to be redeployed to the same position at any campus, where a fillable vacancy exists. Such redeployment shall be in accordance with Section 2 of Article A of this Memorandum of Understanding. Where an employee is redeployed to the same position at any campus, the following shall apply:

a. Such employee shall receive a one-year term appointment at the new campus.

b. Upon the employee's completion of six months of service in the position, the employee shall be notified that: (i) upon expiration of the initial one-year term appointment, a two-year term appointment shall be granted; or (ii) the employee's current term appointment shall not be renewed following its expiration.

c. In the event of non-renewal, the employee may elect one of the transition benefits in accordance with Article 36.2 of the Agreement.

d. An employee granted the subsequent two-year term appointment shall receive a review for permanent appointment, or a five-year term appointment, as may be appropriate, prior to expiration of that appointment. Written notice that a permanent appointment shall be recommended, or that a five-year term appointment will be granted, or that a term appointment is not to be renewed following its expiration is to be given to the employee by the College President or designee not less than one year prior to the end of the two-year term appointment.

e. Any further employment in a position where permanent appointment may be granted may only be on the basis of a permanent appointment, after completion of three consecutive years of service in such position.

f. Transition benefits in accordance with Article 36.2 of the Agreement shall not be applicable where an employee on a two-year term appointment is non-renewed.

g. An employee redeployed under this provision shall continue to receive the same basic annual salary that such employee was receiving immediately prior to the time of redeployment, but in no event shall

such basic annual salary exceed the normal maximum of the salary level for the professional title in which the employee is redeployed.

h. In all events, the employee shall retain the right to return to employment at the contracting-out campus and continue to receive the same basic annual salary for any portion of the two-year period referred to in Section 3.1 above, which may be remaining at the effective date of non-renewal.

§3.5 If as a result of redeployment in accordance with Section 2 of Article A of this Memorandum of Understanding, an employee is offered a different position at the same campus, the following shall apply:

a. Such employee shall receive an initial one-year term appointment at the contracting-out campus with a review for permanent appointment, or a five-year term appointment, as may be appropriate, prior to the expiration of that appointment.

b. The employee appointed from a redeployment list shall receive the basic annual salary and title as listed in the vacancy announcement prepared by the campus.

c. Upon the employee's completion of six months of service, the employee shall be notified in writing by the College President or designee that permanent appointment shall be recommended or that a five-year term appointment will be granted, upon expiration of the initial one year term appointment, or a notice of non-renewal shall be issued.

d. Non-renewal shall be effective upon completion of the initial one-year term appointment and the employee may elect one of the transition benefits in accordance with Article 36.2 of the Agreement.

e. In all events, the employee shall have the right to remain employed at the contracting-out campus and continue to receive the same basic annual salary for any portion of the two-year period referred to in Section 3.1 above, which may be remaining at the effective date of non-renewal.

§3.6 If as a result of redeployment in accordance with Section 2 of Article A of this Memorandum of Understanding, an employee is offered a different position at a different campus, the following shall apply:

a. Such employee shall receive a one-year term appointment in the new position.

b. The employee appointed from a redeployment list shall receive the basic annual salary and title as listed in the vacancy announcement prepared by the campus.

c. Upon the employee's completion of six months of service in the new position: (i) the campus shall notify the employee in writing of whether an additional term appointment shall be granted; or (ii) the campus shall issue a notice of non-renewal.

d. Non-renewal shall be effective upon expiration of the one-year term appointment provided for in Section 3.6 (a) above and the employee may elect one of the transition benefits in accordance with Article 36.2 of the Agreement.

e. In all events, the employee shall retain the right to return to employment at the contracting out campus and continue to receive the same basic annual salary for any portion of the two-year period referred to in Section 3.1 above which may be remaining at the effective date of non-renewal.

f. If the non-renewed employee is subsequently appointed to a position as a result of a redeployment list, any severance previously paid shall be subject to the provisions of Article C of this Memorandum of Understanding, Severance Option. Notwithstanding the above, under no circumstance may more than one severance payment be received.

g. There shall be no eligibility for further redeployment consideration following a second redeployment.

## Section 4. Employees Serving on the Basis of a Term Appointment

§4.1 This Section shall apply to an affected academic employee or an affected professional employee serving on the basis of a term appointment, other than professional employees in titles listed in Appendix A to Article XI of the Policies of the Board of Trustees serving in five-year term appointments.

§4.2 If the employee has completed fewer than 3 years of consecutive service at the contracting-out campus on the date that the Request for Proposal for contracting out is issued:

a. Such employee shall have the right to remain employed at the contracting-out campus for one year from the date the Request for Proposal for contracting out is issued, or the balance of the employee's term appointment, whichever is greater.

b. Upon expiration of an affected employee's right to remain employed at the contracting-out campus as set forth in Section 4.2 (a) above, such employee may elect one of the transition benefits in accordance with Article 36.2 of the Agreement.

§4.3 If the employee has completed 3 or more years of consecutive service at the contracting out campus on the date that the Request for Proposal for contracting out is issued:

a. Such employee shall have the right to remain employed at the contracting-out campus for one year from the date the Request for Proposal is issued, or the balance of the employee's term appointment, whichever is greater.

b. In addition, such employee shall be placed on a redeployment list and receive redeployment consideration in accordance with Section 2 of Article A of this Memorandum of Understanding for one year from the date the Request for Proposal for contracting out is issued, or the balance of the employee's term appointment, whichever is greater.

c. Upon expiration of an affected employee's right to remain employed at the contracting-out campus as set forth in Section 4.3 (a) above, such employee may elect one of the transition benefits in accordance with Article 36.2 of the Agreement.

§4.4 A permanent or continuing appointment can only be granted by the Chancellor. In no event shall the extension of a term appointment under this section render a term employee eligible for consideration for either a permanent or continuing appointment.

## Section 5. Academic Employees with Continuing Appointments

§5.1 An academic employee with a continuing appointment shall retain continuing appointment, the same title, and the same basic annual salary at the time a Request for Proposal for contracting out is issued.

§5.2 An academic employee with a continuing appointment shall be offered redeployment at the contracting-out campus or elsewhere within the State University system.

§5.3 The redeployment offer shall be in writing and the employee must accept or decline the offer in writing within ten working days after the employee's receipt of such offer.

a. If the employee accepts the offer of redeployment, the employee shall retain the academic title which the employee held immediately prior to the time of redeployment. In addition, the employee shall retain continuing appointment and shall continue to receive the same basic annual salary that such employee was receiving immediately prior to the time of redeployment.

b. If the employee declines an offer of redeployment or fails to accept in writing within ten working days, no further redeployment consideration shall be accorded the employee. The employee shall be terminated from employment effective 30 calendar days from the date the employee declines the redeployment offer if such offer is for a position at the contracting out campus. In the event that the offer is for a position other than at the contracting-out campus, the employee shall be terminated from employment effective 180 calendar days from the date the employee declines such redeployment offer. Upon termination, the employee may elect one of the transition benefits in accordance with Article 36.2 of the Agreement.

## Section 6. General Rules

§6.1 Notification to the Union Prior to the Request for Proposal for Contracting Out

The State University shall provide written notification to the United University Professions (UUP) where positions currently held by PSNU employees will be eliminated as a result of the State's exercise of its right to contract out for goods and/or services. Such notification shall be provided at least two weeks prior to the issuance of the Request for Proposal for contracting out and shall be required only in instances where current employees will be affected. Upon UUP's receipt of such written notification, UUP may request a

100

meeting to discuss the campus' plan to contract out for goods and/or services.

§6.2 Work Force Impact Plan

At the time a Request for Proposal for contracting out is issued, the contracting-out campus shall forward in writing to the Tripartite Redeployment Committee a Work Force Impact Plan. The Work Force Impact Plan shall specify the goods and/or services to be contracted out, identify the employees who will be affected by contracting out, and describe the measures the campus expects to undertake to redeploy affected employees to the maximum extent possible, including any campus retraining initiatives that might facilitate redeployment.

§6.3 Redeployment Hiring Incentive

A redeployment hiring incentive of 90 calendar days' salary support shall be paid by the contracting out campus to a hiring campus for each employee redeployed in accordance with this Article A of this Memorandum of Understanding.

§6.4 Reemployment in a Contracting Out Situation

Notwithstanding the above, in the event a specific position eliminated due to contracting out is restored in its entirety at the contracting out campus within two years of issuance of the Request for Proposal for contracting out, the employee who held that specific position at the time of issuance of the Request for Proposal shall be offered reemployment in such position. An offer of reemployment shall be made by the campus in writing to the employee and must be accepted in writing within ten working days after receipt of such offer by the employee. The employee's failure to accept such offer within ten working days shall constitute a declination.

§6.5 President's Discretionary Redeployment Leave

The President's Discretionary Redeployment Leave shall be applicable in the following two instances:

a. At any time following the issuance of a Request for Proposal for contracting out, the College President may elect, in the President's discretion, to offer an affected employee a President's Discretionary Redeployment Leave. Such leave may be offered at full salary or reduced salary. A leave granted pursuant to this provision may be for any period, but in any event shall cease two years from the date a Request for Proposal for contracting out is issued. The employee's election to accept or decline such offer must be in writing and is final and binding and may not thereafter be withdrawn. Failure to accept in writing within ten working days shall be considered a declination and such employee shall remain on the redeployment list until appointed to a position or otherwise separated from employment, whichever occurs first. Upon expiration of such leave, the employee may elect one of the transition benefits in accordance with Article 36.2 of the Agreement. OR,

b. Where an affected employee has not been redeployed in accordance with Article A of this Memorandum of Understanding at the time the contractor commences operation, a President's Discretionary Redeployment Leave shall be granted at full salary. A leave granted pursuant to this provision shall cease upon the same date that the affected employee's employment at the contracting-out campus would have ceased as set forth in Sections 3.1, 4.2(a) or 4.3(a) of Article A of this Memorandum of Understanding, as appropriate to the employee's term or permanent appointment status; or until the affected employee commences other State employment. The employee's election to accept or decline such offer must be in writing and is final and binding and may not thereafter be withdrawn. Failure to accept in writing within ten working days shall be considered a declination. Upon expiration of such leave, the employee may elect one of the transition benefits in accordance with Article 36.2 of the Agreement.

§6.6 Transition Benefits

Transition Benefits as set forth in Article 36.2 (a) and (b) of the Agreement shall be payable by the contracting out campus.

## ARTICLE B. EDUCATION STIPEND

### Section 1. Eligibility

§1.1 The education stipend shall solely apply to affected employees who have agreed to accept the terms as set forth in this Article of the Memorandum of Understanding and who have been notified of their acceptance by the State.

§1.2 Employees who have exercised one of the options described in Article 36.2(b) or (c) of the Agreement shall be ineligible for the education stipend set forth herein.

### Section 2. Stipend

An employee may elect to receive an education stipend for full tuition and fees at an educational institution or organization of the employee's choosing to pursue course work or training offered by such institution or organization provided, however, that the employee meets the entrance and/or course enrollment requirements. The maximum stipend cannot exceed the one year (two semesters) SUNY tuition maximum for Resident Graduate Students. Such tuition will be paid by the State directly to the institution in which the employee is pursuing course work, subject to review and verification of the employee's training plan by the campus.

## ARTICLE C. SEVERANCE OPTION

### Section 1. Definitions

§1.1 The definition of the terms "affected employee" and "employee affected" are found in Article A, Section 1.1 of this Memorandum of Understanding.

§1.2 The term "Service" shall mean an employee's State service as determined by the State University.

### Section 2. Eligibility

§2.1 The severance benefits provided by this Severance Option shall apply solely to affected employees:

a. who are eligible pursuant to Article 36.2 of the Agreement, and

b. who have agreed to accept the terms as set forth herein, have been notified of their acceptance by the State, and who have executed a Severance Agreement.

### Section 3. Payment Schedule

§3.1 All affected employees with at least six (6) months, but less than one year of service, other than those covered under Section 3.2 below, are eligible to receive $2,000 or two weeks' base pay, whichever is greater. Each additional year of service will result in a $600 increase per year to a maximum of $15,000. However, employees in the following categories will receive the amount specified if that amount exceeds that which would be otherwise payable.

One year of service, but less than three years of service:. . . . . . . . . . . . . . . . . . . . . . 4 Weeks of Base Pay

Three years of service, but less than five years of service:  . . . . . . . . . . . . . . . . . . . . 6 Weeks of Base Pay

Five years of service, but less than ten years of service:. . . . . . . . . . . . . . . . . . . . . . . 8 Weeks of Base Pay

Ten years of service, but less than fifteen years of service: . . . . . . . . . . . . . . . . . . . . 10 Weeks of Base Pay

Fifteen years of service, but less than twenty years of service:. . . . . . . . . . . . . . . . . 12 Weeks of Base Pay

Twenty years of service or more:. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14 Weeks of Base Pay

§3.2 Affected employees 50 years of age and over may elect to receive payment pursuant to either the schedule in Section 3.1 above or are eligible to receive the following:

a. with 10 years of service, but less than 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20% of base annual salary

b. with 15 years of service, but less than 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30% of base annual salary

c. with 20 years of service, but less than 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40% of base annual salary

d. with 25 years of service or more . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50% of base annual salary

**Section 4. Payment Conditions**

§4.1 All payments made to affected employees under the Severance Option shall be reduced by such amounts as are required to be withheld with respect thereto under all federal, state and local tax laws and regulations and any other applicable laws and regulations. In addition, the severance payment made pursuant to Section 3 of this Severance Option shall not be considered as part of salary or wages for the purposes of determining State and member pension contributions and for the purposes of computing all benefits administered by the New York State Employees' Retirement System, New York State Teachers' Retirement System or the Optional Retirement Program.

§4.2 All payments made to affected employees under this Severance Option are considered to be one-time payments and shall not be pensionable. Each affected employee must execute a Severance Agreement as set forth in Article D of this Memorandum of Understanding prior to separation from State service in order to be eligible to receive said payment.

§4.3 In no event shall an affected employee who returns to State service receive severance pay in an amount that would exceed that which he or she would otherwise have received as base annual salary during the period of separation from State service. Should the severance pay exceed the amount of base annual pay otherwise earned during the period of separation from State service, said employee shall repay the difference pursuant to the following rules:

a. Any affected employee who resumes State service shall repay such excess payments received within one (1) year of the employee's return to payroll, by payroll deductions in equal amounts.

b. Nothing in this Section 4.3 shall affect the State's right to recover the full amount of the monetary severance payment by other lawful means if it has not recovered the full amount by payroll deduction pursuant to Section 4.3(a) above.

**Section 5. Savings Clause**

§5.1 If any provision of this Severance Option is found to be invalid by a decision of a tribunal of competent jurisdiction, then such specific provision or part thereof specified in such decision shall be of no force and effect, but the remainder of this Severance Option shall continue in full force and effect.

**ARTICLE D. SEVERANCE AGREEMENT**

I hereby apply for the severance benefits as described in the Severance Option as set forth in Article C of the Memorandum of Understanding on Contracting Out as set forth in the 1995-99 Collective Bargaining Agreement between the parties and agree to accept such benefits if my application is approved by the State of New York. I understand that the State of New York shall approve applications of all employees who are eligible to apply for such benefits pursuant to the provisions of Article 36.2 (b) of the 1995-99 Collective Bargaining Agreement.

I understand that by accepting these severance benefits, I agree to be bound by the terms and conditions set forth in Article C of the Memorandum of Understanding on Contracting Out, which is incorporated herein by reference. These terms and conditions include the following:

I understand that I shall not be required to make any payment on account of the monetary severance payment and/or any other benefits I receive pursuant to this agreement into any retirement or pension system or plan of which I am or may become a member, nor shall any such payment be permitted.

I understand that the State of New York shall not be required to make any contribution or payment into any retirement or pension system or plan of which I am or may hereafter become a member based upon the cash severance payment, and/or any other benefits I receive pursuant to this agreement.

I understand that any monetary severance payment and/or other benefits paid to me pursuant to this agreement shall not be considered in determining rights, benefits or allowances to which I or my beneficiaries or heirs may be entitled under any Retirement or Pension System or Plan of which I am or may hereafter become a member.

I understand that, in exchange for my agreement to all the terms and conditions set forth in Article C of the Memorandum of Understanding on Contracting Out, the State will do the following:

The State will pay me a monetary severance payment in the amount determined in accordance with my length of service, as described in Article C of the Memorandum of Understanding on Contracting Out.

This written agreement, including Article C of the Memorandum of Understanding on Contracting Out referenced herein, contains all the terms and conditions agreed upon by the parties. In the event that the terms of this agreement conflict with the 1995-99 Collective Bargaining Agreement between the State and the United University Professions, the terms of the 1995-99 Collective Bargaining Agreement shall prevail.

I accept the severance benefits as described in Article C of the Memorandum of Understanding on Contracting Out as set forth in the 1995-99 Collective Bargaining Agreement between the United University Professions and the State of New York.

Please print:

_____
Employee's Name

_____
Employee's Social Security No.

_____
Employee's Campus

_____
Employee's Official State Title

_____
Signed

_____
Date

Sworn to before me this
_____ date of_____

_____
Notary Public

Dr. William E. Scheuerman, President
United University Professions
RE: Contracting Out/Preferential Consideration With Contractor

Dear Dr. Scheuerman:

This will confirm the understanding reached during negotiations of the 1995-99 State/UUP Agreement regarding transition benefit of Article 36.2(c) of the Agreement concerning preferential employment with the contractor.

In an effort to create possible placement opportunities with the contractor, the State University will include as part of the Request for Proposal a requirement that the contractor give preferential consideration to affected employees for positions with the contractor on such project, if available.

The contracting campus shall be responsible for making affected employees aware of any job opportunities with the contractor which the contractor notifies the campus are available. This responsibility may include providing names of interested employees to the contractor, arranging interviews, and otherwise providing information and assistance regarding contractor hiring.

Such responsibility shall cease at such time as either the affected employees have gained employment with either the State or the contractor or have selected and received a transition benefit from Article 36.2(a) or (b).

Also, the State will seek legislation which shall permit employees to exercise this option without viola-tion of the revolving door provisions of the State Ethics Law.

Sincerely,

s/Linda Angello, Director                                          s/William E. Scheuerman, President
Governor's Office of Employee Relations          United University Professions

Dear Dr. Scheuerman:

Should the State University contract out for services currently performed by employees represented by the United University Professions (UUP), this shall confirm that the following information will be provided by the campus upon the union's written request:

• Copy of the proposal submitted by the vendor awarded the contract in response to the campus' Request for Proposal (RFP) but excluding any proprietary information or confidential trade secrets;

• Copy of the fully executed and approved contract between the campus and the vendor selected to provide the services specified in the RFP;

• Copy of any fully executed and approved amendments during the term of the original contract;

• Copy of any other fully executed and approved contracts between the campus and the selected vendor for goods and/or services in addition to those specified in the RFP; and a

• Copy of any audits/evaluations conducted by an organization external to the State University of the services provided by the selected vendor under the contract.

Sincerely,

s/Linda Angello, Director                                          s/William E. Scheuerman, President
Governor's Office of Employee Relations          United University Professions

Dear Dr. Scheuerman:

This is to confirm our mutual understanding that with respect to the State's right to contract out for goods or services as provided for in Article 36 of the Agreement, the provisions of the Ethics Law, as set forth in Public Officers Law Sections 73 and 74, must be adhered to. When the State is contracting for goods or services performed by PSNU employees, the contract bidding process and any contract must comply with the provisions of the Ethics Law. In this regard, the parties agree that the bidding process and the contract must conform to the Ethics Law provisions concerning potential and actual conflicts of interest.

The parties acknowledge that any subsequent amendments or exception to and/or changes in the Ethics Law, or the application thereof, are binding on the parties.

Sincerely,

s/Linda Angello, Director                                          s/William E. Scheuerman, President
Governor's Office of Employee Relations          United University Professions

Dear Dr. Scheuerman:

This is to confirm our mutual understanding that the State's right to contract out as specified in Article 36 of the Agreement shall apply to all positions, including vacancies. However, in the event current PSNU employees would be affected, the State shall not contract out for goods or services performed by PSNU employees with the following organizations: the Research Foundation, any campus foundation, the SUNY Construction Fund, University Auxiliary Services Corporation, or any Faculty Student Association.

Furthermore, with respect to vacant positions, the State shall not contract out with the aforementioned organizations for goods and/or services which have been exclusively performed by PSNU employees.

Sincerely,

s/Linda Angello, Director
Governor's Office of Employee Relations

### APPENDIX A-28

**Memoranda of Understanding Between The State of New York and United University Professions Relating to Systems of Evaluation and Promotion for Professional Employees (Revised 1989) (Updated 2011)**

**Agreement Between the Executive Branch of the State of New York and United University Professions Relating to a System of Evaluation for Professional Employees in the State University of New York (Updated 2011)**

Pursuant to Article 30 of the 1979-82 collective agreement between the State of New York and United University Professions, the 1972 memorandum of understanding between the State University and the Senate Professional Association (predecessor in interest to UUP) will be revised to incorporate changes in the system made after consideration of recommendations submitted to the State and UUP by a joint study committee. The study committee was created pursuant to Article 30.2(c) of the Agreement to review and make recommendations with respect to evaluation and promotion of professional employees.

The memorandum of understanding between SUNY and UUP shall be a statement of mutual intention and shall not constitute an agreement under Article 14 of the Civil Service Law or for any other purpose. Accordingly, the terms and application of such memorandum of understanding shall not be subject to grievance and arbitration. However, in accordance with Article 30.3 of the Agreement, the procedural steps of the Policies of the Board of Trustees involving matters of appointment, evaluation and/or promotion of employees shall remain unchanged and therefore subject to review in accordance with the provisions of Article 7, Grievance Procedure, of the Agreement.

The terms of the memorandum of understanding between
SUNY and UUP referred to above shall be implemented by directives from the Chancellor of the State University to the College Presidents.

A copy of the memorandum of understanding between SUNY and UUP is attached hereto for identification as Appendix A.

**EXECUTIVE BRANCH OF THE STATE OF NEW YORK**

s/Meyer S. Frucher               s/Thomas F. Hartnett            s/Nancy L. Hodes
Director of Employee Relations   Deputy Director                 Assistant Director
                                 of Employee Relations           of Employee Relations

**UNITED UNIVERSITY PROFESSIONS**

s/Samuel J. Wakshull             s/Evelyn L. Hartman
President                        Executive Director

**Memorandum of Understanding Between The State University of New York and United University Professions Relating to a System of Evaluation for Professional Employees (Revised 2011)**

### I. Evaluation Policy

It shall be the policy of the University to evaluate the performance of all professional employees in the Professional Services Negotiating Unit as hereinafter provided.

### II. Definitions

A. The following terms shall be defined as provided in Article 4 of the Agreement between the State of New York and United University Professions: "University," "professional employee," "college president," "college."

B. "Professional position" shall mean a position in the Professional Services Negotiating Unit other than a position of academic or qualified academic rank.

C. "Immediate supervisor" shall mean the person so designated by the college president for the purposes herein.

D. "Employment status" shall include but not be limited to personnel actions involving appointments, promotion, transfer, reassignment, discretionary salary increase.

### III. Purposes of Evaluation

A. The performance of each professional employee shall be evaluated in order to:

(1) provide the college president with consultation in making a decision to renew or non-renew a professional employee's appointment;

(2) provide a base for performance improvement;

(3) serve as a guide to reevaluate job functions;

(4) provide the college president with consultation in a decision as to promotions and discretionary salary increases;

(5) provide a basis for career growth.

### IV. Implementation of Evaluation System

A. This memorandum of understanding shall be implemented as of September 30, 1981.

### V. Evaluation Procedure

A. Evaluation is a continuing process carried out on a daily basis. A formal evaluation should be the expression of this ongoing process.

(1) Responsibility

Upon initial appointment, the college president or designee shall give written notice to each new professional employee of the person designated as the immediate supervisor.

Each immediate supervisor shall be responsible for evaluating the performance of professional employees who work at the supervisor's direction. Such performance evaluations shall be conducted for the purposes described in Section III above and at regular intervals as specified below.

Upon written request of the professional employee to the college president, the college president or designee shall provide written notice to the employee of the person who has been designated as the employee's immediate supervisor.

The college president or designee shall provide written notice of any change in the immediate supervisor within 30 calendar days of the change.

(2) Frequency

(a) The immediate supervisor of a new professional employee shall consult with such new employee concerning a performance program and the system of evaluation within the first month of the initial appointment. The performance program shall be established within 15 working days from the date of consultation.

(b) The performance of each professional employee, without regard to employment status, shall be formally evaluated in writing by the immediate supervisor once each year during the length of the employee's appointment, and as changing conditions warrant, except where the employee is serving his or her final year of University service.

(c) If, as part of the informal ongoing evaluation process, the immediate supervisor identifies a continuing need for improvement in the employee's performance, it is the responsibility of the immediate supervisor to discuss this with the employee without delay, and with specific suggestions for improvement.

(3) Initial Consultation

The evaluation process shall begin with a discussion between the immediate supervisor and professional

employee concerning the following:

(a) The nature of the professional employee's duties and responsibilities;

(b) Supervisory relationships;

(c) Functional relationships;

(d) Immediate and long-term objectives;

(e) Criteria for evaluating achievement of objectives.

(4) Determination of Objectives and Criteria

Consistent with the professional employee's duties and responsibilities, as well as the employee's role in contributing to the aims of the University, the immediate supervisor, after consultation with the professional employee, shall determine the objectives to be achieved during the evaluation period. Appropriate criteria for evaluating the degree to which objectives are met shall be determined in the same fashion.

As they relate to the particular duties, responsibilities, and objectives to which the professional employee is assigned, the following criteria, where applicable, should be among those on which the evaluation is based:

(a) Effectiveness in performance—as demonstrated, for example, by success in carrying out assigned duties and responsibilities, efficiency, productivity and relationship with colleagues.

(b) Mastery of specialization—as demonstrated, for example, by degrees, licenses, honors, awards, and reputation in professional field.

(c) Professional ability—as demonstrated, for example, by invention or innovation in professional, scientific, administrative, or technical areas; i.e., development or refinement of programs, methods, procedures, or apparatus.

(d) Effectiveness in University service—as demonstrated, for example, by such things as successful committee work, participation in local campus and University governance, and involvement in campus-related or University-related student or community activities.

(e) Continuing growth—as demonstrated, for example, by continuing education, participation in professional organizations, enrollment in training programs, research, improved job performance and increased duties and responsibilities. The foregoing criteria and examples thereof are presented for descriptive and explanatory purposes only and are in no way intended to be all inclusive or to limit the immediate supervisor in the selection of appropriate criteria for evaluation.

(5) Consultation with Secondary Sources

(a) Secondary sources are agencies, offices, or individuals which will be involved with the performance of the employee and may affect the employee's ability to achieve the stated objectives.

(b) The immediate supervisor, after consultation with the professional employee, shall identify in the written performance program the secondary sources to be consulted as part of the evaluation process and the relationship between each secondary source and the professional employee.

(6) Performance Program

(a) The results of discussions with the professional employee, in accordance with provisions of (3) through (5) above, shall be reduced to writing by the immediate supervisor and shall constitute the performance program on which formal evaluation for the ensuing evaluation period will be based. The evaluation period cannot start prior to the date upon which the employee receives a copy of the written performance program.

(b) Copies of this program, signed and dated by the professional employee and the immediate supervisor, shall be distributed to the professional employee and the evaluator's supervisor, and a copy shall be placed in the professional employee's personnel file. If the supervisor and the employee do not concur on the performance program, the employee has the right to attach a statement to the performance program within 10 working days from receipt.

(7) Modification of the Performance Program

As circumstances warrant, the immediate supervisor and the professional employee shall meet to review the appropriateness of elements of the performance program. Modifications in the performance program by the immediate supervisor shall be specified in writing commensurate with provisions of (3) through (6) above.

(8) Formal Evaluation

(a) Formal evaluation shall be based upon the professional employee's performance program, modified as appropriate to reflect changed circumstances.

(b) The immediate supervisor shall prepare a preliminary evaluation report and a new performance program. All evaluations shall include a summary of information from the secondary sources identified in the performance program. Commendable performance and/or areas in need of improvement may be identified. The preliminary report shall include a summary characterization of such employee's performance as "satisfactory" or "unsatisfactory." When appropriate, the report shall contain recommendations relating to: renewal or non-renewal of the professional employee's appointment; promotion; discretionary salary increase; or other actions affecting the employment status of the professional employee. In any event, the employee shall receive the recommendation made by the immediate supervisor pertaining to reappointment no later than 45 calendar days prior to the date upon which notice of non-renewal is due.

(c) The immediate supervisor and the professional employee shall meet to discuss the preliminary evaluation and a new performance program. The extent to which information from secondary sources has influenced the evaluation report shall be reviewed with the employee during this discussion. If an evaluation is characterized as "unsatisfactory," the basis for this characterization shall also be a part of this discussion.

(d) Commensurate with the provisions of (3) through (7) above and prior to concluding the discussion, the immediate supervisor and the professional employee shall discuss a new performance program.

(e) Based upon the evaluation of the professional employee in relation to such employee's performance program and based upon information obtained during discussion with such employee in accordance with (b) through (d) above, the immediate supervisor shall prepare a final written evaluation report which shall include a summary characterization of such employee's performance, any appropriate recommendations, and to which a new performance program shall be attached.

(f) The employee's signature on the final evaluation report signifies only that the employee has received and discussed it with the immediate supervisor, and does not represent agreement or disagreement with the evaluation.

(9) Disposition of Final Evaluation Report

(a) The immediate supervisor shall provide the professional employee with a dated copy of the final evaluation report as soon after completion of the evaluation process as practicable, but not less than forty-five (45) calendar days prior to the notification date for non-renewal of a term appointment for a professional employee serving on such appointment. The original written, dated and signed evaluation report shall be placed in the professional employee's personnel file, a copy of which shall be forwarded to the evaluator's supervisor.

(b) A professional employee who seeks a review of a final evaluation report characterized as "unsatisfactory" must inform in writing the immediate supervisor, the Chair of the Committee on Professional Evaluation, and the college president or designee within ten (10) working days of receipt of the report.

Upon being notified that the professional employee is requesting a review, the immediate supervisor shall, within five (5) working days, provide the Chair of the Committee on Professional Evaluation a dated copy of the final evaluation report.

(c) If the final evaluation report contains recommendations affecting a professional employee's employment status or is to be reviewed by the Committee on Professional Evaluation, it shall be sent to the college president or designee.

(d) If the final evaluation report sent to the college president is not to be reviewed by the Committee on Professional Evaluation, the college president shall take such action as is deemed appropriate with respect to recommendations contained in such report. Otherwise, action shall be delayed until the Committee on Professional Evaluation has completed its review and submitted its recommendations to the college president or designee; however, failure of the Committee to initiate and complete a timely review shall not prevent the college president from acting upon recommendations in the final evaluation report to conform with notice requirements in event of non-renewal of term appointments.

### VI. College Committee on Professional Evaluation

A. Within thirty (30) calendar days after execution of the 1981 revised Memorandum of Understanding between the State University and United University Professions relating to a system of evaluation, a five-person Committee on Professional Evaluation shall be formed at each college.

The Committee shall consist of three (3) professional employees serving in positions in the negotiating unit at each college, elected at large by all of the professional employees in the negotiating unit at the college in accordance with procedures developed and implemented by the UUP chapter president. The remaining members shall be selected by the college president. The chair shall be selected by the Committee from among its members.

In the event of a resignation or the inability of a member to serve, that member shall be replaced within thirty (30) calendar days pursuant to the procedures outlined in A above.

During the period September 1 to September 30 of each year, the UUP chapter president, at his or her discretion, may choose to replace any or all members of the committee elected at large by the professional employees in the negotiating unit and cause a new election to be held pursuant to the above procedures to fill the vacancy or vacancies created. Additionally, during the same period each year, the college president, in his or her discretion, may choose to replace any or all members he or she has selected to serve on the Committee, and select a new member or members to fill the vacancy or vacancies created. The newly established Committee will commence service on October 1.

B. Process of Review

(1) The Committee on Professional Evaluation established pursuant to Section VI. A. shall, upon the timely request of a professional employee, review a final evaluation report characterized as "unsatisfactory."

(2) Committee review shall address both the procedures and substance of the unsatisfactory evaluation.

(3) As part of its review, the Committee at its discretion:

(a) shall have access to all previous formal evaluations of the professional employee concerned;

(b) may request and consider any additional comments by either the immediate supervisor or the professional employee;

(c) may request information pertinent to the review from secondary sources;

(d) may request that the immediate supervisor and/or the appellant meet with the Committee and respond to inquiries;

(e) shall be free to call upon any other individual whom they believe has information relative to the evaluation. All individuals shall be encouraged to cooperate with the Committee if so requested.

C. Disposition of Committee Report

The Committee shall complete the written recommendations within twenty-five (25) working days from the date of appeal, with copies to the professional employee, the immediate supervisor, the evaluator's supervisor and the college president. Within ten (10) working days of the issuance of the report, the college president shall take such action as he or she deems appropriate and shall give written notice of such action to the professional employee, the immediate supervisor, the evaluator's supervisor and the Committee on Professional Evaluation. September 30, 1981.

**STATE UNIVERSITY OF NEW YORK**
s/Clifton R. Wharton, Jr., Chancellor
s/John Cummings, SUNY Binghamton
s/Heidi Mahoney, SUC Buffalo
s/Ronald Satryb, SUC Geneseo
s/Lee Yasumura, SUNY Stony Brook

**UNITED UNIVERSITY PROFESSIONS**
s/Samuel J. Wakshull, President
s/Evelyn L. Hartman, Executive Director
s/Charles Hansen, VP for Professionals, SUNY Stony Brook
s/Richard Allen, SUC Buffalo
s/Henry Geerken, SUATC Cobleskill
s/Ruth Knight, Upstate Medical Center

**Memorandum of Understanding Between The State University of New York and United University Professions Relating to a System of Promotion and Certain Salary Increases for Professional Employees (Revised 2011)**

**I. Promotion Policy**

It shall be the policy of the University to give consideration for promotion to all professional employees in the Professional Services Negotiating Unit and to permit the promotion of any such professional employee as hereinafter provided.

**II. Definitions**

A. The following terms shall be defined as provided in Article 4 of the collective bargaining Agreement between the State of New York and the United University Professions: "University," "professional employee," "college president," "college."

B. "Professional position" or "position" shall mean a position in the Professional Services Negotiating Unit other than a position of academic or qualified academic rank.

C. "Promotion" shall mean an increase in a professional employee's basic annual salary accompanied by movement to a higher salary level with a change in title:

(1) resulting from a permanent significant increase or change in the employee's duties and responsibilities as a consequence of movement from one position to another of greater scope and complexity of function at the same or different campus; or

(2) resulting from a permanent significant increase in the employee's duties and responsibilities as a consequence of a permanent increase in the scope and complexity of function of the employee's position.

The criteria to be used in considering an employee for promotion shall be those defined in Section III, Paragraph D.

**III. System of Promotion**

A. Professional Ranks

The University shall establish six salary levels designated 1, 2, 3, 4, 5 and 6.

B. University Review Board

The University shall maintain a University Review Board to review appeals in accordance with appropriate provisions of Paragraph E (2) below from decisions of the college president not to make promotions of the type defined in Section II, Paragraph C(2).

C. College Review Panel

Each college president shall continue the procedure by which the professional employees shall elect a College Review Panel. Such Panel shall consist of not less than five (5) nor more than seven (7) members elected at large by all professional employees in the negotiating unit.

The Panel shall:

(1) review applications for promotions of the type defined in Section II, Paragraph C(2) and make decisions and recommendations with respect to such applications in accordance with appropriate provisions of Paragraph E(2); and

(2) review applications for salary increases resulting from a permanent and significant increase in duties

and responsibilities which are not accompanied by a change in title or rank.

D. Criteria for Promotion

(1) The criteria to be used in considering an employee for promotion shall be those which relate to the particular type of duties and responsibilities for which the employee is being considered; for example:

(a) Effectiveness in performance—as demonstrated, for example, by success in carrying out assigned duties and responsibilities, efficiency, productivity, and relationship with colleagues.

In the case of University professional employees, satisfactory supervisory evaluations of a professional employee's performance at the present level of duties and responsibilities shall be considered. Additionally, supervisory comments on such evaluation regarding the professional employee's projected capabilities to function at an increased level of responsibility shall also be considered.

(b) Mastery of specialization—as demonstrated, for example, by degrees, licenses, honors, awards, and reputation in professional field.

(c) Professional ability—as demonstrated, for example, by invention or innovation in professional, scientific, administrative, or technical areas; i.e., development or refinement of programs, methods, procedures, or apparatus.

(d) Effectiveness in University service—as demonstrated, for example, by such things as successful committee work, participation in local campus and University governance, and involvement in campus or University-related student or community activities.

(e) Continuing growth—as demonstrated, for example, by continuing education, participation in professional organizations, enrollment in training programs, and research. The foregoing criteria and examples thereof are presented for descriptive and explanatory purposes only and are in no way intended to be all inclusive.

E. Method of Promotion

(1) Vacant Position

(a) Promotions of the type defined in Section II, Paragraph C(1) shall be made as follows:

(i) Colleges shall notify the University Office of Personnel Services of all present or potential vacancies in positions in the Professional Services Negotiating Unit which are intended to be filled. The University shall announce position vacancies of which it has been notified and shall provide proposed salary ranges, minimum qualifications, and brief descriptions of the positions.

The announcements shall also specify information required from applicants for each such position and shall contain time limits for the receipt by the college of applications. All professional employees who file an application with the appropriate college within the specified time limitations shall be considered for the position for which they have applied.

(ii) The college may elect to conduct personal interviews. In that event the college may select from among all applicants for a position those for whom personal interviews will be arranged. In such cases, all applicants shall be notified whether they have been selected for an interview.

Applicants who are not selected for personal interviews will be advised that they will not receive further consideration for promotion to the current vacant position for which they applied.

(iii) Prior to promoting or appointing the successful applicant the college shall inform all remaining unsuccessful applicants of their nonselection. The college decision shall be final, provided, however, that all promotions or appointments shall be subject to approval in accordance with Policies of the Board of Trustees.

(b) If, in the judgment of the college president, and pending the completion of the procedures described herein, an emergency exists which requires any such vacant position to be filled immediately, an employee may be offered the position on an interim basis. If the position is filled on a permanent basis by another person, such employee shall return to the employee's previous position without loss of benefits.

(c) Each college or the University, as the case may be, will make a good faith effort to comply with provisions of (a) above. The failure of any college or of the University, as the case may be, to announce position

vacancies or otherwise to follow procedures in (a) above, or the failure of individual professional employees to be made aware of such announcements or to file an application for vacant positions as provided in (a) above shall not affect or operate to invalidate any promotion or appointment to such vacant positions nor shall anything contained herein be construed to require a college or the University to make promotions or appointments from among professional employees presently employed by the University.

(2) Present Position

(a) Any employee who meets the criteria defined in Section III, Paragraph D(1) may apply for promotions of the type defined in Section II, Paragraph C(2) provided that the employee first has requested a recommendation for such a promotion from the employee's immediate supervisor and the request has been denied at an organizational level below that of the college president.

Application for promotion must be made by completing forms to be provided by the University and submitting them to the College Review Panel.

(b) The Panel shall review all such applications for promotion. If it determines that the increase or change in duties and responsibilities under consideration does not warrant promotion, the Panel shall notify the employee. Further appeal from such determination of the College Review Panel shall not be permitted.

If the Panel determines that the increase or change in duties and responsibilities under consideration warrants promotion, it shall forward its recommendations to the college president. A copy of such recommendation shall be sent to the applicant. The decision of the college president shall be rendered within 90 calendar days. In the event a decision is not issued within the 90 calendar day period, the College President shall be deemed to have denied the request for purposes of the employee's right to file an appeal to the University Review Board. Such decisions shall be final, provided, however, that a decision by the college president which is claimed by the applicant to be arbitrary or capricious may be appealed on such basis to the University Review Board by such person in
accordance with appropriate provisions stated below. A copy of such appeal shall also be sent to the college president. In the event of such appeal the college president may forward the President's recommendation to the University Review Board. A copy of such recommendation, if any, shall also be sent to the College Review Panel and the applicant.

(c) In considering appeals from decisions of the college president not to promote which decisions are claimed to be arbitrary and capricious, the University Review Board or its designee shall: review recommendations from the College Review Panel and college president; examine the duties, responsibilities, scope and complexity of the position involved; and determine by appropriate means and standards—which may include but not be limited to tests of internal and external consistency; desk audits; and other commonly accepted review methods—whether promotion is warranted. The University Review Board's decision shall be final.

(d) Applications for promotion which are disapproved may not be resubmitted for a period of either eighteen (18) months, or until the employee's performance program has been changed, whichever is sooner, following a disapproval by the College Review Panel, by the president—or if an appeal is taken to the University Review Board—by that Board.

## IV. Salary Increase

An employee who has been assigned a permanent and significant increase in duties and responsibilities as demonstrated by the employee's performance program may apply for a salary increase provided that the employee first has requested a recommendation for such a salary increase from the employee's immediate supervisor and been denied at an organizational level below that of the college president. Application for a salary increase must be made by completing forms to be provided by the University to which are attached the current performance program and the next most recent performance program and submitting them to the College Review Panel.

The Panel shall review all such applications for salary increase submitted in accord with these guidelines. If it determines that the increase or change in duties and responsibilities under consideration does not warrant a salary increase, the Panel shall notify the employee, college president and immediate supervisor. Further appeal from such determination of the College Review Panel shall not be permitted.

If the Panel determines that the increase or change in duties and responsibilities under consideration warrants a salary increase, it shall forward its recommendations to the college president.

A copy of such recommendation shall be sent to the applicant.

The decision to provide a salary increase is within the discretion of the college president and the college president's decision shall be final.

**V. Notwithstanding anything contained herein a college president may:**

A. with respect to the type of promotion defined in Section II, Paragraph C(2), promote or recommend for promotion, as the college president's scope of authority permits, any professional employee on the campus; and

B. make upward adjustments in the salary of individual employees. August 8, 1989

| STATE UNIVERSITY OF NEW YORK | UNITED UNIVERSITY PROFESSIONS |
|---|---|
| D. Bruce Johnstone, Chancellor | John Reilly, President |
| Joyce Yaple Villa, Asst. Vice Chancellor, Employee Relations | Thomas Corigliano, VP for Professionals |
| Raymond L. Haines, Jr., Director of Employee Relations | Anthony D. Wildman, Assoc. Director of Staff |

## APPENDIX A-29

TO: Presidents, State-operated Campuses
FROM: Donald G. Dunn
SUBJECT: Compensatory Time Off

During negotiations for the 1995-99 Agreement, the parties agreed to place their existing understandings regarding compensatory time off in an appendix to the Agreement. Those understandings are contained in a series of memoranda promulgated by the University following discussions with UUP or its predecessor in interest beginning in 1972 and thereafter updated and reissued in 1983, 1987 and 1992. This memorandum is intended to summarize and consolidate the currently applicable provisions of those memoranda, but is not intended to alter the understandings of the parties with respect to compensatory time. These source documents should be consulted in the event that further clarification is required on any specific matter.

The first type of compensatory time is accorded under Subdivisions 23.5(b), (c) and (d) of the State-UUP Agreement. An employee eligible to observe holidays but who is required to work on a holiday is entitled to a compensatory day off when the holiday falls on a Saturday, a Sunday, or a pass day; provided, however, that an employee who is eligible to observe Thanksgiving or Christmas is entitled to one and one-half compensatory days off for working each of those holidays. Holiday compensatory days off are used within one year of accrual at times mutually convenient to the employee and the University, or they are forfeited as provided in Article 23.5(d).

A second type of compensatory time is accorded to those managerial and professional employees whose service exceeds their normal professional obligation. It should be noted that this situation arises when that work does not fall within the definition of extra service. Such additional efforts should be recognized by "compensatory" time off at a later date. This compensatory time should be scheduled at a mutually convenient time to the employee and the University. This type of compensatory time has been in place within the University since the June 21, 1972 Memorandum to Presidents on the subject from Ken-

neth MacKenzie, which provided: No member of the professional staff (with the exception of non-exempt employees under the Fair Labor Standards Act) is eligible for payment of overtime. Thus, for example, additional payment to an associate dean for evening or weekend service is not possible. If such service is required by the Chief Administrative Officer, it should be officially recognized by compensatory time off at a later date.

There also has been a concern that employee absences due to use of compensatory time (other than holiday compensatory time referred to in Section 23.5 of the Agreement) be reconciled with required attendance reporting. This may be done by making available the following model form designed for use by employees and their supervisors regarding the use of such time.

TO: Professional Employee
FROM: Immediate Supervisor
SUBJECT: Compensatory Time for Service Exceeding Normal Professional Obligation

This memorandum shall confirm our mutual agreement that you will not be reporting to your work station on (DATE) for the full time that office is normally open. The use of this time is in recognition of the services you have performed beyond your normal professional obligation as provided for under this memorandum. For attendance purposes, you are regarded as having been present on that date sufficient to meet your required professional obligation.

## APPENDIX A-30

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

This is to confirm our mutual understandings with respect to certain issues pertaining to part-time academic employees.

The University shall instruct campuses to appoint part-time term faculty to full-year appointments where they are in a position to do so. This would be possible, for example, in instances where such faculty have been employed for consecutive semesters
for several years and are expected to continue in this capacity. Article XI, Title D §2(b)(1) of the Policies of the Board of Trustees provides that part-time employees who have been granted a term appointment, but for whom classroom enrollment proves
inadequate, shall have no further right to salary or benefits and this provision remains applicable to these appointments.

The University shall encourage campuses to provide support services and facilities needed by part-time faculty in conjunction with the performance of their professional obligation. Examples of such support services and facilities would include office space, access to telephones, photocopying and secretarial services.

The University shall instruct each campus to publish whatever hiring procedures it has in place for filling part-time faculty vacancies. A description of these procedures should be included in any information that is distributed or displayed regarding recruitment or hiring. A copy shall also be provided to the local chapter of UUP. Campuses are not required to create such procedures, but rather to disseminate those that already exist. It is intended that such campus action be taken within six (6) months of the formal execution of the Agreement.

Sincerely,

s/Linda Angello, Director                                        s/William E. Scheuerman, President
Governor's Office of Employee Relations               United University Professions

**APPENDIX A-31**

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

   During the course of negotiations, specific compensation issues were identified by UUP that were of such significant concern that review at the Executive level is required.

   No later than six months after a fully-executed agreement, the Director of the Governor's Office of Employee Relations and the President of United University Professions shall meet to develop and implement procedures for review on these issues.

   Topics that have been specifically cited for review include:

   The University's ability to retain and recruit a highly qualified workforce in the context of national market conditions.

   The presence of structural inhibitors, if any, including campus type, to an equitable salary plan.

   The agreement to review these issues in the labor-management forum does not constitute a waiver of any management or union right or prerogative.

   Sincerely,
   s/Linda Angello, Director                                      s/William E. Scheuerman, President
   Governor's Office of Employee Relations              United University Professions

**APPENDIX A-32**

Dr. Frederick E. Kowal, President
United University Professions

Dear Dr. Kowal:

   During the course of negotiations, certain issues related to professionals were raised by UUP that were of such significant concern that review at the Executive level is required. On a date as soon as practicable but no later than six months after the execution of the Agreement, and agreeable to the parties, the Executive Committee shall convene to discuss and review issues of mutual interest pertaining to professional employees.

   The first category of issues to be addressed by the Committee shall be with regard to Information Technology, including but not limited to titles and title families. Specifically, management has agreed to review issues raised by UUP that are contained in the UUP document entitled A-32 Survey: SUNY Information Technology Titles, related to a review of IT titles and title structure.

   The agreement to review these issues in this forum will not constitute a waiver of any management or union right or prerogative.

   Sincerely,
   s/Michael N. Volforte, Director                             s/Frederick E. Kowal, President
   Governor's Office of Employee Relations              United University Professions

**APPENDIX A-33**

Dr. Frederick E. Kowal, President
United University Professions

Dear Dr. Kowal:

   During the course of negotiations, the parties discussed issues related to the designation of essential and non-essential employees.

   At the start of the academic year, each campus shall identify which employees are anticipated to be

116

essential during an emergency or extraordinary circumstance and such identification as essential should be clearly communicated to affected employees. In addition to the initial identification of essential service employees, the campus has the ability to exercise its discretion to determine who is essential and must report to work based upon the specific emergency or extraordinary circumstance. In general, essential employees shall be those employees whose duties include: continuing care and/or safety of patients, students, property or animals; maintaining mission critical systems; or emergency response, relief and recovery.

Sincerely,

s/Michael N. Volforte, Director                                  s/Frederick E. Kowal, President
Governor's Office of Employee Relations                   United University Professions

### APPENDIX A-34

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

During the course of negotiations, issues were raised by UUP that were of such significant concern that review at the Executive level is required.

No later than six months after a fully executed agreement, the Director of the Governor's Office of Employee Relations and the President of United University Professions shall meet to establish procedures for review.

Among the topics that have been specifically cited for review is exploration of the use of dedicated recognition devices for safety and health and other programmatic purposes and electronic record-keeping.

The agreement to review these issues in the labor-management forum does not constitute a waiver of any management or union right or prerogative.

Sincerely,

s/Linda Angello, Director                                           s/William E. Scheuerman, President
Governor's Office of Employee Relations                   United University Professions

### APPENDIX A-35

Dr. Frederick E. Kowal, President
United University Professions

Dear Dr. Kowal:

During the course of negotiations, the parties discussed whether notices of interrogation should be placed in an employee's official personnel file.

It is agreed by and between the parties that written communication requiring an employee to attend a disciplinary interrogation shall not be placed in an employee's official personnel file at the time it is sent to the employee. Such document shall instead be maintained as separate and confidential until the President, or designee, has made a determination regarding formal discipline pursuant to Article 19 (Discipline) of the Agreement between the State and UUP.

If the President, or designee, does not initiate formal discipline, such correspondence shall never be placed in the official personnel file. If the President proceeds with formal disciplinary action, such document may be placed in the official personnel file as official correspondence.

Sincerely,

s/Michael N. Volforte, Director                                  s/Frederick E. Kowal, President
Governor's Office of Employee Relations                   United University Professions

**APPENDIX A-36**

Dr. Frederick E. Kowal, President
United University Professions

Dear Dr. Kowal:

   During the course of negotiations, the parties discussed the campuses' obligation to indefinitely maintain a counseling memorandum in an employee's official personnel file. It is recognized that management may remove such document(s) from the official personnel file at any time. Specifically, the parties discussed removal of a counseling memorandum where such document has been on file for a period of three or more calendar years and there have been no subsequent event(s) that would cause campus management to believe that the continued retention of such memorandum is necessary.

   The purpose of this letter is to encourage the campuses to remove the counseling memorandum from an employee's personnel file where:

   1. The employee submits a written request specifically identifying the counseling memorandum the employee desires to be removed from their official personnel file; and,

   2. Such counseling memorandum has been in the official personnel file for a period of three or more calendar years; and,

   3. There have been no event(s) subsequent to the issuance of such counseling memorandum which would cause campus management to believe that continued retention of such counseling memorandum is necessary for personnel administration purposes.

   Sincerely,

   s/Michael N. Volforte, Director                          s/Frederick E. Kowal, President
   Governor's Office of Employee Relations                  United University Professions


**APPENDIX A-37**

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

   Challenges facing medical school teaching hospitals nationally suggest that a review of the structure of the SUNY hospitals at the Executive level is required.

   No later than six months after a fully executed agreement, the Director of the Governor's Office of Employee Relations and the President of United University Professions shall meet to develop and implement procedures for review of the SUNY hospital structure.

   The agreement to review these issues in the labor-management forum does not constitute a waiver of any management or union right or prerogative.

   Sincerely,

   s/Linda Angello, Director                                s/William E. Scheuerman, President
   Governor's Office of Employee Relations                  United University Professions


**APPENDIX A-38**

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

   Solely as a matter of computational convenience for purposes of creating a schedule for accruing and using leave under Article 23 for part-time professional employees; part-time academic employees whose professional obligations, as determined by the President, are primarily other than teaching; and full-time

employees whose assigned daily professional obligation varies in length during the course of the work week, the parties have defined a "day" as eight hours. This definition is not intended by either party to have any wider application than the specific and limited use in Article 23 and does not reflect any agreement or acknowledgement by either party as to the length of a workday.

Sincerely,

s/Linda Angello, Director                                          s/William E. Scheuerman, President
Governor's Office of Employee Relations                 United University Professions

### APPENDIX A-39

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

This will confirm our mutual understanding with respect to positive assurance audits raised during negotiations for this collective bargaining agreement. The parties agree that the Governing Board will secure an annual positive assurance audit. The parties intend that such audits should not exceed by more than 15 percent the cost of a comparable attestation audit. At the beginning of each audit cycle and at the request of the Governing Board, representatives of the System Administration Comptroller will be available to meet with the auditor selected by the Governing Board or designee to ensure that the cost of the positive assurance audit will be as described above.

Positive Assurance will be applied against the following Policy provisions:

Compliance with maximum allowable compensation limits pursuant to Article XVI §4(f);

Participation in the Plan pursuant to Article XVI §4(b); and Disbursement of Clinical Practice Income pursuant to Article XVI §4(g).

A report on the revenues and expenditures of the CAO's fund and remainder fund shall be given to the Clinical Practice Governing Board annually.

Sincerely,

s/Linda Angello, Director                                          s/William E. Scheuerman, President
Governor's Office of Employee Relations                 United University Professions

### APPENDIX A-40
### MEMORANDUM OF UNDERSTANDING ON CLINICAL PRACTICE CENTRALIZED BILLING

General Provisions:

Centralized billing shall be instituted only by the individual health sciences center, not by SUNY, except pursuant to Chancellor's authority in Article XVI, §4, subdivision (d) of the Policies of the Board of Trustees in the event the plans are not operated in compliance with the provisions of that subdivision.

Centralized billings and collections for physician services shall be performed only by an agent or agents chosen by the Governing Board of the Clinical Practice Plan (CPGB) or designee at the health sciences center at which a centralized billing system is instituted; provided, however, if no such agent is chosen within six months of the decision to convert to centralized billing, the Chief Administrative Officer (CAO) may select a billing agent.

The organization of group clinical practices at a health sciences center shall not be affected by whether billing is at the department level or centralized.

All clinical practice income collected through a centralized billing system shall remain the property of the department that provided the services until disbursed in accordance with Article XVI and department, CPGB and IRS guidelines.

Procedures for changing to a centralized billing system:

The CPGB may institute centralized billing at any time it deems centralized billing to be in the best interests of the Clinical Practice Plan.

If the CAO or designee believes that a centralized billing system may be in the mutual best interests of the Health Sciences Center and the Clinical Practice Plan, the CAO may propose such a system to the CPGB.

The CAO's Proposal shall include justification for centralized billing, including the reasons for and the anticipated outcomes of such a system, the costs of the proposed system and the costs of transitioning from departmental to centralized billing including, but not limited to, any anticipated cash flow delays or loss of revenues due to the changing of billing systems. The CAO's proposal shall also include an impact statement for the clinical practice plan as a whole and impact statements for each affected department.

The CPGB and the CAO shall be given full access to any and all information and data relevant to the proposal and its impact.

The CPGB shall be given not less than six months to investigate, consider and debate the desirability of instituting a centralized billing system and to discuss with the CAO the need for and impact of such a system; except if the reason given by the CAO is insuring compliance with federal billing requirements as provided hereinafter, the CPGB shall be given not less than three months. Provided, however, nothing contained in this memorandum will prevent the University and the clinical practice plans from immediately complying with a federal or state (external to SUNY) imposed compliance plan, performance standard or other requirements established by the Department of Health and Human Services.

If, after such a period of discussion, the CPGB does not agree that a centralized billing system is justified but the CAO remains convinced that it is in the best interest of the clinical practice plan and the health sciences center, the CAO may impose a centralized billing system under the following conditions:

Upon a finding by the CAO that centralized billing is necessary to insure compliance with federal or state (external to SUNY) billing requirements or upon identification by internal auditors of a lack of compliance with state or federal billing requirements, or

Upon a finding by the CAO that significant savings to the clinical practice plan can be achieved by centralizing the billing system, or

Upon a finding by the CAO that centralized billing is necessary to facilitate billing for managed care contracts or other business agreements or ventures.

If centralized billing is imposed by the CAO, the design, structure, and function and the agent selected to do the billing remain under the control of the CPGB; provided, however, in the event the CPGB decisions regarding design, structure and function have not been resolved within three months in the case of non-compliance with billing requirements as outlined above, or six months in other cases, the CAO may establish design, structure, function and agent on a transitional basis pending CPGB action. The day-to-day management of the centralized billing system shall reside with the CPGB or designee.

The CAO and the CPGB may, by written agreement, mutually agree to reduce or extend the time limits above.

All provisions of this MOU are subject to Article 7 of the Agreement.

## APPENDIX A-41

Dr. Frederick E. Kowal, President
United University Professions

Dear Dr. Kowal:

This letter confirms our mutual understanding regarding the development of guidelines and methodology for a salary equity study to be conducted at each campus and addressed with discretionary salary increases during the 2016-2022 Agreement.

As soon as practicable, but no later than three months following ratification, the Director of the Gover-

nor's Office of Employee Relations, the President of United University Professions and the Chancellor of the State University of New York, or their designees, shall convene at the executive level to review this issue.

The Executive Level Committee shall develop guidelines and methodology for analyzing salary compression and/or inversion at each campus utilizing multiple regression analysis and/or other appropriate methods. The campuses shall apply the developed guidelines and methodology to determine the extent to which salary compression and/or inversion exists at each campus. The results of each campus analysis shall be reviewed and considered by each College President in distributing discretionary salary increases for 2019-2022 to full-time and part-time employees to remedy identified compression and/or inversion. The adopted guidelines and methodology shall be applied to address equity issues at each campus separately, and base salary adjustments shall be made from available funding allocated to each campus.

Following each year in which equity adjustments are distributed to employees, the Executive Level Committee may reconvene to discuss matters of mutual concern pertaining to the implementation of the guidelines and methodology established by the Executive Level Committee.

Sincerely,

s/Michael N. Volforte, Director                                    s/Frederick E. Kowal, President
Governor's Office of Employee Relations                  United University Professions

## APPENDIX A-42

Dr. Fredrick E. Kowal, President
United University Professions

Dear Dr. Kowal:

During the course of negotiations, the parties discussed the matter of employees attempting to balance the demands of work and the impact of family responsibilities. These sometimes conflicting responsibilities impact employees throughout their entire career cycle and may differ widely from employee to employee. These issues range from child-rearing and child care to care of sick and disabled family members, including elders, or assisting family members when deployed abroad for military service. Employees are often confronted with the need to balance the many, and sometimes competing, priorities of their employment and personal lives.

While maintaining SUNY's level of excellence and competitiveness in higher education, we should also be aware of the need to find balance between personal/family life and professional life. A culture of supporting employees in a manner consistent with their employment obligations when the responsibilities of family life are particularly demanding may help employees balance their work/life commitments. Campuses are encouraged to recognize the importance to employees of a flexible approach to accommodating family care needs. Options may include the following: flexible work schedules, modified duties, alternative work assignments, and temporary reduction from full-time to part-time work.

What follows is a listing of potential options for consideration by labor and management in attempting to address such situations as they arise. These brief descriptions are not intended to modify the language, meaning or operation of any law, rule, regulation, policy, procedure or provision of the Agreement. In all cases, the original source, many of which can be located through the sites noted herein or in A-18, should be examined closely.

### I. Unpaid Leave under the Family and Medical Leave Act

Full-time and part-time employees who meet eligibility criteria under the Family and Medical Leave Act ("FMLA") may take up to 12 workweeks of unpaid, job-protected leave during a 12-month period for the birth of a son or daughter*, and to care for the newborn child; for placement with the employee of a son or daughter for adoption or foster care; to care for the employee's spouse, son, daughter or parent with a

serious health condition; because of a serious health condition that makes the employee unable to per-form the functions of the employee's job; and because of any "qualifying exigency" arising out of the fact that the employee's spouse, son, daughter, or parent is on "covered active duty" in the military. Eligible employees may be entitled to take up to 26 workweeks of unpaid leave during a single 12-month period to care for a family member who is a "covered service member" with a serious injury or illness. During FMLA leave, health insurance must be maintained if the employee continues to pay the employee share of the health insurance premium.

*Son or daughter as defined by the Family and Medical Leave Act

## II. Use of Leave Accruals to Retain Pay during FMLA Leave

*Pregnancy*

   Pregnant employees may be asked or encouraged to report the existence of pregnancy, but they may not be required to do so. Where, in the opinion of the Chief Administrative Officer or designee, the nature of the duties performed may be particularly hazardous or burdensome during pregnancy, this should be pointed out in the letter of appointment and such employees should be urged to advise their supervisors of any pregnancy. In any case where the Chief Administrative Officer or designee believes the employee is un-able to perform the duties of the position because of pregnancy, the employee may be required to undergo a medical examination, at the expense of the campus, by a physician designated by the campus. A pregnant employee who is determined to be medically disabled from the performance of job duties must be treated the same as any other employee similarly disabled insofar as disability leave benefits are concerned.

   Sick leave may be used only during a period of medical disability. Under this policy, disabilities arising from pregnancy or childbirth are treated the same as other disabilities in terms of eligibility for or entitle-ment to sick leave with and/or without pay and extended sick leave.

   Generally, the period of such disability is deemed to commence approximately four weeks prior to deliv-ery and to continue for six weeks following delivery. While doctor's certificates may be required for any period of disability, campuses should request detailed medical documentation whenever disability is claimed to commence prior to or to extend beyond the period of disability described above.

   A Chief Administrative Officer or designee may approve an employee's request for leave without pay during pregnancy and prior to the onset of any medical disability as a matter of discretion. Absences dur-ing pregnancy and following childbirth may be charged to vacation, irrespective of whether the employee is disabled. While the use of annual leave prior to the onset of medical disability is discretionary with the Chief Administrative Officer, employees must be permitted to use these accruals during a period of med-ical disability after sick leave with pay has been exhausted.

*Care of Sick Family Members*

   In order to retain pay during a period of designated FMLA leave, employees may use up to 30 days of ac-crued sick leave per contract year to care for the employee's spouse, son, daughter or parent with a serious health condition, or a family member who is a "covered service member" with a serious injury or illness.

*Adoption or Foster Care*

   In order to retain pay during a period of designated FMLA leave, employees may use up to 15 days of ac-crued sick leave per contract year for the placement with the employee of a son or daughter for adoption or foster care after arrival in the family home. If eligible and prior approval has been obtained, employees may also use vacation leave.

## III. Death of a Family Member

   Up to 30 days of accrued sick leave may be used for the death of a family member.

## IV. Leave Donation Program

Employees who, because of a long-term illness, have exhausted all of their leave benefits as provided for in Article 23.2, 23.4, and 23.5 of the Agreement between the State and UUP may be eligible for donation of leave credits from other New York State employees (see Appendix A-45).

## V. Seven-Month Child Care Leave Period

Employees, regardless of gender, are entitled to leave without pay for child care for up to seven months following the date of delivery or adoption under Article 7 of the Domestic Relations Law. However, as provided by Article 23.13 of the Agreement, where the child is required to remain in the hospital following birth, the seven-month mandatory child care leave shall, upon employee request, commence when the child is released from the hospital. If a child is required to be admitted to a hospital for treatment after child care leave has commenced, upon employee request, child care leave shall be suspended during a single continuous period of such hospitalization and that period shall not count toward calculation of the seven-month period. In such cases, any entitlement to mandatory child care leave expires one year from the date the child care leave originally commenced.

For purposes of computing the seven-month period of mandatory leave, periods during which the employee was absent for "disability" or use of leave credits are included: the mandatory seven-month period is not extended by the granting of disability leave or the use of accrued leave. During a period of leave for child care, employees shall be permitted, upon request, to use annual leave before being granted leave without pay. As is the case with other mandatory leaves without pay (e.g., military leave), the University shall not require that employees exhaust all appropriate leave credits prior to being granted leave without pay for child care. Sick leave may be used only during a period of medical disability. Except in the case of continuing medical disability, or utilization of New York State Paid Family Leave, any leave of absence beyond the seventh month following childbirth shall be at the discretion of the Chief Administrative Officer. An employee who requests a leave for child care of less than seven months is entitled to have such leave extended, upon request, up to the seven-month maximum and may at the discretion of the Chief Administrative Officer or designee, have such leave extended beyond the seventh month. In certain situations, an employee may not be permitted to return from such leave until the expiration of the period that such employee requested and was granted. Generally, such restrictions on early return are limited to situations where such return would be disruptive of a project or where the termination of a replacement would occur.

During the seven-month period following childbirth, the granting of leave for child care is mandatory upon request from either parent. If both parents are State employees, leave for child care is mandatory for one parent at a time and the parents may elect to split the mandatory seven-month leave into two separate blocks of leave with each parent entitled to one continuous period of leave but not to exceed a combined total of seven months of leave and not to extend beyond seven months from the date of delivery.

Campuses may, in their discretion, approve other arrangements for shared leave including concurrent leave and may, as a matter of discretion, extend leave for child care beyond the mandatory seven months.

Furthermore, while one parent is absent on leave for child care, campuses continue to have the discretion to approve requests from the other parent for periods of vacation, pursuant to Paragraph 23.2(e) of the Agreement between the State of New York and United University Professions.

Temporary and probationary employees without any permanent status are entitled to leave with full pay and/or without pay as described above. However, these employees are not eligible for leave beyond that date when their employment would otherwise terminate. In general, the State's policy on leave for pregnancy, childbirth and child care shall not be construed to require extension of any employment beyond the time it would otherwise terminate (see Article 23.13 of the State/UUP Agreement).

## VI. New York State Paid Family Leave

Effective beginning January 1, 2019, full-time and part-time employees who meet the eligibility criteria for New York State Paid Family Leave (PFL) have the right to take partially paid leave, without charge to leave credits, to bond with the employee's biological, adopted, or foster child; to participate in providing care, including physical or psychological care, to a family member (child, grandchild, parent, grandparent, spouse, or domestic partner) with a serious health condition; or to attend to obligations arising because a family member (spouse, domestic partner, child or parent) is deployed abroad in active military duty or has been notified of an impending military deployment abroad (a qualifying exigency). Health insurance must be maintained while an employee is out on PFL so long as the employee continues to pay the employee share of the health insurance premium.

*PFL Benefits Levels*

Effective January 1, 2019, an eligible employee may receive up to 10 weeks of paid family leave in a 52-week period at 55 percent of the employee's average weekly wage, not to exceed 55 percent of the NYS Average Weekly Wage (SAWW). In subsequent years, the number of weeks and the amount of payment an employee may receive shall be in accord with the statutory entitlement in effect.

*Use of PFL*

PFL may be taken in full-day increments on either a continuous or intermittent basis.  PFL time to bond with a new child may be taken at any time during the first 12 months after the child's birth or placement in the home. PFL time may also be taken on days the employee will be providing care for a qualifying family member with a serious health condition or assisting a qualifying family member who has been or is being deployed abroad for active military duty.

An employee taking time off to bond with a child or care for a qualifying family member may elect either to receive full pay by charging available leave credits as appropriate and approved in accordance with Article 23 of the State/UUP Agreement OR receive the statutory PFL benefit and not charge accruals. However, an employee may not use both PFL and leave accruals on the same day.  The employee has the choice of either option (charging appropriate accruals or submitting a claim for PFL) on any given day. Time charged to leave credits will not count against an employee's annual PFL entitlement (see Article 23.14 of the State/UUP Agreement).

## VII. Other Leave Options

Under Article XIII, Title F of the State University of New York Policies of the Board of Trustees, leaves of absence at full salary, reduced salary, or without pay may be granted at the discretion of the campus president.

## VIII. Voluntary Reduction in Work Schedule Program

The Voluntary Reduction in Work Schedule program provides a way for UUP members to reduce their work schedules for a planned family care event by "banking" income/leave credits during a period of full-time work. The leave credits can then be used in order to retain health insurance coverage during a leave period that would otherwise have been an unpaid leave (see Appendix A-46 of this Agreement).

## IX. Options to Stop the "Tenure" Clock

Employees are entitled to a mandatory "tenure" (continuing or permanent appointment) clock stop without change in rank or title, at the employee's request following child birth, adoption or foster placement as follows:

• Academic employees with an academic-year obligation shall be entitled to a tenure clock stop for either one or two semesters.

• Academic employees with a calendar-year obligation shall be entitled to a tenure clock stop for either six months or 12 months.

• Professional employees shall be entitled to a "tenure" clock stop for up to the length of the employee's family leave associated with child birth, adoption or foster placement.

Written requests for clock stops within these parameters shall be approved for the time requested. (See Policies of the Board of Trustees, Article XI, Title B, Section 3(d)(3) and Title C, Section 4(3)(c) respectively).

Academics and Professionals can request to stop the "tenure" clock for periods of time beyond that discussed above by requesting a qualified academic rank or a qualified professional title for a pre-defined period. (See the Policies of the Board of Trustees, Article II(k) and (p) respectively).

**X. New York State Work-Life Services Programs**

New York State and its public employee unions have built a comprehensive network of resources and services to address life issues and the need to balance work and family responsibilities. They cover life planning tools, services to address personal concerns and problems, and pre-tax savings plans for specific needs such as child care, elder care, disabled dependent care, health care, and certain commuting expenses. Programs include the Employee Assistance Program (EAP), the Dependent Care Advantage Account, the Health Care Spending Account, NYS-Ride, child care centers on SUNY campuses, wellness programs, and pre-retirement seminars. For detailed information visit NYS Work-Life Services at www.worklife.ny.gov.

## APPENDIX A-43

Dr. William E. Scheuerman, President
United University Professions

Dear Dr. Scheuerman:

This letter shall confirm our mutual understanding regarding the existing laws, rules, regulations, policies, procedures and practices for offsetting outside earnings in grievance and disciplinary arbitrations that award back pay to a grievant. Where an arbitrator awards back pay, the parties acknowledge their mutual understanding that there are withholdings and offsets from such award. In addition to withholdings for such items as taxes, social security, and other contributory items, there is an offset for outside earnings. The offset for earnings pertains to unemployment compensation received during the period of the suspension, as well as monetary compensation received from outside employment; the latter is limited to that earned during those hours that would otherwise have been encompassed by the employee's professional obligation absent the suspension.

Sincerely,

s/George Madison, Director                                    s/William E. Scheuerman, President
Governor's Office of Employee Relations                          United University Professions

## APPENDIX A-44

Dr. Frederick G. Floss, Acting President
United University Professions

Dear Dr. Floss:

This letter confirms the understandings reached by the parties during negotiations of the 2007-2011 State/UUP Agreement on the subject of a pre-tax transportation benefit pursuant to Internal Revenue Code, 26 U.S.C. §132 and related regulations. Such a benefit provides employees an opportunity to pay

for expenses incurred in commuting between work and home.

As a result of the successful pilot program for State employees in the New York City metropolitan area, the State agrees to expand Statewide the benefits, terms, and conditions that currently exist in said pilot program. Such expansion would provide those employees not currently eligible due to their work location the ability to use this pre-tax salary deduction program for commuting costs incurred through the use of mass transit.

The State further agrees, upon ratification of the Agreement, to make enrollment in this program available within six (6) months from the date of ratification.

Sincerely,

s/Gary Johnson, Director                                   s/Frederick G. Floss, Acting President
Governor's Office of Employee Relations            United University Professions


## APPENDIX A-45
### Leave Donation Program

**I. Program Description**

This Appendix describes the Leave Donation Program applicable to employees of the United University Professions bargaining unit. The intent of the Program is to assist employees who, because of long term illness, have exhausted all of their leave benefits as provided for in Article 23.2, 23.4 and 23.5 of the Agreement between the State and UUP and are subject to a severe loss of income during a continuing absence from work.

Provisions governing donation of leave credits across agency lines by employees other than family members are no longer a pilot program. Detailed guidelines on Program administration are contained in the New York State Department of Civil Service Attendance and Leave Manual Appendix H.

**II. Eligibility Criteria—Donors**

In order to donate leave credits, employees must meet the following eligibility requirements:

• be UUP represented employees who are calendar year or college year employees eligible to accrue vacation leave credits pursuant to Article 23.2 of the Agreement.

• make donations from vacation leave only.

• have a minimum vacation balance of at least 10 days after making the donation.

**III. Eligibility Criteria—Recipients**

In order to receive donated leave credits, employees of this Unit must meet the following eligibility requirements:

• be a calendar year, college year or academic year employee eligible to earn leave credits.

• be absent due to a non-occupational personal illness or disability for which medical documentation satisfactory to management is submitted as required.

• have exhausted all leave benefits as provided in Article 23.2, 23.4 and 23.5 of the Agreement.

• be expected to be absent for at least two biweekly payroll periods following exhaustion of all leave benefits as provided in Article 23.2, 23.4 and 23.5 of the Agreement.

• not have had any disciplinary actions, or unsatisfactory performance evaluations within their last three years of State employment.

**IV. Donations to and from Employees in Other Units**

The following provisions allow for UUP represented employees to participate in the voluntary donation or receipt of accrued vacation credit with other bargaining units or M/C employees:

• Vacation credits may only be donated, received, or credited between employees who are deemed eligible to participate in an authorized leave donation program, provided that there are simultaneously

in effect a Leave Donation Exchange Memorandum of Agreement between the Governor's Office of Employee Relations and the employee organizations representing both the proposed recipient and the proposed donor, or applicable attendance rules for managerial or confidential employees, that authorize such donations.

  • Donations are governed by the provisions of the program applicable to the donor; receipt, crediting and use of donations are governed by the provisions of the program applicable to the recipient.

**V. Restriction on Donations**

  • Donations made across agency lines shall be used prior to donations made within the State University.

  • Unused donations made across agency lines are not returned to the donor while unused donations made within the agency are returned to the donor.

  • An employee's continuing eligibility to participate in the program will be reviewed at least every 30 days.

  • Donors must retain a minimum balance of at least 10 days of vacation leave standing to their credit after making a donation.

  • Donations must be made in full-day units.

  • Donors cannot donate vacation that they would otherwise forfeit.

**VI. Use of Donated Credits**

  • Donations can be used in full or half-day units upon exhaustion of all leave benefits as provided in Article 23.2, 23.4 and 23.5 of the Agreement between the State and UUP and prior to attaining eligibility to receive disability benefits under the University's Group Disability Insurance Program as specified in Section 23.8 of the Agreement.

  • Employees who are not covered by the University's Disability Insurance Program as specified in Article 23.8 may use donated credits in either full or half-day units.

  • After attaining eligibility to receive disability benefits in accordance with Article 23.8, but prior to receipt of such benefits, donated credits may be used in full-day units only. Once an eligible employee begins receiving disability benefits under the University's Disability Insurance Program, donated credits may no longer be used.

**VII. Solicitations**

  • The employee, co-workers or local union representatives may solicit donations; the employing campus may not solicit donations.

  • Donor identity is kept strictly confidential.

**VIII. Administrative Issues**

  • The Personnel/Payroll Office of the employing campus will be responsible for verifying medical documentation, reviewing eligibility requirements, approving and processing donations, confirming employee acceptance of donations, and transferring credits.

  • Recipients do not earn leave credits while using donated credits.

  • Employees can be terminated by operation of law, rule or regulation, even if they have received donations that would carry them on the payroll beyond the termination date. (Examples include retrenchment, non-renewal, termination of temporary employment, and termination under Article XIV, Title C of the Policies of the Board of Trustees.)

  • The Program will not be subject to the parties' contractual grievance procedure.

  • For purposes of this Appendix, family shall be defined as any relative or relative-in-law, regardless of place of residence, or any person with whom an employee makes his or her home.

**APPENDIX A-46**
**VOLUNTARY REDUCTION IN WORK SCHEDULE PROGRAM GUIDELINES**
**State University Professional Services Negotiating Unit**

**Introduction**

   Voluntary Reduction in Work Schedule (VRWS) is a program that allows employees to voluntarily trade income for time off. The VRWS Program is available to eligible annual salaried employees in the State University Professional Services Negotiating Unit (PSNU).

   Individual VRWS agreements may be entered into for any number of payroll periods up to a maximum of 26 biweekly pay periods in duration and must expire no later than the end of the last payroll period in the University fiscal year.

**1. Purposes**

   a. VRWS provides campuses a flexible mechanism for allocating staff resources.

   b. VRWS permits employees to reduce their work schedules to reflect personal needs and interests.

**2. Limitations: Eligibility, Work Schedule Reduction**

   a. Eligibility: This program is available to certain full-time calendar year, college year and academic year employees in the PSNU. Eligibility shall be as described under the terms of the VRWS Program Guidelines. All of the following eligibility criteria shall apply:

   1. Full-time employees are required to have a continuing, permanent, or term appointment and be employed to work on a full-time annual salary basis for a minimum of one biweekly payroll period immediately prior to the time of entry into the VRWS Program. Time on paid or unpaid leave from a full-time annual salaried position satisfies this requirement.

   2. Employees must remain in a full-time continuing, permanent, or term appointment position during the term of the VRWS agreement.

   3. Employees must have one continuous year of State University of New York (SUNY) service at a campus at which they are employed on a qualifying schedule (any schedule which entitled the employee to earn leave credits). Periods of leave without pay of any duration are not counted toward the one-year service requirement but do not constitute a break in service.Employees who separate from SUNY service (through resignation, termination, retrenchment, etc.) for more than one year cannot count service preceding that break in service toward the one year requirement. Authorized leave with pay under the SUNY Policies of the Board of Trustees will count toward the one-year service requirement, except leaves of absence for Title F leave or sabbatical leave immediately preceding a request for VRWS are not counted toward the one year service requirement since accruals are not earned during the leave period.

   b. Work Schedule Reduction: Participating employees may reduce their work schedules (and salaries) a minimum of 5 percent, in 5 percent increments, up to a maximum of 30 percent.

**3. Description of an Employee VRWS Agreement**

   a. The employee and management can establish a VRWS agreement on a University fiscal year basis of any number of payroll periods in duration from one to twenty-six. The VRWS agreement must expire no later than the last day of the last payroll period in the University fiscal year. The VRWS agreement must begin on the first day of a payroll period and end on the last day of a payroll period. VRWS ending balances must be segregated for each University fiscal year.

   b. The employee develops and submits a plan for a reduced work schedule. Management reviews and approves the plan as long as it is consistent with operating needs.

   c. A jointly agreed plan specifies:

   i. Duration of VRWS agreement which may be up to a maximum of 26 biweekly payroll periods with the VRWS agreement expiring no later than the last day of the last payroll period in the University fiscal year.

ii. Percentage reduction of professional obligation and salary.

iii. Amount of VR credits to be earned in exchange for reduced salary.

iv. Schedule for use of VR credit to be earned. This may be either a fixed schedule, e.g., every Friday, every Wednesday afternoon, an entire month off, etc., or intermittent time off. An employee's fixed schedule of use of VR credits, once management has agreed upon the VR schedule, cannot be changed without the employee's consent except by mutual agreement in an emergency. VR credits used as intermittent time off will be subject to scheduling during the term of the VRWS agreement, and will require advance approval by the employee's supervisor.

d. While the VRWS agreement is in effect, the employee will earn and accumulate VR credits in accordance with the percentage reduction of professional obligation in a workweek, e.g., a 10 percent reduction will result in eight hours of VR credit earned each payroll period that the employee will charge in the future on his/her scheduled VR absences. If the employee's VR schedule calls for one-half day off every Friday afternoon, four hours of VR credits will be charged for each Friday. An employee whose VRWS agreement calls for a 10 percent reduction and taking an entire month off will work his/her full 40 hours each week, accrue eight hours of VR credit each payroll period, and have the accumulated VR credits to use during the approved VR absence. Solely as a matter of computational convenience for purposes of creating a schedule for accruing and using leave hereunder, a "day" is defined as eight hours. This definition is not intended to have any wider application and does not otherwise reflect any agreement or acknowledgment as to the length of a workday.

e. The employee never goes off the payroll. The employee remains in active pay status for the duration of the agreement and receives paychecks each payroll period at the agreed-upon, temporarily reduced level.

f. The employee will work a prorated share of his/her normal professional obligation over the duration of the VRWS agreement period.

g. Participation in the VRWS Program will not be a detriment to later career moves within the campus.

**4. Attendance Records Maintenance**

a. All VR schedules will be based on the crediting and debiting of VR credits on the employee's attendance record against a regular professional obligation.

b. VR credits earned during a VRWS agreement may be carried on the employee's attendance record past the end of the individual VRWS agreement and past the end of the University fiscal year but must be liquidated by the December 30th following the end of the University fiscal year in which the individual VRWS agreement expires. VR ending balances must be segregated for each University fiscal year.

c. There is no requirement that existing paid leave credits (including previously earned and banked VR credits) be exhausted prior to the beginning of the new VRWS agreement.

Employees are encouraged to use carried-over VRWS on a priority basis.

**5. Advancing of VR Credits**

To accommodate an employee whose VRWS agreement calls for an extended absence during the VRWS agreement period, a campus may advance VR credits in an amount not to exceed the number of hours for which the employee is paid in one payroll period.

**6. Recovering a VR Credit Debit**

If an employee terminates his/her employment and has a VR debit, the campus shall recover the debit from the employee's lagged salary payment for his/her last payroll period at work.

**7. Effect on Benefits and Status**

The effect of participation in the VRWS Program on benefits and status is outlined in Appendix A—Voluntary Reduction In Work Schedule Program Effect on Benefits and Status (attached).

**8. Effect on Overtime Payment for Overtime Eligible Employees**

Scheduled absences charged to VR credits are not the equivalent of time worked for purposes of determining eligibility for overtime payments at overtime rates within a workweek. For example, an employee who, under an 80 percent VRWS schedule, works four days, charges the fifth day to VR credits, and is called in to work a sixth day, will not be considered to have worked the fifth day and thus will not be entitled to overtime payments on the sixth day.

Similarly, VR credits earned, banked, and charged after the payroll period in which they are earned are not counted in determining eligibility for overtime in the workweek in which they are charged. Sections 135.2(h) and (i) of Part 135 of the Budget Director's Overtime Rules are waived to the extent necessary to permit payment of overtime compensation to overtime eligible employees who are participating in this Program.

**9. Discontinuation or Suspension of VRWS Agreements**

Although VRWS agreements are for stated periods of time, they can be discontinued by mutual agreement at the end of any payroll period. VRWS agreements may be discontinued, at management's discretion, when an employee is promoted, transferred or reassigned within a campus, although VR credits must be carried forward on the employee's attendance record.

VRWS agreements may also be discontinued when an employee moves between campuses.

**10. Provisions for Payment of Banked (Unused) VR Credit in Exceptional Cases**

The VRWS Program is intended to be a program that allows employees to voluntarily trade income for time off. The agreement for VRWS Program participation between the employee and management includes a plan for the use of VR credit earned. Management must make every effort to ensure that VR credit earned by an employee is used: (1) under the terms of the individual VRWS agreement, (2) before the December 30th liquidation date (see Section c.), (3) before the employee separates from SUNY service, and (4) while the employee is on the job he/she was in when the VRWS agreement was made. If this is not possible, payment for banked (unused) VR credit may be made in exceptional cases that fall under the following criteria:

a. Upon retrenchment, resignation, termination, or retirement from SUNY, or death, unused VR credit will be paid at the then current rate of compensation.

b. Upon movement of an employee to another state agency or from one campus to another or between campuses or departments within a campus, unused VR credit will be paid at the then current rate of compensation by the campus/department in which the VR credit was earned, unless the employee requests and the new campus/department accepts the transfer of the VR credit on the employee's attendance record. The lump sum payment for VR balances upon movement to another campus will be made irrespective of whether or not the employee is granted a leave of absence from the campus/department where the VR credit was earned. Payment will be made within two payroll periods following the move to the new campus.

c. VRWS ending balances must be segregated for each University fiscal year. Employees who accumulate VR credit in a University fiscal year and who are unable to use the VR credit due to management requirements predicated on workload by the December 30th following the end of the University fiscal year in which the employee's individual agreement expires will be paid at the then current rate of compensation. Payment will be made within two payroll periods following the applicable December 30th liquidation date. Requests for payment in the exceptional cases specified in this subparagraph, as distinct from those specified in subparagraphs (a) and (b) above, should be directed to SUNY System Administration Employee Relations—VRWS Program and will be decided on a case-by-case basis.

In all cases where payment for unused VR credit is made, notification of payment must be sent to SUNY System Administration Employee Relations—VRWS Program. Such notification must include date

of payment, circumstances of payment, employee's name, title, number of days of unused VR credit, and gross dollar amount of payment. In addition, campuses must certify that they have not already used these savings for replacement staff in other programs or, if they have, identify another funding source for the payment.

**11. Review of VRWS Denials**

a. Individual Requests

An employee whose request to participate in the VRWS Program has been denied shall have the right to request a written statement of the reason for the denial. Such written statement shall be provided within five working days of the request. Upon receipt of the written statement of the reason for the denial, the employee may request a review of the denial by the college president or designee. Such requests for review must be made, and will be reviewed, in accordance with the following procedure:

1. Requests must be submitted by the employee or the employee's representative within 10 working days of receipt of the written statement or of the date when the written statement was due.

2. Requests must be submitted to the official who serves as the college president or designee at Step 1 of the grievance procedure.

3. Such requests shall specify why the employee believes the written reasons for the denial are improper. The request must explain how the employee believes his/her work can be reorganized or reassigned so that his/her participation in the VRWS Program will not unduly interfere with the campus's operations.

4. The college president or designee shall review the appeal and make a determination within 10 working days of receipt. The determination shall be sent to the employee and a copy shall be sent to the President of UUP. The determination shall be based on the record, except that the college president or designee may hold a meeting with the employee and/or the employee's supervisors if the designee believes additional information or discussion is required to make a determination. If the employee believes that there are special circumstances that make a meeting appropriate, the employee may describe these circumstances in addition to providing the information specified in paragraph 3 above, and request that a review meeting be held. The college president or designee shall consider such request in determining whether or not to hold a review meeting.

5. The determination of the college president or designee shall not be subject to further appeal.

b. When UUP alleges that a campus has established a practice of routinely denying employee applications to participate, this matter shall be an appropriate subject for discussion in a labor-management meeting at the appropriate level. Such labor-management discussions shall be held in accordance with the provisions of Article 8 of the State/UUP Agreement.

## APPENDIX A
## VOLUNTARY REDUCTION IN WORK SCHEDULE PROGRAM

**Effect on Benefits and Status**

*Annual Leave*—Prorate accruals for calendar year and college year employees  based on the employee's VRWS percentage.

*Banked (Unused) VR Leave Credits Upon Movement From One Campus to Another or Between Departments Within a Campus*—Unused VR credits will be paid at the rate of compensation by the campus/department in which the VR credit was earned, unless the employee requests and the new campus/department accepts the transfer of VR credit on the employee's attendance record.

*Banked (Unused) VR Leave Credits Upon Promotion, Transfer or Reassignment Within a Campus or Within a Department*—Unused VR credits are carried forward on the employee's attendance record when movement is within an appointing authority. Continuation of the VRWS agreement is at the discretion of management.

*Banked (Unused) VR Leave Credits Upon Return to Normal Work Schedule*—VR credits may be carried forward on the employee's attendance record after completion of the individual VRWS agreement period, but must be liquidated by the December 30th after the end of the University fiscal year in which the employee's individual VRWS agreement expires. VR ending balances must be segregated for each University fiscal year.

*Banked (Unused) VR Leave Credits Upon Separation*—Unused VR credits will be paid at the rate of compensation upon resignation, termination, or retirement from SUNY service, or death.

*Employee Benefit Fund*—There is no effect.

*Health Insurance*—There is no effect. The employee retains full coverage.

*Holidays*—There is no change.

*Inconvenience Pay*—Prorate based on the VRWS percentage.

*Leave Donation*—Employees who are absent using donated leave credits for 28 consecutive calendar days will have their VRWS agreement suspended.

*Location Pay*—Prorate based on the VRWS percentage.

*Military Leave*—There is no impact on eligibility or entitlement.

*Overtime Work*—VR credit used shall not be counted as time worked in determining eligibility for overtime payments within a workweek. For non-exempt employees, VR credit shall not be counted as time worked for determining eligibility for comp time.

*Paid Leave Balances on Attendance Record*—There is no requirement that leave credits be exhausted prior to the beginning of the VRWS agreement. Vacation, sick leave, and holiday balances are carried forward without adjustment.

*Payroll*—The employee never leaves the payroll. An employee remains in full payroll status with partial pay for the duration of the VRWS agreement period and receives pay checks each pay period at the agreed upon temporarily reduced level.

*Probationary Appointment*—There is no effect. Scheduled non-work time under a VRWS agreement is not an absence for the purpose of extension of probationary appointment.

*Retirement Benefit Earnings*—Earnings are reduced based on the VRWS percentage.

*Retirement Service Credit*—Prorate based on the VRWS percentage for TRS and ERS only.

*Retrenchment*—There is no impact.

*Return to Normal Work Schedule*—An employee will return to his/her normal full-time work schedule and pay basis upon completion of the VRWS agreement period.

*Sabbatical Leave*—There is no impact if sabbatical leave is requested after participation in the VRWS agreement. If sabbatical leave coincides with the VRWS agreement, the VRWS agreement will be suspended.

*Salary*—Normal gross salary earned is reduced by the VRWS percentage. There is no effect on the basic annual salary.

*Service Credit*—There is no impact. An employee on VRWS is considered to be in full-time status for service credit purposes.

*Sick Leave*—Prorate accruals based on the employee's VRWS percentage. Employees on sick leave for 28 consecutive calendar days will have their VRWS agreement suspended and will be returned to their professional obligation and pay base.

*Social Security*—There is no change. The contribution rate is set by Federal Law and is applied to the salary that the employee is paid.

*Title F Leave*—There is no impact if Title F leave is requested after participation in the VRWS agreement. If Title F leave coincides with the VRWS agreement, the VRWS agreement will be suspended.

*Unemployment Insurance*—There is no change. The formula is set by statute.

*Workers' Compensation Benefits*—There is no impact on eligibility for entitlement to workers'

compensation benefits. Following 28 consecutive calendar days of absence due to a work related injury or illness, the VRWS agreement is suspended and the employee is returned to his/her normal full-time work schedule and pay base. At that point the employee receives workers' compensation benefits based on the normal full-time salary and no longer earns VR credits. Suspension of a VRWS agreement does not extend the agreement beyond its scheduled termination date. If an employee returns to work prior to the scheduled termination date of the VRWS agreement, the employee's participation in the VRWS agreement resumes and continues until the scheduled termination date, unless both parties agree to terminate the VRWS agreement.

**APPENDIX A-47**

Dr. Frederick G. Floss, Acting President
United University Professions

Dear Dr. Floss:

   During the course of negotiations certain issues related to part-time employees were raised by UUP that were of such significant concern that review at the Executive Level is required. As soon as practicable after a fully executed agreement, GOER, SUNY and UUP shall meet to discuss and review issues of mutual concern regarding part-time employees. The agreement to review these issues in the labor-management forum does not constitute a waiver of any management or union right or prerogative.

   Sincerely,
   s/Gary Johnson, Director                                    s/Frederick G. Floss, Acting President
   Governor's Office of Employee Relations          United University Professions

**APPENDIX A-48**

Dr. Frederick E. Kowal, President
United University Professions

Dear Dr. Kowal:

   During the course of negotiations, certain issues related to librarians were raised by UUP that were of such significant concern that review at the Executive Level is required.  As soon as practicable after a fully executed agreement, GOER, SUNY and UUP shall meet to discuss and review issues regarding librarians. Such discussion and review may include but are not limited to titles, obligation, protected time, and compensation.

   Particular attention shall focus on reviewing existing protected time policies. In addition, the University will issue a letter to all campuses clarifying that they have the option, when appointing librarians to 1) appoint them to either academic year or calendar year appointments and 2) appoint them to either the appropriate librarian title or the appropriate professor title.

   The agreement to review these issues in the labor-management forum does not constitute a waiver of any management or union right or prerogative.

   Sincerely,
   s/Michael N. Volforte, Director                              s/Frederick E. Kowal, President
   Governor's Office of Employee Relations          United University Professions

**APPENDIX A-49**

Dr. Frederick E. Kowal, President
United University Professions
Re: Labor-Management Funds Extension

Dear Dr. Kowal:

   This letter confirms our agreement that all committees funded pursuant to Article 21 of the 2016-2022 State/UUP Agreement shall be so funded through March 31, 2023. Accordingly, appropriations shall be secured to fund such committees for both the term of this Agreement and the period between July 2, 2022 and March 31, 2023 at a prorated amount to cover such period.
   Sincerely,
   s/Michael N. Volforte, Director                                   s/Frederick E. Kowal, President
   Governor's Office of Employee Relations                           United University Professions


**APPENDIX A-50**

Dr. Frederick E. Kowal, President
United University Professions

Dear Dr. Kowal:

   This letter confirms the mutual understandings reached during negotiation of the 2016-2022 Agreement regarding the allocation of funding provided to the Article 46 Work-Life Services Programs.

   The parties have herein mutually agreed to allocate the following funding from monies appropriated for Joint Labor-Management Committees pursuant to Article 21.2 of the 2016-2022 Agreement to the Article 46 Work-Life Services Programs:
   • Agreement Year 2016-2017 - $1,462,680
   • Agreement Year 2017-2018 - $1,491,934
   • Agreement Year 2018-2019 - $1,521,773
   • Agreement Year 2019-2020 - $1,552,208
   • Agreement Year 2020-2021 - $1,583,252
   • Agreement Year 2021-2022 - $1,614,917
   Allocation of funding provided from Article 21.2 to the Work-Life Services Programs shall be initially established as follows:
   • Eighteen percent of the funds allocated in each year of the Agreement shall be set aside to achieve the goals of the Employee Assistance Program (EAP).
   • Fifty-eight percent of the funds allocated in each year of the Agreement shall be set aside for the employer contribution to the Dependent Care Advantage Account.
   • Twenty percent of the funds allocated in each year of the Agreement shall be set aside for initiatives recommended by the Work-Life Services Advisory Board.
   • Four percent of the funds allocated in each year of the Agreement shall be set aside for the benefit of network child care center support.
   Changes in the allocation of funds may be made as mutually determined by the Director of GOER and the President of UUP or their designees.
   This letter also confirms the mutual understandings reached during negotiation of the 2016-2022 Agreement concerning EAP coordinators. The parties agree that ensuring employees have adequate and timely access to EAP coordinators is an important priority.  The parties shall develop and implement strategic outreach to educate campuses and employees about available EAP services and ensure accurate EAP co-

ordinator contact information is readily available to employees. The Advisory Board shall meet and discuss the establishment of EAP coordinator-to-employee ratios, release time minimums and other strategies to ensure the existence of a robust and accessible EAP coordinator network.

Sincerely,

s/Michael N. Volforte, Director                                  s/Frederick E. Kowal, President
Governor's Office of Employee Relations                United University Professions


## APPENDIX A-51

Dr. Frederick E. Kowal, President
United University Professions

Dear Dr. Kowal:

This will confirm the mutual understandings reached by the parties during the negotiations for the 2016-2022 collective bargaining agreement regarding parking.

Due to the complexity of issues associated with pre-tax parking and the potential applicability to different employee groups, the parties agreed to continue engaging on this issue through a joint labor-management committee. Through this committee, the parties agreed to engage relevant stakeholders in the State, including the Division of the Budget and the Office of the State Comptroller, with the express goal of examining the legality, practicality and financial impacts of taking deductions for employer-provided parking on a pre-tax basis and making a recommendation to the President of UUP and the Director of GOER. Where the President and Director agree, those recommendations shall be implemented.

Additionally, the parties discussed the current benefits provided under the NYS-Ride Program which permits many State employees to save money on eligible transportation expenses through pre-tax payroll deductions and the opportunity for potential expansion of that program by permitting employees to pay for parking, not provided by the employer, on a pre-tax basis. The parties agreed to seriously explore the expansion of the NYS-Ride Program to include a pre-tax parking component that the parties determine is feasible, practicable and cost-effective in the context of the Work-Life Services Advisory Board.

Sincerely,

s/Michael N. Volforte, Director                                  s/Frederick E. Kowal, President
Governor's Office of Employee Relations                United University Professions


## APPENDIX A-52

Dr. Frederick E. Kowal, President
United University Professions

Dear Dr. Kowal:

This letter confirms the mutual understandings reached during negotiation of the 2016-2022 State/UUP Agreement on the subject of a pre-tax adoption assistance program pursuant to Internal Revenue Code, 26 U.S.C. §125 and related regulations. Such a benefit provides employees an opportunity to pay for qualified adoption assistance expenses.

The State further agrees to make enrollment in this pre-tax program available as soon as practicable after ratification of the Agreement.

Sincerely,

s/Michael N. Volforte, Director                                  s/Frederick E. Kowal, President
Governor's Office of Employee Relations                United University Professions

**APPENDIX A-53**

Dr. Frederick E. Kowal, President
United University Professions

Dear Dr. Kowal:

  During negotiations over the 2016-2022 Agreement, the parties discussed the issue of scheduling of hospital employees who work on shifts at the SUNY hospitals. The parties have committed to continue negotiating over the subject matter of hospital scheduling and entering into an agreement designed to address the needs of the SUNY hospitals and the concerns of hospital shift-work employees.

  The parties shall continue meeting immediately after ratification of the 2016-2022 Agreement to reach an agreement on hospital scheduling provision(s) for hospital employees who work on shifts at the SUNY hospitals. An agreement shall be reached no later than December 31, 2018, and the agreement that is reached shall be implemented on July 1, 2019, without the requirement of ratification by either side.

  Sincerely,

s/Michael N. Volforte, Director                                    s/Frederick E. Kowal, President
Governor's Office of Employee Relations                      United University Professions

## APPENDIX B-1
### Seasonal/Temporary Part-Time Lifeguard Employees

**1. Applicable Articles and Appendices**

The provisions of the annexed Professional Services Negotiating Unit (PSNU) Agreement shall be applied as specified in this Appendix (excluding Articles 4, 5, 8, 9, 11, 18, 19, 20, 21, 23, 25, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39 (except as described below), 40 (except as described below), 42, 43, 44, 45, 46, 47, 48, 49 and all Appendices except A-2, A-7, A-8, A-11, A-17, A-21, A-25 and A-44) to seasonal and part-time temporary employees in lifeguard titles other than those in annual salaried positions in lifeguard titles insofar as they apply by their terms; such employees are hereinafter collectively referred to as "employees."

**2. Substitutions**

For articles and appendices that apply: "facility" is substituted for "college"; "facility head" is substituted for "college president"; and, "agency head" is substituted for "chancellor". Representatives of the Governor's Office of Employee Relations and United University Professions shall meet in labor-management as necessary to discuss any other modifications to terminology in articles and appendices that do apply.

**3. Labor-Management Minutes and Agreements**

All labor-management committee meetings shall be conducted in good faith. These committees shall have no power to contravene any provisions of this Appendix or to agree to take any action beyond the authority of the management at the level at which the meeting takes place. Matters may be referred to and from the local and agency levels as necessary. The parties may issue joint meeting minutes and letters of understanding. Any arrangement which is mutually agreed upon at the local level shall be reduced to writing within fourteen calendar days and is subject to review and agreement by the Governor's Office of Employee Relations and United University Professions. Any arrangement which is the subject of a memorandum of understanding, letter of understanding, or joint meeting minutes shall not be altered or modified by either party without first meeting and discussing with the other party at the appropriate level in a good faith effort to reach a successor agreement. Any alterations or modifications to a written local labor-management agreement as described in this section may occur no sooner than five days after such meeting and discussion and subsequent written notification of the changes received by the other party. Implementation of such alterations or modifications shall not occur without adherence to the procedures herein described. In cases where emergency conditions necessitate a variation of an established labor-management agreement by either party, the other party must be notified of such variation as soon as possible. Such variation will be reviewed by the designated union and management chairs of the local labor-management committee within seven days. Disagreements growing out of the implementation of memorandum of letters of understanding may be initiated at Step 3 of the grievance procedure as contained in Article 7, Grievance Procedure, of the Professional Services Negotiating Unit Agreement and will not be subject to arbitration.

**4. Compensation**

a. Employees eligible for an increase shall receive the following:

| | |
|---|---|
| April 1, 2016 – 2.0% | April 1, 2019 – 2.0% |
| April 1, 2017 – 2.0% | April 1, 2020 – 2.0% |
| April 1, 2018 – 2.0% | April 1, 2021 – 2.0% |

b. To be eligible for a retroactive increase, an employee must have been in employment status on the effective date of the hourly wage rate increase or during a season that commences during the fiscal year that includes the effective date of an hourly wage rate increase and must be in employment status on April 1, 2018, or during a season that commences the fiscal year that includes April 1, 2018.

c. The percentage increases in 4(a) shall be applied to the hourly wage rates for all employees subject to this Appendix.

**5. Exit Interview**

Employees who have completed at least three years of continuous service of six pay periods on a

scheduled half-time or greater basis in each of those three years shall be entitled to an exit interview session with the appointing authority or designee following notice of involuntary separation. In such instances, the local union representative shall be notified of the involuntary separation, and a union representative may accompany the employee to the exit interview session if the employee so chooses. The employee may present reasons, arguments and/or documentary evidence including any relevant witness statements the employee may have as to why the employee should not be involuntarily separated. The appointing authority, upon request, may allow the presentation of other information at this exit interview session if it deems such information to be beneficial to evaluating the employee's reasons, arguments and/or documentary evidence as to why the employee should not be involuntarily separated. Employees have no other due process rights upon separation other than those described in this paragraph.

**6. Scheduling Job or Shift Assignments**

Effective April 1, 2013, management shall have the right to make any job or shift assignment necessary to maintain services of the agency and to maintain staff at appropriate operating levels.

Specifically,

• There shall be no right to be called in during inclement weather.

• There shall be no wash up time.

**7. Holiday Compensation**

Employees who work at least 160 hours during the season (at least 20 days) will be entitled to additional compensation at their hourly rate, up to a maximum of eight hours, for time worked on each of the first three days during their employment in any seasonal period (April 1 to September 30 or October 1 to March 31) which are observed as holidays by the State. Such compensation shall be paid retroactively upon completion of five weeks of work.

**8. Uniforms**

The State will continue to provide seasonal employees presently receiving uniforms with uniforms according to the policies in effect in the employing agencies.

**9. Health Insurance**

Employees are eligible for health insurance under the terms of the health insurance contracts in force during the annexed Agreement as follows:

a. Part-time employees in Lifeguard titles as of July 1, 2013, who are enrolled for health insurance on that date, may continue eligibility for benefits as contained in Articles 39 and 40.

b. Part-time employees hired after that date will be subject to the eligibility terms therein as applicable.

c. Seasonal employees will be eligible for health insurance as contained in Article 39 and the benefits provided pursuant to the fund established under Article 40, at the employee premium share while they are on the payroll as follows: the employee must be expected to work at least six months and the employee must be employed on at least a half-time basis. Upon an employee leaving the payroll, if the employee is not off the payroll for more than six months, the employee is eligible for such benefits upon the return to work and will not be required to satisfy the six month minimum employment requirement.

d. Employees who have completed at least six years of continuous service of six pay periods on a scheduled 40 hours per pay period or greater basis in each of those six years and who are eligible for rehire may continue their health insurance coverage as contained in Article 39 on a full pay basis between seasons. Should an employee fail to return in the following season, health insurance coverage will be terminated.

e. Seasonal employees who are hired for a period of less than six months are eligible for coverage as contained in Article 39 during the term of their employment by paying the full cost of coverage (employee and employer share).

**10. Attendance Rules Coverage**

Seasonal employees who have been continuously employed on at least a 40 hours per pay period basis for 19 pay periods shall be entitled to attendance rules coverage in accordance with Civil Service Atten-

dance Rules. Employees not covered by the Civil Service Attendance Rules will be allowed leave with pay for injuries sustained in the line of duty. Use of such leave is to be held to a minimum and shall not exceed three days or 24 hours pay per year, whichever is less.

**11. Grievance Procedure**

The provisions of Article 7 of the PSNU shall apply to employees in lifeguard titles covered by this Agreement subject to the following modifications:

a. With respect to Section 7.2, the section shall read as follows: A grievance is a dispute concerning the interpretation, application or claimed violation of a specific term or provision of this Agreement for employees in lifeguard titles working in State agencies other than the State University of New York.

b. With respect to Section 7.5(a), replace "Contract Grievance Form" with "Contract Grievance Form for Lifeguards."

c. With respect to Section 7.5(b)(2), delete the subsection.

d. With respect to Section 7.7(b)(1), the subsection shall read as follows: "The arbitrator shall neither add to, subtract from, nor modify the terms or provisions of this Agreement. The arbitrator shall confine the decision and award solely to the application and/or interpretation of this Agreement. Where provisions of this Agreement call for the exercise of judgment, the arbitrator shall not substitute the arbitrator's judgment for that of the official making such judgment but shall be confined to a determination as to whether this Agreement has been followed. If the arbitrator determines that this Agreement has not been followed, the arbitrator may fashion an appropriate remedy.

**12. Review of Personal History Folder**

a. For the purposes of this Appendix, there shall be one official personal history folder maintained for an employee. Employees shall, within five working days of a written request to their facility, have an opportunity to review their official personal history folder in the presence of a UUP representative (if requested by the employee) and an appropriate official of the facility. Such right shall not be abused. The employee shall be allowed to place in such file a response of reasonable length to anything contained therein which such employee deems to be adverse.

b. The official personal history folder shall contain all memoranda or documents relating to such employee which contain criticism, commendation, appraisal or rating of such employee's job performance. Copies of such memoranda or documents shall be sent to such employee simultaneously with their being placed in their official personal history folder.

c. Employees may, at any time, request and be provided copies of all documents and notations in their official personal history folder of which the employee has not previously been given copies. If such file is maintained at a location other than the facility in which the employee works, it shall be forwarded to the employee's facility for review by the employee.

**13. Contracting Out**

The State shall not contract out for goods and services performed by employees which will result in any employee being reduced or laid off without prior consultation with UUP concerning any possible effect on the terms and conditions of employment of employee covered by this Appendix.

14. All staff representatives of the Governor's Office of Employee Relations and United University Professions will render assistance to local joint committees in procedural and substantive issues as necessary to fulfill the objectives of this Appendix and may participate in such meetings.

15. This Appendix shall be in effect for the term of the annexed Professional Services Negotiating Unit Agreement from July 2, 2016 to July 1, 2022.

IN WITNESS WHEREOF, the parties hereto have caused this Memorandum of Agreement to be signed by their respective representatives on October 9, 2018.

**APPENDIX B-2**
**Annual Salaried Lifeguard Employees**

Dr. Frederick E. Kowal, President
United University Professions

Dear Dr. Kowal:

  This shall confirm the understanding reached between the parties regarding employees appointed to permanent part-time positions in lifeguard titles on an annual salaried basis.

  If new appointments are made to permanent part-time positions during the term of the 2016-2022 State/UUP Agreement, the initial terms and conditions of employment for such appointments shall be consistent with the terms and conditions of employment for such positions on July 1, 2016, except as outlined below.

  The hiring rates for Lifeguard, Grade 5/NS shall be increased by 2 percent each year effective the pay period beginning nearest to April 1 of each year. As a result, the hiring rate for Lifeguard, Grade 5/NS will increase as follows:

  $27,201 – April 1, 2016
  $27,745 – April 1, 2017
  $28,300 – April 1, 2018
  $28,886 – April 1, 2019
  $29,443 – April 1, 2020
  $30,032 – April 1, 2021

  Health benefits shall be provided to eligible employees consistent with the provisions of Article 39 and 40 of the 2016-2022 State/UUP Agreement.

  As soon as practicable following such an appointment, representatives of the Governor's Office of Employee Relations and United University Professions shall meet in labor-management to further discuss the application of the articles and appendices of the 2016-2022 State/UUP Agreement applicable to such employees and reach agreement on any modifications.

  Sincerely,

s/Michael N. Volforte, Director                                    s/Frederick E. Kowal, President
Governor's Office of Employee Relations                            United University Professions