*Kershnar v. Kolison*
Motion for Preliminary Injunction

Decl. Adam Steinbaugh

# EXHIBIT 20



February 3, 2022

Dr. Stephen H. Kolison, Jr.
President's Office
138 Fenton Hall
State University of New York at Fredonia
Fredonia, New York 14063

### ***URGENT***

*Sent via Electronic Mail (president.office@fredonia.edu)*

Dear President Kolison:

The Foundation for Individual Rights in Education (FIRE) is a nonpartisan, nonprofit organization dedicated to defending liberty, freedom of speech, due process, academic freedom, legal equality, and freedom of conscience on America's college campuses.

FIRE is concerned by your decision to suspend a tenured philosophy professor, Stephen Kershnar—a decision which followed a directive by the university's police barring Kershnar from campus due to asserted security concerns and which comes in advance of an anticipated "interrogation" by university officials. We write today to remind you—and your institution, for the second time concerning the same professor's rights[1]—that the First Amendment bars SUNY Fredonia, a public university, from retaliating against faculty for protected speech. This is the case even where others may find that expression offensive, objectionable, or wrong.

### I.      Background

Our understanding of the pertinent facts follows. If you believe we are in error, please apprise us of any facts that might change our analysis.

Stephen Kershnar is a tenured professor in SUNY Fredonia's philosophy department, where his work over the course of two decades has focused on "applied ethics and political philosophy."[2] Kershnar currently teaches, among other courses, PHIL 313 ("Sex and Love"),

---

[1] *See* Letter from Greg Lukianoff, President, FIRE, to Dennis L. Hefner, President, SUNY Fredonia (July 7, 2006), *available at* https://www.thefire.org/fire-letter-to-suny-fredonia-president-dennis-l-hefner-july-7-2006 (criticizing SUNY Fredonia's retaliation against Kershnar after his criticism of the university's "affirmative action policy as well as the lack of conservatives on the SUNY Fredonia faculty").

[2] SUNY FREDONIA, *Dr. Stephen Kershnar*, https://www.fredonia.edu/academics/colleges-schools/college-liberal-arts-sciences/philosophy/faculty/Stephen-Kershnar (last visited Feb. 2, 2022).

which discusses "sexual ethics" and queries "[w]hat kinds of sexual activity are morally permissible under what sort of circumstances?"[3]

Kershnar's academic work is marked by intentionally provocative, and often transgressive, discussions of—as the university's website explains—"abortion, adult-child sex, hell, . . . pornography, punishment, sexual fantasies, slavery, and torture."[4] As another professor of ethics and philosophy put it, Kershnar is a "Socratic gadfly, inquiring in a very traditional philosophical way about beliefs many tend to take for granted[,]" and his work "often focuses on beliefs the denial of which would be thought of as outrageous, and raises problems for their justification, or shows how rather unpopular beliefs might be justifiable."[5]

On Tuesday, you issued a statement asserting that the university was "aware of a video posted online involving one of its professors," who expressed "reprehensible" views that are "solely the professor's views."[6] That statement followed vociferous social media commentary responding to Kershnar's appearance on two philosophy podcasts, *Brain in a Vat*[7] and *Unregistered with Thaddeus Russell*,[8] during which Kershnar discussed philosophical and ethical assumptions and arguments concerning sexual contact between children and adults. Your February 1 statement concluded by promising that the "matter is being reviewed."[9]

Last night, Kershnar received an email from Brent Isaacson, SUNY Fredonia's Chief of Police, to "discuss safety concerns and planning."[10] In the course of those communications, Isaacson conveyed that you had directed him to order that Kershnar not enter SUNY Fredonia's campus, and informed Kershnar that his students would be told that his classes today had been canceled. Kershnar, not having been apprised of the nature of the safety concerns or provided a written directive, shared his objections to the decision but expressed a willingness to comply with it. He then asked the university to permit him to continue teaching online, which should have obviated any legitimate security concerns.[11]

Today, you announced that Kershnar has been indefinitely banned from campus, that his duties have been reassigned, and that you view the content of videos of Kershnar circulating on social media to be "absolutely abhorrent."[12] In a notice to Kershnar this afternoon, SUNY

---

[3] SUNY Fredonia, *PHIL 313 – Sex and Love*, *available at* https://bit.ly/3sfIM4H (last visited Feb. 2, 2022).

[4] SUNY Fredonia, *Dr. Stephen Kershnar*, https://www.fredonia.edu/academics/colleges-schools/college-liberal-arts-sciences/philosophy/faculty/Stephen-Kershnar (last visited Feb. 2, 2022).

[5] Justin Weinberg, *Kershnar Cycle Reactivated*, Daily Nous (Feb. 3, 2022), https://dailynous.com/2022/02/03/kershnar-cycle-reactivated.

[6] SUNY Fredonia (@FredoniaU), Twitter (Feb. 1, 2022, 11:09 PM), https://twitter.com/FredoniaU/status/1488726120338006017 ("February 1 Statement").

[7] Brain in a Vat, *Sexual Taboos | Stephen Kershnar*, YouTube (Jan. 30, 2022), https://www.youtube.com/watch?v=QFrCHJJqETo.

[8] Unregistered with Thaddeus Russell, *Unregistered 142: Stephen Kershnar (VIDEO)*, YouTube (Dec. 5, 2020), https://www.youtube.com/watch?v=ZIG__mlSEms.

[9] February 1 Statement, *supra* note 6.

[10] E-mail from Brent S. Isaacson, Chief of Police, N.Y. State Univ. Police, SUNY Fredonia, to Stephen Kershnar, Professor, SUNY Fredonia (Feb. 2, 2022, 6:46 PM) (on file with author).

[11] E-mail from Kershnar to Isaacson (Feb. 3, 2022, 8:19 AM) (on file with author).

[12] SUNY Fredonia (@FredoniaU), Twitter (Feb. 3, 2022, 3:48 PM), https://twitter.com/fredoniau/status/1489339982661701633.

Fredonia banned Kershnar from campus, prohibited him from "contact with the campus community" with limited exceptions, and assigned him to an "alternate work assignment from an alternate location" until "further notice."[13] That re-assignment was issued "pursuant to Article 19.11(c)" of the operative labor agreement, which provides that re-assignments are permissible "[p]rior to an interrogation" by university officials.[14]

## II.  Kershnar's Statements Are Protected by the First Amendment

Kershnar's statements are protected by the First Amendment, which prohibits SUNY Fredonia from taking adverse action against faculty members for protected speech, however provocative or offensive it may be to others. By banning Kershnar from campus and initiating disciplinary procedures, including an "interrogation" of Kershnar or "review" of his extramural statements, SUNY Fredonia is in violation of the First Amendment.

### A.     The First Amendment bars SUNY Fredonia from penalizing faculty members' protected expression.

It has long been settled law that the First Amendment is binding on public universities like SUNY Fredonia.[15] Accordingly, the speech-related decisions and actions of a public university implicate the "basic constitutional values" attendant to the First Amendment, which places strict limitations on the manner in which the institution may respond to the controversial public statements of its faculty.[16] To be absolutely clear: Faculty members do not surrender their First Amendment rights as a condition of public employment.[17]

Instead, the First Amendment protects the rights of public employees, including faculty members of public universities and colleges, when they speak as private citizens on matters of public concern—for example, on social media, in public debates, in media commentary, on podcasts, or in speech directed to government officials.[18] Likewise, when faculty members speak as academics in pedagogically relevant contexts—for example, in classroom lectures, publications, or, again, on podcasts—their speech is protected by academic freedom, which the Supreme Court of the United States has identified as "a special concern of the First Amendment."[19]

---

[13] Letter from Maria Carroll, Dir., Human Resources, SUNY Fredonia to Kershnar (Feb. 3, 2022) (on file with author).

[14] AGREEMENT BETWEEN THE STATE OF N.Y. & UNITED UNIV. PROFESSIONS (July 2, 2016 – July 1, 2022), Art XIX, §19.11(c), *available at* https://bit.ly/3Bannyh.

[15] *Healy v. James*, 408 U.S. 169, 180 (1972).

[16] *See, e.g., Levin v. Harleston*, 966 F.2d 85, 90 (finding that "the commencement, or threat thereof, of disciplinary proceedings against [a public university faculty member] predicated solely upon his protected speech outside the classroom violates his First Amendment rights").

[17] *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

[18] *Id.*

[19] *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). One federal appellate court put it more bluntly, unequivocally rejecting as "totally unpersuasive" any "argument that teachers have no First Amendment rights when teaching, or that the government can censor teacher speech without restriction." *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 680 (6th Cir. 2001).

4

### B.  Kershnar's speech addresses matters of public concern and remains protected even if it is deeply offensive to others.

Kershnar's speech in off-campus podcast appearances is quintessential speech as a private citizen on matters of public concern. The "critical question" in determining whether the speech is that of an employee or private citizen is "whether the speech at issue is itself ordinarily within the scope of an employee's duties[.]"[20] That a professor's speech involved "topics related to their expertise" does not render it speech on behalf of the institution.[21] Kershnar's speech is directed to the general public and took place in a forum unrelated to the institution.[22]

His comments likewise address matters of public concern, which are those that "can be fairly considered as relating to any matter of political, social, or other concern to the community[.]"[23] Kershnar's comments address consent and sexual assault, both of which are matters of significant public concern. That other members of the community may find the *viewpoint* offered on those matters "inappropriate or controversial" does not alter this analysis, as its "controversial character . . . is irrelevant to the question of whether it deals with a matter of public concern," as opposed to one of purely private concern.[24]

Indeed, the Supreme Court has repeatedly, consistently, and clearly held that expression may not be restricted on the basis that others find it to be offensive. This core First Amendment principle is why the authorities cannot outlaw burning the American flag,[25] punish the wearing of a jacket emblazoned with the words "Fuck the Draft,"[26] penalize cartoons depicting a pastor losing his virginity to his mother in an outhouse,[27] or disperse civil rights marchers out of fear that "muttering" and "grumbling" white onlookers might resort to violence.[28] In ruling that the First Amendment protects protesters holding insulting signs outside of soldiers' funerals, the Court reiterated this fundamental principle, remarking that

---

[20] *Lane v. Franks*, 573 U.S. 228, 240 (2014). Even if Kershnar's speech were that of an employee, and not as a private citizen, it would remain protected by his rights to academic freedom, as the employee-speech exception provided by *Garcetti v. Ceballos*, 547 U.S. 410 (2006), does not apply in the "academic context of a public university," *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 562 (4th Cir. 2011), to expression "related to scholarship or teaching," *Demers v. Austin*, 746 F.3d 402, 406 (9th Cir. 2014), or to faculty "engaged in core academic functions, such as teaching and scholarship." *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021). *See also, e.g.*, *Van Heerden v. Bd. of Supervisors of La. State Univ.*, No. 3:10-cv-155, 2011 U.S. Dist. LEXIS 121414, at *19–20 (M.D. La. Oct. 20, 2011) (sharing "concern that wholesale application of the *Garcetti* analysis . . . could lead to a whittling-away of academics' ability to delve into issues or express opinions that are unpopular, uncomfortable or unorthodox").

[21] *Austin v. Univ. of Fla. Bd. of Trs.*, No. 1:21cv184-MW/GRJ, 2022 U.S. Dist. LEXIS 11733, at *41 n.35 (N.D. Fla. Jan. 21, 2022).

[22] Even if Kershnar made similar arguments in the academic environment, it would still be protected by academic freedom. *See, e.g.*, *Hardy*, 260 F.3d at 680.

[23] *Snyder v. Phelps*, 562 U.S. 443, 453 (2011).

[24] *Rankin v. McPherson*, 483 U.S. 378, 384 (1987).

[25] *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (burning the American flag was protected by the First Amendment, the "bedrock principle underlying" the holding being that government actors "may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable").

[26] *Cohen v. California*, 403 U.S. 15, 25 (1971).

[27] Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50 (1988).

[28] *Cox v. Louisiana*, 379 U.S. 536, 557 (1965).

"[a]s a Nation we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate."[29]

This long-established national principle applies with particular strength to our public universities, dedicated to open debate and discussion. Take, for example, a student newspaper's vulgar headline ("Motherfucker Acquitted") and a front-page "political cartoon . . . depicting policemen raping the Statue of Liberty and the Goddess of Justice."[30] These words and images—published at the height of the Vietnam War—were no doubt intensely offensive to many at a time of deep polarization and unrest. Yet, the Court made plain that "the mere dissemination of ideas" in public higher education, "no matter how offensive" they may be to others, "may not be shut off in the name alone of 'conventions of decency.'"[31]

Some might charge that Kershnar's views, if adopted, would be dangerous or lead to the erosion of laws criminalizing sexual abuse of minors. For his part, Kershnar's writing on the subject has argued that sexual conduct with minors *should* be criminalized.[32] His arguments generally concern *why* such conduct *should* be criminalized, with a critical evaluation of whether morality—as distinct from other reasons to prohibit it—is *alone* sufficient to impose criminal sanctions.[33] Yet even if Kershnar's critics are correct in their estimation of his argument, Kershnar's speech would *still* be protected by the First Amendment. While the law provides no shelter for incitement, that exception is limited to speech "directed to" inciting "imminent lawless action" and likely to result in that action.[34] The Supreme Court has made clear that this exception does not extend to the "mere advocacy" of unlawful conduct, the "abstract teaching" of unlawful conduct, or arguments about the "moral propriety or even moral necessity" for unlawful action, leaving all such speech within the protection of the First Amendment.[35]

## C. *Removing a professor from campus due to public opposition is an affront to fundamental principles of freedom of expression.*

Kershnar has been banned from campus, banned from communicating with other members of the Fredonia community, and removed from his assigned duties without justification by the university's administration. Law enforcement earlier removed him from campus, citing "safety concerns," but the precise nature of those concerns has not been disclosed to the public or to Kershnar. We appreciate that members of the public, outraged by Kershnar's comments or views, have contacted the university, and that there may be legitimate public

---

[29] *Snyder*, 562 U.S. 443 at 448, 461.

[30] Papish v. Bd. of Curators of the Univ. of Mo., 410 U.S. 667, 667–68 (1973).

[31] *Id.*

[32] *See, e.g.*, STEPHEN KERSHNAR, PEDOPHILIA AND ADULT-CHILD SEX: A PHILOSOPHICAL DEFENSE 119 (2015) ("[G]iven the value in preventing child rape and incest, both of which are extremely harmful. . . the criminalization of willing adult-child sex passes the practical tests" that would justify criminalization).

[33] *Id.* (suggesting that the "armchair evaluations of empirical effects [may not be] enough to warrant criminal punishment, let alone significant criminal punishment.").

[34] *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

[35] *Id.* at 448–49 (quoting, in part, *Noto v. United States*, 367 U.S. 290, 297–98 (1961)).

safety concerns that necessitate immediate action. However, objections from students or threats from the public will not justify eroding Kershnar's expressive rights.

We recognize, too, that public safety is an indispensable prerequisite to the ability to engage in the exchange of ideas. Yet rewarding threats of violence by taking action against an unpopular speaker—that is, effectuating a "heckler's veto"[36]—will only incentivize future threats. In that event, a public university—where expression should be at its most free—would be effectively closed to "views unpopular with bottle throwers."[37] To avoid that illiberal result, the First Amendment requires public actors take the least restrictive means to redress safety concerns arising from threats of violence or speech hostile to the speaker. "[R]emoving" or "by other means silencing a speaker due to crowd hostility," even a crowd that is *physically present,* "will seldom, if ever, constitute the least restrictive means available to serve a legitimate government purpose," including public safety.[38] Removing faculty from teaching as a means of responding to threats of violence will incentivize further threats, and we urge you to ensure that the university not permit those who would issue threats of violence to dictate who may speak, or what may be said, in higher education.

Nor will objections from students or threats from the public qualify as the sort of disruption that would permit adverse employment action, which would be permitted only where the *employee*'s speech caused disruption. Here, any disruption is caused not by Kershnar, but by those *opposed* to Kershnar. Disruption "caused not by the speech itself but by threatened reaction to it by offended segments of the public" does not justify "public employer disciplinary action directed at that speech,"[39] and where speech involves "serious and substantial issue[s] of public concern," an "even stronger showing of disruption" is necessary to justify any limitations on an employee's speech.[40]

Finally, because Kershnar's speech is protected, we caution that the initiation of an investigation will impermissibly chill expression, as the First Amendment prohibits not only formal punishment, but any action that "would chill or silence a person of ordinary firmness from future First Amendment activities[.]"[41] For example, a New York university launched an investigation into a tenured faculty member's offensive writings on race and intelligence, which the university's leadership said "ha[d] no place at" the college.[42] The United States Court of Appeals for the Second Circuit—the decisions of which are binding on SUNY Fredonia—held that investigation itself constituted an implicit threat of discipline, and the resulting chilling effect constituted a cognizable First Amendment harm.[43]

---

[36] *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 234 (6th Cir. 2015).

[37] *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992).

[38] *Bible Believers*, 805 F.3d at 248.

[39] *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985).

[40] *Adams v. Trs. of the Univ. of N. Carolina-Wilmington*, 2013 U.S. Dist. LEXIS 189344 (quoting, in part, *Love-Lane v. Martin*, 355 F.3d 766, 778 (4th Cir. 2004)).

[41] *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999).

[42] *Levin*, 966 F.2d at 89.

[43] *Id.* at 89–90.

### III.     Conclusion

Kershnar's speech is doubtlessly offensive to some (especially those exposed to it shorn of context), and many have—exercising their own First Amendment rights[44]—made their objections known to the university. However, whether speech is protected by the First Amendment is "a legal, not moral, analysis,"[45] and no person—student, colleague, administrator, donor, or lawmaker—holds a veto over freedom of expression, *least* of all those who would answer objectionable speech with threats of violence.

We urge you to avoid effectuating a heckler's veto by returning Kershnar to the classroom and publicly committing to protect the First Amendment rights of your faculty.

Given the urgent nature of this matter, we request receipt of a response to this letter no later than the close of business on Monday, February 6, 2022, confirming that SUNY Fredonia will not pursue an investigation or disciplinary sanctions in this matter.

Sincerely,

Adam Steinbaugh
Director, Individual Rights Defense Program

Cc:     Brent Isaacson, Chief of Police, SUNY Fredonia
        Dr. David Starrett, Executive Vice President & Provost

---

[44] *Whitney v. California*, 274 U.S. 357, 377 (1927).
[45] *Animal Legal Def. Fund v. Reynolds*, 353 F. Supp. 3d 812, 821 (S.D. Iowa 2019).