*Kershnar v. Kolison*
Motion for Preliminary Injunction

Decl. Stephen Kershnar

# EXHIBIT 34

PUBLIC AFFAIRS QUARTERLY
Volume 15, Number 2, April 2001

# THE MORAL STATUS OF HARMLESS ADULT-CHILD SEX

## Stephen Kershnar

ABSTRACT: Nonforcible adult-child sex is thought to be morally wrong in part because it is nonconsensual. In this paper, I argue against this notion. In particular, I reject accounts of the moral wrongfulness of adult-child sex that rest on the absence of consent, concerns about adult exploitation of children, and the existence of a morally primitive duty against such sex.

## I. INTRODUCTION

There are two standard reasons given in support of the notion that nonforcible adult-child sex is morally impermissible: it harms the participating children and it infringes upon the children's rights because it is nonconsensual. This issue is important since the empirical case for the harmfulness of voluntary adult-child sex has been called into doubt.[1] If such nonforcible adult-child sex is not harmful, then the moral impermissibility of such sex (and the case for banning it) rests on another reason. In this paper, I argue against the existence of this second reason. In particular, I argue for the following thesis: other things equal, pedophilia is wrong if and only if it is harmful or the child's parents do not agree to it. The "other things equal" clause is designed to screen out third-party concerns, e.g., it screens concerns relating to the promotion of an atmosphere conducive to child rape. If this is correct, then our best judgment as to the general permissibility of adult-child sex rests on the empirical analysis of its harmfulness (or lack thereof) and on concerns surrounding parental permission to it. If a reader views nonforcible adult-child sex as invariably harmful, then this paper can be seen as a theoretical investigation of whether there are additional reasons against such interactions.

111

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

My paper has five parts. In the first part, I investigate the notion that adult-child sex is morally wrong because the child does not consent to it. Here I look at two recent arguments in support of this notion and argue against them. In the second part, I look at an exploitation-based argument against such sex and argue that it also fails. In the third part, I reconsider whether my analysis focuses on an overly narrow account of harm and conclude that it does not do so. In the fourth part, I argue that assuming the child's parents consent, the permissibility of adult-child sex rests on whether it is harmful and that this result is not as counterintuitive as it first appears. In the fifth part, I respond to concerns that my argument ignores the contemporary cultural context and that it might be used to support harmful adult-child sex.

## II. Consent-Based Arguments against Adult-Child Sex

Two recent articles argue that adult-child sex is morally impermissible because of the child's inability to consent to sexual relations. These arguments rest on the notion that because such sex is not consented to, it does not reflect the overall preferences of a child or the adult that the child will become and thus the adult sexual partner fails to respect the child as a person. Before looking at the arguments in these articles, I will put forth some of my assumptions since they affect my criticism of these arguments.

For the purposes of this essay, adult-child sex involves a sexual interaction between a person eighteen years or older and a prepubescent or pubescent child. Thus, I am screening out of this discussion sexual interaction with adolescents since sex with such persons intuitively seems less disturbing and since it requires less justification than sex with children, given the adolescent's greater degree of autonomy. I use the phrase "adult-child sex" to refer to any sexual interaction between an adult and a child. This may involve mutual masturbation, fondling, passionate kissing, etc. It may even involve observation for sexual purposes by one person, usually the adult, of the child. In this loose sense, one party need not even be aware of the sexual interaction. So, for example, intercourse between an adult and a comatose child is adult-child sex for the purposes of this essay.

Second, in the cases of adult-child sex to be discussed in this essay, I shall assume that they are nonforcible and that the child's parents consent to it. The former part is assumed to screen out force as the explanation of the wrongfulness of such sex. The latter part is assumed because the absence of parental consent makes adult-child sex a wrong to the parents. However, since the intuitive wrongfulness of adult-child sex

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

relates to a claim of some sort on behalf of the child, this wrong-making feature should be set aside.

An act is unconsented to (and hence involuntary) where it involves an agent who lacks the capacity to consent or an agent who does not consent either because she has no preference or a contrary preference with regard to the activity in question. By force, I mean the use of physical dominance or a threat related to this dominance to overpower a contrary desire of an agent. Thus, forced acts are not consented to but the converse need not be true.

Third, I assume that in almost all, if not all, cases motive does not affect the deontic status of an act. The possible exception is in the type of case where the recipient of an act benefits from the act being done from a certain motive rather than merely benefiting from the act itself.[2] An example of this may occur with regard to acts that satisfy a debt of gratitude. Here the debt may be satisfied only if the act is done from a certain motive. However, even in such cases it is the truthful communication of the motive (another act) and not the motive itself that is relevant. I also assume that the deontic status of an act is distinct from whether the agent is morally responsible for performing it. For example, an agent can be praiseworthy for performing a morally wrong act.

Fourth, I assume that harm is a setback to a person's interest.[3] This makes the specific analysis of harm dependent upon the analysis of an interest. For example, on some accounts a person always has an interest in having her rights respected and hence every right infringement is a harm, whereas other accounts deny this. I will assume that persons have interests in having their desires satisfied, experiencing pleasure (and desire-satisfaction), and in certain objective-list things, e.g., having meaningful relations with others, having true beliefs, appreciating beauty, determining their characters and the shape of their lives.[4] On this account, the objective-list interests are independent of the interests in desire-satisfaction and pleasure.

This last assumption might lead to the objection that with such a sufficiently broad view of interests, all the reasons against adult-child sex will be types of harm, thus rendering my conclusion of dubious worth. However, if, as I argue below, the objective-list interests are not set back by adult-child sex, then the thesis becomes significant since it makes the sort of interests that determine the permissibility of adult-child sex capable of empirical investigation.

### A. Adult-Child Sex Is Wrong Because Children Do Not Consent to It

Both Igor Primoratz and Robert Ehman view consent as legitimate only if it is informed and free.[5] Informed consent occurs where the

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

114            PUBLIC AFFAIRS QUARTERLY

consentor has a sufficient level of knowledge about the nature of her choice and its consequences. Free consent occurs where the consentor is sufficiently independent from subordination to others. These two dimensions admit of degrees and are independent of one another. Primoratz argues that adult-child sex fails to satisfy both dimensions.

Primoratz argues that relative to the adult, the child does not have sufficient knowledge of the physical, psychological, and social aspects of sex to legitimize an adult's sexual involvement with her.[6] He notes that with regard to an adult, insufficient knowledge of these features with regard to a sexual interaction in which she participates need not make the sex morally wrong. What Primoratz seems to have in mind here is that a participating adult may choose not to familiarize herself with the relevant facts or may be negligent in doing so, and in such cases sex is not necessarily morally wrong. However, Primoratz notes, the absence of such knowledge in children is a result of the child's incapacities rather than something over which she might have exercised control. This asymmetry of information is exacerbated, he argues, by the different interpretation adults and children often give to adult-child sex, with the child looking for sympathy and affection whereas the adult looks for sexual gratification.[7]

Primoratz also argues that the child's consent to adult-child sex is not free in that it is not sufficiently independent of subordination to others.[8] In support of this subordination, Primoratz cites the asymmetries of physical and psychological maturity and power in adults and children that reflect the way in which children are brought up. Primoratz notes that since neither asymmetry is present in the sexual interactions between children, his argument does not apply to such interactions.

An initial problem with Primoratz's arguments is that his invocation of defects in the consent of children to adult-child sex rests on a generalization that may not be true for all children. There might be children who are precocious and fully grasp the different dimensions of sex, much like some precocious children can grasp the different dimensions of music and mathematics. Also, it might be that some of these children are sufficiently independent of their parents that they are able to escape the psychological and physical domination that accompanies adult-child interactions. And even if there are no such cases in the actual world, such cases seem possible. However, Primoratz might respond that such young human beings would not be children but merely adults whose appearance is misleading. He would thereby distinguish adults and children on the basis of their having (or lacking) certain capacities. Such a response, at least to my mind, is convincing since children do intuitively seem to be distinguished more on the basis of their capacities than on their age.

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

A second problem involves Primoratz's refusal to apply the requirements of consent to sex between children. The asymmetry of knowledge goes toward the moral responsibility of the adult for the adult-child sex, not toward whether it is permissible. This can be seen if we consider the case of an adult who had intercourse with an eleven-year-old girl who looked and behaved like a nineteen-year-old woman. The adult was not culpable for his action since he nonnegligently believed that she was nineteen. Whether such an adult acted wrongly is distinct from the issue of whether he is blameworthy for his act. Similarly, whether a mentally retarded adult who had sex with a nine-year-old girl acted wrongly is a distinct issue from whether the adult was culpable for his acts. Contrary to Primoratz's analysis (once the factors that go toward blameworthiness are set aside), if the absence of consent makes sex with a child wrong, sex between children is wrong even if none of the participants are morally responsible for their acts.

An objector might claim that children and the mentally retarded are not (full) moral agents and hence that their actions are not (fully) wrong. Our language usage in evaluating the actions of such young (and disabled) human beings is ambiguous. However, if this objection is correct, it at most shows that such actions have no deontic status and such a result does not add any support to Primoratz's analysis.

Primoratz might respond that since the nature and consequences of sex acts between young children are different from the nature and consequence of adult-child sex acts, children may be able to validly consent to the former but not the latter. Valid consent involves the voluntary and intentional grant of (and communication of) permission to another, where the intentionality condition requires an adequate understanding of (or recklessness with regard to) the nature and consequences of the sexual involvement. It is not clear that actual children satisfy the intentionality condition since it is not clear that prepubescent children have adequate understanding of (or are reckless with regard to) the nature and consequences of sex acts between themselves and other young children. It is not clear that they are even capable of having the requisite understanding. However, if we assume that children have the relevant capacities and validly consent to sexual interaction with other children, and this is dubious, the next objection still applies.

An even more damaging failure of Primoratz's argument occurs in that it rules out many adult-child interactions that we intuitively think are permissible. Consider the following case.

### The jujitsu case

Brian, 11, is an excellent jujitsu player. He can effectively compete against adult men (perhaps he has grown up with one of the Brazilian

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

116          PUBLIC AFFAIRS QUARTERLY

families that are legendary in this sport). An adult friend of Brian's
family (with his parent's permission) asks Brian's father permission
to enter him into submission matches with a number of adult military
men. Brian is greatly reluctant but under his father's stern commands
he enters the tournament. The father acts in the boy's interest and
reasonably expects the boy to enjoy the competition once he gets
used to it. These matches involve extraordinary close contact and
emotional resilience. While Brian interprets these matches as a form
of competitive play (and eventually comes to enjoy them), the men
interpret this as ritualized combat designed to prepare them for ac-
tual military combat and express their dominance over others.

Notice that Brian's choice is not free since it reflects subordination to
his father. Nor is it informed since Brian does not fully grasp the type
of demands that such matches make upon its entrants (and may not be
capable of doing so prior to actually taking part in them). This differ-
ence in interpretation is exacerbated by the different interpretation that
Brian and the adults put on the activity. However, intuitively such par-
ticipation of adults with Brian seems permissible. Similar cases involving
medical treatment, gymnastics, or religious training all seem to be per-
missible even if they do not involve an informed or free choice. One
cannot distinguish these latter cases from cases of adult-child sex through
an assertion that sex but not the latter cases involve improper subordi-
nation since this is precisely what is at issue.

An objector might claim that sexual activity is relevantly different
from the other activities e.g., medical treatment, gymnastics, and reli-
gious training. My argument does weaken if there is a relevant differ-
ence between adult-child sex and these other activities. However, the
former does not seem to be distinguishable from the latter in terms of
its role in forming one's self-identity, the connection to an individual's
likelihood of flourishing, or in terms of its relation to a network of a
child's current or future interests. It might be claimed that sex taps into
deep-seated physiological processes that the child does not grasp and
that this feature is what distinguishes the former type of activity from
the latter types. However, the latter types of activities tap into powerful
psychological forces that children often do not grasp and it is hard to
see why such connections to psychological processes are distinguish-
able from connections to physiological processes. It may be claimed
that adult-child sex runs a substantial risk of harm that is not present in
the other activities. However, if persons have a claim against being ex-
posed to a substantial risk of harm, then the adult-child sex, while not
always harmful, is still closely enough connected to harm to be wrong on
harm-related grounds. In the absence of such a risk of harm, a morally
relevant difference does not seem to be present. The background idea

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

here is that the reason that persons have claims against having a high risk of harm imposed on them is closely related to the reason against their being harmed.

My claim about the lack of a relevant difference between sex and the other activities might lead an objector to claim that my analysis ignores the real-world cultural context in which adult-child sex takes place. This objection does not weigh against my argument because the real-world cultural context is relevant here only insofar as it relates to the risk of harm to which a child participant is exposed. This is the sort of empirical consideration that goes to the issue of the harmfulness (or lack thereof) of the sex and which is outside the scope of this paper.

### B. Adult-Child Sex Is Wrong Because Children Conceived of As Adults Would Not Consent to It

Robert Ehman argues that nonconsensual sexual interactions with children are permissible if the child conceived as capable of mature judgment would be likely in fact to retrospectively consent to the interaction. The justification of sex (or any other interaction) between adults and children does not demand that an adult know the retrospective assessment of the interaction. It requires only that the adult has good reason to affirm that the child conceived as capable of mature judgment will have good reason to consent to the sexual interaction, i.e., it is in accord with her goals and values. The duty toward the child in this case is a duty to demonstrate a concern for the child's future welfare. The moral wrong of a violation of this duty is independent of any psychological harm that might result from the sex. Ehman, similar to Primoratz, argues that since this duty does not apply to children, it does not make sexual interactions between children impermissible.

On Ehman's account, what is needed is a biographical judgment as to what the child would consent to if he had the information and freedom sufficient for him to be capable of valid consent. The question is one of narrative consistency about what we know about the child. However, it is not purely a narrative account. The focus of Ehman's account is on the preferences of the child conceived of as capable of mature judgment. These preferences rest on the goals and values that the child would *likely have* if he had the information and independence to provide valid consent. The biographical judgment does not rest on the goals and values that the child has *good reason to have*. This account is designed to respect the child by respecting his goals and values. At the same time, however, it is designed to screen out the effects of the child's ignorance and subordination, incapacities that might interfere with the identification and expression of the child's goals and values.

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

118                PUBLIC AFFAIRS QUARTERLY

A concern arises as to whether the notion of a child conceived as a mature person (i.e., adult) is usable or even possible. My assumption here is that children and adults are distinguished by their capacities and not by their chronological age. The values, goals, and preferences of a child seem to be closely related to his ignorance and dependence on others. It is unclear whether the former can remain partially fixed when the latter change. And even if this is possible, it seems so far removed from our experiences as to be unusable as a tool by which to analyze the moral status of actual instances of adult-child sex. Setting these problems aside, the goals, values, and preferences of the child with the added capacities probably differ significantly from that of the actual child. It is unclear whether we end up respecting the child by looking at the preferences of this hypothetical person.[9]

It might be argued against Ehman that the focus should be on the promotion of the objective interests of children. This focus on objective interests can be seen in the medical context where the best-interest standard has often determined the treatment that is given to incapacitated or immature patients. However, this would allow for at least some occurrences of harmless adult-child sex. This is because the sex does not set back the child's interests (i.e., she is not harmed) and because the child's interests may be promoted at least to some degree via enjoyment of the adult's attention or receipt of benefits from him.

An initial problem with this account is that it makes the permissibility of an action a function of the motive from which the adult performs it. If one accepts that the deontic status of an act is independent of the motive, and I think one should, then the motive of the adult will not be relevant to accepting the permissibility of adult-child sex. Whether the agent is justified in his belief as to whether the child conceived of as an adult would consent to the sex, is thus irrelevant to whether the act of sex was permissible (although it might still be relevant to judgments of the agent's moral responsibility). Rather, the focus should be on what would be consented to by the child conceived of as capable of mature judgment (i.e., a mature person). Hence, the key premise of Ehman's argument should be recast as (1).

(1) An act of adult-child sex children is morally permissible if and only if the child as mature person would consent to it.

(1) should be rejected. To see this, consider the following case.

Jane is an incest victim and seven-year-old child prostitute. Given her terrible self-image, she seeks attention and companionship through sexual intercourse even where her partners are completely inappropriate (e.g., her father).[10] Jane conceived of as a person capable of mature judgment, retains the same preference scheme and

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

would consent to intercourse with a pedophile viewing it as a way of satisfying her psychological needs.

Intuitively the preferences of Jane conceived of as an adult do not justify adult-child sex involving the child Jane. While the sex may not be harmful, it reflects a problematic (i.e., dysfunctional) network of preferences and is probably not beneficial to Jane. A trustee seeking to promote Jane's objective interests would not agree to allow such sex to occur. Since (1) runs afoul of this intuition (and intuitions in cases like this), it ought to be rejected.

My argument here does not rest on the wrongfulness of adult-child sex or even incestuous sex. Rather, it is that if moral duties toward a child focus on whether the child's interests are on balance being promoted, i.e., the trustee model that Ehman seems to adopt, then (1) should be rejected.

Nor can one say that as a mature person capable of free and informed consent, Jane would have a better grasp of what is in her interests, e.g., more effective routes to attention and companionship. There are some adults for whom this is not true and there is no reason to believe that Jane conceived of as an adult capable of informed and free consent, is not one of them. If Ehman builds into his counterfactual-consent test the adult's accurate assessment of her own interests, we then have an account that is far removed from the biographical analysis of the child's preferences. Such an account comes perilously close to being a mere objective assessment of a person's interests with regard to a sexual interaction and would thus allow no role for consent. This is because a person's consent, whether actual or counterfactual, need not track the maximization of her objectively weighted interests.

A person's capacity for mature judgment probably does entail some awareness of and desire to realize her objective interests. This is because the capacity presumes rationality and on the most plausible accounts rationality includes (or almost inevitably brings about) some awareness of the person's interests. For example, it is hard to imagine a rational agent who was entirely indifferent to (or ignorant of) her own pleasure and desire-satisfaction. However, having the capacity for mature judgment does not preclude a person from having an inadequate understanding of her interests and an inaccurate assessment of the way in which they are to be protected or promoted. The sort of decisional defect present in the case of Jane involves these latter defects and hence is consistent with her having the capacity for mature judgment.

As a result of the inability of the counterfactual-consent account to handle this type of case, the account should be rejected. An exploitation-based account of the wrongfulness of adult-child sex is still, however, available.

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

### III. An Exploitation-Based Argument against Adult-Child Sex

#### A. *An Account of Pejorative Exploitation*

There are cases of pejorative exploitation that are wrongful but neither rights-infringing nor harmful. Perhaps adult-child sex is wrong because it involves this pejorative type of exploitation. To explore this notion, let us begin by considering the following case.[11]

*The lecherous rich man*

A rich man offers to pay for the very expensive surgery that alone can save the life of Helen's child provided that Helen becomes for a period his mistress. Helen values the life of her child much more than she values avoiding the sexual arrangement. The man is from a different country and does not know Helen other than by description. He has no antecedent duty to Helen and is considering spending his money to save other children in the Third World. The surgery is so expensive that no state or charitable agency will pay for it. Thus, if the rich man does not pay for the expensive surgery, the child will die. Helen sleeps with the man in order to save her child's life.

My background assumption here is that prostitution does not in itself involve a rights infringement. The rich man does not infringe upon Helen's rights since he has rights to give or not give the money to Helen and to have or not have consensual sex with her. Hence, he has the (moral) power to waive his right to the money in order to exercise another right.[12] Nor is Helen harmed by this transaction. She is in a better position than she would be in under the expected and a just course of events. Assuming her choice is an informed one that is based on her rational assessment of her circumstances, she consents to the arrangement.

An act of exploitation is wrong in virtue of its being exploitative where one side takes unfair advantage of the other side.[13] The "in virtue of" clause is designed to screen out cases where an act is exploitative and wrong but where the act's wrongfulness is not a result of its being exploitative. For example, where a thief steals a loaf of bread from a store and then outruns the heavy-set store owner, the thief exploits the store owner's lack of speed and acts wrongly, but there is no connection between the exploitation and the wrongfulness of his act.

The feature of pejorative exploitation that makes it unfair is that the probable benefits of the interaction accrue disproportionately to the person (or group) with the stronger position because of their relative position. In the case of transactions, such an unfair advantage must result from an asymmetry in bargaining potential between the two parties. That an outcome conflicts with a person's self-image, religious principles, or values does not make a transaction exploitative. For if this

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

were so, then many choices reflecting hard personal or economic cir-
cumstances would be exploitative and this does not seem intuitively
correct. So, for example, a socially unattractive individual who has to
choose between being single (which she abhors) and men she finds con-
flict with her self-image, does not seem to be exploited if she chooses
one of those men. This is so even though this is precisely the sort of
hard choice that often causes a person to feel that she is between a rock
and a hard place. A party's bargaining potential is primarily a function
of her external characteristics, e.g., resources and circumstances,
whereas her bargaining ability is primarily a function of her internal
characteristics, e.g., information, toughness, patience, perceptiveness.[14]
When the context is personal rather than economic, many of the inter-
nal characteristics should be considered part of each party's bargaining
potential. Can this model account for the wrongness of adult-child sex?

### B. Adult-Child Sex is Not Morally Wrong on the Basis of Its Being Pejoratively Exploitative

Adult-child sex often involves differences in advantages between the
two parties. The adult often has material, psychological, and informa-
tional advantages. If he then gains most of the benefit of the sexual
interaction via his relative advantages, he pejoratively exploits the child.
The issue then arises as to whether this is grounds for finding such sex
to be unfair and thus wrongful.

One problem with this approach is that it makes the permissibility of
adult-child sex a function of the enjoyment or desire satisfaction that
the adult receives from it. If the adult feels very guilty and as a result
gets little enjoyment (or other benefit) out of the sex then he will not
exploit the child. Also, if the child's gain in sympathy and affection
exceeds the adult's gain in sexual satisfaction, then there will not be
any pejorative exploitation present. This problem occurs even if we take
an *ex ante* view of the interaction since the expected gain need not fa-
vor the adult given each party's knowledge of things such as the adult's
likely feelings of guilt and the child's desire for affection and sympa-
thy. Even if this picture is too optimistic with regard to the child's gain,
it is certainly possible and thus pejorative exploitation is at most a con-
tingent reason against the permissibility of adult-child sex. In other
words, the appeal to pejorative exploitation does not show that adult-
child sex is invariably or even presumptively wrong. Also, the wrong-
fulness of pejoratively exploiting a child in a sexual context is no
different from doing so in a financial or occupational context.

This result seems disturbing if one views adult-child sex as wrong
even if the child enjoys it and incurs no significant or net harm from it.
And where the adult benefits the child as a result of the sex, e.g., by

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

giving her significant educational or financial benefits, the adult will probably not receive a disproportionate gain. Hence, at least in some cases, even if only possible ones, the moral impermissibility of adult-child sex cannot be accounted for by pejorative exploitation.

This conclusion may seem to weaken my thesis in that it would suggest that it may be the case that adult-child sex is usually wrong because it is pejoratively exploitative even though the wrong-making feature is only contingently connected to the sex. However, there are two things to note about this conclusion. First, whether the child benefits as much as the adult with regard to these sexual interactions seems capable of empirical investigation and is not the sort of thing that can be determined through mere introspection. Second, even if the conclusion is correct, this would set forth conditions under which adults might pursue sex with children, i.e., where they ensure that the child receives the majority of the benefits of their interaction. Since I suspect that such a case is not merely possible but in fact attainable in many cases, this would open the door for such interactions.[15]

It could be objected that my whole strategy here is suspect in that I have been assuming that adult-child sex is wrong only if there is one invariable wrong-making feature of it.[16] Instead it could be argued that there are multiple wrong-making features accompanying it, specifically harm, the lack of parental consent, and pejorative exploitation, which ensure that in the vast majority of cases of adult-child sex the adult's actions are morally wrong even if the pertinent feature varies from case to case. This may be correct but again such an assertion seems capable of empirical investigation and does allow pedophiles to seek out situations in which none of the wrong-making features are present. Such points motivate the search for opposition to such sex based on a single wrong-making feature rather than on an assumption that there will be one of a number of wrong-making features present. And it is the purpose of this paper to argue that with regard to harmless adult-child sex, such a feature will not be found.

## IV. OBJECTIVE-LIST INTERESTS AND HARM TO THE CHILD

An objector might assert that the account of harm assumed here is too narrow. In particular, he might assert that there are harms that focus on setbacks to objective-list interests, i.e., interests that are independent of a person's desire-fulfillment or pleasure.[17] Such interests are difficult, if not impossible, to measure through social science techniques. Objective-list interests include persons being in the proper relation to truth, beauty, and other persons (e.g., via reciprocal and meaningful friendships) and moral goodness. In this context, it might be argued

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

that a child has an objective-list interest related to retaining her virginity so that she might someday share it with her spouse or permanent partner. On this account, adult-child sex involving intercourse is harmful in this broader sense. A similar result occurs if one thinks that a child has an objective-list interest in staying innocent or sexually pure. This objection does not directly threaten the argument in this paper since it explains the wrongfulness of adult-child sex in terms of its being harmful. However, it does threaten to make my conclusion trivial, given that if the objection is correct, then adult-child sex is always harmful.

The problem with this objection is that it rests on the assertion that persons in general or children in particular have an objective-list interest in preserving their premarital virginity, innocence, or sexual purity. It is unclear why these things should be valuable independent of their effects on promoting desire-fulfillment or pleasure. Consider the hypothetical case where members of a community care little about these things, perhaps because they focus on developing their minds and view sexual pleasure as an innocent and insignificant release from their intellectually demanding projects. Given the possibility of such a case, it is hard to see why anyone would view such a loss as in itself setting back an objective-list interest of the child or the adult into which he grows.

It might, however, be thought that in the actual world such a loss indirectly (probably causally) sets back an objective-list interest. The link between virginity (or innocence or sexual purity) may be causally linked to moral flourishing, meaningful relationships, truth, or beauty in that its loss brings about a lesser participation in one of these entities. Perhaps there is an empirical case for such a linkage and that case justifies the emphasis placed on sexual purity before marriage. However, in the absence of an empirical argument for psychological, emotional, or sexual damage that might impede a person's establishing the right relation to such objective-list items, it is not clear why such a position should be accepted. And such an empirical argument is distinct from the conceptual argument from harm that the objector probably has in mind.

The objector might reply that there are intuitive cases that show that in this context my account of interests is too narrow. For example, he might assert that an adult who is in a permanent coma has an interest in not having the hospital orderlies masturbating at the sight of her naked body or having intercourse with her. This interest is unrelated to her experiencing pain or the discomfort of having her desires frustrated. Similarly, the objector might assert that an adult has an interest in not being subjected to a secret trespassing voyeur, again even though such an interest is unrelated to pain or the experience of frustration of her desire or desires. However, such cases can be distinguished on grounds that are

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

not available in the case of adult-child sex. First, I shall assume that the adult in a coma is in effect dead and hence the issue is what sort of claim, if any, does a person have with regard to certain postmortem treatments. I shall assume that an adult's claim against certain postmortem treatments can rest on antecedent consent (or contract) to other treatment or autonomously chosen desires the object of which is the treatment of her body after death. None of these are available in the case of a child. In the case of the secret trespassing voyeur, the voyeur is infringing upon the adult's property rights or her legitimate expectation of privacy. Also, because the adult victim is capable of consenting and does not do so, her moral rights are being forcibly infringed upon. In addition, her preference not to be looked at is being ignored. None of these elements is present in the case of nonforcible adult-child sex since a child is incapable of giving consent and since the sex is not in opposition to her preferences (such opposition would make the sex forcible).

The objector might also assert that a child has an interest in not becoming a pedophile and that participation as a child in adult-child sex is likely to significantly increase the child's chances of becoming a pedophile, thus harming the child. This objection is capable of empirical testing. In addition, this objection works only if pedophilia is either intrinsically bad or likely to lead to a (net) frustration of the pedophile's desires or to his experiencing displeasure. If harmless adult-child sex is morally permissible, and this is what is at issue, then it is hard to see why the desire to engage in such activity is intrinsically bad. The notion that pedophilia is instrumentally bad because it leads to desire-frustration or displeasure is a type of empirical claim subject to empirical testing. This desire- or pleasure-grounded harm may result from the difficulty of finding interested children. If such effects are often present, then adult-child sex would constitute (or at least often constitute) a type of harm. The harm may also result from the way in which the surrounding community treats pedophiles. If the surrounding community's attitudes reflect improper sexual norms then the disvalue to be attached to this harm would be unclear. The disvalue would be analogous to disvalue of the harm brought about in the past by a desire to enter into an interracial marriage when living in the heart of the segregated South.

If sexual virginity, purity, and innocence are not objective-list interests nor tightly linked to them, then the sort of harm that can act as a wrong-making feature for adult-child sex will be precisely that type of harm capable of investigation by social scientists. However, there still is the matter of the significance of the intuitive distaste that most persons have for harmless adult-child sex and it is to this that I now turn.

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

## V. The Argument from Intuitive Distaste

With regard to adults, an adult can legitimately complain that an act wrongs her only if the act violates a moral right of hers (or other perfect duty if this is a distinct type of relation) or harms her. A perfect duty is one that is owed to a determinate person and that must be satisfied by a narrow range of acts, e.g., a person's duty not to batter an innocent and nonthreatening child. An imperfect duty, e.g., the duty of charity, is one that lacks one or both of these elements. A moral right contains a perfect duty (or at least a potential one that becomes actual upon the exercise of a power) as a component. Hence, if there is no perfect duty against adult-child sex then there will also be no moral right against it. In the case of harmless adult-child sex, such a perfect duty does not appear to be violated. This can be seen in that any plausible candidate right would rule out a whole range of activities in which it is intuitively permissible to involve children, e.g., the *jujitsu* case.

The objector might claim that there is a justificationally primitive duty on an adult (or perhaps on all agents) not to have sex with a child. The idea here is that there are certain duties whose justification does not rest on more fundamental moral principles. These justificationally primitive duties best explain the coherent body of considered moral and nonmoral judgments that persons hold. Such coherence is evidence that such duties apply to persons and that our belief in them in epistemically justified. Such an account would explain the widespread revulsion to adult-child sex along with the failure to justify the wrongfulness of such sex via more general moral principles.

The problem with such an account is that restricting the duty to sexual interactions with children seems arbitrary in scope. Possible explanations of such a restricted scope must focus on some feature of sex that is not present in other activities. However, with the exception of arousal, the relevant features, e.g., affection, sympathy, close physical contact, all seem present in other areas. For example, the first two are expressed in a hug while the third can be found in some athletic activities, e.g., wrestling and gymnastics training. While arousal is often the purpose of sexual activities, it is not clear why this feature should give rise to a special range of duties. However, the specific duty might still supervene on the combination of features that comprise adult-child sex. And asking why a feature gives rise to the duty is the sort of question that is probably unanswerable with regard to justificationally primitive duties.

There are other reasons to reject the existence of such a duty. Such a duty does not seem to apply to two adults that have a committed relationship where one has the mental capacities of a child. For example, consider an infertile heterosexual couple stranded after a boat wreck on

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

126                    PUBLIC AFFAIRS QUARTERLY

an undiscovered island in the Pacific Ocean. The woman is mentally retarded and as a result has the mental capacity equivalent to the average seven-year-old. After a number of years, if the two develop a close enough relation to one another, sexual intercourse would intuitively be permissible. This is especially true if the woman gets a significant amount of enjoyment from the intercourse. If the intercourse is permissible, then the proposed duty would have to be specific to children and such a distinction is even more arbitrary.

Some objectors claim not to share my intuition about this case. On the basis of their opposing intuition, they claim that there is reason to believe that it is morally wrong for a fully functioning adult to have sex with a human being who has the mental age of a child (regardless of whether she is a child or cognitively impaired). In the above case, it is hard to see how this intuition can be defended. The case does not involve the mentally retarded woman experiencing pain, having her desires frustrated, or having one of her objective-list interests set back. In fact, it would seem that if a guardian were asked he would, given the hypothesized circumstances, grant permission for the sexual relations. Assuming that there is no chance of the couple being saved and that they know this (or at least the man does), it is hard to see what bad consequences could come of this sexual interaction or how it could be understood as abusive or pejoratively exploitative. The intuition that the man's actions are morally wrong is one that ought to be rejected in order to make our judgment of the case cohere with various principles (both moral and nonmoral) that we already accept.

The opponent of adult-child sex might still argue that it violates an imperfect duty. Some acts (or, more accurately, some collections of acts or omissions that occur over a given period of time with regard to a particular agent) are wrong but do not wrong anyone in particular. This is true of acts that violate imperfect duties, e.g., the imperfect duty to be charitable. Harmless adult-child sex is not impermissible because it violates an imperfect duty. This is because the intuitive wrongness of harmless adult-child sex seems to wrong the child and not merely reflect a flawed moral character in the adult or constitute a free-floating moral evil as is characteristic of imperfect duties. Since moral duties are either perfect or imperfect and since we have seen that harmless adult-child sex does not seem to violate either type of duty, it in itself is not morally wrong.

I suspect that the intuitive sense that adult-child sex is wrong rests on the belief that it really is harmful in most cases and that in those few cases in which it is not harmful the agent is so blameworthy for engaging in it that little injustice is done in banning it outright and punishing all adult participants. If it turns out that in a significant number of cases

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

adult-child sex is not harmful, then many of the intuitions about it are mistaken. To see this, consider the following case.

### The entrepreneurial parents

The Joneses need money to pay for their boy's future education in a private school. Attending such a school will allow him to avoid the ineffective and gang-infested public school. They agree to allow a pedophile behind a soundproof one-way mirror to watch their young infant (i.e., the boy) be bathed, dressed, and undressed in return for $5,000. The child never becomes aware of the pedophile's presence. The parents never lie to the boy about the arrangement.

This case appears to be aesthetically unappealing but it does not seem to me to be other-things-equal morally wrong. One has to be careful about inferring moral wrongness from the aesthetic unappealing nature of some acts. Many heterosexual men report images of gay sex between males to be disgusting. This, however, does not in itself show that the sex is morally wrong. And if more powerful explanations of this reaction are present, e.g., biological explanations, it does not even present a strong case for a lack of objective beauty in such interactions.

Nor does it appear to be wrong if the man was in the room but closely monitored so that he does not make any contact with the infant. Consider the case where the parents ask a young child to perform what to a pedophile appear to be sexual acts (e.g., dancing naked to music), where the child enjoys doing such acts since he sees them as a type of play, enjoys the parents' attention, and is unaware of the pedophile's presence. Such acts are morally indistinguishable from the entrepreneurial parents case. And if we then place the pedophile close enough so that the child is aware of him, no further wrong-making feature seems to be present. If any significant discomfort or displeasure results from the pedophile's presence, this constitutes harm and thus prevents the case from being harmless. Our intuitions change as there is a progressive increase in the level of intimacy between the pedophile and the young boy, but it is not clear what accounts for this change other than an intuitive distaste for the scene. Concern for harm and against exploitation may explain this intuitive distaste and if such concerns are unwarranted, then the distaste is no more informative than the aesthetic distaste many heterosexual males have for gay sex between males.

## VI. Two General Concerns

### A. The Above Argument Ignores the Cultural Context

One major objection to my argument rests on its lack of connection to the current cultural context and existing moral attitudes. The objector

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

allows that it may be the case that in a different culture many children would not be harmed by adult-child sex. However, in our culture the stigma and shame of having been involved in such a relationship is so great that the involvement is almost always, if not always, harmful. So, for example, the objector might assert that my argument that adult-child sex might not be pejoratively exploitative because the adult may benefit the child more than the adult benefits from the sex is not a realistic possibility given the current cultural context.

This objection, if true, might present a powerful case against nonforcible adult-child sex on the basis of its being, or almost always being, harmful. This case would have to be supported by empirical research, but perhaps this can be done. This does not weaken my argument which addresses only those cases in which adult-child sex is not known on empirical grounds to be (or likely to be) harmful to the child participant. If adult-child sex produces stigma and shame because it is harmful, then the harmfulness conclusion need not rest exclusively on the effects of stigma and shame and perhaps not on these effects at all.

In general, however, one must be careful about allowing prevalent moral attitudes to ground the moral impermissibility of an activity even where these attitudes lead to the activity's participants being harmed through stigmatization and shame. This is especially true where the attitudes are morally suspect. For example, consider the facts in *Palmore v. Sidoti*, 466 U.S. 429 (1984). In this Supreme Court case, a white woman, who had married a black man and lived with him in the South, was involved with her ex-husband in a custody dispute over their child. The trial court ruled in favor of the husband on grounds that in a racist atmosphere the child would likely be harmed by social stigmatization. The Supreme Court reversed on the basis that that in the Constitutional context, this harm ought not to be given significant weight in deciding whether the mother should lose custody. It based its ruling on the indefensible nature of the social stigmatization. If a similar approach prevails in the moral and broader legal context, and I think it ought to, then the case for not permitting an activity on the basis of the community's distaste for it would depend on whether the distaste is independently justified. This essay supports the conclusion that unless harm is empirically shown to result from adult-child sex, the distaste for it is unjustified.

### B. The Overall Argument in This Paper Will Help to Bring About Harmful Adult-Child Sex

An objector might assert that there are likely to be only a small number of child participants not harmed by adult-child sex. Yet were my argument widely accepted, the passage and enforcement of the prohibition

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

against harmful adult-child sex would be more difficult because of the climate of opinion in which the opposition to harmful adult-child sex is weakened.[18] This is in part because the overall case for banning this activity would weaken. The background idea here is that with regard to an activity that is wrongful only if harmful, the opponents of such activities should bear the burden of showing that it is in general harmful. In addition, if enforcers of the prohibition in particular cases are to not run afoul in this climate of opinion, they would have to be careful to focus only on those cases in which the harm can be shown to have occurred or be likely to occur. This may lead to less protection for vulnerable children.

The issue of whether most adult-child sexual interactions are harmful is not something that this paper addresses. It is worth noting, however, that if the arguments in this paper succeed, then the assertion that adult-child sex is harmful should influence state policy only if it is supported by the relevant social science data. Whether this paper contributes to an atmosphere that ends up protecting harmful activity (either at the legislative or enforcement level) is a legitimate concern but one that must be balanced against the value of an accurate appraisal of the reasons for and against allowing the activity to occur. One justification for performing such an appraisal is that if incorrect reasons are given recognition in support of morally legitimate laws, policies, or regulations, then these reasons may then be used to support morally illegitimate ones.

In a society that emphasizes liberty, one might think that nonharmful (and non-rights-violating) activities should be permitted, even if wrongful, at least where the relevant parties consent to (or are not forced into) the activity. This is because having act-options that are morally wrong is valuable at least in part because it gives persons the space to exercise their autonomy and thereby shape themselves and their lives. The arguments contained in this paper may well add to a climate of opinion in which the prohibition of adult-child sex on grounds unrelated to harm is made more difficult and, other things being equal, this is a good thing.

## VII. Conclusion

If adult-child sex is harmless and the child's parents consent to it, then it is probably morally permissible. This is because the most plausible explanations of the wrongfulness of adult-child sex—the absence of the child's consent, the pejorative exploitative nature of such acts, and the intuitive wrongfulness (and aesthetic distaste that most people have for it)—all fail to show that it in itself is morally wrong. If it is in fact harmful, then its wrongfulness can be accounted for in a straightforward way. However, two points about harmfulness are worth noting.

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

130          PUBLIC AFFAIRS QUARTERLY

First, the claim that such an activity is harmful, or more specifically psychologically harmful, can be empirically investigated. Should the studies fail to establish a strong enough causal relation between psychological harm and sexual interaction with adults, the burden would then fall to those who wish to disallow the activity. Second, even if adult-child sex is psychologically harmful, the degree of harmfulness is important in determining whether such sex ought to be banned. This is because some activities which produce minor harm, e.g., eating unhealthy foods, watching large amounts of television, ought not to be banned because the child enjoys them and they fall within the domain of parental rights. Hence, the legal status of adult-child sex should be determined in large part by the outcome of the empirical investigation of its degree of harmfulness.

*SUNY College at Fredonia*


## NOTES

I am grateful to Raymond Belliotti, Robert Ehman, Neil Feit, John Kekes, Igor Primoratz, and Dale Tuggy for their helpful comments and criticisms.

1. Bruce Rind et al., "A Meta-Analytic Examination of Assumed Properties of Child Sexual Abuse Using College Samples," *Psychological Bulletin* 124 (1998), pp. 22–53; Michael Ingram, "Participating Victims: A Study of Sexual Offenses with Boys," *British Journal of Sexual Medicine* 6 (44) (1979); Frits Bernard, "Pedophilia: A Study of Psychological Consequences for the Child," in *Love and Attraction*, ed. M. Cook and G. Wilson (Oxford: Perjamon, 1979); Larry L. Constantine, "The Effects of Early Sexual Experiences: A Review and Synthesis of the Research," in *Children and Sex*, ed. Larry L. Constantine and Floyd M. Martinson (Boston: Little Brown, and Co., 1981), pp. 217–44, esp. pp. 238–42. I make no claim with regard to the quality of these studies.

2. This assertion and the following example come from Michel Gorr, "Motives and Rightness," *Philosophia* 27 (1999), pp. 588–94. The assertion is also defended by W. D. Ross in *The Right and the Good* (Indianapolis: Hackett Publishing Company, 1988), pp. 4–6. The arguments for this account of rightness rest on the claim that motives are not directly enough controlled by the agent to support an ought statement, that there is conceptual and pragmatic value in being able to distinguish an agent's blameworthiness/praiseworthiness from the status of his actions, and that the distinction tracks the way in which we ordinarily use language (e.g., "Joe did the right thing but for all the wrong reasons"). However, it is worth noting that ordinary language at times also conflicts with the distinction. In addition, if the motive theorist adopts the view that (1) one's duty is to act from a certain motive and (2) the motive from which we must act is the sense of duty, then an infinite regress results that makes such an account untenable. Ross, pp. 5–6.

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

3. This notion comes from Joel Feinberg, *Harm to Others* (New York: Oxford University Press, 1984), pp. 31–6.

4. This categorization of interests comes from Derek Parfit, *Reasons and Persons* (Oxford: Clarendon Press, 1984), pp. 3–4, pp. 493–502.

5. Primoratz analyzes these two elements in "Pedophilia," *Public Affairs Quarterly* 13 (1999), p. 107; Ehman does so in "What Really Is Wrong with Pedophilia?" *Public Affairs Quarterly* 14 (2000), p. 130.

6. Primoratz, pp. 106–7.

7. Ibid., p. 107.

8. Ibid., pp. 107–8.

9. In the context of adult-child sex, a child's actual preferences (and choices) are taken into account via the absence-of-force requirement since it focuses on the child's dominant preferences (and choices).

10. I am assuming that instances of incestuous sex between a parent and child may be wrong for reasons other than their being instances of adult-child sex.

11. The idea for this example comes from Daniel Lyons, "Welcome Threats and Coercive Offers," *Philosophy* 50 (1975), p. 430.

12. My assumption here is that if a person has the right to X or not X and the right (with another's permission) to Y or not Y, then other things being equal he may waive his right to not X in return for the other granting him permission to Y. The other-things-equal clause relates to other rights or moral entities that might make such an exchange impermissible. A power in the moral sense is the moral standing by which to create or extinguish a perfect duty or a liberty.

13. Given this account and given that Helen benefits more than the rich man in the above case, this would seem to entail that the rich man does not act wrongly toward Helen (leaving aside any duty not to do things likely to insult another). This does not necessarily follow since the rich man might violate an imperfect duty via his action. However, the case can be modified so as to screen out such a violation. I would suggest that the rich man does act in a permissible manner. Our intuitions to the contrary weaken considerably if we consider cases where Helen takes the initiative in offering sex for the money. Since it is morally arbitrary who makes the offer (again leaving aside the duty not to insult another) and since the rich man has no *ex ante* perfect duty to benefit Helen, our intuitions here are mistaken.

14. Alan Wertheimer, *Exploitation* (Princeton: Princeton University Press, 1996), p. 64.

15. My suspicion is based in part on anecdotal accounts of persons who as children were involved with pedophiles and on the self-reports of college students who as children had participated in adult-child sex and reported neutral or positive reactions toward it. Bernard, "Pedophilia: A Study of Psychological Consequences for the Child"; Rind et al., "A Meta-Analytic Examination of Assumed Properties of Child Sexual Abuse Using College Samples," p. 44.

16. Some actions may be other-things-equal wrong in virtue of having a certain property, e.g., being an intentional violation of a promise. Other actions are almost

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms

132                    PUBLIC AFFAIRS QUARTERLY

always other-thing-equal morally wrong, although the ground for this property varies with the context. My interest here is in both of these positions.

17. I leave aside the issue of whether harm is better understood as an other-things-equal state that might be outweighed by certain benefits or whether it is an all-things-considered state that focuses on the net effect on a person's properly weighted network of interests.

18. I owe this objection to John Kekes.

This content downloaded from
100.34.241.68 on Fri, 12 May 2023 13:38:26 +00:00
All use subject to https://about.jstor.org/terms