UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

STEPHEN KERSHNAR,

                        Plaintiff,

              -vs-

STEPHEN H. KOLISON, JR., in his individual
capacity and his official capacity as the President
of the State University of New York at Fredonia, and

DAVID STARRETT, in his individual capacity and
official capacity as Executive Vice President and
Provost of the State University of New York at
Fredonia,

                    Defendants.

_____

                    23-cv-525

**DEFENDANTS' MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S MOTION FOR
A PRELIMINARY INJUNCTION AND
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

LETITIA JAMES
Attorney General of the State of New York
JENNIFER METZGER KIMURA
ALYSSA JORDAN PANTZER
Assistant Attorneys General, of Counsel
350 Main Street, Suite 300A
Buffalo, NY 14202

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................................................... 1

**STATEMENT OF ALLEGED FACTS** ..................................................................... 4

**LEGAL STANDARD** .......................................................................................... 10

**ARGUMENT** ...................................................................................................... 11

**POINT I: PLAINITFF'S ALLEGATIONS FAIL TO STATE A CLAIM AND PLAINTIFF HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS** ................................................................................................................... 11

    A.   Legal Standard for First Amendment Claims by Public Employees ................................. 11

    B.   Plaintiff Did Not Speak as a Private Citizen................................................. 12

    C.   Plaintiff's Speech Was Not on a Topic of Public Concern................................ 15

    D.   Plaintiff's Speech was Not the Motivating Factor for Fredonia's Actions and Plaintiff Has Not Adequately Pled a Retaliation Claim. ......................................... 19

    E.   Plaintiff's Claim of Prior Restraint Fails ................................................... 21

**POINT II: PLAINTIFF HAS NOT SHOWN IRREPARABLE HARM AND THE BALANCE OF THE EQUITIES FAVORS DEFENDANTS** ................................................. 22

**POINT III: DEFENDANT KOLISON IS SHIELDED BY QUALIFED IMMUNITY AND THEREFORE PLAINTIFF'S CLAIM FOR MONEY DAMAGES SHOULD BE DISMISSED** ......................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*Ahmed v. Long Island Univ.,* 18 F. Supp. 245 (E.D. N.Y. 1998) .................................................. 22

*Albany Welfare Rights Organization Day Care Center, Inc. v. Schreck*, 463 F.2d 620 (2d Cir.

    1972)..................................................................................................................................... 11

*Anderson v. Creighton*, 483 U.S. 635 (1987) ................................................................................. 24

*Anemone v. Metro. Transp. Auth.*, 629 F.3d 97 (2d Cir. 2011) ............................................. 17, 20

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ...................................................................................... 24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................... 11, 24

*Beal v. Stern*, 184 F.3d 117 (2d Cir. 1999) .................................................................................... 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2005) .......................................................................... 11

*Benihana, Inc. v. Benihana of Tokyo, LLC.*, 784 F.3d 887 (2d Cir. 2015)................................... 22

*Berisha v. Lawson*, 141 S. Ct. 2424 (2021) ................................................................................... 18

*Blum v. Schlegel*, 18 F.3d 1005 (2d Cir. 1994).............................................................................. 10

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30

    (2d Cir. 2010) ....................................................................................................................... 10

*City of San Diego v. Roe*, 543 U.S. 77 (2004) ......................................................................... 14, 15

*Connick v. Myers*, 461 U.S. 138 (1983)................................................................................... 15, 25

*Costello v. McEnery*, 767 F. Supp. 72 (S.D.N.Y. 1991)................................................................ 22

*Davi v. Hein*, No. 21-719-cv, 2023 U.S. App. LEXIS 7087 (2d Cir. Mar. 24, 2023) ................. 18

*Elrod v. Burns,* 427 U.S. 347 (1976) ............................................................................................. 23

*Ezuma v. City Univ. of N.Y.*, 367 Fed. Appx. 178 (2d Cir. 2010)................................................. 13

*Flynn v. CNN, Inc.*, 621 F. Supp. 3d 432 (S.D.N.Y. 2022) .......................................................... 18

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 847 F.3d 133 (2d Cir. 2016).. 10

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ........................................................................... *passim*

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ................................................................................ 24

*Harman v. City of N.Y.,* 140 F.3d 111 (2d Cir. 1998) ................................................................ 21

*Heil v. Santoro*, 147 F.3d 103 (2d Cir. 1998) ........................................................................... 16

*Jeffries v. Harleston*, 52 F.3d 9 (2d Cir. 1995) ........................................................................ 12

*Johnson v. Jones*, 515 U.S. 304 (1995) ..................................................................................... 25

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ..................................................... 11-12

*Kirkpatrick v. Washingtonville*, No. 7:09-cv-2591 (WWE), 2011 U.S. Dist. LEXIS 40097

   (S.D.N.Y. Mar. 31, 2011) ..................................................................................................... 21

*Lane v. Franks*, 573 U.S. 228 (2014) .................................................................................. 12, 25

*Levin v. Harleston*, 966 F.2d 85 (2d Cir. 1992) ....................................................................... 20

*Lewis v. Cowen*, 165 F.3d 154 (2d Cir. 1999) ..................................................................... 12, 15

*Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018) ......................................................... 20

*Majorica v. R.H. Macy & Co*., 762 F.2d 7 (2d Cir. 1995) ......................................................... 22

*Malley v. Briggs*, 475 U.S. 335 (1986) .................................................................................... 24

*Marinoff v. City Coll. of N.Y.*, 357 F. Supp. 2d 672 (S.D.N.Y. 2005) ........................................ 21

*Martin v. Warren*, 482 F. Supp. 3d 51 (W.D.N.Y. Aug. 26, 2020) ............................................ 10

*Mastrovincenzo v. City of New Yor*k, 435 F.3d 78 (2d Cir. 2006) .............................................. 10

*Melzer v. Bd. of Educ.*, 336 F.3d 185 (2d Cir. 2003) ........................................................... 19, 21

*Miller v. California*, 413 U.S. 15 (1973) .................................................................................. 15

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ........................................................................... 24, 25

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) .................................... 12

iii

*National Rifle Ass'n of America v. Vullo*, 49 F.4th 700 (2d Cir. 2022) ........................................ 24

*Neu v. Corcoran*, 869 F.2d 662 (2d Cir. 1989) .................................................................... 24-25

*New York v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ...................................................... 10

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................................... 10

*Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67 (2d Cir 1998) ............................................ 24

*Panse v. Eastwood*, 303 Fed. Appx. 933 (2d Cir. 2008) ............................................ 13, 25

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) ............................................................ 6, 14

*Piscottano v. Murphy*, 511 F.3d 247 (2d Cir. 2007) ...................................................... 16, 18

*Rankin v. McPherson*, 483 U.S. 378 (1987) ............................................................... 12, 15

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) .......................................................... 10

*Shady v. Tyson*, 5 F. Supp. 102 (E.D.N.Y. 1998) ...................................................... 22

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995) .............................. 10

*Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969 (2d Cir. 1989) ................................. 22

*United States v. N.Y. City Bd. of Educ.,* 2002 U.S. Dist. LEXIS 23956

   (E.D.N.Y. Jul. 24, 2002) .................................................................................... 22

*Waters v. Churchill*, 511 U.S. 661 (1994) ................................................................. 12

*Weinstein v. Univ. of Conn.*, 753 Fed. Appx. 66 (2d Cir. 2018) .................................... 13

*Weintraub v. Bd. of Educ.*, 593 F.3d 196 (2d Cir. 2010) ............................................. 13

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...................................... 10, 11

**Statutes**

18 U.S.C. § 2251 ........................................................................................................ 19

## **PRELIMINARY STATEMENT**

State University of New York at Fredonia ("SUNY Fredonia") President Stephen H. Kolison, Jr. and SUNY Fredonia Executive Vice President and Provost David Starrett (collectively "Defendants") submit this memorandum of law in Opposition to Plaintiff's Motion for a Preliminary Injunction and in support of Defendants' motion to dismiss the Verified Complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).

The action arises from the steps that Defendants took to keep the SUNY Fredonia campus safe in the aftermath of Dr. Stephen Kershnar ("Plaintiff") appearing on a podcast, *Brain in a Vat*, on January 30, 2022. Plaintiff is a professor of philosophy at SUNY Fredonia. On the podcast, Plaintiff was introduced as "from" SUNY Fredonia and went on to lay out a thought experiment that began: "Imagine that an adult male wants to have sex with a twelve-year-old girl."[1] Plaintiff opined as to why he did not think such adult-child sex was morally wrong. When asked whether there was any age at which sex with a child would be immoral, Plaintiff responded that "the notion that it's wrong even with a one-year-old is not quite obvious to me. There are reports in some cultures of grandmothers fellating the baby boys, to calm them down when [they are] colicky." *Id*. 9:2-7.

Almost immediately thereafter, on February 1, 2022, a Twitter social media account, picked up the statements made by Plaintiff and posted portions of the podcast. The post went viral and resulted in threats of violence directed toward Plaintiff and SUNY Fredonia generally. As a result of these threats, and to preserve the safety of the campus community and prevent further disruption, SUNY Fredonia's then Chief of Police, Brent S. Isaacson, requested that

---

[1] Dkt. No. 3-12, Steinbaugh Decl., Ex. 10, Brain in a Vat, January 30, 2022 Transcript ("BIV Tr.), 2:9-11.

Plaintiff remain off campus to provide a "cooling down" period and to allow law enforcement "to develop more information to guide our threat assessment."  Isaacson Decl., Ex. B.  Isaacson suggested that "[t]he duration of this removal can be assessed on a continuing basis" and conducted periodic additional safety assessments.  *Id*.  The recommendation that Plaintiff remain off campus due to security concerns remains in place.  *Id*.

During this time, Plaintiff has remained employed as philosophy professor at SUNY Fredonia and has been paid his full salary.  Plaintiff has been assigned alternative projects and duties since February 2022.  Most recently, in Spring 2023, SUNY Fredonia instructed Plaintiff to take steps to create an online course.  While Plaintiff took certain steps, he failed to meet a number of required milestones to be able to teach a course online. Melohusky Decl., ¶ 15.

Plaintiff commenced this action pursuant to 42 U.S.C. § 1983, asserting that Defendants' action of "barring Kershnar from campus" deprived him of his right to free speech under the First Amendment of the United States Constitution.  Dkt. 1, ¶ 16.  Plaintiff is requesting injunctive and declaratory relief against both Defendants and money damages against Defendant Kolison.  Plaintiff asserts four causes of action, all under the First Amendment, alleging (1) content and viewpoint discrimination, (2) retaliation, (3) prior restraint and (4) direct and retaliatory infringements of freedom of speech, as to Defendant Kolison.

Having waited a year and half after the incident in question to bring suit, Plaintiff now claims that immediate relief is necessary in the form of a preliminary injunction, "barring Defendants . . . from (a) barring Kershnar from teaching responsibilities due to his exercise of rights protected by the First Amendment, (b) initiating or threatening disciplinary action against Kershnar arising from his commentary on matters of public concern . . . or (c) enforcing the

directive . . . that Kershnar not "be on college property, or have contact with the campus community." Dkt. 3, Pl's Notice of Mot.

Plaintiff is not entitled to the relief he seeks. First, professors at SUNY Fredonia have no right to teach specific classes and teaching assignments are solely within the discretion of the President or his/her designee. *See* Karafa Decl. ¶ 6, Ex. B. Second, SUNY Fredonia has not disciplined Plaintiff for appearing on the Brain in a Vat podcast, does not intend to discipline him for that appearance and now cannot discipline him because the incident in question happened over a year ago, and discipline must be commenced within one year pursuant to the current Collective Bargaining Agreement[2] between Plaintiff's Union (United University Professions) and New York State. Third, Plaintiff has been asked to remain off campus, not due to his speech, but to ensure the safety of himself and the campus community. Though Plaintiff has been assigned off campus duties, his speech has not been limited by Defendants, nor have Defendants issued any directive limiting Plaintiff's speech; Plaintiff is free to continue to engage in any speech he chooses. Plaintiff is therefore not entitled to preliminary injunctive relief.

Plaintiff's Complaint should be dismissed for failure to state a claim for several reasons. First, Plaintiff's graphic speech about adult-child sexual relations was not made as a private citizen on a "matter of public concern" and thus is not entitled to First Amendment protection under *Pickering v. Bd. of Educ.* and its progeny. 391 U.S. 563 (1968). Second, even if Plaintiff's speech was on a matter of public concern, his interests are outweighed by SUNY Fredonia's interest in the safety, security, and efficient operations of the University. Third,

---

[2] The new Collective Bargaining Agreement ("CBA") has not been ratified yet. The current and applicable CBA is available at: https://oer.ny.gov/system/files/documents/2020/05/2016-2022-nys-uup-agreement_final.pdf

Defendant Kolison is entitled to qualified immunity as to Plaintiff's claim for money damages as the law in this area, under these specific factual circumstances, is not clearly established.

## STATEMENT OF ALLEGED FACTS

Plaintiff is a professor at SUNY Fredonia and has been teaching since 1998.  Dkt. 1 ¶ 35. Throughout his career, outside of teaching undergraduate philosophy classes, he has published a multitude of books, scholarly articles, and newspaper articles.  *Id.* ¶¶ 23-26.  Plaintiff's publications routinely address controversial topics including but not limited to torture, slavery, and adult-child sex.  *Id.*  The topic of "adult-child sex" appears on Plaintiff's official SUNY Fredonia faculty page.[3]  SUNY Fredonia hired and promoted Plaintiff throughout his tenure, rising to Chair of the Philosophy Department and to earn the title of Distinguished Teaching Professor.  *Id.* ¶¶ 39-40.  Plaintiff appeared on the *Unregistered* podcast on December 5, 2020 and stated that "some sexual conduct involving minors is not always harmful." *Id.* ¶¶ 54-60.

On January 30, 2022, Plaintiff was the featured guest on the *Brain in a Vat* podcast.  *Id.* ¶ 62.  Plaintiff was introduced "Stephen Kershnar from Fredonia State University in New York." BIV Tr. 2:3-5.  During the podcast, Plaintiff questioned the immorality of adult-child sex.  While engaging in a philosophical "thought experiment," Plaintiff said that he could find no obvious wrong in an adult male engaging in sex with a twelve-year-old girl:

> Imagine that an adult male wants to have sex with a 12-year-old girl. Imagine that she's a willing participant.  A very standard, very widely held view is that there's something deeply wrong about this — and it's wrong independent of it being criminalized.  It's not obvious to me that it's in fact wrong.  I think this is a mistake.

BIV Tr. 2:9-18.  He was then asked by the podcast host whether he would agree that, in considering sex between an adult and a one-year-old, the one-year-old could never give consent

---

[3] https://www.fredonia.edu/academics/colleges-schools/college-liberal-arts-sciences/philosophy/faculty/Stephen-Kershnar

and it would never be permissible in an attempt to find a threshold of consent. He responded that

even sex with a one-year-old is not obviously wrong:

> [T]he notion that it's wrong even with a 1-year-old is not quite obvious to me. There are reports in some cultures of grandmas fellating the baby boys, to calm them down when [they're] colicky. Now, I don't know if this is true, but this is sort of [widely reported] as occurring in at least one culture and it working that the grandmas believe that this actually works. If it were to be true, and again, I don't know it to be true. If it were to be true, it's hard to see what would be wrong with it. So, yeah I guess I think no, I don't think there is a blanket period beyond which this is permissible. BIV Tr. 9:2-18.

The podcast video was posted to Twitter on the day it aired and quickly went viral. *Id.*

¶¶ 73-78. Almost immediately, SUNY Fredonia began receiving various emails, calls, and other

contacts threatening Plaintiff and the SUNY Fredonia community. *See* Isaacson Decl. ¶¶ 13-16.

Many others contacted the University objecting to Plaintiff's statements, expressing disgust

towards his views, and demanding that he be terminated.

SUNY Fredonia received numerous messages over the course of several days. *Id.* at ¶ 25.

Students threatened to leave school, parents threatened to pull their children from enrollment,

and alumni threatened to stop financial support if the University did not remove Plaintiff.

Several of these comments included threats against the University and its administration,

including threats of violence. Examples include:

- "Shame on you, you should resign. We the people are coming for all of the evilness. If your campus is to move forward, I demand to see in the news paper that a investigation of this pervert has started."

- Again resign because you have allowed this demonic activity to take place on campus. I am hopeful as so many of you are arrested, tried, sentenced and hung. You have no right to walk on this earth. You sir, are disgusting. I will be sharing this letter with many."

- "As a parent and grandparent I am disgusted by the comments made by Stephen Kershnar about the acceptability of child and infant sexual exploitation…. I am well acquainted with those who try to sexually exploit children as one of them tried to groom my 9 year old son

many years ago.  He thought I was a stupid, unaware single mother and I would not notice or I would let him have his way.  He changed his perception when I told him I would shoot him if he ever came near my child again, and I meant it.  My father was a military sniper and I don't miss."  Kimura Decl. ¶ 7, Ex. E.

      The University also received hundreds of communications detailing threats against

Plaintiff.  These included:

- "On the subject of adult-child relationships, I find a shovel to the head works for adults. Many such studies have been conducted on this subject. Write an essay and meditate about that you sack of festering rot."

- "Scum. Do you live locally? Fredonia/Dunkirk?"

- "You mentally ill faggot. I hope parents tar, feather, cut your innards out, and drag your body through town. I think society's reaction would be cheers. Non binary people are mentally ill, sorry you were touched as a child. I hope someone, even you, ends your life. Fuck off and die, Steve. pedo, you're going to prison."

- "Straight to hell. I hope it's the most excruciating eternity any soul has ever or will ever experience. No mercy for a man that wants to fuck infants, you disgusting piece of shit. I hope I see your end come across my news feed soon, and I hope it's as bloody and tortuous as you deserve."

- "I saw your Zoom meeting. Nice to see where you stand. Your viewpoints on child RAPE are worthy of having your flesh peeled from your bones while you watch kiddy porn. You are truly a demented individual who will be punished by God along with your sick fucking Loser desciples [*sic*] who think what you spew is OK. Judgement Day for pedophiles is coming. You are Evil."

- "You need to be put down."

- "You should be hung and pissed on! Your death is one small step towards the better safety of our children. It is a terrible witness to the sad state of our society that you openly state your sick and perverted views. Ask Jesus Christ to heal you or spend eternity burning."  Isaacson Decl. ¶ 21, Exh. C.

      On February 2, 2022, one day after the University became aware of the threats against

Plaintiff and the campus community, SUNY Fredonia's Chief of Police, Brent Isaacson,[4] issued

---

[4] Mr. Isaacson was SUNY Fredonia's Chief of Police for four years and retired on June 30, 2023, shortly after this case was filed.  Prior to his employment with SUNY Fredonia, he was a Special Agent with the FBI for over twenty-three years.  Mr. Isaacson's successor, Charles Holder, has also submitted a

a security assessment regarding the situation.  Isaacson Decl. ¶ 13, Ex. B.  Isaacson determined

that Plaintiff's continued presence on campus created a security threat to the SUNY Fredonia

community, and he recommended that Plaintiff be removed from campus and that his contact

with students be discontinued.  In accordance with this recommendation, on February 3, 2022,

Plaintiff was placed on alternative assignment and was "directed not to be on college property, or

have contact with the campus community, except for the following: Human Resources, Dean

Karafa, Provost Startett, University Police, and your union representative." *See* Dkt. 5-3 ("Maria

Carroll Correspondence").

On February 3, 2022, President Kolison issued public remarks which read, in relevant

part, "effective immediately and until further notice, the professor is being assigned to duties that

do not include his physical presence on campus and will not have contact with students…I view

the content of the video as absolutely abhorrent. I cannot stress strongly enough that the

independent viewpoints of this individual professor are in no way representative of the values of

the SUNY Fredonia campus."   Dkt. 1 ¶ 101.

Isaacson issued an updated threat assessment was on March 17, 2022.  Isaacson Decl.

¶¶ 21-36, Ex. C.  He found there was a marked improvement in the intensity of the public's

interest in the matter and this was undoubtedly a direct result of Plaintiff's removal from campus

and discontinuation of his contact with students.  Isaacson Decl. ¶ 22.  Namely, Isaacson found

that President Kolison's public remarks concerning Plaintiff's removal from campus had their

desired effect – the public's outrage and resultant threats of violence against the campus

community were cooled, but unfortunately, were not eliminated.  Isaacson Decl. ¶¶ 23-24.

---

declaration.  Mr. Holder's assessment is the same as Isaacson's.  Holder Decl. ¶¶ 6, 7.

However, Isaacson noted that, according to the most recent research on targeted violence, attackers rarely first communicate specifics as to their impending attacks because they know that doing so limits their ability to carry out an attack.  Isaacson Decl. ¶ 27.  Rather, attackers may intimate that violence is justified without articulating an unequivocal threat.  *Id*.  These are precisely the types of threats that Plaintiff and the campus community received.  Isaacson Decl. ¶ 28.  While SUNY Fredonia monitors and guards against potential attackers, in this matter, Mr. Isaacson and his team found that there was an "enormous" potential population of attackers, highly aggrieved by Plaintiff's statements normalizing child sexual exploitation – this was not a matter of monitoring just the campus community for threats of violence – Plaintiff's comments had incensed a much larger population.  Isaacson Decl. ¶ 31.  Accordingly, Isaacson continued to recommend that Plaintiff remain away from campus.

On August 14, 2022, Isaacson issued an updated threat assessment.  Isaacson Decl.¶ 37, Ex. E.  The ongoing analysis found that Plaintiff's return to campus would pose the unacceptable risk of targeted violence.  Isaacson Decl. ¶ 38.  Isaacson substantiated the assessment with data showing that a motive for vigilante attacks was to target alleged sex offenders and that the public viewed Plaintiff as an advocate of child sexual exploitation and/or a child molester.  Isaacson Decl. ¶¶ 41-42.  Accordingly, Isaacson continued to recommend Plaintiff remain off campus due to the threats of violence.

On October 31, 2022, Isaacson issued another threat assessment, continuing to find that a return of Plaintiff to the campus would pose "an unacceptable risk of an act of targeted violence occurring on [] campus."  Isaacson Decl.¶ 44, Ex. F.  For this assessment, Isaacson consulted with Open Source Intelligence Product from A1C Partners, LLC ("A1C"), which confirmed earlier work by SUNY Fredonia, that a large volume of concerning threats advocating for

violence were circulating on the "dark web" as to Plaintiff's commentary.  Isaacson Decl. ¶ 45.

Most of the comments identified by A1C were posted in antisemitic and racist conversations

blaming pedophilia and other perceived societal ills against the Jewish faith, and as part of a

generalized belief in conspiracy theories.  Isaacson Decl. ¶ 46.  The language used to describe

the types of violence threatened was graphic, and included postings of Plaintiff's faculty website,

specifically identifying Plaintiff's office address.  Isaacson Decl. ¶ 46.

Ultimately Isaacson found, barring an extraordinary and financially prohibitive expansion

of the University Police Department's staffing and capabilities, it is not possible to adequately

protect the SUNY Fredonia campus with Plaintiff on it.  Isaacson Decl. ¶ 50; Holder

Decl. ¶¶ 6, 7.  Due to the continuing threat assessment finding that Plaintiff should remain off

campus, Defendants instructed Plaintiff to take training and steps to develop online courses.

Dkt. 1 ¶ 131.  All professors who are teaching a course online for the first time are required to

complete a series of required courses and provide deliverables by a certain timeframe.

Melohusky Decl. ¶ 7.  Once a professor completes all the required steps needed to teach the

proposed online course, SUNY Fredonia's Office of Online Learning reviews the materials.  *Id.*

¶ 8.  Plaintiff did not complete the requirements by the deadline of March 27, 2023 and failed all

the required steps to teach online at this time.  *Id.* ¶¶ 11, 15.

Plaintiff continues to be paid his full salary, continues to speak on podcasts,[5] and was

offered the opportunity to develop online courses.  Melohusky Decl. ¶¶ 4, 5. Plaintiff has not

been disciplined and will not be disciplined for his statements on the podcast.  CBA at §19.9.

---

[5] Plaintiff appeared on *Brain in a Vat* on February 5, 2023 now with a caveat that he is not speaking on
behalf of his employer.  It may be viewed here: https://www.youtube.com/watch?v=5Tx15Rzo77s

**LEGAL STANDARD**

Preliminary Injunction

A moving seeking a preliminary injunction must establish the following elements:
(1) that there is likelihood of success on the merits; (2) that the party will likely experience
irreparable harm if the preliminary injunction is not issued; (3) the balance of equities tip in their
favor; and (4) that the public interest would not be disserved by the relief.  *Winter v. Nat. Res.
Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Friends of the E. Hampton Airport, Inc. v. Town of E.
Hampton*, 847 F.3d 133, 143 (2d Cir. 2016); *Salinger v. Colting*, 607 F.3d 68, 74 (2d Cir. 2010);
*Blum v. Schlegel*, 18 F.3d 1005, 1016 (2d Cir. 1994) (affirming the district court's denial of
preliminary injunctive relief).

The initial step of inquiry requires that Plaintiff demonstrate a likelihood of success on
the merits.  The movant must show a "clear" or "substantial" likelihood of success on the merits.
*New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (*citing Beal v. Stern*, 184 F.3d 117,
123 (2d Cir. 1999)).  A heightened 'substantial likelihood' standard is required when the
requested injunction would provide the plaintiff with all the relief that is sought and could not be
undone by a judgment favorable to defendants on the merits at trial.   *Citigroup Global Markets,
Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, at 35 n. 4 (2d Cir. 2010);
*Mastrovincenzo v. City of New Yor*k, 435 F.3d 78, 90 (2d Cir. 2006) (*quoting Tom Doherty
Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34-35 (2d Cir. 1995)).

The final two factors, "the balance of equities and the public interest merge when . . . the
Government is the opposing party." *Martin v. Warren*, 482 F. Supp. 3d 51, 68 (W.D.N.Y.
Aug. 26, 2020) (*citing Nken v. Holder*, 556 U.S. 418, 435 (2009)).  This Court "must balance the
competing claims of injury and must consider the effect on each party of the granting or

withholding of the requested relief.  *Winter*, 555 U.S. at 24.  The *Winter* Court continued "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Id.*

Motion to Dismiss Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2005)).  Legal conclusions, deductions, or opinions are not given a presumption of truthfulness.  *See, e.g., Iqbal*, 556 U.S. at 678; *Albany Welfare Rights Organization Day Care Center, Inc. v. Schreck*, 463 F.2d 620 (2d Cir. 1972).

## ARGUMENT

### POINT I: PLAINTIFF'S ALLEGATIONS FAIL TO STATE A CLAIM AND PLAINTIFF HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

A. Legal Standard for First Amendment Claims by Public Employees

The Supreme Court "has made clear that public employees do not surrender all their First Amendment rights by reason of their employment."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).  Public employees may be entitled to the protections of the First Amendment "in certain circumstances," when they "speak as a citizen addressing matters of public concern."  *Id.* Conversely, when public employees speak pursuant to their official duties, they "are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Id*.

When a public employee does speak as a citizen addressing a matter of public concern, the court "should attempt to engage in 'a delicate balancing of the competing interests surrounding the speech and its consequences.'"  *Kennedy v. Bremerton Sch. Dist*., 142 S. Ct.

2407, 2423 (2022) (*quoting Garcetti* 547 U.S. at 423).  This balancing test was established in *Pickering*, 391 U.S. 563, and later refined in subsequent cases including *Garcetti* and *Lane v. Franks*, 573 U.S. 228 (2014).  "*Pickering* provides the framework for analyzing whether the employee's interest or the government's interest should prevail in cases where the government seeks to curtail the speech of its employees."  *Lane*, 573 U.S. at 236.  "[T]he state interest element of the test focuses on the effective functioning of the public employer's enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

"When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her."  *Waters v. Churchill*, 511 U.S. 661, 675 (1994).  When speech has the potential to cause significant interference with the effective functioning of the public employer, the government's interests will typically prevail. Moreover, "[t]he State need show only a 'likely interference' with its operations, and 'not an actual disruption.'"  *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir. 1999) (*quoting Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir. 1995)).

"[I]f the employee succeeds in demonstrating that his speech is constitutionally protected under *Pickering*, he must then prove that the speech was a substantial or motivating factor in the adverse employment action," under a test first developed in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977).  *Lewis*, 165 F.3d at 163.  The employer rebuts that showing if "it would have taken the same action even in the absence of the protected speech."  *Id.*

> B.   Plaintiff Did Not Speak as a Private Citizen

Under *Garcetti* "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution

does not insulate their communications from employer discipline." *Garcetti*, 410 U.S. at 421.  It

remains "an open question in this Circuit whether *Garcetti* applies" in the academic context.

*Panse v. Eastwood*, 303 Fed. Appx. 933, 934 (2d Cir. 2008).  However, the Second Circuit has

applied *Garcetti* in several summary orders addressing First Amendment claims by university

professors.  *See, e.g.*, *Weinstein v. Univ. of Conn.*, 753 Fed. Appx. 66, 68 (2d Cir. 2018)

(applying *Garcetti* to First Amendment claim by professor denied reappointment); *Ezuma v. City

Univ. of N.Y.*, 367 Fed. Appx. 178, 180 (2d Cir. 2010) (holding that speech "did not pertain to a

matter of public concern" under *Garcetti*).

To the extent *Garcetti* applies in the academic context, Plaintiff's speech is not entitled to

First Amendment protection because he was speaking pursuant to his official duties.  Plaintiff is

a philosophy professor, who was speaking on a philosophy podcast about a topic of his academic

research he conducted as a part of his job duties.  Plaintiff alleges that his podcast appearances

"were not part of his official duties," (Dkt. 1 ¶ 70), but "the listing of a given task in an

employee's written job description is neither necessary nor sufficient to demonstrate that

conducting the task is within the scope of the employee's professional duties for First

Amendment purposes."  *Garcetti*, 547 U.S. at 425; *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 201

(2d Cir. 2010) ("speech can be 'pursuant to' a public employee's official job duties even though

it is not required by, or included in, the employee's job description, or in response to a request by

the employer.")

Plaintiff was introduced on both the *Brain in a Vat* and *Unregistered* podcasts as a

philosophy professor "from" SUNY Fredonia and he spoke about a topic listed on his official

university biography.[6]  Plaintiff also wrote a book on this subject while employed at SUNY

---

[6] Plaintiff's SUNY Fredonia biography can be found at: https://www.fredonia.edu/academics/colleges-schools/college-liberal-arts-sciences/philosophy/faculty/Stephen-Kershnar

Fredonia.  Dkt. 1, ¶ 25.  In the forward of his book, <u>Pedophilia and Adult-Child Sex: A Philosophical Analysis</u>, he acknowledged that much of the book was based on discussions with colleagues "while watching football, drinking wine, or hanging out in the office." Kimura Decl., ¶ 3, Ex. A.  Plaintiff also individually credited colleagues employed at SUNY Fredonia.

In short, in his podcast appearance, Plaintiff was unequivocally speaking on his academic research and an area he researched, wrote, and taught about while being paid a salary by SUNY Fredonia.  Plaintiff's invitation to appear on the podcasts was attributable to his status as a professor at SUNY Fredonia.  The Supreme Court has been clear that, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen."  *Garcetti*, 547 U.S. at 421-22.

Plaintiff contends his speech was extramural because it was made "at home" and "outside of his regular working hours."  Dkt 1. ¶¶ 65-67.  But Plaintiff is not an hourly employee who is on the clock from 9-5; he is a salaried university professor.  Plaintiff's appearance on the podcasts from home, which was almost certainly due to the COVID-19 pandemic, is irrelevant.

Even salaried employees who were speaking off the clock and from their home have been found to be speaking not as a private citizen when their speech was purposefully linked to their employer.  In *City of San Diego v. Roe*, 543 U.S. 77, 81 (2004), the Supreme Court held that a police officer performing sexual acts on video while in uniform but off duty was speaking related to his employment, reasoning that "[f]ar from confining his activities to speech unrelated to his employment, [the officer] took deliberate steps to link his videos and other wares to his police work, all in a way injurious to his employer."  Here, Plaintiff was introduced on both podcasts as "from" SUNY Fredonia.  He took no steps to distance his statements from his employer, such as explaining that his statements express solely his own views and not those of his employer.

14

### C.  Plaintiff's Speech Was Not on a Topic of Public Concern

Even if the Court finds Plaintiff's speech was made "as a private citizen," it was nonetheless not on a matter of public concern.  "[W]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). The Supreme Court has been clear that "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication."  *Roe*, 543 U.S. at 83-84.

While courts often focus on whether speech is addressed to a "purely private matter," *see Lewis*, 165 F.3d at 164, that is not determinative.  Speech being addressed to a purely private matter is a sufficient – but not a necessary – reason to hold that speech is not addressing a matter of public concern.  The Court must look to whether the topic is "of value and concern to the public at the time of publication."  *Roe*, 543 U.S. at 83-84.  This standard is similar to one element of the test used for obscenity, which looks to "the average person, applying contemporary community standards."  *Miller v. California*, 413 U.S. 15, 33 (1973).

The Supreme Court has admonished that the "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin*, 483 U.S. at 387.  Thus, for example, "negative comments about the President of the United States" no matter how inappropriate or controversial will still touch on a matter of public concern because they are about the President.  *Roe*, 543 U.S. at 83-84.  However, the converse is not true: simply because speech is inappropriate or controversial does not somehow transform the topic into a matter of public concern.

While Plaintiff styles his speech as focused on "age of consent laws" and "morality" (Dkt. 1 ¶¶ 59-60), his speech certainly went beyond this.  Discussion of what the law should be is plainly a topic of public concern.  But Kershnar asked his audience to "imagine" an adult male who "wants to have sex with a 12-year-old girl."  Dkt. 1 ¶ 68.  He also graphically discussed "grandmothers fellating the baby boys" who are "one year old."  BIV Tr. 9:3-6.  These topics were not of value and concern to the public at the time of publication.  This country finds adult-child sex to be of so little social value that we have criminalized it as well as any depictions of it.  *See* 18 U.S.C. § 2251, *et seq.*  The Court need not make any major inferential leap to hold that speech about sex between grandmothers and their one-year-old grandchildren is not a topic that is of "value," "concern" or of "legitimate news interest" to the contemporary American public.

A.  Plaintiff Caused the Potential for Substantial Disruption at SUNY Fredonia

Under the *Pickering* test, even if the Court finds that Plaintiff's speech was made as a private citizen on a matter of public concern, Defendants' actions were justified because of the actual and potential disruption to the SUNY Fredonia campus caused by Plaintiff's speech – namely the numerous and extreme threats of violence directed to Plaintiff and the broader SUNY Fredonia community, including Defendants – outweighs Plaintiff's interests.  *See Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir. 1998) (citation omitted).

Defendants should prevail if they "can show that [they] reasonably believed that the speech would potentially interfere with or disrupt the government's activities," and "that the potential disruptiveness was sufficient to outweigh the First Amendment value of that speech."  *Id.*  The government may point to the reasonable potential impact of the speech on, among other things, "maintaining efficiency, discipline, and integrity, preventing disruption of operations, and avoiding having the judgment and professionalism of the agency brought into serious disrepute."

*Piscottano v. Murphy*, 511 F.3d 247, 271 (2d Cir. 2007).  Here, the potential for disruption from Plaintiff's speech was immense, and the value of Plaintiff's speech, as explained, was minimal.

That Plaintiff's speech caused a tidal wave of threats to him and the SUNY Fredonia community cannot be seriously disputed on the record currently before the Court.  Defendants have provided the Court with some of the dozens of explicit threats made against Plaintiff following his appearance on the podcasts.  Plaintiff's contention that "SUNY Fredonia records do not reflect reports of threats of violence" (Dkt. 1 at ¶ 25) is belied by documentary evidence. The security risk posed by the reaction to Plaintiff's speech is well documented by SUNY Fredonia's then Chief of Police, a former Special Agent for the FBI, Brent Isaacson. *See* Isaacson Decl. ¶¶ 13, 21, 37, 44.  This view is echoed by SUNY Fredonia's current interim Chief of Police, Charles Holder.

Plaintiff alleges, based on narrowly worded Freedom of Information Law requests for specific threats sent to certain law enforcement agencies, that this security risk was essentially feigned as a pretext for his removal from campus based because SUNY Fredonia's administration did not like the content of his speech.  But as Chief Isaacson explains, it is unlikely that an individual that actually plans to engage in targeted violence would make an explicit threat and reveal their plans.  (Isaacson Decl. ¶¶ 17, 27-29).  Defendants appropriately relied on the judgment of SUNY Fredonia's then Chief of Police when deciding how to respond to the fallout caused by Plaintiff's speech.

Even if the Court accepts Kershnar's incorrect allegations about the absence of threats (Dkt. 1 ¶¶ 138-151), that is not determinative for the legal analysis the Court is required to conduct.  What matters is whether the "employer's prediction of the disruption that such speech will cause is reasonable."  *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 115 (2d Cir. 2011)

Therefore, "[e]vidence that such harms or disruptions have in fact occurred is not necessary." *Piscottano,* 511 F.3d at 271; *see also Davi v. Hein,* No. 21-719-cv, 2023 U.S. App. LEXIS 7087, at *6 (2d Cir. Mar. 24, 2023).

Plaintiff's statements on the podcasts make him appear to be a defender of pedophilia.  In the contemporary political environment, there have been many threats and acts of violence against those perceived to be associated with such views.  *See, e.g., Flynn v. CNN, Inc*., 621 F. Supp. 3d 432, 438 (S.D.N.Y. 2022) ("a QAnon follower is an adherent to the QAnon belief system – including the belief that a high-ranking government insider known as 'Q' is exposing a cabal of Satan-worshipping pedophiles which controls the government."); *Berisha v. Lawson*, 141 S. Ct. 2424, 2425 (2021) (Thomas, J., dissenting from denial of *cert*) (discussing "the shooting at a pizza shop rumored to be "the home of a Satanic child sex abuse ring'") (citation omitted).  Against this backdrop, Defendants' anticipation of threats of violence against the SUNY Fredonia campus community were eminently reasonable.

These threats must be weighed heavily when engaging in *Pickering* balancing.  If First Amendment rights can be curtailed based on concerns around "efficiency" and preventing "disruption" of operations, *Piscottano*, 511 F.3d at 271, then certainly the grave threat of targeted violence directed to the SUNY Fredonia campus must be sufficient.  In addition to the threats of violence – which were the principal reason for Defendants' actions – the SUNY Fredonia campus was predictably disrupted in other ways by Plaintiff's speech.  Alumni threatened to pull and withhold financial support, students threatened to disenroll, and parents threatened to disallow their children from attending SUNY Fredonia. Kimura Decl.¶¶ 5-6, Ex. C, D. In engaging in *Pickering* balancing, "[a]ny actual disruption that has already occurred is of course a persuasive argument for the government that it has met its burden, but even a showing of

probable future disruption may satisfy the balancing test, so long as such a prediction is reasonable." *Melzer v. Bd. of Educ.*, 336 F.3d 185, 197 (2d Cir. 2003)

In *Melzer*, the Second Circuit upheld the firing of a high school teacher who was a member of the North American Man/Boy Love Association, a group that advocated for permitting sexual relations between adult men and minor boys. The Court's conclusion was driven in large part by the potential and actual disruption caused by the teacher:

> Parents are not outsiders seeking to heckle Melzer into silence, rather they are participants in public education, without whose cooperation public education as a practical matter cannot function. Any disruption created by parents can be fairly characterized as internal disruption to the operation of the school, a factor which may be accounted for in the balancing test and which may outweigh a public employee's rights.

*Melzer*, 336 F.3d at 199. Although *Melzer* involved a high school teacher and Plaintiff is a university professor, similar concerns apply here. SUNY Fredonia has a number of minors on campus, including many taking courses. Kimura Decl. at ¶ 4, Ex. B. And the SUNY Fredonia student population undoubtedly includes a number of survivors of childhood sexual abuse. Many students expressed their deep discomfort about the potential of being in the classroom with Plaintiff with several stating they were "scared" and felt "unsafe." Kimura Decl. ¶ 5, Ex. C.[7]

As a result of Plaintiff's speech, Defendants reasonably anticipated that SUNY Fredonia would be subject to substantial disruption, and such disruption occurred. These facts, coupled with the grave nature of the threats of violence to the SUNY Fredonia community, mean that Plaintiff's First Amendment claims fail under *Pickering*.

---

[7] Specifically, the article in The Leader, SUNY Fredonia's Student-Run Newspaper, p. 7, entitled "Students respond to the Kershnar situation and share their experiences."

D. Plaintiff's Speech was Not the Motivating Factor for Fredonia's Actions and Plaintiff Has Not Adequately Pled a Retaliation Claim.

Plaintiff's First Amendment claims, including his retaliation claim, fail absent a showing that his speech was the "but-for cause" of Defendants' actions. *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1952 (2018). Thus, there is no liability if Defendants can show that they would have taken the same adverse action in the absence of the protected speech. *Anemone*, 629 F.3d at 114. In addition, to state a First Amendment retaliation claim, Plaintiff must also show that he suffered an adverse employment action. Plaintiff has failed to do so here.

Plaintiff has continued to receive his full salary. Plaintiff has not been disciplined for his appearance on the podcasts. Plaintiff was presented with an opportunity to develop online courses, but Plaintiff failed to complete the required steps in a timely manner. Melohusky Decl. ¶¶ 11, 15. And while Plaintiff complains about not being given an in-person classes to teach, it is the Provost who determines teaching assignments, which are entirely within his discretion. Karafa Decl. ¶ 6, Ex. B.

Plaintiff relies heavily on *Levin v. Harleston*, 966 F.2d 85, 88 (2d Cir. 1992) in asserting that "[b]ecause Defendants' responses surpass the unconstitutional steps taken in *Levin*, they are adverse employment actions." (Pl's Mem. at 22.) But *Levin* did not address the question of whether the speech in question was protected under *Pickering* and is therefore inapposite. If Defendants succeed under *Pickering*, Plaintiff's First Amendment claims fail.

Even if this Court finds that Plaintiff has suffered an adverse employment action by being asked to remain off campus, Plaintiff's speech was not the but-for cause of Defendants' actions. Instead, Defendants were motivated entirely by seeking to avoid disruption and injury to those on campus, as a result of threats and acts of violence to the campus community.

SUNY Fredonia hired Plaintiff in 1998.  Dkt. 1 ¶ 35.  Plaintiff has a "long history of provocative philosophical inquiry and teaching." *Id.* at p. 6.  Plaintiff rose to full professor and then Distinguished Teaching Professor.  *Id.* ¶¶ 36, 40.  Plaintiff published a book in 2015, Pedophilia and Adult-Child Sex: A Philosophical Analysis.  *Id.* ¶ 25(c).  SUNY Fredonia continues to publish Kershnar's biography on their website where they acknowledge that Plaintiff published articles and books on the topic of adult-child sex.

In *Melzer*, the Second Circuit held "the fact that the Board knew of Melzer's NAMBLA membership as early as the mid-1980s and did not terminate him until after his membership became public knowledge makes it highly implausible that a retaliatory motive was the lever for the Board's action dismissing him."  336 F.3d at 200.  The same is true here.  Defendants were aware of Plaintiff's provocative views.  It was only when the serious threats of harm towards Plaintiff and the entire campus community, along with disruption impairing SUNY Fredonia's daily operations, arose that Plaintiff was asked to not be physically present on campus. Defendants' actions were a response to these threats and disruptions, not to Plaintiff's speech.

### E.   Plaintiff's Claim of Prior Restraint Fails

Plaintiff asks the Court to apply prior restraint case law.  However, where a restriction on speech is "'particularized' instead of 'generally applicable . . . the balancing standard from *Pickering*" will apply."  *Marinoff v. City Coll. of N.Y.*, 357 F. Supp. 2d 672, 687 (S.D.N.Y. 2005); *see Kirkpatrick v. Washingtonville*, No. 7:09-cv-2591 (WWE), 2011 U.S. Dist. LEXIS 40097, at *24 (S.D.N.Y. Mar. 31, 2011) ("the *Pickering* balancing test favors a finding that the gag order was narrowly tailored to uphold an important government interest"); *Harman v. City of N.Y.,* 140 F.3d 111, 118 (2d Cir. 1998) (noting that "concerns that lead courts to invalidate a statute on its face may be considered as factors in balancing the relevant interests under

*Pickering*.")  To the extent that Defendants prevail under *Pickering*—which for the reasons

stated above—they do, Plaintiff has no claim based upon prior restraint.

### POINT II: PLAINTIFF HAS NOT SHOWN IRREPARABLE HARM AND THE BALANCE OF THE EQUITIES FAVORS DEFENDANTS

Plaintiff carries the burden to show that, in the absence of the injunction, he will suffer

irreparable harm.  *Benihana, Inc. v. Benihana of Tokyo, LLC.*, 784 F.3d 887, 895 (2d Cir. 2015).

Irreparable harm must be imminent, not remote or speculative.  *Tucker Anthony Realty Corp. v.

Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989).  Delay in seeking enforcement of one's rights

"tends to indicate at least a reduced need for such drastic, speedy action and may indicate an

absence of the kind of irreparable harm required to support a preliminary injunction."  *United

States v. N.Y. City Bd. of Educ.,* 2002 U.S. Dist. LEXIS 23956 *15 (E.D.N.Y. Jul. 24, 2002); *see

also Majorca v. R.H. Macy & Co*., 762 F.2d 7, 8 (2d Cir. 1995); *Ahmed v. Long Island Univ.,* 18

F. Supp. 245, 249 (E.D. N.Y. 1998) (plaintiff's fifteen-month delay requesting a preliminary

injunction undermined his motion); *Shady v. Tyson*, 5 F. Supp. 102, 108 (E.D.N.Y. 1998) ("This

delay in seeking relief bolsters the Court's conclusion that there has been an insufficient showing

of irreparable harm to justify issuance of a preliminary injunction.") (*quoting Costello v.

McEnery*, 767 F. Supp. 72, 75 (S.D.N.Y. 1991), *aff'd* 948 F.2d 1278 (2d Cir. 1992)).

Plaintiff was removed from campus on February 2, 2022, and was requested to remain off

campus at that time.  Dkt. 3-1, at p. 10.  Plaintiff now seeks the extraordinary remedy of an

immediate preliminary injunction more than sixteen months later.  His significant delay seriously

undercuts Plaintiff's claim of irreparable harm.

Furthermore, Plaintiff argues that this element is met by claiming only that absent a court

ordered preliminary injunction, he will continue to be exiled from the classroom.  Dkt. 3-1, at p.

13.  Plaintiff argues "[t]he loss of First Amendment freedoms 'for even minimal periods of time'

22

is always irreparable harm." (Pl's Mem. at 7) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)). But Plaintiff has not endured "loss of First Amendment freedoms." In fact, Plaintiff has retained full professor status including his full salary. He was not terminated or disciplined, and no Court order is needed to enjoin such actions. Plaintiff continues to speak on various platforms, including the *Brain in a Vat*[8] podcast. And Plaintiff was offered the opportunity to develop online classes. Melohusky Decl. ¶¶ 4-5.

The determination of who teaches what class at SUNY Fredonia is discretionary and is up to the Provost and his/her designee. Karafa Decl. ¶ 6, Ex. B. There may be a variety of reasons that a professor is not given certain in-person teaching assignments for a period of time, for example as was broadly the case during the COVID-19 pandemic. But simply because a professor is not offered the opportunity to teach in class does not mean that their First Amendment rights are violated. Plaintiff has no entitlement to an injunction "barring Defendants from barring Kershnar from teaching responsibilities" because no such bar exists.

The principal relief Plaintiff seeks is to be permitted to return to campus. But an order granting that relief would potentially lead to the disruption and security threats that Defendants' actions were taken to avoid. Granting such relief could lead to truly irreparable harm to the SUNY Fredonia community.

The balance of the equities in this case tip sharply in favor of Defendants. Plaintiff remains employed as a professor and is being paid his full salary. The only harms he has suffered is a lack of physical access to the campus. When balanced against the significant safety concerns that would arise were Plaintiff to return to campus, the scales tip decidedly in Defendants' favor.

---

[8] A list of podcasts where Plaintiff has spoken can be found here:
https://podcasts.apple.com/za/podcast/brain-in-a-vat/id1509951964

**POINT III: DEFENDANT KOLISON IS SHIELDED BY QUALIFED IMMUNITY AND THEREFORE PLAINTIFF'S CLAIM FOR MONEY DAMAGES SHOULD BE DISMISSED**

Plaintiff seeks "compensatory and nominal damages against President Kolison."  Dkt. 1 ¶ 257.  Because President Kolison is entitled to qualified immunity, Plaintiff's claim for money damages should be dismissed.

Qualified immunity shields government officials performing discretionary functions from suits for money damages unless their conduct violates clearly established law of which a reasonable official would have known.  *National Rifle Ass'n of America v. Vullo*, 49 F.4th 700, 714 (2d Cir. 2022); *citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  It gives government officials breathing room to make reasonable, even if mistaken, judgments and protects "all but the plainly incompetent or those who knowingly violate the law."  *Id.* (*citing Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  It applies unless (1) the plaintiff sufficiently pleaded a constitutional violation; and (2) the law the official allegedly violated was clearly established and apparent to a reasonable official at the time of the alleged conduct.  *Id.* (*citing Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) and. *Iqbal*, 556 U.S. at 673.)

"[A]n affirmative defense of official immunity should be resolved as early as possible by the court and may be resolved by Rule 12(b)(6) if clearly established by the allegations within the complaint."  *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir 1998) (internal citations omitted).  Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Id.* at 526; *see Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  Notably, an official is liable only if the contours of the rights allegedly violated are sufficiently clear, at the time of the actions in question, that a reasonable official would understand his actions violated the right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Neu v. Corcoran*, 869 F.2d 662, 665 (2d Cir.

1989).  If there is a "legitimate question about the right in question, qualified immunity attaches."  *Mitchell* at 535 n.12 (1985); *Johnson v. Jones*, 515 U.S. 304, 312 (1995).

It is currently an open question of whether *Garcetti* applies in the academic context in the Second Circuit.  *Panse*, 303 Fed. Appx. at 934.  To the extent *Garcetti* applies, Plaintiff's speech on a topic of his academic research at SUNY Fredonia is not speech as a private citizen and is therefore not entitled to Frist Amendment protection.  In light of this ambiguity, Defendants cannot be said to have violated clearly established law.  *See, e.g. Lane*, 573 U.S. at 245 (affirming grant of qualified immunity because "Circuit precedent did not provide clear notice that [the speech in question] is speech of a citizen entitled to First Amendment protection.").

The Supreme Court has acknowledged that *Pickering* involves "particularized balancing" and "is difficult."  *Connick*, 461 U.S. at 150 (1983).  *Pickering* and its progeny do not provide a bright line rule.  Plaintiff has not adequately alleged a First Amendment violation for the reasons discussed above.  But even if the Court ultimately disagrees with Defendants' position, their actions cannot be said to have violated clearly established law.

In the wake of the enormous backlash and threats of violence to the SUNY Fredonia campus following Plaintiff's remarks, President Kolison took steps to keep the campus safe.  These steps were recommended by the campus's Chief of Police.  Even if this Court would now weigh the factors differently, it cannot be said that President Kolison acted incompetently or with the intent to violate the law.  He acted to ensure the safety of the campus and to avoid a serious threat of disruption.  President Kolison is therefore entitled to qualified immunity.

## **CONCLUSION**

For all the reasons stated herein, Defendants respectfully request that the Court deny Plaintiff's Motion for a Preliminary Injunction and grant Defendants' Motion to Dismiss.

DATED:      July 24, 2023                    **LETITIA JAMES**
            Buffalo, New York                Attorney General of the State of New York
                                             Attorney for Defendants

                                  BY:        _s/ Jennifer Metzger Kimura_
                                             JENNIFER METZGER KIMURA
                                             ALYSSA PANTZER JORDAN
                                             Assistant Attorneys General of Counsel
                                             Main Place Tower
                                             350 Main Street, Suite 300A
                                             Buffalo, New York 14202
                                             (716) 853-8477
                                             Jennifer.Kimura@ag.ny.gov
                                             Alyssa.Pantzer@ag.ny.gov