UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

STEPHEN KERSHNAR,

                            Plaintiff,

                -vs-                                                    23-CV-525

                                                            **DECLARATION OF**
STEPHEN H. KOLISON, JR., in his individual              **BRENT S. ISAACSON**
capacity and his official capacity as the President
of the State University of New York at Fredonia, and

DAVID STARRETT, in his individual capacity and
official capacity as Executive Vice President and
Provost of the State University of New York at
Fredonia,

                            Defendants.
_____

        **BRENT S. ISAACSON** declares under penalty of perjury that the following is true and

correct in accordance with 28 USC § 1746:

        1.      I was the Chief of Police for the State University of New York at Fredonia

("SUNY Fredonia") during the relevant time period in this action.  I retired on June 30, 2023.

        2.      I respectfully submit this Declaration in support of Defendants' Opposition to

Plaintiff's Motion for Preliminary Injunction and in support of Defendants' Motion to Dismiss.  I

make this declaration based upon my personal knowledge of this matter, my training and

experience in threat assessments and threat mitigation, and my personal review of documents

provided to me by counsel.

                **RELEVANT BACKGROUND OF BRENT ISAACSON**

        3.      I am a former Special Agent of the Federal Bureau of Investigation ("FBI"),

having served in the Washington, DC field office of the FBI for over 2 years and the Buffalo

1

field office of the FBI for over 20 years.  For most of my tenure in the FBI's Buffalo Division, I served as the primary coordinator for the FBI's National Center for the Analysis of Violent Crime ("NCAVC") and the FBI's Behavioral Analysis Unit ("BAU"), which are based in Quantico, Virginia.  A copy of my curriculum vitae is attached as Exhibit A.

4.      The NCAVC and BAU are specialized units staffed by Special Agents and Analysts who conduct research, training, and case consultations which focus on the behaviors exhibited by a range of criminal actors, including serial killers, child abductors, and active shooters.  The NCAVC and BAU provide advice to law enforcement investigators to solve and prevent particularly serious crimes.

5.      My responsibilities as FBI-Buffalo's primary NCAVC and BAU coordinator included providing NCAVC and BAU support to police investigators in the Western District of New York who were investigating particularly serious violent crimes, including murders, child abductions, and sexual exploitation.  Importantly for the instant matter before the Court, I was also responsible for assisting police departments, universities, and K through 12 public schools when they identified persons of concern who might be planning an act of targeted violence, such as an active shooting incident.

6.      After the tragic active shooting incident at Sandy Hook Elementary School in 2012, the FBI's BAU created a specialized unit called the Behavioral Threat Assessment Center ("BTAC").  BTAC is a national-level, multi-agency, multi-disciplinary task force focused on the prevention of terrorism and targeted violence through the application of behaviorally based operational support, training, and research. The task force routinely conducts research to learn from past events, enhance and improve future prevention efforts, and provide training opportunities.

2

7.      As FBI-Buffalo's NCAVC and BAU coordinator, I received advanced training in behavioral threat assessments and threat mitigation from the BTAC.  This training included classroom instruction from researchers and BTAC personnel in the practical application of threat assessments in real world cases.

8.      In 2014, I earned a Master's degree in General Psychology.  I focused my academic work on examining and understanding research into the behaviors persons exhibit before they carry out an act of targeted violence, such as an active shooting incident at a school or university.  As a part of my work as FBI-Buffalo's primary NCAVC and BAU coordinator, I was intimately involved in many investigations of persons in Western New York who were exhibiting behaviors which indicated they may have been planning an act of targeted violence.  The aim of all of these investigations was to prevent acts of targeted violence, and all of these investigations were successful in that regard.

9.      In 2018, I co-founded with the Chautauqua County District Attorney's Office a specialized unit called the School Threat Assessment and Response ("STAR") team.  The STAR team's mission is to assist school districts in the county to assess and mitigate the threats to school safety posed by anyone identified as possibly considering an act of planned, targeted violence such as a school shooting. This team is comprised of experienced and senior officials in agencies spanning many disciplines – law enforcement, mental health, child protective services, health and human services, probation, prosecuting attorneys, and education.  It serves as a "one stop shop" for county K-12 school administrators to turn to when they have identified a person-of-concern who may pose a serious safety risk to their school. Using the FBI's approach to assessing threats and mitigating those threats through a multidisciplinary approach, the STAR team brings to county school districts the needed expertise, authorities, and resources to prevent

violence by persons-of-concern.  In 2019, the STAR team was recognized as a best practice by the National Prosecutors' Consortium.

10.     As the Chief of Police at SUNY Fredonia, I was a member of the Students of Concern Team, a multi-disciplinary team of SUNY Fredonia professionals, including New York State certified mental health counselors and officials who are expert in student affairs, academic affairs, and student misconduct investigations and adjudications.  The Students of Concern Team's mission is to identify and support students who may be struggling with mental health and other issues which interfere with their success at the university.  With my training and experience, I reviewed all of the cases managed by the Students of Concern Team with the goal of identifying behaviors which may have indicated a student was considering a violent act.  In a small number of cases, I developed threat mitigation plans to ensure a student would not act out violently.

11.     During my law enforcement career in the FBI and at SUNY Fredonia, I provided threat recognition and threat assessment training to over 5,000 school administrators, faculty, staff, and law enforcement officers.  I provided this training to nearly all of the University Police chiefs and criminal investigators, student conduct directors, and several behavioral intervention teams in SUNY campuses across New York State.  This training equipped attendees with information on the pre-attack behaviors exhibited by persons who carry out acts of mass targeted violence, and how to best assess and mitigate the threats such persons pose.

12.     Based on the foregoing information, I submit that my training and experience in the field of threat assessments and threat mitigation is much more advanced than that of most law enforcement professionals.  As detailed below, the advice and recommendations I provided to

4

administrators at SUNY Fredonia in the matter before this Court involving Dr. Stephen Kershnar ("Kershnar") were based on my training and experience in the field of threat assessments.

### ISAACSON'S RECOMMENDATIONS TO SUNY FREDONIA ADMINISTRATORS

13.     On February 2, 2022, I provided a threat assessment and recommendation to SUNY Fredonia administrators, as discussed below.  A copy of the February 2, 2022, threat assessment is attached as Exhibit B.

14.     On February 1, 2022, University Police at Fredonia became aware of social media posts and traditional media inquiries into online videos showing SUNY Fredonia Professor Dr. Kershnar apparently providing rationalizations for allowing sexual contact between adults and underage children, including children as young as infants. These videos were posted on various social media outlets, like Twitter and Tik Tok, and were quickly picked up and promulgated across the country by major media outlets.

15.     I know from extensive training and experience in the FBI that targeted violence against individuals and institutions starts with deeply held grievances. I also know that there is a massive population of Americans who were either victims of child sexual exploitation in their youth or who have their own children who were victimized by others. It is difficult to imagine a circumstance where a topic so deeply grieving to so many has been broadcast in such a deeply offensive way to such a large population. This situation has, in effect, given potential offenders a target upon which to focus their grievances against those who sexually exploit children.

16.     I followed closely the social media posts from a threat assessment perspective for our campus. Nearly all the posts were authored by people expressing disgust and revulsion at Kershnar's messages. However, a significant percentage of the posts referred to violence as a way "to deal" with Kershnar.  Images of guns, bullets, woodchippers, lynching, and verbal

references to violence are examples that were common in these posts.  Most were directed toward Kershnar, but all the authors knew that he was an employee on our campus. Many viewed the campus as tolerant of or complicit in Kershnar spreading rationalizations for sexual crimes against children.

17.     Many laypersons, without training or experience in threat assessments, view explicit and articulated threats as the most credible and serious. In fact, they rarely are. We often say in threat assessments, "hunters don't howl, and howlers don't hunt."  Accordingly, my concern is directed to the much larger audience who have remained silent. They have seen Kershnar's videos, know that he works on this campus, and yet they have not commented. These circumstances have created a very large pool of people outside of our campus whose understanding is that an advocate of child sexual exploitation works here.

18.     Accordingly, my professional opinion is that Kershnar's continued physical presence on our campus or continuing professional contact with our students will continue to magnify the grievances against pedophiles that many potential violent actors harbor. His continued presence will be the source of growing attention by traditional and social media, which will create a growing likelihood that someone may come on our campus to engage in violence against Kershnar or those they perceive as approving of him.

19.     I recommended that Kershnar be removed from our campus and that his professional contact with our students be discontinued for a time to be determined. This would provide a needed "cooling down" period for any persons who may otherwise feel compelled to confront Kershnar on our campus. The duration of this initial removal was intended to be assessed on a continuing basis, as University Police worked with campus authorities and our law enforcement partners to develop more information to guide our threat assessment.

20.     It should be noted that this opinion was based strictly on my concerns about the physical security of all members of our campus community. Other factors related to public relations or other ancillary matters were not factors in formulating my opinion or recommendation.

## MARCH 17, 2022 – UPDATED THREAT ASSESSMENT

21.     On March 17, 2022, I provided SUNY Fredonia administrators an updated threat assessment, as discussed below.  A copy of the March 17, 2022, threat assessment is attached as Exhibit C.

22.     In the weeks after the incident in early February 2022, a marked improvement occurred in the intensity of the public's interest in the Kershnar matter. The interest of the public, at least as reflected in the quantity and quality of social media posts, waned. This is undoubtedly a direct result of Kershnar's removal from campus and discontinuation of his contact with students. Importantly, on February 3, 2022, President Kolison issued public remarks which read, in relevant part, "effective immediately and until further notice, the professor is being assigned to duties that do not include his physical presence on campus and will not have contact with students…I view the content of the video as absolutely abhorrent. I cannot stress strongly enough that the independent viewpoints of this individual professor are in no way representative of the values of the SUNY Fredonia campus."

23.     President Kolison's statements were unambiguous and clearly announced that Kershnar is no longer on campus and his views on child sexual exploitation are rejected by campus. Those who may have contemplated targeting Kershnar or the campus may have been dissuaded by President Kolison's remarks.

24.     From a threat assessment perspective, this new status quo is an excellent and welcome change from the situation in early February. The "cooling down" period I noted in my February 2, 2022 memorandum did occur, and it did have the desired effects.  Sustaining this period of public disinterest in Kershnar for the indefinite future is, in my view, highly desirable from a campus safety perspective.  When considered from a campus safety perspective, the growing public disinterest in the Kershnar matter reduces the likelihood of an offender coming on our campus to settle a grievance held against Kershnar. There are fewer people who are following this issue, and those who may be following it should know that Kershnar is physically off our campus. Reducing the population of people angered and aggrieved reduces the likelihood that one decides to target Kershnar or the campus.

25.     Since February 2, 2022, I was authorized by President Kolison to review emails sent and received by Kershnar via his Fredonia eServices email account, stephen.kershnar@fredonia.edu. Among the emails received by Kershnar were several dozen in which the authors used threatening or abusive language toward Kershnar. A few verbatim excerpts, including grammatical errors, follow:

       a.   "On the subject of adult-child relationships, I find a shovel to the head works for adults."

       b.   "Many such studies have been conducted on this subject. Write an essay and meditate about that you sack of festering rot."

       c.   "Scum. Do you live locally? Fredonia/Dunkirk?"

       d.   "You mentally ill faggot. I hope parents tar, feather, cut your innards out, and drag your body through town. I think society's reaction would be cheers.

Non binary people are mentally ill, sorry you were touched as a child. I hope someone, even you, ends your life."

e.   "Fuck off and die, Steve. pedo, you're going to prison."

f.   "Straight to hell. I hope it's the most excruciating eternity any soul has ever or will ever experience. No mercy for a man that wants to fuck infants, you disgusting piece of shit. I hope I see your end come across my news feed soon, and I hope it's as bloody and tortuous as you deserve."

g.   "I saw your Zoom meeting. Nice to see where you stand. Your viewpoints on child RAPE are worthy of having your flesh peeled from your bones while you watch kiddy porn. You are truly a demented individual who will be punished by God along with your sick fucking Loser desciples who think what you spew is OK. Judgement Day for pedophiles is coming. You are Evil."

h.   "You need to be put down."

i.   "You should be hung and pissed on! Your death is one small step towards the better safety of our children. It is a terrible witness to the sad state of our society that you openly state your sick and perverted views. Ask Jesus Christ to heal you or spend eternity burning."

j.   "You are a pedo rape advocate who supports raping little children. I honestly hope you meet an untimely demise. You are scum. Absolute fucking rodent shit. Die in a fucking fire you repulsive fuck."

k.   "You are a pedophile. I hope you are publicly executed."

26.    These emails represent a subset of the emails received by Kershnar in the days following the social media uproar over his comments. Throughout the emails he received, the

intimations toward and support for violence against Kershnar are clear. They illustrate plainly the intensity of the disgust that many members of the public feel toward Kershnar.  If he were to return to our campus, the public's disgust would extend to this campus, and we would again be viewed by many members of the public as sympathetic to Kershnar's views and therefore at risk of violence.

27.     In my February 2, 2022 memorandum, I noted that research into targeted violence shows that those who directly communicate threats to their intended targets typically do not complete acts of targeted violence, i.e., "howlers don't hunt." Conversely, those who have completed acts of targeted violence typically do not communicate direct and unambiguous threats to their targets, i.e., "hunters don't howl." That is, we rarely see attackers first communicate the time and place of an impending attack. Doing so limits their ability to carry out an attack, as such threats draw a predictable reaction by the intended victim to protect themselves. Such explicit threats also draw a predictable law enforcement response which has the effect of hardening the intended target.

28.     We see in the research, instead, that those who go on to complete acts of targeted violence tend to display "behavioral leakage" before they attack. This is the phenomenon where future offenders, having decided that violence is justified and that they plan to attack, will tend to use language that betrays their intentions to attack, without conveying a time, place, and manner of an attack. They will intimate that violence is justified and imminent without unequivocally articulating a threat of violence, e.g., using language similar to that contained in emails received by Kershnar, like, "Judgment Day is coming" and "you need to be put down."

29.     Importantly, we know from the research of past attacks that offenders do not "snap." They do not wake up on the day of an attack and impulsively launch an attack. Instead,

they plan.  Offenders go through a predictable and well-understood progression along a

"pathway of violence" that always begins with a deep-seated, intense, fixated grievance against a

target. Having developed the grievance, they progress to a period of violent ideation and fantasy,

where they imagine carrying out what they perceive is a justified act of targeted violence. In later

stages along the pathway of violence, they research past attacks, conduct target surveillance,

prepare for an attack by collecting and training with weapons, and then finally approach and

attack their intended target. This progression along the pathway of violence, from grievance to

attack, often takes months and sometimes years.

30.     SUNY Fredonia has a robust and effective methodology to identify persons of

concern who may be in the early stages of the pathway of violence. Our Students of Concern

Team, for example, routinely assesses concerning behaviors among our students and mitigates

concerns for possible future violence through a set of helping interventions. Our efforts on

campus are successful because our population of concern is internal, and we are in the best

position to observe their behaviors. They are members of the campus community, and we have

excellent visibility of their behaviors. We can mitigate the risks persons of concern on our

campus may pose before they lead to real world violence.

31.     In the Kershnar matter, however, we find ourselves in the position of an enormous

external population being highly aggrieved by Kershnar's normalization of child sexual

exploitation. And as a campus, we have essentially no visibility to any pre-attack behaviors that

an aggrieved person may exhibit before appearing on our campus to locate Kershnar. It is the

worst of both worlds from a threat assessment and mitigation perspective. That is, this situation

has created an enormous aggrieved population over which we have no visibility.  Accordingly,

preventing the first step in the pathway of violence (i.e., the creation of the grievance) is the best

and only way we can mitigate the safety threats to our campus which result from the Kershnar matter.

32.     Kershnar himself demonstrated that he is not a dependable ally in our efforts to keep the campus safe. On February 2 and 3, 2022, I spoke by telephone with Kershnar to convey the directives of President Kolison. I also implored Kershnar to immediately advise me of any information which may have safety implications for our campus.

33.     In a follow-up email from me to Kershnar on February 7, 2022, I reiterated my request that he let me know of such concerns.  A copy of my email is attached as Exhibit D. My email to him read, in relevant part:

    a.  "I am writing to advise you that University Police have received phone calls to campus offices in which the callers threaten or intimate violence to you and to members of our campus. University Police are working with law enforcement partners to learn more about these calls and assess whether they impact on the safety of you and the campus community.  I wish to reiterate points I made to you during our conversation on February 2.

        i. Be observant for any indication that persons unknown are approaching or surveilling you, your home, or your vehicle. Be mindful of your surroundings. If you see something suspicious, call 911.

        ii. Pay extra attention to anything that may indicate vandalism to your property.

iii. Please keep University Police aware of anything which may have an implication for campus safety. You may do so by emailing or calling me directly.

iv. If you become aware of an emergency concern related to campus, please call University Police at 716-673-3333."

33.     Kershnar has not complied with this request. Kershnar has not contacted me to advise me that he has received threatening emails. Kershnar did, however, take the time to assemble scores of concerning emails, some of which are noted above, and place them in a lengthy Microsoft Word document. He then forwarded this document, which he titled "Podcast Law #2 Hate Mail 02 03 22," to a number of persons around the country with whom he has had conversations via email. In my discussions with Kershnar on February 2 and 3, 2022, he was cavalier about being the subject of threats. He told me "I've gotten death threats before," and that such threats do not concern him.

34.     Those threats do concern me. They have a direct connection to the safety posture of our campus. If Kershnar returns to this campus, I have little confidence that Kershnar would wholeheartedly cooperate with University Police by keeping us informed of threatening messages he would likely receive.

35.     My recommendation of February 2, 2022 stands. When viewed strictly from a campus safety perspective, a return of Kershnar to our campus would pose an unacceptable risk of violence. The following weeks since February 2, 2022 have demonstrated the intensity of the public outrage over Kershnar's views and the accompanying concerns for a violent reply from an aggrieved offender.

36.    In my professional opinion, if he were to return, strong safeguards would need to be put in place to assure the personal safety of Kershnar and those near him. Kershnar should be ordered to be fully cooperative with University Police in conveying any information he receives which could impact the safety of the campus.

### AUGUST 14, 2022 – UPDATED THREAT ASSESSMENT

37.    On August 14, 2022, I provided SUNY Fredonia administrators an updated threat assessment, as discussed below.  A copy of the August 14, 2022, threat assessment is attached as Exhibit E.

38.    As of August 14, 2022, I continued to assess that a return of Kershnar to our campus will pose an unacceptable risk of an act of targeted violence occurring on our campus. In the months since February 2022, the public's attention to the Kershnar matter had waned, at least as reflected in the relative paucity of recent social media posts about him. Nevertheless, it is reasonable to conclude that Kershnar's return to campus would immediately generate an enormous amount of negative attention to our campus, with the prevalent narrative being that SUNY Fredonia is endorsing Kershnar's stated opinions which normalize adult sexual contact with young children. That narrative will likely be carried to a national audience by social and traditional media outlets, and will, in my opinion, provide justification to some people for targeted violence directed toward Kershnar and/or our campus.

39.    There have been many incidents in which lone offenders, who were not connected to a broader terrorist or extremist organization, were self-radicalized and motivated to attack victims based on a grievance that the offenders adopted as their own. Such grievances are not a result of the lived experiences of the offenders, such as when an offender targets a school where he was bullied. Rather, these offenders adopted the grievances or took up the cause of others.

These offenders, dubbed "pseudo-warriors" by threat assessment professionals, view themselves as serving a greater cause than their own personal grievance when they attack. They view themselves as "righting a wrong" against their worldview and, importantly, providing "justice" for others who share their worldview but are too weak to act to vindicate or protect it.

40.     Offenders have developed grievances based on their perception that the intended victims were a proponent or provider of abortions, had certain political or religious views, were members of a certain race, had committed sex crimes against children, and a myriad of other factors. For example, in 1998 in Western New York, James Kopp killed Dr. Barnett Slepian with a long-distance rifle shot while Slepian was in his home. Dr. Slepian was an abortion provider, and Kopp held strong anti-abortion views. Another example occurred in 2015 when a married couple carried out a mass murder attack in San Bernardino, California in which 14 people were killed. The offenders were not connected to a terrorist organization, but rather, they were self-radicalized through their consumption of terrorist propaganda and their personal adoption of the grievances of foreign terrorist organizations. Also in 2015, Dylan Roof killed nine in a church shooting in Charleston, South Carolina. Federal prosecutors said he was self-radicalized online to carry out the racist attack. More recently, an armed intruder attempted to breach the FBI's field office in Cincinnati and was killed soon thereafter by law enforcement. Media reports indicated that the offender believed, as stated on his social media postings, that the 2020 election was stolen and required an armed insurgency against the government. In the summer of 2022, an offender stormed the stage of the Chautauqua Amphitheater and gravely wounded Salman Rushdie, an author whose writings have been condemned by religious extremists as blasphemous. Although it is unknown at this point, it is possible that this offender adopted these grievances without explicit and recent direction from a foreign actor and was, instead, self-

motivated to attack. The offender was not yet born when the Ayatollah Khomeinhi issued a fatwa to kill Rushdie.

41.     Kershnar is perceived by the public as condemnable by endorsing or advocating adult-on-child sexual contact. Notwithstanding Kershnar's assertion to the contrary (i.e., that his position is much more nuanced than what is perceived by the public), his verbatim statement, "the notion that [adult-child sex] is wrong even with a one-year old is not quite obvious to me," and similar statements have been trumpeted to millions of people by traditional and social media.  Kershnar's professed nuanced position on the topic is lost on the public.  Kershnar's statements have generated intense expressions of anger, revulsion, and disgust in the public, and they will again if he returns to campus.

42.     In 2019, researchers published findings of a study of 279 incidents between 1983 and 2015 of vigilantism against registered sex offenders, including murder.  Most of the registered sex offenders had victimized children. The motive in the vigilante attacks was the attackers' view that the targeted sex offender deserved more punishment than occurred in the court system. The authors noted that the 279 examined incidents likely represented a small subset of the actual number of vigilante attacks on sex offenders. In some cases, the victim was only suspected of being a sex offender. In the Kershnar matter, many of the social media posts allege Kershnar is a child molester, an advocate of child sexual exploitation, or both. The likely narrative that SUNY Fredonia endorses his views, false as it will be, will have obvious consequences for our safety posture.

43.     If Kershnar is reinstated, a very large population, perhaps millions, will reach the correct conclusion that Kershnar is physically on our campus and the incorrect conclusion that the campus endorses his positions regarding adult-child sex. Self-radicalization and the

16

development of a pseudo-warrior mentality are real phenomena that have motivated lone

offenders to complete acts of targeted violence on many occasions. Violence directed toward a

known or suspected child sex offender is a notion that many would endorse, and some would

undertake. My concern is the one self-radicalized pseudo-warrior out of the many persons

aggrieved in the echo chamber of social media who decides to right this perceived wrong

through a violent attack on our campus.

### OCTOBER 31, 2022 – UPDATED THREAT ASSESSMENT

44.     On October 31, 2022, I updated my assessment of the impact a physical return of

Stephen Kershnar would have on the safety posture of SUNY Fredonia's campus. This update

was informed by new information contained in an analysis by A1C Partners, LLC, which I

received on September 20, 2022. A1C's analysis is discussed in more detail below.  A copy of

the October 31, 2022, threat assessment is attached as Exhibit F.

45.     On September 20, 2022, I received an Open Source Intelligence Product from

A1C Partners, LLC, a company with a cadre of experienced senior executive former federal law

enforcement officials and a staff of trained intelligence analysts. A1C has investigative tools to

search the internet, social media platforms, and the "dark web" for information on a given topic,

and they were tasked with identifying additional internet traffic regarding the Kershnar

controversy.  A1C confirmed earlier work by SUNY Fredonia and an outside consultant that a

large volume of concerning message traffic occurred after Kershnar's video interviews were

widely circulated.  The messages advocated for violence against Kershar, although no direct

threat to harm was noted. As I explained in an earlier assessment, the lack of a direct threat

toward a target is cold comfort and should not be understood to mean there is not a risk of

violence. In fact, research shows that nearly all acts of targeted violence are not preceded by an

explicit threat of violence directed to the target. Importantly, A1C identified that message traffic on the website BitChute exists which accurately identifies Kershnar's home address in Fredonia and his cell phone number. This confirms my earlier suspicion that a natural progression of this matter would be that potential bad actors would share information to allow targeting of Kershnar, and by extension our campus, for harassment and/or violence.

46.     According to A1C, one of the platforms on which the comments appear was identified as GoyimTV.tv, a media sharing site operated by the Goyim Defense League. The Anti-Defamation League assesses Goyim Defense League labels as virulently antisemitic. Individuals responding to the Kershnar video stated Professor Kershnar should be subjected to various types of physical harm. Most of the comments identified by A1C were posted in antisemitic and racist conversations blaming pedophilia and other perceived societal ills against the Jewish faith, and as part of a generalized belief in conspiracy theories. The language utilized during these conversations is extremely graphic, but not unlike the language regularly used in these communities. Several individuals posted screenshots of Kershnar's SUNY Fredonia faculty page. The faculty page specifically identifies the physical address of Professor Kershnar's office.

47.     These findings support and magnify my concern that a reinstatement of Kershnar would inevitably lead to an explosion of extreme rhetoric among many persons around the country, some of whom will feel justified, even compelled, to violently target Kershnar and/or our campus.

48.     Law enforcement generally and University Police particularly have few tools to prevent such attacks on the Fredonia campus, because the threat of targeted violence will

originate overwhelmingly from outside our campus from an immense population of aggrieved persons.

49.     Accordingly, for this reason and those detailed in my previous assessments, my recommendations as provided in the updated March 17, 2022 and October 31, 2022 assessments stand.

## ADDITIONAL INFORMATION

50.     On January 3, 2023, I received an unsolicited telephone call from FBI Special Agent (SA) Chad Artrip during which I learned that the FBI had uncovered threatening communications online pertaining to Kershnar. SA Artrip requested University Police assistance in contacting Kershnar to convey a warning to him regarding the threatening communication.  SA Artrip appeared at the University Police office at approximately 9:30 a.m. on January 4, 2023, where he met with UPD Lieutenant Scott Martin and me. SA Artrip stated that the threatening communication indicated that Kershnar's campus office is located in Fenton Hall.  Due to the sensitive nature of the FBI's investigation, SA Artrip was unable to provide details of the threatening communication or the underlying FBI investigation. The FBI had no information regarding the credibility of the threat. The threat did, however, meet the FBI's "duty to warn" criteria, thus prompting the FBI notification to UPD-Fredonia and Kershnar.  The FBI's conclusion that the credibility of the threat was unknown does not, in my view, mean that the threat was not credible or frivolous.  Based on my experience in the FBI, a threat that raises concern to the level within the FBI where the target of the threat must be warned is not "not credible."  This is a semantic distinction with an important difference.

51.     During this meeting and at SA Artrip's request, I attempted to contact Kershnar by phone (XXX-XXX-6604).  Kershnar's phone immediately went to voicemail. I left a message

requesting Kershnar to telephone UPD-Fredonia and advising him that we have law enforcement information to pass to him.  I provided SA Artrip with Kershnar's contact information and residential address, and I learned later that SA Artrip made contact with Kershnar.

### CURRENT THREAT ASSESSMENT AND SUMMARY

52.     Based on the foregoing, my recommendation to SUNY Fredonia administrators remained unchanged until my retirement on June 30, 2023.  Barring an extraordinary and financially prohibitive expansion of the University Police Department's staffing and capabilities, I do not believe it possible to adequately protect the SUNY Fredonia campus in a situation where Kershnar is physically present on the campus or having authorized contacts with SUNY Fredonia students.

53.     I wish to reiterate to this Court that my threat assessments during this period were based exclusively on preserving the physical safety of the SUNY Fredonia campus and Kershnar himself as mandated by my position as Chief of University Police.  Other ancillary considerations, including potential impacts to student enrollment, the reputation of SUNY Fredonia, fundraising impacts, or political views, did not in any way play a role in my consideration of the facts and circumstances of this matter or my recommendations to campus administrators.

Dated: July 20, 2023
        Trenton, ME

                                        s/ Brent S. Isaacson
                                        **BRENT S. ISAACSON**

20

# EXHIBIT A

# BRENT S. ISAACSON

Phone: ████████
Email: Brent.Isaacson@gmail.com

## Comprehensive Leadership, Investigative, and Violence Prevention Experience

**Profile:** A highly experienced and successful police chief, former FBI Special Agent, and former US Navy Officer with a proven track record of leadership and vision. An experienced law enforcement leader with advanced and unique violence prevention expertise. A uniquely trained and experienced advisor in mass attack prevention for universities, law enforcement agencies, and community groups. Skilled at leading law enforcement colleagues in challenging or dangerous circumstances, with a record of solving and preventing violent crime, child sexual exploitation, narcotics trafficking, computer crime, and complex white collar crimes, all while delivering meaningful empathy, encouragement, and compassion to victims, witnesses, and offenders alike. A mission-driven leader, strategic thinker, and decision-maker with strong analytical skills, unwavering adherence to ethical and legal standards, and a broad knowledgebase that draws on extensive practical experience, advanced training, and academic achievement.

### PROFESSIONAL ACHIEVEMENTS & RESPONSIBILITIES

**Chief of Police,** New York State University Police
State University of New York at Fredonia
2019 to 2023

Responsible for all operational, personnel, financial, and administrative functions of a police department on a state university campus. Trained sworn police officers in preventing acts of mass violence and in tactically resolving such incidents. Focused the department's efforts in community policing, building trust and confidence among members of the campus community. Personally trained hundreds of campus community members to recognize and report the telltale signs of persons planning violent acts, turning bystanders into "upstanders." As a member of the Students of Concern Team, conducted threat assessments and developed threat mitigation plans when indicators of future violence were detected among students.

**Special Agent,** Federal Bureau of Investigation
Washington, DC; Buffalo and Jamestown, NY
1996 to 2019

Responsible for leading all of the FBI's work in the three western counties of New York's southern tier and providing direction to the area's FBI employees who enforce federal law, ensure public safety, and collect intelligence to protect the community from criminal and terrorist activity. Proven leadership as the primary consultant and coordinator in the 17 western counties of New York for the FBI's National Center for the Analysis of Violent Crime, which applies the world's foremost subject matter behavioral science expertise to solve and prevent especially violent or heinous crimes. Served as an advisor to university law enforcement agencies, federal, state, and local law enforcement agencies and prosecutors. Earned numerous awards and commendations from the FBI and other law enforcement agencies for expert assistance and achieving positive results. Through rigorous academic training and real-world experience, I have developed a deep understanding of how offenders behave before they commit serious violent crimes. My primary focus has always been to use the formidable authorities and capabilities of the FBI in a way that

honors victims and provides respect and dignity for all, including those accused of committing crimes.

**Law Enforcement Professional Experience Profile:**

- Developed a comprehensive program on a state university campus to prevent acts of targeted violence and mass attacks by training hundreds of employees and students on recognizing and reporting pre-attack behavioral indicators exhibited by persons of concern. Conducted threat assessments and developed threat mitigation plans for students and employees exhibiting concerning behaviors. Provided threat assessment training to university police chiefs, police investigators, student conduct directors, and behavioral intervention teams across the State University of New York system.

- Led FBI investigative activities in three western NY southern tier counties, encompassing approximately 260,000 people living in 3,800 square miles, as the Senior Resident Special Agent in Jamestown. Developed deep professional, collaborative, positive, and friendly relationships with dozens of federal, university, state, local, and tribal law enforcement agencies. Responsible for the effective performance and safety of FBI employees including Special Agents, analysts, office staff, and language experts assigned to the FBI office in Jamestown.

- Highly trained and successful in preventing violence at universities and public schools. Performed threat assessments and developed threat mitigation plans for universities and public schools with students whose behavior raised grave concerns of school violence, with all cases resulting in violence prevention, and most often, positive outcomes and continued enrollment for the students.

- Co-founded with the District Attorney, the Chautauqua County School Threat Assessment and Response "STAR" Team, a collaborative group of experts in academia, mental health, law enforcement, and human services to quickly address threats posed to universities and schools in our county by persons of concern who may be planning a violent attack. Recognized as a best practice by the National Prosecutors' Consortium.

- Conducted training for over 5,000 school administrators and faculty, police officers, mental health professionals, and interfaith clergy in western NY and Canada on identifying the pre-attack behaviors of persons of concern who may be planning a mass casualty event at universities, schools, and places of worship.

- Co-presenter of "*Comprehensive Threat Assessment in a University Setting: A Case Study*," for the 2018 Conference of the Association of Threat Assessment Professionals, Rochester NY; 2018 Campus Safety Conference in Herndon, VA; the 2016 SUNY Chiefs of Police Association Conference in Cooperstown, NY; the 2016 National Behavioral Intervention Team Association Conference in San Antonio, TX; and the 2015 International Association of Chiefs of Police Conference in Chicago, IL.

- Highly experienced in the unique law enforcement and threat management needs of university campuses gained through many successful investigations and consultations.

- Well positioned to guide university police officers in all types of criminal investigations, including violent crimes, sex crimes, computer crimes and property crimes. Successfully investigated and convicted over 100 persons who had engaged in serious felonious

crimes, including murderers, drug traffickers, child molesters, sophisticated white collar criminals who stole millions of dollars, and corrupt public officials.

- Highly trained and experienced to ensure university police officers keep the public and themselves safe in dangerous situations. Directed and participated in countless high profile, high-risk apprehensions, and tactical and patrol operations involving violent offenders. Certified by the FBI to teach law enforcement officers tactics and firearms proficiency. For six years, successfully led and taught an FBI school teaching law enforcement crisis site observation techniques and precision marksmanship. Led FBI-Buffalo's first Tactical Operations Center. NYS and FEMA certified in all levels of incident command.
- Well versed in the requirements of Title IX, the Clery Act, the New York State Enough is Enough law, and the Violence Against Women Act.
- From years of FBI experience, knowledgeable in the administrative requirements and benefits of law enforcement agency inspection and accreditation programs.
- Recipient of numerous FBI special achievement and outstanding performance awards and certificates of appreciation from law enforcement agencies including the Buffalo State University Police, the Town of Hamburg Police, and the Cattaraugus County Sheriff's Office.
- A long record of leading high profile, successful investigations, including:
  o The FBI's investigation of the most significant public corruption case in the history of the US Department of Transportation in Washington, DC.
  o A solved cold-case homicide, which generated national media interest, including the production of hour-long documentaries on three separate television networks.
  o A multi-agency international investigation of child exploitation that resulted in the first-ever case in the United Kingdom in which UK laws provided justice for a child sexual exploitation victim from another country, and the first-ever case in which a convicted felon imprisoned outside of the UK provided video-linked testimony in a British criminal trial.
- Awarded the rare FBI Agents Association Character and Service Award, recognizing exceptional devotion to the FBI's core values of obedience to the Constitution, respect for the dignity of all, compassion, fairness, integrity, accountability, leadership, and diversity – all attributes perfectly suited for campus policing.
- Leader of the FBI-Buffalo Cold Case Homicide Working Group, a collection of western NY law enforcement agencies working together to apply new behavioral science and forensic laboratory techniques to long-unsolved cases.

**Project Manager, Senior Engineer,** Westinghouse Science and Technology Center
Pittsburgh, PA 1993 to 1996
**Lieutenant, Nuclear Engineer,** Naval Nuclear Propulsion Program Headquarters
United States Navy
Washington, DC 1987 to 1993

Before joining the FBI, served as a commissioned officer in the United States Navy. Completed a full-time, six-month master's level academic program in nuclear engineering at the Bettis Atomic Power Laboratory. Provided technical, budgetary, and program leadership to naval nuclear research

and development efforts at two national laboratories, leading the efforts of dozens of PhD level scientists and engineers. Oversaw state-of-the-art laboratory testing and computational modeling programs in two technologies, reactor thermal hydraulics and reactor fluid mechanics, to ensure the highest possible performance and safety of reactors aboard nuclear powered submarines and aircraft carriers. Following the Navy, conducted similar program and budgetary management of multi-million dollar new-technology research projects at Westinghouse.

## EDUCATION

- Master of Arts, General Psychology, Northcentral University, Prescott, Arizona - 2014
- Certificate in Nuclear Engineering, Bettis Reactor Engineering School, Bettis Atomic Power Laboratory (a classified 6-month, full time curriculum recognized as a master's degree program by the U.S. Navy), Pittsburgh, PA -1988
- Bachelor of Science, Mechanical Engineering, University of Rochester – 1987

## SELECTED CERTIFICATIONS, PRESENTATIONS & PROFESSIONAL DEVELOPMENT

| | |
|---|---|
| Advanced FBI behavioral threat assessment/mitigation training | 2019 |
| Law Enforcement Executive Development Seminar (LEEDS), guest lecturer, "Active Shooters; Pre-Attack Indicators" | 2019 |
| Incident Command System 100, 200, 235, 300, 360, 363, 400, 700 and 800 certifications, New York State and Federal Emergency Management Agency | 2018-2019 |
| Canadian American Law Enforcement Organization (CALEO), guest lecturer, "Active Shooters; Pre-Attack Indicators" | 2017 |
| U.S. Secret Service, Safe Schools Conference, Buffalo, NY, guest lecturer, "Active Shooters; Pre-Attack Indicators" | 2016 |
| NYS Department of Agriculture, Cornell University, guest lecturer, "Active Shooters; Pre-Attack Indicators" | 2016 |
| New York State Department of Criminal Justice Services, Police Supervision Course, guest lecturer, "Active Shooters; Pre-Attack Indicators" | 2014, 2016 |
| Founder/Leader, FBI-Buffalo Tactical Operations Center | 2011-2015 |
| Graduate/Counselor, FBI National Academy, Quantico, Virginia | 2009 |
| Founding member, FBI-Buffalo hazardous materials response team | 2004-2007 |
| FBI Certified Firearms and Tactical Instructor | 2003, 2006 |
| FBI Behavioral Analysis Unit, Primary Coordinator | 2003-Present |
| FBI SWAT Team, Certified SWAT Operator, Certified Precision Marksman | 2002-2011 |
| FBI Academy New Agents' Training, Quantico, Virginia | 1996 |

# EXHIBIT B



TO:         Maria Carroll
            Director
            Human Resources

            Seth Gilbertson
            Senior Counsel
            SUNY

FROM:       Brent S. Isaacson
            Chief of University Police

DATE:       February 2, 2022

RE:         Campus safety implications and recommendations re: Kershnar matter

On February 1, 2022, University Police at Fredonia became aware of social media posts and traditional media inquiries into online videos showing Fredonia Professor Stephen Kershnar providing justifications for allowing sexual contact between adults and underage children, including children as young as infants.  These videos were posted on Twitter and were quickly picked up and promulgated across the country by major media outlets.

I know from extensive training and experience in the FBI that targeted violence against individuals and institutions starts with deeply held grievances.  I also know that there is a massive population of Americans who were either victims of child sexual exploitation in their youth or who have their own children who were victimized by others.  It is difficult to imagine a circumstance where a topic so deeply grieving to so many has been broadcast in such a deeply offensive way to such a large population.  This situation has, in effect, given potential offenders a target upon which to focus their grievances against those who sexually exploit children.

I have followed closely the social media posts from a threat assessment perspective for our campus.  Nearly all the posts are authored by people expressing disgust and revulsion at Kershnar's messages.  However, a significant fraction of the posts make reference to violence as a way to deal with Kershnar.  Images of guns, bullets, woodchippers, lynching, and verbal references to violence are common in these posts.  Most are directed toward Kershnar, but all of the authors know that he is an employee on our campus.  Many view the campus as tolerant of or complicit in Kershnar spreading rationalizations for crimes against children.

Many laypersons without training or experience in threat assessments view explicit, articulated threats as the most credible and serious.  In fact, they rarely are.  We often say in threat assessments, "hunters don't howl, and howlers don't hunt."  Accordingly, my concern is directed to the much larger audience who have remained silent.  They have seen Kershnar's videos, know that he works on this campus, and yet they have not commented.  This circumstance has created a very large pool of people outside of our campus who understand that an advocate of child sexual exploitation works here.

Accordingly, my professional opinion is that Kershnar's continued physical presence on our campus or continuing professional contact with our students will continue to magnify the grievances against pedophiles that many potential actors harbor.  His continued presence will be the source of growing attention by traditional and social media, which will create a growing likelihood that someone may come on our campus to take matters into their own hands in a violent way.

I recommend that Kershnar be removed from our campus and that his professional contact with our students be discontinued for a time to be determined.  This will provide a needed "cooling down" period for any persons who may otherwise feel compelled to confront Kershnar on our campus.  The duration of this removal can be assessed on a continuing basis, as University Police work with campus authorities and our law enforcement partners to develop more information to guide our threat assessment.

It should be noted that this opinion is based strictly on my concerns about the physical security of all members of our campus community.  Other factors related to public relations or other ancillary matters were not factors in formulating my opinion or recommendation.

# EXHIBIT C



TO:   Maria Carroll
    Director
    Human Resources

    Katie McCutcheon
    Associate Counsel
    Office of General Counsel
    SUNY

FROM:  Brent S. Isaacson
    Chief of University Police

DATE:  March 17, 2022

RE:   Campus safety implications and recommendations re: Kershnar matter;
    Updated assessment

On February 2, 2022, I provided my assessment of the impact the Kershnar matter had on the physical safety posture of SUNY Fredonia.  This memorandum provides an updated assessment of the campus safety posture.  This updated assessment is informed by additional facts not known to me on February 2.  As detailed below, I continue to assess that Kershnar's physical presence on our campus or exposure to Fredonia students creates an increased risk for targeted violence on campus.

For ease of reference, below is the narrative of my February 2, 2022 assessment.  An updated assessment is included thereafter.

*On February 1, 2022, University Police at Fredonia became aware of social media posts and traditional media inquiries into online videos showing Fredonia Professor Stephen Kershnar providing justifications for allowing sexual contact between adults and underage children, including children as young as infants.  These videos were posted on*

Twitter and were quickly picked up and promulgated across the country by major media outlets.

I know from extensive training and experience in the FBI that targeted violence against individuals and institutions starts with deeply held grievances.  I also know that there is a massive population of Americans who were either victims of child sexual exploitation in their youth or who have their own children who were victimized by others.  It is difficult to imagine a circumstance where a topic so deeply grieving to so many has been broadcast in such a deeply offensive way to such a large population.  This situation has, in effect, given potential offenders a target upon which to focus their grievances against those who sexually exploit children.

I have followed closely the social media posts from a threat assessment perspective for our campus.  Nearly all the posts are authored by people expressing disgust and revulsion at Kershnar's messages.  However, a significant fraction of the posts make reference to violence as a way to deal with Kershnar.  Images of guns, bullets, woodchippers, lynching, and verbal references to violence are common in these posts.  Most are directed toward Kershnar, but all of the authors know that he is an employee on our campus.  Many view the campus as tolerant of or complicit in Kershnar spreading rationalizations for crimes against children.

Many laypersons without training or experience in threat assessments view explicit, articulated threats as the most credible and serious.  In fact, they rarely are.  We often say in threat assessments, "hunters don't howl, and howlers don't hunt."  Accordingly, my concern is directed to the much larger audience who have remained silent.  They have seen Kershnar's videos, know that he works on this campus, and yet they have not commented.  This circumstance has created a very large pool of people outside of our campus who understand that an advocate of child sexual exploitation works here.

Accordingly, my professional opinion is that Kershnar's continued physical presence on our campus or continuing professional contact with our students will continue to magnify the grievances against pedophiles that many potential actors harbor.  His continued presence will be the source of growing attention by traditional and social media, which

*will create a growing likelihood that someone may come on our campus to take matters into their own hands in a violent way.*

*I recommend that Kershnar be removed from our campus and that his professional contact with our students be discontinued for a time to be determined.  This will provide a needed "cooling down" period for any persons who may otherwise feel compelled to confront Kershnar on our campus.  The duration of this removal can be assessed on a continuing basis, as University Police work with campus authorities and our law enforcement partners to develop more information to guide our threat assessment.*

*It should be noted that this opinion is based strictly on my concerns about the physical security of all members of our campus community.  Other factors related to public relations or other ancillary matters were not factors in formulating my opinion or recommendation.*

Updated information and campus safety assessment

In the intervening weeks, a marked improvement has occurred in the intensity of the public's interest in the Kershnar matter.  The interest of the public, at least as reflected in the quantity and quality of social media posts, has waned.  This is undoubtedly a direct result of Kershnar's removal from campus and discontinuation of his contact with students.  Importantly, on February 3, President Kolison issued public remarks which read, in relevant part, "effective immediately and until further notice, the professor is being assigned to duties that do not include his physical presence on campus and will not have contact with students…I view the content of the video as absolutely abhorrent.  I cannot stress strongly enough that the independent viewpoints of this individual professor are in no way representative of the values of the SUNY Fredonia campus."

President Kolison's statements were unambiguous and clearly announced that Kershnar is no longer on campus and his views on child sexual exploitation are rejected by campus.  Those who may have contemplated targeting Kershnar or the campus may have been dissuaded by President Kolison's remarks.  From a threat assessment perspective, this new status quo is an excellent and welcome change from the situation in early February.  The "cooling down" period I noted in my February 2 memorandum did occur, and it did have the desired effects.  Sustaining

this period of public disinterest in Kershnar for the indefinite future is, in my view, highly desirable from a campus safety perspective.

When considered from a campus safety perspective, the growing public disinterest in the Kershnar matter reduces the likelihood of an offender coming on our campus to settle a grievance held against Kershnar.  There are fewer people who are following this issue, and those who may be following it should know that Kershnar is physically off our campus. Reducing the population of people angered and aggrieved reduces the likelihood that one decides to target Kershnar or the campus.

As a thought experiment, it is worth considering a scenario where Kershnar were to return to campus, perhaps after litigation where his return became legally inevitable.  It is reasonable to conclude that the public would immediately become aware of his return, and that a narrative would very quickly develop that the campus was somehow complicit in his return.  We saw this in early February.  A major theme of the public narrative was that SUNY Fredonia was aware of and supportive of Kershnar's views on child sexual exploitation, notwithstanding President Kolison's message to the contrary.  Kershnar's hypothetical future return to campus and his normal teaching duties would drive a narrative that our campus, now fully aware of Kershnar's statements normalizing child sexual exploitation, has nevertheless allowed his return.  Absent a purposeful and effective messaging campaign to the contrary, the fact that his return may have been mandated by a court after litigation will have little effect on reducing the anger and grievances developed by the public toward our campus.  Accordingly, our campus should be working now to develop contingency plans which include a messaging campaign that explains to the public that Kershnar's return is not of our making, that we argued in court for his permanent removal from our campus, and that his return is a result of losing hard-fought litigation.

In the intervening weeks since February 2, I was authorized by President Kolison to review emails sent and received by Kershnar via his Fredonia eServices email account, stephen.kershnar@fredonia.edu.  Among the emails received by Kershnar were several dozen in which the authors used threatening or abusive language toward Kershnar.  A few excerpts follow:

- "On the subject of adult-child relationships, I find a shovel to the head works for adults. Many such studies have been conducted on this subject. Write an essay and meditate about that you sack of festering rot."
- "Scum.  Do you live locally?  Fredonia/Dunkirk?"
- "You mentally ill faggot.  I hope parents tar, feather, cut your innards out, and drag your body through town. I think society's reaction would be cheers.  Non binary people are mentally ill, sorry you were touched as a child. I hope someone, even you, ends your life. Fuck off and die,  Steve.  pedo, you're going to prison."
- "Straight to hell.  I hope it's the most excruciating eternity any soul has ever or will ever experience. No mercy for a man that wants to fuck infants, you disgusting piece of shit. I hope I see your end come across my news feed soon, and I hope it's as bloody and tortuous as you deserve."
- "I saw your Zoom meeting. Nice to see where you stand.  Your viewpoints on child RAPE are worthy of having your flesh peeled from your bones while you watch kiddy porn.  You are truly a demented individual who will be punished by God along with your sick fucking Loser desciples who think what you spew is OK.  Judgement Day for pedophiles is coming.  You are Evil."
- "You need to be put down."
- "You should be hung and pissed on! Your death is one small step towards the better safety of our children. It is a terrible witness to the sad state of our society that you openly state your sick and perverted views.  Ask Jesus Christ to heal you or spend eternity burning."

These emails represent a subset of the emails received by Kershnar in the days following the social media uproar over his comments.  Throughout the emails he received, the intimations toward and support for violence against Kershnar are clear.  They illustrate plainly the intensity of the disgust that many members of the public feel toward Kershnar.  If he were to return to our campus, the public's disgust would extend to this campus, and we would again be viewed by many members of the public as sympathetic to Kershnar's views.

In my February 2 memorandum, I noted that research into targeted violence shows that those who directly communicate threats to their intended targets typically do not complete acts of targeted violence, i.e., "howlers don't hunt."  Conversely, those who have completed acts of

targeted violence typically do not communicate direct and unambiguous threats to their targets, i.e., "hunters don't howl."  That is, we rarely see attackers first communicate the time and place of an impending attack.  Doing so limits their ability to carry out an attack, as such threats draw a predictable reaction by the intended victim to protect themselves.  Such explicit threats also draw a predictable law enforcement response which has the effect of hardening the intended target.

We see in the research, instead, that those who go on to complete acts of target violence tend to display "behavioral leakage" before they attack.  This is the phenomenon where future offenders, having decided that violence is justified and that they plan to attack, will tend to use language that betrays their intentions to attack, without conveying a time, place, and manner of an attack. They will intimate that violence is justified and imminent without unequivocally articulating a threat of violence, e.g., using language similar to that contained in emails received by Kershnar, like, "Judgment Day is coming" and "you need to be put down".  Importantly, we know from the research of past attacks that offenders do not "snap."  They do not wake up on the day of an attack and impulsively launch an attack.  Instead, they *plan*.

Offenders go through a predictable and well-understood progression along a "pathway of violence" that always begins with a deep seated, intense, fixated grievance against a target. Having developed the grievance, they progress to a period of violent ideation and fantasy, where they imagine carrying out what they perceive is a justified act of targeted violence.  In later stages along the pathway of violence, they research past attacks, conduct target surveillance, prepare for an attack by collecting and training with weapons, and then finally approach and attack their intended target.  This progression along the pathway of violence, from grievance to attack, often takes months and sometimes years.

SUNY Fredonia has a robust and effective methodology to identify persons of concern who may be in the early stages of the pathway of violence.  Our students of concern team, for example, routinely assesses concerning behaviors among our students and mitigates any concerns for possible future violence through a set of helping interventions.  Our efforts on campus are successful because our population of concern is internal and we are in a position to observe their behaviors.  They are members of the campus community, and we have excellent visibility

of their behaviors.  We can mitigate the risks persons of concern on our campus may pose before they lead to real world violence.

In the Kershnar matter, however, we find ourselves in the position of an enormous *external* population being highly aggrieved by Kershnar's normalization of child sexual exploitation.  And as a campus, we have essentially no visibility to any pre-attack behaviors that an aggrieved person may exhibit before appearing on our campus to locate Kershnar.  It is the worst of both worlds from a threat assessment and mitigation perspective.  Accordingly, preventing the first step in the pathway of violence (i.e., the creation of the grievance) is the best and only way we can mitigate the safety threats to our campus which result from the Kershnar matter.

Finally, I note that Kershnar himself has demonstrated that he is not a dependable ally in our efforts to keep the campus safe.  On February 2 and 3, I spoke with Kershnar to convey the directives of President Kolison.  I also implored Kershnar to immediately advise me of any information which may have safety implications for our campus.  In a followup email from me to Kershnar on February 7, I reiterated my request that he let me know of such concerns.  My email to him read, in relevant part:

> I am writing to advise you that University
> Police have received phone calls to campus
> offices in which the callers threaten or
> intimate violence to you and to members of our
> campus.  University Police are working with law
> enforcement partners to learn more about these
> calls and assess whether they impact on the
> safety of you and the campus community.
>
> I wish to reiterate points I made to you during
> our conversation on February 2.
>
> ●    Be observant for any indication that
> persons unknown are approaching or surveilling
> you, your home, or your vehicle.  Be mindful of
> your surroundings.  If you see something
> suspicious, call 911.
> ●    Pay extra attention to anything that may
> indicate vandalism to your property.

- Please keep University Police aware of anything which may have an implication for campus safety.  You may do so by emailing or calling me directly.
- If you become aware of an emergency concern related to campus, please call University Police at 716-673-3333.

Kershnar has not complied with this request. Kershnar has not contacted me to advise me that he has received threatening emails.  Kershnar did, however, take the time to assemble scores of concerning emails, some of which are noted above, and place them in a lengthy Microsoft Word document.  He then forwarded this document, which he titled "Podcast Law #2 Hate Mail 02 03 22," to a number of persons around the country with whom he has had conversations via email.  In my discussions with Kershnar on February 2 and 3, he was cavalier about being the subject of threats.  He told me "I've gotten death threats before," and that such threats do not concern him.

Those threats do concern me.  They have a direct connection to the safety posture of our campus.  If the legal inevitability of any future litigation is that Kershnar returns to this campus, I have little confidence that Kershnar would wholeheartedly cooperate with University Police by keeping us informed of threatening messages he would likely receive.

Summary

My recommendation of February 2 stands.  When viewed strictly from a campus safety perspective, a hypothetical return of Kershnar to our campus would pose an unacceptable risk of violence.  The intervening weeks since February 2 have demonstrated the intensity of the public outrage over Kershnar's views and the accompanying concerns for a violent reply from an aggrieved offender.

If Kershnar's return becomes inevitable, it should be preceded by an intense messaging campaign by campus and SUNY that Kershnar's return is over our strong, but unfortunately unsuccessful, legal efforts to keep him away from our campus and our students.  The intent of this messaging campaign should be to unequivocally inform the public that SUNY Fredonia in

no way supports Kershnar's views, but that we have been ordered by a judge over our strong objections to let him return.

If he were to return, strong safeguards would need to be put in place to assure the personal safety of Kershnar and those near him.  Kershnar should be ordered to be fully cooperative with University Police in conveying any information he receives which could impact the safety of the campus.

# EXHIBIT D

**Sent:**      Mon 2/7/2022 6:09:32 PM (UTC-05:00)
**Subject:**   Safety message
**From:**       Brent S Isaacson <brent.isaacson@fredonia.edu>
**To:**         Stephen P Kershnar <stephen.kershnar@fredonia.edu>

Dr. Kershnar,

I am writing to advise you that University Police have received phone calls to campus offices in which the callers threaten or intimate violence to you and to members of our campus. University Police are working with law enforcement partners to learn more about these calls and assess whether they impact on the safety of you and the campus community.

I wish to reiterate points I made to you during our conversation on February 2.

   • Be observant for any indication that persons unknown are approaching or surveilling you, your home, or your vehicle. Be mindful of your surroundings. If you see something suspicious, call 911.
   • Pay extra attention to anything that may indicate vandalism to your property.
   • Please keep University Police aware of anything which may have an implication for campus safety. You may do so by emailing or calling me directly.
   • If you become aware of an emergency concern related to campus, please call University Police at 716-673-3333.

Last week, I asked the Chautauqua County Sheriff's Office and the New York State Police to increase patrols near your home.

Please feel free to contact me with questions or concerns.

Thank you.

_____

Brent S. Isaacson

Chief of Police

New York State University Police

State University of New York at Fredonia

280 Central Avenue

Fredonia, NY 14063

Tel (716) 673-3333

# EXHIBIT E



FREDONIA
STATE UNIVERSITY OF NEW YORK

Memo

TO:          Maria Carroll
             Director
             Human Resources

             Katie McCutcheon
             Associate Counsel
             Office of General Counsel
             SUNY

FROM:        Brent S. Isaacson
             Chief of University Police

DATE:        August 14, 2022

RE:          Campus safety implications and recommendations re: Kershnar matter;
             Updated assessment

On February 2, 2022, I provided my assessment of the Stephen Kershnar matter on the physical safety posture of SUNY Fredonia.  On March 17, 2022, I provided an updated assessment.  For ease of reference, I have attached to this document the March 17 assessment, which also includes the full text of the February 2 assessment.  I continue to assess that a return of Kershnar to our campus will pose an unacceptable risk of an act of targeted violence occurring on our campus.

In the months since my last assessment, the public's attention to the Kershnar matter has waned, at least as reflected in the relative paucity of recent social media posts about him. Nevertheless, it is reasonable to conclude that Kershnar's return to campus would immediately generate an enormous amount of negative attention to our campus, with the prevalent narrative being that SUNY Fredonia is endorsing Kershnar's stated opinions which normalize adult sexual contact with young children.  That narrative will likely be carried to a national audience by social and traditional media outlets, and will, in my opinion, provide justification to some people for targeted violence directed toward Kershnar and/or our campus.

There have been many incidents in which lone offenders, who were not connected to a broader terrorist or extremist organization, were self-radicalized and motivated to attack victims based on a grievance that the offenders adopted as their own.  Such grievances are not a result of the lived experiences of the offenders, such as when an offender targets a school where he was bullied.  Rather, these offenders adopted the grievances or took up the cause of others.   These offenders, dubbed "pseudo-warriors" by threat assessment professionals, view themselves as serving a greater cause than their own personal grievance when they attack.  They view themselves as righting a wrong against their worldview and, importantly, providing justice for others who share their worldview but are too weak to act to vindicate or protect it.

Offenders have developed grievances based on their perception that the intended victims were a proponent or provider of abortions, had certain political or religious views, were members of a certain race, had commited sex crimes against children, and a myriad of other factors.  For example, in 1998 in western New York, James Kopp killed Dr. Barnett Slepian with a long distance rifle shot while Slepian was in his home.  Dr. Slepian was an abortion provider, and Kopp held strong anti-abortion views.  In 2015, a married couple carried out a mass murder attack in San Bernardino, California in which 14 people were killed.  The offenders were not connected to a terrorist organization, but rather, they were self-radicalized through their consumption of terrorist propaganda and their personal adoption of the grievances of foreign terrorist organizations. Also in 2015, Dylan Roof killed nine in a church shooting in Charleston, South Carolina.  Federal prosecutors said he was self-radicalized online to carry out the racist attack.  More recently, an armed intruder attempted to breach the FBI's field office in Cincinnati and was killed soon thereafter by law enforcement.  Early media reports indicate that the offender believed, as stated on his social media postings, that the 2020 election was stolen and required an armed insurgency against the government.  Just a few days ago, an offender stormed the stage of the Chautauqua Amphitheater and gravely wounded Salman Rushdie, an author whose writings have been condemned by religious extremists as blasphemous. Although it is unknown at this point, it is possible that this offender adopted these grievances without explicit and recent direction from a foreign actor and was, instead, self-motivated to attack.  The offender was not yet born when the Ayatollah Khomeinhi issued a fatwa to kill Rushdie.

Kershnar is perceived by the public as condemnable by endorsing or advocating adult-on-child sexual contact.  Notwithstanding Kershnar's assertion to the contrary (i.e., that his position is much more nuanced than what is perceived by the public), his verbatim statement, "the notion that [adult-child sex] is wrong even with a one-year old is not quite obvious to me," and similar statements have been trumpeted to millions of people by traditional and social media. Kurshnar's professed nuance on his position is lost on the public.  Kershnar's statements have generated intense expressions of anger, revulsion, and disgust in the public, and they will again if he is reinstated.

In 2019, researchers published findings of a study of 279 incidents between 1983 and 2015 of vigilantism against registered sex offenders, including murder[1].  Most of the registered sex offenders had victimized children.  The motive in the vigilante attacks was the attackers' view that the targeted sex offender deserved more punishment than occurred in the court system. The authors noted that the 279 examined incidents likely represented a small subset of the actual number of vigilante attacks on sex offenders.  In some cases, the victim was only suspected of being a sex offender.  In the Kershnar matter, many of the social media posts allege Kershnar is a child molester, an advocate of child sexual exploitation, or both.  The likely narrative that Fredonia endorses his views, false as it will be, will have obvious consequences for our safety posture.

If Kershnar is reinstated, a very large population, perhaps millions, will reach the *correct* conclusion that Kershnar is physically on our campus and the *incorrect* conclusion that the campus endorses his positions on adult-on-child sex.  Self-radicalization and the development of a pseudo-warrior mentality are real phenomena that have motivated lone offenders to complete acts of targeted violence on many occasions.  Violence directed toward a known or suspected child sex offender is a notion that many would endorse and some would undertake. My concern is the one self-radicalized pseudo-warrior out of the many persons aggrieved in the echo chamber of social media who decides to right this perceived wrong through a violent attack on our campus.

Law enforcement generally and University Police particularly have few tools to prevent such attacks on the Fredonia campus, because the threat of targeted violence will originate

---

[1] Cubellis, Evans, D. N., & Fera, A. G. (2019). Sex Offender Stigma: An Exploration of Vigilantism against Sex Offenders. Deviant Behavior, 40(2), 225–239. https://doi.org/10.1080/01639625.2017.1420459

overwhelmingly from outside our campus from an immense population of aggrieved persons. Accordingly, for this reason and those detailed in my previous assessments, my recommendations as provided in the March 17 assessment stand.

# EXHIBIT F



TO:          Maria Carroll
             Director
             Human Resources

             Katie McCutcheon
             Associate Counsel
             Office of General Counsel
             SUNY

FROM:        Brent S. Isaacson
             Chief of University Police

DATE:        October 31, 2022

RE:          Campus safety implications and recommendations re: Kershnar matter;
             Updated assessment

On February 2, 2022, I provided my assessment of the Stephen Kershnar matter on the
physical safety posture of SUNY Fredonia.  On March 17, 2022, I provided an updated
assessment.  For ease of reference, I have attached to this document the March 17
assessment, which also includes the full text of the February 2 assessment.  An additional
safety assessment update was provided on August 14, 2022.

This memorandum updates my August 14, 2022 assessment of the impact a physical return of
Stephen Kershnar would have on the safety posture of SUNY Fredonia's campus.  The instant
update is informed by new information contained in an analysis by A1C Partners, LLC, which I
received on September 20, 2022.  A1C's analysis is discussed in more detail below.  I continue
to assess that a return of Kershnar to our campus will pose an unacceptable risk of an act of
targeted violence occurring on our campus.

In the months since February 2022, the public's attention to the Kershnar matter has waned, at
least as reflected in the relative paucity of recent social media posts about him.  Nevertheless, it

is reasonable to conclude that Kershnar's return to campus would immediately generate an enormous amount of negative attention to our campus, with the prevalent narrative being that SUNY Fredonia is endorsing Kershnar's stated opinions which normalize adult sexual contact with young children. That narrative will likely be carried to a national audience by social and traditional media outlets, and will, in my opinion, provide justification to some people for targeted violence directed toward Kershnar and/or our campus.

There have been many incidents in which lone offenders, who were not connected to a broader terrorist or extremist organization, were self-radicalized and motivated to attack victims based on a grievance that the offenders adopted as their own. Such grievances are not a result of the lived experiences of the offenders, such as when an offender targets a school where he was bullied. Rather, these offenders adopted the grievances or took up the cause of others. These offenders, dubbed "pseudo-warriors" by threat assessment professionals, view themselves as serving a greater cause than their own personal grievance when they attack. They view themselves as righting a wrong against their worldview and, importantly, providing justice for others who share their worldview but are too weak to act to vindicate or protect it.

Offenders have developed grievances based on their perception that the intended victims were a proponent or provider of abortions, had certain political or religious views, were members of a certain race, had committed sex crimes against children, and a myriad of other factors. For example, in 1998 in western New York, James Kopp killed Dr. Barnett Slepian with a long distance rifle shot while Slepian was in his home. Dr. Slepian was an abortion provider, and Kopp held strong anti-abortion views. In 2015, a married couple carried out a mass murder attack in San Bernardino, California in which 14 people were killed. The offenders were not connected to a terrorist organization, but rather, they were self-radicalized through their consumption of terrorist propaganda and their personal adoption of the grievances of foreign terrorist organizations. Also in 2015, Dylan Roof killed nine in a church shooting in Charleston, South Carolina. Federal prosecutors said he was self-radicalized online to carry out the racist attack. More recently, an armed intruder attempted to breach the FBI's field office in Cincinnati and was killed soon thereafter by law enforcement. Media reports indicated that the offender believed, as stated on his social media postings, that the 2020 election was stolen and required an armed insurgency against the government. In the summer of 2022, an offender stormed the stage of the Chautauqua Amphitheater and gravely wounded Salman Rushdie, an author whose writings have been condemned by religious extremists as blasphemous. Although it is unknown

at this point, it is possible that this offender adopted these grievances without explicit and recent direction from a foreign actor and was, instead, self-motivated to attack.  The offender was not yet born when the Ayatollah Khomeinhi issued a fatwa to kill Rushdie.

Kershnar is perceived by the public as condemnable by endorsing or advocating adult-on-child sexual contact.  Notwithstanding Kershnar's assertion to the contrary (i.e., that his position is much more nuanced than what is perceived by the public), his verbatim statement, "the notion that [adult-child sex] is wrong even with a one-year old is not quite obvious to me," and similar statements have been trumpeted to millions of people by traditional and social media. Kurshnar's professed nuanced position on the topic is lost on the public.  Kershnar's statements have generated intense expressions of anger, revulsion, and disgust in the public, and they will again if he is reinstated.

In 2019, researchers published findings of a study of 279 incidents between 1983 and 2015 of vigilantism against registered sex offenders, including murder[1].  Most of the registered sex offenders had victimized children.  The motive in the vigilante attacks was the attackers' view that the targeted sex offender deserved more punishment than occurred in the court system. The authors noted that the 279 examined incidents likely represented a small subset of the actual number of vigilante attacks on sex offenders.  In some cases, the victim was only suspected of being a sex offender.  In the Kershnar matter, many of the social media posts allege Kershnar is a child molester, an advocate of child sexual exploitation, or both.  The likely narrative that Fredonia endorses his views, false as it will be, will have obvious consequences for our safety posture.

If Kershnar is reinstated, a very large population, perhaps millions, will reach the *correct* conclusion that Kershnar is physically on our campus and the *incorrect* conclusion that the campus endorses his positions regarding adult-on-child sex.  Self-radicalization and the development of a pseudo-warrior mentality are real phenomena that have motivated lone offenders to complete acts of targeted violence on many occasions.  Violence directed toward a known or suspected child sex offender is a notion that many would endorse and some would undertake.  My concern is the one self-radicalized pseudo-warrior out of the many persons

[1] Cubellis, Evans, D. N., & Fera, A. G. (2019). Sex Offender Stigma: An Exploration of Vigilantism against Sex Offenders. Deviant Behavior, 40(2), 225–239. https://doi.org/10.1080/01639625.2017.1420459

aggrieved in the echo chamber of social media who decides to right this perceived wrong through a violent attack on our campus.

*A1C Partners, LLC Analysis:* *On September 20, 2022, I received an Open Source Intelligence Product from A1C Partners, LLC, a company with a cadre of experienced senior executive former federal law enforcement officials and a staff of trained intelligence analysts. A1C has investigative tools to search the internet, social media platforms, and the "dark web" for information on a given topic, and they were tasked with identifying additional internet traffic regarding the Kershnar controversy.*

*A1C confirmed earlier work by SUNY Fredonia and an outside consultant that a large volume of concerning message traffic occurred after Kershnar's video interviews were widely circulated. The messages advocated for violence against Kershar, although no direct threat to harm was noted. As I explained in an earlier assessment, the lack of a direct threat toward a target is cold comfort and should not be understood to mean there is not a risk of violence. In fact, research shows that nearly all acts of targeted violence are not preceded by an explicit threat of violence directed to the target. Importantly, A1C identified that message traffic on the website BitChute exists which accurately identifies Kershnar's home address in Fredonia and his cell phone number. This confirms my earlier suspicion that a natural progression of this matter would be that potential bad actors would share information to allow targeting of Kershnar, and by extension our campus, for harassment and/or violence.*

*According to A1C, one of the platforms on which the comments appear was identified as GoyimTV.tv, a media sharing site operated by the Goyim Defense League. The Anti-Defamation League assesses Goyim Defense League labels as virulently antisemitic. Individuals responding to the Kershnar video stated Professor Kershnar should be subjected to various types of physical harm. Most of the comments identified by A1C were posted in antisemitic and racist conversations blaming pedophilia and other perceived societal ills against the Jewish faith, and as part of a generalized belief in conspiracy theories. The language utilized during these conversations is extremely graphic, but not unlike the language regularly used in these communities. Several individuals posted screenshots of Kershnar's SUNY Fredonia faculty page. The faculty page specifically identifies the physical address of Professor Kershnar's office.*

*These findings support and magnify my concern that a reinstatement of Kershnar would inevitably lead to an explosion of extreme rhetoric among many persons around the country, some of whom will feel justified, even compelled, to violently target Kershnar and/or our campus.*

Law enforcement generally and University Police particularly have few tools to prevent such attacks on the Fredonia campus, because the threat of targeted violence will originate overwhelmingly from outside our campus from an immense population of aggrieved persons. Accordingly, for this reason and those detailed in my previous assessments, my recommendations as provided in the March 17 assessment stand.