## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHEN KERSHNAR, | |
| *Plaintiff*, | Case No.: 1:23-cv-00525-LJV |
| v. | |
| STEPHEN H. KOLISON, JR, *et al.*, | |
| *Defendants*. | |

## PLAINTIFF'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Adam B. Steinbaugh*
CA Bar No. 304829
FOUNDATION FOR INDIVIDUAL
  RIGHTS & EXPRESSION
510 Walnut St.; Ste. 1250
Philadelphia, PA 19106
Tel: (215) 717-3473
Fax: (267) 573-3073
Email: adam@thefire.org

Joshua T. Bleisch*
IN Bar No. 35859-53
FOUNDATION FOR INDIVIDUAL
  RIGHTS & EXPRESSION
700 Pennsylvania Avenue SE; Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Fax: (267) 573-3073
Email: josh.bleisch@thefire.org

Barry N. Covert, Esq.
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Ave.; Ste. 120
Buffalo, NY 14202
Tel: (716) 849-1333
Email: bcovert@lglaw.com

* Admitted *pro hac vice*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..........................................................................iii

INTRODUCTION ........................................................................................ 1

STATEMENT OF FACTS ............................................................................ 1

    Professor Kershnar's long history of provocative philosophizing is
    rewarded by SUNY and praised by SUNY Fredonia—until brief clips
    of podcast debates cause it to reverse course and join the Twitter mob
    in condemning him. ................................................................................ 1

    Eighteen months later, Kershnar remains barred from teaching and
    campus while SUNY Fredonia struggles to find lecturers for his
    classes. ................................................................................................... 4

PROCEDURAL BACKGROUND ................................................................ 6

STANDARD OF REVIEW........................................................................... 6

ARGUMENT ............................................................................................... 7

    I.    Kershnar's Speech Is Protected Under the First Amendment. .............. 7

        A.    Whether Kershnar spoke as a private citizen or academic,
             his speech is evaluated under *Levin*. ............................................. 8

            1.    The Complaint sufficiently alleges that Kershnar
                 spoke as a private citizen. ................................................... 9

            2.    Even if Kershnar spoke as an academic, *Garcetti*
                 does not apply to scholarly speech................................... 10

        B.    Kershnar's speech addressed matters of public concern............ 12

    II.    Defendants Took Multiple and Repeated Adverse Actions
        Against Kershnar Due to His Protected Expression............................ 13

        A.    Defendants' removals of Kershnar from classroom
             teaching were adverse actions prohibited by *Levin*, *Dube*,
             and *Blum*. ................................................................................. 14

            1.    Strident—even threatening—opposition to faculty
                 members' scholarly views does not outweigh the
                 value of the free exchange of ideas in higher
                 education. ........................................................................ 14

i

    2.    Removing Kershnar from the classroom never satisfied a legitimate educational interest..................... 16

    3.    Renewing Kershnar's exile in August and November 2022 did not address reasonable predictions of future disruption. ....................... 17

    4.    Kershnar's initial removal from teaching was retaliatory. ....................... 17

    B.    Defendants' initiation of a criminal investigation for protected extramural speech was adverse action prohibited by *Levin*. ....................... 18

    C.    Defendants' prior restraint on Kershnar's speech is an adverse action they do not attempt to defend. ........................... 19

    D.    Kershnar's retaliation causes of action sufficiently allege retaliatory intent and causation. ................................. 20

III.    President Kolison Is Not Entitled to Qualified Immunity. .................. 21

    A.    Kolison violated Kershnar's clearly established rights in removing him from teaching and announcing an investigation. ................................. 22

    B.    Kolison's deliberative conduct highlights his objective unreasonableness. ....................... 24

CONCLUSION ............................................................... 25

## TABLE OF AUTHORITIES

### Cases

*Adams v. Trs. of the Univ. of N.C.-Wilmington,*
    640 F.3d 550 (4th Cir. 2011) ............................................................................... 11

*Appel v. Spiridon,*
    531 F.3d 138 (2d Cir. 2008) ................................................................................ 21

*Bible Believers v. Wayne Cnty.,*
    805 F.3d 228 (6th Cir. 2015) ............................................................................... 16

*Blum v. Schlegel,*
    18 F.3d 1005 (2d Cir. 1994) ........................................................... 8, 11, 12, 16

*Buchanan v. Alexander,*
    919 F.3d 847 (5th Cir. 2019) ............................................................................... 11

*Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,*
    444 F.3d 158 (2d Cir. 2006) ............................................................................... 10

*Connick v. Myers,*
    461 U.S. 138 (1983) ............................................................................................. 12

*Davis v. Scherer,*
    468 U.S. 183 (1984) ............................................................................................. 24

*Deem v. DiMella-Deem,*
    941 F.3d 618 (2d Cir. 2019) ............................................................................... 11

*DeJong v. Pembrook,*
    No. 3:22-CV-01124-NJR, 2023 U.S. Dist. LEXIS 46763 (S.D. Ill. Mar. 20,
    2023) ..................................................................................................................... 19

*Demers v. Austin,*
    746 F.3d 402 (9th Cir. 2014) ............................................................................... 11

*Dube v. State Univ. of N.Y.,*
    900 F.2d 587 (2d Cir. 1990) ..................................................................... *passim*

*Edrei v. Maguire,*
    892 F.3d 525 (2d Cir. 2018) ............................................................................... 21

*Freidus v. Barclays Bank PLC,*
    734 F.3d 132 (2d Cir. 2013) ................................................................................. 6

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) .......................................................................... 8, 9

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1981) ............................................................................. 25

*Harman v. City of N.Y.,*
    140 F.3d 111 (2d Cir. 1998) ............................................................... 19

*Healy v. James,*
    408 U.S. 169 (1972) ............................................................................. 24

*Hoggard v. Rhodes,*
    141 S. Ct. 2421 (2021) ........................................................................ 25

*Kassner v. 2nd Ave. Delicatessen, Inc.,*
    496 F.3d 229 (2d Cir. 2007) ................................................................. 6

*Keyishian v. Bd. of Regents,*
    385 U.S. 589 (1967) ............................................................................. 23

*Lane v. Franks,*
    573 U.S. 228 (2014) ........................................................................ 9, 10

*Levin v. Harleston,*
    770 F. Supp. 895 (S.D.N.Y. 1991) ............................... 15, 18, 19, 24

*Levin v. Harleston,*
    966 F.2d 85 (2d Cir. 1992) ....................................................... *passim*

*Lewis v. Cowen,*
    165 F.3d 154 (2d Cir. 1999) ............................................................... 20

*Locurto v. Giuliani,*
    447 F.3d 159 (2d Cir. 2006) ............................................... 14, 16, 17

*Lynch v. City of N.Y.,*
    952 F.3d 67 (2d Cir. 2020) ................................................................... 7

*Malley v. Briggs,*
    475 U.S. 335 (1986) ............................................................................. 25

*Matthews v. City of N.Y.,*
    779 F.3d 167 (2d Cir. 2015) ................................................................. 9

*Matzell v. Annucci,*
    64 F.4th 425 (2d Cir. 2023) ........................................................ 21, 22

*McKenna v. Wright,*
    386 F.3d 432 (2d Cir. 2004) ............................................................ 22

*Melzer v. Bd. of Educ.,*
    336 F.3d 185 (2d Cir. 2003) .......................................... 12, 13, 17, 21

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) .......................................................... 11

*Neb. Press Ass'n v. Stuart,*
    427 U.S. 539 (1976) ........................................................................ 19

*Ole Monmouth Stock Transfer Co. v. Depository Tr. & Clearing Corp.,*
    485 F. Supp. 2d 387 (S.D.N.Y. 2007) .............................................. 7

*Pickering v. Bd. of Educ.,*
    391 U.S. 563 (1968) .......................................................................... 8

*Rankin v. McPherson,*
    483 U.S. 378 (1987) ........................................................................ 13

*Reuland v. Hynes,*
    460 F.3d 409 (2d Cir. 2006) ............................................................ 22

*Roth v. United States,*
    354 U.S. 475 (1957) ........................................................................ 13

*Sabir v. Williams,*
    52 F.4th 51 (2d Cir. 2022) .............................................................. 22

*Shelton v. Tucker,*
    364 U.S. 479 (1960) ........................................................................ 23

*Skehan v. Vill. of Mamaroneck,*
    465 F.3d 96 (2d Cir. 2006) .............................................................. 21

*Smith v. Cnty. of Suffolk,*
    776 F.3d 114 (2d Cir. 2015) ........................................................ 8, 20

*Specht v. City of N.Y.,*
    15 F.4th 594 (2d Cir. 2021) ...................................................... 14, 19

*Sweezy v. New Hampshire,*
    354 U.S. 234 (1957) .................................................................. 11, 23

*Vincent v. Yelich,*
    718 F.3d 157 (2d Cir. 2013) ............................................................ 22

*Weintraub v. Bd. of Educ.*,
    593 F.3d 196 (2d Cir. 2010) ................................................................ 10

## **<u>Regulations</u>**

34 CFR 668.46(f)(1) .......................................................................................... 5

34 CFR 668.46(f)(2) .......................................................................................... 5

## **<u>Other Authorities</u>**

Br. for Defs.-Appellees, *Heim v. Daniel*,
    No. 22-1135 (2d Cir. Dec. 1, 2022) ............................................... 11, 12

## INTRODUCTION

Challenging core assumptions is what philosophers *do*. For years, SUNY Fredonia praised Dr. Stephen Kershnar for his Socratic inquiries into the moral assumptions society makes about difficult subjects, including intimate relations between adults and adolescents. But then a 28-second clip of a podcast in which Kershnar challenged this taboo went viral.

Rather than directing the university to weather the transient social media storm that followed, President Kolison, who agreed with Kershnar's online critics, censored him by exiling Kershnar from campus as a first resort. He publicly proclaimed *Kershnar* a threat, declared SUNY Fredonia would prevent him from "contact with students" pending investigation, and directed police to investigate. Even after the furor over Kershnar's comments—ostensibly the reason for exiling him—dissipated, Defendants persisted in barring him from the classroom.

Kolison's facilitation of a heckler's veto is poison in the lifeblood of universities, whose central mission is to foster the unfettered exchange of ideas. That's why settled law prohibits university leaders from sidelining faculty to quell a hostile public. To permit otherwise would imperil every idea that may attract public anger.

## STATEMENT OF FACTS

***Professor Kershnar's long history of provocative philosophizing is rewarded by SUNY and praised by SUNY Fredonia—until brief clips of podcast debates cause it to reverse course and join the Twitter mob in condemning him.***

Dr. Stephen Kershnar is an award-winning Distinguished Teaching Professor at SUNY Fredonia, where he has taught philosophy since 1998. (Verified Complaint, ECF No. 1 ("Compl.") ¶¶ 35–40.) Kershnar is renowned for his thoughts on the

philosophical underpinnings of morality. (Compl. ¶¶ 12–13, 22, 24–26, 37–41, 45–48.) In keeping with the intellectual tradition of Socratic inquiry, Kershnar stakes out provocative positions to question the assumptions society makes about morality. (*Id.*)

SUNY Fredonia praised Kershnar's scholarly examinations of society's moral commitments on a host of issues, including abortion, slavery, and torture. (Compl. ¶¶ 37–38, 40–41, 46.) When SUNY named him a Distinguished Teaching Professor (its "highest academic honor") and recipient of the "Chancellor's Award of Excellence" in teaching, it issued press releases lauding his iron-sharpens-iron approach:

> Dr. Kershnar has established a reputation as one of the most prolific authors on campus . . . . He is known for promoting unpopular or previously ignored positions that often leads those who disagree with him to sharpen their own views when reacting to his reasoning.

(Compl. ¶¶ 3, 37–38, 40–41.) It even praised Kershnar's willingness to explore moral questions involved in sexual conduct between adults and adolescents, referencing it in his bio on the university's website. (Compl. ¶¶ 3, 37–38, 40–41, 46.)

SUNY Fredonia's support for Kershnar's freedom of inquiry ended abruptly when strident online critics came calling on February 1, 2022. (Compl. ¶¶ 73–79.) Kershnar had appeared on two podcasts, *Unregistered* in December 2020 and *Brain in a Vat* in January 2022.[1] He went viral on Twitter based on a 28-second video excerpt from his hourlong *Brain in a Vat* discussion, which posed a hypothetical

---

[1] Neither podcast had any relationship with SUNY Fredonia, neither was promoted to the SUNY Fredonia community, and the university did not ask Kershnar to appear on these (or any) podcasts. (Compl. ¶¶ 30–33, 55–58, 63–67, 70–72.)

introducing a broader discussion about the nature of moral wrongs and why they are wrong:

> Imagine that an adult male wants to have sex with a 12-year-old girl. Imagine that she's a willing participant. A very standard, very widely held view is that there's something deeply wrong about this, and it's wrong independent of being criminalized. It's not obvious to me that it is in fact wrong.

(Compl. ¶¶ 54–62, 68–69, 73–79.)

Just three hours after the clip was posted, SUNY Fredonia President Stephen Kolison issued a statement on Twitter condemning Kershnar's "reprehensible" views as unrepresentative of "the values of SUNY Fredonia in any way, shape or form" and announcing that the "matter is being reviewed." (Compl. ¶ 79.) That evening, campus police told two complaining callers that Kershnar was under investigation. (Compl. ¶ 80.) The next evening, as public criticism continued,[2] Kolison directed SUNY Fredonia University Police Chief Brent Isaacson to seize Kershnar's computer for "analysis" and to bar him from campus, which Isaacson did on the morning of February 3. (Compl. ¶¶ 82–83, 85–88, 94–95.)

Isaacson told Kershnar there were safety concerns but did not specify their nature. (Compl. ¶ 87.) Kershnar asked for information about any threats and the anticipated length of his exile and offered to teach remotely to mitigate any plausible safety concerns, while pointing out that barring him from teaching altogether effected a "heckler's veto." (Compl. ¶¶ 87–89.) Isaacson did not respond. (Compl. ¶¶ 92–93.)

---

[2] Members of the State Assembly's Higher Education Committee also later wrote to SUNY's chancellor demanding Kershnar's "immediate removal" from teaching, and that SUNY report him to police. (Compl. ¶ 84.)

By midday, director of human resources Maria Carroll emailed Kershnar and, invoking a SUNY disciplinary provision authorizing President Kolison to reassign faculty duties ahead of disciplinary action, barred him from campus and from contacting "the campus community" without permission "until further notice." (Compl. ¶¶ 96–98.) Carroll declined to provide any information about specific threats, declined to disclose their nature or number, citing their "volume," and told Kershnar the "duration" of his removal was "unknown, because the safety concerns . . . remain ongoing." (Compl. ¶¶ 99–100.)

That afternoon President Kolison issued a second Twitter statement announcing that Kershnar would have no "physical presence on campus and will not have contact with students while" an "expeditious[]" investigation "is ongoing." (Compl. ¶ 101.) Kolison again "reiterate[d]" his denunciation of the "content of the video" and Kershnar's "abhorrent" views, urging he could not "stress strongly enough that the independent viewpoints" of Kershnar "are in no way representative of the values of the SUNY Fredonia campus." (*Id.*)

### *Eighteen months later, Kershnar remains barred from teaching and campus while SUNY Fredonia struggles to find lecturers for his classes.*

For the last eighteen months, SUNY Fredonia has not told Kershnar what the "specific threats" were. (Compl. ¶¶ 93, 99, 118, 125, 128–29, 178.) The FBI is unaware of any specific threats. (Compl. ¶ 139.) Local, county, and state police have no records of threats or investigations related to Kershnar. (Compl. ¶¶ 140–42.) And SUNY

Fredonia's own daily crime log—required by federal law[3]—does not reference any threats. (Compl. ¶¶ 138, 143–48.) The momentary public reaction has long since waned. (Compl. ¶¶ 152–53.) And in response to criticism of Kolison's actions by academic freedom organizations and faculty around the world, SUNY's attorney acknowledged that Kershnar's speech was protected by the First Amendment. (Compl. ¶¶ 105–111.)

Yet Defendants have repeatedly barred him from the classroom because of objections to Kershnar's views—not just those of the public, but also President Kolison's *personal* objections, consistent with the retaliatory steps Kolison took in the first days of the controversy. (*See supra* p. 3, Compl. ¶¶ 94–98, 101–104.) And Defendants periodically renewed these measures even as public interest waned. (Compl. ¶¶ 152–54.) On August 24, 2022, Executive Vice President and Provost David Starrett wrote Kershnar, renewing his exile due to "ongoing concerns regarding your safety and the safety of others on campus should you return[.]" (Compl. ¶¶ 117–18.) Starrett wrote again on September 9, 2022, stating the university had not decided whether to allow Kershnar to teach "due to ongoing concerns regarding your safety and the safety of others on campus should you return to the campus." (Compl. ¶ 125.) And on November 1, 2022, Provost Starrett sent Kershnar a third letter, barring him from teaching during the Spring 2023 semester. (Compl. ¶¶ 127–28.)

---

[3] *See* 34 CFR 668.46(f)(1)–(2) (requiring a "daily crime log" recording, within two business days, "any crime. . . reported to the campus police").

None of these letters described the nature of or basis for any safety concerns. Each cites the same unidentified "your safety" language. (Compl. ¶¶ 6, 99, 118, 125, 128–29, 135–36.) Confronted by a faculty member in August 2022, Kolison refused to say whether the publicly announced investigation concluded, citing privacy interests, and Starrett refused to inform faculty of any safety concerns. (Compl. ¶¶ 156–59.) Yet Kershnar remains banned from classrooms. (Compl. ¶ 113.)

## PROCEDURAL BACKGROUND

On June 23, 2023, Kershnar filed suit and contemporaneously moved for a preliminary injunction. (ECF Nos. 1, 3–5.) The Complaint alleges four claims for First Amendment violations: content and viewpoint discrimination; retaliation claims seeking prospective relief against Defendants Kolison and Starrett in their official capacities, damages against Kolison in his individual capacity, and prior restraint given the prohibition on contacting community members.

Defendants filed a consolidated response to the Complaint and preliminary injunction motion on July 24, 2023 (ECF No. 13) ("Opp'n"). Kershnar filed his reply brief supporting the preliminary injunction motion on August 4, 2023. (ECF No. 14.)

## STANDARD OF REVIEW

On a motion to dismiss, the court "is to accept as true all facts alleged in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237–40 (2d Cir. 2007). Dismissal is warranted only if a complaint does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 137 (2d Cir. 2013) (cleaned up), with plausibility presenting a

standard lower than probability that requires only "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Lynch v. City of N.Y.*, 952 F.3d 67, 74 (2d Cir. 2020). Finally, in reviewing Defendants' Motion, this Court should consider only "allegations in the complaint," and disregard any evidence submitted in opposition to Plaintiff's Motion for a Preliminary Injunction. *See Ole Monmouth Stock Transfer Co. v. Depository Tr. & Clearing Corp.*, 485 F. Supp. 2d 387, 391 (S.D.N.Y. 2007).

## ARGUMENT

The Court should deny the Motion to Dismiss because the Complaint plausibly alleges President Kolison violated Kershnar's clearly established First Amendment rights. University faculty members enjoy robust First Amendment rights in their academic expression and—like all public employees—when they speak as private citizens on matters of public concern. Those expressive freedoms are central to the mission of universities and cannot be overcome by the din of an angry public or vetoed by a university president who finds a view "abhorrent." When Defendants took adverse actions against Kershnar—launching a criminal investigation, repeatedly banning him from the classroom, and prohibiting him from speaking to thousands of members of his community—they violated binding Second Circuit precedent. And, as reasonable university officials would know, the First Amendment protects tenured faculty's academic expression, President Kolison cannot claim qualified immunity.

## I.      Kershnar's Speech Is Protected Under the First Amendment.

University professors, like all public employees, possess the right "to comment on matters of public interest" as private citizens without fear of adverse action by

7

their state employer. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) (public school teacher's letter to the editor criticizing employer was protected by the First Amendment). When faculty speak as academics, their speech—inside and outside the classroom—enjoys robust protection under the First Amendment. *Levin v. Harleston*, 966 F.2d 85, 88 (2d Cir. 1992); *Blum v. Schlegel*, 18 F.3d 1005, 1010–12 (2d Cir. 1994). Where, as here, a public university professor speaks either as an academic or a private citizen on matters of public concern, the burden shifts to the university to show both that (1) the professor's speech itself is likely to disrupt the educational environment *and* (2) that the "harm caused by the disruption outweighs the value" of his expression. *Smith v. Cnty. of Suffolk*, 776 F.3d 114, 119 (2d Cir. 2015); *Levin*, 966 F.2d at 88 (public university had no "legitimate educational interest" in removing philosophy professor from teaching following disruptive student protests over his extramural speech).

### A.   Whether Kershnar spoke as a private citizen or academic, his speech is evaluated under *Levin*.

Kershnar adequately alleges his extramural speech was as a private citizen, not as an academic. But even accepting, as Defendants insist, that he spoke as an academic, *Garcetti v. Ceballos*, 547 U.S. 410 (2006), did not alter the Second Circuit's longstanding recognition that academic speech enjoys robust protection under the First Amendment. *See, e.g., Dube v. State Univ. of N.Y.*, 900 F.2d 587, 597–98 (2d Cir. 1990) (professor denied promotion due to "pressure exerted by government officials and community activists outraged by" his views alleged First Amendment claim).

1.   <u>The Complaint sufficiently alleges that Kershnar spoke as a private citizen.</u>

Kershnar spoke as a private citizen because his speech was outside his "official responsibilities" and podcasts are a medium "available to citizens generally." *See Matthews v. City of N.Y.*, 779 F.3d 167, 173–175 (2d Cir. 2015). Kershnar's podcast appearances are not "speech that owes its existence to [his] professional responsibilities[.]" *Garcetti*, 547 U.S. at 421. Rather, SUNY faculty members' duties are those "consistent with" their "academic rank" or "title," including "teaching" and duties "required" of faculty. (Compl. ¶ 27.)

Conversely, appearing on extramural podcasts is not "ordinarily"—or ever— among Kershnar's duties, (Compl. ¶¶ 27–28, 30–34), which answers the "critical question" in his favor. *Lane v. Franks*, 573 U.S. 228, 240 (2014). Appearing on podcasts is neither "teaching" nor "required" of Kershnar, who prepared for and appeared on *Brain in a Vat* in his own home on his own time. (Compl. ¶¶ 30–33, 57– 58, 65–67, 70–72.) His duties—as his "Distinguished Teaching Professor" title and academic rank reflect—are to teach, not to do podcasts. (Compl. ¶¶ 27–28.) Nor has SUNY Fredonia ever "required" him to appear on any podcast, facilitated his appearances, or publicized them. (Compl. ¶¶ 30–33.) His podcast appearances, then, are not speech SUNY "itself has commissioned or created." *Garcetti*, 547 U.S. at 422.

This is reinforced by the fact that podcast appearances are a "form or channel of discourse available to non-employee citizens" like *Pickering*'s letter to the editor— a strong indication of speech as a citizen, not as an employee. *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 204 (2d Cir. 2010) (union grievance was communication

available only to employees). When speech is directed to the public, which has an "interest in receiving the well-informed views" of government employees, it is not in service of an employee's duties. *Id.* at 205 (citing *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167 n.3 (2d Cir. 2006) (football coach "was speaking as a citizen, who also happened to be a public employee," about misconduct he learned about through his employment)).

        2.    <u>Even if Kershnar spoke as an academic, *Garcetti* does not apply to scholarly speech.</u>

Defendants insist that Kershnar spoke as an academic (not a citizen) because the "topic" of discussion involved "research he conducted." (Opp'n 13.)[4] This finds no support in the law and cannot change the outcome, as courts in this Circuit evaluate faculty *academic* speech—like faculty speech as *citizens*—under pre-*Garcetti* law. Defendants are wrong to argue that the *subject* of speech means it is that of an employee. Just because speech merely "relates to" or "concerns information learned in the course of [that] employment" does not mean it is speech "ordinarily within the scope of an employee's duties." *Lane*, 573 U.S. at 239–40. Indeed, there is "special value" to the public when public employees can speak on "subject matters" related to their employment. *Id.* at 240. And that's especially true of public university faculty,

---

[4] Defendants also argue Kershnar spoke as an employee because a podcast host—not Kershnar—introduced Kershnar as "from" SUNY Fredonia, and because Kershnar developed his arguments while "watching football, drinking wine, or hanging out in the office." (Opp'n 13–14.) This cuts *against* Defendants' assertion because faculty are not paid to watch sports and drink. In any case, these assertions rely on evidence outside the Complaint and cannot be considered on a motion to dismiss.

whose freedom to share ideas unfettered by the State serves a unique social function. *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

But whether Kershnar spoke as an academic or as a citizen is ultimately immaterial, as *Garcetti* does not apply to academic speech—precisely because of the unique function faculty serve. *Garcetti* expressly reserved the question of whether its rule extends to university professors' academic expression.[5] This means there is no "conflict, incompatibility, or inconsistency" with preexisting precedent. *See Deem v. DiMella-Deem*, 941 F.3d 618, 623 (2d Cir. 2019). As SUNY recently acknowledged to the Second Circuit,[6] that leaves in place the Circuit's longstanding protection of faculty expression—including *Levin*, 966 F.2d at 88–90; *Dube*, 900 F.2d at 597–98 (pressure by officials and "community activists outraged by" professor's views); and *Blum*, 18 F.3d at 1011–14 (professor's advocacy, in and out of class, of legalizing marijuana). Neither of the unpublished decisions Defendants offer here negates these binding precedents. (Opp'n 13).

---

[5] Each of the four Circuits to consider whether *Garcetti* reaches university professors' academic speech has held it does not. *Demers v. Austin*, 746 F.3d 402, 406 (9th Cir. 2014) (faculty expression "related to scholarship or teaching" falls outside of *Garcetti*); *Meriwether v. Hartop*, 992 F.3d 492, 505 (6th Cir. 2021) (faculty expression "engaged in core academic functions, such as teaching and scholarship" falls outside *Garcetti*); *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 564 (4th Cir. 2011) (declining to apply *Garcetti* to public university faculty expression because it "could place beyond the reach of First Amendment protection many forms of public speech or service a professor engaged in during his employment"); *Buchanan v. Alexander*, 919 F.3d 847, 853 (5th Cir. 2019) (applying *Pickering* to in-class speech).

[6] *See* Br. for Defs.-Appellees, *Heim v. Daniel*, No. 22-1135 (2d Cir. Dec. 1, 2022), at 41–44, 43 n.15, *available at* https://bit.ly/45hOuVZ (acknowledging that *Garcetti* "left undisturbed" the "robust First Amendment protection for academic speech by public-university professors" in *Dube* and *Blum*, which "remain binding").

**B.      Kershnar's speech addressed matters of public concern.**

The second *Pickering* step considers whether the speech, considering its "content, form, and context," is related to "any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146–48 (1983). Defendants argue that Kershnar's remarks, when taken out of context, have diminished social value and therefore do not address matters of public concern. Defendants' argument fails for two reasons. First, academic speech necessarily addresses matters of public concern. Second, the Second Circuit holds the subject matter of his speech addresses matters of public concern.

To begin, Defendants' claim that Kershnar's remarks depended on his academic employment (Opp'n 13–14) *concedes* his speech is a matter of public concern: In the arena of higher education, speech related to scholarship or teaching inherently implicates important public issues. *Dube*, 900 F.2d at 598; *Blum*, 18 F.3d at 1012. Indeed, as SUNY has conceded in a pending case, *Dube* suggests "all academic speech . . . is categorically a matter of public concern[.]"[7]. So if Kershnar spoke as an academic as Defendants contend, his academic speech is categorically on matters of public concern. *Dube*, 900 F.2d at 598.

But Defendants' arguments also fail because the Second Circuit has held that abstract discussion of child-sex abuse addresses matters of public concern. *Melzer v. Bd. of Educ.*, 336 F.3d 185, 198 (2d Cir. 2003). Defendants pluck Kershnar's hypotheticals from their context and urge that they resemble "obscenity." (Opp'n 15

---

[7] *See* Br. for Defs.-Appellees, *Heim v. Daniel*, *supra* n.6, at 44 n.17.

(*citing Miller v. California*, 413 U.S. 15, 33 (1973)).) But the public-concern test *requires* analysis of a statement in its "context," *Melzer*, 336 F.3d at 196, and posing challenging hypotheticals in "a philosophical 'thought experiment'" (Opp'n 4) forms the backbone of philosophical inquiry. Defendants' reliance on the *Miller* test for the notion that some speech is valueless is misplaced, as *Miller* requires that speech be "taken as a whole" to prevent out-of-context excerpts from being used to suppress a broader "interchange of *ideas*." *See Miller*, 413 U.S. at 34–35 (quoting, in part, *Roth v. United States*, 354 U.S. 475, 484 (1957)). Prohibiting adult-child relationships does not mean there is no social value in abstract philosophical *discussions* about its morality. In short, whether a given statement is "inappropriate or controversial" is irrelevant to whether it addresses matters of public concern. *Rankin v. McPherson*, 483 U.S. 378, 387 (1987).

Kershnar addressed matters of public concern just as any good philosopher would: by asking provoking questions. Whether he did so as a citizen or an academic is itself an academic question, as his speech is protected in either capacity.

## II.    Defendants Took Multiple and Repeated Adverse Actions Against Kershnar Due to His Protected Expression.

The Complaint sufficiently alleges that each of Defendants' adverse actions did not serve a "legitimate educational interest." *Levin*, 966 F.2d at 88. Under this standard, the adverse actions against Kershnar—repeatedly barring him from the classroom, the criminal investigation, and the prior restraint—are allowed only if (1) the potential disruptiveness outweighs the value of his speech; (2) the action served a reasonable prediction of disruption; and (3) it was intended to address "this

disruption and not in retaliation for the speech." *Locurto v. Giuliani*, 447 F.3d 159, 172–73 (2d Cir. 2006).

Opposition by the public, students, and lawmakers is never sufficient to impose a heckler's veto on academic speech. And Kolison's retaliatory actions at the outset of the controversy were unrelated to addressing public pressure but rather focused on treating *Kershnar* as a threat, all based on Kolison's objection to his viewpoint. Further, as public interest waned, Defendants' repeated decisions to bar Kershnar from the classroom lost any pretense of being necessary to prevent disruption.

### A. Defendants' removals of Kershnar from classroom teaching were adverse actions prohibited by *Levin*, *Dube*, and *Blum*.

Each of Defendants' repeated decisions to ban Kershnar from teaching are adverse actions—that is, each act would deter an objective faculty member from exercising their rights. *Specht v. City of N.Y.*, 15 F.4th 594, 604 (2d Cir. 2021). None of these actions can be justified by President Kolison's objections to Kershnar's views, or by tempestuous opposition of the public, students, lawmakers, or donors, because it cannot serve any "legitimate educational interest" to cave to passing community pressure and veiled threats. *See Levin*, 966 F.2d at 88.

1. Strident—even threatening—opposition to faculty members' scholarly views does not outweigh the value of the free exchange of ideas in higher education.

For more than thirty years, the Second Circuit has recognized the danger of allowing controversy as a reason to *suppress* academic expression. Allowing otherwise would permit the most illiberal among us—here, avowed racists and anti-Semites (Opp'n 9)—to dictate who may speak or what ideas circulate at public universities.

To avoid this, *Levin* and *Dube* require universities to address public pressure through measures other than sacrificing the expressive freedoms central to their missions.

Unlike the online critics and speculative violence here, the risk of violence and disruption in *Levin* was manifest after a philosophy professor's extramural remarks on race spurred public furor as student protesters roiled the campus of City College. 966 F.2d at 87.[8] Despite those considerable safety concerns and actual disruption, the Second Circuit denounced administrators' adverse actions in caving to student opposition, offering "shadow" sections so they could avoid his classes, and launching a protracted investigation ripe with the potential for disciplinary action as interfering with Levin's "basic constitutional values." *Id*. at 88, 90.

The Defendants' effort to wave away *Levin* by claiming it is not a *Pickering* balancing case (Opp'n 20) must fail. The Second Circuit balanced the school's "legitimate educational interest" against the professor's First Amendment rights, adapting *Pickering*'s balancing test to the interests of higher education. *Levin*, 966 F.2d at 88. In doing so, it affirmed the district court, which expressly rested on "the rule thus enunciated in *Pickering*." *Levin*, 770 F. Supp. at 921.

The Second Circuit likewise stood firm in *Dube* against "community pressure," including that by "government officials" threatening to "defund" university programs and by "community activists outraged by" an academic's views. 900 F.2d at 597–98.

---

[8] The district court recounted death threats ("We know where you live you Jewish bastard your time is going to come"), student protests outside and inside the professor's classrooms, and a "melee with security" outside his class. *Levin*, 770 F. Supp. at 903–05.

As the court explained, "efficient" functioning of academia "actually depends, to a degree, on the dissemination in public fora of controversial speech implicating matters of public concern." *Blum*, 18 F.3d at 1012. "[F]ree and open debate on issues of public concern" is not just desirable but "essential to" the central purpose of higher education. *Id.* at 1011.

> 2.   Removing Kershnar from the classroom never satisfied a legitimate educational interest.

As alleged in Kershnar's Complaint, each decision to bar him from teaching— in February, August, and November 2022—was an adverse action that fails to satisfy at least one *Locurto* test. 447 F.3d at 172–73. Taking just one of those tests, none of Defendants' three separate decisions addressed any potential disruptiveness that outweighed the value of Kershnar's speech. *See id.* at 172. As *Levin* and *Blum* establish, community pressure is not a legitimate educational interest authorizing universities to effect a heckler's veto. And that's exactly how SUNY Fredonia viewed the public's reaction—not as threats, but as hate mail (Compl. ¶¶ 138–48, 178) indistinguishable from the community pressure that could not justify censorship in *Levin* and *Blum*. As the Sixth Circuit put it, officials cannot silence a speaker as an "expedient alternative" to other, obvious measures to address a hostile mob opposed to his message.[9] *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 252 (6th Cir. 2015) (en banc).

---

[9] As Kershnar alleges, Defendants failed to consider narrower measures like allowing him to teach remotely, increasing police presence, soliciting backup from other agencies, reporting threats to external agencies, and seeking to arrest anyone who *did* make a threat. (Compl. ¶ 204.) Defendants' claim that Kershnar is unable to

3.   <u>Renewing Kershnar's exile in August and November 2022 did not address reasonable predictions of future disruption.</u>

Even if community pressure were sufficient to outweigh academics' expressive freedom (it's not), that pressure dissipated here before Defendants decided the second and third times (in August and November 2022) to remove Kershnar from teaching. (Compl. ¶¶ 117, 127, 152–53.) Accepting at face value that the original removal from class was justified (but see *infra* Section II.A.4), predictions of future disruption were no longer viable six or nine months later. Those decisions accordingly fail *Locurto*'s requirement that predictions of future disruption be reasonable. 447 F.3d at 172.

4.   <u>Kershnar's initial removal from teaching was retaliatory.</u>

The measures taken in February 2022, meanwhile, fail *Locurto*'s independent requirement that action must be "based on this disruption" and not as "retaliation for the speech." *Id.* at 172–73. Even if Defendants could otherwise "prevail[] in the balancing test," therefore, Kershnar "still carr[ies] the day" because Defendants' "motivation . . . was retaliation for the speech itself, rather than for any resulting disruption." *See Melzer*, 336 F.3d at 193.

President Kolison's retaliatory intent is apparent in both word and deed. His denunciations of Kershnar's speech ("abhorrent" and inconsistent with campus "values") alone show retaliatory intent. (Compl. ¶ 101.) He also directed law

---

design an asynchronous course in the Fall 2023 semester (Opp'n 9) is irrelevant to whether they ignored his offer to teach live classes via Zoom as a mitigating measure in February 2022 (Compl. ¶ 90.) In any event, Defendants' claim—along with the self-serving threat assessments offered in response to the preliminary injunction—lies outside the four corners of the Complaint and cannot be considered on a motion to dismiss.

enforcement not to protect Kershnar, but to *investigate* him. (Compl. ¶¶ 5, 94–95, 102–04.) These steps were not necessary to protect public safety from threats posed by outsiders. Instead, they reflect the irrational belief that *Kershnar* was a threat to safety due to his views, as revealed by Kolison's public pledge that Kershnar would "not have contact with students" during an investigation. (Compl. ¶¶ 5, 101–04.)

### B. Defendants' initiation of a criminal investigation for protected extramural speech was adverse action prohibited by *Levin*.

Investigation into Kershnar is an independent adverse action against him that stands as its own actionable First Amendment harm. On this, *Levin* is unambiguous: It is not only the "commencement" of "disciplinary proceedings" for "protected speech outside the classroom" that violates a professor's constitutional rights, but the "implicit threat" of punishment as well—whether from the proceedings themselves, or an investigation that never leads to them. *Levin*, 966 F.2d at 89–90.

The parallels between this case and *Levin* are inescapable. Like the president in *Levin*, President Kolison invoked disciplinary procedures to initiate an investigation. *Levin*, 966 F.2d at 89; (Compl. ¶¶ 96–97). And both publicly denounced their philosophy professor's extramural speech as contrary to their institution's "values." *Levin*, 966 F.2d at 89; (Compl. ¶¶ 79, 101).

And the differences between *Levin* and this case only reinforce Plaintiff's position: Where the *Levin* president assembled an "advisory" committee of faculty members, President Kolison enlisted police to conduct an investigation, taking steps far beyond the chilling conduct of his *Levin* counterpart. *Levin*, 770 F. Supp. at 911; (Compl. ¶ 5, 80, 94–95). And while *Levin*'s investigation cleared the professor in ten

18

months, *Levin*, 966 F.2d at 89; 770 F. Supp. at 912, Defendants have refused to share the conclusion of their 18-month investigation—despite publicly pledging Kershnar would be removed from campus while they "expeditiously" completed it. (Compl. ¶¶ 101, 156–57, 171.) Investigations have chilling effects even when their targets are ultimately vindicated, and Kolison's step over *Levin*'s line satisfies the objective "ordinary firmness" test for retaliation. *Specht*, 15 F.4th at 604.

### C. Defendants' prior restraint on Kershnar's speech is an adverse action they do not attempt to defend.

Defendants' imposition on Kershnar of an ongoing, 18-month ban on speaking without permission to anyone in the "campus community" about any subject is a third adverse action that does not serve a legitimate educational interest. (Compl. ¶¶ 98, 101, 169–70, 229–48.)[10] No-contact directives are a prior restraint, s*ee, e.g.*, *DeJong v. Pembrook*, No. 3:22-CV-01124-NJR, 2023 U.S. Dist. LEXIS 46763, at \*37–39 (S.D. Ill. Mar. 20, 2023), and prior restraints are "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Defendants offer no explanation what interest the no-contact directive serves, even though they concede both that *Pickering* applies and that the weighty public interests underlying the constitutional aversion to prior restraints "may be considered as factors in balancing the relevant interests under *Pickering*." (Opp'n 21–22) (quoting *Harman v. City of N.Y.*, 140 F.3d 111, 118 (2d Cir. 1998)).

---

[10] The prior restraint is implicated in each of Kershnar's four causes of action. It is alleged as an independent cause of action and as adverse actions under the retaliation and content/viewpoint discrimination causes of action.

Defendants' prior restraint makes no attempt to balance any university interest against Kershnar's interests. The prohibition reaches *all* speech on matters of public concern to an audience of thousands. (Compl. ¶¶ 98, 101, 113, 169–70.) It effectively shut Kershnar out from defending himself to longtime colleagues, even as the president of his institution repeatedly denounced him to the very same audience. (Compl. ¶¶ 166–71.) This broad restraint on a scholar's speech to an academic community serves no legitimate educational interest.

### D. Kershnar's retaliation causes of action sufficiently allege retaliatory intent and causation.

The Court should reject Defendants' claim that Kershnar's retaliation causes of action fail to plausibly plead causation. A plaintiff may plead a causal connection "either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith*, 776 F.3d at 118. Here, Kolison's statements show both retaliatory animus and temporal proximity: each statement expressly condemned Kershnar's views and the first came within hours of the initial complaints about him. (Compl. ¶¶ 79, 101.)

Defendants' argument seems to be that because SUNY Fredonia was "aware" of Kershnar's views before his podcast appearance, Defendants' adverse actions could only have been driven by their interest in preventing disruption by Kershnar's critics. (Opp'n 21.) But that conflicts with Kershnar's allegations and the precedent on which Defendants rely.

Kershnar need only establish that his speech was "a substantial or motivating factor" in Kolison's actions. *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir. 1999). That a

defendant claims he had "other, non-retaliatory reasons" for an adverse action "irrelevant" if his "motivation was unconstitutional." *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 107 (2d Cir. 2006), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008). Kolison specifically condemned Kershnar's "views" and the "content" of his speech and took actions unrelated to remedying public hostility. (Compl. ¶¶ 79, 101.)

Defendants' position is also unsupported by *Melzer*. In *Melzer*, that "the Board" itself "knew" of the K-12 teacher's views made it unlikely that a retaliatory motive drove their decision to terminate the teacher. *Melzer*, 336 F.3d at 200. While SUNY Fredonia had *institutional* knowledge of Kershnar's views (Compl. ¶¶ 37–38, 41, 46), that does not mean *Kolison* was aware of his views. To the contrary, his statement— made hours after it was brought to his attention on Twitter—denouncing Kershnar's independent "views" as inconsistent with SUNY Fredonia's "values" (even as those views were disclosed on its website) suggests he had learned of them for the first time. (Compl. ¶¶ 46, 75, 79, 101.)

## III. President Kolison Is Not Entitled to Qualified Immunity.

President Kolison is not entitled to qualified immunity because he violated Kershnar's clearly established First Amendment rights. *Edrei v. Maguire*, 892 F.3d 525, 532, 540 (2d Cir. 2018) (affirming denial of qualified immunity where a "wealth of cases inform" officials that protesters enjoy "robust" First Amendment rights). To begin with, a defendant invoking qualified immunity at the motion-to-dismiss stage "faces a formidable hurdle" and is "usually not successful." *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023) (quoting *Sabir v. Williams*, 52 F.4th 51, 64 (2d Cir.

2022)). That's because "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the qualified immunity defense." *Id.* (quoting *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004)). That hurdle is cleared only if the facts supporting the defense "may be discerned from the face of the complaint" after "accepting as true all [its] material allegations . . . and drawing all reasonable inferences in favor of the plaintiff." *Vincent v. Yelich*, 718 F.3d 157, 167 (2d Cir. 2013). Kolison cannot clear that hurdle, as binding Second Circuit law, including *Dube*, puts any reasonable university president on notice that he cannot remove a professor from classes because their academic speech, inside or outside the classroom, proved controversial. 900 F.2d at 597–98.

### A.   Kolison violated Kershnar's clearly established rights in removing him from teaching and announcing an investigation.

Kolison's violation of the First Amendment, discussed above, transgressed clearly established law. A right is clearly established if the law (1) was "defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from existing law that his conduct was unlawful." *Reuland v. Hynes*, 460 F.3d 409, 420 (2d Cir. 2006) (affirming denial of qualified immunity in First Amendment case when defendant acted with retaliatory motive) (cleaned up). Over the last three decades, the Second Circuit has firmly established that the First Amendment protects faculty members' freedom of expression inside and outside the classroom.

In *Levin*, the Second Circuit held that university presidents may not remove faculty from the classroom, nor threaten—directly or by implication—disciplinary

action for extramural expression protected by the First Amendment. *Levin*, 966 F.2d at 88–89. Were *Levin* alone not enough (and it is), *Dube* held before *Levin* that qualified immunity did not lie where a university president, under pressure from lawmakers and "activists outraged" by a professor's academic work, canceled his class. *Dube*, 900 F.2d at 590. Affirming the court's denial of qualified immunity, the court explained it "*need only note* that 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" *Id.* at 597 (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)) (emphasis added).

This was because, the court further explained, "for decades it has been clearly established that the First Amendment tolerates neither laws *nor other means of coercion, persuasion or intimidation* 'that cast a pall of orthodoxy' over the free exchange of ideas" at universities. *Id.* at 598 (quoting, in part, *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)) (emphasis added). Citing the Supreme Court's repeated emphasis of "the importance of" free expression in higher education, the Court noted the pronouncement in *Sweezy* that:

> The essentiality of freedom in the community of American universities is almost self-evident. . . . Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise, our civilization will stagnate and die.

*Id.* at 597–98 (quoting *Sweezy*, 354 U.S. at 250). Were further precedent necessary (it's not), the Supreme Court also put university leaders on notice that threats to public safety do not give officials broad latitude to narrow the First Amendment's strong protection for the exchange of ideas. *Healy v. James*, 408 U.S. 169, 180–85

(1972) (despite the "acknowledged need for order," including against "disruptive and violent campus activity," the First Amendment's protections apply with no "less force on college campuses than in the community at large.")

If Kershnar spoke as an academic, as Kolison insists (Opp'n 13), it was clearly established that community opposition, including "intimidation," cannot justify removing him from the classroom. A reasonable university president would have recognized the contours of the First Amendment rights of faculty—even the president in *Levin* was denied qualified immunity, as "retaliat[ing] against a teacher based solely on the content of his protected writings or speech as a teacher . . . is, as a matter of law, objectively unreasonable." *Levin*, 770 F. Supp. at 927. These rights have been defined with at least enough clarity, in fact, for SUNY to enshrine them in their own policies, recognizing that faculty members' "role as citizens" entitles them to free expression outside the classroom. (Compl. ¶ 34.) Qualified immunity does not lie here.

## B.   Kolison's deliberative conduct highlights his objective unreasonableness.

That Kolison had time to reflect on the constitutional rights of faculty and chose to disregard them reinforces his objective unreasonableness.

Qualified immunity should not shield constitutional violations by public university presidents resulting from deliberate decisions. An official with time to assess the circumstances and the authority controlling his actions does not face the same risk that hesitation would render his action "futile" or irresponsible. *Davis v. Scherer*, 468 U.S. 183, 196 (1984). By contrast, where deliberation would suggest to an official that his "conduct would violate statutory or constitutional rights, he *should*

be made to hesitate; and a person who suffers injury caused by such conduct . . . have a cause of action." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1981) (emphasis added). As Justice Thomas aptly queried, "why should university officers, who have time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting?" *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (statement of Thomas, J., respecting the denial of *certiorari*).

Even in the first hours of controversy, Kolison announced that he and his advisors were "review[ing]"—that is, deliberating—their options. (Compl. ¶ 79.) Days later, he repeated that "[w]e will continue to investigate[.]" (Compl. ¶ 101.) While deliberating, he received advice from academic freedom experts and SUNY lawyers, who understood Kershnar's speech was protected by the First Amendment. (Compl. ¶¶ 105–109, 111.) As weeks of deliberation turned to months, Defendants continued to deliberate, advising Kershnar in September they were contemplating his status, then making that decision months later. (Compl. ¶¶ 125, 127.)

An objective university president would have known his actions raised First Amendment alarms, and Kolison knew Kershnar's speech was protected. Qualified immunity does not shield "those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), nor should it.

## **CONCLUSION**

This Court should deny Defendants' Motion.

Dated: August 7, 2023                    Respectfully submitted,

                                         /s/ Adam B. Steinbaugh

Barry N. Covert, Esq.
LIPSITZ GREEN SCIME
CAMBRIA LLP
42 Delaware Ave.; Ste. 120
Buffalo, NY 14202
Phone: (716) 849-1333
Email: bcovert@lglaw.com

Adam B. Steinbaugh*
CA Bar No. 304829
FOUNDATION FOR INDIVIDUAL
RIGHTS & EXPRESSION
510 Walnut St.; Ste. 1250
Philadelphia, PA 19106
Tel:     (215) 717-3473
Email:  adam@thefire.org

Joshua T. Bleisch*
IN Bar No. 35859-53
FOUNDATION FOR INDIVIDUAL
RIGHTS & EXPRESSION
700 Pennsylvania Ave. SE; Ste. 340
Washington, DC 20003
Tel:     (215) 717-3473
Email:  josh.bleisch@thefire.org

* Admitted *pro hac vice*.

*Counsel for Plaintiff*