UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

STEPHEN KERSHNAR,

                            Plaintiff,

          -vs-

STEPHEN H. KOLISON, JR., in his individual
capacity and his official capacity as the President
of the State University of New York at Fredonia, and

DAVID STARRETT, in his individual capacity and
official capacity as Executive Vice President and
Provost of the State University of New York at
Fredonia,

                            Defendants.
_____

23-cv-525

# DEFENDANTS' REPLY MEMORANDUM OF LAW
# IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

LETITIA JAMES
Attorney General of the State of New York
JENNIFER METZGER KIMURA
ALYSSA JORDAN PANTZER
Assistant Attorneys General, of Counsel
350 Main Street, Suite 300A
Buffalo, NY 14202

# **TABLE OF CONTENTS**

**POINT I: Plaintiff Did Not Speak as a Private Citizen on a Matter of Public Concern** ........ 1

**POINT II: Plaintiff's Claims Fail Under *Pickering* Balancing** ................................................. 3

    A.   Defendants' Actions Must be Judged at the Time of the Incident ...................................... 3

    B.   Plaintiff Fails to Rebut Defendants' Evidence of Disruption .............................................. 3

    C.   Defendants Did Not Retaliate Against Plaintiff .................................................................. 5

    D.   Plaintiff's Prior Restraint Claims Are Subsumed Under *Pickering* ..................................... 6

    E.   Plaintiff Fails to Adequately Plead But-For Causation ....................................................... 7

**POINT III: President Kolison is Entitled to Qualified Immunity** ............................................ 9

# **TABLE OF AUTHORITIES**

**Cases**

*Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661 (2010) ................ 10

*City of San Diego v. Roe*, 543 U.S. 77 (2004) ................................................................................ 2

*Connick v. Myers*, 461 U.S. 138 (1983) ....................................................................................... 10

*Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139 (2d Cir. 2014) ............................................. 6

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ................................................................................ 9

*DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461 (E.D.N.Y. 2009) .............. 10

*DeJong v. Pembrook* No. 3:22-CV-01124-NJR, 2023 U.S. Dist. LEXIS 46763 (S.D. Ill. Mar. 20, 2023) .......................................................................................................................................... 7

*Healy v. James*, 408 U.S. 169 (1972) ....................................................................................... 9, 10

*Jeffries v. Harleston*, 52 F.3d 9 (2d Cir. 1995) ........................................................................... 3, 9

*Levin v. Harleston*, 966 F.2d 85 (2d Cir. 1992) .......................................................................... 3, 9

*Lewis v. Cowen*, 164 F.3d 154 (2d Cir. 1999) ............................................................................... 7

*Locurto v. Giuliani*, 447 F.3d 159 (2d Cir. 2006) .................................................................. 5, 6, 8

*Melzer v. Bd. of Educ.*, 336 F.3d 185 ............................................................................. 2, 5, 6, 7, 8

*Miller v. California*, 413 U.S. 15 (1973) ....................................................................................... 2

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ...................................................................................... 9

*Panse v. Eastwood*, 303 Fed. Appx. 933 (2d Cir. 2008) .......................................................... 1, 10

*Vega v. Miller*, 273 F.3d 460 (2d Cir. 2001) .............................................................................. 1, 2

*Waters v. Churchill*, 511 U.S. 661 (1994) ..................................................................................... 9

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) ................................................................ 8

Defendants submit this reply in further support of their Motion to Dismiss and in reply to Plaintiff's Opposition.  Plaintiff's graphic statements about adult-child sex—including incestuous sex with a one-year-old—were not on a topic of public concern.  Even if they were, Plaintiff's interest in such speech is outweighed by the substantial actual and potential disruption to the SUNY Fredonia campus that occurred as a result, including threats of violence, disenrollment by students, and cessation of funding by alumni.  Plaintiff offers no evidence to support his claims of retaliation and acknowledges that SUNY was aware of his controversial views for years and took action *only when* there was a massive backlash leading to disruption. Given the lack of clearly established law in this area, including the open question of whether *Garcetti* applies to academic speech, President Kolison is entitled to qualified immunity.

**POINT I: Plaintiff Did Not Speak as a Private Citizen on a Matter of Public Concern**

Kershnar makes the bold—and legally incorrect—statement that virtually *anything* he says is protected speech because he is either speaking (i) as a private citizen or (ii) as an academic, and that all academic speech is categorically protected.  (Pl's Opp. at 8-11.)  But the Supreme Court and the Second Circuit have never adopted this rule.  Even if *Garcetti* does not apply to academic speech, which the Second Circuit has said remains an open question, *Panse v. Eastwood*, 303 Fed. Appx. 933, 934 (2d Cir. 2008), *Pickering* controls and requires Plaintiff to show that his speech was a topic of public concern. Plaintiff relies on *Dube* for his argument that "academic speech is categorically on matters of public concern." (Pl's Opp. at 12.)  But,

> *Dube*, much relied on by the Plaintiff, upheld the right of a teacher, in a course on racism, to express the view that Zionism was a form of racism. Protection was accorded despite the offensiveness of the teacher's viewpoint to some students and some members of the community…Vega's toleration of the students' shouted vulgarities was far removed from Dube's expression of his political views.

*Vega v. Miller*, 273 F.3d 460, 467 (2d Cir. 2001).  In *Vega*, the court granted qualified immunity to school administrators where "a college teacher has been disciplined for permitting a classroom

1

exercise, initiated for legitimate pedagogical purposes, to continue to the point and beyond where students are calling out a series of vulgar, sexually explicit words and phrases." *Id.* at 467.

Just as in *Vega*, while Kershnar was free to discuss the topic of age of consent laws and related moral issues—something both sides acknowledge he had done for years at SUNY Fredonia—his speech on the podcast went beyond this. Just as the "legitimate pedagogical" exercise in *Vega* was held to go too far once "sexually explicit words" were being uttered in the classroom, so too did Kershnar when he graphically asked his audience to "imagine" an adult man who wants to have sex with a twelve-year-old girl and then went on to discuss incestuous fellatio of a one-year-old by the child's grandmother. Indeed, the statements found to be problematic in *Vega*—such as "your[sic] so hard," and "eating girls out"—are tame by comparison to Kershnar's, and were uttered by students, not the professor. *Id.* at 463.

Plaintiff argues that "the Second Circuit has held abstract discussion of child-sex abuse addresses matters of public concern" citing exclusively to *Melzer*. Plaintiff is wrong. In *Melzer,* the Court held, "we need not resolve the public concern issue in the case at bar because it is not critical to the outcome." *Melzer*, 336 F.3d at 196. Instead, the court assumed *arguendo* that Melzer's speech was a matter of public concern and found that his claims nonetheless failed under *Pickering* balancing. Absent his inapposite reliance on *Melzer*, Plaintiff does little to plausibly plead how his specific speech—graphic discussions of sex with minors including a one-year-old—is "of value and concern to the public at the time of publication." *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004). If Plaintiff had gone on a video podcast and played obscene materials, that speech would not be protected even if he styled his broadcast as relating to academic inquiry. *Miller v. California*, 413 U.S. 15 (1973). Plaintiff bears the burden of showing that his speech is on a matter of public concern. He advanced no cogent argument as to

2

why graphic discussions of sex with minors is "a subject of legitimate news interest." *Id*.

### POINT II: Plaintiff's Claims Fail Under *Pickering* Balancing

A. <u>Defendants' Actions Must be Judged at the Time of the Incident</u>

Plaintiff, apparently recognizing that Defendants' actions were reasonable when taken, posits that "[e]ven if 'cooling down' measures once could have been appropriate, the question for this Court is simple: Are they now?" (Pl's Opp. at 1.)  But if Defendants' actions were justified at the time taken, then Plaintiff's claims are subject to dismissal under *Pickering*.

Plaintiff bemoans his ongoing "bar" from the classroom, but Defendants could have, consistent with *Pickering*, fired Plaintiff if their prediction of disruption was reasonable. *Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir. 1995) (precedent "permits a government employer to fire an employee for speaking on a matter of public concern if: (1) the employer's prediction of disruption is reasonable" and meets the *Pickering* balancing test).  If firing Plaintiff would have been constitutionally permissible, then temporarily barring him from teaching on campus while continuing to pay him his full salary also passes constitutional muster.

B. <u>Plaintiff Fails to Rebut Defendants' Evidence of Disruption</u>

Plaintiff repeatedly argues that Defendants must show a "legitimate educational interest" in their actions under *Levin* and that this somehow "adapt[ed] *Pickering's* balancing test to the interests of higher education." (Pl's Opp. at 15.)  However, the Second Circuit's decision in *Levin* does not mention *Pickering*.  *Levin* turned on the fact that there was "a complete lack of evidence to support appellants' claim." 966 F.2d at 88.  Because Defendants have provided ample evidence of potential and actual disruption, *Levin* is inapposite.

Incredibly, Plaintiff alleges that there were no threats to SUNY Fredonia or himself, and instead only "invective." (Pl's Reply at 4.)  But this significantly mischaracterizes messages that,

3

although not a statement to carry out a specific act of violence on a specific date—something Chief Isaacson explained an assailant would be unlikely to do—clearly conveyed intentions to harm Plaintiff, Defendants, and the wider campus community, including telling Kershnar "You need to be put down," telling Defendants they should be "hung" and "have no right to walk on this earth." (Def's Mem. at 5-6.)  The fact that these threats did not lead to criminal prosecutions does not minimize their seriousness.

  Plaintiff also attempts to downplay the potential disruption to students and the rest of the campus community. One student explained that Kershnar made others "feel unsafe in the classroom," another recounted that a female friend was scared "for her safety," and others felt that although they wanted to drop Kershnar's class because they "don't feel comfortable" they could not do so because they needed the credits to remain a full-time student.  (Kimura Decl., Ex. C, 6-7.)  Plaintiff ignores evidence of the significant number of minors on the campus, including minors enrolled in classes.  (Kimura Decl., Ex. B.)  Kershnar also fails to address the potential harm to survivors of childhood sexual abuse in the SUNY Fredonia student body. Plaintiff additionally disregards the threatened loss of enrollment and alumni financial support. Indeed, one alumni who has "financially supported the university" and "referred countless prospect students," threatened to pull all support.  (Kimura Decl., Ex. D.)

  Defendants needs not establish actual disruption to prevail.  Plaintiff concedes that proof of "potential disruption" is sufficient (Pl's Opp. at 4, 6), but fails to explain how Defendants anticipation of potential disruption was unreasonable. Indeed, Plaintiff does not address this point at all. Defendants have offered testimony from Chief Isaacson who assessed a significant potential for disruption based on his years of experience in law enforcement including over two decades with the FBI.  Plaintiff offers no contrary evidence or plausible allegations.

Finally, Plaintiff continues to cast Defendants as embracing a "heckler's veto" and goes so far as to suggest that the concerns of students are "never sufficient" to limit speech. (Pl's Opp at 14.) But as in *Melzer*, the SUNY Fredonia community including students, their parents, and alumni are not "outsiders seeking to heckle [plaintiff] into silence, rather they are participants in public education, without whose cooperation public education as a practical matter cannot function." *Melzer*, 336 F.3d at 199. Students and alumni were not merely opposed to Kershnar's views, just as in *Melzer*, their reaction threatened to significantly disrupt SUNY Fredonia through declining enrollment and decreased financial support. *Melzer*, 336 F.3d at 199 (crediting testimony that "having a teacher with beliefs such as Melzer's would provoke anxiety and be a disruptive experience for the average student."). Moreover, "[w]here a Government employee's job quintessentially involves public contact," such as Plaintiff, "the Government may take into account the public's perception of that employee's expressive acts in determining whether those acts are disruptive to the Government's operations." *Locurto v. Giuliani*, 447 F.3d 159, 179 (2d Cir. 2006). Students disenrolling and alumni ceasing donations are all disruptions that Defendants reasonably anticipated and were constitutionally entitled to consider under *Pickering*.

  C. <u>Defendants Did Not Retaliate Against Plaintiff</u>

Plaintiff claims that Defendants retaliated based entirely on "Kolison's express denunciation" of Plaintiff's views including calling them "abhorrent." (Pl's Opp. at 17.) But President Kolison was entirely within his rights to express his disagreement with Plaintiff's comments about pedophilic sex, and doing so was necessary to attempt to avoid severe disruption to the University's operations. President Kolison's comments are not sufficient to show that Defendants acted with retaliatory intent. In *Locurto*, city employees participated in a racist parade float. The mayor condemned their actions as "a disgusting display of racism," and

5

in the same statement added "[t]hey will be fired." *Id.* at 165.  Despite this direct connection between the mayor's views on the plaintiffs' speech and promised adverse action, the Second Circuit held that describing "the plaintiffs' speech as 'a disgusting display of racism' does not, without more, mean he fired the plaintiffs in 'retaliation' for engaging in racist speech." *Id.* at 180.  Kershnar does not offer more than the unsuccessful plaintiffs in *Locurto*.

Even Plaintiff admits that SUNY Fredonia "praised Kershnar's willingness to explore moral questions involved in sexual conduct between adults and adolescents."  (Pl's Opp. at 2.)  Given that Defendants were aware of Kershnar's controversial views, there is no basis to conclude that they suddenly decided to retaliate against him for his speech after the podcast aired.  The more plausible explanation is that Defendants reacted to the potential and actual disruption caused by the reaction to Plaintiff's speech by students, their parents, alumni, and the public.  *Melzer*, 336 F.3d at 200 ("that the Board knew of Melzer's NAMBLA membership as early as the mid-1980s and did not terminate him until after his membership became public knowledge makes it highly implausible that a retaliatory motive was the lever for the Board's action dismissing him."); *see Locurto*, 447 F. 3d at 181 ("the evidence is overwhelming that the *content* of racist speech did not bring about dismissal, in the absence of notoriety").

Plaintiff argues that the investigation into the fallout of Kershnar's comments was also retaliatory because of the "implicit threat" of punishment.  However, an employee "may not claim retaliation simply because the employer undertakes a fact-finding investigation." *Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139, 147 (2d Cir. 2014).  Moreover, Plaintiff ignores Defendants' statement that "Plaintiff has not been disciplined and will not be disciplined for his statements on the podcast."  (Def's Mem. at 9.)

   D.  <u>Plaintiff's Prior Restraint Claims Are Subsumed Under *Pickering*</u>

6

Plaintiff argues that the directive not to have contact with the "campus community" constitutes prior restraint of speech. (Pl's Opp. at 19.) Plaintiff relies on *DeJong v. Pembrook*, but that case simply noted that, "whether the [no contact orders] pass constitutional muster is not yet the question before the Court," and would ultimately turn on whether the speech would "disrupt university activities." No. 3:22-CV-01124-NJR, 2023 U.S. Dist. LEXIS 46763, at *33, 38 (S.D. Ill. Mar. 20, 2023). Ultimately, if Plaintiff's claims fail under *Pickering* balancing, his prior restraint claim must also fail. (Defs' Mem. at 21.)

Under *Pickering*, Defendants could have terminated Plaintiff. Terminating the plaintiff in *Melzer* from his position as a high school teacher certainly acted as a prior restraint on his speech with his former students. But this is permitted under *Pickering* where the potential for disruption is sufficient. If Defendants could constitutionally *permanently terminate* Plaintiff, then they could request that he *temporarily* refrain from contact with the campus community.

While Kershnar claims that he has been shut out "from defending himself to longtime colleagues," this is untrue as Kershnar remains free to speak to the public at large and has continued to do so by appearing on podcasts. And Kershnar was offered the opportunity to develop online classes but failed to complete the required steps. Melohusky Decl., ¶ 15.

E.  <u>Plaintiff Fails to Adequately Plead But-For Causation</u>

It is well settled that Plaintiff's retaliation claims fail absent proof of but-for causation pursuant to *Mt. Healthy*. Plaintiff claims that he "need only establish that his speech was 'a substantial or motivating factor' in Kolison's actions," citing to *Lewis v. Cowen*, 164 F.3d 154, 163 (2d Cir. 1999). Plaintiff omits the very next sentence holding defendants still prevail if they "would have taken the same action even in the absence of the protected speech." *Id*.

Plaintiff complains that Defendant Kolison "condemned Kershnar 'views' and the

7

'content' of his speech." But just as the mayor could condemn racist speech by fire department employees without retaliating, so too could President Kolison. *See Locurto*, 447 F.3d at 180. Moreover, Kershnar himself, in his own book, stated that such "activity intuitively strikes many people, including myself, as sick, disgusting and wrong." Stephen Kershnar, *Pedophilia and Adult-Child Sex*, p. xi (2015). Plaintiff cannot quarrel with President Kolison describing these views as "reprehensible."

Kershnar, realizing that *Melzer* eviscerates his claim of but-for causation, attempts to distinguish that case because there "the Board" was aware of the teacher's views, while here Kolison's statement "suggests he had learned of them for the first time." Initially, Plaintiff does not plead, and no evidence suggests, that Kolison first learned of Kershnar's views at the time of the incident. Regardless, Plaintiff sued President Kolison in his official capacity and it is well settled that, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Therefore, Plaintiff's concession that "SUNY Fredonia had *institutional* knowledge of Kershnar's views" (Pl's Opp. at 21) is sufficient to eliminate the meagre allegations of retaliatory motive that Plaintiff has offered.

In any event, President Kolison's aim in distancing SUNY Fredonia from this lightning rod position was to protect the campus community in the wake of the storm created by Kershnar's comments. As Defendants explained—and Plaintiff failed to address—there have been several high-profile acts of violence against those perceived as defending pedophilia. (Defs' Mem. at 18.) It was reasonable to attempt to distance Fredonia from these views.

**POINT III: President Kolison is Entitled to Qualified Immunity**

Plaintiff cites to settled law that qualified immunity cannot be granted where there are material factual disputes. But where a defendant is entitled to qualified immunity as a matter of law, it is clear that qualified immunity "should be resolved as early as possible," *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998), because it is "an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original).

Plaintiff argues that *Dube* prevents granting qualified immunity because it decided that a professor cannot be removed "from classes because their academic speech, inside or outside the classroom, proved controversial." But Plaintiff categorizes his speech as "extramural" (Compl., *passim*), and claims "Kershnar adequately alleged his extramural speech was as a private citizen, *not as an academic*." (Pl's Opp. 8.)

In addition to *Dube*, Plaintiff relies on *Levin*, a decision that did not analyze *Pickering* balancing and which rested on the fact that the defendant-appellant claimed the speech in question "harmed the students" but there was a "complete lack of evidence to support appellants' claim." 966 F.2d at 88. Moreover, both *Levin* and *Dube* predate *Waters v. Churchill*, 511 U.S. 661, 681 (1994), in which the Supreme Court first recognized that "potential disruptiveness was enough to outweigh whatever First Amendment value the speech might have had." And "[b]y stressing that *actual* disruption is not required, *Waters* pulls a crucial support column out from under," prior Second Circuit precedent on this issue. *Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir. 1995). Given that neither *Dube* nor *Levin* applied the currently mandated test of analyzing potential disruption, they fail to establish that President Kolison violated clearly established law.

Plaintiff claims that "threats to public safety" do not justify restrictions on speech (Pl's Opp. at 23) citing to *Healy v. James*, 408 U.S. 169, 180-85 (1972). But *Healy* involved denial of

9

recognition of a campus group because the national organization was perceived to have a "philosophy of violence." *Id*. *Healy* turned on the fact that the defendant "denied the student group official recognition *because of* the group's viewpoint." *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 684 n.15 (2010). The potential for violence, given the myriad threats to the SUNY Fredonia community, qualifies as potential disruption that can be taken into account under *Pickering*. "To hold otherwise would be to preclude school officials from preventing harm to students, including violence, even where the substantial disruption is reasonably foreseeable. Nothing in the First Amendment, or the Supreme Court jurisprudence interpreting the First Amendment, requires such an absurd rule." *DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461, 480 (E.D.N.Y. 2009).

Plaintiff is silent when it comes to the impact of *Garcetti* on President Kolison's qualified immunity claim. The Second Circuit itself has recognized as "an open question" whether *Gracetti* applies in the academic context, *Panse*, 330 Fed. Appx. at 934, the law on this issue is not clearly established and President Kolison is entitled to qualified immunity. Plaintiff claims that President Kolison should "have known that his actions raised First Amendment alarms," and disingenuously suggests that he had time to act with "deliberation." (Pl's Opp. at 25.) But knowledge that action might implicate the First Amendment does not establish that President Kolison knowingly violated the law. As the Supreme Court has recognized, *Pickering* involves "particularized balancing" and "is difficult." *Connick v. Myers*, 461 U.S. 138, 150 (1983). President Kolison acted with immediacy to try to quell an uproar that reasonably threatened substantial disruption to the campus community including threats of targeted violence, disenrollment, and loss of financial support. Even if this Court ultimately determines that it would have weighed the scales differently, President Kolison is entitled to qualified immunity.

DATED:   August 9, 2023                    **LETITIA JAMES**
             Buffalo, New York              Attorney General of the State of New York
                                            Attorney for Defendants

                                 BY:   *s/ Jennifer Metzger Kimura*
                                       JENNIFER METZGER KIMURA
                                       ALYSSA PANTZER JORDAN
                                       Assistant Attorneys General of Counsel
                                       Main Place Tower
                                       350 Main Street, Suite 300A
                                       Buffalo, New York 14202
                                       (716) 853-8477
                                       Jennifer.Kimura@ag.ny.gov
                                       Alyssa.Pantzer@ag.ny.gov