12:59PM

1

           UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF NEW YORK

2

3

_____

STEPHEN KERSHNAR,

4                                    Case No. 1:23-CV-525
              Plaintiff,                        (LJV)

5

vs.                                  August 11, 2023

6

STEPHEN H. KOLISON, JR., in his
7  individual capacity and his
official capacity as the President
8  of the State University of New York
at Fredonia, and

9

DAVID STARRETT, in his individual
10  capacity and official capacity as
Executive Vice President and
11  Provost of the State University of
New York at Fredonia,

12

              Defendants.
13  _____

14

   TRANSCRIPT OF ORAL ARGUMENT re PRELIMINARY INJUNCTION MOTION
15          BEFORE THE HONORABLE LAWRENCE J. VILARDO
                UNITED STATES DISTRICT JUDGE

16

17  APPEARANCES:      LIPSITZ GREEN SCIME CAMBRIA LLC
                     BY: BARRY N. COVERT, ESQ.
18                        42 Delaware Avenue
                         Suite 300
19                        Buffalo, New York 14202

20                   FOUNDATION FOR INDIVIDUAL RIGHTS & EXPRESSION
                     BY: ADAM B. STEINBAUGH, ESQ.
21                        510 Walnut Street
                         Suite 1250
22                        Philadelphia, Pennsylvania 19106
                     BY: ROBERT CORN-REVERE, ESQ.
23                        700 Pennsylvania Avenue SE
                         Suite 340
24                        Washington, DC 20003
                     For the Plaintiff

25

```
 1                      LETITIA A. JAMES
                        NEW YORK STATE ATTORNEY GENERAL
 2                      BY: ALYSSA JORDAN PANTZER, ESQ.
                            Assistant NYS Attorney General
 3                          Health Care Bureau
                            28 Liberty Street
 4                          19th Floor
                            New York, New York 10005
 5                      BY: JENNIFER METZGER KIMURA, ESQ.
                            CHRISTOPHER LAWRENCE BOYD, ESQ.
 6                          Assistant NYS Attorneys General
                            350 Main Street
 7                          Suite 300 A
                            Buffalo, New York 14202
 8                      For the Defendant

 9   PRESENT:           KRISTIN KLEIN WHEATON, ESQ.
                            State University of New York
10                          Via Teleconference

11   DEPUTY CLERK:   JANE D. KELLOGG

12   COURT REPORTER: ANN M. SAWYER, FCRR, RPR, CRR
                        Robert H. Jackson Courthouse
13                      2 Niagara Square
                        Buffalo, New York 14202
14                      Ann_Sawyer@nywd.uscourts.gov

15

16                  *   *   *   *   *   *   *   *

17
```

01:00PM   18          (Proceedings commenced at 1:00 p.m.)

01:00PM   19          THE CLERK:  All rise.  United States District Court

01:00PM   20   for the Western District of New York is now in session, the

01:00PM   21   Honorable Lawrence J. Vilardo presiding.

01:00PM   22          THE COURT:  Please be seated.

01:00PM   23          THE CLERK:  23-CV-525, Kershnar versus Kolison, et al.

01:01PM   24   Counsel for the plaintiff, please state your name for the

01:01PM   25   record.

Kershnar v Kolison - Oral Argument - 8/11/23

3

01:01PM   1          MR. COVERT:  Good afternoon, Your Honor.  Barry

01:01PM   2  Covert on behalf of Mr. Kershnar, who is present in the

01:01PM   3  courtroom.  He's in the first row behind me, immediately.

01:01PM   4          I'd also like to introduce the Court to Robert

01:01PM   5  Corn-Revere.  We filed a pro hac motion for his appearance

01:01PM   6  today.

01:01PM   7          And the Court has met Adam Steinbaugh, also

01:01PM   8  cocounsel, at the last appearance.

01:01PM   9          Your Honor we are going to accept the Court's

01:01PM  10  invitation to have inexperienced counsel argue a case.

01:01PM  11  Mr. Steinbaugh will be conducting the primary oral argument.

01:01PM  12  This will be his first federal court argument of any

01:01PM  13  substance, and he's very much looking for to it.

01:01PM  14          And then Mr. Corn-Revere will be handling any

01:01PM  15  rebuttal arguments afterwards.

01:01PM  16          So the Court will be absolved of having to listen to

01:01PM  17  me any further beyond this introduction.

01:02PM  18          THE COURT:  You've done a wonderful job so far.  So,

01:02PM  19  I take it Mr. Corn-Revere, is that the way it's pronounced?

01:02PM  20          MR. COVERT:  Yes.

01:02PM  21          THE COURT:  Is not yet admitted to practice in this

01:02PM  22  Court.

01:02PM  23          MR. COVERT:  I don't believe so.  We did file the

01:02PM  24  pro hac motion, but I was informed that it was being -- that

01:02PM  25  the approval was being docketed, I believe, when I came in

01:02PM    1   here.  But I did not see any objection.

01:02PM    2          THE COURT:  Let me just -- any objection to him

01:02PM    3   arguing --

01:02PM    4          MS. PANTZER:  No, Your Honor.

01:02PM    5          THE COURT:  -- pending his admission?

01:02PM    6          MS. PANTZER:  No, Your Honor.

01:02PM    7          THE COURT:  Terrific.  Great.  That's not a problem.

01:02PM    8   That's not a problem.

01:02PM    9          MR. COVERT:  Thank you, Your Honor.

01:02PM   10          THE COURT:  Yeah, I don't stand on principle for

01:02PM   11   things like that.  I assume he will be admitted in due course,

01:02PM   12   and it hasn't been done yet, but there's no reason to delay

01:02PM   13   things.

01:02PM   14          MR. COVERT:  Thank you.

01:02PM   15          THE COURT:  Okay.  Great.  Thank you very much.  I

01:02PM   16   appreciate that.

01:02PM   17          THE CLERK:  Counsel for the defendants, please state

01:02PM   18   your name for the record.

01:02PM   19          MS. PANTZER:  Your Honor, my name is Alyssa Jordan

01:02PM   20   Pantzer.  I'm an Assistant Attorney General with the New York

01:02PM   21   State Office of the Attorney General.

01:02PM   22          MS. KIMURA:  Jennifer Metzger Kimura, Assistant

01:02PM   23   Attorney General on behalf of the defendant.

01:02PM   24          MR. BOYD:  Good afternoon, Your Honor, Christopher

01:03PM   25   Boyd, Deputy Assistant Attorney General in charge.  Like

01:03PM    1    Mr. Covert, I'm not going to be speaking any more after this,

01:03PM    2    hopefully.

01:03PM    3              THE COURT:  Okay.  Well, you've done a good job, too.

01:03PM    4              MR. BOYD:  Thank you, Your Honor.

01:03PM    5              THE COURT:  So you can both go back and, you know,

01:03PM    6    take credit for doing a job well done.  Okay.

01:03PM    7              THE CLERK:  Judge, we also have Assistant Attorney

01:03PM    8    General Kristin Klein Wheaton, who's present on the telephone.

01:03PM    9              This is the date set for oral argument.

01:03PM    10             MR. BOYD:  Just a correction, Ms. Klein Wheaton is

01:03PM    11   with SUNY counsel's office, she's not an AAG.

01:03PM    12             THE COURT:  Okay.

01:03PM    13             MR. BOYD:  She was going to be present on behalf of

01:03PM    14   the client, but she is sick currently, and so we appreciate

01:03PM    15   the Court accommodating her with the dial-in so she can hear

01:03PM    16   how things go.

01:03PM    17             THE COURT:  Okay.  And I'm sorry to hear about the

01:03PM    18   illness, but let me just say, because we have someone

01:03PM    19   listening remotely, that no one is to record or rebroadcast

01:03PM    20   this in any way.  That's under penalty of contempt and the

01:03PM    21   sanctions that might go along with it.

01:03PM    22             Okay.  So before we get into the nitty-gritty of the

01:04PM    23   argument, as I understand it, you're bringing three claims for

01:04PM    24   injunctive relief and for damages, right?

01:04PM    25             MR. STEINBAUGH:  Correct.

| 01:04PM | 1 | THE COURT:  I'm having a tough time wrapping my head |
| 01:04PM | 2 | around the differences among those three claims.  Can you |
| 01:04PM | 3 | explain to me the difference between the retaliation claim and |
| 01:04PM | 4 | the Pickering claim just to start? |
| 01:04PM | 5 | MR. STEINBAUGH:  I think Pickering controls both of |
| 01:04PM | 6 | those claims.  So once -- one of the retaliation claims is for |
| 01:04PM | 7 | monetary damages, the other is for injunctive relief. |
| 01:04PM | 8 | THE COURT:  Okay.  But really, there's only one |
| 01:04PM | 9 | theory, right?  The theory for money damages and the theory |
| 01:04PM | 10 | for injunctive relief is the same with respect to all of them, |
| 01:04PM | 11 | right? |
| 01:04PM | 12 | MR. STEINBAUGH:  Yes. |
| 01:04PM | 13 | THE COURT:  And with respect to the prior restraint |
| 01:04PM | 14 | claim, tell me what the prior restraint is. |
| 01:04PM | 15 | MR. STEINBAUGH:  Well, it's a restraint on his |
| 01:05PM | 16 | ability to communicate with an academic community. |
| 01:05PM | 17 | So Stephen Kershnar is part of a broader academic |
| 01:05PM | 18 | community.  And while he can speak to people outside of that |
| 01:05PM | 19 | community, there is a set of people which is very broad that |
| 01:05PM | 20 | he cannot speak to about any subject. |
| 01:05PM | 21 | THE COURT:  Right.  So that's really not your |
| 01:05PM | 22 | traditional prior restraint claim, which is -- which would be |
| 01:05PM | 23 | a restraint from speaking about a certain topic.  And, again, |
| 01:05PM | 24 | I come back to the same thing that I started with:  How is |
| 01:05PM | 25 | that any different than the retail -- I mean, isn't the prior |

Kershnar v Kolison - Oral Argument - 8/11/23

7

| | | |
|---|---|---|
| 01:05PM | 1 | restraint simply, in your view, part of the penalty that's |
| 01:05PM | 2 | been imposed for the content of his speech? |
| 01:05PM | 3 | MR. STEINBAUGH:  That's correct.  And in the |
| 01:05PM | 4 | Pickering balancing application, or the application of the |
| 01:05PM | 5 | Pickering balancing test to that restriction, the Court can |
| 01:05PM | 6 | consider the weighty factors involved in why we have a |
| 01:05PM | 7 | constitutional allergy to prior restraints. |
| 01:05PM | 8 | THE COURT:  Okay.  But you don't think I need to make |
| 01:06PM | 9 | three different decisions on three different claims; I just |
| 01:06PM | 10 | make one decision on one general claim, right? |
| 01:06PM | 11 | MR. STEINBAUGH:  I believe so, yes. |
| 01:06PM | 12 | THE COURT:  Great.  Terrific.  Good.  Do you disagree |
| 01:06PM | 13 | with that? |
| 01:06PM | 14 | MS. PANTZER:  No, Your Honor. |
| 01:06PM | 15 | THE COURT:  Great, good.  Great, terrific.  Okay.  Go |
| 01:06PM | 16 | ahead.  No one argues from the podium anymore, and I think |
| 01:06PM | 17 | it's a mistake -- no, no, no, come up, I think it's a mistake. |
| 01:06PM | 18 | I think -- so I'll tell you, I was an appellate advocate for a |
| 01:06PM | 19 | whole lot of years, and this is very similar to appellate |
| 01:06PM | 20 | advocacy.  And never in a million years would I not get up and |
| 01:06PM | 21 | take the podium in court.  I think it's much more effective. |
| 01:06PM | 22 | So I'm glad to see you do it.  You're the first person who has |
| 01:06PM | 23 | done it in my courtroom in maybe three years, maybe since |
| 01:06PM | 24 | COVID started. |
| 01:07PM | 25 | MR. STEINBAUGH:  I am used to standing faux pas -- |

01:07PM    1        THE COURT:  Good.

01:07PM    2        MR. STEINBAUGH:  -- in that I had the honor of

01:07PM    3 conducting a number marriage ceremonies.  And the last one

01:07PM    4 that I conducted, the husband -- or, the father of the bride

01:07PM    5 stopped me in the middle of my speech and said is it okay to

01:07PM    6 if we sit down?  Because I'd never told anyone to sit down.

01:07PM    7        THE COURT:  Yeah, great.

01:07PM    8        MR. STEINBAUGH:  So in any event --

01:07PM    9        THE COURT:  So go ahead, the floors is yours.

01:07PM   10        MR. STEINBAUGH:  Good afternoon, Your Honor.  May it

01:07PM   11 please the Court.  My name is Adam Steinbaugh.  I'm here,

01:07PM   12 obviously, on behalf of the plaintiff, Stephen Kershnar.

01:07PM   13        Stephen Kershnar is a tendered philosophy professor,

01:07PM   14 and he's been removed from the classroom because people found

01:07PM   15 his thought experiment in a podcast, outside of the classroom,

01:07PM   16 outside of the campus, on his own time, offensive.

01:07PM   17        Under clearly-established law, his speech on

01:07PM   18 extramural podcasts is protected by the First Amendment, and

01:07PM   19 university's willful acquiescence to the fear of heckler's

01:07PM   20 veto is anathema to the free exchange of ideas and prohibited

01:08PM   21 by the 2nd Circuit's decision in Levin.  No governmental

01:08PM   22 entity, least of all a university, can choose censorship as

01:08PM   23 the first and only solution to an anti-intellectual outrage on

01:08PM   24 social media.

01:08PM   25        This Court should do two things.  First, it should

Kershnar v Kolison - Oral Argument - 8/11/23

9

01:08PM  1  dissolve the ban on contact with the campus community, because

01:08PM  2  that ban is not balanced against any university interest.

01:08PM  3          Second, it should prohibit SUNY Fredonia from using

01:08PM  4  public objections to protected extramural speech as a basis to

01:08PM  5  bar Professor Kershnar from his classroom.

01:08PM  6          THE COURT:  Let me ask you this.

01:08PM  7          MR. STEINBAUGH:  Sure.

01:08PM  8          THE COURT:  Is it your position that a public

01:08PM  9  university can never restrict a professor's speech based on

01:08PM  10  the reaction to that speech?

01:08PM  11          MR. STEINBAUGH:  I would look to both Levin and to

01:08PM  12  the 6th Circuit's decision in Bible Believers to guide that

01:08PM  13  analysis.  In that under a ticking time bomb scenario, a

01:09PM  14  university could take steps that would limit the speech of a

01:09PM  15  public university professor because that is the only realistic

01:09PM  16  solution.

01:09PM  17          But they need to look for bona fide or bona fide

01:09PM  18  measures to protect the speaker before they resort to

01:09PM  19  censorship.  And if they don't consider those measures, then

01:09PM  20  you can't say that the restriction is a narrow remedy to

01:09PM  21  mitigate the interest of the university.

01:09PM  22          THE COURT:  Your friends on the other side say that I

01:09PM  23  should consider just the action that took place in February of

01:09PM  24  2022, and whether it was appropriate then, not whether the

01:09PM  25  continuation of it is appropriate.  Are they right?

01:09PM 1    MR. STEINBAUGH:  No.  I -- the university, for one,

01:09PM 2  made several decisions.  This is not just one decision that

01:10PM 3  was continuing, but they were telling Stephen Kershnar that we

01:10PM 4  are continuing reassessing our analysis to determine whether

01:10PM 5  or not you will be allowed to return to the classroom.

01:10PM 6    So these are multiple discrete decisions.

01:10PM 7    THE COURT:  So even if they were right in doing what

01:10PM 8  they did, and I'm not asking you to concede that they were,

01:10PM 9  but even if they were right in doing what they did in

01:10PM 10 February 2022, you're still entitled to relief because they're

01:10PM 11 no longer right in August of 2023?

01:10PM 12    MR. STEINBAUGH:  Correct.

01:10PM 13    THE COURT:  Okay.  Let me ask you this.  What is it

01:10PM 14 that you want right now?  I mean, I know that my office

01:10PM 15 reached out to see whether it made sense to argue both this

01:10PM 16 motion for preliminary injunction and the defendant's motion

01:10PM 17 to dismiss at the same time, and you folks balked at that.

01:10PM 18 Why?  He doesn't expect to be put back on campus to teach for

01:10PM 19 the fall 2023 term, right?

01:10PM 20    MR. STEINBAUGH:  The university has had a long period

01:10PM 21 to prepare for his return.

01:11PM 22    THE COURT:  I understand.  But the fall 2023 term

01:11PM 23 ship has sailed, right?

01:11PM 24    MR. STEINBAUGH:  Even if it has sailed, the Court

01:11PM 25 could consider or could order the university to cease con --

01:11PM    1    or, cease the consideration of the protected extramural

01:11PM    2    speech.

01:11PM    3              THE COURT:  No, I get it.  I get it.  I get it.

01:11PM    4              But I'm trying to figure out what the urgent -- and,

01:11PM    5    you know, when we talked last time, I said I thought that this

01:11PM    6    matter had some urgency, but not emergency.  And so I fully

01:11PM    7    expected you, everyone, to say yeah, it made sense to argue

01:11PM    8    both things at the same time.

01:11PM    9              Ou folks said no.  I'd like to know why.

01:11PM    10             What is it?  What's -- what is -- is there some magic

01:11PM    11   date?  Is there something that I need to know about in terms

01:11PM    12   of why, you know, August 11th is different than August 18th,

01:11PM    13   is different than August 21st, other than ten days of what you

01:12PM    14   say is punishment for speech.

01:12PM    15             MR. STEINBAUGH:  Well, let me take that in two parts.

01:12PM    16             So the question of the motion for the preliminary

01:12PM    17   injunction and the motion to dismiss, those depend on

01:12PM    18   different records before the Court.  And I think the Court

01:12PM    19   only needs to consider the motion for the preliminary

01:12PM    20   injunction today.

01:12PM    21             THE COURT:  Right.

01:12PM    22             MR. STEINBAUGH:  On the question of whether or not

01:12PM    23   relief today for the fall semester is appropriate, I think

01:12PM    24   that it is.  But even if the Court doesn't order that today,

01:12PM    25   ordering the university to cease continuing consideration of

01:12PM      1   his extramural speech would allow him to prepare for the

01:12PM      2   coming spring semester.

01:12PM      3              THE COURT:  Sure.

01:12PM      4              MR. STEINBAUGH:  So just recently one of the other

01:12PM      5   philosophy professors in his department, Neil Feit, announced

01:12PM      6   his retirement.  And as we've shown in our exhibits, the

01:12PM      7   university has struggled to find faculty members to teach

01:12PM      8   these classes.

01:13PM      9              So, in the spring semester, even if the Court does

01:13PM     10   not permit Stephen Kershnar to teach this fall, he would start

01:13PM     11   ordinarily preparing for the spring semester in, say, early

01:13PM     12   October.  So if the Court orders relief now, that prevents --

01:13PM     13   or, allows him to prepare for the spring semester.  And it

01:13PM     14   also gives the university additional time to take whatever

01:13PM     15   measures they deem necessary in order to mitigate any

01:13PM     16   additional public attention that might come from the Court's

01:13PM     17   order.

01:13PM     18              THE COURT:  Okay.  Go ahead.

01:13PM     19              MR. STEINBAUGH:  So, I would start first that Stephen

01:13PM     20   Kershnar's speech is protected by the first amendment.

01:13PM     21   There's no serious argument to the contrary.  Whether or not

01:13PM     22   he spoke is an academic or as a public citizen, which I think

01:13PM     23   that we have alleged and shown, because he is -- he's taught

01:13PM     24   to teach, he is not taught to podcast, Fredonia did not ask

01:13PM     25   him to appear on a podcast, it doesn't facilitate his podcast,

01:14PM   1   and they don't promote any of his podcasts.  This is speech

01:14PM   2   that's directed to the public as part of a thought experiment.

01:14PM   3        And even if the subject matter is part of his

01:14PM   4   expertise, Lane v Franks teaches us that subject matter does

01:14PM   5   not render the speech to be the speech of an employee.  So if

01:14PM   6   an employee says, of a police department for example, says to

01:14PM   7   the local reporter, here's a bunch of corruption within my

01:14PM   8   department, this is what I've learned about in my job.  The

01:14PM   9   public has an interest in learning about that.  And the police

01:14PM   10  officer is not speaking for the department, he's speaking as a

01:14PM   11  citizen to the public.

01:14PM   12       THE COURT:  Let me ask you this.  Was he introduced

01:14PM   13  in the podcast as a professor at Fredonia?

01:14PM   14       MR. STEINBAUGH:  I believe the host made reference to

01:14PM   15  that, yes.

01:14PM   16       THE COURT:  Okay.  And was there any disclaimer given

01:14PM   17  that his remarks are his remarks, and not Fredonia's remarks?

01:14PM   18       MR. STEINBAUGH:  No.

01:14PM   19       THE COURT:  Okay.

01:14PM   20       MR. STEINBAUGH:  But the Supreme -- I can't recall if

01:14PM   21  it's the Supreme Court, but the notion that a university

01:15PM   22  endorses the speech of a professor I don't think is

01:15PM   23  reasonable.  Professors are hired because they are experts.

01:15PM   24  They're speaking on their own.

01:15PM   25       And if you look to, for example, a state like Florida

Kershnar v Kolison - Oral Argument - 8/11/23

14

01:15PM 1  right now, where the state is attempting to use its employment

01:15PM 2  relationship to tell faculty members that this is how they

01:15PM 3  will speak about matters of race, this is how faculty members

01:15PM 4  in the law school who are serving as expert witnesses these

01:15PM 5  are the positions they can or cannot take, the notion that

01:15PM 6  when a professor speaks on their subject matter or the matter

01:15PM 7  of their expertise, if they're also speaking on behalf of the

01:15PM 8  State or on behalf of their employer, that extends almost

01:15PM 9  unfettered authority to the employer, the university, to limit

01:15PM 10  their speech, and that's a very dangerous tool.

01:15PM 11       Can I -- we have academic freedom for the very

01:15PM 12  purpose of being able to say things that offend the State,

01:15PM 13  that offend students, that offend the public.

01:15PM 14       THE COURT:  Okay.

01:15PM 15       MR. STEINBAUGH:  So, whether or not Stephen Kershnar

01:16PM 16  spoke as an academic or as a citizen, the -- his speech is

01:16PM 17  analyzed under Levin and under other Pickering cases to

01:16PM 18  determine whether or not the university's interest outweighs

01:16PM 19  his interest in expression.

01:16PM 20       And where the university's interest is in the free

01:16PM 21  exchange of ideas, I don't think that it can.  And I would

01:16PM 22  point the Court's attention to Bloom where the 2nd Circuit

01:16PM 23  said that the efficient function of academia, the Court

01:16PM 24  actually depends to a degree on the dissemination in public

01:16PM 25  fora of controversial speech implicating matters of public

Kershnar v Kolison – Oral Argument – 8/11/23

15

01:16PM  1   concern.  Free and open debate on issues of public concern is

01:16PM  2   essential to the purpose of higher education.

01:16PM  3        So all of the sources of objections that the

01:16PM  4   university has offered, that's not enough to overcome the

01:16PM  5   interest in the free exchange of ideas, because to do so would

01:16PM  6   impose a heckler's veto.  And, here, it's not even a heckler's

01:17PM  7   veto, it's the fear that a heckler's veto might result.

01:17PM  8        THE COURT:  And you think that a college professor

01:17PM  9   has a heightened interest in free speech, such that Garcetti

01:17PM  10  doesn't apply, right?  That there's a broader protection

01:17PM  11  because of academic freedom, because of the fact that college

01:17PM  12  campuses are supposed to be places where ideas, sometimes

01:17PM  13  controversial ideas, can be exchanged, that there's heightened

01:17PM  14  protection there; is that right?

01:17PM  15       MR. STEINBAUGH:  That's exactly right.  And that's

01:17PM  16  why the Garcetti Court singled out one, and only one,

01:17PM  17  government employee to say we're not reaching that far.  And

01:17PM  18  that's public university professors.

01:17PM  19       THE COURT:  Okay.

01:17PM  20       MR. STEINBAUGH:  So all of these sources of

01:17PM  21  opposition that the university has cited, all of these are not

01:17PM  22  sufficient to overcome Professor Kershnar's interest in being

01:17PM  23  able to engage in the free exchange of ideas.

01:18PM  24       So, for example, you have some tepid opposition by

01:18PM  25  students.  The university's own evidence shows that the --

01:18PM   1   there was a protest on campus, or a planned protest on campus,

01:18PM   2   but the student newspaper reported that basically nobody

01:18PM   3   turned out.  There was not really any student interest here.

01:18PM   4        THE COURT:  Well, if -- so if a lot of students did

01:18PM   5   turn out, and if there was something next week where, you

01:18PM   6   know, lots of students turned out to protest, would that --

01:18PM   7   would that change --

01:18PM   8        MR. STEINBAUGH:  No.

01:18PM   9        THE COURT:  -- should that change my decision?

01:18PM   10        MR. STEINBAUGH:  No.  And that's the question

01:18PM   11   answered by Levin, which is -- in Levin, you had students not

01:18PM   12   only out on campus protesting, you had students protesting in

01:18PM   13   the classroom.  You had a melee with the security guard

01:18PM   14   outside the classroom.

01:18PM   15        And that physical violence on campus was not

01:18PM   16   sufficient to overturn or override Professor Levin's interest

01:18PM   17   in free exchange of ideas.  And no doubt, his ideas were

01:18PM   18   offensive to a wide range of students and faculty members and

01:19PM   19   activists, but a professor on a public university campus is

01:19PM   20   going to be able to engage in an exchange of ideas that other

01:19PM   21   people are going to find noxious.

01:19PM   22        THE COURT:  Let me ask you this.  They say he can

01:19PM   23   teach online, and they've given him some opportunities to set

01:19PM   24   up online courses, and I guess he hasn't taken that

01:19PM   25   opportunity.  Shouldn't that --

01:19PM    1          MR. STEINBAUGH:  Well --

01:19PM    2          THE COURT:  -- shouldn't that factor into the

01:19PM    3   analysis here?

01:19PM    4          MR. STEINBAUGH:  -- let me answer that in two parts.

01:19PM    5          What they did not do is offer that at the outset of

01:19PM    6   the controversy.  And he offered to teach online, to say, just

01:19PM    7   as faculty members throughout the pandemic have, I can teach

01:19PM    8   live classes via Zoom.  The university never responded to that

01:19PM    9   offer.

01:19PM   10          Now they have since then offered to allow him to

01:19PM   11   teach asynchronous classes online, so it's a class that a

01:20PM   12   student can come home late at night, 3 in the morning, and

01:20PM   13   download the audio.  And there's no back and forth, it is not

01:20PM   14   a live class.  And that's contrary to the interest in the

01:20PM   15   exchange of ideas in the classroom.

01:20PM   16          THE COURT:  If they let him teach an online course

01:20PM   17   that is a realtime online course, is that sufficient?

01:20PM   18          MR. STEINBAUGH:  That's better.  I think that that

01:20PM   19   would allow -- that would be a -- a mitigating measure that

01:20PM   20   they could take on an interim basis.  But I think there's also

01:20PM   21   value in the face-to-face exchange of ideas.  So as a

01:20PM   22   temporary measure, certainly if there is a subsequent flare-up

01:20PM   23   of public attention here, could that be an interim measure?  I

01:20PM   24   think that would be correct.

01:20PM   25          THE COURT:  But that's not what you're asking for

Kershnar v Kolison - Oral Argument - 8/11/23

18

01:20PM  1   now.

01:20PM  2          MR. STEINBAUGH:  No.

01:20PM  3          THE COURT:  You want him to be able to go back on

01:20PM  4   campus to teach?  That's what you want now?

01:20PM  5          MR. STEINBAUGH:  Correct.  And if the university

01:20PM  6   needs to come back and say these are the reasons why we can't

01:20PM  7   have him in the classroom right now, why we have to have him

01:21PM  8   teach online, via live classes, that's one thing, and that's

01:21PM  9   certainly something that we can work with the university on.

01:21PM  10         THE COURT:  Okay.

01:21PM  11         MR. STEINBAUGH:  So the other opposition here that

01:21PM  12  we've seen is the university cites opposition by a donor.  And

01:21PM  13  in Dube, the 2nd Circuit rejected opposition by government

01:21PM  14  officials by putting pressure on a university and threatening

01:21PM  15  its funding.  I think that if a -- government officials are

01:21PM  16  putting pressure on a university with regard to its funding,

01:21PM  17  the university gets much more funding from the government in

01:21PM  18  most cases than from private donors.  And academic freedom, if

01:21PM  19  it means anything, must mean that you're going to be able to

01:21PM  20  say something that a donor does not agree with.  And whether

01:21PM  21  or not that patron is the State or a private donor makes no

01:21PM  22  difference.

01:21PM  23         And then the -- the other opposition here comes from

01:22PM  24  social media, it comes from outraged activists.  And in

01:22PM  25  Melzer, the Court took as a given that community objection

Kershnar v Kolison - Oral Argument - 8/11/23

01:22PM   1   cannot dictate whether employees' constitutional rights are

01:22PM   2   protected because allowing the public with the government's

01:22PM   3   help to shout down unpopular ideas that stir anger is

01:22PM   4   generally not permitted under our juris prudence.  And I think

01:22PM   5   if anywhere, that is most important on college campus.

01:22PM   6        We have a illiberal strain running through our

01:22PM   7   society, sort of an anti-intellectual strain, where people had

01:22PM   8   learned that if you are the squeakiest wheel, if you engage in

01:22PM   9   speech that appears intimidating, sort of "if I were king,

01:22PM  10   you'd be first against the wall" sort of speech, they can

01:22PM  11   enlist governments to suppress speech they don't like.

01:22PM  12        And even setting aside Stephen Kershnar, if a

01:23PM  13   professor on a public university campus offends some sect of

01:23PM  14   the dark web, or society, or some political figure, regarding

01:23PM  15   almost any subject, that would imperil -- as the university

01:23PM  16   would then suppress the speech of that professor, that would

01:23PM  17   imperil almost any idea.

01:23PM  18        Even in the emails that the university cites, there's

01:23PM  19   an email from someone saying that LGBTQ people are mentally

01:23PM  20   ill, and I don't think that, for example, a professor who

01:23PM  21   advances ideas on -- about gender and the role of gender in

01:23PM  22   society, or a professor who identifies as LGBTQ, can be

01:23PM  23   removed from the classroom on the basis that someone somewhere

01:23PM  24   believes their speech or their identity to be offensive.

01:24PM  25        So, before speech is censored, the government's

01:24PM   1   obligation is to detect the speech, and in assessing the risk

01:24PM   2   it bears the burden to show that -- disruptions like this.

01:24PM   3           In Locurto, the Court said that the action must serve

01:24PM   4   a reasonable prediction of disruption, and Lewis v Cowen says

01:24PM   5   that that means precisely disruption.

01:24PM   6           So where we are now, today, the -- what the Court has

01:24PM   7   to look to is whether or not the university's belief that if

01:24PM   8   Stephen Kershnar returns to campus, it is likely that violence

01:24PM   9   will result, if that is a reasonable prediction of disruption.

01:24PM  10   I don't think that it is.

01:24PM  11           THE COURT:  Well, you're saying more than that,

01:24PM  12   though.  You're saying even if violence would result, that

01:24PM  13   still wouldn't necessarily be good enough, because there are

01:24PM  14   measures that they can take to shop that short of having him

01:25PM  15   come.  I mean, I think what you're saying is that the

01:25PM  16   heckler's veto can't beat, can't -- can't trump everything

01:25PM  17   with respect to free speech.

01:25PM  18           MR. STEINBAUGH:  We don't hand over our

01:25PM  19   constitutional rights to -- on a silver platter to anyone

01:25PM  20   willing to make threats.  I don't think that it would be --

01:25PM  21   there is not a -- no scenario in which a university could not

01:25PM  22   take action, but it has to show that the action it's taking is

01:25PM  23   necessary.

01:25PM  24           THE COURT:  Yep.  Okay.  Let me hear from the

01:25PM  25   defense, unless -- wrap up.  Wrap up.

Kershnar v Kolison - Oral Argument - 8/11/23

| | | |
|---|---|---|
| 01:25PM | 1 | MR. STEINBAUGH:  Well, I am perfectly happy to answer |
| 01:25PM | 2 | any further questions, but I'm happy to let them go, too. |
| 01:25PM | 3 | THE COURT:  Terrific.  Great. |
| 01:25PM | 4 | MR. STEINBAUGH:  Thank you. |
| 01:25PM | 5 | THE COURT:  Now I guess you have to come up, don't |
| 01:25PM | 6 | you, because I -- |
| 01:25PM | 7 | MS. PANTZER:  I'm coming up. |
| 01:25PM | 8 | THE COURT:  -- well, after I said what I said.  But I |
| 01:25PM | 9 | really do believe that. |
| 01:25PM | 10 | MS. PANTZER:  I agree. |
| 01:25PM | 11 | THE COURT:  I really do believe that. |
| 01:25PM | 12 | MR. BOYD:  She was going to come up anyway, |
| 01:25PM | 13 | Your Honor. |
| 01:25PM | 14 | MS. PANTZER:  I was coming up. |
| 01:25PM | 15 | Your Honor, my name is Alyssa Jordan Pantzer.  I am |
| 01:26PM | 16 | an Assistant Attorney General, again, with the Office of the |
| 01:26PM | 17 | New York State Attorney General.  I, along with my cocounsel, |
| 01:26PM | 18 | Jennifer Kimura, represent the defendants in this case. |
| 01:26PM | 19 | Your Honor, AG Kimura and I intend to split the |
| 01:26PM | 20 | argument.  I'm going to address the lack of likelihood of |
| 01:26PM | 21 | success of the merits as to Garcetti and Pickering, and |
| 01:26PM | 22 | AG Kimura is prepared to address the absence of likelihood of |
| 01:26PM | 23 | success on the merits based on Mount Healthy, and she's also |
| 01:26PM | 24 | prepared to address the remaining preliminary injunction |
| 01:26PM | 25 | elements, irreparable harm, balancing of the equities.  And to |

Kershnar v Kolison - Oral Argument - 8/11/23

01:26PM 1  the extent the Court would like to hear, AG Kimura is also

01:26PM 2  going to address the qualified immunity defense pursuant to

01:26PM 3  our motion to dismiss.

01:26PM 4      THE COURT:  Qualified immunity does not -- doesn't go

01:26PM 5  to the preliminary injunction.

01:26PM 6      MS. PANTZER:  No, Your Honor.

01:26PM 7      THE COURT:  Yeah, I just want to do -- I mean, again,

01:26PM 8  I just want to do preliminary injunction today.

01:26PM 9      MS. PANTZER:  Understood.

01:26PM 10     THE COURT:  That's all I want to do.

01:26PM 11     MS. PANTZER:  Understood.

01:26PM 12     What we believe this case boils down to, Your Honor,

01:26PM 13 is this.  Plaintiff would like this Court to find that there

01:26PM 14 are no limits to any speech that's framed as academic.  But

01:27PM 15 that's not what the law says.  The law establishes that there

01:27PM 16 is a limit, and that limit largely is Pickering balancing,

01:27PM 17 Your Honor.

01:27PM 18     We have submitted competent evidence by way of Chief

01:27PM 19 Isaacson's declaration to establish that SUNY faced

01:27PM 20 significant security disruptions.

01:27PM 21     THE COURT:  But that's not why -- but that's not why

01:27PM 22 he was barred from the campus.  Your president said that his

01:27PM 23 speech was despicable, and -- and reprehensible, and used lots

01:27PM 24 of language immediately after the Twitter feed went viral to

01:27PM 25 decry what he said.  I mean, that's why he wasn't let back on.

01:27PM   1        MS. PANTZER:  No, Your Honor, it was the security

01:27PM   2   disruption.

01:27PM   3        The -- the president did make those statements,

01:27PM   4   absolutely.  But the fact of the matter is that the university

01:27PM   5   already knew that Mr. -- Dr. Kershnar held these views.  It

01:28PM   6   was published on his university biography.  It was widely

01:28PM   7   available to the University President Kolison to know that the

01:28PM   8   plaintiff held these views.

01:28PM   9        Further, I think the Locurto case is directly on

01:28PM  10   point there, Your Honor.  In that case Mayor Guiliani spoke

01:28PM  11   about his NYPD firefighters' racist antics and stated they,

01:28PM  12   will be fired, they will be fired.  As in, they will be fired

01:28PM  13   essentially for being racist.

01:28PM  14        And even in that case, the Court found, Your Honor,

01:28PM  15   that wasn't enough to establish retaliatory motive.  In that

01:28PM  16   case, the Court found that the limit was reasonable because of

01:28PM  17   the potential for disruption to the firefighters in that case.

01:28PM  18        THE COURT:  So -- so there was a potential for

01:28PM  19   disruption in February of 2022.

01:28PM  20        MS. PANTZER:  Yes.

01:28PM  21        THE COURT:  Why is there a potential for disruption

01:29PM  22   in August of 2023?  I mean, doesn't there come a point where

01:29PM  23   the potential for disruption goes away?

01:29PM  24        MS. PANTZER:  Well, Your Honor, we have repeatedly

01:29PM  25   0conducted these security assessments.  We have done them

01:29PM   1   several times since this situation arose.  And in each of

01:29PM   2   those cases, we've found that there still is a security risk.

01:29PM   3   And that evidence is laid out in the declaration of Chief

01:29PM   4   Isaacson.  And there is absolutely zero evidence before this

01:29PM   5   Court to rebut what Chief Isaacson has provided.

01:29PM   6          So we think that this case boils down to plaintiff's

01:29PM   7   arguing that there should just be no limit, even in the face

01:29PM   8   of both actual and potential disruption to the campus.

01:29PM   9          So I do want to make one initial point.  We do

01:29PM  10   interpret local Rule 65 to require an evidentiary hearing

01:29PM  11   prior to the issuance of a preliminary injunction, and --

01:30PM  12   unless there is a waiver.  And so we had noted at our earlier

01:30PM  13   appearance that we believe that this case is ripe for an

01:30PM  14   evidentiary hearing.  And --

01:30PM  15          THE COURT:  An evidentiary hearing to determine what?

01:30PM  16          MS. PANTZER:  Well, if there is any question in the

01:30PM  17   Court's mind as to whether or not there is a legitimate

01:30PM  18   security concern here, then we would like to present Chief

01:30PM  19   Isaacson for the Court.  We would like to bring him in.

01:30PM  20          We do believe that if there is a question in the

01:30PM  21   Court's mind, bringing Chief Isaacson in will absolutely

01:30PM  22   resolve that question.

01:30PM  23          THE COURT:  So does this mean -- so does this mean

01:30PM  24   that the heckler's veto is -- trumps everything, because if

01:30PM  25   there is it a legitimate security concern, if there are enough

01:30PM    1   people who don't like someone's speech, they can shut that

01:30PM    2   person up?

01:30PM    3          MS. PANTZER:  Well, no, Your Honor.  So -- so, that's

01:30PM    4   not what we have here.  Right?

01:30PM    5          So, we have competent evidence before this Court from

01:31PM    6   Chief Isaacson, a former FBI Special Agent, that he assessed

01:31PM    7   there to be a significant security concern.  I don't think we

01:31PM    8   would have that evidence in every case.  This is a special

01:31PM    9   circumstance.

01:31PM   10          THE COURT:  I understand that.  I understand that.

01:31PM   11   But what I'm saying is in any case where someone says

01:31PM   12   something that is controversial enough, unpopular enough to

01:31PM   13   create a -- a -- an uprising of folks against him, that they

01:31PM   14   can shut that person up.

01:31PM   15          So, if I can get -- depending on how many people I

01:31PM   16   can get together to, you know, so if somebody on SUNY Fredonia

01:31PM   17   campus says, you know, the Red Sox are the best baseball team,

01:31PM   18   and I'm a Yankee fan, if I can get a whole lot of people

01:31PM   19   together to say gosh, darn it, I don't want that kind of stuff

01:32PM   20   said on -- and we're gonna riot if this guy keeps saying these

01:32PM   21   things on the SUNY Fredonia campus, I can shut them up.

01:32PM   22          MS. PANTZER:  Right, I hear your concern, Your Honor.

01:32PM   23   But I think in this case, under these circumstances, we do

01:32PM   24   have what Chief Isaacson has analyzed to be a significant and

01:32PM   25   legitimate security concern.

Kershnar v Kolison - Oral Argument - 8/11/23

01:32PM   1          THE COURT:  But tell me where -- tell me where --

01:32PM   2    tell me where we draw that line.  Tell me where -- when do we

01:32PM   3    turn over to the hecklers the ability to shut up a speaker?

01:32PM   4          How do I determine when that -- so -- so, and your

01:32PM   5    friend conceded that there might be a situation where, you

01:32PM   6    know, a ticking time bomb where something's gonna go off where

01:32PM   7    the university has to do something, it's got no choice.  And,

01:32PM   8    so, I understand that.

01:32PM   9          But what I'm not understanding is where you want me

01:32PM  10    to go.  What you're suggesting, I think, is that this can

01:32PM  11    continue forever, as long as there are enough people who are

01:33PM  12    upset enough about the speech that they're willing to threaten

01:33PM  13    violence.  And if that's the case, then I think we've now

01:33PM  14    turned over our universities to the hecklers, and they can

01:33PM  15    decide what's taught and what's not taught, what's said and

01:33PM  16    what's not said.

01:33PM  17          MS. PANTZER:  We will continue to balance the

01:33PM  18    security risk, Your Honor.  And --

01:33PM  19          THE COURT:  What does that mean?

01:33PM  20          MS. PANTZER:  Pickering balancing requires us to

01:33PM  21    assess the First Amendment value of the speech versus the

01:33PM  22    potential for actual disruption to the campus community.

01:33PM  23          THE COURT:  Okay.  And what's the First Amendment

01:33PM  24    value of the speech --

01:33PM  25          MS. PANTZER:  Well --

01:33PM  1          THE COURT:  -- here?

01:33PM  2          MS. PANTZER:  -- the First Amendment value of the

01:33PM  3   speech, Your Honor, you know, it's our contention that the --

01:33PM  4   the security -- the both potential and actual disruption here

01:33PM  5   outweighs the secure -- the First Amendment value of the

01:33PM  6   speech here.

01:33PM  7          THE COURT:  So tell me what the First Amendment value

01:34PM  8   of the speech -- how do you view the First Amendment value of

01:34PM  9   the speech?

01:34PM  10         MS. PANTZER:  Well, we have to assess it under

01:34PM  11  Pickering.

01:34PM  12         THE COURT:  And, so, assess it for me.

01:34PM  13         MS. PANTZER:  Well, initially, you have to assess

01:34PM  14  whether or not it is a matter of public concern, right?  The

01:34PM  15  speech.  So, that is the first step of the Pickering analysis.

01:34PM  16         THE COURT:  Okay.

01:34PM  17         MS. PANTZER:  So here, what happened was essentially

01:34PM  18  the speech was asking the audience of the podcast to imagine

01:34PM  19  an adult male having sex with a 12-year-old girl.  That is,

01:34PM  20  you know, that is essentially espousing or declining to

01:34PM  21  immoralize pedophilia, Your Honor.  And it's our contention

01:34PM  22  that that is not a matter of public concern.

01:34PM  23         THE COURT:  So you're telling me that the content of

01:34PM  24  the speech, whether you agree with the person's pos -- so, if

01:34PM  25  someone said -- well, what if I said that sex between an adult

01:35PM    1    and a child is wrong under any circumstances; would I be

01:35PM    2    speaking on a matter of public concern?

01:35PM    3              MS. PANTZER:  Yes.

01:35PM    4              THE COURT:  But if I say it's not wrong under any

01:35PM    5    circumstances, I'm not speaking on a matter of public concern?

01:35PM    6              MS. PANTZER:  No, I don't think that's the argument.

01:35PM    7              The argument, Your Honor, is that -- listen, we

01:35PM    8    acknowledge that whether or not it's a matter of public

01:35PM    9    concern is a sticky subject.  Right?  The Melzer --

01:35PM   10              THE COURT:  I don't think it's a close question.  I

01:35PM   11    honestly don't think it's a close question.

01:35PM   12              I don't know how -- I mean, you just told me that if

01:35PM   13    I said that an adult having sex with a child under any

01:35PM   14    circumstances is absolutely wrong under any circumstances,

01:35PM   15    that's a matter of public concern.  And I don't see how you

01:35PM   16    could argue any other way.

01:35PM   17              But I don't see how you can say that the opposite of

01:35PM   18    that is not true.  Because the topic is what's the matter of

01:36PM   19    public concern, not the position that you take on it.

01:36PM   20    Otherwise, we'd go down a road that is -- if -- if I agree

01:36PM   21    with the speech, it's protected; if I don't agree with the

01:36PM   22    speech, it's not protected.  And we know that's not the law.

01:36PM   23              MS. PANTZER:  No.  No.  We absolutely don't advocate

01:36PM   24    for that rule, Your Honor.  But look -- we're looking -- so

01:36PM   25    whether or not it's a matter of public concern, the test is

| | | |
|---|---|---|
| 01:36PM | 1 | newsworthiness.  So the topic of whether or not pedophilia |
| 01:36PM | 2 | should be considered immoral, that is not newsworthy. |
| 01:36PM | 3 | THE COURT:  It went ballistic. |
| 01:36PM | 4 | MS. PANTZER:  Right. |
| 01:36PM | 5 | THE COURT:  It went crazy. |
| 01:36PM | 6 | MS. PANTZER:  I understand. |
| 01:36PM | 7 | THE COURT:  That's not news?  Isn't that by |
| 01:36PM | 8 | definition newsworthy? |
| 01:36PM | 9 | MS. PANTZER:  No.  I don't think the public's |
| 01:36PM | 10 | reaction determines whether or not the speech is newsworthy, |
| 01:36PM | 11 | Your Honor.  A visceral reaction in anger to what was being |
| 01:36PM | 12 | said does not necessarily require a finding of newsworthiness. |
| 01:36PM | 13 | What was newsworthy here was that SUNY Fredonia was employing |
| 01:36PM | 14 | someone who the public could, you know, construe as being a |
| 01:37PM | 15 | supporter of pedophilia.  That was -- not the underlying |
| 01:37PM | 16 | content, questioning whether it should be deemed immoral to |
| 01:37PM | 17 | have -- for an adult male to have sex with a 12-year-old girl, |
| 01:37PM | 18 | or demanding that the audience consider incestuous sex between |
| 01:37PM | 19 | a grandmother and a 1-year-old baby.  That was not newsworthy. |
| 01:37PM | 20 | So, in moving on from -- |
| 01:37PM | 21 | THE COURT:  Not newsworthy because of the |
| 01:37PM | 22 | reprehensibility of what he's saying? |
| 01:37PM | 23 | MS. PANTZER:  Because it is largely and widely |
| 01:37PM | 24 | accepted that -- that pedophilia is immoral, Your Honor.  And |
| 01:37PM | 25 | what was newsworthy here, what was the public concern was, |

01:37PM    1    frankly, SUNY Fredonia's employment of someone who appeared to

01:37PM    2    be a pedophilia -- a pedophile sympathizer.

01:37PM    3            THE COURT:  Boy, I tell you, I think that it's

01:37PM    4    circular, and you keep coming back to the content of the

01:37PM    5    speech as -- and the position that he takes on an issue that I

01:37PM    6    think you've conceded is a matter of public concern, takes --

01:37PM    7    takes a position on that issue.  That makes it -- that makes

01:37PM    8    it not a matter of public concern.  And, that to, me is just

01:38PM    9    circular.

01:38PM   10            MS. PANTZER:  No.  I, first of all, I haven't

01:38PM   11    conceded that it was a matter of public concern, Your Honor.

01:38PM   12    What I'm saying --

01:38PM   13            THE COURT:  When I asked you -- well, when I asked

01:38PM   14    you if I said that speech -- if I said that sex between an

01:38PM   15    adult and a child under any circumstances is wrong, you said

01:38PM   16    that's a matter of public concern.  I think that's a

01:38PM   17    concession.

01:38PM   18            MS. PANTZER:  No.  I'm sorry, Your Honor.  What I

01:38PM   19    meant to -- I thought what you were indicating was whether or

01:38PM   20    not age of consent laws, their variability across states.

01:38PM   21    Whether or not a 17-year-old versus a 16-year-old should be

01:38PM   22    able to consent.  Certainly, those are matters of public

01:38PM   23    concern.  Sex, even, Your Honor, is a matter of public

01:38PM   24    concern.

01:38PM   25            THE COURT:  Okay.  So 17 versus 14 is a public matter

01:38PM    1    of public concern?

01:38PM    2         MS. PANTZER:  Maybe.  Maybe, Your Honor.

01:38PM    3         THE COURT:  Okay.  So where do you want me to draw

01:38PM    4    that line?  17 versus 14?  17 versus 16 is okay, right?

01:38PM    5    That -- you would have to concede that?  That that's a matter

01:39PM    6    of public concern.

01:39PM    7         MS. PANTZER:  Your Honor, this was not that.  This

01:39PM    8    was not that.  This was, imagine an adult male having sex with

01:39PM    9    a 12-year-old girl.  Imagine a grandmother fellating her baby

01:39PM   10    grandson.  That's what this was.

01:39PM   11         THE COURT:  So if he said imagine a 19-year-old boy

01:39PM   12    having sex with a 17-year-old girl, that's a different story?

01:39PM   13         MS. PANTZER:  Maybe, Your Honor.

01:39PM   14         THE COURT:  Okay.  How about a 23-year-old male and a

01:39PM   15    16-year-old girl?

01:39PM   16         MS. PANTZER:  Maybe, Your Honor.

01:39PM   17         THE COURT:  Where do you want to cross the line?

01:39PM   18    Where do you want to draw that line?

01:39PM   19         MS. PANTZER:  I think the distinction is in, you

01:39PM   20    know, what we have described in our papers.

01:39PM   21         And, again, we acknowledge, Your Honor, that public

01:39PM   22    concern is a sticky subject.  The Melzer Court in the

01:39PM   23    2nd Circuit declined to deal with it, essentially.  The Melzer

01:39PM   24    Court moved on.  It said assuming arguendo that this is a

01:39PM   25    matter of the public concern, it doesn't matter because we

Kershnar v Kolison - Oral Argument - 8/11/23

01:40PM   1   still have actual and potential disruption under Pickering.

01:40PM   2   And again --

01:40PM   3         THE COURT:  So let's agree to do that now.  Assuming

01:40PM   4   it's a matter of public concern --

01:40PM   5         MS. PANTZER:  Well, so, then we move on to Pickering

01:40PM   6   balancing, which again, I think that the predominant point

01:40PM   7   here, Your Honor, is that we have submitted evidence,

01:40PM   8   competent evidence to the Court in the form of Chief

01:40PM   9   Isaacson's declaration establishing both actual and potential

01:40PM  10   disruption, and there's no evidence beyond speculation and

01:40PM  11   conjecture to counter that.  And --

01:40PM  12         THE COURT:  And that's all you -- and that's all you

01:40PM  13   need?

01:40PM  14         MS. PANTZER:  Yes, Your Honor.  We've -- we've

01:40PM  15   submitted the evidence of the actual and potential disruption

01:40PM  16   to the campus.  That's what we need.

01:40PM  17         THE COURT:  So whenever there's -- whenever there's

01:40PM  18   potential disruption, a speaker can be silenced?

01:40PM  19         MS. PANTZER:  Yes.

01:40PM  20         THE COURT:  Okay.

01:40PM  21         MS. PANTZER:  And the Levin case that is heavily

01:40PM  22   relied upon both during oral argument and in the papers is

01:40PM  23   distinguishable, because the Levin case predates the Waters

01:41PM  24   decision, which held that the Court can consider both actual

01:41PM  25   and potential disruption.

01:41PM   1      Levin Court was only considering actual disruption.

01:41PM   2      This Court, postdating -- this -- this case and this

01:41PM   3  Court after Waters is allowed to consider both.

01:41PM   4      And we submit that we have provided evidence of both,

01:41PM   5  Your Honor.

01:41PM   6      Unless the Court has any further questions, I will

01:41PM   7  yield to my colleague as to the remaining elements of our

01:41PM   8  defense.

01:41PM   9      THE COURT:  Yep.

01:41PM  10      MS. KIMURA:  Good job.

01:41PM  11      Your Honor, before I get into the brunt of my

01:41PM  12  portion, I'd like to just briefly address the heckler's veto

01:41PM  13  that my colleague I think was attempting to distinguish.

01:41PM  14      This case is similar to the Melzer case as it relates

01:41PM  15  to the heckler's veto.  That Court did say it wasn't a

01:41PM  16  heckler's veto because students aren't hecklers, they are

01:41PM  17  participants of the school and the public education.  And

01:41PM  18  similarly here, the students and alumni were also not hecklers

01:42PM  19  as they were not outsiders.

01:42PM  20      THE COURT:  But, so, well, we don't need to call them

01:42PM  21  hecklers.  But you're saying that students have the ability or

01:42PM  22  alumni have the ability to silence professors on a public

01:42PM  23  campus regardless of what the message is?

01:42PM  24      MS. KIMURA:  I think that we need to look at the fact

01:42PM  25  that the actual and potential disruption is not necessarily

Kershnar v Kolison - Oral Argument - 8/11/23

| | | |
|---|---|---|
| 01:42PM | 1 | dealing with the students.  I mean, there's other cases where |
| 01:42PM | 2 | students didn't even complain about what was going on. |
| 01:42PM | 3 | I do believe that in the Vega v Miller case, students |
| 01:42PM | 4 | did not complain regarding this clustering exercise where |
| 01:42PM | 5 | students were screaming out obscenities, like, you're so hard, |
| 01:42PM | 6 | or sex -- sex terms.  There was no disruption.  There's no |
| 01:42PM | 7 | complaints coming from the students.  And yet still, the Court |
| 01:43PM | 8 | found that the firing of the teacher, the professor, was |
| 01:43PM | 9 | lawful. |
| 01:43PM | 10 | THE COURT:  Well, sure.  But the point -- the |
| 01:43PM | 11 | question I'm asking is, so suppose -- suppose the professor |
| 01:43PM | 12 | says I think that sex between anyone over the age of 18 and |
| 01:43PM | 13 | anyone under the age of 18 is wrong under all circumstances |
| 01:43PM | 14 | and should be criminalized.  And there's a whole bunch of |
| 01:43PM | 15 | 19-year-old boys on the campus who say, holy cow, that better |
| 01:43PM | 16 | not be the case.  We don't like that at all. |
| 01:43PM | 17 | So they start, you know, shouting down this professor |
| 01:43PM | 18 | and threatening violence and all that. |
| 01:43PM | 19 | MS. KIMURA:  I think in that matter, Your Honor, if |
| 01:43PM | 20 | there was actual and potential disruption, I think that the |
| 01:43PM | 21 | Court would be able to terminate that teacher as it relates to |
| 01:44PM | 22 | Pickering. |
| 01:44PM | 23 | THE COURT:  What do you mean, terminate the teacher? |
| 01:44PM | 24 | MS. KIMURA:  Terminate the teacher or the professor. |
| 01:44PM | 25 | THE COURT:  Fire him? |

Kershnar v Kolison - Oral Argument - 8/11/23

35

01:44PM  1        MS. KIMURA:  Yeah.

01:44PM  2        THE COURT:  He can be fired because the students --

01:44PM  3        MS. KIMURA:  If the -- if the college campus wanted

01:44PM  4  to do so, and take discipline.  But that's not what happened

01:44PM  5  in this matter, Your Honor.

01:44PM  6        THE COURT:  So you're giving the students

01:44PM  7  effectively -- you're giving groups of students effectively

01:44PM  8  the power to silence speakers, depending on whether they like

01:44PM  9  what they say or what they don't like.

01:44PM  10        MS. KIMURA:  I do not agree with that statement,

01:44PM  11  Your Honor.

01:44PM  12        THE COURT:  Well, I just gave you -- so tell me why

01:44PM  13  my example is wrong.  Tell me what about my -- so you've got a

01:44PM  14  teacher who says I think that sex between a boy who's 18 years

01:44PM  15  old and 3 days, and a woman who is 18 years old less 5 days,

01:44PM  16  so 17 years old and 360 days, is -- should be illegal, should

01:44PM  17  be criminalized.  And you've got a lot of 18-year-old and

01:45PM  18  19-year-old boys, freshmen and sophomores on your college

01:45PM  19  campus that say BS, you know, that's got to be wrong, and they

01:45PM  20  start, you know, mobilizing, and having protests, and shouting

01:45PM  21  down this professor whenever he speaks on campus and

01:45PM  22  threatening violence against him.

01:45PM  23        MS. KIMURA:  I think --

01:45PM  24        THE COURT:  They've effectively shut him up, right?

01:45PM  25        And you say that the university can then say, you

01:45PM  1  know what?  He's gone.

01:45PM  2        MS. KIMURA:  Well, I'm saying that as it relates to

01:45PM  3  the disruption, that would disrupt the internal operations of

01:45PM  4  the campus, Your Honor.  It's not about the speech, per se, in

01:45PM  5  your example, it's about what would happen thereafter in the

01:45PM  6  aftermath that disrupts the operation, in which the college

01:45PM  7  campuses are entitled to pursue disciplinary actions if they

01:45PM  8  wanted.

01:45PM  9        THE COURT:  Okay.

01:45PM  10        MS. KIMURA:  Your Honor, I have to address

01:45PM  11  retaliation.  The plaintiff has not overcome the but-for under

01:46PM  12  the Mount Healthy standard.  The law says that the plaintiff

01:46PM  13  must prove that the speech was a substantial or motivating

01:46PM  14  factor in the alleged adverse employment action.  However,

01:46PM  15  there is no liability if the defendant can show that they have

01:46PM  16  taken the same -- if they would have taken the same adverse

01:46PM  17  action in the presence or the absence of the protected speech.

01:46PM  18        Plaintiff being reflected to be physically off campus

01:46PM  19  was never about the contents of the speech.  As we articulated

01:46PM  20  in our papers, defendants have long known about the content of

01:46PM  21  the plaintiff, the curriculum that he teaches.  His CV is on

01:46PM  22  SUNY Fredonia's website.  He has published by book entitled

01:46PM  23  Adult-Child Sex in 2015.  He's gone on numerous podcasts prior

01:46PM  24  to this incident talking about these controversial topics.

01:46PM  25        THE COURT:  Yeah, but the first time it was

01:46PM    1    disseminated widely was this podcast, right?

01:47PM    2        MS. KIMURA:  I don't know, Your Honor.  This is the

01:47PM    3    first time -- I don't know how frequently.  But I think with

01:47PM    4    respect to the bringing of that podcast, that's the portion

01:47PM    5    that did go viral.  And but the campus has known about -- the

01:47PM    6    defendants have known about this topic area, and they never

01:47PM    7    acted to discipline him as it relates to this.  They know that

01:47PM    8    this is his curriculum.

01:47PM    9        THE COURT:  Doesn't the fact that your president said

01:47PM   10    the things that he said about the speech cut directly against

01:47PM   11    what you're saying?

01:47PM   12        MS. KIMURA:  I disagree, Your Honor.  That is very

01:47PM   13    similar to what my cocounsel had mentioned regarding the

01:47PM   14    Locurto v Guiliani matter, where Mayor Guiliani did come out

01:47PM   15    explicitly and say I'm going to fire these guys.  And in

01:47PM   16    that -- and that Court upheld the termination because of the

01:47PM   17    disruption, and the idea that the reasoning behind it was that

01:47PM   18    they didn't want to let New Yorkers think that the FDNY and

01:48PM   19    the NYPD were racist.

01:48PM   20        THE COURT:  Okay.

01:48PM   21        MS. KIMURA:  So, Your Honor, it was never about the

01:48PM   22    content of the speech, it was regarding -- what had happened

01:48PM   23    was dealing with the actual and potential disruption that

01:48PM   24    occurred.

01:48PM   25        Plaintiff failed under Pickering.  Defendant, in our

01:48PM    1   opinion, could have terminated plaintiff permissibly.  And

01:48PM    2   I -- as it relates similarly to the Locurto case.

01:48PM    3           Also, as in the Melzer case, they upheld the

01:48PM    4   termination of that teacher.  The school board knew about his

01:48PM    5   association, the teachers association of the North American

01:48PM    6   Man-Boy Love Association, also known as NAMBLA.  The Court

01:48PM    7   acknowledged that he had a First Amendment right to that

01:48PM    8   association, but still upheld that termination.

01:48PM    9           Plaintiff was never disciplined in this matter.  He

01:48PM   10   was never terminated, but he could have been under that

01:48PM   11   Pickering standard.

01:48PM   12           THE COURT:  He was never disciplined?  He can't come

01:49PM   13   on campus.

01:49PM   14           MS. KIMURA:  Your Honor, that's a physical bar.  He

01:49PM   15   still is receiving his full salary.  He's still able to speak

01:49PM   16   freely if he wants to go on podcasts, which I -- he has --

01:49PM   17           THE COURT:  He can't speak with students.

01:49PM   18           MS. KIMURA:  I -- that's according to the letter.

01:49PM   19           THE COURT:  Yeah.  Can't speak with students.  Can't

01:49PM   20   come on campus.  That seems to me to be -- certainly, he's

01:49PM   21   been restricted in what he can do vis a vis the university

01:49PM   22   where he's employed.  So if they pay his salary, but he can't

01:49PM   23   teach, can't speak, can't talk to students --

01:49PM   24           MS. KIMURA:  Well, Your Honor, that goes to sort of

01:49PM   25   what we were talking about, you were talking about earlier.

01:49PM    1            The university did give him opportunities to develop

01:49PM    2    these online courses, and he failed to do so in a timely

01:49PM    3    manner.  And yet, it's my understanding, that he has not

01:49PM    4    finished those courses.

01:49PM    5            THE COURT:  Why should he have to jump through the

01:50PM    6    university's hoops to teach online courses?  Why can't -- why

01:50PM    7    couldn't the university simply say we will allow you to teach

01:50PM    8    what you teach online, and our IT people will do everything we

01:50PM    9    need to do in order to allow you to do that?

01:50PM   10            MS. KIMURA:  Your Honor, I don't -- it's not relating

01:50PM   11    to an IT issue, Your Honor.  Any new -- any professor who

01:50PM   12    wants to teach online has to go through this process.  It has

01:50PM   13    to develop through SUNY's rubric, not just SUNY Fredonia's

01:50PM   14    rubric, has to go through this process to develop and build

01:50PM   15    their course.  That's provided by the evidence that's provided

01:50PM   16    by Lisa Melohusky.

01:50PM   17            Your Honor, I do want to point out the fact that the

01:50PM   18    plaintiff has delayed this preliminary injunction for

01:50PM   19    16 months after he was placed off campus.  This legal remedy

01:50PM   20    is meant to be -- a preliminary injunction is meant to be used

01:50PM   21    for emergencies.  It's supposed to be speedy.  It's supposed

01:50PM   22    to be swift.  Instead, he has waited.  The Courts have

01:51PM   23    denied --

01:51PM   24            THE COURT:  But there comes a point -- I mean, so,

01:51PM   25    again, your friend on the other side said that there's, you

01:51PM  1   know, when there's a ticking time bomb, and there's a reason

01:51PM  2   to take action, you take the action.

01:51PM  3           And then a month goes by, two months go by, ten

01:51PM  4   months go by, 19 months go by, and -- if my math is correct,

01:51PM  5   and -- and, you know, the ticking time bomb isn't still

01:51PM  6   ticking, and/or at least in their view, so now let's pull the

01:51PM  7   trigger -- not to mix a metaphor, I guess, and let's bring

01:51PM  8   this action for a preliminary injunction now.  What's wrong

01:51PM  9   with that?

01:51PM  10          MS. KIMURA:  Your Honor, I think waiting for so long

01:51PM  11  truly undercuts his irreparable harm.  He could --

01:51PM  12          THE COURT:  So he can never bring one now?

01:51PM  13          MS. KIMURA:  No, Your Honor.

01:51PM  14          THE COURT:  So five years from now -- five years from

01:51PM  15  now, if he's still in the same place he is that -- the same

01:51PM  16  place five years from now as he is today, he can't bring a

01:51PM  17  preliminary injunction case then?

01:52PM  18          MS. KIMURA:  I think that he could bring a

01:52PM  19  preliminary injunction on his own at any time, but courts have

01:52PM  20  denied preliminary injunction for lesser times, 15 months.

01:52PM  21          Courts have denied -- when they didn't file -- the --

01:52PM  22  the Upstate Jobs Party v Kosinski denied a preliminary

01:52PM  23  injunction because they said you could have filed this over

01:52PM  24  two years ago.  So he could have brought this, but I do

01:52PM  25  believe that him waiting for so long undercuts his alleged

Kershnar v Kolison - Oral Argument - 8/11/23
41

01:52PM    1   irreparable harm.

01:52PM    2          THE COURT:  So explain to me then why he can bring

01:52PM    3   one five years from now.

01:52PM    4          MS. KIMURA:  I --

01:52PM    5          THE COURT:  I mean, you're gonna make -- you're going

01:52PM    6   to have even a stronger argument five years from now.

01:52PM    7          MS. KIMURA:  Well, I don't think that he would be --

01:52PM    8   I think he could just bring a complaint, Your Honor.  He could

01:52PM    9   bring an action if he wanted, but I think a preliminary

01:52PM   10   injunction is meant to be swift, and there is no need for

01:52PM   11   this.

01:52PM   12          THE COURT:  Okay.

01:52PM   13          MS. KIMURA:  Plaintiff has no irreparable harm and

01:52PM   14   has not established a burden of proof.  As I said, he was

01:53PM   15   being paid, he was offered alternative assignment, and was

01:53PM   16   offered to develop online courses which he failed to do so.

01:53PM   17          And then he also continued to go on podcasts to

01:53PM   18   deliver his speech.

01:53PM   19          He has not been disciplined, and cannot and will not

01:53PM   20   be disciplined.

01:53PM   21          Plaintiff cites Levin throughout his papers,

01:53PM   22   Your Honor, and in that situation the Court did deny the

01:53PM   23   preliminary injunction because Levin did not show real

01:53PM   24   imminent, not remote, and irreparable harm.

01:53PM   25          Then as it relates to the balancing of equities,

01:53PM  1   Your Honor, we do believe that it tips sharply in defendant's

01:53PM  2   favor.  We do understand that President Kolison wrote those

01:53PM  3   statements after the disruption ensued, but he wrote that to

01:53PM  4   quell what was going on, to squash what was going on within

01:53PM  5   the disruption.  Students are on campus, there are minor

01:53PM  6   children on campus.  We've submitted that evidence in our

01:54PM  7   papers.  The administration -- there's usually around 3,200

01:54PM  8   students --

01:54PM  9        THE COURT:  How do I factor -- how do I factor

01:54PM  10  academic freedom into the balance of the equities?

01:54PM  11       MS. KIMURA:  I think that we need to look at the

01:54PM  12  Pickering balancing when it comes to academic freedom, and --

01:54PM  13  since Waters v Churchill said that we just need to show

01:54PM  14  potential disruption we've satisfied the burden.

01:54PM  15       THE COURT:  Boy, I'll tell you, I think that your

01:54PM  16  argument leads to frightening possibilities on college

01:54PM  17  campuses.

01:54PM  18       I think that your argument leads to what being taught

01:54PM  19  on college campuses, limited to what students want, or

01:54PM  20  students demand, or what is popular, what is -- and that ideas

01:54PM  21  that are out of the mainstream and that are dangerous and that

01:55PM  22  are exactly the sort of things that our colleges and

01:55PM  23  universities have been teaching for years and years and years

01:55PM  24  just won't get taught.  And so, and so everything goes

01:55PM  25  along -- it's Big Brother sort of stuff.

01:55PM   1          It's everything goes along in this homogenous, you

01:55PM   2    know, parochial mindset that no one can challenge, because as

01:55PM   3    soon as someone challenges it, you can get shot down, and shut

01:55PM   4    down.

01:55PM   5          MS. KIMURA:  Your Honor, I have to say that it's --

01:55PM   6    in this case, it's not about the content, Your Honor.  The

01:55PM   7    plaintiff was allowed to teach these matters throughout his

01:55PM   8    entire -- he was even, in his own terms, he rose to the

01:55PM   9    highest SUNY status, which is distinguished teaching professor

01:55PM   10   all the while doing that.  He has been able to teach his

01:55PM   11   controversial topics.

01:55PM   12         THE COURT:  Until there was an uproar, and then he

01:55PM   13   couldn't.  And then he couldn't.

01:55PM   14         MS. KIMURA:  Potential disruption is our burden.

01:56PM   15   Actual disruption did occur as well, Your Honor, and that is

01:56PM   16   persuasive.

01:56PM   17         THE COURT:  And, again, that means that whenever

01:56PM   18   there's potential or actual disruption, the disruptors can

01:56PM   19   silence the speaker on college campuses where academic freedom

01:56PM   20   ought to be king, as far as I'm concerned.

01:56PM   21         MS. KIMURA:  I would argue that the significant

01:56PM   22   safety concerns outweigh --

01:56PM   23         THE COURT:  I understand.  I understand.  I

01:56PM   24   understand the argument.

01:56PM   25         MS. KIMURA:  Okay.

01:56PM   1          THE COURT:  I'm just saying it leads to, I think,

01:56PM   2   some very dangerous things for our colleges and universities.

01:56PM   3   I mean, that's not to -- I'm not going to decide this today,

01:56PM   4   obviously, I'm going to reserve on this.  But that is a

01:56PM   5   concern that I have.  And whether that meshes with the law,

01:56PM   6   I'll have to decide.  But, and I'll decide it based on the

01:56PM   7   law, obviously.

01:56PM   8          The -- the -- the -- the concern I have about

01:56PM   9   academic freedom is real, and I think your argument leads to

01:57PM  10   some -- some pretty scary consequences in academia.

01:57PM  11          Okay.  Anything else?

01:57PM  12          MS. KIMURA:  Thank you, Your Honor.  If you have any

01:57PM  13   other questions --

01:57PM  14          THE COURT:  No, that's all.

01:57PM  15          Counsel?

01:57PM  16          MR. CORN-REVERE:  Thank you, Your Honor.  I'll be

01:57PM  17   brief.

01:57PM  18          I just wanted to address a couple of the points that

01:57PM  19   came up in the course of the argument.  First is whether or

01:57PM  20   not an evidentiary hearing is needed.

01:57PM  21          Here, I think it's pretty obvious that the showing

01:57PM  22   that the university has tried to make is -- doesn't satisfy

01:57PM  23   the test under Levin where you have in the face of actual

01:57PM  24   disruption on campus students disrupting classes, actual death

01:57PM  25   threats, and a series of other things that went on for an

Kershnar v Kolison - Oral Argument - 8/11/23
45

01:58PM  1   extended period.

01:58PM  2        THE COURT:  How do we know if he comes back on campus

01:58PM  3   that that's not going to happen?  How do we know without a

01:58PM  4   hearing that -- that what they're saying is not going to

01:58PM  5   happen?  That -- that, so -- so he goes back, I issue an

01:58PM  6   injunction and allow him to go back on campus, and, you know,

01:58PM  7   he gets beat up, or there are riots or, you know, whatever

01:58PM  8   happens, happens, and I now have egg on my face.

01:58PM  9        Why shouldn't we have a hearing before that?

01:58PM  10       MR. CORN-REVERE:  Well, again, I think under the law,

01:58PM  11  the obligation is to protect the speaker first.  And it's

01:58PM  12  clear from this record, even on the face of the Isaacson

01:58PM  13  declaration, that the campus never considered any alternative

01:58PM  14  short of censoring the speaker.

01:58PM  15       If you look at paragraph 31, for example, of the

01:58PM  16  Isaacson declaration where he says preventing the first step

01:59PM  17  in the pathway to violence, i.e., creation of the grievance,

01:59PM  18  is the best and only way we can mitigate the safety threats to

01:59PM  19  our campus which result from the Kershnar matter.

01:59PM  20       In other words, censorship is the only answer that

01:59PM  21  was ever considered by Chief Isaacson and by President

01:59PM  22  Kolison, and they have enforced it throughout this entire

01:59PM  23  time.

01:59PM  24       THE COURT:  Stop there.  Stop there.

01:59PM  25       Is that true?

01:59PM   1          MS. PANTZER:  I'm sorry, Your Honor?

01:59PM   2          THE COURT:  Is that true, what he just said?

01:59PM   3          MS. PANTZER:  That that was the only option

01:59PM   4   considered?

01:59PM   5          THE COURT:  Yeah.

01:59PM   6          MS. PANTZER:  I was just looking for the paragraph

01:59PM   7   where we -- where Chief Isaacson stated that it would be

01:59PM   8   prohibitively cost -- cost -- you know, financially, for the

01:59PM   9   university to develop the type of police force that would be

01:59PM   10  necessary to quell the violence that is possible from what

01:59PM   11  we've analyzed here.

01:59PM   12         THE COURT:  Okay.  Why isn't that good enough?

01:59PM   13         MR. CORN-REVERE:  Because Chief Isaacson was saying

01:59PM   14  if you're trying to provide protection against every

01:59PM   15  conceivable threat in the world, as opposed to what we have on

02:00PM   16  this record, and on the face of the Chief Isaacson's

02:00PM   17  declaration he makes clear what facts he was relying on, in

02:00PM   18  all of his assessments after the February 2nd assessment, he

02:00PM   19  acknowledged that the level of interest had waned, that people

02:00PM   20  were not filing comments.  He suggests that they would come

02:00PM   21  back if Professor Kershnar were to return to campus, provides

02:00PM   22  zero basis and zero --

02:00PM   23         THE COURT:  Why isn't the safest thing to do is get

02:00PM   24  him in here and you cross-examine him?

02:00PM   25         MR. CORN-REVERE:  We would welcome that opportunity,

02:00PM    1    Your Honor, but I don't think it's necessary.

02:00PM    2            THE COURT:  Okay.  I hear you.

02:00PM    3            MR. CORN-REVERE:  Right.  And so for that reason, I

02:00PM    4    think it's not necessary for an attorney hearing, and that

02:00PM    5    under the -- under Levin and under Bible Believers, the

02:00PM    6    obligation to protect the speaker and to the minimize the

02:00PM    7    measures being undertaken comes first.

02:00PM    8            That leads us to the question of what do we want now.

02:00PM    9    You had a brief conversation with my colleague about that, and

02:01PM   10    I think there are two things.

02:01PM   11            The first is to issue an injunction dissolving the

02:01PM   12    no-contact order.  That's easy, doesn't take any preparation.

02:01PM   13    The university can do that today.

02:01PM   14            The second is to allow Professor Kershnar to return

02:01PM   15    to classes and to teach at the earliest practical time.  Now

02:01PM   16    it may be that as a practical matter he would not be back in

02:01PM   17    the classroom teaching his own classes until next semester,

02:01PM   18    but I don't know that that's true.

02:01PM   19            You know, they have announced classes, they've had a

02:01PM   20    hard time finding people to fill.  Also, during the course of

02:01PM   21    any semester, substitutes are needed from time to time.  If --

02:01PM   22    Professor Kershnar is entitled to rejoin the community of

02:01PM   23    scholars, as he has a right to do, then he could perform those

02:01PM   24    functions, and then get back into the classroom at the

02:01PM   25    earliest practicable time.

02:01PM   1        THE COURT:  What about dissolving the no-contact

02:01PM   2   order?  Why should that not be something, especially in light

02:02PM   3   of what you folks are saying with respect to disruption being

02:02PM   4   the key, why -- why shouldn't he be allowed to talk to

02:02PM   5   students?

02:02PM   6        MR. BOYD:  Your Honor, I'll address that briefly, if

02:02PM   7   you'll allow me.

02:02PM   8        So I think SUNY is prepared to dissolve the

02:02PM   9   no-contact order as to other faculty at this point.  They --

02:02PM   10   our understanding is that Professor Kershnar has been talking

02:02PM   11   to colleagues in the past, they haven't enforced the so-called

02:02PM   12   no-contact order, and they are prepared at this point to not

02:02PM   13   enforce it as to his communications with his colleagues.

02:02PM   14        You know, the primary goal when that was issued was

02:02PM   15   to keep him physically off campus.  I understand that the

02:02PM   16   letter certainly also said that he couldn't communicate, and

02:02PM   17   at this point in time, I agree with Your Honor, and that's why

02:02PM   18   our client is prepared to lift it at this point as to his

02:02PM   19   colleagues.

02:02PM   20        THE COURT:  What about students?

02:02PM   21        MR. BOYD:  The university still has concerns, given

02:03PM   22   what occurred here, and given the very real concerns that a

02:03PM   23   large portion of the student community had with allowing him

02:03PM   24   affirmatively to reach out to students at this point in time.

02:03PM   25   And again --

02:03PM 1      THE COURT:  Why?  Why?  Tell me -- tell me how

02:03PM 2 that -- you know, I understand how his presence on campus

02:03PM 3 might result in disruption conceivably, but I don't understand

02:03PM 4 how contacting students might, as well.

02:03PM 5      MR. BOYD:  I believe the thought process is that some

02:03PM 6 of those communications may get out, may make it into the

02:03PM 7 media and social media, and that that may reignite the up --

02:03PM 8 sort of uproar that we saw in February.  That's my

02:03PM 9 understanding of what the nature of the concern is.  I'm sure

02:03PM 10 Chief Isaacson could explain that better.  I'm not a security

02:03PM 11 expert, he is.

02:03PM 12      THE COURT:  Okay.  Go ahead.

02:03PM 13      MR. CORN-REVERE:  Well, it is nice to hear that the

02:03PM 14 university is willing to concede something after 18 months,

02:03PM 15 but up to now, before receiving some skeptical questioning

02:03PM 16 from the Court, they have refused to budge, and they have

02:04PM 17 strung Professor Kershnar along this whole time necessitating

02:04PM 18 this hearing.

02:04PM 19      As I was saying, the two things that we wanted was

02:04PM 20 resolving the no-contact order and to return him to campus at

02:04PM 21 the earliest possible time.

02:04PM 22      Bottom line, this case is about a campus that

02:04PM 23 panicked in response to an ephemeral Twitter mob.  And as

02:04PM 24 Your Honor has pointed out, the consequences for higher

02:04PM 25 education, if that becomes the standard, are grave, and we may

Kershnar v Kolison - Oral Argument - 8/11/23

50

02:04PM   1   as well close down universities.

02:04PM   2           We have read continuing references, both in the

02:04PM   3   briefs filed by the State and in the affidavits being filed,

02:04PM   4   that sort of broadly intimate that in some way Professor

02:04PM   5   Kershnar is unsavory, and it's unsafe to have him around

02:04PM   6   students.  And the very thought of evening raising moral

02:04PM   7   questions as a philosopher is going to get you branded as a

02:04PM   8   pedophile.  Those kinds of insinuations are unworthy, and they

02:05PM   9   have no place here.

02:05PM   10          And this is, by the way, exactly what philosophers

02:05PM   11  do, they raise these kinds of moral questions.  And if --

02:05PM   12          THE COURT:  Yeah, I get that.  I've ready the papers,

02:05PM   13  and I certainly get that.  And --

02:05PM   14          MR. CORN-REVERE:  Right.

02:05PM   15          THE COURT:  -- and especially in a case like this,

02:05PM   16  you know, as Mr. Covert can tell you, I deal with child

02:05PM   17  pornography cases on a pretty regular basis, and I'm not known

02:05PM   18  as a judge who is lenient on those cases at all.

02:05PM   19          So my views, I think, on those sorts of things are

02:05PM   20  pretty well known.

02:05PM   21          On the other hand, the fact that I may disagree with

02:05PM   22  what the professor said sort of heightens my focus on the

02:05PM   23  First Amendment issue here, because that's what's important,

02:05PM   24  not my agreement or disagreement with what he said.

02:05PM   25          MR. CORN-REVERE:  That's right.  Which is the very

02:05PM  1  purpose of the First Amendment, and the purpose of

02:05PM  2  universities; to allow people to explore these questions, and

02:05PM  3  to push back against ideas that they strongly disagree with.

02:06PM  4          THE COURT:  Okay.

02:06PM  5          MR. CORN-REVERE:  Thank you.

02:06PM  6          THE COURT:  Got it.  Thank you.  Anything further?

02:06PM  7          MS. PANTZER:  No, Your Honor, not at this time.

02:06PM  8          THE COURT:  I'll reserve decision.  We'll get

02:06PM  9  something out in relatively short order, and if I think I need

02:06PM  10  a hearing, we'll schedule that in relatively short order.

02:06PM  11          Thank you very much.

02:06PM  12          ALL PARTIES:  Thank you, Your Honor.

02:06PM  13          THE CLERK:  All rise.

02:06PM  14          (Proceedings concluded at 2:06 p.m.)

02:06PM  15          *          *          *          *          *

16

17                    **CERTIFICATE OF REPORTER**

18

19          In accordance with 28, U.S.C., 753(b), I

20  certify that these original notes are a true and correct

21  record of proceedings in the United States District Court for

22  the Western District of New York on August 11, 2023.

23

24          s/ Ann M. Sawyer
            _____
            Ann M. Sawyer, FCRR, RPR, CRR
25          Official Court Reporter
            U.S.D.C., W.D.N.Y.