09:53AM

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**STEPHEN KERSHNAR,**

                                    Case No. 1:23-CV-525
              Plaintiff,                         (LJV)

vs.                                 September 14, 2023

**STEPHEN H. KOLISON, JR.,** in his
individual capacity and his
official capacity as the President
of the State University of New York
at Fredonia, and

**DAVID STARRETT,** in his individual
capacity and official capacity as
Executive Vice President and
Provost of the State University of
New York at Fredonia,

              Defendants.
_____

**EVIDENTIARY HEARING - DAY 2**
**BEFORE THE HONORABLE LAWRENCE J. VILARDO**
**UNITED STATES DISTRICT JUDGE**

<u>APPEARANCES:</u>       **LIPSITZ GREEN SCIME CAMBRIA LLC**
                  **BY: BARRY NELSON COVERT, ESQ.**
                       42 Delaware Avenue
                       Suite 300
                       Buffalo, New York 14202
                          And
                  **FOUNDATION FOR INDIVIDUAL RIGHTS & EXPRESSION**
                  **BY: ADAM B. STEINBAUGH, ESQ.**
                       **KELLEY L. BREGENZER, ESQ.**
                       510 Walnut Street
                       Suite 1250
                       Philadelphia, Pennsylvania 19106
                  **BY: ROBERT CORN-REVERE, ESQ.**
                       **JOSHUA T. BLEISCH, ESQ.**
                       700 Pennsylvania Avenue SE
                       Suite 340
                       Washington, DC 20003
                  For the Plaintiff

```
 1                    LETITIA A. JAMES
                      NEW YORK STATE ATTORNEY GENERAL
 2            BY: ALYSSA JORDAN PANTZER, ESQ.
                   Assistant NYS Attorney General
 3                 Health Care Bureau
                   28 Liberty Street
 4                 19th Floor
                   New York, New York 10005
 5            BY: JENNIFER METZGER KIMURA, ESQ.
                  CHRISTOPHER LAWRENCE BOYD, ESQ.
 6                 Assistant NYS Attorneys General
                   350 Main Street
 7                 Suite 300 A
                   Buffalo, New York 14202
 8                     And
              STATE UNIVERSITY OF NEW YORK
 9            BY: KRISTIN KLEIN WHEATON, ESQ.
                   Office of General Counsel
10                 Western Campuses Office
                   1300 Elmwood Avenue
11                 Cleveland Hall, Room 507-A
                   Buffalo, New York 14222
12            For the Defendant

13    PRESENT:        MEGAN COMMAROTO, Paralegal

14    COURT CLERK:    COLLEEN M. DEMMA

15    COURT REPORTER: ANN M. SAWYER, FCRR, RPR, CRR
                       Robert H. Jackson Courthouse
16                     2 Niagara Square
                       Buffalo, New York 14202
17                     Ann_Sawyer@nywd.uscourts.gov

18

19                  *   *   *   *   *   *   *   *

20
```

10:09AM   21          (Proceedings commenced at 10:09 a.m.)

10:09AM   22          THE CLERK:  All rise.  United States District Court

10:09AM   23    for the Western District of New York is now in session, the

10:09AM   24    Honorable Lawrence J. Vilardo presiding.

10:09AM   25          THE COURT:  Please be seated.

| | | |
|---|---|---|
| 10:09AM | 1 | THE CLERK:  23-CV-525, Kershnar versus Kolison, et al. |
| 10:09AM | 2 | Attorneys Barry Covert, Joshua Bleisch, Adam |
| 10:09AM | 3 | Steinbaugh, Robert Corn-Revere and Kelley Bregenzer, and |
| 10:09AM | 4 | paralegal Megan Commaroto, appearing on behalf of the |
| 10:09AM | 5 | plaintiff. |
| 10:09AM | 6 | Assistant Attorneys General Jennifer Kimura, Alyssa |
| 10:09AM | 7 | Pantzer, and Christopher Boyd, and chief campus counselor for |
| 10:09AM | 8 | SUNY Kristen Klein Wheaton, appearing on behalf of the |
| 10:09AM | 9 | defendants. |
| 10:09AM | 10 | This is the continuation of the evidentiary hearing. |
| 10:09AM | 11 | THE COURT:  Good morning, everyone. |
| 10:10AM | 12 | ALL PARTIES:  Good morning, Your Honor. |
| 10:10AM | 13 | THE COURT:  So anything we need to do before we begin |
| 10:10AM | 14 | the cross-examination? |
| 10:10AM | 15 | MR. COVERT:  No, Your Honor. |
| 10:10AM | 16 | THE COURT:  Is Mr. Isaacson here? |
| 10:10AM | 17 | MS. PANTZER:  He is. |
| 10:10AM | 18 | THE COURT:  Great.  Let's bring him in.  Thanks. |
| 10:10AM | 19 | (Brent Isaacson seated at 10:10 a.m.) |
| 10:10AM | 20 | THE COURT:  Okay.  I remind the witness that he's |
| 10:10AM | 21 | still under oath, and Mr. Covert, you may continue. |
| 10:10AM | 22 | |
| 10:10AM | 23 | **B R E N T   I S A A C S O N**, having been previously duly |
| 10:10AM | 24 | called and sworn, continued to testify as follows: |
| 10:10AM | 25 | |

Case 1:23-cv-00525-LJV-JJM   Document 51   Filed 09/16/23   Page 4 of 71
Kershnar v Kolison - Isaacson - Covert/Cross - 9/14/23

4

| | | |
|---|---|---|
| 10:10AM | 1 | **CROSS EXAMINATION BY MR. COVERT:** |
| 10:10AM | 2 | Q.  Thank you.  Good morning, Mr. Isaacson. |
| 10:10AM | 3 | A.  Good morning. |
| 10:10AM | 4 | Q.  I'll let you get situated. |
| 10:10AM | 5 | A.  Thanks. |
| 10:11AM | 6 | Q.  Yesterday you testified -- I'm bringing you back to |
| 10:11AM | 7 | February of 2022 -- you testified that when you first spoke |
| 10:11AM | 8 | with President Kolison, I'm saying his name right -- |
| 10:11AM | 9 | A.  Um-hum. |
| 10:11AM | 10 | Q.  -- and indicated that it was your recommendation that |
| 10:11AM | 11 | Dr. Kershnar be removed from the campus, he gave you a bit of |
| 10:11AM | 12 | pushback initially, correct? |
| 10:11AM | 13 | A.  I would say it was reluctance.  He didn't disagree with |
| 10:11AM | 14 | me, but he didn't immediately agree.  I don't remember the |
| 10:11AM | 15 | verbatim language that he used. |
| 10:11AM | 16 | Q.  And what was Vice-President Metzger's response to that |
| 10:11AM | 17 | recommendation? |
| 10:11AM | 18 | A.  He quickly concurred. |
| 10:11AM | 19 | Q.  Okay.  Showing you what's been marked Exhibit 96, which I |
| 10:11AM | 20 | will -- is that -- do you recognize that as an email you |
| 10:11AM | 21 | received from Vice-President Metzger? |
| 10:11AM | 22 | A.  Yes. |
| 10:11AM | 23 | MR. COVERT:  And I would move that into evidence. |
| 10:12AM | 24 | MS. PANTZER:  I can't see the entire chain, can you |
| 10:12AM | 25 | keep scrolling? |

10:12AM  1          MR. COVERT:  It's also -- we provided it to you as

10:12AM  2  96, you have the physical copy.

10:12AM  3          MS. PANTZER:  We agree, that's fine.

10:12AM  4          THE COURT:  Okay.  It's admitted without objection.

10:12AM  5          MR. COVERT:  Thank you.

10:12AM  6      **(Plaintiff's Exhibit 96 was received in evidence.)**

10:12AM  7          BY MR. COVERT:

10:12AM  8  Q.  And you, at the top of the page, the email that you

10:12AM  9  received from Vice-President Metzger at 7:40 a.m., was very

10:12AM  10  well done, with the word "very" capitalized, correct?

10:12AM  11  A.  Yes.

10:12AM  12  Q.  That's indicative of his agreement with that plan to have

10:12AM  13  Dr. Kershnar removed, correct?

10:12AM  14  A.  Yes.

10:12AM  15          MR. COVERT:  94, please.

10:13AM  16          BY MR. COVERT:

10:13AM  17  Q.  Showing you Plaintiff's Exhibit 94, do you recognize this

10:13AM  18  email?

10:13AM  19  A.  I do, but I don't have the whole context in view quite

10:13AM  20  yet, if we can scroll down.

10:13AM  21          MR. COVERT:  Because this is a little more difficult

10:13AM  22  to scroll down to read, would it be okay, Your Honor, if I

10:13AM  23  hand him the exhibit to read?

10:13AM  24          THE COURT:  Of course.  I think it's a good idea.

10:13AM  25          THE WITNESS:  Thanks.

10:13AM  1          MR. COVERT:  There's three pages, the middle page is

10:13AM  2  blank.

10:13AM  3          THE COURT:  This is Plaintiff's 94?

10:13AM  4          MR. COVERT:  Plaintiff's 94, Your Honor.

10:14AM  5          THE WITNESS:  Would it be possible to zoom in on the

10:14AM  6  screen for that tweet?

10:14AM  7          MR. COVERT:  The third page, I think he's

10:14AM  8  referencing.

10:14AM  9          THE COURT:  Is the second page blank?

10:14AM  10          MR. COVERT:  It is.  It is, Your Honor.

10:14AM  11          THE COURT:  I'm glad it's not just my eyes,

10:14AM  12  Mr. Isaacson, I couldn't read it.

10:14AM  13          THE WITNESS:  Yes, Judge.

10:14AM  14          MR. COVERT:  If you'd like her to scroll down, just

10:14AM  15  let us know.

10:14AM  16          THE WITNESS:  That helps me, thank you.

10:14AM  17          BY MR. COVERT:

10:14AM  18  Q.  Okay.  And can you put some context on that email, the

10:14AM  19  exchange there?

10:14AM  20  A.  Sure.  This -- the email chain starts with Jeff Woodard,

10:14AM  21  who is Fredonia's director of marketing and communications.

10:14AM  22  On February 3rd at 4:06, he forwarded to me, and it looks

10:15AM  23  like the cabinet, a tweet that he saw related to a upcoming

10:15AM  24  protest that I believe was organized by students.  And it was

10:15AM  25  to start in Barker Commons, which is a common area, public

10:15AM    1    area in downtown Fredonia, off campus.  That -- it was

10:15AM    2    supposed to come onto campus as part of the route that they

10:15AM    3    were gonna take.

10:15AM    4        That was on February 3rd at 4:06 that it was sent to me.

10:15AM    5    And it looks like just five minutes later, I forwarded it to

10:15AM    6    the four lieutenants that work with me at University Police,

10:15AM    7    asking them to review this, and that we put an extra officer

10:15AM    8    on patrol for this.

10:16AM    9    Q.  And this protest was in relation, to your knowledge, was

10:16AM   10    going to be in relation to Dr. Kershnar controversy, correct?

10:16AM   11    A.  Correct.

10:16AM   12    Q.  And your response was only to put one extra vehicle in

10:16AM   13    play?

10:16AM   14    A.  Yes.

10:16AM   15    Q.  You didn't call for any snipers to be called because of

10:16AM   16    the nature of the controversy?  There was no added patrols

10:16AM   17    beyond the one vehicle that you called, correct?

10:16AM   18    A.  No.  I recall a conversation with the chief of police of

10:16AM   19    Fredonia village, and just that this was gonna be happening,

10:16AM   20    our sense of it was it would be maybe a hundred students or

10:16AM   21    so.

10:16AM   22    Q.  And your recollection was that that protest was then

10:16AM   23    supposed to lead back to the Fredonia campus for -- if I can

10:16AM   24    explain, too, and if you can agree with me -- the Village of

10:16AM   25    Fredonia is a half a mile or so from the campus in general

10:17AM    1   terms, they would then march from the village to the campus

10:17AM    2   and protest, and continue the protest on campus, was your

10:17AM    3   knowledge?

10:17AM    4   A.  Yes.

10:17AM    5   Q.  And this was almost -- this was the -- you were alerted

10:17AM    6   of this the day after on February 3rd, the day after you

10:17AM    7   first become aware of the situation, and a protest was

10:17AM    8   supposed to be a few days after that, correct, on

10:17AM    9   February 6th, I believe?

10:17AM   10       And I can show you People's -- I'm sorry, Plaintiff's

10:17AM   11   Exhibit 88.  People's exhibit.

10:17AM   12       The second page, the heading of Protest Held in Barker

10:17AM   13   Commons.  Would this refresh your recollection once it's

10:17AM   14   scrolled down?

10:17AM   15           MR. COVERT:  Keep scrolling.

10:17AM   16           THE WITNESS:  Oh, yes.

10:17AM   17           BY MR. COVERT:

10:17AM   18   Q.  Does that refresh your recollection?

10:18AM   19           MR. COVERT:  Can you scroll down a little more,

10:18AM   20   please, Megan?

10:18AM   21           THE WITNESS:  Okay.  Now I see.  February 6th was the

10:18AM   22   protest.  Yes.

10:18AM   23           BY MR. COVERT:

10:18AM   24   Q.  And does this refresh your recollection as to the

10:18AM   25   turnout?

10:18AM  1   A.  I'm not seeing it.  My recollection is a very, very small

10:18AM  2   turnout.

10:18AM  3   Q.  Okay.  So between January -- February 2nd, that is, and

10:18AM  4   February 6th, you were alerted to a number of correspondence

10:18AM  5   from people who were dissatisfied with Dr. Kershnar's

10:18AM  6   situation, correct?

10:18AM  7   A.  Yes.

10:18AM  8   Q.  You've characterized some of them as threatening?

10:18AM  9   A.  Yes.

10:18AM  10  Q.  These protestors were going to come out to the campus

10:19AM  11  from -- beginning in an off-campus protest to an on-campus

10:19AM  12  protest, right?

10:19AM  13  A.  Yes.

10:19AM  14  Q.  Did you call for any increased security on campus for

10:19AM  15  fear of public safety incidents, for fear of violence on the

10:19AM  16  campus, beyond one patrol car?

10:19AM  17  A.  No.  I had no safety concerns related to this protest in

10:19AM  18  and of itself.

10:19AM  19  Q.  Well, you had all these communications from individuals

10:19AM  20  unhappy with the Kershnar situation, correct?

10:19AM  21  A.  Yes.

10:19AM  22  Q.  Some threatening, correct?

10:19AM  23  A.  Yes.

10:19AM  24  Q.  This is -- you're alerted to a protest which could call

10:19AM  25  these unhappy individuals to the area, correct?

10:19AM    1    A.  It could.

10:19AM    2    Q.  And your threat assessment was one patrol car was needed?

10:19AM    3    A.  Well, we were seeing --

10:19AM    4    Q.  I'm asking a simple question, yes or no.  Your -- your

10:19AM    5    assessment was one single patrol car was enough to secure the

10:19AM    6    campus from this protest?

10:19AM    7    A.  I had more information than what was reflected in the one

10:20AM    8    tweet that you showed me.

10:20AM    9    Q.  Okay.  Now, showing you Plaintiff's Exhibit 90.  If you

10:20AM   10    could take a moment, and I'm happy to hand you that exhibit,

10:20AM   11    as well, if that's easier.

10:20AM   12        So this is a -- fair to say that this is an email, well,

10:20AM   13    first of all let's go backward.

10:20AM   14            MR. COVERT:  Did I move the last exhibit into

10:20AM   15    evidence?

10:20AM   16            MR. CORN-REVERE:  The last two.

10:20AM   17            MR. COVERT:  The last two?  I would like to move

10:20AM   18    Exhibits 94 and 88 into evidence Your Honor.

10:20AM   19            MS. PANTZER:  No objection.

10:20AM   20            THE COURT:  They're received without objection, 94

10:20AM   21    and 88.

10:20AM   22            MR. COVERT:  Thank you.

10:20AM   23    **(Plaintiff's Exhibits 94 and 88 were received in evidence.)**

10:20AM   24            BY MR. COVERT:

10:20AM   25    Q.  And do you recognize this email, which is Exhibit 90?

Case 1:23-cv-00525-LJV-JJM    Document 51    Filed 09/16/23    Page 11 of 71
Kershnar v Kolison - Isaacson - Covert/Cross - 9/14/23

11

10:21AM  1   A.  I do.

10:21AM  2        MR. COVERT:  And because I've been very remiss, I'm

10:21AM  3   going to move it into evidence right now.

10:21AM  4        MS. PANTZER:  No objection.

10:21AM  5        THE COURT:  Received without objection.

10:21AM  6        **(Plaintiff's Exhibit 90 was received in evidence.)**

10:21AM  7        BY MR. COVERT:

10:21AM  8   Q.  Can you describe in general terms, you don't have to name

10:21AM  9   everybody on there, but generally who are you sending this

10:21AM  10  email to, the email at 9:14 a.m., on February 5th of 2022?

10:21AM  11  A.  This was sent by me to all of the members, police

10:21AM  12  officers and staff, of University Police.

10:21AM  13  Q.  And the purpose of this email is to alert them to legal

10:21AM  14  proceedings that you anticipate are going to arise as a

10:21AM  15  result of the Professor Kershnar situation, correct?

10:21AM  16  A.  Yes.

10:21AM  17  Q.  And you anticipated those legal proceedings are going to

10:21AM  18  be the result of the removal of Dr. Kershnar from campus,

10:21AM  19  correct?

10:22AM  20  A.  I didn't understand your question.

10:22AM  21  Q.  Well, what legal proceedings are you anticipating on

10:22AM  22  February 5th of 2022?

10:22AM  23  A.  Oh.  I assumed at some point this matter would come to a

10:22AM  24  courtroom.

10:22AM  25  Q.  In relation to the removal of Dr. Kershnar --

10:22AM   1   A.   Yes.

10:22AM   2   Q.   -- from the campus?

10:22AM   3   A.   Yes.

10:22AM   4   Q.   In a violation of his First Amendment rights?

10:22AM   5   A.   I think that's for the Court to decide.

10:22AM   6   Q.   Correct.  But that's the general nature of what you

10:22AM   7   anticipated the legal proceedings would be on February 5th of

10:22AM   8   2022, correct?

10:22AM   9   A.   Generally.

10:22AM   10  Q.   Okay.  And this is what's generally known as a legal

10:22AM   11  hold?  It's a document to -- that informs everybody on the

10:22AM   12  staff to make sure you don't destroy any records, correct?

10:22AM   13  A.   Correct.

10:22AM   14  Q.   Okay.  Thank you.

10:22AM   15          MR. COVERT:  Plaintiff's 49, please?

10:23AM   16          BY MR. COVERT:

10:23AM   17  Q.   Is it fair to say that for the years preceding 2023, that

10:23AM   18  there was an installation process to enhance the security of

10:23AM   19  the campus by increasing or providing for better locking

10:23AM   20  mechanisms on various doors throughout the campus?

10:23AM   21  A.   Yes.

10:23AM   22  Q.   And can you describe that just in general terms for the

10:23AM   23  Court?

10:23AM   24  A.   Sure.  The -- the idea is to get the campus as --

10:23AM   25  especially in the academic buildings -- as close as we can to

Case 1:23-cv-00525-LJV-JJM   Document 51   Filed 09/16/23   Page 13 of 71
Kershnar v Kolison - Isaacson - Covert/Cross - 9/14/23

13

10:23AM   1   the model that's used in K through 12 schools where classroom

10:23AM   2   doors are lockable, where you can, if there's an active

10:23AM   3   shooting somewhere in the building or outdoors, you can get

10:23AM   4   as many people into a hardened classroom with a hard door and

10:23AM   5   hard lock.

10:23AM   6   Q.  And would this include all of the academic, the teaching

10:23AM   7   buildings, aside from the dormitory buildings?

10:24AM   8   A.  Yes, that's the effort that was undertaken here.

10:24AM   9   Q.  And is this article dated April 6, 2023, does that

10:24AM   10  signify a completion of that process?

10:24AM   11  A.  I believe it's -- it was nearing completion, I don't know

10:24AM   12  the exact status now, but it's close to being done or done.

10:24AM   13  Q.  In April it was close to being done, in 2023?

10:24AM   14  A.  It was getting done.

10:24AM   15  Q.  And was it completed by the time you left in June 30th of

10:24AM   16  2023?

10:24AM   17  A.  I believe it was almost done, I don't know for sure

10:24AM   18  whether it was done.

10:24AM   19  Q.  And this is part of an overall security for the campus on

10:24AM   20  top of what we discussed yesterday, the 300 cameras

10:24AM   21  throughout the campus, the 200 blue phones, having patrol

10:24AM   22  cars, at least two, driving around the campus at any given

10:24AM   23  time; is that correct?

10:24AM   24  A.  Yes.

10:24AM   25  Q.  Thank you.  Did you ever determine for purposes of

Case 1:23-cv-00525-LJV-JJM    Document 51    Filed 09/16/23    Page 14 of 71
Kershnar v Kolison - Isaacson - Covert/Cross - 9/14/23

14

10:24AM    1    alternatives to barring Dr. Kershnar from the campus, did you

10:25AM    2    ever inquire into how many hours he was actually on campus

10:25AM    3    during the semester per week?

10:25AM    4    A.   I did not inquire.

10:25AM    5    Q.   And if you were looking into either providing a Fredonia

10:25AM    6    University Police officer or a police officer on overtime,

10:25AM    7    you would have to determine how many hours he was on campus

10:25AM    8    to determine the cost of accompanying him while he's on

10:25AM    9    campus, right?

10:25AM    10   A.   That would be part of an analysis like that, yes.

10:25AM    11   Q.   But that analysis was never conducted, correct?

10:25AM    12   A.   No.

10:25AM    13            MR. COVERT:  Exhibit 64, please.  Plaintiff's 64.

10:25AM    14            MR. BOYD:  Barry, I just want to flag, this is the

10:26AM    15   one we've marked confidential.

10:26AM    16            MR. COVERT:  Okay.  Please take that down for a

10:26AM    17   second, Megan.

10:26AM    18            MR. BOYD:  I --

10:26AM    19            MR. COVERT:  First of all, I want to go backwards.  I

10:26AM    20   would move Exhibit 49 into evidence.  I'm doing a very poor

10:26AM    21   job here, Your Honor.

10:26AM    22            THE COURT:  So 49, first of all.

10:26AM    23            MS. PANTZER:  No objection.

10:26AM    24            THE COURT:  Is admitted without objection.

10:26AM    25            **(Plaintiff's Exhibit 49 was received in evidence.)**

Case 1:23-cv-00525-LJV-JJM    Document 51    Filed 09/16/23    Page 15 of 71
Kershnar v Kolison - Isaacson - Covert/Cross - 9/14/23

15

10:26AM    1          MR. COVERT:  Could I have a moment to speak --

10:26AM    2          THE COURT:  Absolutely, go ahead, yeah.

10:26AM    3          (Off the record at 10:26 a.m.)

10:26AM    4          (Back on the record at 10:27 a.m.)

10:27AM    5          MR. COVERT:  Your Honor, we're going to utilize this

10:27AM    6  document with the agreement that we will move it into evidence

10:27AM    7  pending redaction, then we'll provide the Court with a copy of

10:27AM    8  that.  But right now, I will just show the witness the hard

10:27AM    9  copy of the document.

10:27AM   10          THE COURT:  That's fine.

10:27AM   11          MR. COVERT:  Thank you.  Hang on.

10:27AM   12          BY MR. COVERT:

10:27AM   13  Q.  Mr. Isaacson, I'm going to hand you this document.  I'm

10:27AM   14  going to ask that you not disclose any personal identifying

10:27AM   15  information from the document, we will just discuss the

10:27AM   16  general nature of the memo.

10:28AM   17      So I've handed you what's marked as Plaintiff's 64.

10:28AM   18          MR. COVERT:  And I'm moving that into evidence, as

10:28AM   19  well, pending redaction of the personal information which we

10:28AM   20  will then provide the redacted copy to the Court.

10:28AM   21          MS. PANTZER:  No objection, Your Honor.

10:28AM   22          THE COURT:  Okay.  So it's admitted, but the redacted

10:28AM   23  form with the redactions to come.

10:28AM   24          **(Plaintiff's Exhibit 64 was received in evidence.)**

10:28AM   25          THE COURT:  And you two will agree on the redactions,

10:28AM    1    if you can't, I'll break the tie.

10:28AM    2              MS. PANTZER:  We'll be able to agree, Your Honor.

10:28AM    3              THE COURT:  Thank you.

10:28AM    4              MR. COVERT:  Your Honor this is 64, if the Court

10:28AM    5    wants to follow in the binder.

10:28AM    6              THE COURT:  Yep, I have it in front of me.

10:28AM    7              MR. COVERT:  Thank you.

10:28AM    8              BY MR. COVERT:

10:28AM    9    Q.  Can you please describe this document?

10:28AM   10    A.  Yes.  This is a memo that I authored.  It was directed to

10:28AM   11    the UPD, University Police staff.  It's dated March 25th,

10:29AM   12    2022.  And it's titled President Kolison personal security.

10:29AM   13        This is a directive I issued for our police officers to

10:29AM   14    take certain actions to ensure the security of the president

10:29AM   15    as he was coming and going from his office.

10:29AM   16    Q.  And was this memorandum and the discussions you had with

10:29AM   17    the president surrounding this memorandum, was that at his

10:29AM   18    behest because he feared that there was security concerns

10:29AM   19    that he should be concerned with, or this was at your behest,

10:29AM   20    or some other party's behest?

10:29AM   21    A.  I learned -- my recollection is I learned of the

10:29AM   22    president's concern for his safety through Vice-President

10:29AM   23    Metzger.  And then I called and spoke to President Kolison

10:29AM   24    about what his concerns were.  At the time he was, he

10:30AM   25    expressed to me that he often worked late in his office, and

10:30AM    1    he was concerned -- worried about potential danger as he came

10:30AM    2    and went from his office out to his vehicle.

10:30AM    3    Q.  And this was a concern he had generally based upon the

10:30AM    4    Kershnar controversy, if we can call it that?

10:30AM    5    A.  Yes.

10:30AM    6    Q.  And were there any specific imminent threats that you

10:30AM    7    were aware of at the time that he had these concerns?

10:30AM    8    A.  The threats that we talked about yesterday at length were

10:30AM    9    still in social media, but not a direct threat to a target.

10:30AM   10    Q.  Okay.  No direct target was known, no one -- there was --

10:30AM   11    no one was known to be coming to the area or anything along

10:30AM   12    those lines, but the exact same concerns that were discussed

10:30AM   13    earlier just in general terms that were existent in February

10:30AM   14    were there in the middle of March, correct?

10:31AM   15    A.  That's right.

10:31AM   16    Q.  And in relation to those concerns, you thought it was

10:31AM   17    sufficient that the officers would view the camera monitoring

10:31AM   18    system on campus to watch President Kolison when he's coming

10:31AM   19    to and from his automobile, correct?

10:31AM   20    A.  Yes.

10:31AM   21    Q.  You did not even require that he be accompanied

10:31AM   22    physically by an officer, correct?

10:31AM   23    A.  No.

10:31AM   24    Q.  And you invited officers to be in the parking lot, but it

10:31AM   25    was not required, correct?

Case 1:23-cv-00525-LJV-JJM    Document 51    Filed 09/16/23    Page 18 of 71
Kershnar v Kolison - Isaacson - Covert/Cross - 9/14/23

18

10:31AM    1    A.  Correct.

10:31AM    2    Q.  And that these steps, you felt, were sufficient to

10:31AM    3    protect President Kolison from the exact same threats that

10:31AM    4    Dr. Kershnar was facing, correct?

10:31AM    5    A.  Given what we knew, I felt this was sufficient for the

10:31AM    6    president.

10:32AM    7    Q.  Thank you.

10:32AM    8            MR. COVERT:  Number 70, please.

10:32AM    9            Do we have to turn it back on?

10:32AM   10            THE CLERK:  Yep, you're on.

10:32AM   11            BY MR. COVERT:

10:32AM   12    Q.  You testified yesterday, I think repeatedly, on the

10:32AM   13    grievances that various individuals would have against

10:32AM   14    Dr. Kershnar and/or the SUNY administration in light of his

10:32AM   15    views that caused the controversy, correct?

10:32AM   16    A.  Yes.

10:32AM   17    Q.  You're a former FBI agent, correct?

10:32AM   18    A.  Correct.

10:32AM   19    Q.  You're familiar with the FBI keeping hate crime

10:32AM   20    statistics?

10:32AM   21    A.  Yes.

10:32AM   22    Q.  I'm showing you as a sample to this exhibit Plaintiff's

10:33AM   23    70, a document that that is representative of what the FBI

10:33AM   24    generally releases regarding hate crimes statistics; is that

10:33AM   25    fair to state?

10:33AM   1   A.  Yes.

10:33AM   2        MR. COVERT:  I'd like to move this document into

10:33AM   3   evidence.

10:33AM   4        MS. PANTZER:  No objection.

10:33AM   5        THE COURT:  Received without objection.

10:33AM   6        **(Plaintiff's Exhibit 70 was received in evidence.)**

10:33AM   7        BY MR. COVERT:

10:33AM   8   Q.  Thank you.  And under the heading of victims of hate

10:33AM   9   crime incidents, there's a listing of various categories,

10:33AM  10   hate crimes that occur against members of the public by

10:33AM  11   individuals that are often unknown to them; is that correct?

10:33AM  12   A.  I didn't understand your question.

10:33AM  13   Q.  These -- this is a listing of hate crimes, or in other

10:33AM  14   words, crimes that occurred because an individual is

10:33AM  15   perceived by someone in the public to have one of these -- be

10:34AM  16   in one of these categories that creates sufficient grievance

10:34AM  17   by that individual that they engage in violent behavior

10:34AM  18   towards the target individual, correct?

10:34AM  19   A.  Correct.

10:34AM  20   Q.  And that's similar to what you testified to yesterday,

10:34AM  21   correct?

10:34AM  22   A.  I don't know, I truly don't know if a crime against

10:34AM  23   Dr. Kershnar in this context would be counted at a hate crime

10:34AM  24   by the FBI, if that's what you're getting at, I don't know.

10:34AM  25   Q.  But hate crimes listed here by the FBI, the categories

10:34AM   1   include race, ethnicity, and ancestry bias, correct?

10:34AM   2   A.   Yes.

10:34AM   3   Q.   Sexual orientation bias?

10:34AM   4   A.   Yes.

10:34AM   5   Q.   Religious bias, correct?

10:34AM   6   A.   Yes.

10:34AM   7   Q.   Gender identity bias?

10:34AM   8   A.   Yes.

10:34AM   9   Q.   Disability bias?

10:34AM  10   A.   Yes.

10:34AM  11   Q.   Gender bias?

10:34AM  12   A.   Yes.

10:34AM  13   Q.   Those are all biases that apparently the FBI believes

10:34AM  14   creates grievances sufficient to cause individuals to engage

10:35AM  15   in violent behavior against other individuals that have --

10:35AM  16   that are in one of these categories, correct?

10:35AM  17   A.   Correct.

10:35AM  18   Q.   Thank you.  Now, you're also familiar with the sex

10:35AM  19   offender registry that New York State has, as well as every

10:35AM  20   state across the country?

10:35AM  21   A.   Yes.

10:35AM  22   Q.   And Chautauqua County has obviously got

10:35AM  23   sex-offender-registered individuals that reside there?

10:35AM  24   A.   Yes.

10:35AM  25   Q.   And these are individuals who are actually pedophiles,

10:35AM    1    correct?

10:35AM    2    A.   Correct.

10:35AM    3    Q.   And their information, if you're a level 2 or 3, on the

10:35AM    4    store or registry, their information is made public,

10:35AM    5    including their names, their addresses, things along those

10:35AM    6    lines, correct?

10:35AM    7    A.   Correct.

10:35AM    8    Q.   And you're familiar that some of those individuals even

10:35AM    9    reside in the vicinity of the SUNY Fredonia campus, correct?

10:35AM   10    A.   Yes.

10:35AM   11    Q.   During your time at SUNY Fredonia, are you aware of any

10:36AM   12    violent acts perpetrated on any of those individuals because

10:36AM   13    they are actually convicted pedophiles?

10:36AM   14    A.   No.

10:36AM   15         MR. COVERT:  Defendant's Exhibit 1, page 42.

10:36AM   16         Scrolling down to the paragraph that begins within

10:36AM   17    the months.  This -- well, I'm sorry.  Go to the top of that

10:36AM   18    page just so he can see what the document is.

10:36AM   19         BY MR. COVERT:

10:36AM   20    Q.   So this is your assessment of August 14th, 2022, correct?

10:37AM   21    A.   Yes.

10:37AM   22         MR. COVERT:  And then scroll down to the in the

10:37AM   23    months since, that paragraph.

10:37AM   24         BY MR. COVERT:

10:37AM   25    Q.   Now, on August 14th, 2022, you note that in the first

10:37AM   1   paragraph of that first sentence of that paragraph, quote, in

10:37AM   2   the months since my last assessment, the public's attention

10:37AM   3   to the Kershnar matter has waned, at least reflected in the

10:37AM   4   relative paucity of recent social media posts about him,

10:37AM   5   correct?

10:37AM   6   A.   Yes.

10:37AM   7         MR. COVERT:  Okay.  And if we can go to page 48, to

10:37AM   8   49, the bottom of page 48.

10:37AM   9         I'm sorry, can we go to the top, then we can identify

10:37AM  10   that document, as well.

10:37AM  11         And go until you see it's October 31st heading.

10:37AM  12         BY MR. COVERT:

10:37AM  13   Q.   I'm showing you from page -- page 38, I believe, I'm

10:38AM  14   sorry, 37.  I'm showing you now the October 31st threat

10:38AM  15   assessment, correct?

10:38AM  16   A.   Yes.

10:38AM  17         MR. COVERT:  And if you can scroll down to paragraph

10:38AM  18   that begins the same.  The bottom of page 48.

10:38AM  19         THE COURT:  The paragraph that begins with what?

10:38AM  20         MR. COVERT:  I thought there was a paragraph, but

10:38AM  21   maybe I got it wrong.  In the months since.  48 to 49.

10:39AM  22         THE COURT:  The bottom of page 47.

10:39AM  23         MR. COVERT:  47.  Thank you, Your Honor.

10:39AM  24         So we can go scroll up, I'm sorry, there it is.  47

10:39AM  25   to 48.

| | | |
|---|---|---|
| 10:39AM | 1 | BY MR. COVERT: |
| 10:39AM | 2 | Q.  So this paragraph, is it fair to say that that's pretty |
| 10:39AM | 3 | much cut and pasted from the earlier threat assessment that |
| 10:39AM | 4 | we just discussed? |
| 10:39AM | 5 | A.  Yes. |
| 10:39AM | 6 | Q.  Still a paucity of media posts about Dr. Kershnar, |
| 10:39AM | 7 | correct? |
| 10:39AM | 8 | A.  Yes. |
| 10:39AM | 9 | Q.  Okay.  Now, yesterday, we testified, you testified -- |
| 10:39AM | 10 | MR. COVERT:  Document 91, please. |
| 10:39AM | 11 | BY MR. COVERT: |
| 10:39AM | 12 | Q.  -- you testified about the A1C report.  And you were in |
| 10:39AM | 13 | the middle of discussing that when we broke for the day |
| 10:39AM | 14 | yesterday, correct? |
| 10:39AM | 15 | A.  Yes. |
| 10:39AM | 16 | Q.  Showing you what's marked as Plaintiff's Exhibit 91, do |
| 10:39AM | 17 | you recognize that document? |
| 10:40AM | 18 | A.  Yes. |
| 10:40AM | 19 | Q.  And if it's easier, I'm happy to hand you a physical |
| 10:40AM | 20 | copy, because it is a multiple-page document. |
| 10:40AM | 21 | A.  That would be helpful, thank you. |
| 10:40AM | 22 | MR. COVERT:  Your Honor, I'm going to hand him, I'm |
| 10:40AM | 23 | going to move that document into evidence. |
| 10:40AM | 24 | THE COURT:  Any objection? |
| 10:40AM | 25 | MR. BOYD:  Could I just have a minute, Your Honor? |

10:40AM  1  The digital version I have I think is missing a page.

10:40AM  2        MR. COVERT:  We emailed last night the additional

10:40AM  3  page.

10:40AM  4        MR. BOYD:  Oh, okay.

10:40AM  5        MR. COVERT:  We can hand you another copy.  Someone

10:40AM  6  can hand you a copy.  Actually, the physical copies we gave

10:40AM  7  you should have -- we gave you physical copies this morning.

10:40AM  8        MS. PANTZER:  We have no objection, Your Honor.

10:40AM  9        THE COURT:  Okay.  So 91 is admitted without

10:40AM  10  objection.

10:40AM  11        **(Plaintiff's Exhibit 91 was received in evidence.)**

10:40AM  12        BY MR. COVERT:

10:40AM  13  Q.  Now, yesterday, you testified that you were critical of

10:40AM  14  A1C's ability to engage in the threat assessment that they

10:41AM  15  were hired to engage in, correct?

10:41AM  16  A.  I had concerns about their narrative about the data they

10:41AM  17  collected.

10:41AM  18  Q.  All right.  Showing you the first page of that document,

10:41AM  19  the second paragraph.  And the last sentence of the second

10:41AM  20  paragraph clearly specifies that A1C supports an

10:41AM  21  enterprise-wide open source intelligence program supporting

10:41AM  22  investigative and intelligence requirements of more than a

10:41AM  23  dozen U.S. government law enforcement agencies, correct?

10:41AM  24  A.  I didn't -- could you point me to where you're reading

10:41AM  25  from?  I'm sorry.

10:41AM   1          MR. COVERT:  Would you mind if I approach,

10:41AM   2   Your Honor?

10:41AM   3          THE COURT:  No, of course not.

10:41AM   4          BY MR. COVERT:

10:41AM   5   Q.  If that's the first page -- I believe it's the first

10:41AM   6   page.  There it is.

10:41AM   7   A.  Gotcha.  Yes, I see where you've marked that.  Thank you.

10:42AM   8   Q.  Can you generally describe what this document is just in

10:42AM   9   general terms?

10:42AM  10   A.  This was a description that Richard Denholm, my former

10:42AM  11   FBI colleague, sent to me describing A1C and their services.

10:42AM  12   Q.  And what was his -- what was his job at the FBI?

10:42AM  13   A.  He was a special agent.  He worked largely in public

10:42AM  14   corruption through his career.

10:42AM  15   Q.  And was he a computer expert?  Is that why he engaged

10:42AM  16   this company, why he started the company, or was in charge of

10:42AM  17   it?

10:42AM  18   A.  I do not believe he's expert in computer or internet

10:42AM  19   matters.

10:42AM  20   Q.  So he hires other individuals that do have that

10:42AM  21   expertise, correct?

10:42AM  22   A.  Yes.

10:42AM  23   Q.  Okay.  And the sentence that I referenced, that's a

10:42AM  24   sentence that talks about their capabilities in relation to

10:42AM  25   open source research intelligence, correct?

10:43AM   1    A.  Yes.

10:43AM   2    Q.  At the next page, the second paragraph, short paragraph,

10:43AM   3    states, A1C will provide intelligence and subject-matter

10:43AM   4    expertise primarily in an online virtual environment,

10:43AM   5    correct?

10:43AM   6    A.  Correct.

10:43AM   7         MR. COVERT:  Then if we can scroll down to realtime

10:43AM   8    situation awareness of events.

10:43AM   9         BY MR. COVERT:

10:43AM   10   Q.  Threat intelligence through open source tools and

10:43AM   11   methodologies of events of interest that may include threats

10:43AM   12   to community safety and law enforcement officers and

10:43AM   13   infrastructure and/or in preparation of certain law

10:43AM   14   enforcement operations, correct?

10:43AM   15   A.  I apologize, I've lost track of where you are in the

10:43AM   16   document.

10:43AM   17   Q.  The heading is realtime situation awareness of events, if

10:43AM   18   you look at your screen.  I think she's pointing it for you.

10:43AM   19   A.  Thank you.  Yes.

10:43AM   20   Q.  So that paragraph indicates that you -- SUNY Fredonia's

10:43AM   21   engaging them to engage in threat intelligence and threat

10:44AM   22   assessment, correct?

10:44AM   23   A.  This was more of a proposal for what the services they

10:44AM   24   could offer.

10:44AM   25   Q.  That's a proposal, the threat assessment?

10:44AM  1   A.  Correct.

10:44AM  2   Q.  And then the last page, page 4, was signed, the proposal

10:44AM  3   was accepted by President Kolison, correct?

10:44AM  4   A.  Yes.

10:44AM  5   Q.  So, President Kolison accepted paying A1C for this exact

10:44AM  6   threat intelligence, correct?

10:44AM  7   A.  Yes.

10:44AM  8   Q.  Going to Defendant's 33, second page, recommendations.

10:45AM  9        I think we left off where A1C, under the recommendations

10:45AM  10   section, recommended persistent evaluation of online activity

10:45AM  11   over the near term, correct?

10:45AM  12   A.  Yes.

10:45AM  13   Q.  So they weren't even calling for long-term evaluation of

10:45AM  14   online activity due to the paucity, as you noted, the paucity

10:45AM  15   of any social media attention, correct?

10:45AM  16   A.  Correct.

10:45AM  17   Q.  And then the next sentence indicates that persistent

10:45AM  18   evaluation of information posted online will assist in the

10:45AM  19   proactive identification of safety and security-related

10:45AM  20   issues that may rise to a level requiring action by Fredonia

10:45AM  21   and SUNY administrators and/or safety and security officials,

10:45AM  22   correct?

10:45AM  23   A.  Yes.

10:45AM  24   Q.  Was that followed through on?  Did SUNY Fredonia engage

10:45AM  25   this company or any other company in persistent evaluation of

10:46AM    1    such information?

10:46AM    2    A.   No.

10:46AM    3    Q.   The next paragraph seems to be a footnote, but it

10:46AM    4    indicates that there was an initial assessment completed at

10:46AM    5    the time that they were engaged the week of February 5th,

10:46AM    6    correct?

10:46AM    7    A.   Yes.

10:46AM    8    Q.   Do you know whether there was ever a report generated as

10:46AM    9    a result of that evaluation?

10:46AM   10    A.   I believe this is the only report we got from them.

10:46AM   11    Q.   But you're not certain of that?  It appears that they're

10:46AM   12    referencing a separate report, correct?

10:46AM   13    A.   I understand the language, and it appears that way.  My

10:46AM   14    recollection is this is the only one.

10:46AM   15    Q.   Under methodology, they indicate immediately under the

10:46AM   16    methodology title, to better define the physical threats to

10:46AM   17    the Fredonia community, including Professor Kershnar, other

10:46AM   18    staff members, and students, they are going to engage in a

10:46AM   19    number of tasks to do that, correct?

10:47AM   20    A.   Yes.

10:47AM   21    Q.   Going to the next page, under analyst findings.

10:47AM   22         MR. COVERT:  You can scroll down, please.

10:47AM   23         BY MR. COVERT:

10:47AM   24    Q.   A review of NeverAloneWithChrist's BitChute account

10:47AM   25    disclosed anti-Semetic and extremist content; however, no

10:47AM   1   direct threats demonstrating an intent to harm Professor

10:47AM   2   Kershnar or Fredonia were identified, correct?

10:47AM   3   A.  Correct.

10:47AM   4   Q.  Continues, Analyst Note:  In the event a profile of

10:47AM   5   interest includes content appearing to clearly articulate an

10:47AM   6   actual or perceived threat, A1C uses established

10:47AM   7   methodologies and practices to resolve the identity of the

10:47AM   8   user, and conduct subsequent due diligence to further assess

10:47AM   9   the threat, including referral of the threat to appropriate

10:47AM  10   law enforcement officials.

10:47AM  11       No additional instances of doxing, D-O-X-I-N-G, regarding

10:48AM  12   Professor Kershnar were identified, correct?

10:48AM  13   A.  Correct.

10:48AM  14   Q.  That's fair to state that you did not include any of this

10:48AM  15   information in your affidavit to the Court, correct?

10:48AM  16   A.  I'd like to reiterate, my declaration --

10:48AM  17   Q.  I'm asking yes or no, you did not include that?

10:48AM  18   A.  That doesn't accurately characterize it.  My declaration

10:48AM  19   to the Court --

10:48AM  20   Q.  It's a simple question.  Did you include --

10:48AM  21           MS. PANTZER:  Your Honor, the witness is trying to

10:48AM  22   explain his answer.

10:48AM  23           MR. COVERT:  He can do that on redirect.

10:48AM  24           THE COURT:  You can answer yes, no, or I can't answer

10:48AM  25   "yes" or "no."

Case 1:23-cv-00525-LJV-JJM   Document 51   Filed 09/16/23   Page 30 of 71
Kershnar v Kolison - Isaacson - Covert/Cross - 9/14/23

30

10:48AM    1          MS. PANTZER:  Thank you, Your Honor.

10:48AM    2          THE WITNESS:  I did not include it in my declaration

10:48AM    3    to the Court.

10:48AM    4          BY MR. COVERT:

10:48AM    5    Q.  Thank you.  The next title is Calls For Violence Against

10:48AM    6    Professor Kershnar.  No clear demonstration of intent,

10:49AM    7    correct?

10:49AM    8    A.  Correct.

10:49AM    9    Q.  Then going to the next page, I'm sorry, going to the

10:49AM   10    bottom of that page:  Research disclosed numerous comments

10:49AM   11    appearing in online platforms, suggesting Professor

10:49AM   12    Kershnar's expressed views regarding pedophilia are of

10:49AM   13    concern.  The identified comments advocate for different

10:49AM   14    levels of violence toward Professor Kershnar; however, the

10:49AM   15    comments do not suggest the evidence (sic) of an imminent

10:49AM   16    intent to act on the part of the authors of the comments,

10:49AM   17    correct?

10:49AM   18    A.  Yes.

10:49AM   19    Q.  Again, that was not included in your affidavit, correct?

10:49AM   20    A.  Correct.

10:49AM   21    Q.  The next paragraph:  Most of the comments identified by

10:49AM   22    A1C were posted in anti-Semetic and racist conversations

10:49AM   23    blaming pedophilia and other perceived social ills against

10:49AM   24    the Jewish faith, and as part of a generalized belief in

10:50AM   25    conspiracy theories.

10:50AM  1      The language utilized during these conversations is

10:50AM  2  extremely graphic, but not unlike the language regularly used

10:50AM  3  in these communities, correct?

10:50AM  4  A.  Yes.

10:50AM  5  Q.  And, again, that was not included in your affidavit to

10:50AM  6  the Court?

10:50AM  7  A.  That's right.

10:50AM  8  Q.  Looking at the next paragraph, in the middle of the

10:50AM  9  paragraph, it's after some analysis of speech, the comments

10:50AM  10 appear to be aspirational in nature.  Research fails to

10:50AM  11 disclose any direct calls for violence or other retribution

10:50AM  12 directed toward Fredonia, correct?

10:50AM  13 A.  Yes.

10:50AM  14 Q.  And, again, that was not included in your affidavit to

10:50AM  15 the Court, correct?

10:50AM  16 A.  Correct.

10:50AM  17 Q.  The next paragraph, fourth line down, after further

10:50AM  18 analysis, the report indicates, quote, no direct threats to

10:50AM  19 Fredonia were disclosed, end quote, correct?

10:50AM  20 A.  Yes.

10:50AM  21 Q.  Again, that was not included in your affidavit to the

10:50AM  22 Court?

10:50AM  23 A.  Correct.

10:50AM  24 Q.  The next section --

10:51AM  25      MS. PANTZER:  Your Honor, I'm going to object to this

10:51AM   1   line of questioning at this point.  I think this exhibit is in

10:51AM   2   evidence.  The Court can read the entire exhibit, identify

10:51AM   3   what was in the affidavit and what was not in the affidavit.

10:51AM   4   I think that this is belaboring the point.

10:51AM   5            THE COURT:  Overruled.

10:51AM   6            MR. COVERT:  Thank you.

10:51AM   7            BY MR. COVERT:

10:51AM   8   Q.  The next section is titled Dark Web Research Results,

10:51AM   9   correct?

10:51AM  10   A.  Yes.

10:51AM  11   Q.  And it states, quote, a search of dark web marketplaces

10:51AM  12   and forums failed to disclose references to potential doxing,

10:51AM  13   swatting, or calls for cyberattacks targeting Fredonia, its

10:51AM  14   staff, students, and Professor Kershnar.

10:51AM  15       In addition, a review of dark web communities also failed

10:51AM  16   to disclose any calls for cyberattacks targeting Fredonia's

10:51AM  17   infrastructure, including distributed denial of service

10:51AM  18   attacks, end quote; is that correct?

10:51AM  19   A.  Yes.

10:51AM  20   Q.  And, again, that was not included in your affidavit to

10:51AM  21   the Court, correct?

10:51AM  22   A.  Correct.

10:52AM  23   Q.  The next section is titled Timeline of Reactions.  It

10:52AM  24   states, beginning, quote, an analysis of search engine trends

10:52AM  25   and social media postings indicates reactions to the video in

10:52AM  1   which Professor Kershnar's comments were publicized spiked

10:52AM  2   during February 2022, and trended downward shortly

10:52AM  3   thereafter.  No additional spikes in social media comments in

10:52AM  4   response to the video were observed, correct?

10:52AM  5   A.  Yes.

10:52AM  6   Q.  And, again, that passage was not included in your

10:52AM  7   affidavit to the Court, correct?

10:52AM  8   A.  Yes.

10:52AM  9   Q.  Going back to Defendant's Exhibit 1, I believe page 20.

10:53AM  10  Paragraph 52.  You indicate in your affidavit to the Court

10:53AM  11  that based on the foregoing, my recommendation to SUNY

10:53AM  12  Fredonia administrators remains -- remained unchanged until

10:53AM  13  my retirement on June 30th of 2023.  Barring an extraordinary

10:53AM  14  and financially prohibitive expansion of the University

10:53AM  15  Police Department's staffing capabilities, I do not believe

10:53AM  16  it possible to adequately protect the Fredonia campus in a

10:53AM  17  situation where Kershnar is physically present on the campus

10:53AM  18  or having any authorized contacts with SUNY Fredonia

10:53AM  19  students, correct?

10:53AM  20  A.  Correct.

10:53AM  21  Q.  Did you actually engage in any, yes or no, analysis of

10:54AM  22  the financial costs of measures short of barring Dr. Kershnar

10:54AM  23  from campus?

10:54AM  24  A.  No.

10:54AM  25  Q.  From the period of February 2nd, 2022, through June 30th

10:54AM  1   of 2023, were you ever asked by Vice-President Metzger,

10:54AM  2   President Kolison, or the SUNY Fredonia cabinet, to provide

10:54AM  3   them with alternative measures short of barring Dr. Kershnar

10:54AM  4   from campus that they could consider?

10:54AM  5   A.  No.

10:54AM  6   Q.  Did they ever ask you for a financial analysis of

10:54AM  7   alternative measures short of barring him from campus that

10:54AM  8   they could consider?

10:54AM  9   A.  No.

10:54AM  10  Q.  Did they ever ask you to provide them with a security

10:55AM  11  analysis relating to allowing Dr. Kershnar to teach virtually

10:55AM  12  or remotely?

10:55AM  13  A.  I remember conversations about that.  I don't remember

10:55AM  14  them with specificity.  My recommendation was that he not be

10:55AM  15  allowed to teach remotely.

10:55AM  16  Q.  Did they ask you for a formal analysis of what that would

10:55AM  17  entail?  How that would happen?

10:55AM  18  A.  No.

10:55AM  19  Q.  From the period of February 2nd, 2022, to June 30th of

10:55AM  20  2023, to your knowledge, did anyone ever come to the Fredonia

10:55AM  21  campus with the intent of harming Dr. Kershnar or SUNY

10:55AM  22  officials in relation to this matter, to your knowledge?

10:55AM  23  A.  No.  No.

10:56AM  24          MR. COVERT:  I'm done, Your Honor.

10:56AM  25          THE COURT:  Okay.  Redirect?

| | | |
|---|---|---|
| 10:56AM | 1 | MR. BOYD:  Your Honor, can we get two minutes to |
| 10:56AM | 2 | huddle up before redirect? |
| 10:56AM | 3 | THE COURT:  Say it again? |
| 10:56AM | 4 | MR. BOYD:  Can we get two minutes to talk before |
| 10:56AM | 5 | redirect? |
| 10:56AM | 6 | THE COURT:  Sure.  Let's take a little more than two |
| 10:56AM | 7 | minutes.  We'll come back at 5 after, and we'll resume then. |
| 10:56AM | 8 | MS. METZGER KIMURA:  Thank you, Your Honor. |
| 10:56AM | 9 | MR. BOYD:  Thank you, Your Honor. |
| 10:56AM | 10 | THE WITNESS:  Thanks, Judge. |
| 10:56AM | 11 | THE CLERK:  All rise. |
| 10:56AM | 12 | (Off the record at 10:56 a.m.) |
| 10:56AM | 13 | (Back on the record at 11:07 a.m.) |
| 11:07AM | 14 | THE CLERK:  All rise. |
| 11:07AM | 15 | THE COURT:  Please be seated. |
| 11:07AM | 16 | THE CLERK:  We are back on the record for the |
| 11:07AM | 17 | continuation of the hearing in case number 23-CR-525, Kershnar |
| 11:07AM | 18 | versus Kolison, et al. |
| 11:07AM | 19 | All counsel and parties are present. |
| 11:07AM | 20 | THE COURT:  Ready to go? |
| 11:07AM | 21 | MS. PANTZER:  Yes, Your Honor. |
| 11:07AM | 22 | THE COURT:  I remind the witness that he's still |
| 11:07AM | 23 | under oath. |
| 11:07AM | 24 | THE WITNESS:  Yes, Judge. |
| 11:08AM | 25 | MS. PANTZER:  Let's start with Exhibit 33, |

11:08AM   1   Defendant's Exhibit 33 in evidence, please.

11:08AM   2        THE CLERK:  Who's doing it from your side?  Thank

11:08AM   3   you.  Sorry.  It should be coming up.

11:08AM   4

11:08AM   5        **REDIRECT EXAMINATION BY MS. PANTZER:**

11:08AM   6   Q. Chief Isaacson, when was this A1C report in evidence

11:08AM   7   provided to SUNY Fredonia?

11:08AM   8   A.  September 20 of 2022.

11:08AM   9   Q.  And how long after the Kershnar matter arose was that,

11:08AM   10  approximately?

11:08AM   11  A.  About seven months.

11:08AM   12  Q.  So at that point, had the cooling-down period occurred?

11:08AM   13  A.  Yes.

11:08AM   14  Q.  Was Dr. Kershnar off campus at that point?

11:08AM   15  A.  No.

11:08AM   16  Q.  In September of 2022, wasn't Dr. Kershnar off campus?

11:08AM   17  A.  Oh, yeah, Dr. Kershnar was not on campus.

11:08AM   18  Q.  And, so, this report -- how does that play into your

11:09AM   19  analysis with regard to this report?

11:09AM   20  A.  This report was not a surprise to me.  This report was

11:09AM   21  performed in an environment when Dr. Kershnar was not on the

11:09AM   22  campus.  In fact, my professional opinion is, is that if this

11:09AM   23  report had been provided in a situation where he had never

11:09AM   24  left, for example, March of 2022, the month afterward, this

11:09AM   25  report would be absolutely filled with content, concerning

11:09AM   1   content that I described at length during my testimony, where

11:09AM   2   there would be many, many hundreds, perhaps thousands of

11:09AM   3   comments that intimated that violence was an appropriate

11:10AM   4   answer that advocated for violence.

11:10AM   5       The atmosphere that I was trying to prevent --

11:10AM   6           MR. COVERT:  Your Honor, I object.  This is going way

11:10AM   7   afield of the question.

11:10AM   8           THE COURT:  Overruled.

11:10AM   9           THE WITNESS:  The atmosphere that I was trying to

11:10AM  10   prevent would have been occurring, and the security posture of

11:10AM  11   the campus, in my professional opinion, would be very much

11:10AM  12   compromised.

11:10AM  13           This report was done in the threat atmosphere that I

11:10AM  14   was trying to achieve with my recommendations to my

11:10AM  15   administrators.

11:10AM  16           BY MS. PANTZER:

11:10AM  17   Q.  So in essence, this report shows that your recommendation

11:10AM  18   for removal worked?

11:10AM  19   A.  Correct.

11:10AM  20   Q.  Thank you.  You were asked several questions on cross

11:10AM  21   about sections of this report that weren't included in your

11:11AM  22   declaration to the Court.  Can you explain why sections of

11:11AM  23   this report were not included?

11:11AM  24   A.  Sure.  I discredited the narrative portions of this

11:11AM  25   report.  I give them very little value.  The -- the authors

11:11AM  1   of this narrative, although they are retired analysts and

11:11AM  2   agents, they frankly do not have the level of threat

11:11AM  3   assessment, threat mitigation training or experience, that I

11:11AM  4   received during my career in the FBI.

11:11AM  5      My experience was fairly rare in the bureau.  The FBI and

11:11AM  6   the Secret Service are really the only two agencies that

11:11AM  7   think about threat assessment and violence prevention in the

11:11AM  8   terms that we -- that are relevant for this matter.

11:11AM  9      I had a conversation with Richard Denholm, the principal

11:12AM  10  of A1C that I worked with to get this report.  And I asked

11:12AM  11  him, are the authors of this narrative portion, did they have

11:12AM  12  the kind of training that the FBI -- that the FBI provides

11:12AM  13  former agents like me, or agents in the Behavioral Analysis

11:12AM  14  Unit?  The answer was no.

11:12AM  15     And I told him that opining on the existence or opining

11:12AM  16  on a threat, based on the fact that there's not a specific

11:12AM  17  articulated directed threat to a specific target, and taking

11:12AM  18  that to mean that there's not a risk of physical violence, is

11:12AM  19  exactly opposite of what the research shows.

11:12AM  20     You know, we've gone at length, and I won't go through it

11:12AM  21  again, but howlers don't hunt, and hunters don't howl.

11:13AM  22     So I discounted that.  I did not include that.  Those

11:13AM  23  opinions, frankly, from people, in my view, were not equipped

11:13AM  24  to give those opinions.  I discounted those opinions in my

11:13AM  25  recommendations to my administration.

11:13AM    1    My declaration to the Court is plainly worded to express

11:13AM    2    that I was giving to the Court in that declaration a summary

11:13AM    3    of my recommendations to my administration.

11:13AM    4    I was fully aware that this A1C was a part of this Court

11:13AM    5    record.  I certainly expected the commentary here would

11:13AM    6    generate some interest from counsel.  We talked about that.

11:13AM    7    But the notion that I was trying to be in any way evasive or

11:13AM    8    hiding a ball from the Court or from counsel is just not at

11:13AM    9    all true.

11:13AM    10    Q.  Okay.  And that does lead me to my next question.  You

11:13AM    11    noted that A1C was pointing out that there were no direct

11:14AM    12    threats, and you were asked several questions on cross about

11:14AM    13    immanence.  Could you explain what an imminent danger is, and

11:14AM    14    why that's not really relevant here?

11:14AM    15    A.  Sure.

11:14AM    16    The idea of immanence in a threat assessment requires

11:14AM    17    that we have a specific person in mind, that we have optics

11:14AM    18    on a person of concern.  And then we can start to collect

11:14AM    19    evidence about that person of concern, to make a judgment on

11:14AM    20    the validity of a threat and also its immanence.  But we need

11:14AM    21    to identify a particular person.

11:14AM    22    Examples of some of the tools we might use for immanence.

11:14AM    23    If we were doing a threat assessment on a known individual

11:14AM    24    who's acting in concerning ways, we would try to collect

11:14AM    25    evidence to see whether he sees himself in the future.  Is he

11:14AM   1   making realistic plans that reflect that he's got future

11:15AM   2   plans?  Is he acting in reckless ways, financially, or

11:15AM   3   sexually, or socially, that would indicate that he doesn't

11:15AM   4   care what happens to him?  Those kinds of indicators would

11:15AM   5   increase our level of concern that a pending attack could be

11:15AM   6   coming sooner.

11:15AM   7       As I mentioned in my earlier testimony, this matter has

11:15AM   8   given us an enormous population of grieved persons that we

11:15AM   9   have no optic on.  We have no ability to do that detailed

11:15AM  10   person by person analysis of immanence.

11:15AM  11       Sort of a way to illustrate the point.  Imagine on the

11:15AM  12   other side, behind the Statler Building across from the

11:15AM  13   courthouse, out of view, there was a large and angry crowd

11:16AM  14   that was angry at us here in this courtroom.  And we know

11:16AM  15   they're very, very angry at us.

11:16AM  16       We're getting the kind of message traffic online that

11:16AM  17   would remind us of the kind of message traffic we're talking

11:16AM  18   about in this Court, in this matter.

11:16AM  19       If we were outside on the sidewalk in front of the

11:16AM  20   courthouse, we'd have no way to judge the immanence of a

11:16AM  21   threat until somebody came around the corner and we saw that

11:16AM  22   person charging towards us.  Now we can say, okay, that --

11:16AM  23   there is a person who we've identified, that's an imminent

11:16AM  24   threat.

11:16AM  25       So again, I'll remind -- I'll remind the Court and

11:16AM   1   everybody here that the idea of a direct articulated threat

11:16AM   2   to a target is not indicative, usually, that an attack is

11:16AM   3   pending.

11:16AM   4        What we intend -- what we tend to see is that people that

11:17AM   5   carry out attacks speak in language very reminiscent of what

11:17AM   6   we've seen in traffic in the February and March 22

11:17AM   7   time frame.

11:17AM   8   Q.  On cross, it was intimated that your professional opinion

11:17AM   9   that Dr. Kershnar be removed from campus is the same as

11:17AM  10   cancelling all concerts or keeping the president permanently

11:17AM  11   in a bunker.  Can you explain why that's not the same

11:17AM  12   concept?

11:17AM  13   A.   In this case, my focus, and I think the focus of my

11:17AM  14   administrators, was to keep the campus running in a way that

11:17AM  15   was not disruptive, in a way that SUNY Fredonia will continue

11:17AM  16   to look like SUNY Fredonia.  It will still be an open college

11:18AM  17   campus, it will be a place without fear, without, you know, a

11:18AM  18   heavy, heavy police presence.

11:18AM  19        If we were to take the metaphor used by counsel and --

11:18AM  20   or, to cancel a concert, I think the metaphor extended to the

11:18AM  21   campus is close the campus, which I think is certainly not a

11:18AM  22   point of discussion here.

11:18AM  23        My recommendations to cabinet -- or to, pardon me, to the

11:18AM  24   president, were intended to keep the campus safe.  And based

11:18AM  25   on my training and experience, the least disruptive way to do

11:18AM   1   that, for Dr. Kershnar's safety, and for the safety of the

11:18AM   2   campus, was to remove him from campus.  And that was my

11:18AM   3   recommendation.

11:18AM   4   Q.  On cross, you were asked whether you're aware of any

11:19AM   5   convicted pedophiles in and around the Fredonia area that had

11:19AM   6   been threatened violently.  Are you aware of any of those

11:19AM   7   convicted pedophiles going on a podcast to espouse the values

11:19AM   8   of pedophilia?

11:19AM   9           MR. COVERT:  I object to mischaracterization.

11:19AM  10           THE COURT:  Mischaracterization of what?

11:19AM  11           MR. COVERT:  Of what Professor Kershnar stated on the

11:19AM  12   podcast.

11:19AM  13           THE COURT:  I don't think she's characterizing

11:19AM  14   anything.  Overruled.  Overruled.

11:19AM  15           THE WITNESS:  No, I'm not.

11:19AM  16           BY MS. PANTZER:

11:19AM  17   Q.  Also, would you be involved in the investigation of

11:19AM  18   threats of violence against convicted pedophiles in the

11:19AM  19   Fredonia region?

11:19AM  20   A.  I may be asked to opine on it and contribute my

11:19AM  21   expertise, but I was not.

11:19AM  22   Q.  On cross, you were also repeatedly asked about your,

11:19AM  23   quote, level of concern in connection with the threats that

11:19AM  24   we've presented to the Court during this hearing.  And it was

11:20AM  25   suggested that your, quote, level of concern was not

11:20AM    1    significant enough for to you present these threats to local

11:20AM    2    law enforcement or FBI.

11:20AM    3        Can you explain why that's a mischaracterization of what

11:20AM    4    happened?

11:20AM    5    A.   Sure.  That's really a two-part question.

11:20AM    6        My level of concern was greatly reduced as the threat

11:20AM    7    environment cooled with Dr. Kershnar's absence.  My level of

11:20AM    8    concern in February was very, very high.

11:20AM    9        The second part of your thought that the utility and the

11:20AM    10   wisdom of sending out all of these concerning messages that

11:20AM    11   we were seeing online out to law enforcement or out to the

11:20AM    12   FBI, these are comments that were almost exclusively written

11:21AM    13   by authors who hide their identity behind screen names or

11:21AM    14   monikers online.

11:21AM    15       To get Twitter or Facebook or any of these social media

11:21AM    16   platforms to disclose identifying information or

11:21AM    17   IP addresses, to resolve the true identity of those authors,

11:21AM    18   requires legal process, requires a grand jury subpoena, or a

11:21AM    19   search warrant.

11:21AM    20       In my view, and certainly based on my experience in the

11:21AM    21   FBI, the FBI would not even open a case or dedicate an agent

11:21AM    22   to this matter because there are no actionable leads.

11:21AM    23       And what are we trying do here?  From my chair, as the

11:21AM    24   police chief at SUNY Fredonia, I was trying to keep my campus

11:21AM    25   safe.  I was not trying to put in jail people across the

11:21AM   1   country who were saying threatening things about one of our

11:21AM   2   professors.  In fact, to do so, if we were able -- even if we

11:22AM   3   were able to do that, and we're not, even if we were able to

11:22AM   4   do that, that would just add fuel to the grievance fire that

11:22AM   5   I'm trying to put out to keep my campus safe.

11:22AM   6        Having a hundred people across the country get charged

11:22AM   7   with what almost certainly would be minor misdemeanor crimes

11:22AM   8   by state agencies would do nothing other than enflame the

11:22AM   9   passions around this matter, and it would be an even bigger

11:22AM   10  issue and draw more national and social media attention.  I

11:22AM   11  want attention on Fredonia to wane, and it did.

11:22AM   12       MS. PANTZER:  Your Honor, I'd like the Court's

11:22AM   13  permission to briefly show the witness a demonstrative exhibit

11:22AM   14  that was created based on Exhibit 16 in evidence.  It

11:22AM   15  delineates --

11:23AM   16       THE COURT:  Have you shared that with counsel?

11:23AM   17       MS. PANTZER:  I have not, Your Honor.

11:23AM   18       THE COURT:  Why don't you share it with counsel and

11:23AM   19  see if he has any objection to it.

11:23AM   20       MS. PANTZER:  Jenna is going to pull it up right now.

11:23AM   21       This is the demonstrative exhibit that was created.

11:23AM   22  It's a delineation of the social media monikers that Chief

11:23AM   23  Isaacson testified to as to Exhibit 16 in evidence.  I want to

11:23AM   24  ask him brief questions about this.

11:23AM   25       MR. COVERT:  Go ahead and ask him, and then we can

11:23AM   1   move -- try to move it into evidence.  I don't really follow

11:24AM   2   this, so I'll let you ask questions.

11:24AM   3           MS. PANTZER:  It's demonstrative.  I don't intend to

11:24AM   4   move it into evidence, Your Honor.

11:24AM   5           THE COURT:  Go ahead.

11:24AM   6           BY MS. PANTZER:

11:24AM   7   Q.  Chief Isaacson, showing you what -- the demonstrative

11:24AM   8   exhibit that we created, this has to do with the social media

11:24AM   9   compilation we looked at yesterday.  Do you recall that,

11:24AM  10   Exhibit 16 in evidence?

11:24AM  11   A.  Yes.

11:24AM  12   Q.  And these are screen names, identified threat conveyors

11:24AM  13   from that exhibit.

11:24AM  14       In your professional opinion, and based on your

11:24AM  15   experience, working as a special agent with the FBI, what

11:24AM  16   would happen if you had presented these threatening tweets

11:24AM  17   with these screen name monikers to the FBI?

11:24AM  18   A.  Nothing.

11:24AM  19   Q.  Thank you.  And is that, in part, because there's very

11:24AM  20   limiting identifying information when someone's screen name

11:24AM  21   is Bad Dad or, you know, Average Booba Enjoyer, Chief

11:25AM  22   Isaacson?

11:25AM  23   A.  That, and I know from long experience from the FBI, if I

11:25AM  24   were to go to the U.S. Attorney's Office and say as an FBI

11:25AM  25   agent I have these monikers and these concerning comments

11:25AM  1   that these authors have written, none of which are a direct

11:25AM  2   threat to kill somebody, a clear and unequivocal threat to

11:25AM  3   kill somebody, the U.S. Attorney's Office would say we're not

11:25AM  4   going to open a case.  I would tell my bosses at the FBI that

11:25AM  5   the U.S. Attorney's Office is not willing to open a case or

11:25AM  6   grant authority for grand jury subpoenas, and my bosses would

11:25AM  7   say the FBI's not going to open a case.

11:25AM  8   Q.  Okay.  Again, the lack of a direct threat or an imminent

11:25AM  9   danger, as you illustrated for the Court earlier, does not

11:25AM  10  indicate that there's no security risk to campus?

11:26AM  11  A.  Correct.  It often indicates, as I mentioned earlier,

11:26AM  12  that the presence of a direct threat from a threat assessment

11:26AM  13  standpoint often reduces our concern for an actual real-world

11:26AM  14  physical attack.

11:26AM  15       MS. PANTZER:  Jenna, can you please pull up

11:26AM  16  Plaintiff's Exhibit in evidence 88.

11:26AM  17       BY MR. COVERT:

11:27AM  18  Q.  Chief Isaacson, on cross you were shown Plaintiff's

11:27AM  19  Exhibit 88 --

11:27AM  20  A.  Yes.

11:27AM  21  Q.  -- as to the student protest held in Barker Commons on

11:27AM  22  Sunday February 6th, do you recall that?

11:27AM  23  A.  Yes.

11:27AM  24  Q.  And you were asked questions about your concern about

11:27AM  25  that protest.  The student protest, was this the population

| | | |
|---|---|---|
| 11:27AM | 1 | of people that you were concerned about when you were working |
| 11:27AM | 2 | up your threat assessments? |
| 11:27AM | 3 | A.  No.  I was concerned about an external population.  We |
| 11:27AM | 4 | had good visibility on this particular matter.  You see |
| 11:27AM | 5 | mentioned in this news article about the social media |
| 11:27AM | 6 | platform YikYak.  That's a platform where -- especially our |
| 11:28AM | 7 | students at Fredonia love to use this because it broadcasts a |
| 11:28AM | 8 | message to people within a five mile circle.  So students |
| 11:28AM | 9 | loved it.  And what the students didn't know is that the |
| 11:28AM | 10 | police department was also participating in YikYak so we |
| 11:28AM | 11 | could read this message traffic.  We saw a lot of traffic on |
| 11:28AM | 12 | this about this planned protest, that it was going to be |
| 11:28AM | 13 | peaceful, and we got the impression that this was not gonna |
| 11:28AM | 14 | be a large turnout. |
| 11:28AM | 15 | Q.  So, in other words, you had optics on this group? |
| 11:28AM | 16 | A.  Correct. |
| 11:28AM | 17 | MS. PANTZER:  Jenna, can you pull up Plaintiff's |
| 11:28AM | 18 | Exhibit 64 in evidence, please.  Actually, let's put it down. |
| 11:29AM | 19 | Actually, this is marked confidential. |
| 11:29AM | 20 | BY MS. PANTZER: |
| 11:29AM | 21 | Q.  Chief Isaacson, you know what Plaintiff's Exhibit 64 in |
| 11:29AM | 22 | evidence is.  You were asked questions on cross with regard |
| 11:29AM | 23 | to your recommendations in that memo for the protection of |
| 11:29AM | 24 | President Kolison; do you recall those questions? |
| 11:29AM | 25 | A.  I do. |

11:29AM  1  Q.  It was intimated that you weren't suggesting a large

11:29AM  2  security detail for President Kolison.  Can you explain why

11:29AM  3  that was?

11:29AM  4  A.  This occurred in a -- in the cooled threat environment,

11:29AM  5  that the reaction and the response to requests for added

11:29AM  6  security to the president would have been more robust if we

11:30AM  7  were in the environment that we were throughout, you know,

11:30AM  8  those early days of the controversy.

11:30AM  9      But to add to that, it also reflects the near

11:30AM  10  impossibility of adequately protecting the campus from an

11:30AM  11  outside threat when we don't know the timing of that, we

11:30AM  12  don't know who would be coming on, especially with a

11:30AM  13  limited -- limited resources and that the police department

11:30AM  14  had.

11:30AM  15  Q.  Chief Isaacson, I think this is my last question.

11:30AM  16      What is the difference, in your professional opinion,

11:30AM  17  between hardening the target as plaintiff suggests and

11:30AM  18  reducing the security risk to campus by removing Dr. Kershnar

11:31AM  19  from campus, in your professional opinion?

11:31AM  20  A.  The whole idea of protecting campuses across the country,

11:31AM  21  I hope, is going to focus more on preventing the likelihood

11:31AM  22  of targeted violence.  It's -- it's already, from a

11:31AM  23  statistical standpoint, something that is low probability and

11:31AM  24  extremely high consequence if you focus on any one campus.

11:31AM  25  But we see these attacks occurring all the time around the

11:31AM    1    country.  Once a week you're gonna turn on the news at least

11:31AM    2    and see another tragedy at another college campus or a

11:31AM    3    shopping mall or a high school.

11:31AM    4        The idea of being able to harden a target, like this

11:31AM    5    courtroom is hardened.  There's bollards out on the sidewalk

11:31AM    6    so a truck bomb can't get too close.  There's armed security.

11:32AM    7    There's a metal detector.  That hardens this target.  And I'm

11:32AM    8    feeling extremely safe sitting in this classroom, or in this

11:32AM    9    courtroom, pardon me.

11:32AM   10        But the idea of bringing anything that approaches what

11:32AM   11    we're enjoying right now in this courtroom to a college

11:32AM   12    campus, it's a fool's errand.  You just cannot do it.

11:32AM   13        If I had 500 million dollars, I would build a moat

11:32AM   14    around -- from a security standpoint I would build a moat

11:32AM   15    around SUNY Fredonia.  I'd put up an electrified fence.  I'd

11:32AM   16    have 300 officers there.  And it wouldn't look like a college

11:32AM   17    campus anymore.

11:32AM   18        This is a small rural campus that has attracted national

11:32AM   19    negative attention on an extremely out-of-the-blue,

11:32AM   20    hot-topic, enflaming issue that has demonstrably angered

11:33AM   21    hundreds and hundreds, perhaps thousands, of people .  I

11:33AM   22    would submit tens of thousands.  It's a huge number of

11:33AM   23    people, just by what we saw on social media.

11:33AM   24        And I would submit that the people commenting on social

11:33AM   25    media are the tip of a huge iceberg of people that are

| | | |
|---|---|---|
| 11:33AM | 1 | disgusted and angered by -- by these views. |
| 11:33AM | 2 | The idea that we can somehow protect one person or |
| 11:33AM | 3 | protect one campus from this unseen angry population is |
| 11:33AM | 4 | absolutely absurd. |
| 11:33AM | 5 | The only thing, in my professional opinion, we can do is |
| 11:33AM | 6 | reduce or eliminate the grievance.  That's what the research |
| 11:33AM | 7 | shows, that's what we do when we have a single identified |
| 11:33AM | 8 | individual, person of concern. |
| 11:33AM | 9 | As a threat assessor, my first question is always what's |
| 11:33AM | 10 | the grievance, and can we resolve it.  That's my first |
| 11:34AM | 11 | question.  And if we're able to resolve the grievance, we can |
| 11:34AM | 12 | bring down that level of concern that we have that that |
| 11:34AM | 13 | person might act out violently. |
| 11:34AM | 14 | So, my hope is that Fredonia keeps focusing on that in |
| 11:34AM | 15 | the years ahead and preventing violence, and that's certainly |
| 11:34AM | 16 | what my recommendation was in this matter. |
| 11:34AM | 17 | MS. PANTZER:  Thank you, Chief Isaacson.  Nothing |
| 11:34AM | 18 | further. |
| 11:34AM | 19 | |
| 11:34AM | 20 | **RECROSS-EXAMINATION BY MR. COVERT:** |
| 11:34AM | 21 | Q.  Recross.  Chief, bringing you back to your testimony on |
| 11:34AM | 22 | redirect, you began the A1C report, and you stated, quote, |
| 11:34AM | 23 | not a surprise to me, end quote, correct? |
| 11:34AM | 24 | A.  Yes. |
| 11:34AM | 25 | Q.  But you disagree with 75 percent of the report, correct? |

| | | |
|---|---|---|
| 11:34AM | 1 | A.  The -- I can clarify that. |
| 11:34AM | 2 | Q.  Just, do you disagree with the majority of the report, |
| 11:34AM | 3 | the threat assessment part? |
| 11:35AM | 4 | MS. PANTZER:  Your Honor, if the Court requires |
| 11:35AM | 5 | clarification, I would just ask that the witness be allowed to |
| 11:35AM | 6 | give that clarification. |
| 11:35AM | 7 | THE COURT:  Well, again, if it's a yes-or-no |
| 11:35AM | 8 | question, the witness can say yes, no, or I can't answer "yes" |
| 11:35AM | 9 | or "no." |
| 11:35AM | 10 | THE WITNESS:  Could you ask the question again, |
| 11:35AM | 11 | please? |
| 11:35AM | 12 | BY MR. COVERT: |
| 11:35AM | 13 | Q.  You disagree with a significant portion of the report, |
| 11:35AM | 14 | specifically the threat assessment portions? |
| 11:35AM | 15 | A.  I disagreed only with the threat assessment portion.  I |
| 11:35AM | 16 | agreed with the data that was collected. |
| 11:35AM | 17 | Q.  You disagree with the portions that I read to you, and |
| 11:35AM | 18 | you did not include in your affidavit to the Court, correct? |
| 11:35AM | 19 | A.  I do, yes. |
| 11:35AM | 20 | Q.  And you engaged, on behalf of SUNY Fredonia, A1C to |
| 11:35AM | 21 | engage in this specific threat assessment analysis that they |
| 11:35AM | 22 | provided, correct? |
| 11:35AM | 23 | A.  Yes. |
| 11:35AM | 24 | MS. PANTZER:  Objection, asked and answered. |
| 11:35AM | 25 | THE COURT:  Overruled. |

11:35AM    1            THE WITNESS:  Yes.

11:35AM    2            BY MR. COVERT:

11:35AM    3    Q.  But now your testimony is that the company that you

11:36AM    4    engaged in is not as qualified to conduct a threat assessment

11:36AM    5    as you are?

11:36AM    6            MS. PANTZER:  Objection, asked and answered.

11:36AM    7            THE COURT:  Overruled.

11:36AM    8            BY MR. COVERT:

11:36AM    9    Q.  Yes or no.

11:36AM   10    A.  I can't answer that question yes or no.

11:36AM   11    Q.  Do you believe that you are more qualified or better

11:36AM   12    qualified to conduct the threat assessment than A1C was?

11:36AM   13    A.  Yes.

11:36AM   14    Q.  Yet you engaged A1C to conduct a threat assessment,

11:36AM   15    correct?

11:36AM   16    A.  I engaged them to --

11:36AM   17    Q.  Yes or no.

11:36AM   18    A.  I engaged them to conduct an internet scrub.

11:36AM   19    Q.  But we already established earlier, yes or no, that part

11:36AM   20    of their engagement was for threat assessment?

11:36AM   21    A.  Yes.

11:36AM   22    Q.  You testified on redirect to the student protest,

11:36AM   23    correct?

11:36AM   24    A.  Yes.

11:36AM   25    Q.  In general terms, you were made aware of the protest on

| | | |
|---|---|---|
| 11:36AM | 1 | February 3rd, and that the protest was going to occur on |
| 11:36AM | 2 | February 6th of 2022, correct? |
| 11:37AM | 3 | A.  Correct. |
| 11:37AM | 4 | Q.  February 6th of 2022, being about four days after the |
| 11:37AM | 5 | controversy began, correct? |
| 11:37AM | 6 | A.  Yes. |
| 11:37AM | 7 | Q.  And you testified on redirect that you're -- one of the |
| 11:37AM | 8 | part of the reasons for your analysis of only providing one |
| 11:37AM | 9 | patrol car as additional security for the protest was because |
| 11:37AM | 10 | you followed the social media, correct? |
| 11:37AM | 11 | A.  Yes. |
| 11:37AM | 12 | Q.  Haven't you been testifying throughout yesterday and |
| 11:37AM | 13 | today that the individuals who make threats are on social |
| 11:37AM | 14 | media are not the threats of actual violence, it's the silent |
| 11:37AM | 15 | ones? |
| 11:37AM | 16 | A.  Sometimes. |
| 11:37AM | 17 | Q.  So, you have no idea whether the individuals who were not |
| 11:37AM | 18 | on social media were going to show up and induce violence, |
| 11:37AM | 19 | correct? |
| 11:37AM | 20 | A.  It goes to -- |
| 11:37AM | 21 | Q.  Yes or no. |
| 11:37AM | 22 | A.  Repeat the question. |
| 11:37AM | 23 | Q.  Can you read it back? |
| 11:37AM | 24 | (The above-requested question was then read by the |
| 11:38AM | 25 | reporter.) |

| | | |
|---|---|---|
| 11:38AM | 1 | THE WITNESS:  Correct. |
| 11:38AM | 2 | BY MR. COVERT: |
| 11:38AM | 3 | Q.  You also testified in relation to the email regarding the |
| 11:38AM | 4 | request by President Kolison to have increased security on |
| 11:38AM | 5 | March 25th, 2022, on your redirect, correct? |
| 11:38AM | 6 | A.  Yes. |
| 11:38AM | 7 | Q.  And you testified that the reason you responded that the |
| 11:38AM | 8 | video monitoring and asking but not mandating someone to be |
| 11:38AM | 9 | in the parking lot was because of the cooling-down period had |
| 11:38AM | 10 | worked, correct? |
| 11:38AM | 11 | A.  Correct. |
| 11:38AM | 12 | Q.  Prior to the cooling-down period in early February, was |
| 11:38AM | 13 | President Kolison ever provided with an armed guard? |
| 11:39AM | 14 | A.  No. |
| 11:39AM | 15 | Q.  He's never accompanied on and off campus? |
| 11:39AM | 16 | A.  No. |
| 11:39AM | 17 | Q.  So you took more security steps after the cool -- after |
| 11:39AM | 18 | the more tense time than you did during the tense time in |
| 11:39AM | 19 | early February to provide for his safety?  Yes or no. |
| 11:39AM | 20 | A.  Yes. |
| 11:39AM | 21 | MR. COVERT:  Thank you. |
| 11:39AM | 22 | Nothing further, Your Honor. |
| 11:39AM | 23 | THE COURT:  Anything more? |
| 11:39AM | 24 | MS. PANTZER:  No, Your Honor. |
| 11:39AM | 25 | THE COURT:  Okay.  You can step down. |

| | | |
|---|---|---|
| 11:39AM | 1 | THE WITNESS:  Thanks, Judge. |
| 11:39AM | 2 | (Witness excused at 11:39 a.m.) |
| 11:39AM | 3 | THE COURT:  Okay.  We will take our afternoon break |
| 11:39AM | 4 | now. |
| 11:39AM | 5 | MR. COVERT:  Your Honor, can we actually address |
| 11:39AM | 6 | something? |
| 11:39AM | 7 | THE COURT:  Of course. |
| 11:39AM | 8 | MR. COVERT:  So it's my understanding from speaking |
| 11:39AM | 9 | with Mr. Boyd yesterday, and I don't want to speak on their |
| 11:39AM | 10 | behalf, but they were going ask that in relation to our two |
| 11:39AM | 11 | expert witnesses, that we provide their direct testimony this |
| 11:39AM | 12 | afternoon, and then the Court break and reschedule for a |
| 11:40AM | 13 | different date to conduct their cross-examination. |
| 11:40AM | 14 | I hope I said that accurate. |
| 11:40AM | 15 | MR. BOYD:  That's accurate, Your Honor.  Our concern, |
| 11:40AM | 16 | as I articulated it yesterday, is with the amount of |
| 11:40AM | 17 | disclosure in the expert witness summaries we were given and |
| 11:40AM | 18 | the summary of the testimony was four sentences, it was not |
| 11:40AM | 19 | signed by the experts, it's nothing we could cross them on. |
| 11:40AM | 20 | So my theory, my thought was, why not have them do their |
| 11:40AM | 21 | directs, we'll listen to them, we'll go back and prepare our |
| 11:40AM | 22 | cross-examination now actually having some insight into what |
| 11:40AM | 23 | we were going say which we don't really have right now. |
| 11:40AM | 24 | And given the amount of time remaining, it seems |
| 11:40AM | 25 | unlikely that we would get through both witnesses any event, |

11:40AM    1    and we'd probably have to come back here anyway.  In addition,

11:40AM    2    we still haven't put our second witness on, which I think is

11:40AM    3    going to be substantially shorter than Chief Isaacson, but it

11:40AM    4    just seems like a more logical approach to resolve our

11:40AM    5    objections.

11:40AM    6         MR. COVERT:  Your Honor, our proposal, we are not in

11:40AM    7    agreement in breaking and having them cross-examine on a

11:41AM    8    separate date.

11:41AM    9         What we would be amenable to is providing for a new

11:41AM   10    date to do direct and cross.  In the meantime, given that they

11:41AM   11    have been in court with the permission of -- with the consent

11:41AM   12    of the AG's office, have been able to observe the testimony,

11:41AM   13    which I think that they find to be significantly different in

11:41AM   14    many respects to what we had anticipated they were going to

11:41AM   15    testify to, that we will provide them in the interim with more

11:41AM   16    extensive indication of what they're going to testify to,

11:41AM   17    signed by them, well in advance of the next hearing date, if

11:41AM   18    we just set a new date for direct, cross, direct, cross.

11:41AM   19         MR. BOYD:  Yeah, Your Honor, that's certainly

11:41AM   20    helpful.  But, you know, we are here today.  And I think if

11:41AM   21    there's remaining time in the afternoon, they can put them on,

11:41AM   22    you know, at least start their direct so we can hear what they

11:41AM   23    have to say.

11:41AM   24         You know, there was a Court order that they provide

11:41AM   25    us with a substantial equivalent of an expert report.  They

11:42AM    1    came nowhere near complying with that.

11:42AM    2        We worked all weekend to produce and review thousands

11:42AM    3    of documents.  I personally, while traveling, conducted a

11:42AM    4    personal review of many, many documents, I put eyeballs on

11:42AM    5    thousands, and we got a four-sentence disclosure.

11:42AM    6        Now, a few hours later, we got an email from counsel

11:42AM    7    with more substance about what the testimony would be.  But

11:42AM    8    that only shows that they knew all along what the substance

11:42AM    9    was going to be, and they didn't bother to put it in the

11:42AM    10   witness summary that they gave us.

11:42AM    11       THE COURT:  I get that.  But why isn't a solution to

11:42AM    12   that what that doesn't unduly prejudice your side, what

11:42AM    13   Mr. Covert suggested?  So I understand that it certainly would

11:42AM    14   be better for you, let them testify on direct and you have a

11:42AM    15   couple weeks to figure out how to cross them, you do your

11:42AM    16   cross, I get that.  But that's not how it generally works.

11:42AM    17   Mr. Covert didn't have that opportunity to having a couple

11:43AM    18   weeks to prepare his cross-examination.  So why isn't -- how

11:43AM    19   does it prejudice you to have the direct and cross of the

11:43AM    20   experts with a more fulsome export disclosure done in the

11:43AM    21   meantime, in a couple weeks.

11:43AM    22       MR. BOYD:  A couple reasons, Your Honor.  First of

11:43AM    23   all, they've had a 20-page declaration from Chief Isaacson for

11:43AM    24   over a month and a half.  Now they're going to have our expert

11:43AM    25   and fact witnesses, direct and cross testimony, that they can

Kershnar v Kolison - Proceedings - 9/14/23

58

11:43AM  1  go back and prepare and submit a brand new expert report

11:43AM  2  addressing everything Chief Isaacson just said, what they've

11:43AM  3  just sat through in the courtroom and heard.  Right?  They're

11:43AM  4  getting the full benefit of all of that.  Right?

11:43AM  5       Their failure to comply with the Court's order to

11:43AM  6  give us the substantial equivalent of an expert report should

11:43AM  7  not benefit them.

11:43AM  8       And also, we're all here.  If we have time this

11:43AM  9  afternoon, let's go forward and do the direct of one of their

11:43AM  10  experts.  Let's get it started.

11:43AM  11       THE COURT:  Well, if we're going to do the direct,

11:43AM  12  we're going to the cross.  So, I leave that up to you.  If you

11:44AM  13  want to accept the proposal, if we'll do the direct --

11:44AM  14       Well, let me say this.  Let me see the expert

11:44AM  15  disclosure that was made and the supplemental disclosure that

11:44AM  16  was made, please.  I will look at that, I will look at that

11:44AM  17  over the lunch break.

11:44AM  18       MR. BOYD:  Thank you, Your Honor.  I think haveing

11:44AM  19  those would be helpful.

11:44AM  20       THE COURT:  Then when we come back, we will talk

11:44AM  21  about how to proceed in the future.  I mean, I can tell you

11:44AM  22  I'm leaning toward accepting the proposal that Mr. Covert has

11:44AM  23  made, because I think that's the fairest way to do it.  But I

11:44AM  24  will -- I will take into account what you're arguing to me,

11:44AM  25  Mr. Boyd.

11:44AM    1        MR. COVERT:  Your Honor, if I can throw one caveat

11:44AM    2    into the mix?  The Court, weeks ago, ordered the disclosure of

11:44AM    3    the documents that we did not get until we had to engage in

11:44AM    4    formal motion practice.  We received 6,000 additional

11:44AM    5    documents at the close of business on Monday.  Documents that,

11:44AM    6    quite honestly, I was still adding to our list today and

11:44AM    7    provided to the Court, we added yesterday.

11:45AM    8        It was very difficult to come to our final theories

11:45AM    9    of what we're going to do without access to those documents

11:45AM   10    which we just received.  So I believe that our disclosures are

11:45AM   11    sufficient for the informal pur -- for purposes of an informal

11:45AM   12    hearing.  But in any event, what we've done yesterday and

11:45AM   13    today, and I think that kind of shows that it was a little

11:45AM   14    smoother today, was -- in relation to my cross, was because

11:45AM   15    yesterday it was still clunky trying to figure out what was in

11:45AM   16    those documents and how to organize them and use them for

11:45AM   17    cross.  That's no different than our experts reviewing those

11:45AM   18    documents which honestly we should have had two weeks ago.  We

11:45AM   19    have engaged in some informal motion practice, the Court

11:45AM   20    ordered them to give it to us, Monday we get 6,000 documents.

11:45AM   21        Now, we didn't come into court yesterday and

11:45AM   22    complain, but it was 6,000 documents that we had to review and

11:45AM   23    integrate into what we were doing, both in our cross and with

11:45AM   24    our experts.  And I would ask the Court take that into account

11:46AM   25    as well.

11:46AM  1      MR. BOYD:  I briefly just want to respond to that,

11:46AM  2  because they served us with 13 discovery requests, which I

11:46AM  3  think the Court saw and agreed were more similar to discovery

11:46AM  4  in a plenary action and were overbroad.

11:46AM  5      We, after the Court said you want everything that any

11:46AM  6  decisionmaker relied upon, we undertook extensive efforts.  I

11:46AM  7  mean, we ran -- I won't get into the detailed email search,

11:46AM  8  the but the word "Kershnar" on the decisionmakers' email

11:46AM  9  boxes.  And I understand they got 6,000 emails, we saw more

11:46AM  10  than that when we were reviewing for both privilege and

11:46AM  11  responsiveness.  We did it in three business days.

11:46AM  12      THE COURT:  Look it.  This is exactly why I thank God

11:46AM  13  every night I have magistrate judges who handle discovery.

11:46AM  14  But I will try to take a look at this and make a call.

11:46AM  15      I understand.  You know, again, I sat where you guys

11:46AM  16  are sitting just eight years ago, and so I understand what

11:46AM  17  both sides are talking about about their unhappiness with what

11:47AM  18  the other side did with respect to disclosure and inadequate

11:47AM  19  disclosure and late disclosure.  I get it.  I get it.  I get

11:47AM  20  it.  I will take a look and try to reach what I think is a

11:47AM  21  fair way to proceed that balances both sides' interests and

11:47AM  22  both sides' unhappiness with the other side.  Okay.

11:47AM  23      MR. BOYD:  Thank you, Your Honor.

11:47AM  24      MR. COVERT:  Your Honor, I'm not unhappy with the

11:47AM  25  other side, they're actually nice people.  Don't tell them I

Kershnar v Kolison - Proceedings - 9/14/23

61

| | | |
|---|---|---|
| 11:47AM | 1 | said that. |
| 11:47AM | 2 | THE COURT:  No, I won't. |
| 11:47AM | 3 | Thank you, all, very much.  Just hand them up. |
| 11:47AM | 4 | THE CLERK:  All rise. |
| 11:47AM | 5 | THE COURT:  Did we say what time we're coming back? |
| 11:47AM | 6 | Let's take a little bit longer because of the, you know, we |
| 11:47AM | 7 | took a very short lunch yesterday.  Let's take -- 1:00? |
| 11:47AM | 8 | MR. COVERT:  1:00. |
| 11:47AM | 9 | THE COURT:  1:00. |
| 11:47AM | 10 | MS. PANTZER:  Thank you, Your Honor. |
| 01:04PM | 11 | (Off the record at 11:47 a.m.) |
| 01:04PM | 12 | (Back on the record at 1:04 p.m.) |
| 01:04PM | 13 | THE CLERK:  All rise. |
| 01:04PM | 14 | THE COURT:  Please be seated. |
| 01:04PM | 15 | THE CLERK:  We are back on the record for the |
| 01:04PM | 16 | continuation of the evidentiary hearing in case number |
| 01:04PM | 17 | 23-CV-525, Kershnar versus Kolison, et al. |
| 01:04PM | 18 | All counsel and parties are present. |
| 01:04PM | 19 | THE COURT:  Okay.  So, first of all, I've reviewed |
| 01:04PM | 20 | the expert submissions.  And while I agree that the first set |
| 01:04PM | 21 | of submissions was a bit sparse on the expected testimony, I |
| 01:04PM | 22 | think that, you know, for a few reasons. |
| 01:04PM | 23 | Number 1, given the fact that the plaintiff just had |
| 01:04PM | 24 | the documents shortly before they gave the expert response, |
| 01:04PM | 25 | given the fact that it's difficult to cull, I know, because |

Kershnar v Kolison - Proceedings - 9/14/23

62

01:04PM    1    I've been there, to submit an expert disclosure when the

01:04PM    2    expert is going to be responding to what the other side says,

01:04PM    3    and given the more fulsome response in emails that were

01:05PM    4    exchanged, I don't think there was any gamesmanship going on

01:05PM    5    here.  And so I think that what Mr. Covert has suggested is a

01:05PM    6    good way to proceed, and that's the way we will proceed.

01:05PM    7         But I will say this, I would expect you to give them

01:05PM    8    expert disclosure that is pretty much equivalent of what you

01:05PM    9    would give for a trial expert disclosure.  So I'm going to

01:05PM    10   expect more given the fact that we're adjourning this for a

01:05PM    11   while.

01:05PM    12             MR. COVERT:  We agree to that.

01:05PM    13             MR. BOYD:  Your Honor, can I be heard on that just

01:05PM    14   briefly?

01:05PM    15             THE COURT:  Absolutely.

01:05PM    16             MR. BOYD:  Our preference would be to go forward

01:05PM    17   today, we'll proceed with cross today with what we have, if

01:05PM    18   Your Honor would still allow that.

01:05PM    19         One other development, after hearing the testimony

01:05PM    20   from Chief Isaacson, we believe we have all the evidence we

01:05PM    21   need currently in evidence, so we have no need to call Charles

01:05PM    22   Holder at this point, which saves us some time.  We have the

01:05PM    23   afternoon.

01:05PM    24         You know, we've objected to the quality of the

01:05PM    25   disclosure, but we understand Your Honor's point, and we're

01:05PM    1    prepared to proceed with cross.

01:06PM    2         MR. COVERT:  Your Honor, if I could have a moment?

01:06PM    3         THE COURT:  Yeah, go ahead.

01:06PM    4         MR. COVERT:  Your Honor, we still would -- we would

01:06PM    5    request that we put this off.  We still would like to organize

01:06PM    6    the testimony of our experts.

01:06PM    7         I did prepare for the crosses.  I had additional

01:06PM    8    documents this morning.  But I would like to also have the

01:06PM    9    opportunity to go through those documents with our experts,

01:06PM   10    which we have not really done.

01:06PM   11         I can -- we can put our experts on and go with what

01:06PM   12    we had previously outlined, but -- so -- so, I still would ask

01:06PM   13    that we --

01:06PM   14         THE COURT:  Let me ask this.  You folks understand

01:06PM   15    that this is going to delay, obviously, a decision in this

01:06PM   16    case.  And what I'm contemplating, just so you folks know, is

01:07PM   17    submissions from both sides, written submissions from both

01:07PM   18    sides, and then probably oral argument at the -- at the

01:07PM   19    conclusion of this.  Do you understand that?

01:07PM   20         MR. COVERT:  Yes.  And we understand this will delay

01:07PM   21    it a few weeks, this whole process.  But I would rather err on

01:07PM   22    the side of being thorough in our experts in making sure that

01:07PM   23    they had all the time that they needed to review the documents

01:07PM   24    that are pertinent out of 6,000 -- obviously, 6,000 are not

01:07PM   25    all pertinent.  We have culled the ones that we can quickly

Kershnar v Kolison - Proceedings - 9/14/23

64

01:07PM    1    cull out of that group.  But my preference would be to do

01:07PM    2    that.

01:07PM    3        MR. BOYD:  Your Honor, just briefly on that.

01:07PM    4        THE COURT:  Go ahead.

01:07PM    5        MR. BOYD:  They had a declaration from Chief Isaacson

01:07PM    6    that substantively laid out his testimony for a month and a

01:07PM    7    half.

01:07PM    8        We wanted more time, we asked for more time, we were

01:07PM    9    overruled.  We went forward today.

01:07PM    10       The plan was all along that they were going to go

01:07PM    11   forward today.  I don't think it's any big change to make them

01:07PM    12   present their witnesses today, which is what had been

01:07PM    13   contemplated all along.

01:07PM    14       We're all here.  I've already blocked off the

01:07PM    15   afternoon.  We have Kristin Klein Wheaton, who blocked off her

01:07PM    16   afternoon, two other lawyers.  I don't see why we wouldn't

01:08PM    17   just go forward as we had planned this afternoon.

01:08PM    18       THE COURT:  Let me give this a few minutes to think

01:08PM    19   about.  Okay?

01:08PM    20       MR. COVERT:  Thank you, Your Honor.

01:08PM    21       THE COURT:  Let me go back, I want to give this a

01:08PM    22   couple minutes to think about, I'll come back and let you

01:08PM    23   folks know.  Okay?

01:08PM    24       MR. BOYD:  Thank you, Your Honor.

01:08PM    25       MS. PANTZER:  Thank you, Your Honor.

| | | |
|---|---|---|
| 01:08PM | 1 | THE CLERK:  All rise. |
| 01:08PM | 2 | (Off the record at 1:08 p.m.) |
| 01:15PM | 3 | (Back on the record at 1:15 p.m.) |
| 01:15PM | 4 | THE CLERK:  All rise. |
| 01:15PM | 5 | THE COURT:  Please be seated. |
| 01:15PM | 6 | THE CLERK:  We are back on the record for the |
| 01:16PM | 7 | continuation of the evidentiary hearing in case number |
| 01:16PM | 8 | 23-CV-525, Kershnar versus Kolison, et al. |
| 01:16PM | 9 | All counsel and parties are present. |
| 01:16PM | 10 | THE COURT:  Okay.  So since the status quo is going |
| 01:16PM | 11 | to remain in plaintiff, and that's advantage of the plaintiff, |
| 01:16PM | 12 | but I would expecting the plaintiff to be pushing to get this |
| 01:16PM | 13 | done sooner, rather than later, I'm going to adjourn the |
| 01:16PM | 14 | proceeding now. |
| 01:16PM | 15 | I will allow the state -- we'll keep the case open. |
| 01:16PM | 16 | So if you want to put on another witness when we resume, you |
| 01:16PM | 17 | can do that.  And then we'll have the plaintiff's case after |
| 01:16PM | 18 | that. |
| 01:16PM | 19 | So, let's reschedule.  When are you thinking? |
| 01:16PM | 20 | MR. COVERT:  Next week, the week after, Your Honor. |
| 01:16PM | 21 | Whatever -- |
| 01:16PM | 22 | THE COURT:  Next week is impossible. |
| 01:16PM | 23 | MR. COVERT:  The week after would be fine. |
| 01:16PM | 24 | MR. BOYD:  Your Honor, I've heard your ruling, but |
| 01:16PM | 25 | could I briefly just put on the record -- |

Kershnar v Kolison - Proceedings - 9/14/23

66

01:17PM     1         THE COURT:  Yes, you can always, always, always put

01:17PM     2   anything on the record you want.

01:17PM     3         MR. BOYD:  Yes, I would just object.  The only reason

01:17PM     4   that we're considering putting this off was our objection to

01:17PM     5   the deficiency in their expert disclosure.  Otherwise, we were

01:17PM     6   planning forward all along to go forward today.  Right?

01:17PM     7         I'm not sure why they're being rewarded with a delay

01:17PM     8   because of deficiencies in their expert disclosure.

01:17PM     9         If I hadn't made that objection, they'd be going

01:17PM    10   forward.  Right?  I mean, that's -- that's the bottom line.

01:17PM    11         They rushed and rushed when we were under the gun,

01:17PM    12   and we asked for more time and it was denied.

01:17PM    13         THE COURT:  I understand.

01:17PM    14         MR. BOYD:  And now they're asking for more time, and

01:17PM    15   they're getting it.

01:17PM    16         And I think that the Court has to consider this in

01:17PM    17   the exigency analysis that they're asking for this delay.  It

01:17PM    18   has to factor in.

01:17PM    19         THE COURT:  I understand.  I've ruled what I've

01:17PM    20   ruled, and I understand you're unhappy with it.  But I've

01:17PM    21   ruled what I've ruled, and that's my ruling.  So you make

01:17PM    22   whatever record you want.  Put whatever you want on the

01:17PM    23   record.  I understand that, and I've been in your shoes

01:17PM    24   before.

01:17PM    25         MR. BOYD:  Yep.

01:17PM  1    THE COURT:  And, look it, there are lots of judges

01:17PM  2    that made me unhappy, and lots of times the judges did things

01:17PM  3    that I thought were unreasonable and wrong.

01:18PM  4        And you obviously think that, and maybe you're right.

01:18PM  5    You know, you've got the right to your opinion.  But I've

01:18PM  6    ruled what I've ruled, and that's what we're gonna do.

01:18PM  7        MR. BOYD:  I understand, Your Honor.  I just wanted

01:18PM  8    to put it on the record.  I'm satisfied at this point.  We can

01:18PM  9    talk scheduling.

01:18PM  10       THE COURT:  Thank you.

01:18PM  11       THE CLERK:  So I'm looking at Monday, September 25th

01:18PM  12   at 11 a.m.  Does that work with your schedules?

01:18PM  13       MR. COVERT:  It does.

01:18PM  14       MR. BOYD:  Could we have a moment to check?

01:18PM  15       THE COURT:  Yeah.

01:18PM  16       MR. BOYD:  Ms. Pantzer already has a court argument

01:18PM  17   scheduled for that day.  She may be able to move it, but --

01:18PM  18       THE COURT:  I'm certainly -- I'm certainly not going

01:18PM  19   to ask you folks to move heaven and earth --

01:19PM  20       MS. PANTZER:  Thank you, Your Honor.

01:19PM  21       THE COURT:  -- for something like this, so let's try

01:19PM  22   to find --

01:19PM  23       MS. PANTZER:  I'm completely free on Thursday the

01:19PM  24   28th.

01:19PM  25       MR. COVERT:  That works for us.

Kershnar v Kolison - Proceedings - 9/14/23

68

| | | |
|---|---|---|
| 01:19PM | 1 | MR. BOYD:  I think that's fine, Your Honor.  Could we |
| 01:19PM | 2 | ask that we get their more fulsome expert reports very |
| 01:19PM | 3 | promptly and have a sufficient amount of time to review them? |
| 01:19PM | 4 | MR. COVERT:  Yes. |
| 01:19PM | 5 | THE COURT:  When do you -- Monday? |
| 01:19PM | 6 | MR. COVERT:  Well, can we just do it a week before |
| 01:19PM | 7 | whatever the hearing date is? |
| 01:19PM | 8 | MR. BOYD:  I would ask for a bit more time, |
| 01:19PM | 9 | Your Honor. |
| 01:19PM | 10 | THE COURT:  Okay.  Let's set the date first. |
| 01:19PM | 11 | Does that Thursday work for us, Colleen, or not? |
| 01:19PM | 12 | THE CLERK:  I can reschedule us, Judge. |
| 01:19PM | 13 | THE COURT:  Is there a lot to reschedule? |
| 01:19PM | 14 | THE CLERK:  There are, but I can reschedule them. |
| 01:19PM | 15 | Okay?  So we will do Thursday, September 28th at 9 a.m. |
| 01:19PM | 16 | MR. COVERT:  Very good. |
| 01:19PM | 17 | MS. PANTZER:  Thank you. |
| 01:19PM | 18 | THE COURT:  And have your disclosure to them -- today |
| 01:19PM | 19 | is Thursday the 14th, so the 20th. |
| 01:20PM | 20 | MR. COVERT:  Very good. |
| 01:20PM | 21 | THE COURT:  Okay? |
| 01:20PM | 22 | MR. COVERT:  Thank you, Your Honor. |
| 01:20PM | 23 | THE COURT:  It's a little more than a week. |
| 01:20PM | 24 | MR. COVERT:  Yep, that's fine.  Thank you. |
| 01:20PM | 25 | THE COURT:  And as I say, we're gonna keep this open, |

01:20PM   1   so if you folks want to put on somebody in addition, you are

01:20PM   2   welcomed to.  Let the other side know, obviously.

01:20PM   3          MR. BOYD:  Okay.

01:20PM   4          THE COURT:  And let us know.

01:20PM   5          MR. BOYD:  All right.  We appreciate that,

01:20PM   6   Your Honor, thank you.

01:20PM   7          THE COURT:  And then we'll expect to go and hopefully

01:20PM   8   get it done that day.  Then as I say, I'm gonna want a

01:20PM   9   briefing schedule, and then probably oral argument, is my

01:20PM   10  guess.  So this is going to delay things a bit, but we'll get

01:20PM   11  it done as quickly as we can.

01:20PM   12         MR. COVERT:  Thank you, Your Honor.

01:20PM   13         THE COURT:  Anything else we should do today?

01:20PM   14         MR. COVERT:  No, Your Honor.

01:20PM   15         MR. BOYD:  No, Your Honor.

01:20PM   16         MS. PANTZER:  No, Your Honor.

01:20PM   17         THE COURT:  Okay.

01:20PM   18         MS. PANTZER:  Thank you.

01:20PM   19         MR. COVERT:  Thank you.

01:20PM   20         THE CLERK:  All rise.

01:20PM   21         (Proceedings adjourned at 1:20 p.m.)

01:20PM   22         *       *       *       *       *

          23

          24

          25

1

2                    **CERTIFICATE OF REPORTER**

3

4              In accordance with 28, U.S.C., 753(b), I

5     certify that these original notes are a true and correct

6     record of proceedings in the United States District Court for

7     the Western District of New York on September 14, 2023.

8

9

10                         s/ Ann M. Sawyer
                           Ann M. Sawyer, FCRR, RPR, CRR
11                         Official Court Reporter
                           U.S.D.C., W.D.N.Y.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
          **KERSHNAR v KOLISON et al - 23-cv-525**
2                   **September 14, 2023**
                 **Evidentiary Hearing - Day 2**
3

4

5    **B R E N T   I S A A C S O N**                    3

6         CROSS EXAMINATION BY MR. COVERT:              4

7         REDIRECT EXAMINATION BY MS. PANTZER:         36

8         RECROSS-EXAMINATION BY MR. COVERT:           50

9

10

11   Plaintiff's Exhibit 96                             5

12   Plaintiff's Exhibits 94 and 88                    10

13   Plaintiff's Exhibit 90                            11

14   Plaintiff's Exhibit 49                            14

15   Plaintiff's Exhibit 64                            15

16   Plaintiff's Exhibit 70                            19

17   Plaintiff's Exhibit 91                            24

18

19

20

21

22

23

24

25