

**FIRE**

Foundation for Individual
Rights and Expression

September 26, 2023

**Sent *Via* ECF**
Hon. Lawrence J. Vilardo
United States District Judge
Robert H. Jackson United States Courthouse
2 Niagara Square
Buffalo, New York 14202

    *Re: Declaration of Richard Denholm II (Dkt. 57)*

Dear Judge Vilardo:

    On September 26, 2023, Defendants filed the declaration of Richard Denholm II (Dkt. 57). In paragraphs 13 and 14, Mr. Denholm references the Expert Rebuttal Report of J.A. "Tony" Olivo. In order to provide the Court with context so as to properly understand the record and Mr. Denholm's Declaration, a redacted copy of the Olivo's Expert Rebuttal Report is attached. Plaintiff also intends to object to the entry of Mr. Denholm's declaration into evidence absent his direct testimony in advance of the testimony of Plaintiff's rebuttal expert witnesses.

        Sincerely,

        /s/ Joshua T. Bleisch
        Joshua T. Blesich*
        D.C. Bar No. 90001269
        FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
        700 Pennsylvania Ave. SE, Ste. 340
        Washington, DC 20002
        Tel: (215) 717-3473
        Email: josh.bleisch@thefire.org

        * Admitted *pro hac vice*

        *Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

STEPHEN KERSHNAR,

    *Plaintiff,*

  v.

STEPHEN H. KOLISON, JR, *et al.*,

    *Defendants.*

Case No.: 1:23-cv-00525

**EXPERT REBUTTAL REPORT OF J.A. "TONY" OLIVO**

1

**Introduction**

1)    I am J.A. "Tony" Olivo. I hold degrees in public administration and criminal justice from Capital University in Ohio and the University of Hawaii, respectively. I am also a board-certified Professional Criminal Investigator (CPCI) and a Certified International Investigator (CII). I am also a member of the Association of Threat Assessment Professionals and I am a certified expert on school security and negligence security by the Technical Advisory Service for Attorneys.

2)    I began my law enforcement career in 1979 as an Air Force Military Police Investigator. In that role I was a member of the SWAT Team and received advanced training and expertise in hostage negotiations.

3)    After I was honorably discharged from active duty in the Air Force in 1984, I became a police officer and detective in Cheyenne, Wyoming. In that role I was a hostage negotiator and spent six years as a child abuse and sex crimes investigator. As a detective, I also supplemented the United States Secret Service in the protection of presidential candidates, including Dick Gephardt and George H.W. Bush.

4)    In 1988 I joined the United States Marshals Service as a Deputy Marshal, and served with the Marshals Service for 6 years. In 1989 I became a member of the U.S. Marshals' Special Operations Group—consisting of only 110 deputies nationwide. With that group, I was on teams that extracted Manuel Noriega from Panama, apprehended Randy Weaver at Ruby Ridge, and assisted local law enforcement in Los Angeles during the Rodney King riots.

5)      While with the Marshals Service, I was tasked with conducting risk assessments and executive protection planning, planning for high-risk prisoner movements, and protection of the federally protected witnesses. I also had responsibility for providing security for members of the federal judiciary. In that capacity, I personally guarded United States Supreme Court Justices Antonin Scalia, Sandra Day O'Connor, and Harry Blackmun. Among many other assignments, I was tasked with executive protection planning for members of the United Nations General Assembly in New York City, and commanded the federal fugitive squad in Cleveland.

6)      I left the U.S. Marshals Service in 1994 and became a NY State Licensed Investigator. I am now a Partner and Director of Investigating Services at Corporate Screening and Investigative Group (CSI Group), LLC. CSI Group is a professional investigative firm that assists school districts, universities, and hospital organizations throughout New York State on security and risk and threat assessment. CSI Group provides risk and threat assessment services to a wide variety of institutions, specifically including schools and universities.

7)      For the past 28 years with CSI Group, I have provided risk and threat assessments for over 70 K-12 school districts, five universities, and various hospitals, including the Cleveland Clinic. I work with four Boards of Cooperative Educational Services (BOCES) throughout New York State to provide services and consulting for their school districts. These four BOCES represent about 400 different school districts.

8)      School security is a special focus of mine. In 2012, after the Sandy Hook school shooting, CSI Group offered complementary threat assessments of local schools. We are now the consultants that many districts will call whenever there is a threat, and will vet those and issue specific recommendations for response.

9)      My bio is attached as **Attachment 1**.

10)     I am submitting this expert report pursuant to this Court's Order of September 14, 2023 (ECF No. 47). I disclose that I am being compensated at a rate of $150/hour.

11)     In the past four years, I have testified once as an expert witness in *Eastchester Union Free School District v. Richter*, a New York State administrative proceeding.

## Assignment

12)     I have been engaged by the Foundation for Individual Rights and Expression (FIRE) to evaluate claims made by Defendants in this case that there exists a severe and ongoing threat to the security of Professor Stephen Kershnar and SUNY Fredonia because of the public reaction to Professor Kershnar's statements. This includes assessing the claim by Defendants' witness that the perceived public reaction to Professor Kershnar's statements, and his potential return to SUNY Fredonia's campus, is unique because of the subject matter involved. I have also been asked to assess Defendants' claim that the only way to safeguard Kershnar's and SUNY Fredonia's security is to ban Kershnar from campus and from teaching online classes in perpetuity.

4

13)    In performing this assignment, I have reviewed pleadings filed in this case; the declarations and exhibits submitted in support of, and in opposition to, the motion for a preliminary injunction; certain materials produced in discovery; and additional materials listed in **Attachment 2.** I attended the evidentiary hearings in this matter on September 13 and 14, 2023, and listened to the testimony of former SUNY Fredonia Police Chief Brent Isaacson. I have since reviewed the transcripts of Isaacson's testimony. Sept. 13 Tr. (ECF No. 50); Sept. 14 Tr. (ECF No. 51).

### Summary of Conclusions

14)    Based on my training and expertise, my review of the relevant materials, and the testimony of former Chief Isaacson, I have reached the following conclusions:

a)    I disagree with Isaacson's conclusion that the public reaction to Professor Kershnar's statements demonstrates an ongoing and credible threat of violence, either to Professor Kershnar or to other members of the SUNY Fredonia community, because Isaacson's conclusion is based on conjecture;

b)    As a security professional, I disagree with Isaacson's conclusion that the "only" way to protect its campus is to "reduce or eliminate the grievance" in order to mollify an "unseen angry population." His conclusion is inconsistent with accepted institutional security practices, which seek to mitigate risks;

c)    Isaacson's threat assessments and recommendations failed to account for accepted institutional security practices that would mitigate security concerns and, as such, do not represent a bona fide effort to address security concerns before taking action against the speaker;

d)    I disagree with the underlying premises of Isaacson's opinions, that the subject matter of Professor Kershnar's statements poses a unique threat or potential trigger to violence, or that the public response generates unique security concerns.

5

e)    A more detailed summary of my conclusions is set forth below.

## Isaacson's Threat Assessments Do Not Establish a Credible Risk of Violence Because They Rely on Conjecture

15)   Chief Isaacson's assertion that SUNY Fredonia and Professor Kershnar would face an even greater security threat (in contrast to the initial public response in February 2022) if he were to resume teaching on campus relies on Isaacson's own conjecture and does not reflect a credible evaluation of risk.

16)   During his testimony on September 13 and 14, I heard Isaacson testify several times that the public backlash to Kershnar's comments had "cooled" and that the amount of people contacting the university or posting about Kershnar on the internet had slowed significantly, if not stopped completely. *See, e.g.*, Sept. 13 Tr. 73:12–14, 94:1–3, 118:22–24. Isaacson testified that because of SUNY Fredonia's actions to bring about this "cooling down," there was no "evidence of imminent danger to Dr. Kershnar or the campus" by early February 2022 at the latest. Sept. 13 Tr. 119:8–10. Indeed, Isaacson testified that there were never any specific direct threats in connection with the matter. Sept. 14 Tr. 17:8–9.

17)   However, Isaacson testified that allowing Kershnar back on campus would create a situation even more dangerous than that faced by SUNY Fredonia in February 2022 because "the public and potentially violent actors would attach blame to the campus" and those "grievances that would drive potential violence toward the campus would be inflamed." Sept. 13 Tr. 153:20–154:4.

18)   Nothing in Isaacson's testimony suggested the existence of any specific intelligence, information, or facts supporting Isaacson's conclusion that Kershnar's

return would result in likely violence or an imminent threat. Chief Isaacson never set forth any factual basis to support this assertion regarding the anticipated public reaction or its magnitude, much less its potential connection to violence. When asked by the Court, Isaacson could not identify anything that occurred between March and August 2022 that supported his belief that bringing Kershnar back would inflame public backlash. Sept. 13 Tr. 154:7.

19)   Based on my training and expertise, the absence of verifiable or actionable intelligence does not provide a reasonable basis to conclude that Kershnar's return to SUNY Fredonia's campus would result in likely violence or an imminent threat, and is insufficient to justify the actions taken against Professor Kershnar.

20)   Although Isaacson attributed the marked decline in public attention to the Kershnar controversy to the success of what he called his "cooling off" period, he never presented any evidence to support his assumption that the public was reacting to SUNY Fredonia's "no contact" order imposed on Professor Kershnar, Kershnar's removal from campus, or President Kolison's statements. Isaacson offered no reason to believe that the waning public interest was not just the short duration of a typical "Twitter storm."

21)   Isaacson testified that he engaged the services of A1C Partners in September 2022 to search social media platforms and the dark web for posts about Kershnar and conduct a threat assessment based on those results. Isaacson disregarded the assessment of A1C because he did not believe its analysts were

7

adequately qualified to perform threat assessments. Sept. 13 Tr. 158:23–24. I have reviewed the report A1C Partners furnished to Isaacson and SUNY Fredonia. The A1C Report has been admitted into evidence as Defs.' Ex. 33.

22)    In its report, A1C Partners concluded that online comments "do not suggest the existence of an immediate or imminent threat to the Fredonia campus, staff, students, or Professor Kershnar" and recommended only "persistent evaluation of online activity be conducted over the near term." A1C Report at 2.

23)    Isaacson testified that he does "believe the public has largely lost interest in this [controversy]." Sept. 13 Tr. 94:2–3. This is consistent with A1C's finding that "reactions to the video in which Professor Kershnar's comments were publicized spiked during February 2022 and trended downward shortly thereafter. No additional spikes in social media comments in response to the video were observed." A1C Report at 4.

24)    Overall, it is my opinion that Chief Isaacson's conclusions were undermined by the report of A1C Partners, which was the only independent threat assessment regarding Professor Kershnar conducted on behalf of SUNY Fredonia. The A1C Report found no evidence of any actual or immediate threats of violence, that social media activity involving Professor Kershnar dissipated by mid-February 2022, and it recommended nothing more than continuing social media monitoring in the near term.  Chief Isaacson did not include the contrary findings from the A1C Partners Report in his declaration to the Court, and his explanation that he

8

discounted the report's narrative because he believed A1C Partners lacked the necessary expertise is not credible.

25) As a security professional, I regularly order and review the types of reports provided by A1C Partners. In my experience, reports of this type produced by reputable entities are reviewed by more senior, experienced professionals before they are provided to the client. Based on my review of the leadership of A1C Partners, I would be surprised if the report provided at Mr. Isaacson's direction was produced and reviewed only by a low-level analyst. That is both because Mr. Isaacson has or had a relationship with A1C leadership (in that at least one of its senior leaders is a former colleague of Mr. Isaacson at the FBI) and reviewing A1C's leadership, which consists of numerous professionals with a great deal of experience.

26) My firm, like A1C Partners, utilizes open-source intelligence analysts. If the analysts produced a report like the one A1C Partners produced, I would have trusted the conclusions the analysts reached based on the data they produced and analyzed. Those analysts are experts at what they do, and their expert analysis is why we utilize them—much like how A1C's expert analysis is why Isaacson engaged them.

27) Further, Isaacson testified that he was "not trained in scrubbing the corners of the internet for relevant content" and that he believed A1C Partners' report credible with respect to identifying "concerning material they found on the internet." Sept. 13 Tr. 93:5–23. However, while Isaacson believed A1C's ability to conduct this research provided him with credible intelligence, he testified that he did not follow

their recommendation to continue conducting that monitoring. Sept. 14 Tr. 27–28:24–2, 51:13–16. SUNY Fredonia's decision not to continue monitoring for future "behavioral leakage" is, in my training and experience, an indication that SUNY officials do not believe the "behavioral leakage" on the internet is indicative of a high level of risk.

28)    The A1C Partners Report, based on data from September 2022, is SUNY Fredonia's most current assessment of any possible risk of violence if Professor Kershnar were to return to campus. Given the fact that this case, and Professor Kershnar's desire to return to Fredonia, has received substantial news coverage in 2023, including in the *New York Times*, I decided to test Chief Isaacson's prediction that renewed attention to this matter would lead to heightened threats on social media and a more dangerous security situation. A recent *New York Times* article about the case is attached as **Attachment 3**. On September 17, 2023, I commissioned Sandra Stibbards of Camelot Investigations to look into whether there has been a reaction to Kershnar being back in the news as a result of his lawsuit. Ms. Stibbards, like A1C, found that public reaction "tapered off before the end of February 2022." Further, she found that in the most recent two months, "there does not appear to be an active interest into the situation." That report is attached as **Attachment 4**. More specifically, Camelot Investigations findings include the following:

- The result of the investigation found no ongoing threats or danger reflected in social media as well as all platforms mentioned herein during the designated timeframe.

- After reviewing news stories about Professor Kershnar from June through mid-September 2023, there does not appear to be any trending

10

conversations or posts about the potential of the subject returning to campus.

- The review confirmed that by the third week in February 2022, "interest in the subject had diminished to almost zero," and the level of interest "remains this way even with information being released of the potential return to campus by the subject."

29)    I have also reviewed Isaacson's memo concerning his interaction with an FBI special agent, as well as the FBI's duty-to-warn communication to Kershnar. I have taken into account Special Agent Artrip's notice that the FBI was "not aware of any specific credible threat" as well as A1C Partners' conclusion that no threat to Kershnar or SUNY Fredonia exists. The memo detailing Isaacson's interaction with Special Agent Artrip is attached as **Attachment 5** (and has been admitted into evidence as Defs.' Ex. 35). The FBI's duty-to-warn communication to Kershnar is attached as **Attachment 6**.

30)    Based on my training and expertise, and relying on the specific information and assessments of the FBI and A1C, I do not believe there is an existing threat to Kershnar or SUNY Fredonia if Kershnar were to return to campus and resume teaching.

## There Are Viable Less-Restrictive Alternatives to an Indefinite Campus Ban That Would Provide Adequate Campus Security

31)    SUNY Fredonia has a variety of options at its disposal to address, mitigate, or meet any security concerns, however remote, raised by public opposition to Kershnar's protected expression. I disagree with Isaacson's conclusion that the "only" way to adequately secure the campus and protect Kershnar's safety is to ban him from campus and teaching indefinitely. Sept. 14 Tr. 50:5–8.

11

32)     I have reviewed Isaacson's declaration and its exhibits, as well as SUNY Fredonia policies and practices regarding limiting access to campus facilities, door security enhancements, the campus access control policy, and policies about how the university responds to support victims of threats of workplace violence, gender-based violence, and domestic violence. I have reviewed the security measures in place in residence halls and classrooms therein. I am also familiar with and listened to Isaacson's testimony regarding SUNY Fredonia's robust surveillance camera system.

33)     SUNY Fredonia's policies, practices, and public remarks identify the various tools and options available to the university to allow Kershnar to return to campus. These measures reflect common strategies, methods, and tools that can be used—in isolation or in combination with one another—to deter would-be malevolent actors and to mitigate any legitimate security concerns.

34)     These existing measures include:

- Providing Kershnar with one or more police escorts for the limited and predictable times that he is on campus. SUNY Fredonia's existing domestic violence and gender-based violence in the workplace policies provide that victims may be assigned an escort for entry to and exit from campus buildings to help mitigate the reoccurrence of domestic violence. SUNY Fredonia's Domestic Violence in the Workplace Policy has been previously identified as Pl.'s Ex. 51 and SUNY's Gender-Based Violence in the Workplace Policy has been previously identified as Pl.'s Ex 56. For example, the ability to provide armed escorts to employees, to proactively identify potential threats, and to change work locations on campus to reduce the possibility that a would-be assailant can act against an intended target.

- Stationing an armed guard outside Kershnar's classroom for the limited and predictable times that he is teaching. Isaacson testified that "[i]n the case of armed security following an individual around a campus, there's probably a reasonable improvement in the safety of that individual." Sept. 13 Tr. 91:2–4. Isaacson claimed that pulling an armed

12

SUNY police officer off patrol duty to guard Kershnar would leave the rest of the campus more vulnerable than usual to safety concerns. *Id.* 90: 4–17.   Isaacson ignores SUNY's ability to hire an armed security guard to escort Kershnar during the limited time he is on campus. *See Id.* 90:5–7. Not all "bread-and-butter duties of a police officer on today's campuses" requires an armed officer. *Id.* at 90:13–15.

- SUNY Fredonia could also provide the guard stationed outside of Kershnar's classroom with photos of the students in that particular class so the guard can identify out-of-place visitors.

- Security camera monitoring. SUNY Fredonia already has an extensive security camera monitoring system on campus and used the cameras in real-time to monitor President Kolison's safety. The University's Security Camera Policy has been previously identified as Pl.'s Ex. 87. A copy of a Fredonia Leader article offering details about the security cameras on the Fredonia campus has been previously identified as Pl.'s Ex. 63. I have listened to an audio recording demonstrating the efficacy in using SUNY Fredonia's camera system for precisely this purpose. *See* Exhibit of audio, attached as **Attachment 7**.

- Cursory investigations into individuals who send harassing messages to determine their identity and location, and to assess the likelihood that the individual will engage in violence. I have listened to an audio recording of Chief Isaacson reflecting the ability of SUNY law enforcement to quickly conduct such an investigation at the height of the Kershnar controversy in February 2022. In that instance, Isaacson learned about a caller threatening to burn the school down. During this cursory investigation, Isaacson was able to determine the caller was located in California, that the caller's remark was insincere, and that the caller did not represent any serious risk.

- Reporting concerning messages to outside law enforcement agencies. Isaacson testified that other than asking some contacts at the FBI to "run [a few phone] numbers," he did not report any of the messages Kershnar or SUNY received in February 2022 to law enforcement agencies. Sept. 13 Tr. 123:7–25, 124:1–12. In my training and experience, law enforcement agencies have a variety of tools at their disposal to evaluate potential risks and take steps—short of arrest or confrontation—to mitigate those risks. A law enforcement officer cognizant of the importance of a "see something, say something" mentality would report instances of "behavioral leakage" to other law enforcement agencies if he believed them to be indicative of a potential risk of violence.

13

- Re-locating Kershnar's classes to secure classrooms equipped with access card readers and located within locked residence halls, such as Kasling Hall or Grissom Hall. SUNY Fredonia's Security in Residence Halls Policy has been previously identified as Pl.'s Ex. 54 and a SUNY update announcing special classrooms in certain residence halls has been previously identified as Pl.'s Ex. 55. Holding classes in an area with controlled access significantly reduces the possibility that a potential malevolent actor would gain access to the area and increases the likelihood they would be identified as a risk in the unlikely event that they did gain access.

- Temporarily moving Kershnar's courses online if his return to campus results in an uptick of threatening messages. Isaacson's refusal to permit Kershnar to teach online at any point cannot be justified as a reasonable measure to advance any cognizable security interest.

- Instructing Kershnar to download and use the RAVE Guardian app. When users press the police badge icon, the app automatically places a call to the police department and provides the emergency responder with the app user's precise location. A description of the RAVE Guardian App has been previously identified as Pl.'s Ex. 84.

- Holding Kershnar's classes in a location that is not publicly disclosed.

- Moving Kershnar's office to a location that is not publicly disclosed. I am aware that the physical address of Kershnar's office remains listed on his online SUNY Fredonia bio page, suggesting to the public that he remains on campus and providing information about his likely location. Professor Kershnar's biography, as published on SUNY Fredonia's website has been previously identified as Pl.'s Ex. 1.

- Monitoring the internet for potential threats. A1C Partners uses subversive measures to identify potential malevolent actors operating on the 'dark web' or within extremist online communities. A description of A1C Partners' Open Source Intelligence Product has been previously identified as Pl.'s Ex. 61. Identifying potential messages of concern is a first, important step to understanding the security environment and identifying risk.

35) I was particularly struck by the camera coverage SUNY Fredonia has of its campus, as evidenced both from its policies and from Isaacson's testimony about

14

the camera system. SUNY Fredonia's camera system allows it to track potential threats on campus and respond to concerns quickly.

36) For example, I reviewed the recorded audio of one incident in which a staff member called university police about a suspicious vehicle in the parking lot near the president's office. *See* **Attachment 7**. Within seconds, the police dispatcher was able to cue live video from the appropriate camera, view the suspicious vehicle, identify the state that issued its license plates, and convey that information in real time to President Kolison's office. This audio contradicts Mr. Isaacson's testimony that cameras are not useful in preventing crime, only in using it as evidence after a criminal act has taken place.

37) Chief Isaacson also testified about a memorandum he sent to all university police officers about providing security to the president. In it, he directed officers to "use the camera system to ensure the President safely gets to his vehicle and departs campus." This memorandum is attached as **Attachment 8**.

38) I disagree with Isaacson that cameras can only be used to solve crimes after the fact and do nothing to proactively address security concerns. There are software-based technologies that help make camera systems proactive instead of reactive. For example, cameras can be used to identify firearms and other weapons. If someone pulled a gun from their car and began walking toward a campus building, camera systems would alert officers who would then be able to respond.

39) SUNY Fredonia could also pursue video fencing. This would allow the university to delineate areas where no person should be at certain times, such as a

15

hallway leading to Professor Kershnar's office, or around his car in the parking lot, for example. If any person were to breach that invisible barrier, the system would alert officers who would then be able to respond.

40)    There are various ways to harden campus buildings at SUNY Fredonia without changing its character as an open college campus. One example that SUNY Fredonia policy has specifically contemplated and taken steps to implement is key-card entry. Fredonia's Access Policy has been previously identified as Pl.'s Ex. 52 and an announcement discussing door security enhancements on campus has been previously identified as Pl.'s Ex. 49. The university could increase the number of buildings that have key-card restricted access. Kershnar could teach in one of those buildings and keep his office at home. This would likely cost the university no more than $2,000 per door. *See* **Attachment 9.**

41)    Isaacson testified that SUNY Fredonia enhanced the security of its doors, saying he hoped to get "as close as we can to the model that's used in K through 12 schools where classroom doors are lockable . . . with a hard door and hard lock." Sept. 14 Tr. 12:22–13:5. He testified this ongoing effort included doors for all the academic buildings. I assist K-12 school districts with this type of room hardening measure very frequently as part of a risk mitigation plan for crises like an active shooter. The university could also apply bullet-resistant film to the windows of its buildings. These physical security upgrades would likewise come at no great cost to the university.

42)    SUNY Fredonia could also hire off-duty officers or a New York State licensed armed security firm to provide additional security to Kershnar and outside any classroom he teaches in. This service would cost about $75/hour, and would only be necessary for the relatively limited hours Kershnar would be physically present on campus to teach his classes or hold office hours. Even in the event that armed security could not be provided, SUNY could either (a) assign one of its current armed police officers to protect Professor Kershnar while retaining an unarmed security officer to provide other bread-and-butter assistance to students; or (b) temporarily reassign other SUNY police officers to SUNY Fredonia as an interim measure.

43)    These preceding examples are just some of the alternatives available to SUNY Fredonia that can be permuted or built upon to mitigate any minor threat that may still exist when allowing Kershnar back on campus. For further illustration, I have attached a sample cost estimate for campus security components as **Attachment 9**.

44)    I was surprised to learn during Isaacson's testimony that he prepared no financial analysis of costs associated with various alternatives for allowing Kershnar back on campus. It is clear from Isaacson's testimony that he did not seriously consider any other alternative. He never looked at physical upgrades that would mitigate any potential threat.

45)    I acknowledge that campus safety professionals cannot guarantee security—we cannot prove a negative. But institutional security is about mitigation

17

and deterrence, not absolute prevention. Security officials can assess a threat's likelihood, and that threat can be mitigated by using accessible tools.

46) In this instance, there is absolutely a way to bring Professor Kershnar back to campus that is cost-effective and will preserve the character of a college campus.

## Isaacson's Response Did Not Reflect a Bona Fide Effort to Address Security Concerns

47) Based on his testimony, it is clear that Chief Isaacson's conduct ignored measures that would have addressed security concerns with respect to Professor Kershnar. In my opinion, Isaacson's actions do not represent a bona fide effort to address security concerns short of taking action against the speaker.

48) The incremental measures Isaacson took even at the height of the controversy, including the incremental measures taken with respect to President Kolison's security, reflect both (1) that SUNY Fredonia did not believe there was an imminent or serious risk of violence; and (2) that SUNY Fredonia can undertake incremental measures to address security concerns, and shows SUNY Fredonia's response was not a bona fide effort to address Professor Kershnar's security.

49) Mr. Isaacson testified that his concern was for the possibility of violence against SUNY Fredonia's administrators by members of the public aggrieved that administrators had known of Professor Kershnar's views. *See, e.g.*, Sept. 13 Tr. 28:3–10, 31:15–17, 69:2–12, 69:22–70:1, 70:6–15. Mr. Isaacson's testimony shows that he and SUNY Fredonia took incremental measures to mitigate risks at the outset for President Kolison, including repairing an existing panic button and upgrading the

18

door to President Kolison's office. Only in March did Mr. Isaacson craft a modest protection plan for President Kolison involving the use of cameras (but not an escort) and a visible patrol car when available. *See* Tr. at 16:21–24; *see also* **Attachment 8**. Although Mr. Isaacson testified that he was concerned about the security risk posed to campus administrators, these modest steps SUNY Fredonia took reflect an assessment, from early February 2022 through March 2022, that the risk of violence was extremely low.

50)    These incremental measures also indicate that SUNY Fredonia was cognizant of and did not implement the incremental options available to mitigate security concerns, either with respect to President Kolison in early February 2022 or with Professor Kershnar in the months since public interest waned. In Professor Kershnar's case, Mr. Isaacson did not take the obvious steps he recommended for President Kolison (like the use of an escort, the visible presence of on-campus police, or the use of cameras to actively monitor for suspicious activity or persons in Kershnar's vicinity, or the other options identified in ¶¶ 32–36 above).

51)    There was also a protest on February 6, 2022, during which members of the public were expected to gather in an off-campus location and then march onto campus. I was struck by Mr. Isaacson's testimony that at this point (on February 3, 2023), he recommended that an additional patrol car be made available during the protest, but had not otherwise added patrols. Sept. 14 Tr. 6:20–7:21. In my opinion, this response cannot be squared with Isaacson's testimony that his recommendations with respect to Professor Kershnar and President Kolison were motivated by a

19

concern for the threat posed to campus by unidentifiable outsiders coming to campus. This is especially so given that some of the people Isaacson was worried about were local and identifiable, or otherwise indicated an interest in making their presence known. For example, one message sent to Kershnar said "do you live locally? Fredonia/Dunkirk?" This message has been admitted into evidence as Defs.' Ex. 15; *see also* Sept. 13 Tr. at 51:1–3. If Mr. Isaacson believed these risks to have been serious and imminent, I would expect him to have taken greater steps to increase patrols around campus even in the absence of a protest, and to undertake efforts to identify potential persons of concern to look for during the protest or at other times. That SUNY Fredonia did not do so also suggests that they assessed the risk to be sufficiently low that even these modest measures were not necessary.

52)    Similarly, SUNY Fredonia apparently did not take steps to identify the person responsible for posting a message on Kershnar's door. An incident report detailing this incident has been admitted into evidence as Defs.' Ex. 3. They did not seek to find the person who left that message even though that was an example of "behavioral leakage" that Isaacson explained was part of the pathway to violence. One easily utilized tool at their disposal to identify the person or persons responsible would be their robust video surveillance system. *See* Sept. 13 Tr. 47:13–19.

### SUNY Fredonia's Situation is Not Unique, As Institutions Often Face Public Anger.

53)    Isaacson testified that the subject matter of and public reaction to Kershnar's speech resulted in "a very unique case." Sept. 13 Tr. at 78:23. However, in my experience institutions—including colleges and universities, K-12

school districts, and government officials and agencies—regularly face widespread public backlash, often as the result of controversial commentary or actions.

54)     For example, when public school districts in New York began to re-open school buildings during the COVID-19 pandemic, angry citizens accosted school administrators and school board members. People take issues concerning their kids very seriously and emotions run very high. but we did not try to keep these parents off school property. To mitigate safety threats, we worked with campuses to develop zero tolerance policies. If anyone made a threat, there was a criminal complaint charging them with harassment, the were given no-trespass letters, and we put them on law enforcement's radar so local police knew who there were. If it rose to a high enough level, there would be a red flag notice made, escalating law enforcement involvement.

55)     To this day, I get three or four emails per week notifying me that a school entered lockout procedures, where they exclude everyone from the building besides students and staff, because a threat was made to the school. This happens every day, and K-12 schools deal with it effectively.

J.A. "Tony" Olivo
September 20, 2023

MEGAN G. COMMAROTO
Notary Public, State of New York
Reg. No. 01CO6297521
Qualified in Erie County
Commission Expires 02/24/20 26

21

# <u>Attachment 1</u>

## J.A. "Tony" Olivo, L.P.I., CPCI, CII

Mr. Olivo is a professional investigator and consultant with more than 40 years of experience in Military, Federal and Civilian Law Enforcement.  He has more than 6,000 hours of specialized training and certification in Criminal Investigations, Sexual Assault Investigations, Homicide Investigations, Fraud Investigations, Risk and Threat Analysis, Workplace Violence and School Security.

Mr. Olivo is a Certified Expert in the areas of School Security and Negligent Security. Mr. Olivo is a Board-Certified Professional Criminal Investigator (CPCI) and a Certified International Investigator (CII). Mr. Olivo is Licensed in New York and Florida.

Mr. Olivo has advanced training in Child Abuse and Sex Crimes Investigations. Mr. Olivo served as a Criminal Investigator and SWAT Special Operations Agent at the U. S. Department of Justice – U. S. Marshals Service.  He was a Police Officer, and Detective, Crime Scene Technician, as well as a Field Training Officer for the Cheyenne, Wyoming Police Department.  He served as a Law Enforcement Supervisor and Criminal Investigator in the United State Air Force. Mr. Olivo received his A. A. in Science from the Community College of the Air Force and Criminal Justice from the University of Hawaii, and B. S. in Public Administration from Capital University.

Mr. Olivo is a member of the Council of International Investigators, Association of Certified Fraud Examiners, National Association of Fugitive Investigators, American Society for Industrial Security and National Association of Threat Assessment Professionals.

Mr. Olivo serves as the New York State Director for V4CR (Veterans for Child Rescue), an organization dedicated to the investigation and recovery of victims of Child Sex Trafficking.

P 0001311

# **Attachment 2**

In addition to the attachments to this report, I have been provided and/or

reviewed the following:

(1)     Declaration of Brent S. Isaacson and exhibits A–F, ECF No. 13-3;

(2)     Declaration of Charles Holder and exhibit A, ECF No. 13-4;

(3)     SUNY Fredonia Police Incident Report Re: Case No. 2022-00000325, Feb. 2, 2022 [Defs.' Ex. 3];

(4)     Brent Isaacson email to Stephen Kershnar, Feb. 7, 2022 [Defs.' Ex. 4];

(5)     Email from Scott Martin to Soteris Tzitzis re: panic button, Feb. 4, 2022 [Defs.' Ex. 5];

(6)     Email complaints received by SUNY administrators and Plaintiff [Defs.' Exs. 6–13];

(7)     Change.org petition to fire Kershnar [Defs.' Ex. 14]

(8)     Email complaints received by Plaintiff [Defs.' Exs. 15, 17–25];

(9)     Social media posts related to Kershnar, collected by Isaacson [Defs.' Ex. 16]

(10)    Complaints received via telephone or voicemail [Defs.' Exs. 26–32];

(11)    Sept. 20, 2022, Threat Assessment Report by A1C Partners, LLC [Defs.' Ex. 33];

(12)    Apr. 8, 2022, Social Media Assessment by AMI Aware [Defs.' Ex. 34];

(13)    Jan. 4, 2023, Memo by Brent S. Isaacson documenting unsolicited telephone call from FBI Special Agent Chard Artip regarding threatening communications [Defs.' Ex. 35];

(14)    FBI Agent Chad Artin email to Stephen Kershnar, Jan. 5, 2023 [Pl.'s Ex. 23];

(15)    SUNY Fredonia Campus Safety Committee [P0001045];

(16)    SUNY Fredonia, *Door security enhancements increase campus-wide safety*, Apr. 6, 2023 [P00001236];

(17)    SUNY Fredonia Emergency Operations Plan, June 20, 2016 [P0001156];

(18)    SUNY Fredonia Domestic Violence in the Workplace Policy [P0001079];

(19)    SUNY Fredonia Keys and Campus Access Control Policy [P0001075];

(20)    SUNY Fredonia Workplace Violence Prevention Policy and Program [P0001064];

(21)    SUNY Fredonia, Security in Residence Halls [P0001062];

(22)    SUNY Fredonia, Smart Classrooms in Kasling Hall and Grissom Hall [P0001060];

(23)    SUNY Gender-Based Violence and the Workplace Policy [P0001047];

(24)    SUNY Fredonia Campus Emergency Procedure Flip Chart, Feb. 12, 2013 [P0001279];

(25)    SUNY Fredonia Classified Staff Employment Handbook 2015 [P0001239];

(26)    SUNY Fredonia Emergency Evacuation Locations [P0001233];

(27)    SUNY Fredonia Emergency Response Procedures [P0001147];

(28)    SUNY Fredonia Campus Building Evacuation Policy [P0001137];

(29)    SUNY Fredonia Campus Life Policy on Large Performance Events [P0001296];

(30)    SUNY Fredonia Crowd Manager Plan [P0001134];

(31)    SUNY Fredonia Security Camera Policy [P0001072];

(32)    SUNY Fredonia Third Party Event Policy [P0001069];

(33)    Complaint, *Hill v. DePaul Univ.*, Case No. 2020L004358 (Ill. Cir.Ct., Apr. 20, 2020) [P0001389];

(34)    DePaul University, Jason Hall course schedule, Fall 2023 [P0001401];

(35)    Abby L. Ferber, *"Are You Willing to Die for This Work?" Public Targeted Online Harassment in Higher Education*, Gender & Society Journal, June 2018 [P0001404];

(36)    Indictment, *United States v. Harris*, Case No. GR21-CR-390 (D. Md. Sept. 29, 2021) [P0001480];

(37)    Affidavit in Support of Criminal Complaint, *United States v. Sullivan*, Case No. 22-cr-00434 (D. Md. Aug. 17, 2022) [P0001482];

(38)    Anna Kamenetz, *Professors Are Targets in Online Culture Wars; Some Fight Back*, NPR, Apr. 4, 2018 [P0001549];

(39)    Bryan Schatz, *Michael Mann Fought Climate Denial. Now He's Fighting Climate Doom.*, Cal. Alumni Ass'n, June 11, 2020 [P0001569];

(40)    Craig Miller, *Climate Scientist Won't Back Down Despite Threats, Harassment*, KQED, May 7, 2018 [P0001577];

(41)    Michael E. Mann, *Opinion: I'm a Scientist Who Has Gotten Death Threats. I Fear What May Happen Under Trump*, Wash. Post, Dec. 16, 2016 [P0001584];

(42)    Jay Bhattacharya, How Stanford Failed the Academic Freedom Test, Tablet Magazine, Jan. 11, 2023 [P0001657];

(43)    Stanford University, Jay Bhattacharya course schedule, Fall 2023 [P0001672];

(44)    Colleen Flaherty, *Scholars Defend Stanford Professor Receiving Threats*, Inside Higher Ed., Jan. 30, 2018 [P0001678];

(45)    David Palumbo-Liu, *Why I Voted Against a Committee on Academic Freedom*, Stanford Daily, Feb. 14, 2023 [P0001680];

(46)    Stanford University, David Palumbo-Liu course schedule, Fall 2023 [P0001684];

(47)    SUNY Fredonia Ethnic and Gender Studies Department Collaborative for Diversity and Social Justice [P0001686];

(48)    Syracuse University, Jenn Jackson course schedule, Fall 2023 [P0001689];

(49)    James T. Muldor, *Syracuse University Professor Receives Violent Threats Over Controversial 9/11 Comments*, Syracuse.Com, Sept. 13, 2021 [P0001690];

(50)    Steve Kolowich*, Tough Talk*, The Chronicle of Higher Education, July 26, 2017 [P0001695];

(51)    Texas A&M University, Tommy Curry course schedule, Fall 2017 [P0001712];

(52)    Colleen Flaherty, Furor Over Philosopher's Comments on Violence Against White People, Inside Higher Ed., May 10, 2017 [P0001713];

(53)    Nick Judin, Past Never Dead: UM Academic Freedom, JFP.ms, Oct. 30, 2019 [P0001719];

(54)    Penn University, Michael Mann course schedule, Fall 2023 [P0001723];

(55)    Canadian Press, *University of Waterloo Removes Course Details from Its Website in Wake of Triple Stabbing*, CBC, Aug. 16, 2023 [P0001736];

(56)    Kevin Nielsen, *Gender Studies Students at University of Waterloo Returning to Class This Week: School President*, Global News, July 4, 2023 [P0001738];

(57)    University of Waterloo Provost's Office, *Sharing our Approach to Action on Safety and Culture*, Aug. 14, 2023 [P0001741];

(58)    Megan Olsen, Weber State Grapples with Issues of Racism, Academic Freedom in Wake of Viral Student YouTube Videos, Daily Herald, Nov. 2019 [P0001743];

(59)    Phil Fairbanks, *Buffalo FBI Agents Tracking People Believed to Pose Shooting Threats*, Buffalo News, July 3, 2019 [P0001375];

(60)   Chloe Kowalyk & Alyssa Bump, University Police Set to Activate Body-Worn Cameras, Leader Magazine, Fall 2022 [P0001424];

(61)   Alyssa Bump, *Terroristic Threat on Thompson Results in Criminal Charges*, Leader Magazine, Fall 2022 [P0001426];

(62)   Will Karr, *UPD Encourages Campus To Be Proactive Over Reactive in Safety Seminar*, Leader Magazine, Spring 2023 [P0001430];

(63)   Suny Fredonia Campus Security and Fire Safety Report: 2021 Report [P0001437];

(64)   SUNY Fredonia, RAVE Guardian App [P0001493];

(65)   Chloe Kowalyk, *The Threats Made on Thompson Hall: One Semester Later*, Leader Magazine, Spring 2023 [P0001724];

(66)   June 6, 2023 SUNY Fredonia police blotter list of incidents after November 7, 2021 [P0000702];

(67)   SUNY Brockport Building Security Policy [P0002322];

(68)   Samantha Miles, *SUNY Geneseo Professor Under Investigation Over Quiz* ABC-13 WHAM, Oct. 22, 2017 [P0002327];

(69)   *Best Practices for Campus Safety and Security*, Center for Digital Educ. (2014) [P0002038];

(70)   *The Best Ways To Strengthen Access Control on Campus*, Genetec [P0002092];

(71)   *4 Security Protocols Every College Needs to Implement*, IBS Electronics [P0002096];

(72)   Visual AI Advisor for School Safety, SparkCognition, *available at* https://content.sparkcognition.com/i/1HRB8Vf82c___GKdKc2lw1IJVIk TjqR6QoH5LCv0nnqhP62JZ2XSvpJDIzex8xAmvN8ba7owpa0vvfUPub NW___yz8rJcDPIX9izHNzZSpDs1zFT___O6NnL9qwgqASpcgX5hY;

(73)   *How Can Advanced Visual AI Technology Help Schools Prevent and Mitigate Active Shooter Incidents?*, SparkCognition [P0002318];

(74)   Law Enforcement Resources: Behavioral Analysis, FBI [P0002080];

(75)   First Responder's Toolbox: Threat Assessment and Threat Management (TATM) – Assessment and Management, Joint Counterterrorism Assessment Team, Feb. 13, 2023 [P0002804]; and

# **<u>Attachment 3</u>**

Case 1:23-cv-00525-LJV-JJM    Document 58    Filed 09/26/23    Page 31 of 68

**The New York Times** | https://www.nytimes.com/2023/09/13/nyregion/suny-fredonia-professor-lawsuit.html

# A Professor's Remarks on Sexual Consent Stir Controversy. Now He's Banned From Campus.

Stephen Kershnar, who teaches philosophy, is suing for the right to return to SUNY at Fredonia. The university defends its ban as necessary for safety.

**By Vimal Patel**
Sept. 13, 2023

Stephen Kershnar, a philosophy professor, is in academic purgatory.

He is still employed by the State University of New York at Fredonia, but he has not taught or even been allowed on campus for more than a year — fallout from remarks he made in a 2022 podcast about whether it is ever moral for an adult male to have sex with a "willing" 12-year-old girl.

"It's not obvious to me that this is, in fact, wrong," he said on the philosophy podcast, as part of a wide-ranging thought experiment about ethics and consent. (As a matter of law, he has said that it should be criminalized.)

His remarks went viral after a right-wing social media account, LibsofTikTok, posted about it.

The president of SUNY Fredonia, Stephen H. Kolison Jr., called the professor's comments "absolutely abhorrent" and said that Dr. Kershnar was being reassigned to duties that did not require contact with students. He announced an investigation and, Dr. Kershnar said, directed police to search his office and seize his computer.



A screen grab from the podcast appearance where Stephen Kershnar made controversial comments about sexual consent.

That was 19 months ago. Dr. Kershnar, a tenured professor who has taught at Fredonia since 1998, is now suing for the right to return to campus, and a hearing in the case began on Wednesday in the Federal District Court for the Western District of New York.

His lawsuit says that university leaders have been "effectuating a social media heckler's veto, allowing momentary public and political reactions to dictate who may teach at a public university."

Case 1:23-cv-00525-LJV-JJM   Document 58   Filed 09/26/23   Page 32 of 68

Dr. Kershnar, the lawsuit adds, has never been cited, charged or arrested by any law enforcement agency, aside from traffic infractions.

Free-speech advocates support him, saying that the university's moves against him are a brazen attack on academic freedom, and they accuse SUNY of invoking safety as a mere pretense.

One of his lawyers, Adam Steinbaugh of the Foundation for Individual Rights and Expression, a free speech group, declined to comment for this article.

In court documents, SUNY Fredonia cites threats and defends its ban as necessary for both Dr. Kershnar's safety and that of the campus.

"If he were to return," Brent S. Isaacson, the campus police chief at the time, said in a July court filing, "the public's disgust would extend to this campus, and we would again be viewed by many members of the public as sympathetic to Kershnar's views and therefore at risk of violence."

There were other considerations as well: The university said students and alumni had expressed outrage at the remarks, leading to losses of donations and enrollment.

A university official declined to comment for this article on the pending litigation.

The case reflects continuing tensions over how universities should handle online conflagrations, freewheeling academic discourse and campus safety. Can public universities, which are bound by the First Amendment, restrict professors from campus because of comments they made on a podcast? Should they do so when threats are involved? And what is the marker of an actual threat, anyway?

In January 2022, Dr. Kershnar appeared on a respected philosophy podcast, Brain in a Vat. Each episode follows a format: The guest presents a thought experiment, and the hosts spend the rest of the episode questioning the guest about it. Dr. Kershnar's thought experiment was explosive.

"Imagine that an adult male wants to have sex with a 12-year-old girl; imagine that she's a willing participant," he said. "A very standard, a very widely held view is there's something deeply wrong about this. And it's wrong independent of it being criminalized. It's not obvious to me that is, in fact, wrong. I think this is a mistake. And I think that exploring why it's a mistake will tell us not only things about adult child sex and statutory rape, but also about fundamental principles of morality."

Dr. Kershnar has written about this topic in depth for years. In 2017, he published a book entitled "Pedophilia and Adult-Child Sex: A Philosophical Analysis." An abstract of the book describes it as a look into "the moral status" of such sex, which he said strikes him intuitively as "sick, disgusting and wrong."

Dr. Kershnar has built his career taking provocative, though rigorously and professionally argued, positions that may horrify or amuse people. Is it morally OK to fake an orgasm? To prefer Asian romantic partners? To not leave a tip? Yes, yes, and no, he has concluded — unless you explicitly tell the server you're not tipping.

Dr. Kershnar is a "Socratic gadfly" who goes around questioning fundamental assumptions, often quite annoyingly, to try to get at a clearer understanding of morality and why something is or is not wrong, said Justin Weinberg, a philosophy professor at the University of South Carolina and the editor of Daily Nous, a popular philosophy news website.

Controversies surround Dr. Kershnar frequently enough that Dr. Weinberg coined a term for them: "Kershnar Cycles." Like hurricanes, he wrote, they come in varying strengths, but are usually limited to the academic discipline of philosophy.

After LibsofTikTok posted clips of Dr. Kershnar's podcast remarks on X, formerly known as Twitter, the university was immediately deluged with demands for action.

An undergraduate at Fredonia started a petition stating that she didn't feel safe on campus and demanding Dr. Kershnar's removal. His views, the petition said, are "directly harmful to a community already dealing with instances of sexual assault and struggles with consent." It received more than 60,000 signatures online.

Alumni threatened to stop giving money. In court documents, the university wrote that the situation with Dr. Kershnar has "unquestionably" caused a loss of donations and a decline in enrollment. Several members of the New York State Assembly's committee on higher education wrote to the chancellor of the entire SUNY system, calling for the professor's "immediate removal," according to his lawsuit.

More troubling, the university received what officials described as threats of violence. One that was quoted in a court filing said, "On the subject of adult-child relationships, I find a shovel to the head works." Another said, "I hope parents tar, feather, cut your innards out, and drag your body through town."

Mr. Isaacson, who was the campus police chief at the time and is a former F.B.I. agent, recommended that Dr. Kershnar remain off campus for a "cooling down" period as police assessed the threat. That recommendation remains in place, the university said in the documents, because protecting the professor would take "an extraordinary and financially prohibitive expansion" of the campus police department.

To critics who said there was no actionable threat of violence, Mr. Isaacson said "Hunters don't howl," meaning that an actual violent actor would not telegraph an attack.

Mr. Isaacson recently stepped down, but the new interim police chief agrees with the policy.

Dr. Kershnar's lawsuit argued that the messages cited by the university did not represent actual threats that justified barring him from campus. And advocates of academic freedom say it is troubling that a vague possibility of violence could bar a professor from campus indefinitely.

"As soon as you accept that principle," said Mark Oppenheimer, a lawyer in Johannesburg, South Africa, and a co-host of Brain in a Vat, "you can ban any speech you like."

Philosophy, he said, is especially prone to misunderstanding by the public.

Philosophers "say the wildest stuff and come up with the strangest cases, and any onlooker would go, 'But you people are all mad,'" Mr. Oppenheimer said. "That's what happened with Steve."

**Vimal Patel** is a higher education reporter for The Times, focusing on speech and campus culture. He was previously a reporter for The Chronicle of Higher Education. More about Vimal Patel

A version of this article appears in print on , Section A, Page 21 of the New York edition with the headline: SUNY Professor Banned From Campus Sues

# **<u>Attachment 4</u>**

# CONFIDENTIAL
# INVESTIGATION REPORT

**RE:**            **Professor Stephen P. Kershnar**

**DATE:**          **September 19, 2023**

**ISSUE TO:**      **Tony Olivo**
                   **Corporate Consultants Investigations**



**CAMELOT INVESTIGATIONS**
**17404 Ventura Blvd, 2nd Fl, Encino, CA, 91316**
**6140 S Gun Club Rd, K6-105, Aurora, CO, 80016**
**CA License # PI18099**
**(888) 584-3393  office    (888) 584-6778 cell**

THIS REPORT IS BASED UPON INFORMATION RECEIVED RELATIVE TO THE SUBJECT'S NAME. ALTHOUGH OBJECTIVELY OBTAINED FROM BELIEVED RELIABLE SOURCES, CAMELOT INVESTIGATIONS WILL NOT BE HELD LIABLE FOR THIS REPORTED INFORMATION.  REPORTED INFORMATION IS HELD IN THE STRICTEST CONFIDENCE BY OUR AGENCY AND IS PROVIDED TO YOU FOR YOUR EXCLUSIVE USE AND INTERPRETATION.  WRITTEN AUTHORIZATION FROM OUR AGENCY IS REQUIRED FOR ANY DISCLOSURE OF INFORMATION TO ANYONE OTHER THAN YOUR CLIENT.  WE RESERVE THE RIGHT UNDER GOVERNED REGULATIONS, NOT TO REVEAL OR DISCLOSE INFORMANTS, INVESTIGATIVE METHODS, TECHNIQUES OR OTHER SOURCES UTILIZED IN OUR INVESTIGATIVE SERVICES.

## **TABLE OF CONTENTS**

Investigation Request                                                                    Page 3

Investigation Results                                                                    Page 4

- Executive Summary                                                            Page 4

- Subject Identification                                                          Page 7

- Internet Profile and Social Media Search                           Page 9

  o  Initial Activity February 2022 with Comments and Reviews        Page 9

  o  Articles with No Comments                                              Page 13

  o  Recent Activity June 2023 to September 2023              Page 18

  o  Google Trends                                                              Page 21

- Closing Remarks                                                              Page 22

2

## INVESTIGATION REQUEST

An internet profile and social media search was conducted for the subject, Professor Stephen P. Kershnar, to determine if there is consistent threatening activity relating to his comments on pedophilia since February 2022 until today. The investigation focused on developing trends and vulnerabilities indicating threats and/or danger toward the professor as well as the campus if rehired by SUNY at Fredonia. The searches include social networks, media publications, blogs, message boards, forums, websites, advertisements, and other open source forums as well as the dark web. The search criteria included name variations, email addresses, usernames, phone numbers, addresses, business affiliations, relatives, and other identifiers along with keyword searches, advanced operator searches, and hashtags.

3

**INVESTIGATION RESULTS**

**EXECUTIVE SUMMARY**

- Sources indicate the subject, Stephen Peter Kershnar, uses a social security number ███████ issued in ████████ in ████████ with a date of birth ████████. Another name reported to the subject is Stephen P. Kershner. The current reported residential address for the subject is ███████████████████ NY, 14063.

- The subject, Stephen Kershnar, has an address history reflecting six (6) counties in which he has resided within the US. The counties are █████████████████████████████████████ ██████████████████████████████████████████████████████████.

- The result of the investigation found no ongoing threats or danger reflected in social media as well as all platforms mentioned herein during the designated timeframe. There appears to be a history of negative chatter against the subject within the first month of the video being published expressing his comments on pedophilia. The trends and patterns reflect a stall in the activity focused on the subject in open source platforms. No direct threat towards the professor or the campus was developed through the investigation. There does not appear to be a focus on this issue relating to the subject.

- Although individuals made statements reflecting their anger towards the subject's comments about pedophilia, no information or chatter was found stating anyone was going to kill or destroy the subject.

- There are reported to be many articles published on or around the time of February 2022 speaking of the situation created by the subject's video commenting on pedophilia. None of the articles appear to be threatening the life of the subject or danger to the campus and do not appear to be encouraging anyone to do so. These articles do not reflect comments in response to the content. These articles also reflect the extensive reach the situation created where the video and subject's views were being discussed nationally and internationally. Yet, no direct threats were found toward the subject or the campus.

4

- The investigation found chatter referencing the possibility of the subject, Professor Stephen P. Kershnar, returning to SUNY at Fredonia.  The posts and articles found from June 2023 to September 2023 reflect discussion of this occurring.  Comments are limited with no direct threats toward the subject or the campus.  The situation initially escalated throughout social media and open source platforms during the first week of February 2022 when the video of the subject stating his comments on pedophilia was published.  However, the comments and chatter of the situation with the subject tapered off as weeks passed in February 2022.  No discussions or chatter of anger against the subject have been found trending after February 2022.  It appears the conversation from articles and posts starting June 2023 through September 2023 are minimal.  There does not appear to be any trending conversations or posts about the potential of the subject returning to the campus.

- According to Google Trends, the subject, Stephen Kershnar, does not appear to be of interest in Google searches beyond the first three (3) weeks of February 2022.  The search for the subject's name as trending in Google from February 1, 2022, through today indicates there was a strong presence of searching for the subject in the first three (3) weeks of February 2022.  By the third week of February, interest in the subject diminished to almost zero.  Following the graph line in the screenshot provided, it appears there has been no trending of the subject and remains this way even with information being released of the potential return to campus by the subject.  The Google trends graph provides the amount of searching conducted on a specific phrase.

- The investigation to determine if there is a threat and present danger reflected through social media searches relating to the subject, Professor Stephen P. Kershnar, working on campus of SUNY at Fredonia resulted negatively.  In February 2022, there was extensive derogatory and negative chatter relating to the subject's comments on pedophilia.  The majority of the harsh comments and inflammatory statements directed at and about the subject occurred during the same month.  The activity and chatter tapered off before the end of February 2022.  There does not appear to be any trending within social media associated with the subject relating to the pedophilia comments.  There is no indication of a threat for the subject or the campus with the current activity within social media as well as past activity.  Reviewing the current social media activity in the most recent two (2) months due to the litigation by the subject requesting to

5

return to campus, there does not appear to be an active interest in the situation.  Currently, there are no items trending regarding the option of the subject returning to campus.

6

**SUBJECT IDENTIFICATION**

According to sources, the subject, Stephen Peter Kershnar, uses a social security number ██████ issued in ██████████████████ with a date of birth ██████████. Another name reported to the subject is Stephen P. Kershner. The current reported residential address for the subject is ████ ██████████ ██████████, 14063. The following provides an aerial view by Bing Maps and a street view by Realtor.com of the residential location.



7

The subject, Stephen Kershnar, has an address history reflecting six (6) counties in which he has resided within the US. The counties are ███████████████████████████████ ████████████████████████████████████████████████████████████████. The following provides the complete address history relating to the subject's social security number.



Sources indicate several telephone numbers and email addresses relating to the subject, Stephen Kershnar. The following lists provide telephone numbers and the likeliness they still relate to the subject as well as email addresses reported to relate to the subject.



## INTERNET PROFILE AND SOCIAL MEDIA SEARCH

An internet profile and social media search was conducted for the subject, Professor Stephen P. Kershnar, to determine if there is consistent threatening activity relating to his comments on pedophilia since February 2022 until today. The investigation focused on developing trends and vulnerabilities indicating threats and/or danger toward the professor as well as the campus if rehired by SUNY at Fredonia. The searches include social networks, media publications, blogs, message boards, forums, websites, advertisements, and other open source forums as well as the dark web. The search criteria included name variations, email addresses, usernames, phone numbers, addresses, business affiliations, relatives, and other identifiers along with keyword searches, advanced operator searches, and hashtags.

The result of the investigation found no ongoing threats or danger reflected in social media as well as all platforms mentioned herein during the designated timeframe. There appears to be a history of negative chatter against the subject within the first month of the video being published expressing his comments on pedophilia. The trends and patterns reflect a stall in the activity focused on the subject in open source platforms. No direct threat towards the professor or the campus was developed through the investigation. There does not appear to be a focus on this issue relating to the subject.

The following URLs provide a history from February 2022 of those commenting negatively about the subject. Although individuals made statements reflecting their anger towards the subject's comments about pedophilia, no information or chatter was found stating anyone was going to kill or destroy the subject. One (1) comment was found indicating the person would be ok with the subject being burned alive. However, this comment from February 2022 did not appear to be stating this is what the commenter would do to the subject, just that he would be ok if it did happen to the subject.

https://www.facebook.com/Newsweek/posts/stephen-kershnar-a-philosophy-professor-at-suny-fredonia-is-being-criticized-aft/10159721845341101

https://www.facebook.com/wten.albany/posts/in-the-video-professor-stephen-kershnar-discussed-the-morality-of-sex-between-ad/10166462276195195

9

https://www.facebook.com/news4buffalo/posts/suny-fredonia-administration-and-students-are-responding-after-a-video-circulate/10159708267490505

https://www.facebook.com/60388086891/posts/10158479662626892

https://twitter.com/AnOpenSecret/status/1488720704220631041

https://twitter.com/foxnews/status/1488878623092195332?lang=ca

https://twitter.com/Jereme45/status/1490072588730650629

https://twitter.com/foxnews/status/1488878623092195332

https://twitter.com/SpencerLndqst/status/1494496151575224320

https://twitter.com/MythinformedMKE/status/1490347528587563012

https://thewartburgwatch.com/2022/02/02/professor-stephen-kershnar-suny-fredonia-allegedly-says-that-having-sex-with-a-1-year-old-child-is-not-obviously-wrong-to-him/

https://twitter.com/mrctv/status/1489034650664284163

10

https://rumble.com/vu3cpb-fredonia-university-professor-stephen-kershnar-endorses-pedophilia-5971.html

https://rumble.com/vuj8pl-professor-argues-for-freedom-to-diddle-kids-stephen-kershnar-suny-fredonia.html

https://rumble.com/vv9wfj-suny-fredonia-students-protest-professors-disgusting-remarks.html

https://www.volnation.com/forum/threads/another-child-molester.328400/page-7



- The above blog from February 4, 2022, reflects a comment by one person stating the following:
    - "It is people like this that make it difficult for me to refrain from burning them alive."

https://www.tiktok.com/@boomerzrock/video/7093322697475640622

https://notthebee.com/article/holy-crap-professor-at-a-new-york-university-argues-that-it-isnt-obvious-that-adult-child-sex-is-wrong

https://www.amazon.com/Pedophilia-Adult-Child-Sex-Philosophical-Analysis-ebook/dp/B00Y2A3JZW#customerReviews

11

https://www.instagram.com/tv/CZdKuwyl19P/

https://www.instagram.com/p/CZdg-shu5k8/

https://www.instagram.com/p/CZh_BTmoeIS/

There are reported to be many articles published on or around the time of February 2022 speaking of the situation created by the subject's video commenting on pedophilia.  None of the articles appear to be threatening the life of the subject or danger to the campus and do not appear to be encouraging anyone to do so.  These articles do not reflect comments in response to the content.  These articles also reflect the extensive reach of the situation created where the video and subject's views were being discussed nationally and internationally.  Yet, no direct threats were found toward the subject or the campus.  The following URLs provide the details of the articles speaking of the subject and his views.

https://heavy.com/news/stephen-kershnar/

https://showbizcorner.com/fredonia-stephen-kershnar-suny-professor-wikipedia

https://www.thefire.org/research-learn/faculty-letter-support-stephen-kershnar-february-4-2022

https://www.tvguidetime.com/people/who-is-stephen-kershnar-suny-professor-fredonia-author-wikipedia-and-linkedin-217843.html

https://www.professorwatchlist.org/professor/stephenkershnar

https://www.change.org/p/suny-fredonia-fire-professor-stephen-kershnar

https://quillette.com/2022/03/26/stephen-kershnar-and-the-importance-of-unaskable-questions/

https://buffalonews.com/news/local/education/suny-fredonia-professor-who-appeared-to-condone-pedophilia-wants-back-on-campus/article_a201ef48-0ac0-11ee-8e7d-cb2c7c4164dc.html

13

https://www.insidehighered.com/news/2022/02/07/philosophers-comments-pedophilia-lead-his-suspension

https://reason.com/volokh/2022/02/04/faculty-letter-to-suny-fredonia-in-support-of-stephen-kershnar/

https://www.wgrz.com/article/news/local/suny-fredonia-releases-statement-following-professor-making-controversial-comments-college-podcast/71-841ebc66-a45a-4cb0-b151-0b2a521b0fbb

https://www.wkbw.com/news/local-news/suny-fredonia-responds-to-video-of-professors-comments-on-adult-child-sex

https://nypost.com/2022/02/02/suny-fredonia-professor-under-review-for-video-of-him-supporting-pedophilia/

https://dailynous.com/2022/02/03/kershnar-cycle-reactivated/

https://www.yahoo.com/video/suny-fredonia-responds-video-professors-232429749.html?guccounter=1

https://www.newgon.net/wiki/Stephen_Kershnar

https://angloamerica101.wordpress.com/2022/02/05/the-foundation-for-individual-rights-in-education-and-the-academic-freedom-alliance-rushing-to-defend-pedophile-apologist-stephen-kershnar-at-suny-fredonia/

14

https://www.wkbw.com/news/local-news/suny-fredonia-professor-assigned-to-duties-that-do-not-include-his-physical-presence-as-investigation-continues

https://thefederalist.com/2022/02/03/another-unhinged-professor-has-been-exposed-as-a-pedophilia-apologist/

https://fredonialeader.org/news/2022/02/23/three-weeks-later-the-kershnar-situation/

https://fredonialeader.org/news/2022/02/05/suny-fredonia-students-respond-to-the-kershnar-situation/

https://theaquilareport.com/another-unhinged-professor-has-been-exposed-as-a-pedophilia-apologist/

https://www.change.org/p/suny-fredonia-fire-professor-stephen-kershnar?source_location=decision_maker_profile

https://pjmedia.com/uncategorized/kevindowneyjr/2022/02/02/suny-professor-is-trying-to-normalize-pedophilia-n1555398

https://www.ibtimes.sg/who-stephen-kershnar-suny-professor-under-review-after-videos-him-defending-pedophilia-emerge-62567

15

https://thepeoplesvoice.tv/liberal-professor-sex-with-willing-children-is-not-wrong-there-are-evolutionary-advantages-to-pedophilia/

https://thepostmillennial.com/suny-fredonia-stephen-kershnar-statement-condemning

https://www.syracuse.com/state/2022/02/suny-professor-under-investigation-after-discussing-pedophilia-in-viral-video.html

https://fism.tv/professor-under-review-after-reprehensible-video-shows-him-supporting-pedophilia/

https://meaww.com/suny-fredonia-philosophy-professor-stehen-kershnar-cant-see-anything-wrong-in-pedophilia-video

https://realwomenofcanada.ca/pedophilias-ugly-presence/

https://salvomag.com/post/out-of-the-map-closet

https://www.prindleinstitute.org/tag/pedophilia/

16

There are numerous URLs found from various countries that do not open to an active website relating to the subject with regards to pedophilia.  The URLs appear to be unusual with the beginning of them showing random letters followed by a domain.  The following screenshots provide two (2) examples of the URLs found associated with the subject and pedophilia.



sarlbrunetfils.fr
https://dxjbtgvqp.sarlbrunetfils.fr   ⋮

## Pedophilium

... **pedophile** is continuing to make waves in the academic community. In May 2023 ... A State University of New York at Fredonia professor, Stephen **Kershnar**, is ...



leonardopaolettisindaco.it
https://yofjndtbr.leonardopaolettisindaco.it › ...   ⋮

## 4

The. Pedophilia erotica. Israeli far-right lawmaker Avi Maoz accused the Justice Ministry of attempting to normalize pedophilia within the country by ...

17

The investigation found chatter referencing the possibility of the subject, Professor Stephen P. Kershnar, returning to SUNY at Fredonia. The posts and articles found from June 2023 to September 2023 reflect discussion of this occurring. Comments are limited with no direct threats toward the subject or the campus. The situation initially escalated throughout social media and open source platforms during the first week of February 2022 when the video of the subject stating his comments on pedophilia was published. However, the comments and chatter of the situation with the subject tapered off as weeks passed in February 2022. No discussions or chatter of anger against the subject have been found trending after February 2022. It appears the conversation from articles and posts starting June 2023 through September 2023 are minimal. There does not appear to be any trending conversations or posts about the potential of the subject returning to the campus.

The following tweet reflected in the below screenshot was posted by NYC Alliance Against Sexual Assault on September 14, 2023, saying the subject, "Stephen Kershnar, is suing for the right to return to SUNY at Fredonia." There are three (3) comments on the tweet with 117 views. None of the comments appear threatening or indicate danger. Interest in the topic appears lacking due to the minimal views. View the tweet at https://twitter.com/NYCAASA/status/1702389249113464989.



**NYC Alliance Against Sexual Assault**
@NYCAASA

"Stephen Kershnar is still employed by SUNY at Fredonia, but he has not taught...for more than a year — fallout from remarks he made in a 2022 podcast about whether it is ever moral for an adult male to have sex with a 'willing' 12-year-old girl."

nytimes.com
A Professor's Remarks on Sexual Consent Stir Controversy. Now He's Banne...
Stephen Kershnar, who teaches philosophy, is suing for the right to return to SUNY at Fredonia. The university defends its ban as necessary for safety.

12:30 PM · Sep 14, 2023 · **117** Views

18



https://www.nytimes.com/2023/09/13/nyregion/suny-fredonia-professor-lawsuit.html

https://leiterreports.typepad.com/blog/2023/06/philosophy-professor-stephen-kershnar-sues-suny-fredonia-for-violation-of-his-first-amendment-rights.html

https://www.post-journal.com/news/top-stories/2023/06/controversial-kershnar-files-suit-against-suny/

https://www.wivb.com/news/investigates/professor-exiled-from-suny-fredonia-for-provocative-views-seeks-teaching-job-back/

https://www.insidehighered.com/news/faculty-issues/academic-freedom/2023/08/18/suny-fredonia-fights-keep-professor-campus

19

https://www.rochesterfirst.com/new-york-state/suny-fredonia-professor-reassigned-after-controversial-adult-child-sex-comments/

https://fredonialeader.org/news/2022/02/10/suny-fredonia-professors-have-varying-views-on-kershnar-uproar/

https://leiterreports.typepad.com/blog/2023/08/first-the-hecklers-veto-now-the-lone-wolfs-veto.html#more

### First the "heckler's veto," now the "lone wolf's veto"

SUNY Fredonia still does not want to let philosopher Stephan Kershnar (earlier coverage) back on campus, arguing in court that "the potential unseen threat from some lone 'pseudo warrior' quietly planning a violent attack on campus – triggered by Kershnar's return" justifies excluding him:

> Assistant Attorney General Jennifer Metzger Kimura, representing the university, said the university's decision to bar him from campus was not made because of the content of his speech but in response to the aftermath of his podcast comments that kicked off a social-media firestorm and disrupted operations.
>
> But U.S. District Judge Lawrence Vilardo expressed concern about that rationale. With that as a guide, a university could take actions against any professor if enough people got together and raised a big enough fuss over anything the professor said – whether it was innocuous or not.   "I think your argument leads to frightening possibilities on college campuses," Vilardo said.

Hopefully the judge will decide against the university.

Posted by Brian Leiter on August 14, 2023 at 09:14 AM in Academic Freedom, Philosophy in the News | Permalink

20

**GOOGLE TRENDS**

According to Google Trends, the subject, Stephen Kershnar, does not appear to be of interest in Google searches beyond the first three (3) weeks of February 2022. The search for the subject's name as trending in Google from February 1, 2022, through today indicates there was a strong presence of searching for the subject in the first three (3) weeks of February 2022. By the third week of February, Google Trends reflects interest in the subject diminished to almost zero. Following the graph line in the screenshot below, it appears there has been no trending of the subject and remains this way even with information being released of the potential return to campus by the subject. The Google Trends graph provides the amount of searching conducted on a specific phrase. The below graph reflects the time frame for the subject, Stephen Kershner, from February 1, 2022 through today.



21

## **CLOSING REMARKS**

The investigation to determine if there is a threat and present danger reflected through social media searches relating to the subject, Professor Stephen P. Kershnar, working on campus of SUNY at Fredonia resulted negatively.  In February 2022, there was extensive derogatory and negative chatter relating to the subject's comments on pedophilia.  The majority of the harsh comments and inflammatory statements directed at and about the subject occurred during the same month.  The activity and chatter tapered off before the end of February 2022.  There does not appear to be any trending within social media associated with the subject relating to the pedophilia comments.  There is no indication of a threat for the subject or the campus with the current activity within social media as well as past activity.  Reviewing the current social media activity in the most recent two (2) months due to the litigation by the subject requesting to return to campus, there does not appear to be an active interest in the situation.  Currently, there are no items trending regarding the option of the subject returning to campus.

If you have any questions regarding this report or require additional investigation, contact our office for recommendations.  Thank you!

Sandra Stibbards\
Owner & President
Camelot Investigations



22

# **<u>Attachment 5</u>**

1



TO:        Maria Carroll
           Director
           Human Resources
           SUNY Fredonia

           Kristin Klein Wheaton
           Chief Campus Counsel
           Office of General Counsel
           SUNY

           Katie McCutcheon
           Associate Counsel
           Office of General Counsel
           SUNY

FROM:      Brent S. Isaacson
           Chief of University Police

DATE:      January 4, 2023

RE:        FBI information regarding threats to Stephen Kershnar

On January 3, 2023, I received an unsolicited telephone call from FBI Special Agent (SA) Chad Artrip during which I learned that the FBI had uncovered threatening communications online pertaining to Stephen Kershnar.  SA Artrip requested University Police assistance in contacting Kershnar to convey a warning to him regarding the threatening communication.

SA Artrip appeared at the University Police office at approximately 9:30 a.m. on January 4, 2023 where he met with UPD Lieutenant Scott Martin and me.  SA Artrip stated that the threatening communication indicated that Kershnar's campus office is located in Fenton Hall.  Due to the sensitive nature of the FBI's investigation, SA Artrip was unable to provide details of the threatening communication or the underlying FBI investigation.  The FBI had no information regarding the credibility of the threat.  The threat did, however, meet the FBI's "duty to warn" criteria, thus prompting the FBI notification to UPD-Fredonia and Kershnar.

During this meeting and at SA Artrip's request, I attempted to contact Kershnar by phone (203-530-6604).  Kershnar's phone immediately went to voicemail.  I left a message requesting Kershnar to telephone UPD-Fredonia and advising him that we have law enforcement information to pass to him.  If Kershnar calls UPD, I have instructed UPD dispatchers to provide

2

Kershnar with SA Artrip's name and contact information and request that Kershnar call the FBI. I provided SA Artrip with Kershnar's contact information and residential address.

As this is an FBI matter, UPD intends no further actions to contact Kershnar.

# **<u>Attachment 6</u>**

1

Duty to Warn call 1/4/2022
External
Inbox



**Chad Artrip** ▮▮▮▮ **@fbi.gov>**                                           Thu, Jan 5, 1:18 PM
                                                                              (20 hours ago)

to stephen kershnar@fredonia.edu

Dr Kershnar,

Special Agent Chad Artrip. We spoke on the phone early evening yesterday. I'm sending you an email from my FBI.gov address to ensure your confidence that yesterday's contact was legitimate.

Just to reiterate, The FBI is aware of information which identified you as a potential target of criminal activity, to include the possibility of violence. At this time, FBI is not aware of any specific credible threat to you, nor does FBI have any information related to the validity or the nature of the threat. FBI is advising you of this information for you safety and awareness.

My office number is (716) ▮▮▮▮▮ .


https://irp fas.org/dni/icd/icd-191.pdf

# **<u>Attachment 7</u>**

**Audio file produced in native format**

# **<u>Attachment 8</u>**



Memorandum

TO:        All Shifts

FROM:      Chief Isaacson

DATE:      03/25/2022

RE:        President Kolison - personal security

With recent events surrounding the Professor Stephen Kershnar matter, I have discussed with the President his personal security.  The President lives in the ███████████████████ ███████████████████████████████████ the President sometimes works in his ████ office after hours.

From time to time, the President may call UPD to advise that he is leaving his ████ office for the day.  In those instances, officers/dispatchers should use the camera system to ensure the President safely gets to his vehicle and departs campus.  If a patrol car is available, patrols should be present and visible in the area of ██████████.  Officers should feel welcome, but not required, to exchange greetings with the President, as appropriate.

No specific threats to the President have been received.  However, any suspicious persons near the President, his office, or ████ should draw a hasty UPD response to ensure the safety of all involved.

The President drives a ██████████████████████████ and a ██████████ ███████████████████ He typically uses designated ████ spaces.

Please initial and date to indicate you have read and understand this memorandum.

| Bixby | Chesbro | Drummond | Hodkin |
|-------|---------|----------|--------|
| Huels | Husul | Isaacson | Best-Kelm |
| Laurito | Majewski | Martin | Miller |
| Brady | Price | Raynor | Studley |

Confidential

# **<u>Attachment 9</u>**



**Corporate Screening & Investigative Group, LLC**
*Professional. Ethical. Diligent.*

# <u>Sample Costs for Campus Security Components</u>

## <u>Access Control</u>

The number one mitigation technique used in campus security as well as corporate security is access control. Over 90% of acts of violence in educational settings occurred because the offender had either unfettered or minimally resistant access to the target locations.

Controlling access utilizing swipe cards or fobs with electronic readers is the easiest and most efficient way to accomplish a higher level of security. This allows the systems to be programmed to delete access consent virtually immediately. A swipe card or fob cannot be duplicated without administrative access to the system.

Another method of access control entails utilizing a mechanical key. This can be problematic in that even high security keys may be duplicated unless the institution has a proprietary key way and key system. There are systems such as the Medeco XT System by ASSA Abloy that allows for the replacement of a normal key cylinder with a programable cylinder and a programable mechanical key.

The approximate costs involved in the aforementioned access control methods are;

Electronic Swipe/FOBS- $2000 per door.

High Security Mechanical Keys- $350 per cylinder; $170 per key; one time cost of $700 for software to program keys

## <u>Armed Guard Services</u>

It is suggested that SUNY Fredonia Police provide an on-duty officer to act as both a deterrent as well as security in the area of the classroom as well as offices of Professor Kershnar while he is on campus.

Alternatively, the SUNY Fredonia Police could provide and officer to do the same. Evan at their overtime rate should they decide to utilize and off-duty officer, it would be less. The average salary of a SUNY Police Officer is $64,000 per year, at time and a half that would equate to $48 per hour.

The cost associated with providing an armed guard or security agent to be present while the professor is on campus would be approximately $75 per hour. This service could be outsourced to a NY State Licensed Armed Security firm that would be licensed, bonded and insured.

## <u>Social Media Monitoring</u>

To utilize a professional Open-Source Intelligence firm such as AIC and other to conduct a single subject monitoring of web based traffic on an on-going basis would range between $1000-$1500 per month. The same types of firms that do so for large universities and monitor *all traffic* for threats etc. cost approximately $40,000 per year.



## Corporate Screening & Investigative Group, LLC
*Professional. Ethical. Diligent.*

The physical security and access control measures mentioned herein would almost certainly be able to be sourced through NY State Contract which would have vendors available to provide all of those services at a cost that would presumably be less that those indicated herein.