```
UNITED STATES  DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
------------------------------x
STEPHEN KERSHNAR,

            Plaintiff,                   1:23-CV-525(LJV)

vs.
                                         Buffalo, New York
STEPHEN H. KOLISON, JR., in his          September 28, 2023
individual capacity and his              9:16 a.m.
official capacity as the President
of the State University of
New York at Fredonia,

and

DAVID STARRETT, in his individual
capacity and his official capacity
as Executive Vice President and
Provost of the State University of
New York at Fredonia,

            Defendants.
------------------------------x
```

**EVIDENTIARY HEARING - VOLUME III**


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE


TRANSCRIBER:       Diane S. Martens
                   dmartensreporter@gmail.com

(Proceedings recorded by electronic audio recording,
 transcript produced by computer.)

<u>A P P E A R A N C E S</u>

FOR PLAINTIFF:           LIPSITZ GREEN SCIME CAMBRIA LLC
                          **BY:  BARRY NELSON COVERT, ESQ.**
                          42 Delaware Avenue
                          Suite 300
                          Buffalo, New York 14202
                                -and-
                          FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
                          **BY:  ROBERT CORN-REVERE, ESQ.**
                          **BY:  JOSHUA T. BLEISCH, ESQ.**
                          700 Pennsylvania Avenue SE
                          Suite 340
                          Washington, D.C. 20003
                          **BY:  KELLEY L. BREGENZER, ESQ.**
                          510 Walnut Street
                          Suite 1250
                          Philadelphia, Pennsylvania 19106


FOR DEFENDANTS:         OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL
                          **BY:  ALYSSA JORDAN PANTZER, AAG**
                          Health Care Bureau
                          28 Liberty Street
                          19th Floor
                          New York, New York 10005
                          **BY:  CHRISTOPHER L. BOYD, AAG**
                          **BY:  JENNIFER METZGER KIMURA, AAG**
                          Main Place Tower
                          350 Main Street, Suite 300A
                          Buffalo, New York 14202
                                -and-
                        STATE UNIVERSITY OF NEW YORK
                        **BY:  KRISTIN KLEIN WHEATON, ESQ.**
                        Office of General Counsel
                        Western Campus Offices
                        1300 Elmwood Avenue
                        Cleveland Hall, Room 507-A
                        Buffalo, New York 14222

Kershnar v. Kolison, et al - 23-CV-525

1            **P R O C E E D I N G S**

2                    *          *          *

3

4    **THE CLERK:**  23-CV-525, Kershnar v. Kolison, et al.

5        Attorneys Barry Covert, Joshua Bleisch, Robert

6    Corn-Revere and Kelley Bregenzer, and paralegal Megan

7    Commaroto appearing on behalf of the plaintiff.

8        Assistant Attorney General Jennifer Kimura, Alyssa

9    Pantzer and Christopher Boyd.  Chief campus counsel for SUNY,

10   Kristin Wheaton appearing on behalf of defendants.

11       This is the continuation of the evidentiary hearing.

12   **THE COURT:**  Okay.  Good morning, everybody.

13       (Counsel say good morning.

14   **THE COURT:**  So I think where we left off, I told the

15   defendants that I was going to give them a chance to call any

16   other witnesses that they wanted to call.

17       Do you have anyone else you want to call?

18   **MS. PANTZER:**  No, your Honor.

19   **THE COURT:**  Okay.  But you do have an affidavit that you

20   would like me to consider?

21   **MS. PANTZER:**  Yes, your Honor.

22   **THE COURT:**  And the plaintiffs have indicated that they

23   are going to object to that.

24   **MR. COVERT:**  Well, your Honor, we are.  We thought that

25   the defendants were asking for a factual hearing so that we

Kershnar v. Kolison, et al - 23-CV-525

1  can have live testimony from witnesses as opposed to
2  declarations.  Obviously we leave that to the discretion of
3  the Court.
4      If the Court is inclined to accept the declaration, we
5  will likely seek some time for a rebuttal, a rebuttal
6  declaration as to that, perhaps seven or ten days after we
7  close the hearing so we can make that determination.  To be
8  very honest, we're getting ready -- busy getting prepared for
9  this and we haven't thought that through.
10     **THE COURT:**  But your only objection is that you want
11 live testimony?
12     **MR. COVERT:**  Yeah.
13     **THE COURT:**  Okay.  Well, I'm going -- I'll admit the
14 declaration.  I mean, again, this is a preliminary injunction
15 hearing.  The defendants have submitted some law that
16 indicates that this sort of submission is often considered in
17 preliminary injunction hearings and I see no reason not to
18 consider it.
19     Obviously I think I know how to view written materials
20 as opposed to testimony and I will view it that way but I see
21 no reason not to admit it.
22     So, as long as you have no other objection to it, other
23 than the fact that it's written and not live.
24     **MR. COVERT:**  Yeah, not -- as long as we're able to, as I
25 indicated, provide rebuttal declarations if we see fit.  We

Kershnar v. Kolison, et al - 23-CV-525


1   don't -- just to have a period of time after the close of the
2   hearing to do that.
3       **THE COURT:**  Any problem with that from the defense?
4       **MR. BOYD:**  No.  I mean, I think your Honor has
5   contemplated post-hearing briefing on this.
6       **THE COURT:**  Absolutely.
7       **MR. BOYD:**  So I assume we'll all have things to say
8   about what everyone had to say during testimony.
9       **THE COURT:**  Yes, I think that that's probably right, so
10  yes.  But what we'll do is if the plaintiffs want time to
11  submit some sort of evidentiary declaration before the
12  briefing on the law even begins, we'll give them a chance to
13  submit that and then the briefing on the law will begin.
14      **MR. BOYD:**  And just so I'm clear, is that going to come
15  from plaintiff's current expert, a third-party or --
16      **THE COURT:**  I think they don't know because they haven't
17  thought through it yet.
18      **MR. COVERT:**  Judge is speaking for us very well.
19      **MR. BOYD:**  That's, that's fine, your Honor.  Obviously
20  after we see that, we may have some other things to say.
21      **THE COURT:**  Of course.  No, look it.  I get it.  I get
22  it.  But I just want to make sure there's no objection in
23  principle to what they are suggesting.  Okay.
24      So, the defendants are finished?
25      **MS. PANTZER:**  Yes, your Honor.

Kershnar v. Kolison, et al - 23-CV-525

1    **THE COURT:**  And the plaintiffs have some witnesses they

2    want to call?

3    **MR. COVERT:**  Yes, we do, your Honor.

4    **THE COURT:**  And let me just get a sense from you of

5    where we're going today, how long it's going to take and all.

6    How many witnesses do you have?

7    **MR. COVERT:**  Two witnesses.

8    **THE COURT:**  And how long do we think it's going to take?

9    **MR. COVERT:**  I think we'll be done today.  I don't know

10   exactly how long.  I would anticipate that we will first call

11   Tony Olivo, that will take, between direct and cross, it

12   could be most of the morning.  I don't know whether we'll

13   make it to Mr. Wilson.  Then he will testify and we don't

14   expect him to be as long.  So it really just depends on how

15   long the cross-examination is.

16   I would note that the defendants submitted a amended

17   exhibit list and so that would lead me to believe that

18   there's going to be some protracted cross-examination of our

19   witnesses and that's just my --

20   **THE COURT:**  Okay.

21   **MR. COVERT:**  -- observation.

22   **THE COURT:**  We'll do what we have to do.

23   **MR. COVERT:**  Yeah.

24   **THE COURT:**  Just for planning purposes, I have another

25   matter at 1:00 and so we're going to break, probably, at noon

Olivo - Direct - Covert

1    so I can prepare for that and probably come back around 1:30,

2    2 o'clock.

3        **MR. COVERT:**  I still think we'll be done today.

4        **THE COURT:**  Okay.

5        **MR. COVERT:**  I, I would think --

6        **THE COURT:**  We'll probably take a longer break for lunch

7    than we usually do because I do have another matter that I

8    have to handle.

9        **MR. COVERT:**  Very good.

10       **THE COURT:**  Okay.  So you may call your first witness.

11       **MR. COVERT:**  Thank you, your Honor.

12   We'll call Tony Olivo.

13       (**WHEREUPON**, discussion was held off the record.)

14       **THE COURT:**  Okay.  Go ahead.

15

16       **JAMES ANTHONY OLIVO,** called as a witness, being duly

17   sworn, testified as follows:

18   **DIRECT EXAMINATION BY MR. COVERT:**

19       **Q**    Good morning, Mr. Olivo.

20       A    Good morning.

21       **Q**    Can you talk into the microphone, please.  You can

22   pull it closer.

23       **THE COURT:**  Yeah, we want to make sure we speak into the

24   microphone now, especially because of the issues we have with

25   the court reporter.

Olivo - Direct - Covert

1       So go ahead.

2       **MR. COVERT:**  Yes, thank you.

3       **Q**    Mr. Olivo, can you tell the Court where your

4   current business is located and what the nature of the

5   business is.

6       A    I am the president and director of Investigative

7   Services for Corporate Screening and Investigative Group, CSI

8   Group for short.  We are located in Orchard Park, New York.

9       **Q**    And how long have you been a private investigator?

10      A    Licensed in New York State for 28 years.

11      **Q**    And can you just get into some of your background,

12  for example, where you went to college and what courses you

13  took, what your majors were?

14      A    I have a degree from the University of Hawaii

15  through the Community College of the Air Force in criminal

16  justice.  I have a degree in Public Administration from

17  Capital University in Columbus, Ohio.

18      **Q**    And do you have a law enforcement background?

19      A    Yes.  I began my law enforcement career in 1979.

20      **Q**    And can you describe that to the Court?

21      A    Began my law enforcement career in 1979 in the

22  United States Air Force as what at that time was called the

23  Law Enforcement Specialist.  I was a law enforcement

24  supervisor, criminal investigator, and a SWAT team member.

25      **Q**    And how long were you in the Air Force?

1    A    Six years on active duty and nine years on reserve
2 duty.

3    Q    And then after the Air Force, what did you do?

4    A    I became a police officer and police detective in
5 Cheyenne, Wyoming.

6    Q    And what were your job duties in Cheyenne as a
7 police and detective?

8    A    I was a child abuse and sex crimes detective.  I
9 was a hostage negotiator.  And I worked in the detective
10 division of the Cheyenne Police Department.

11    Q    And did that -- was there any federal component to
12 that job?

13    A    We often supplemented the United States Secret
14 Service, the Office of Special Investigations for the
15 U.S. Air Force and Protective Details.  I was actually on the
16 protective detail assigned to George Bush the First when he
17 came to Cheyenne and, also, Caspar Weinberger, the former
18 Secretary of Defense.

19    Q    And when you were on those details, what did that
20 require you to do?

21    A    To supplement the Secret Service in their
22 protective details to provide executive protection, services,
23 escort services and those type of protection assignments as
24 given to us by the Secret Service.

25    Q    And then after you left the Cheyenne, Wyoming

Olivo - Direct - Covert

1    Police Department, what did you do after that?

2        A    I joined the United States Marshal Service where I

3    initially served in the Southern District of New York as a

4    member of the United States Marshal service.  I was on the

5    Caribbean Drug Gang Task Force for a few years and then I was

6    also a member of the U.S. Marshal Special Operations Group

7    which is like our SWAT unit which would be analogous to the

8    FBI's Hostage Rescue Team.

9        Q    And were you involved in any risk assessments or

10   threat assessments while you were a U.S. Marshal, and can you

11   describe that to Court?

12       A    We conducted high risk and high threat transports

13   of prisoners such as the individual that was accused of

14   killing DEA agent Kiki Camarena on the southern border.

15            We protected the Supreme Court Justices.  I

16   personally ran the details of Justice Sandra Day O'Connor,

17   Justice Antonin Scalia and Justice Harry Blackmun when they

18   were in Cleveland, Ohio where I was stationed.

19            We also conducted extractions of Manuel Noriega

20   from Panama and high risk threat and prisoner movements.  We

21   supplemented the Secret Service and the U.S. State Department

22   on the UN security details in New York City for the General

23   Assembly meetings.  So I was on the planning teams of all of

24   those high risk and high threat movements.

25       Q    And did those duties involve threat assessments?

Olivo - Direct - Covert

1    A    Yes.  They involved physical and tactical threat
2    assessments which was part of my duties.
3    Q    And how would you conduct those assessments or how
4    would you utilize those?
5    A    In conjunction with the intelligence acts that we
6    worked with, we would assess if there was any known or
7    potential threat, imminent threat and then address the
8    movements and the protection accordingly.
9    Q    And after -- how long were you in the U.S. Marshal
10   Service?
11   A    Seven years.
12   Q    And then what -- and were there any other matters
13   that you were involved with that were of notoriety while you
14   were with the Marshals?
15   A    Other than the ones that I just mentioned, many,
16   many movements of high threat and high risk prisoners,
17   protection of federal witnesses, federal judiciary.
18   Q    And were you involved at the extraction of various
19   federal officials from foreign countries?
20   A    That was when I was in the Air Force, yes.
21   Q    Okay.
22   A    In Grenada.
23   Q    I'm sorry.  So that was in the Air Force?
24   A    Yes.
25   Q    And what did you do with respect to that?

Olivo - Direct - Covert

1    A    We extracted the General assigned to Grenada at the

2  time.

3    Q    Because there was a risk assessment and threat

4  assessment in --

5    A    Well --

6    Q    -- relation to --

7    A    There was an armed conflict going on in Grenada so,

8  yes, there was a potential threat.

9    Q    Okay.  Then after you left the U.S. Marshal

10  Service, what did you do then?

11    A    I formed the company that I currently preside over.

12    Q    And what are your functions with that company and

13  what does the company do in relation to threat assessments or

14  safety on college campuses or high school campuses?

15    A    We specialize in working with school districts,

16  health care organizations, hospitals and high risk

17  organizations to provide risk and threat assessments and

18  security system design, security consulting and, if need be,

19  coordinate protection for anyone that might need it in case

20  of a threat.

21    Q    And who do you do that for?

22    A    70 different school districts throughout New York

23  State.  4 different BOCES, which is B-O-C-E-S; it's the Board

24  of Cooperative Educational Services -- that are dispersed

25  throughout New York State.  And underneath each BOCES,

12

Olivo - Direct - Covert

1    there's anywhere from 50 to 100 different school districts

2    that they're responsible for providing services for.  So our

3    firm works with all of those different BOCES and their

4    component school districts to provide those services.

5        Q    And if you can get into a little more detail as to

6    what services you provide in relation to the security -- I'm

7    going to call it capacity, whether it's a high school or a

8    college, but what type of services do you provide for the

9    security of the campus?

10       A    So, with each school district that we work with and

11   consult with, we provide a detailed, what we call, risk and

12   threat assessment for each district.  It's a three-component

13   assessment that consists of:

14            Number one, interviewing and reviewing their

15   policies and procedures.  So, every district is pretty much

16   different.  There's no real consistency with respect to how

17   each school district operates.  So we review comprehensively

18   their policies and procedures with respect to how they

19   respond to a threat, when they would lock down a school, when

20   they would call in a lockout, shelter in place, all of those

21   things, visitor access control, all of that.

22            The second component is what we call covert

23   observations and penetration test.  During this period, we

24   would send undercover operatives to the campus to see if they

25   could identify potential risk areas and, if so, exploit those

13

Olivo - Direct - Covert

1  areas in such a way where they're unnoticed.  For instance,

2  we have had operatives walk into school districts and sit

3  down in the kindergarten classroom and have breakfast with

4  kindergarteners during the day with nobody noticing them.  So

5  that's the second phase.

6          And then the third phase of our risk and threat

7  assessment would be a physical assessment.  At this point we

8  would look at all of their camera systems, alarm systems,

9  lockdown mechanisms, panic buttons, door locks, all of the

10 physical components that go into securing a campus.

11     Q    And you said you did that in relation to 70

12 K through 12 schools, correct?

13     A    Correct.

14     Q    And you performed all of those analysis -- those

15 three levels of analysis for those schools?

16     A    Correct.

17     Q    And then, also, have you done that for universities

18 and can you identify some of universities that you provide

19 that for, unless it's confidential?

20     A    We have consulted with several universities, one of

21 which would be locally would be D'Youville College.

22     Q    And what did you do for them?

23     A    We consulted with them on enhancing their security

24 of their campus and gave them various methodologies to do

25 that.

Olivo - Direct - Covert

1    **Q**    And what exactly did you look at?  What was the

2    concern and what was your advice?

3    A    At that time we actually looked at their physical

4    security issues and their locking systems.  We just

5    recently -- well, I say recently -- prior to COVID, we did

6    the same thing for Roswell Park Cancer Institute.

7    **Q**    So you also do this for health care providers?

8    A    Yes.

9    **Q**    And about how many different health care providers

10   have you done that for and if you could name some of them?

11   A    We've done it for Olean General Hospital in all of

12   their component care facilities.  We've done it for Bradford

13   Regional Medical Center and all of their components.  We've

14   worked with the -- actually the State Police consulting with

15   Catholic Health, as well.  And Roswell Park.

16   **Q**    And are any health care providers out of the area?

17   A    No.

18   **Q**    Okay.  Not for the Cleveland Clinic?

19   A    We have worked with the Cleveland Clinic but we

20   didn't do any physical work with the Cleveland Clinic.  We've

21   consulted with them and their police department --

22   **Q**    Okay.

23   A    -- but we didn't do any physical --

24   **Q**    And when you say --

25   A    -- upgrades.

Olivo - Direct - Covert

1    **Q**    The physical work that you did with the other

2    health care providers, the local ones, was that similar to

3    the three-prong analysis that you provided to the K through

4    12 schools?

5    **A**    With respect to Olean General Hospital and Bradford

6    Regional Medical Center, yes, they engaged us to do the

7    entire process.  Roswell Park was more of a physical

8    component where we looked at their locking mechanisms and

9    made suggestions as to how they could upgrade them in certain

10   areas and all of those type of things.  Catholic Health was

11   more training for situational awareness and active shooter

12   training.

13   **Q**    And in relation to all of the campuses, including

14   the health care providers, these all include threat

15   assessments as to the dangers that could be caused by

16   outsiders coming on to those campuses?

17   **A**    Yes.  To a certain extent we would conduct a threat

18   assessment with respect to any known threats that they have

19   had, anything that has been communicated to them via email,

20   voicemail, social media, any problems that they've had with

21   local, whether it be parents or anyone else in the community

22   that have had issues with the campus itself.

23   **Q**    And would you advise them as to how to handle those

24   situations?

25   **A**    Yes, absolutely.  For instance, in a health care

Olivo - Direct - Covert

1    environment, it's very problematic when various surgeons have

2    their names in parking spaces physically marked.  We have had

3    actual surgeons who have lost patients on the table where

4    they were followed home and had threats made to them and

5    those type of things.  So we've actually consulted with them

6    and said how to mitigate those problems and get rid of them.

7        Q    Now, in addition to being a private investigator,

8    do you have any certifications or licenses currently that you

9    hold in relation to that field?

10       A    Yes.  I am a New York State Licensed Private

11   Investigator, a Florida State Licensed Private Investigator.

12   I'm a Board Certified Professional Criminal Investigator and

13   a Certified International Investigator.  I'm also a member of

14   the Association of Threat Assessment Professionals.

15       Q    And what certifications do you have in relation to

16   school security?

17       A    I am a TASA certified expert in school security and

18   negligence security.

19       **MR. COVERT:**  Your Honor, I would offer Mr. Olivo as an

20   expert on threat assessment and campus safety including

21   threat assessments on campuses.

22       **MS. PANTZER:**  Your Honor, I have -- I have a two-pronged

23   objection to that qualification.  First, I don't think

24   Mr. Ol -- Olivo.

25       **THE WITNESS:**  Olivo, yes.

Olivo - Direct - Covert

1       **MS. PANTZER:**  -- has offered any testimony as to his

2    expertise on behavioral threat analysis.  In fact, his report

3    doesn't mention anything about behavioral threat analysis.

4       Additionally, Mr. Olivo has only testified that he

5    helped secure D'Youville's campus.  I do not think that

6    qualifies him as an expert on campus security.  I think that

7    there's a hole in the qualification there, as well.

8       **THE COURT:**  Do you --

9       **MR. COVERT:**  We're --

10      **THE COURT:**  -- want to ask any --

11      **MR. COVERT:**  -- not offering him as a --

12      **THE COURT:**  -- questions?

13      **MR. COVERT:**  -- behavioral -- what was the phrase you

14   used?

15      **MS. PANTZER:**  Behavioral threat analyst.

16      **THE COURT:**  What does that mean?

17      **MS. PANTZER:**  Well, your Honor, Chief Isaacson offered

18   lots of testimony about his ability to analyze potential

19   threat actors based on behavioral leakage and potential for,

20   potential for violence based on a behavioral analysis.

21      Mr. Olivo has offered testimony that he understands the

22   physical and tactical elements of threat assessment but I

23   don't think he's offered any testimony as to behavioral

24   analysis.

25      **MR. COVERT:**  Your Honor, Mr. Isaacson was not offered as

Olivo - Direct - Covert

1    a behavioral threat analyst.  I would read from day one of

2    the testimony, Page 26, quote:

3        "Your Honor, we would offer Chief Isaacson as an expert

4    in threat assessment, as well as campus law enforcement and

5    safety."

6        We are doing the same with Mr. Olivo who testified that

7    he's provided threat assessments in a three-prong manner to

8    75 different school districts, to 5 universities, and various

9    health care providers.  We are offering him for exactly what

10   I said.  I never used the word "behavioral" in what I asked

11   him to be permitted as an expert upon.

12       **MS. PANTZER:**  Your Honor, I maintain the objection.  I

13   understand that Mr. -- Chief Isaacson was offered as a expert

14   in threat assessment.  I will maintain the objection that I

15   think Mr. Olivo is not an expert as to behavioral analysis,

16   and to the extent he's not being offered for that purpose,

17   that's fine.

18       I also maintain the objection that I don't think Mr.

19   Olivo has established expertise as to university and campus

20   security the way that Chief Isaacson did.

21       **THE COURT:**  You said 5, is that what you testified to?

22       **MR. COVERT:**  5 universities.  75 K through 12 campuses,

23   5 university campuses and various health care provider

24   campuses, as well.

25       **THE COURT:**  Is that accurate, sir?

Olivo - Direct - Covert

1     **THE WITNESS:**  Yes.

2     **THE COURT:**  I'll allow him to testify.

3     **MR. COVERT:**  Thank you, your Honor.

4     **Q**    Now at some point you have been retained by FIRE,

5     F-I-R-E being the Foundation for Individual Rights and

6     Expression, to provide your expertise services in threat

7     assessments and threat assessments particularly in relation

8     to campuses, whether it's K through 12 or universities,

9     correct?

10    A    Correct.

11    **Q**    And what have you -- what is your retainer, what

12    are you charging for that?

13    A    There was no retainer obtained.  Our rates are $150

14    an hour.

15    **Q**    Okay.  And in relation to performing that function

16    as an expert, what did you review to prepare both your expert

17    report and to prepare for testifying here today?

18    A    I reviewed a declaration by Chief Isaacson.  I

19    reviewed emails that were provided to me and other

20    documentation that FIRE provided, as well.

21    **Q**    Were you provided roughly 5500 document -- pages of

22    documents from the Attorney General's Office that was

23    provided -- that they provided to the plaintiff's counsel?

24    A    Yes.

25    **Q**    And have you reviewed all of those materials?

20

Olivo - Direct - Covert

1    A    No, I did not.

2    Q    Have you reviewed the materials that we forwarded

3    to you as relevant?

4    A    Yes.

5    Q    And in Plaintiff's Exhibit 98 -- which is not in

6    evidence at this time, your Honor -- would you recognize that

7    as your expert rebuttal report?

8    A    That looks like it, yes.

9    Q    And on Page 21, I believe, of the report is your

10   signature.  Would you recognize that --

11   A    Yes, that is my --

12   Q    -- as --

13   A    -- signature.

14   Q    And the second attachment to that report lists 75

15   documents that you indicated you reviewed in relation to

16   providing testimony here today?

17   A    Yes, that's correct.

18   Q    And that attachment number two is correct in

19   relation to those documents that you reviewed to prepare for

20   today?

21   A    Yes.

22   Q    Were you present during the hearings that occurred

23   earlier this month?

24   A    I was.

25   Q    Two days of hearings on September 13th and 14th,

Olivo - Direct - Covert

1   primarily the testimony of Mr. Brent Isaacson, correct?

2       A    Yes.

3       Q    And you were here to observe all of that?

4       A    Yes.

5       Q    And were you able to also review the transcript of

6   his testimony after it was provided to the plaintiff's team?

7       A    Yes, I was.

8       Q    So you have reviewed documents pertaining to what

9   we'll call the Stephen Kershnar controversy, correct?

10      A    Yes.

11      Q    And how would you describe the initial round of

12  documents that you reviewed, as well as Mr. Isaacson's

13  testimony, in relation to what occurred once the campus was

14  alerted to the controversy on February 2nd, of 2022?

15      A    There was various communications made by people,

16  known or unknown to the campus, regarding their displeasure

17  with Professor Isaacson's podcast.  And as a result that,

18  Chief Isaacson engaged another firm to do a risk and threat

19  assessment, or a threat assessment.  He also conducted an

20  analysis on the threat assessment and made some conclusions.

21      Q    So on February 2nd, 2022, is when he -- the campus

22  first became aware of, and alerted to, the Kershnar

23  controversy, correct?

24      A    Correct.

25      Q    And you have reviewed the documents provided to you

Olivo - Direct - Covert

1   in relation to the emails that were shared within the campus

2   community?

3        A    Yes.

4        **Q**    Including those from Mr. Isaacson?

5        A    Yes, and various other administrators of the

6   campus.

7        **Q**    And you also observed it and listened to his

8   testimony earlier this month, correct?

9        A    Yes, I did.

10       **Q**    Did, in your opinion, did Mr. Isaacson take steps

11  on February 2nd, or even shortly thereafter, that would be

12  indicative of a belief that there is a heightened concern for

13  violence on the campus?

14       A    I saw no evidence that they enhanced security

15  measures on the campus.

16       **Q**    And we're talking about the period of February 2nd

17  and shortly thereafter?

18       A    Correct.

19       **Q**    What, what measures, from what you observed in the

20  documents you reviewed, or listened to of Mr. Isaacson, what

21  measures did they take in the days following February 2nd,

22  2022?

23       A    I believe that, in coordination with their

24  personnel administrators, HR people, they removed professor

25  Isaacson from campus.

Olivo - Direct - Covert

1      **Q**     And in your -- were you -- in your opinion, did you

2    observe any basis to believe that they looked at any

3    alternatives other than removing him from the campus on

4    February 2nd or within the days or weeks thereafter?

5      **A**     Not that I have seen.

6      **Q**     And if you were in charge of campus security, would

7    you have engaged in such an assessment as to whether there

8    are alternatives to removing him from the campus during that

9    time period?

10     **A**     I would have looked at any alternative, yes.

11     **Q**     And what types of alternatives would you look at?

12     **A**     Given the information that would have been

13   available at the time, I would have looked at enhancing

14   security measures around his workspace.  So Chief Isaacson

15   testified previously about walking the academic buildings on

16   the campus to be that similar to a K through 12 building.  I

17   would agree with that.  However, I didn't see any evidence of

18   that, other than the fact that they added locking mechanisms

19   to the classroom doors, enhanced locking mechanisms to the

20   classroom doors.

21            So to bring Mr. Kershnar back on to campus, I would

22   have looked at various measures such as security exterior

23   doors to that academic building which they would have had the

24   ability to do either through a mechanical or an electronic

25   lock system.  They have over 300 cameras on the campus which

Olivo - Direct - Covert

1   they could have also enhanced monitoring.  They could have

2   added additional patrols, and/or one of their officers or a

3   off-duty officer from the sheriff's department or the local

4   police department, to escort Mr. Kershnar to and from his

5   workspace.

6        Q    And did you find any evidence that they either

7   reviewed those options or implemented those options?

8        A    Not that I saw.

9        Q    And in the time period from a few weeks -- from

10  February 2nd and a few weeks thereafter, did they implement

11  any heightened security for campus officials, their staff or

12  students on campus from what you observed?

13       A    The only information I observed or reviewed was a

14  heightened awareness regarding Mr. Kolison.

15       Q    And what was -- what did you observe in February as

16  opposed to March -- in February, what was the evidence of any

17  heightened concern for Mr. Kolison?

18       A    There was none.

19       Q    And the heightened concern you're talking about is

20  on March 25th --

21       A    Correct.

22       Q    -- and the measures?  But in February were any

23  additional measures taken based upon your listening to the

24  testimony of Mr. Isaacson or the review of documents which

25  would indicate that there was any increase in security of

Olivo - Direct - Covert

1  Mr. Kolison or his staff or anyone located in this building

2  in early February of 2022?

3       A    No, I didn't see any evidence of that.

4       Q    And, again, the measures that you talked about that

5  were alternative measures, would also have been available for

6  them to implement in relation to President Kolison, his staff

7  and the students in the area, correct?

8       A    The entire campus would have -- those measures

9  could have been implemented for the entire campus.

10      Q    And did you also review documents pertaining to a

11  protest or parade that occurred on February 6th of 2022?

12      A    I reviewed emails, yes.

13      Q    Okay.  And it's fair to state that the first emails

14  reviewed, that were circulating regarding the upcoming

15  February 6th, 2022, protest were circulated on or about

16  February 3rd of 2022?

17      A    Correct.  It was a march that they were calling

18  for.

19      Q    And that was a march that was going to commence off

20  campus and come on campus, correct?

21      A    Correct.

22      Q    And this was going to be students and there's also

23  documents in the file indicating that the campus officials

24  were alerted to the possibility of nonstudents coming from

25  off campus as part of this protest, correct?

Olivo - Direct - Covert

1    A    Correct.

2        Q    And what measures are you aware of that

3   Mr. Isaacson or campus security took in relation to any

4   potential increase in threats based upon that protest?

5        A    I see no documents relating to it but Chief

6   Isaacson did indicate during his testimony that they added an

7   additional patrol car to the campus.

8        Q    And are there different levels of threat responses

9   that you can implement on any given campus?

10       A    Yes.

11       Q    And how would you characterize that level of

12   response to the protest from students and nonstudents that

13   were coming from off campus on to campus on February 6th?

14       A    Very minimal.  Minimal at best.

15       Q    What were the alternatives if they -- if

16   Mr. Isaacson thought that that actually was a threat to the

17   campus, what alternative measures could he have taken in

18   relation to the protest if he felt there was any danger to

19   the campus community or students that were engaged in that

20   protest?

21       A    There are several measures that could be taken in a

22   circumstance like that, not the least of which is enhancing

23   staffing, manpower, whether it be available manpower from the

24   SUNY police or local police that they could bring in to

25   augment them.  There's other different security measures that

Olivo - Direct - Covert

1    they could take, up to, and including, embedding an

2    undercover operative in the march.

3        Q    Can you describe your understanding of, just

4    generally, the campus security that was existent on the

5    campus before the Kershnar controversy in relation to, for

6    example, cameras and phones on campus and campus safety prior

7    to the Kershnar controversy?

8        A    There were -- well, Chief Isaacson testified that

9    there's 300 cameras on the campus -- which they have a pretty

10   robust camera system on the campus.  They have a certain

11   amount of manpower in terms of patrol officers but with

12   respect to the campus security as a whole and overall, the

13   only facilities on the campus, if you will, that are secure,

14   for the most part, would be the dormitories.

15       Q    And I think you also testified that there were blue

16   light phones throughout the campus; is that correct?

17       A    Right.  Those are emergency phones that,

18   presumably, when you're standing in one place, you could see

19   a phone no matter where you're standing on campus and that

20   phone, if you pick it up, would go right to a dispatcher.

21   And the way it's supposed to work is that the camera, the

22   nearest camera or cameras within the area, is supposed to

23   pull up whoever's on the phone and what's going on over

24   there.

25       Q    And these are all measures that were in place prior

Olivo - Direct - Covert

1    to the Kershnar controversy?

2         A    Correct.

3         Q    Which began February 2nd, correct?

4         A    Correct.

5         Q    Was there any indication through Mr. Isaacson's

6    testimony, or the documents you reviewed, that any of those

7    security measures were enhanced in any manner after

8    February 2nd, 2022, in relation to the Kershnar controversy?

9         A    No.

10        Q    Now, you also reviewed documents and heard

11   Mr. Isaacson's testimony in relation to addressing concerns

12   for Mr. Kershnar's safety on February 2nd and in the days

13   thereafter, correct?

14        A    Correct.

15        Q    And what is your understanding of the measures that

16   were taken by Mr. Isaacson or campus security in relation to

17   Mr. Kershnar's safety on February 2nd and the days

18   thereafter?

19        A    I'm not aware of any enhanced security protocols

20   that they put in place physically to protect Professor

21   Kershnar, other than advising him of the potential threat and

22   that they believe he shouldn't come back on campus.

23        Q    And is that evidence to you of any actual concern

24   that there may be violence visited upon Mr. Kershnar due to

25   the controversy?

Olivo - Direct - Covert

1    A    No.

2    Q    What measures would you have expected that they

3    take in relation to Mr. Kershnar's safety, if they actually

4    believed that he was under threat of violence by some known

5    or unknown individual?

6    A    As I stated earlier, I would have enhanced the

7    security both in his workspace and on the campus environment

8    where he is located.  So we would have suggested enhancing

9    security to the workspace by locking the exterior doors or

10   access to the building.  I believe there was testimony

11   regarding the upgrade of the locks to the classrooms

12   themselves to make it more of a K through 12 environment.

13        So those enhanced locks that were put in that the

14   university paid a half a million dollars for over the

15   previous years, those are great locks and those are great

16   systems and they should have been put in place in his

17   workplace, as well as his classroom.  And they could have

18   provided either a contract guard service or a campus security

19   officer to escort him.

20   Q    We're going to show you what's been marked as

21   Plaintiff's Exhibit 89 which is in evidence.

22   **THE COURT:**  This is in evidence already?

23   **MR. COVERT:**  It is in evidence.

24   And if you can scroll down, Megan.

25   Q    Is this a document that you have reviewed, the

Olivo - Direct - Covert

1    email that Mr. Isaacson wrote on February 2nd, 2022, at

2    10:23 a.m.?

3         A    Yes.

4         Q    And it's an email concerning the safety plan that

5    they were going to effectuate in relation to Mr. Kershnar on

6    February 2nd in response to the controversy?

7         A    Correct.

8         Q    And if you can just review what were the plan in

9    relation to providing for the safety of Mr. Kershnar?

10        A    I don't know what was planned subsequent to this

11   memo.  But at this time, it appears that Chief Isaacson was

12   referring to Dr. Kershnar as a protectee which would have

13   been to provide for physical security for him while he was on

14   campus.

15        Q    And what was the proposal of Mr. Isaacson in

16   relation to Mr. Kershnar who he described as a protectee?

17        A    That he would like to have a meeting with him or be

18   part of the discussions with him on how to best safeguard him

19   by the University Police Department to provide for his

20   physical safety.  He wanted to discuss with him where he

21   would be on campus and when.  Methods of which he could

22   identify or advise the university police of a safety concern.

23   And how they could advise him if they became aware of a

24   credible threat to his physical safety.

25        Q    Now, in your professional opinion, providing for

Olivo - Direct - Covert

1  threat assessments on various campuses, would you consider

2  this to be a heightened response or a significant response

3  that's indicative of the belief that there is going to be

4  imminent violence on campus or concern for Mr. Kershnar's,

5  campus's, or the student's safety?

6      A    I believe it is a response that would have been

7  minimally acceptable at the time.

8      Q    Okay.  But not very significant?

9      A    No.  It does not address anything beyond those

10 three bullet points.

11     Q    Now you're also aware of the situation involving,

12 on February 2nd, a note taped to Mr. Kershnar's office door?

13     A    Yes, I've seen it.

14     Q    And what is your understanding of the campus's

15 response to the taping of that note on that door -- on his

16 door?

17     A    I've not seen any police reports with respect to

18 what they did from an investigator perspective with the note.

19 So I, other than accepting the note and just documenting it,

20 I don't know that there was any additional response.

21     Q    To your knowledge, was there any attempt to

22 determine who the individual was who left that note on his

23 door?

24     A    Not to my knowledge.

25     Q    And could they have tried to identify who the

Olivo - Direct - Covert

1    individual was or what measures would they have taken if they

2    thought that this was a serious threat?

3         A    I believe from an investigator perspective, they

4    definitely could have attempted to identify who the person or

5    persons were that put that there by several means.

6         Number one, they could establish a timeline of when

7    that would have been put there based upon when either

8    Professor Kershnar or his office mate left that area and

9    locked that door.  So, whatever time they left until the time

10   it was discovered would give you a timeline.

11        The second step would be, given the amount of

12   cameras and video surveillance that they have, I didn't see

13   any evidence that they reviewed that or took it a step

14   further and try to attempt to identify that person or

15   persons.

16        Q    Does that evidence to you a concern that that note

17   is indicative of the possibility of actual violence being

18   visited upon Mr. Kershnar or upon the campus?

19        A    Not from the level of response that the campus

20   brought out.

21        Q    Now, there's also been references by Mr. Isaacson,

22   and in some documents, to communications shortly after -- on

23   February 2nd and shortly thereafter, to law enforcement

24   partners including Chautauqua County Sheriff's Office and

25   New York State Police.

Olivo - Direct - Covert

1          Are you familiar with any actual attempt to

2  integrate outside law enforcement on to the campus to

3  actually assist in providing safety to the campus?

4      A    I'm not aware of any.

5      Q    And did you hear Mr. Isaacson discuss in any detail

6  any substantive attempts to have outside law enforcement

7  assist them on the campus?

8      A    I did not.

9      Q    And would you expect that to be a normal course of

10  conduct in providing for a safety assessment for a capacity

11  to have outside law enforcement agencies assist a campus in

12  campus security?

13      A    I believe in a campus environment such as SUNY

14  Fredonia, given the location of the campus, as well as the

15  resources that they have, that would have been a prudent --

16  in fact, expected -- response to it by engaging the law

17  enforcement community as a whole, the local police, being the

18  Fredonia police, as well as the Chautauqua County Sheriff's

19  Office and the New York State Police.

20      Q    Now you also saw documents and heard testimony from

21  Mr. Isaacson in relation to the threats that were on social

22  media and were posted in various -- and also sent in emails

23  to the campus in the weeks shortly after February 2nd, 2022,

24  correct?

25      A    Correct.

Olivo - Direct - Covert

1    **Q**    And Mr. Isaacson testified that he did not provide,

2    or forward any of those emails or threats or social media

3    threats to local or federal law enforcement agencies,

4    correct?

5        A    Correct.

6    **Q**    Would you have expected that if he actually

7    believed that those threats were credible, threats of

8    violence to the campus, that he would have forwarded those to

9    local law enforcement or federal agencies?

10   **MS. PANTZER:**  Your Honor, I'm going to object to that

11   question.  Would you expect if he believed --

12   **THE COURT:**  Yeah.

13   **MS. PANTZER:**  I think that --

14   **THE COURT:**  Sustained.  Sustained.

15   **MS. PANTZER:**  Thank you.

16   **Q**    In your professional opinion, what would you have

17   expected Mr. Isaacson to do with those threats if he believed

18   that they were actually legitimate threats of violence to the

19   campus?

20       A    In my professional opinion, and also in our

21   practice, we actually advise all of our clients campus wide

22   to have a zero tolerance policy.  So if there is a credible

23   threat that's made, law enforcement should be notified

24   immediately of that credible threat.  And if there is any

25   type of imminent threat, then obviously physical protective

Olivo - Direct - Covert

1    measures should be enhanced and taken.

2         So, if these threats that were communicated via

3    email and/or phone that they were able to identify these

4    individuals through, there should have been a referral to

5    local law enforcement for several reasons, one, one of which

6    would be to put those people on law enforcement's radar as a

7    potential threat or hostile actor toward the campus or

8    Mr. Kershnar or Mr. Kolison or anyone else.

9         The second thing is, is that some of these people

10   may have already been on law enforcement's radar.  They may

11   have been identified as potential bad actors or threats prior

12   to them making this commentary online or via the telephone.

13   **Q**    And if law enforcement was given the names of

14   individuals who were already on their radar, in your

15   professional opinion, what would that lead to?

16   A    It would have led to an investigation by local law

17   enforcement or whomever was assigned to that individual

18   threat.

19   **Q**    And in providing advice to campuses throughout your

20   career, were there ever instances where you advised campuses

21   that they should not forward threats to law enforcement

22   agencies?

23   A    No.

24   **Q**    And why is that?

25   A    For the reasons I just stated:  Number one, there

Olivo - Direct - Covert

1   should be a zero tolerance policy.  So anybody makes a

2   threat, there should be steps taken.  If it is a actionable

3   threat of a criminal nature, when law enforcement decides

4   that that is, they would find that person or cite them or

5   arrest them or charge them somehow and also provide them with

6   a trespass notice that they should not be on campus, and if

7   they're caught in the vicinity of the campus, they be

8   arrested.  So there should be a heightened level of awareness

9   there.

10          And, as I stated, if the individual that is

11  identified in the threat may already be a threat to others

12  and may already be on law enforcement's radar and/or

13  probation or something of that nature.

14      Q    Now, Mr. Isaacson testified that one of the reasons

15  he did not send any threats at all to the Department of

16  Justice was because he felt that there was not enough

17  information to actually arrest and charge that person,

18  correct?

19      A    I believe that's what he said, yes.

20      Q    In your professional opinion, is that an

21  appropriate analysis as to whether or not you should forward

22  threats to law enforcement?

23      A    It is not.

24      Q    Why is that?

25      A    Because it's not your job as a law enforcement

Olivo - Direct - Covert

1  professional, investigator or security consultant to

2  determine whether or not someone is going to be prosecuted.

3  That's up to the prosecutor, the DA, the U.S. Attorney's

4  Office.

5      Q     Mr. Isaacson also testified that he, in his

6  opinion, he thought that causing these individuals to be

7  arrested, the ones that were making threats, would increase

8  scrutiny of the campus and cause additional threats, correct?

9      A    I believe that's what he said.

10     Q     All right.  In your professional opinion, is that

11 appropriate to the analysis of whether to forward threats to

12 the campus to law enforcement agencies?

13     A    No.

14     Q    Why not?

15     A    For the same reasons that I stated earlier:  That

16 there should be a zero tolerance policy for anybody that

17 communicates a direct threat to an individual, whether it

18 be an administrator, Professor Kershnar, or even someone

19 working in the cafeteria, there should be a zero tolerance

20 policy for that.

21     Q     And the lack of, in your professional opinion, the

22 failure of Mr. Isaacson to forward any of the threats in

23 February of 2022 to any law enforcement, is that indicative

24 of his not actually believing that there is an actual

25 threat --

Olivo - Direct - Covert

1     **MS. PANTZER:**  Object.

2     **Q**    -- to the campus based upon those communications?

3     **MS. PANTZER:**  Objection, your Honor.

4     **THE COURT:**  Sustained.

5     **Q**    In your professional opinion, the -- what

6     interpretation would you give to Mr. Isaacson's failure to

7     forward any communications involving threats to any law

8     enforcement agency?

9     **A**    Oh, I believe that Chief Isaacson made the decision

10    not to do so because he believed that none of these people

11    would be prosecuted and that's why he didn't do so.

12          In my opinion, that's the wrong decision to make.

13    Again, it's not your decision whether or not someone will be

14    prosecuted for threats.  If it is a direct threat that you

15    think is credible, then that is something that should be

16    referred to law enforcement.

17    **Q**    Mr. Isaacson also testified regarding the level of

18    threat assessment involving individuals who discuss

19    pedophilia, correct?

20    **A**    Yes.

21    **Q**    And in his opinion, individuals who discuss

22    pedophilia are -- he describes as having a level of hatred

23    from the public that is of its own nature and is not

24    equivalent to other levels of hatred?

25    **MS. PANTZER:**  Objection, your Honor.

Olivo - Direct - Covert

1     **THE COURT:**  Yeah, sustained to the form of the question.

2     Q     Do you agree with Mr. Isaacson's conclusion that

3     individuals who discuss pedophilia cause more hatred than

4     individuals who discuss other controversial issues?

5     A     I don't believe that that's accurate.

6     Q     In your professional opinion, what other areas of

7     discussion are controversial and could cause hatred and

8     protests to college campuses?

9     A     Well, we've seen it not only on college campuses

10    but in the K through 12 environment, so there's everything

11    from abortion to critical race theory being taught in the

12    school and here in Western New York, real life examples were

13    the COVID masking mandates that were enhanced.  We had

14    several school superintendents who were threatened regarding

15    mask mandates.

16    Q     And what, in your opinion, what should those

17    campuses do in relation to those issues you just discussed,

18    COVID and race and other such controversial issues?

19    A     Well, we -- it depends on the threat or the

20    presumed threat that was communicated.  But, again, zero,

21    zero tolerance policy, anybody that made such a threat or

22    threatened a school superintendent, police were notified,

23    there were charges brought, there were trespassing notices

24    given, there was enhanced security at the school itself by

25    locking the doors to the school and not allowing visitors who

Olivo - Direct - Covert

1    were not expected to the school.  Local law enforcement was

2    notified to add extra patrols to the area and/or -- and if

3    the school did have an SRO, or school resource officer, they

4    were put on alert as to who made those threats.

5         Q    And are those measures that you just described also

6    measures that could have been taken in relation to the

7    Kershnar controversy in securing Mr. Kershnar, President

8    Kolison and the campus students?

9         A    Yes.

10        Q    Now, by March 17th, 2022, Mr. Isaacson issued a

11   threat assessment that indicated that Mr. Kershnar would

12   essentially never be allowed back on campus?

13        **MS. PANTZER:**  Objection, leading.

14        **THE COURT:**  Yeah, sustained.

15        Q    Okay.

16        **THE COURT:**  Sustained to the leading.

17        Q    Are you familiar with Mr. Isaacson's recommendation

18   in this threat assessment on March 17th, 2022?

19        A    Yes.

20        Q    And what is your understanding of his threat

21   assessment?

22        A    My understanding is that his recommendation was

23   that there was no environment that would allow for Mr. --

24   Professor Kershnar to be allowed to be back on campus or to

25   teach even remotely at SUNY Fredonia that would eliminate the

Olivo - Direct - Covert

1    potential threat environment.

2        Q    And is it your understanding that his opinion ever

3    changed between March 17th of 2022 and that assessment and

4    when he retired on June 30th of 2023?

5        A    It, it did not, to my knowledge.  I believe he

6    testified it did not.

7        Q    And do you agree with his assessment that began as

8    late as March 17th, 2022, and continued through June 30th of

9    2023, that there was no environment in which Mr. Kershnar

10   could be returned to the campus?

11       A    I do not agree with that.

12       Q    What is your opinion?

13       A    My opinion is that there is a methodology and

14   protocols that could be put in place to which Professor

15   Kershnar could be returned to campus and the campus could be

16   secured if he were to, in fact, return to campus as a

17   professor.

18       Q    And did you see any evidence either in the

19   documents you reviewed or in listening to Mr. Isaacson's

20   testimony that he ever looked towards any alternatives to

21   banning Mr. Kershnar from the campus?

22       A    I did not see anything of that nature.

23       Q    In your professional opinion, should he have looked

24   at alternatives to returning Mr. Kershnar to the campus?

25       A    There are many alternatives, yes, that he should

Olivo - Direct - Covert

1    have looked at.

2       **Q**    And I know you've already discussed some of them

3    but if you can discuss them again as to what he should have

4    looked at, what alternatives he should have looked at?

5       **A**    He could have looked at many different

6    alternatives, number one being securing the building where

7    Dr. Kershnar would have been teaching and/or working.  I

8    believe there was only a limited amount of hours where

9    Dr. Kershnar would have been on campus anyway.  During that

10   timeframe he could have provided a -- one of the SUNY campus

11   police officers or an off-duty officer or an armed guard from

12   a private contracting firm that would be available when

13   Dr. Kershnar was on campus.

14          And we already have the enhanced locking systems on

15   the doors.  I'm going to assume that they're on all the

16   campus doors.  I don't know that for a fact but from Chief

17   Isaacson's testimony, as well as what I read in the article,

18   they enhanced those door locks on all those campuses, so

19   that's already there in place.

20          And in addition to the police officers, additional

21   patrols, I would have them enhance the video monitoring in

22   those areas when Professor Kershnar is on campus, just as

23   they did in March for pur -- Mr. Kolison.

24      **Q**    So, are you familiar with a threat assessment that

25   was commissioned by Mr. Isaacson and by the campus in

43

Olivo - Direct - Covert

1    relation to campus security in September of 2022?

2        A    Yes.

3        Q    And can you describe that report?

4        A    It was an open source intelligence investigation

5    done by A1C Corporation and it was -- included a threat

6    assessment.

7        Q    And was A1C commissioned to conduct a threat

8    assessment in your opinion?

9        A    I believe so.

10       Q    And what makes you believe that?

11            And, Megan, you can do Plaintiff's Exhibit 91.

12       **THE COURT:**  In evidence?

13       **MR. COVERT:**  It is in evidence, your Honor.

14       Q    And I can hand it to you, as well, if it's easier,

15   Mr. Olivo.

16       A    This is the engagement between --

17       Q    Yes.  And on the second page, scrolling down to

18   realtime situational awareness of events.  In your opinion --

19   and have you in your practice engaged in these types of

20   assessments?

21       A    Pretty much on a regular basis.

22       Q    All right.  And what is --

23       A    Not our firm personally but we have a professional

24   threat analysis, an open source intelligence firm that we

25   work with.

Olivo - Direct - Covert

1      Q      That you work with?

2      A      Yes.

3      Q      And what does the scope of work mean -- that's the

4   document 91 -- what does that mean?

5      A      The scope of work basically outlines what you would

6   be looking for, what you would want the intelligence analysts

7   to look for with respect to their open source intelligence

8   investigation.  In this case here, on, I believe that's

9   Page 2, that these, this scope of work included these three

10  bullet points.

11     Q      And if -- what is your understanding as to whether

12  that included a threat assessment that was -- that they were

13  being asked to engage in by the campus?

14     A      In bullet point number two, it says threat

15  intelligence through open source tools and methodologies of

16  events of interest that may include threats to community

17  safety and law enforcement officers and infrastructure and/or

18  in preparation for specific law enforcement operations.

19     Q      So, in your opinion did they commission A1C to

20  engage in a threat assessment?

21     A      Yes.

22     Q      And did you review the A1C report?

23     A      I did.

24     Q      And what is your opinion as in relation to their

25  findings of whether there is a threated on campus in

Olivo - Direct - Covert

1   September of 2022?

2       A    They indicated in the report that there was no

3   credible or imminent threat identified.

4       Q    Now you also heard Mr. Isaacson testify, and in his

5   written report he also discounted the A1C report, he did not

6   include the passages from the A1C report regarding threat

7   assessments, correct?

8       **MS. PANTZER:**  Objection, leading.

9       **THE COURT:**  Sustained.

10      Q    In relation to Mr. Isaacson's report to the Court,

11  which I believe is Defendant's Exhibit number 1, in your

12  opinion, did he properly provide the court with the A1C's

13  analysis of the threat to the campus or lack thereof.

14      A    He did not include A1C's complete analysis and

15  summary in his report.

16      Q    But he did include those passages from the report

17  that supported his opinion, correct?

18      A    Correct.

19      Q    And do you have -- having reviewed -- how many

20  threat assessment reports do you think you've reviewed in

21  your career?

22      A    In my career, several hundred.

23      Q    And in your opinion, is the A1C threat assessment

24  report valid, is it properly sourced and properly come to

25  proper conclusions?

Olivo - Direct - Covert

1    A    I reviewed the credentials of the team at A1C.

2  They're very highly qualified to conduct this investigation.

3  I never worked with them personally but, in my opinion, it's

4  a professional assessment and well done.

5    Q    And do you believe in your professional opinion

6  that Mr. Isaacson should have discounted the findings in the

7  A1C report in relation to the lack of threat to the college

8  campus?

9    A    No, I do not.

10    Q    Why not?

11    A    Because he engaged a team of professionals, who I

12  think he testified to he had a personal relationship with at

13  least one of them, to engage them to conduct this assessment

14  and to just discount their assessment because you disagree

15  with it.  I don't agree with that.  I think that he should

16  have taken this assessment into account when he made his

17  decisions.

18    Q    And did you also, as part of your engagement by

19  FIRE, did you retain the services or assist in retaining the

20  services of another agent or group that would provide a

21  threat assessment?

22    A    An open source intelligence investigation such as

23  this, yes.

24    Q    And can you describe that to the court?

25    A    The firm is called Camelot Investigations.  It's

Olivo - Direct - Covert

1  run by an individual named Sandra Stibbards.  She is a expert

2  in open source intelligence investigations and teaches

3  classes throughout the world on it.  So, we asked her to do a

4  similar assessment without giving her the A1C report of the

5  circumstances that surrounded this event.  And I believe you

6  have a copy of her final report but her findings were very

7  similar, if not identical, to what A1C found.

8      Q    And, so, what were her findings?

9      A    Her findings were that there was no credible threat

10 or imminent threat that was identified through her open

11 source intelligence investigation and it was, in fact, no

12 identifiable information regarding Dr. Kershnar and this

13 event past what A1C had identified and even subsequent to our

14 hearing on earlier this month when this hearing and all of

15 the events surrounding it were publicized in the media, there

16 was no additional threat that she could identify.

17     Q    What additional publicity occurred in the last few

18 months that she was also reviewing to see whether there --

19 that caused any additional threats to Mr. Kershnar or the

20 campus or students?

21     A    Oh, there's a New York Times article.  There was

22 Channel 2 news locally.

23     Q    And when were these roughly?

24     A    After the hearing.

25     Q    So after the September 13th and 14th of --

Olivo - Direct - Covert

1      A      Right.

2      Q      -- 2023 hearing?

3      A      There was a local talk show host David Bellavia did

4   an entire block of conversation about this hearing on his

5   talk show.  So there was a lot of media that was -- occurred

6   after the last hearing --

7      Q      And --

8      A      -- or last date.

9      Q      And she was retained to review whether there was

10  any increased threat based upon that, those reports after the

11  hearings of September 13th and 14th of 2023?

12     A      Correct.

13     Q      Do you know when she issued her report roughly?  I

14  can hand it to you to refresh your recollection.

15     A      If you could.  I would say it was roughly last

16  Tuesday but I'm not sure --

17     **MR. COVERT:**  Your Honor, can I hand --

18     A      -- the exact date.

19     Q      Would it refresh your recollection if I showed you

20  the report?

21     A      Yes.

22     Q      Handing you what's not in evidence as Plaintiff's

23  Exhibit 98 attachment number 4 which is the Camelot

24  Investigations report.

25     A      September 19th.

Olivo - Direct - Covert

1    **Q**    Does that refresh your recollection as to when they

2  issued -- Camelot issued this report?

3    A    Yes.

4    **Q**    And those findings in your opinion -- well, if you

5  can describe the findings and the conclusions that they

6  reached?

7    A    You want me to read report?

8    **Q**    No.  I can hand it to you, if you like.

9    A    Basically the conclusion was again similar to what

10  A1C found that there was no credible imminent or identifiable

11  threat.

12    **Q**    Based upon the A1C report or the Camelot report, in

13  your professional opinion, is there any reason Mr. Kershnar

14  could not be returned to the campus in a safe manner?

15    A    No.

16    **Q**    In your professional opinion, would it be

17  prohibitively expensive to return Mr. Kershnar to the campus

18  in a manner that is safe to him, to the administration, and

19  to the students?

20    A    No.

21    **Q**    There's no reason not to return him to the campus,

22  in your opinion?

23    A    Not that I am aware of.

24    **Q**    What would you advise, if you were advising in your

25  professional opinion, the SUNY campus to do, at least for the

Olivo - Direct - Covert

1    short term, in returning Mr. Kershnar to the campus?

2        A    I would implement the technologies and the sources

3    that we discussed earlier with respect to locking mechanisms.

4    And, again, I'm not familiar with the exact building that

5    Professor Kershnar works in but I am familiar with a lot of

6    the buildings on campus where they have a mechanical lock or

7    a electronic locking systems.  The electronic locking systems

8    would be accessed either by an ID card or a fob or something

9    of that nature.  If they already have that in place on that

10   door, like they do in many of the other buildings on campus,

11   it's a matter of programming.  So they could just program

12   that door or the entrance door to Professor Kershnar's

13   academic building to allow him and/or any students that have

14   classes during that timeframe access to that building while

15   he's there.  So that would secure the environment of his

16   academic building.

17           The second thing I would consider doing, as I said

18   before, would be either to provide a campus police officer or

19   a guard, at least initially while he is on campus to escort

20   him.  And also make an enhanced awareness of the dispatcher

21   whomever's assigned to camera viewing, just like they did

22   with Mr. Kolison while Professor Kershnar's there.  Professor

23   Kershnar should probably notify campus security when he's

24   leaving if they don't have a guard posted with him.  Maybe

25   they send somebody over there to escort him to and from his

Olivo - Direct - Covert

1  vehicle, follow him off campus to make sure that he's not

2  being followed from campus.  And that would be it.

3      **Q**    Are you familiar with the measures that were taken

4  on March 25th of 2022, when apparently Mr. Kolison, President

5  Kolison, indicated that he had some fear for his safety?

6      A    Yes.

7      **Q**    And what measures were those?

8      A    I believe there was a directive by Chief Isaacson

9  to his dispatcher to monitor the cameras when Professor

10 Kolison went to and from his vehicle.  And, also, there was a

11 directive to repair a panic button system that was in

12 Professor Kolison's office.  Actually at his secretary's

13 desk.

14     **Q**    And in your professional opinion, were those

15 appropriate responses to Mr. Kolison's concerns on March 25th

16 of 2022?

17     A    They're minimal at best.  I mean, there would have

18 been much -- much better responses to that concern of a

19 threat.

20     **Q**    So your -- is it your opinion that that is a low

21 level response indicating a low level threat?

22     A    Or a nonexistent threat.

23     **Q**    And up and between February 2nd of 2022 and March

24 25th of 2022 when they took these minimal measures, were

25 there any other measures put in place, especially during the

Olivo - Direct - Covert

1    weeks after February 2nd when there was the most social media

2    and internet traffic?

3        A    I'm not aware of any.

4        Q    None.  So the first measures were taken in March --

5    to your knowledge, in March 25th, 2022?

6        A    The first enhanced security measures, by that I

7    mean physical security measures that I'm aware of with

8    respect to professor -- or Dr. Kolison or Mr. Kolison.

9        Q    And could they have taken those exact same measures

10   back in February and March of 2022 to secure the safety of

11   Mr. Kershnar?

12       A    Yes.

13       Q    Was there any evidence that they reviewed those as

14   options for doing so?

15       A    Not that I'm aware of.

16       **MR. COVERT:**  Your Honor, at this time I would like to

17   move the --

18       Q    Well, I'm going to have you review the expert

19   rebuttal report, Mr. Olivo, the cover page.

20            Do you recognize that as an expert rebuttal report

21   that we submitted to the defendants?

22       A    Yes.

23       Q    And --

24       A    Yes.

25       Q    And on Page 21 of that report, you signed your name

Olivo - Direct - Covert

1    to that?

2        A    Yes.

3        Q    And there's a, also a notary who signed counter to

4    your signature?

5        A    Yes.

6        Q    And does that report accurately reflect your

7    opinions in relation to this matter?

8        A    Yes, it does.

9        Q    And is that based upon your review of the documents

10   you were provided and listening to Mr. Isaacson's testimony?

11       A    Yes.

12       **MR. COVERT:**  Okay.  We would move that and the exhibits

13   into evidence, your Honor.

14       **MS. PANTZER:**  No objection, your Honor.

15       **THE COURT:**  Received without objection.

16       Q    Going to Page 6, top of the page.

17            Is it your professional opinion that Mr. Isaacson's

18   various threat assessments from February 2nd, 2022, through

19   his retirement on June 30th of 2023, were not consistent with

20   your opinion of the threat assessment?

21       A    That is correct.

22       **THE COURT:**  Can I -- let me ask a question because

23   there's something that's troubling me.

24            One of the things that Mr. Isaacson testified to

25   was that threats were not so much what he was worried about.

Olivo - Direct - Covert

1    What he was worried about were emails and posts and things

2    like that, that were not actually overt threats but that

3    expressed concern or problems with what Professor Kershnar

4    said.

5            When you're using the word "threat assessment",

6    is that different than a risk assessment or is that the same

7    thing?

8        A    That's a great question, your Honor.  In fact,

9    those terms are often interchangeable amongst many people not

10   only in the public but in our industry.  So there's, there's

11   two different types of threat assessments, one of them is the

12   behavioral assessment that was done or that Chief Isaacson

13   was talking about.

14           The other one is by taking that data and

15   everything, you know, compiling a threat assessment from

16   that, as well as everything else such as the emails, such as

17   the voicemails that were left and taking those things and

18   then conducting a risk assessment so from the threat what is

19   the risk?  How do we move forward to mitigate that risk or,

20   you know, neutralize the risk or terminate the risk, however

21   you want to talk about, but eliminate the risk.

22           And so it happens every day.  I mean, quite

23   frankly, there's people in this courthouse every day that

24   have had many things on social medial or in the news written

25   about them derogatorily.  No offense, but Mr. Covert should

Olivo - Direct - Covert

1    probably be under protection 24 hours a day if -- in order to

2    go down that road.  So by taking all of that data, then you

3    assess the risk and that's where the risk assessment comes.

4        THE COURT:  Is that what we're talking about now?

5        THE WITNESS:  We're talking about the risk assessment

6    and how we would mitigate any risk.

7        THE COURT:  Right.  And so when you say "threat

8    assessment", that's not based solely on threats, it's based

9    on the entire threat scan, also postings that might not be

10   direct threats but that might create a risk?

11       THE WITNESS:  Right.  You have to take all of that into

12   account.

13       THE COURT:  So you're using threat assessment and risk

14   assessment interchangeably here; is that right?

15       THE WITNESS:  That's correct.

16       THE COURT:  Okay, thank you.

17       I'm sorry, Mr. Covert, to interrupt but I just wanted

18   to --

19       MR. COVERT:  No.  And I really would urge the Court to

20   ask any relevant questions because I think that this should

21   be more of a conversation so that the Court's satisfied with

22   whatever conclusions it makes because those are good

23   questions and that's obviously not our area of expertise and

24   we rely upon these experts to do that.  So I'm just trying to

25   formulate the right questions.

Olivo - Direct - Covert

1      If I could have one moment, your Honor.

2      **THE COURT:**  Sure.

3      **Q**    Mr. Isaacson testified that, in his opinion,

4  allowing Dr. Kershnar back on campus would create a situation

5  even more dangerous than it faced in February of 2022,

6  correct?

7      A    I believe so.

8      **Q**    Do you agree with his assessment?

9      A    I do not.

10     **Q**    Why?

11     A    Because there's been no quantifiable or

12 identifiable evidence that there is any threat, whether it be

13 imminent or, you know, displayed, there's nothing that we can

14 identify, no credible, no imminent or likely threat to either

15 Dr. Kershnar or the campus at the current time.

16     **Q**    You heard Mr. Isaacson also opine that the lack of

17 a threat does not mean that there is not a threat and use

18 that as a justification to ban Mr. Kershnar from the campus,

19 correct?

20     A    Correct.

21     **Q**    Do you agree with that opinion?

22     A    I don't agree with it.  But I also would like to

23 point out that, for all intents and purposes, Professor

24 Isaacson still is on the campus and employed.

25     **Q**    Professor Kershnar.

Olivo - Direct - Covert

1    A    Professor Kershnar, I'm sorry.

2        He still is on the campus and employed.  He's on

3   the website.  There is nothing to indicate that he's not

4   working there.

5    Q    So, in your opinion, individuals who would look at

6   the campus website would still be under the belief that he is

7   still employed by the campus, teaches at the campus, that

8   there's no reason to believe that he has been severed from

9   the campus?

10   A    Not to my knowledge.

11   Q    And why is that significant to your opinion?

12   A    Because in following Chief Isaacson's train of

13  thought, those people who are not making direct threats have

14  had well over a year and a half now to take any action.

15  Knowing that he is still employed by that university, they

16  have not taken, you know, they have not taken any action to

17  terminate him or make him not an employee of theirs.  So, by

18  doing so, there was some threats communicated to the

19  university as a whole, if you want to call it a threat, where

20  you need to get rid of this guy, those type of things, those

21  were things that were included in Chief Isaacson's assessment

22  as a threat.

23       I would say, in my opinion, that that is not a

24  direct threat.  But in doing so, by these people

25  communicating that -- this is back in February, of course, of

Olivo - Direct - Covert

1   2022 -- but they're saying that they want this guy off

2   campus.  He's never been taken off the campus in terms of

3   being employed there.  So there's not been any action that's

4   been taken or any threats or overt actions taken against the

5   campus community or Mr. Kolison as a whole since then.

6       **Q**    And --

7       **THE COURT:**  If he's put back on campus, there's going to

8   be a firestorm of media attention and emails and Tweets and

9   all sorts of stuff, right?

10      **THE WITNESS:**  I do not disagree with that, your Honor.

11      **THE COURT:**  Okay.  And don't you think that that would

12  increase the risk of some crazy bringing a gun to campus and

13  start an issue?

14      **THE WITNESS:**  Not any more than it did in February of

15  2022.

16      **THE COURT:**  But he was taken off in February of 2022,

17  right?  The University took some steps to get him off campus

18  in February 2022?

19      **THE WITNESS:**  They took steps but, but nobody else on

20  campus was threatened -- I think the argument is also that

21  it's not just Professor Kershnar.  I heard Chief Isaacson

22  testify that Professor Kershnar can't even teach remotely.

23  And because of that, the university and the campus as a whole

24  and their administration are a target of unknown actors.

25      So, even if he's not physically on the campus, Chief

Olivo - Direct - Covert

1  Isaacson is arguing that there's still a threat.  He is not

2  physically on the campus right now; however, there's been no

3  actions.

4       **THE COURT:**  And you don't think the risk is going to

5  increase if he's brought back on?

6       **THE WITNESS:**  I believe the chatter will increase and if

7  there's an identifiable threat at that time, they can

8  mitigate it.

9       I guess my question, your Honor, are we talking about

10  threats to Dr. Kershnar or threats to the campus --

11       **THE COURT:**  Well --

12       **THE WITNESS:**  -- as a whole?

13       **THE COURT:**  -- you're using the word "threat", and I

14  want to use the word "risk".

15       **THE WITNESS:**  Risk, okay.

16       **THE COURT:**  And I want to use the word "risk".  Because,

17  you know, I see both sides of this.  I see both sides of this

18  issue.  And one of the real concerns I have is the increased

19  chatter that's going to happen when he's back on campus.  And

20  based on what Mr. Isaacson said, that increased attention is

21  going to increase the risk and I don't see how that's not

22  true.  I mean, that just seems to be a given that the risk

23  has to increase.  The question is how much and whether it's

24  enough to ban him forever, right?  That's, that's got to be

25  the question.

60

Olivo - Direct - Covert

1      **THE WITNESS:**  I think that's valid.  And I think the

2   other part of the equation has to be:  Can the risk be

3   mitigated while he is on campus?

4          And I would just, if I may, your Honor, just point out

5   that there are people every day that work in schools, college

6   campuses and I would submit that there's probably people on

7   SUNY Fredonia campus right now that have direct, credible

8   threats made against them.  They have restraining orders

9   against the people who have made those direct, credible

10  threats but, yet, they not only work on the campus and, for

11  instance -- and here's -- here's a real life example.

12  Domestic violence victims, they go to work every day and we

13  know that they're under a threat.  They have restraining

14  orders against the actors who have threatened them but

15  they're on college campuses.  They're in school districts and

16  such, so.

17     **THE COURT:**  Okay, go ahead.  Again, I'm interrupting you

18  and I shouldn't.

19     **MR. COVERT:**  No, not at all.  Please.  As you know, you

20  are the one making the ruling, your Honor, so you get --

21     **THE COURT:**  No, I know.

22     **MR. COVERT:**  You get to ask the right questions.

23     **THE COURT:**  I know.  But as I said when we started this

24  proceeding, I told myself I wasn't going become a lawyer and

25  I was going to be a judge and now I'm somewhere close to that

Olivo - Direct - Covert

1    line.

2         **MR. COVERT:**  You have an open invitation to continue,

3    your Honor.

4         **THE COURT:**  Thank you.

5         **Q**    So the judge was just asking you about the

6    possibility, and it's speculative, but the possibility that

7    if Mr. Kershnar's returned to campus, that the controversy

8    reignites.

9              Do you believe that, in your professional opinion,

10   that the returning to the campus and reigniting the attention

11   to the SUNY Fredonia campus would be perpetual, in

12   perpetuity, or in your professional opinion, is that

13   something that will increase and then dissipate over time?

14        **A**    I don't believe, in my opinion, that it would be

15   any different than the initial actions that were taken by

16   people online or the words that were expressed or the

17   opinions that were expressed.  I believe it would be a

18   short-lived thing that would die out.

19        **Q**    And, again, I would note that, in your professional

20   opinion, that when this controversy came about in February of

21   2022, there -- the campus did not enhance any security

22   measures in your professional opinion?

23        **A**    To my knowledge, they did not.

24        **Q**    Okay.  But in this instance, if we were to return

25   Mr. Kershnar to campus, acknowledging, as you did in your

Olivo - Direct - Covert

1    colloquy with the Court, that there would be an increase of

2    risk to the campus, what measures would you deem to be

3    appropriate at least for the short term, to return him to

4    campus to provide for his safety, the safety of campus

5    officials and the safety of the students?

6        A    So, it would be several different components.  One

7    would be the physical security of the building that he works

8    in and/or has an office in.  Both locking it down during the

9    hours -- not locking it out.  Those terms are usually

10   interchanged as well.  Locking down that building, only

11   allowing access to people who need to be there when Professor

12   Kershnar is there.

13           Having a either a SUNY police officer, off-duty

14   police officer or a armed guard from a private security

15   company on campus with him.  Having enhanced monitoring of

16   the video systems that they have in place -- and they have a

17   robust camera system in place.

18           So, all of those things.

19           And there is one thing that was suggested in the

20   A1C report that I would also agree with and concur with.  And

21   that is that continuous monitoring of the electronic

22   footprint and social media be conducted.  And they could

23   engage a firm like A1C to do that.

24       Q    Showing you what's been marked and is now in

25   evidence as Attachment 9 to Exhibit, Plaintiff's Exhibit 98,

Olivo - Direct - Covert

1   can you identify that document?

2        A    Yes.

3        **THE COURT:**  99?

4        **MR. COVERT:**  98 is the Plaintiff's Exhibit.

5        **THE COURT:**  And it's attachment 9?

6        **MR. COVERT:**  Attachment 9.

7        **THE COURT:**  Okay.

8        **Q**    Can you identify that document?

9        A    Yes.  It is a financial analysis -- sample

10  financial analysis I did for various components such as we

11  spoke here today about enhancing security at SUNY Fredonia.

12       **Q**    And in your opinion, are these reasonable measures

13  that are not prohibitively expensive that would allow SUNY

14  Fredonia to safely bring Mr. Kershnar back on to the campus?

15       A    They would enhance the physical security

16  environment, yes.

17       **Q**    And in your estimation and your professional

18  opinion, should Mr. Isaacson have engaged in similar, maybe

19  not identical, analysis as to whether there are options that

20  would have allowed the campus to bring Mr. Kershnar back on

21  to the campus?

22       A    That would have been a reasonable and prudent

23  exercise for him to undertake.

24       **Q**    And in your professional opinion, due to your

25  training, were you in his position as the head of security at

Olivo - Direct - Covert

1    SUNY Fredonia, would you have engaged in this type of

2    analysis at various periods throughout the time that you were

3    engaged in this controversy?

4        A    Yes.

5        Q    And can you give the Court some examples as to the

6    alternative measures that you found would allow for him to be

7    brought back on to campus and the costs of those measures?

8        A    So, in -- on Page -- the first, the first paragraph

9    here where we talk about access control.  As we spoke about

10   earlier, if the building that Professor Kershnar teaches in,

11   has an access control system already on the doors to the

12   exterior, that's just a programming issue.  They could just

13   program the access control cards.

14           I will submit to you that a lot of SUNY campuses

15   have higher levels of access control and security at the

16   Dean's office and the HR office than they have anywhere else.

17   In fact, many SUNY campuses, you need an access control card

18   to get into the Dean's office and to get into the HR office,

19   where you can walk unfettered into the buildings that are on

20   campus.  So, the same circumstance would be programmed here

21   in the building where Professor Kershnar teaches.

22           So the approximate cost for installing that system,

23   if they don't have one, is about $2,000 per door and that is

24   let's call it the retail environment in the civilian sector,

25   civilian world.  SUNY has the ability to go through state

65

Olivo - Direct - Covert

1    contracts and potentially even get it for less expensive

2    means.

3           If it is a mechanical locking system, there are --

4    which is basically a lock that a key is utilized on.  There's

5    a high security mechanical system made by a company called

6    Assa Abloy.  They're one of the foremost lock producers in

7    the world.  They can exchange the cylinder of the door for

8    $350.  That door cylinder can be replaced with an electronic

9    and mechanical cylinder where every key can be programmed.

10   So, for instance, it would be a mechanical lock with a key.

11   The key would look similar to your car key fob.  And

12   Professor Kershnar's key could work between 7 a.m. and 3 p.m.

13   or whatever hours he's going to be on campus.  After that, if

14   he put his key in that lock, it wouldn't work.

15          So the same level of access control can be done on

16   those locks and on those doors as we would have with an

17   electronic access control system.  So that would be what it

18   would cost to physically enhance the building.

19    Q    And we're not talking about every building on the

20   campus, which, as you heard the testimony, seems to have

21   enhanced locks that have been installed in the last three

22   years or so.  But you're just talking about having these

23   enhancements done to the building at which Mr. Kershnar

24   teaches, correct, and/or where university officials are

25   located?

66

Olivo - Direct - Covert

1    A    Correct.  Chief Isaacson testified that it was
2  their goal to get the academic buildings to the same level of
3  security as a K-12 campus.  And that's what we work at pretty
4  much all the time.  That's pretty much our bailiwick.  We
5  work on K-12 campuses all the time.  So if he's going to
6  enhance security for the academic building where Professor
7  Kershnar teaches, they've already put those locks in the
8  interior, presumably, on the classrooms.  This would be the
9  way to secure the exterior.

10    Q    So, scrolling down.  Then you also discussed armed
11  guard services.  If you can describe what you are referring
12  to and what the cost would be to the campus in relation to
13  providing armed guard services for the short term after he's
14  returned to campus?

15    A    Right.  So, we did an analysis, the average salary
16  of a SUNY police officer is about $64,000 a year.  If they
17  brought in someone on overtime, that would equate to about
18  $48 an hour to provide an off-duty or overtime SUNY police
19  officer.  The average rate for an armed,
20  professionally-trained licensed security guard in New York
21  State is about $75 an hour.

22    Q    And would you require that they pay that 40 hours a
23  week or just when Mr. Kershnar's on the campus?

24    A    Our suggestion would be when Dr. Kershnar's on the
25  campus.

Olivo - Direct - Covert

1      Q      And have you been able to estimate about how many

2  hours that those are, based upon his schedule?

3      A      From what --

4      Q      Or his schedule prior to him being banned from the

5  campus?

6      A      From what I've been advised, between classes and

7  office time, it's approximately ten hours a week.

8      Q      So we're looking at ten hours a week less $750 a

9  week while school is in session for armed guard services,

10  correct?

11      A      While he is on campus and --

12      Q      Class --

13      A      -- engaged in instruction.

14      Q      And you also have a section entitled social media

15  monitor.  If you can describe what that entails and what it

16  costs?

17      A      Right.  So one of the things that A1C suggested in

18  their report -- and I don't disagree with it -- would be a

19  monitoring on a monthly basis of social media going forward

20  for any threats that are communicated online or posted in

21  chat rooms, et cetera.  The average cost for that is 1,000 to

22  $1,500 per month on a single subject.  So in this

23  circumstance, it would be a single subject.  It would be just

24  with regard to Dr. Kershnar.

25              There are firms out there that conduct the same

Olivo - Direct - Covert

1    type of thing in what we call a geofenced environment where,

2    for instance, Depew School District does it.  They, they

3    subscribe to this firm that does all of their school

4    community -- monitors all traffic regarding their school

5    community and campus, as well as the immediately surrounding

6    vicinity for any type of threats, posts of that nature.  And

7    that costs about $40,000 a year to do that.  But we're

8    talking about between 1,000 and $1,500 a month to do constant

9    monitoring of Dr. Kershnar.

10       Q    And would that monitoring, in your professional

11   opinion, allow the SUNY campus to determine when they can

12   relax the safety measures that were instituted immediately

13   after returning Mr. Kershnar to the campus?

14       A    Well, that would allow them to monitor, as your

15   Honor was inquiring about, how much chatter or how much

16   online traffic is out there indicating animus toward

17   Dr. Kershnar or the campus.  And then as that died down, so

18   to speak, they could take different measures and adjust

19   accordingly.

20       Q    Now, you heard Mr. Isaacson testify that the

21   absence of a known threat that's verifiable or actionable

22   does not provide a reasonable basis to conclude that Mr.

23   Kershnar can be safely returned to the campus, correct?

24       A    Yes.

25       Q    In your professional opinion do you agree with

Olivo - Direct - Covert

1   that, do you find it to be accurate?

2       A    I do not agree with it because, again, if that was

3   the metric that we would be working under, there would be a

4   lot of people out there that wouldn't be at work every day.

5   So just because there's no threat or identifiable threat, you

6   can't say definitively that there's an imminent or credible

7   threat made.

8       Q    And based upon your experience in the military,

9   Cheyenne police, U.S. Marshal Service, how many years have

10  you been assisting schools, campuses with threat safety?

11      A    Since 2001.

12      Q    Okay.  So roughly?

13      A    22 years.

14      Q    22 years.  Has there been any -- have you ever been

15  trained through any of those occupation, services, military,

16  U.S. Marshals, that the absence of a verifiable or actionable

17  intelligence would justify banning someone from the campus in

18  perpetuity?

19      A    I've never had any training to that extent about

20  something of that nature.  Nobody's ever said that to me.

21      Q    All right.  And you have never advised any campus

22  that because we don't know who's out there and we don't have

23  any intelligence, that you should ban individuals in

24  perpetuity?

25      A    Correct, I've never advised that.

Olivo - Direct - Covert

1    **Q**    You're also familiar with events that occurred more

2    recently in relation to an FBI duty to warn that was provided

3    to the campus?

4    A    I did read some email exchanges regarding that,

5    yes.

6    **Q**    In January of 2023, correct?

7    A    Correct.

8    **Q**    And in your professional opinion, what significance

9    do you attach to the FBI duty to warn where there was no

10   ability to determine the credibility of the threat?

11   A    I would not attach any significance to it that

12   would change my opinion regarding the ability to secure

13   Dr. Kershnar and/or the SUNY Fredonia campus if he were to

14   return to work because there was no credible imminent or

15   likely threat identified.

16   **Q**    Mr. Isaacson indicated that, in his opinion, while

17   they're -- the FBI informed the campus that there was no

18   credible threat, they don't know, they don't have information

19   regarding the threat, that that, nevertheless, leads him to

20   believe in his opinion that they're still is a level of

21   threat, correct?

22   A    I believe he testified to something along those

23   lines.

24   **Q**    In your professional opinion, do you agree with

25   that assessment?

Olivo - Direct - Covert

1      A     I do not.

2      **Q**     Why is that?

3      A     Because I believe that the chatter line, or where

4    they picked up this chatter, and according to Chief Isaacson,

5    the FBI agent that asked to speak with Dr. Kershnar never

6    identified what specifics were involved in the threat.  We

7    believe there was some mention of it being in the same vein

8    as Jeff Bezos and some others, so.

9      **Q**     Your Honor, if we could, this might be a good time

10    to take a break so I could just review my notes and make sure

11    I've covered everything I need to.

12      **THE COURT:**  Okay, let's do that.  We'll come back at --

13    what time is it now?  We'll come back at ten after 11.

14      **MR. COVERT:**  Thank you.

15      **THE COURT:**  Thanks.

16      (**WHEREUPON**, recess taken.)

17      (Open court:)

18      **THE CLERK:**  We are back on the record for the

19    continuation of the evidentiary hearing in case number

20    23-CV-525, Kershnar v. Kolison, et al.

21      All counsel and parties are present.

22      **MR. COVERT:**  Thank you, your Honor.

23      First, an ad ministerial matter.

24      In relation to Plaintiff's Exhibit 98 which has been

25    entered into evidence, there's a redacted version that is on

72

Olivo - Direct - Covert

1   file at the ECF number 58.  The parties have agreed that

2   we're going to utilize that version for public purposes.

3        **THE COURT:**  What's been redacted?

4        **MR. COVERT:**  There's been redaction from the Camelot

5   report of identifying information in relation to

6   Mr. Kershnar's Social Security number, date of birth --

7        **THE COURT:**  Oh, okay.

8        **MR. COVERT:**  -- address, things of that nature.

9        And there's also the attachment of the previously

10  admitted memo in relation -- from March 25th of 2022 in

11  relation to Mr. Kolison's security concerns.  There was some

12  personal identifying information in there, as well.

13       **THE COURT:**  Yeah, that's --

14       **MR. COVERT:**  They both --

15       **THE COURT:**  It's all personal identifying information,

16  is that right?

17       **MR. COVERT:**  Yes.

18       **THE COURT:**  That's fine, thank you.

19       **Q**    Mr. Olivo, you also heard Mr. Isaacson testify in

20  relation to forwarding the threatening emails and

21  communications to law enforcement, in his opinion they would

22  not be able to identify the individuals who sent those

23  messages just from their email addresses, the names that are

24  associated with those accounts, correct?

25       A    Yes.

Olivo - Direct - Covert

1    **Q**    And this morning, the -- the defendants filed a

2    amended exhibit list document 62 on ECF which lists a number

3    of addresses from individuals who apparently sent concerning

4    messages, correct?

5        A    Email addresses?

6    **Q**    Email --

7        A    Yes.

8    **Q**    -- addresses, yeah.  And what did you do upon

9    receipt of those email addresses in reviewing this document?

10       A    In this short period of time that we had, I

11   utilized your computer to look up and identify those persons.

12   **Q**    And were you able to identify those persons

13   including home addresses?

14       A    The ones that I ran, yes.

15   **Q**    Now, is it fair to state that in your role in the

16   military, with the Cheyenne police, with the U.S.

17   Marshals, and in now as a private investigator for some 22

18   years providing security assessments and advice to various

19   K through 12 campuses, universities and health care campuses,

20   that your bias or your goal is always to protect the

21   individuals that are under your custody if you're in the

22   military or U.S. Marshals or that are on the campuses if it's

23   for the various K through 12 and university and hospital

24   campuses?

25       A    Yes.

Olivo - Direct - Covert

1    Q    It's always for the protection of others?

2    A    Yes.

3    Q    And are you personally familiar with the SUNY

4    Fredonia campus?

5    A    Yes, I am.

6    Q    How often do you believe you've been on that

7    campus?

8    A    Probably at least 50 times.

9    Q    Five zero times?

10   A    Yes.

11   Q    And have you spoken with -- in the past not in

12   relation to this matter -- have you spoken with campus

13   police?

14   A    I spoke with the former chief of police out there.

15   Q    Regarding security?

16   A    Yes.

17   Q    And why have you been on the SUNY campus some 50

18   times?

19   A    Both of my daughters are alumni of SUNY Fredonia.

20   Q    In your professional opinion and your personal

21   opinion given your ties to the campus, are you comfortable in

22   advising the Court that if Mr. Kershnar is returned to the

23   campus under the alternative safety measures, at least for

24   the short term that you've advised, that he would be able to

25   do so safely in relation to his own safety, in relation to

75

Olivo - Cross - Pantzer

1    the campus officials and the students on campus?

2        A    I do believe that if enhanced security measures as

3    recommended were implemented, that Professor Kershnar can be

4    returned to campus.

5        Q    And these are the measures that you testified to

6    and those that you provided as attachment 9 to Exhibit 98

7    which is your assessment report, correct?

8        A    Correct.

9        Q    Expert report.

10   **MR. COVERT:**  Thank you.  Nothing further.

11   **CROSS-EXAMINATION BY MS. PANTZER:**

12       **Q**    Mr. Olivo, hi.

13       A    Good morning.

14       **Q**    My name's Alyssa Pantzer.  I'm an assistant

15   attorney general with the office of the New York State

16   Attorney General.  I'm going to ask you some followup

17   questions.

18            First, you've never been the chief of campus police

19   for a university, correct?

20       A    Correct.

21       **Q**    So you have no direct experience defending a

22   college campus from security threats, is that true?

23       A    I've never been a chief of police or a campus

24   security director.

25       **Q**    So, you testified that you've been on the SUNY

Olivo - Cross - Pantzer

1  Fredonia campus some 50 times; is that correct?

2      A    (No audible response.)

3      Q    Because -- that's a yes?

4      A    Yes, both of my daughters were alumni.

5      Q    Okay.  And in, in going to the SUNY Fredonia

6  campus, you didn't learn the geography intimately, did you?

7      A    I could pretty much tell you, even though I can't

8  name the buildings, I can tell you I've been on every inch of

9  that campus.

10     Q    You've been on every --

11     A    I've been --

12     Q    -- inch of the 250 acre campus?

13     A    We've walked it, we've driven it.  We've -- I've

14  had dinner there many times and, yes, I've spent a lot of

15  time there.  I've been in the Rockefeller Arts Center at all

16  hours of the day and night helping them build sets for

17  theater and -- yes.

18     Q    So you're aware that the campus is 256 acres?

19     A    I wasn't aware exactly the size of the campus.

20     Q    You weren't involved with the security assessments

21  contemporaneously with Professor Kershnar's appearance on the

22  podcast, were you?

23     A    No, I never conducted a security assessment

24  regarding that.

25     Q    And beyond the documents that you've been provided

Olivo - Cross - Pantzer

1    and the testimony that you've heard from Chief Isaacson, you

2    have no personal knowledge of the measures that were taken to

3    safeguard the campus in the days and weeks following

4    Professor Kershnar's appearance on the podcast, do you?

5        A    Other than what I've been provided and Chief

6    Isaacson's testimony, I do not.

7        Q    You testified on direct with regard to the note

8    that was left on Professor Kershnar's office door, do you

9    recall that testimony?

10       A    Yes.

11       Q    You testified -- you indicated in your testimony

12   that there could have been further steps taken to investigate

13   who placed that note on Professor Kershnar's door; is that

14   correct?

15       A    Correct.

16       Q    Do you even know whether there's cameras monitoring

17   that area?

18       A    I don't know that.

19       Q    Okay.  You also testified on direct that if you

20   were sitting in Chief Isaacson's seat, you would have added

21   armed guards, right?  At the time?

22       A    With respect to Professor Isaacson -- or, excuse

23   me, Professor Kershnar?

24       Q    Yes.

25       A    I would have enhanced security measures around

Olivo - Cross - Pantzer

1  Professor Kershnar.

2      **Q**    Right.  You would have added guards?

3      A    That's one of the components.

4      **Q**    You would have asked for increased camera

5  monitoring, right?

6      A    Correct.

7      **Q**    So there was, in your opinion, some threat, right?

8      **MR. COVERT:**  I object.  She's putting words in his

9  mouth.

10     **THE COURT:**  No.  This is cross-examination, no.

11     Overruled.

12     A    If there were a credible, imminent and identifiable

13  threat, I would have taken the steps to enhance security

14  around Professor Kershnar to include increased camera

15  monitoring, providing an armed escort or armed guard service,

16  and also enhancing a lockout or advising of a lockout

17  position in his academic building.

18     **Q**    Right.  And you testified that's what Chief

19  Isaacson should have done, didn't you?

20     A    If there was an imminent and credible threat to

21  provide -- for Professor Kershnar to stay on campus, that

22  would have been the steps I would have taken.

23     **Q**    So, was there or wasn't there?

24     A    Not that I know of.  I've not been advised of any

25  imminent or credible threat that existed.

Olivo - Cross - Pantzer

1    **Q**    Okay.  And you feel that SUNY Fredonia did nothing

2  in the days and weeks following Professor Kershnar's

3  appearance on the podcast to increase security; is that

4  correct?

5    A    I don't see any evidence of the increased security,

6  physical security.

7    **Q**    They didn't increase physical or tactical security,

8  is that your testimony?

9    A    Correct.

10    **Q**    Okay.  But they implemented preventative measures,

11  didn't they?

12    A    What would that be?

13    **Q**    By removing Kershnar from campus?

14    A    I don't know that that would be called preventative

15  measures.

16    **Q**    You don't agree that that's a preventative measure?

17    A    I don't agree with it, no.

18    **Q**    But, at a minimum, you would agree that they did

19  something in the moments, the days and weeks following the

20  podcast appearance, right?

21    A    They did something, yes.

22    **Q**    And they also requested additional patrols at

23  Professor Kershnar's residence, right?

24    A    They advised the local law enforcement that

25  Professor Kershnar may be under a threat.

80

Olivo - Cross - Pantzer

1     **Q**    So that's yet another thing that they did to

2  increase security following Professor Kershnar's appearance

3  on the podcast, correct?

4     A    They advised local law enforcement, yes.

5     **Q**    Okay.  We've established that you're being paid to

6  be here, right?

7     A    Yes.

8     **Q**    By plaintiff's attorneys?

9     A    Correct.

10     **Q**    At a rate of $150 an hour?

11     A    Correct.

12     **Q**    And that's to rebut Chief Isaacson's testimony, is

13  that your understanding?

14     A    No.

15     **Q**    Oh.  It's not?  You're not a rebuttal expert?

16     A    I'm here to provide an opinion as to what I have

17  reviewed in terms of the evidence that was provided.

18     **Q**    Okay.  You were never a special agent with the FBI?

19     A    Correct.

20     **Q**    You've also never been involved with the National

21  Center for Analysis of Violent Crime?

22     A    Correct.

23     **Q**    You've also never undergone any rigorous training

24  in the realm of behavioral threat analysis, is that correct?

25     A    That's correct.

Olivo - Cross - Pantzer

1      **Q**    But you were a member of the U.S. Marshals?

2      A    Correct.

3      **Q**    And that was for about five years?

4      A    Seven years.

5      **Q**    Seven years.  Mr. Olivo, your LinkedIn page says it

6    was five years, your resume says it was six years, and you

7    testified on direct it was seven years.  So which -- which is

8    it?  I just want to nail that down.

9      A    It was six years and some change, yes.

10      **Q**    And that was approximately two decades ago, right?

11      A    Yeah, yes.

12      **Q**    And when you were involved with the U.S. Marshals,

13    you participated in certain security details?

14      A    Correct.

15      **Q**    In doing so, you weren't the lead threat analyst

16    for those security details, were you?

17      A    I was not a threat analyst.

18      **Q**    Right?

19      A    Correct.

20      **Q**    You were a member of the security detail but you

21    weren't the lead threat analyst for those security details?

22      A    So I think the nomenclature needs to be clear.

23      **Q**    Okay.  Go ahead.

24      A    I was never a threat analyst.  I was a team leader

25    on providing security and protection details.

82

Olivo - Cross - Pantzer

1    **Q**    So you didn't engage in any threat analysis with

2    regard to those security details?

3    A    We had a unit that did that.

4    **Q**    Okay.  But not you?

5    A    Correct, me personally, no.

6    **Q**    Okay.  And you've done threat assessments for

7    universities it says in your report at Paragraph 6; is that

8    correct?

9    A    We've done risk and threat analysis and security

10   consulting for colleges, yes.

11   **Q**    And you testified on direct you've done it for five

12   colleges; is that right?

13   A    Correct.

14   **Q**    Which are the five?  We heard about D'Youville.

15   What are the other four?

16   A    My clients have not given me permission to provide

17   all that information.  I mean, D'Youville is one that we can

18   use but we have conducted consulting with other universities,

19   yes.

20   **Q**    You're not permitted to disclose those other

21   universities?

22   A    I would have to ask the client.

23   **Q**    Okay.

24   A    I can --

25   **Q**    But you did --

83
Olivo - Cross - Pantzer

1     A     -- give you names of school campuses and school

2   districts that --

3     Q     We're going to get to --

4     A     -- we had.

5     Q     We're going to get to the K through 12 schools.

6   I'm just asking about universities right now because your

7   report indicates that you've done threat assessments for

8   universities, plural.  So I'm just trying to understand what

9   universities you've done threat assessments for.  But you're

10  telling me that that's confidential information other than

11  D'Youville, is that correct?

12    A     Just to be clear --

13    Q     Mm-hmm.

14    A     You're using threat assessments pretty broadly.

15  Threat assessments are -- we've done security consulting for

16  universities in collaboration with colleges.

17    Q     Okay.  So, is it incorrect to say that you've done

18  threat assessments for universities?

19    A     Full-scale threat assessments would not be

20  accurate, correct.

21    Q     Okay.  You testified on direct that you've worked

22  with D'Youville, is that true?

23    A     Correct.

24    Q     D'Youville, are you aware, is 27 acres?

25    A     I'm not --

84

Olivo - Cross - Pantzer

1      Q    Is that --

2      A    I'm not aware of the size of the campus.

3      Q    Does that sound approximately correct?

4      A    It's a city university, so, sure.

5      Q    And 24 of those acres, Mr. Olivo, are parking lots,

6  are you aware of that?

7      A    I am not aware of that.

8      Q    So it doesn't really compare to SUNY Fredonia's

9  256-acre campus, right?

10     A    In size, you're correct.

11     Q    Okay.  Also, D'Youville only has 15 buildings, are

12  you aware of that?

13     A    I'm not aware the exact amount of buildings but if

14  you say so.

15     Q    Compared to Fredonia's 63?

16     A    Okay.

17     Q    Okay.  So, again, not, not super comparable he

18  those two campuses, right?

19     A    Correct.

20     Q    You testified on direct that you're a member of the

21  National Association of Threat Assessment Professionals?

22     A    Correct.

23     Q    And that's called ATAP, right?

24     A    No.

25     Q    Oh, I'm sorry, what's it called.  I thought that

Olivo - Cross - Pantzer

1    was --

2         A    The National --

3         Q    -- their acronym?

4         A    -- Association of Threat Assessment Professionals

5    is different than ATAP.  It's a -- it's a different

6    organization.

7         Q    The National Association of Threat Assessment

8    Professionals is different taken ATAP.  You know, I couldn't

9    find a different website.  Is there a separate website?

10        A    I could probably find it but it's actually --

11   there's a LinkedIn group.  There's a website for it.

12        Q    How is it different from ATAP?

13        A    Because to become a member of -- there's different

14   credentialing process.  I don't need to go through a

15   credentialing process to be an organizational member of the

16   National Association of Threat Assessment Professionals, like

17   I did for the other credentials I have.

18        Q    Okay.  So you didn't have to be credentialed to

19   join the organization National --

20        A    Correct.

21        Q    Okay.  You're a partner with Corporate Screening

22   and Investigations LLC; is that correct?

23        A    Corporate Screening and Investigative Group, LLC.

24        Q    And -- so as a partner, do you own the company or

25   do you have other partners?

86

Olivo - Cross - Pantzer

1    A    I have a partner, yes.

2    Q    Okay.

3    A    We're part owners, both owners.

4    Q    And it's got locations in Fort Meyers, as well as

5    locally, right?

6    A    Correct.

7    Q    And you worked on the installation of facial

8    recognition technology at Lockport City School District in

9    conjunction with your work with CSI; is that correct?

10   A    I did not work on the installation of it.  I worked

11   on consulting with the school district, as well as the

12   developers of the technology.

13   Q    Well, you're involved with -- yeah, right.  You're

14   involved with SN Technologies, right?

15   A    I was a consultant for SN Technologies, correct.

16   Q    You gained financially from working with SN

17   Technologies?

18   A    I was paid as a consultant to help them develop the

19   technology for use in schools.

20   Q    And you helped implement it at Lockport City School

21   Districts, isn't that true?

22   A    I did not implement the technology.  I helped

23   consult with the Lockport City School Districts with respect

24   to the technology.

25   Q    You encouraged them to use it, right?

87

Olivo - Cross - Pantzer

1      A    I advised them that they -- they actually helped us
2  develop the technology.
3      Q    The school district helped you develop the
4  technology?
5      A    Yes.
6      Q    And that cost about 1.4 to $2.75 million to
7  implement at Lockport, right?
8      A    That includes the upgrade to all of their camera
9  systems.
10      Q    But that number is correct, 1.4 to 2.75 million?
11      A    I -- that's, yes, it's somewhere in that
12  neighborhood.
13      Q    And your company, CSI gained financially from that
14  deal, didn't it?
15      A    We were paid as consultants to help them develop
16  the technology.
17      Q    But you earned around $95,450 annually for five
18  years based on that deal, right, correct?
19      A    That is not correct.
20      Q    That's not correct?
21      A    That is not correct.
22      Q    What did CSI gain financially from that deal?
23      A    CSI made approximately -- between 2015 and the time
24  that that technology was implemented in Lockport as
25  consultants for AEGIS or SN Technologies, CSI made about

Olivo - Cross - Pantzer

1  $142,000.

2      **Q**    In total?

3      A    In total.

4      **Q**    Okay.  I want to turn now to your recommendations

5  for handling the threat in this case.  Let's start with the

6  access control.

7           You recommend that on all of the doors on the

8  Fredonia campus, right, key fob access?

9      A    So I just need to be clear, okay.  You're saying

10 handling the threat.  Can you tell me what the threat is.

11     **Q**    Well, I'm -- I'm sorry for the nomenclature.

12     A    That's okay.

13     **Q**    I'm just going to talk about your recommendations

14 in this case.

15     A    Okay.

16     **Q**    So I think it's Paragraph 34 of your expert report

17 and Exhibit B to your first disclosure, okay.  We can refer

18 to the paragraph if you want.  Would that be helpful?

19     A    Sure.

20     **Q**    Okay.

21     **THE COURT:**  What are we looking at now?

22     **MS. PANTZER:**  The expert rebuttal report at Paragraph

23 34.

24     **THE COURT:**  So this is Exhibit 98?

25     **MS. PANTZER:**  Yes, your Honor.

Olivo - Cross - Pantzer

1    **MR. BOYD:**  Subject to be swapped out for the redacted

2   version.

3    **THE COURT:**  I'm sorry.

4    **MR. BOYD:**  Subject to being swapped out for the redacted

5   version for public viewing, as we discussed previously.

6    **THE COURT:**  Yep, Thank you.

7    A    So I have it.  And, again, we're talking about

8   mitigating the risk or any legitimate security concerns not a

9   threat.  The threat would have been something that would have

10   been identifiable at the time.

11    Q    Okay.  So, minimizing the risk for any legitimate

12   security concerns.  You agree that there's a legitimate

13   security concern here?

14    A    If there's one identified.

15    Q    So these recommendations are hypothetical?

16    A    To mitigate any legitimate security concerns.  If

17   there is an identified security concern, these would be the

18   steps that we would recommend to mitigate that.

19    Q    Didn't you testify on direct that if Professor

20   Kershnar comes back on campus, these are the steps that you

21   would recommend?

22    A    Well, I testified -- can I read them all or -- but

23   these are, these are the steps, yes, mine --

24    Q    Yes.  So the answer is yes?

25    A    I, I testified as to the steps in the financial

Olivo - Cross - Pantzer

1    outline so if there is more that --

2        **Q**    If you want to -- we can go to that instead.

3            Exhibit B to the witness summary.

4        A    I just didn't know if there was more in here than

5    was in the other document.

6        **Q**    There are --

7        A    Okay.

8        **Q**    There are far more in this expert disclosure but

9    this is your most recent expert disclosure?

10       A    Okay.

11       **Q**    And you signed it.  We went over that on direct?

12       A    Right.

13       **Q**    So these are the steps that you would recommend if

14   Professor Kershnar comes back on campus, right?

15       A    Yes.

16       **Q**    Okay.  So, let's start with access control.  And

17   this is actually in and around your report at Paragraph 40.

18       **MS. PANTZER:**  Jenna, if you want to scroll.

19       **Q**    So does, so I'm -- does that orient you to where

20   I'm going here, Mr. Olivo?

21       A    Yes.

22       **Q**    Okay.  All right.  So, like I said, you would

23   recommend key fob access on all of the doors on SUNY

24   Fredonia's campus; is that right?

25       A    Well, my recommendation would be, yes.

Olivo - Cross - Pantzer

1      Q     Okay.  Are you aware of how many doors there are on
2   SUNY Fredonia's campus?
3      A     I am not.
4      Q     Would it surprise you to hear that there's
5   thousands of doors on SUNY Fredonia's campus?
6      A     Exterior entrance doors?
7      Q     Yes.
8      A     There's thousands --
9      Q     And interior, and interior?
10     A     Well, no, I'm not talking about interior.  So you
11  said there's 63 buildings, so however many exterior entrance
12  doors there are in addition to 63 buildings, many of them
13  already have it in place so you'd have to eliminate those.
14  So however many exterior entrance doors there are times the
15  buildings that don't already have them would be my
16  recommendation.
17     Q     So you're only recommending key fob access control
18  to the exterior doors of the campus buildings?
19     A     Because there's been enhanced locking mechanisms
20  and high security locks put into the interiors of the
21  building.
22     Q     That was not my question.  I'm going to repeat just
23  because I want to make sure I understand.
24           You're only recommending key fob access to the
25  exterior doors of the campus -- of the 63 campus buildings;

Olivo - Cross - Pantzer

1   is that correct?

2       A    Well, in a perfect world the whole campus, yes, but

3   in this circumstance I'm referring to where Professor

4   Kershnar's going to be.

5       Q    Okay.  So the entire campus or only where Professor

6   Kershnar's going to be?

7       A    In a circumstance where we would bring professor

8   back on to campus and provide for his security, I'm

9   recommending that these access control measures be placed in

10  the building or buildings that he is going to be in.

11      Q    And only the exterior doors of those buildings?

12      A    Again, because my understanding is that there were

13  high security interior locks placed in those buildings

14  already.

15      Q    What's your understanding based on?

16      A    Based upon Chief Isaacson's testimony and the

17  $500,000 security upgrades that the campus made to those

18  locking mechanisms.

19      Q    Okay.  So, just to be clear, you are only

20  recommending key fob access control to the exterior entrance

21  of the buildings where Professor Kershnar is going to be?

22      A    Correct.

23      Q    Okay.  What about the students who are not in the

24  same building as Professor Kershnar at any given time?

25      A    I don't understand.

Olivo - Cross - Pantzer

1    **Q**    Okay.  Well --

2    A    Are we looking at -- I was asked to --

3    **Q**    Let's say there's --

4    A    -- provide an opinion.

5    **THE COURT:**  One at a time.  One --

6    A    -- regarding --

7    **THE COURT:**  -- at a time.

8    A    -- Professor Kershnar's security or a circumstance

9    for bringing Professor Kershnar back on to campus.  If you

10   want to consider an analysis for all the student populous as

11   well as the staff of SUNY Fredonia, I have not done that but

12   I'm happy to opine on it.

13   **Q**    Well, you understand that it's Professor -- or, I'm

14   sorry, it's Chief Isaacson's opinion that the entire campus

15   community is at risk if Professor Kershnar is brought back,

16   right?

17   A    I believe that's his opinion.

18   **Q**    Right.  So my question to you is this:  If there's

19   only key fob access doors on the buildings where Professor

20   Kershnar is located, how do we protect the students who

21   aren't in the same building as Professor Kershnar?

22   A    You can put the same enhanced security measures on

23   the entire campus.

24   **Q**    Okay.  So you are recommending key fob access on

25   all of the doors of the campus?

94

Olivo - Cross - Pantzer

1    A    I don't believe that's what I said.

2    Q    Well --

3    A    If you're asking me an opinion regarding the campus

4  overall and security all of the students on the campus, my

5  opinion would be to lock down all of the buildings and

6  provide key fob access.  Now there's already that access on

7  those doors.  They're just not set to lock until 10 o'clock

8  at night, and I can testify to that personally because my

9  daughters were in these buildings late at night and the doors

10  weren't locked.  And that was --

11    Q    Okay.

12    A    -- a concern I actually brought up to the chief of

13  police many years ago.

14    Q    All right.  So your recommendation is to put key

15  fob access -- and so your testimony is that there's already

16  key fob access on all of the doors that you're recommending?

17    A    Not on all the doors.  I'm saying for the most

18  part, these buildings -- so, for instance, the residence

19  halls, those already have them.  The --

20    Q    Dorms?

21    A    The dorms.  The Rockefeller Arts Center has it

22  already.  It's just not utilized.  So if you want to secure

23  the campus and you want to secure the students on that

24  campus, you can utilize the systems that they already have in

25  place.  And, in fact, I would recommend that --

95
Olivo - Cross - Pantzer

1     Q     Okay.

2     A     -- whether there's a threat to Professor Kershnar

3  or not.

4     Q     Okay.  So key fob access on all of the doors to all

5  of the academic buildings on campus, that's the

6  recommendation?

7     A     That's one of them.

8     Q     Okay.  Do you have any idea how many doors that

9  would be?

10     A     I do not.

11     Q     Would it surprise you if I told you it would be

12  thousands of doors?

13     A     We've already established that there's 63

14  buildings.  I don't know how many of them would be academic

15  buildings.  So I'd have to extrapolate from there.  And I

16  don't know how many of them already have those readers on

17  them.

18     Q     And the cost is $2,000 per door, right?

19     A     If there needed to be a full installation, that is

20  the retail cost.

21     Q     And let's just say we only need to add this

22  mechanism to 500 additional doors, okay, that's about a

23  million dollars, right?

24     A     If -- I don't know that you needed to add it to 500

25  exterior doors.

Olivo - Cross - Pantzer

1    **Q**    Hypothetically.  That --

2    A    Well, I'm just trying to extrapolate from --

3    **MR. COVERT:**  I object to hypothetical statement.

4    **THE COURT:**  Sustained.

5    A    I'm just trying to extrapolate, given that there's

6    63 buildings on campus and we already know that dormitories,

7    the Rockefeller Arts Center, I'm assuming the police

8    department, the administrative building, all of these

9    buildings already have them in place, that I would say -- I

10   would submit to you that there's probably a lot less doors

11   than you realize that would need to add this system.

12   **Q**    Mr. Olivo, you don't know how many doors would need

13   to add this system?

14   A    Well, if there's 63 buildings --

15   **Q**    You don't know, though, sir, right, you have no

16   personal knowledge?

17   A    You just --

18   **Q**    You're assuming?

19   A    -- told me --

20   **MR. COVERT:**  I ask that he be permitted to answer his --

21   finish his answer.

22   A    You just told me that there's 63 buildings on

23   campus.  Given the fact that there's 63 buildings on

24   campus -- and I do know for a fact that several of these

25   buildings have these readers in place already -- so we'd have

Olivo - Cross - Pantzer

1    to deduct however many buildings that is and however many

2    doors.

3              So from that, if we're going to secure the entire

4    campus with the same system, it would just need to be added

5    on to whatever doors that were needed to be added on that

6    didn't have it already.

7        Q    Okay.  You understand that this is an open campus,

8    right?

9        A    Yes.

10       Q    It's a SUNY school?

11       A    Yes.

12       Q    Owned by the state?

13       A    Yes.

14       Q    Okay.  You can't control access to the entire

15   campus --

16       A    Correct.

17       Q    -- right?  Okay.  And this strategy, access

18   control, it just hardens the target, right, it doesn't

19   prevent the violence?

20       A    That is correct.

21       Q    Okay.  And you have a lot of experience assisting

22   with K through 12 schools, isn't that true?

23       A    Correct.

24       Q    Okay.  You agree with me that a college campus is

25   very different than a K through 12 school?

Olivo - Cross - Pantzer


1      A    Yes.

2      Q    Students in a K through 12 school don't have the

3   ability to roam freely throughout the campus, do they?

4      A    Not for, not for most school districts.

5      Q    And usually there's one access point to a K through

6   12 school, isn't that true?

7      A    That is not true.

8      Q    How many access points are there typically in a

9   K through 12 school?

10     A    Depends on the size of the school district.

11     Q    Well, at a min -- okay.  So we're just be -- let's

12  just take a high school, one high school.  There's usually

13  one access point available during the day to people who

14  aren't typically at that school, isn't that true?

15     A    In a visitor entrance?

16     Q    A visitor entrance?

17     A    Yes.

18     Q    Yes?

19     A    There's usually one single point of entrance for a

20  visitor.  That's what we recommend.

21     Q    And a visitor coming to the school is screened

22  typically before entering, aren't they?

23     A    We really hope so, yes.

24     Q    They sometimes have to present a driver's license?

25     A    Yes.

Olivo - Cross - Pantzer

1    **Q**    They sometimes need a little badge that allows them
2    to traverse the property while they're visiting, right?
3    A    (No response.)
4    **Q**    A badge that they're provided or like a little, you
5    know, tag?
6    A    Something to identify them as a visitor.
7    **Q**    Exactly.  That's what I'm talking about.  That's
8    quite typical in a K through 12 setting, isn't it, for a
9    visitor?
10    A    A single point of entry, identification be required
11    upon entry, that is the recommended protocol, correct.
12    **Q**    That's impossible on a college campus, isn't it?
13    A    It is.
14    **Q**    So in your report at Paragraph 55 where you state
15    that K through 12 schools are able to, quote, effectively
16    exclude everyone from the building besides students and
17    staff?
18    A    (No response.)
19    **Q**    That's not really relevant here, is it?
20    A    Well, we didn't read the whole thing.  If I may.
21    Where they're able to exclude everyone from the building
22    besides students and staff because a threat was made to the
23    school.
24    **Q**    Right.
25    A    And that's called a lockout.  So they're able to do

Olivo - Cross - Pantzer

1   that in a K through 12 school.  If they --

2        **Q**    You can't do that on a college campus, though?

3        A    Well, I would hope if there was an active threat

4   made to SUNY Fredonia where somebody says I'm coming to kill

5   you or posted something online with a video with them holding

6   a gun threatening to kill people on campus, that they would

7   enhance their security measures and go to a lockout

8   circumstance.

9        **Q**    But they can't exclude everyone from a 256-acre

10  campus, can they?

11       A    They can't exclude them from coming on campus but,

12  per Chief Isaacson's testimony, they are trying to make their

13  academic buildings similar to a K through 12 building.  So if

14  that's the goal and that's what they would like to do and

15  that's the standard, they can secure that campus in the same

16  manner a K through 12 building can be --

17       **Q**    Right.

18       A    -- secured.

19       **Q**    They can potentially secure some of the buildings

20  but they can't secure the entire 256 acre property, sir?

21       A    Oh, no, not without putting up a wall.

22       **Q**    Right?

23       A    Or --

24       **Q**    Exactly.  Or barbed wire, right?

25       A    Yeah.

Olivo - Cross - Pantzer

1      **Q**    Okay.  And with this additional access control that
2  you're recommending, you would agree there's going to be some
3  disruption, right?

4      A    In terms of?

5      **Q**    What if a student forgets their key fob?  What if a
6  student wants to hold the door for the student behind them?
7  This is an open campus.  Would you agree that it's going to
8  cause some disruption if every single door is locked by key
9  fob access only?

10     A    Well, if the student forgets the key fob, then they
11  couldn't get back into their dormitory, either, so that would
12  raise an issue.  So you'd have to get access to the dorm or
13  wherever else they were going to need that fob for.  So that
14  would be an issue -- it's probably an issue that exists
15  today.  As far as what you describe, someone holding a door
16  open -- it's called piggybacking -- yes, that's a concern.
17  It's a concern in K through 12.  It's a concern on college
18  campuses where there's secure environments, it is a concern.

19     **MS. PANTZER:**  Your Honor, we have ten minutes until you
20  wanted to take a break.  I'm about to start another section,
21  do you want me to --

22     **THE COURT:**  We can break now.  Are you asking to break
23  now?

24     **MS. PANTZER:**  Well, if it's convenient -- yeah, sure,
25  yes.

Olivo - Cross - Pantzer

1      THE COURT:  Okay.

2      MS. PANTZER:  I mean, I'm about to start another section

3   so I feel like --

4      THE COURT:  We'll break now.

5      MS. PANTZER:  Okay, thank you, your Honor.

6      THE COURT:  Why don't you folks come back at quarter to

7   2.  I may be done by then.  I may not be done by then.  But

8   if I'm done, we can resume because I'll be in the courtroom

9   then, okay.

10     MR. COVERT:  Thank you, your Honor.

11     THE COURT:  Anything we need to put on the record before

12  we break from the plaintiffs?

13     MR. COVERT:  No, your Honor.

14     THE COURT:  From the defendants?

15     MS. PANTZER:  No, your Honor.

16     THE COURT:  Okay.  We'll see you folks at quarter of 2.

17     (**WHEREUPON**, recess taken.)

18     (Open court:)

19     THE CLERK:  We are back on the record for the

20  continuation of the evidentiary hearing in 23-CV-525,

21  Kershnar v. Kolison, et al.

22     All counsel and parties are present.

23     THE COURT:  Okay.  I remind the witness that he's still

24  under oath and you may continue.

25     MS. PANTZER:  Thank you, your Honor.

Olivo - Cross - Pantzer

1    **Q**    Mr. Olivo, we're going to continue working through

2   your recommendations in this case.

3         Were Kershnar to -- I'm sorry, were Dr. Kershnar to

4   return to campus.  I think your next suggestion is

5   potentially armed guards to protect Dr. Kershnar; is that

6   correct?

7    A    Or providing police escorts, yes.

8    **Q**    Okay.  You're not familiar with the Taylor Law, are

9   you?

10   A    (No response.)

11   **Q**    The Taylor Law?

12   A    (No response.)

13   **Q**    Union rules for state employees?

14   A    No.

15   **Q**    Okay.  What about the labor rules in New York

16  State, you're not familiar with those either, are you?

17   A    I'm ...

18   **Q**    No, okay.

19   A    No.

20   **Q**    Are you aware that the SUNY police force is

21  unionized?

22   A    I would imagine they would be.

23   **Q**    And the terms and condition of their employment is

24  covered by union contract with the state, you understand

25  that?

Olivo - Cross - Pantzer

1     A     If you say so.

2     Q     Okay.  And if the state were to employ armed guards

3  for Dr. Kershnar, they would have to negotiate outside of the

4  contract; do you understand that?

5     A     I'm not familiar with what their --

6     Q     Okay.

7     A     Collective bargaining agreement says or any of

8  their contract.

9     Q     Okay.  You would agree that many kids first time

10  away from home is when they go to college, right?

11     A     Or the military, yes.

12     Q     Right.  Your daughters' first time away from home

13  was --

14     A     Yes.

15     Q     -- going to SUNY Fredonia?  So being on campus,

16  first time away from home with armed guards roaming around

17  might be a little frightening, right?

18     A     Are you saying that I suggested that armed guards

19  roam around?

20     Q     Well, okay.  Even having armed guards protect

21  Kershnar might be a little frightening for kids first time

22  away from home, right?

23     A     Well, they arm -- they have armed police officers

24  already on campus.

25     Q     Right.  But specific to Professor Kershnar could

Olivo - Cross - Pantzer

1    frighten students of his, right?

2        A    There --

3        Q    To see armed guards protecting him?

4        A    There would be a methodology where a plainclothesed

5    armed officer agent would be able to protect him.

6        Q    Okay.  But you suggest armed guards only for

7    Dr. Kershnar, right?

8        A    In this circumstance I suggested one of the

9    methodologies for mitigating a risk to Dr. Kershnar would be

10   to provide an armed escort for him, yes.

11       Q    Right.  Mitigating the risk only to Dr. Kershnar,

12   right?

13       A    Correct.

14       Q    Not to the students?

15       A    That would be what the campus police are there to

16   do.

17       Q    Right.  But the campus police aren't armed guards

18   watching over the students all day, right?

19       A    They are armed police officers watching over the

20   entire campus population all day.

21       Q    Okay.  But back to your suggestion:  Only for

22   Dr. Kershnar, right, the armed guards would only be for him?

23       A    In this circumstance as one of the methodologies

24   for bringing Dr. Kershnar back to campus, I recommended an

25   armed guard or a police officer be with him, yes.

Olivo - Cross - Pantzer

1    **Q**    Okay.  Not for the president?

2    A    No.

3    **Q**    Not for any of the other administrators or

4    decision-makers on SUNY Fredonia's campus, right?

5    A    I did not recommend that, no.

6    **Q**    Okay.  And not for anyone else who received threats

7    here, just Dr. Kershnar, right?

8    A    Dr. Kershnar was allegedly the target of the

9    threats.

10    **Q**    Well, there was evidence presented with Chief

11    Isaacson that there were threats to the campus community as a

12    whole, right?

13    A    I don't recall that.

14    **Q**    Okay.  We'll show you some down the line a little

15    bit.  But there was also evidence presented with Chief

16    Isaacson that there were threats made to administrators,

17    including the President, right?

18    A    To my recollection, there was a concern by the

19    President of him contacting Chief Isaacson regarding his

20    concern for his security, if that's what you're referencing.

21    **Q**    What about the threat that we presented into

22    evidence, Exhibit 27, a voicemail stating:  I'd like to,

23    quote, punch the President in the F'ing face and we're coming

24    for you, that's a threat to the President, isn't it?

25    A    I would consider that as a threat to the --

107

Olivo - Cross - Pantzer

1       **Q**    But --

2       A    -- president.

3       **Q**    You don't suggest armed guards for the President,

4    just for Dr. Kershnar?

5       A    Well, Chief Isaacson didn't take that threat

6    seriously obviously because he didn't increase any security

7    with respect to Mr. Kolison.

8       **Q**    That wasn't my question.  My question was whether

9    or not you suggested any armed guards for the President based

10    on that threat?

11       A    I did not.

12       **Q**    Okay.  You also suggested stationing an armed guard

13    outside of Dr. Kershnar's classroom, right?

14       A    In the hallway, yes, in the vicinity of his

15    classroom.

16       **Q**    That also would do nothing to protect students who

17    aren't in Dr. Kershnar's immediate vicinity; is that right?

18       A    It would enhance security only for the students

19    within Dr. Kershnar's classroom or immediately in his

20    vicinity.

21       **Q**    So that's a yes to my question, does nothing to

22    protect the students outside of Dr. Kershnar's immediate

23    vicinity, that's a yes?

24       A    I can't just answer that yes or no.  Because,

25    again, the scope here is with respect to Dr. Kershnar and

Olivo - Cross - Pantzer

1    securing him in this environment.  The campus police are

2    responsible for security of the entire student population, as

3    well as the rest of the people on the campus.  So, that would

4    already be in existence, if that's what you're asking.

5        Q    Well, again, you were here for Chief Isaacson's

6    testimony --

7        A    Correct.

8        Q    -- right?  And he testified that he has a concern,

9    in his opinion, the entire campus community is threatened by

10   Dr. Kershnar's return to campus, you heard him testify to

11   that, right?

12       A    I understand that that is his concern.

13       Q    Right, okay.  You also suggested hiring off-duty

14   police officers; is that right?  In your report?

15       A    Yes.

16       Q    And that's at Paragraph 42.  If you need to see.

17            Off-duty police officers would only be necessary

18   while Dr. Kershnar's on campus in your opinion?

19       A    Correct.

20       Q    Okay.  And, again, what about the students on

21   campus when Dr. Kershnar isn't?  This measure would do

22   nothing to protect them, right?

23       A    And, again, that's what campus police are there

24   for.

25       Q    So it's your contention that the campus police, the

Olivo - Cross - Pantzer

1    SUNY Fredonia campus police, two to three officers on duty at

2    any one time can protect a campus of 3,000 students and 256

3    acres by themselves?

4         A    If you're asking --

5         Q    In this heightened risk environment?  Is that your

6    testimony?

7         A    When you say a heightened risk environment, can you

8    tell me exactly what you're speaking of in terms of a

9    credible or imminent threat.

10        Q    Well, you suggested certain security measures if

11   Dr. Kershnar were to return to campus?

12        A    Correct.

13        Q    Armed guards for Dr. Kershnar, right, further

14   access control on doors?

15        A    Correct.

16        Q    Okay.  So, in that environment, in that height --

17   obviously you believe that there's a heightened risk, right,

18   because you're suggesting additional security measures for

19   Dr. Kershnar if he were to return?

20        A    I don't believe that at all.

21        Q    So the heightened risk is only for Dr. Kershnar, in

22   your opinion?

23        A    No.  I'm saying that I don't see any evidence that

24   there is a heightened risk or credible threat.  That is an

25   opinion that was rendered by Mr. Isaacson when there is no

Olivo - Cross - Pantzer

1   credible, imminent or likely threat that has been tendered

2   with respect to this issue.

3       **Q**     But you testified earlier before lunch that if

4   Dr. Kershnar were to return to campus, the items in

5   Paragraph 34 of your report would be necessary, right?

6       A     I --

7       **Q**     That's what you testified to before lunch, Mr.

8   Olivo.

9       A     I don't believe I said that they would be

10  necessary.  I would say that they are suggested as a

11  heightened security measure.

12      **Q**     In light of a heightened risk?

13      A     I did not say that.

14      **Q**     Okay.  In your work serving as security detail --

15  helping with security detail for certain prominent

16  individuals that you mentioned in your report, it's important

17  for the protected individual to be cooperative with his

18  detail, isn't it?

19      A     The answer is yes and no.  I mean, there are

20  circumstances where we have protected high risk and high

21  threat prisoners that weren't always necessarily cooperative.

22  But, in general, a protectee, yes, it would be preferable if

23  they were cooperative with the protective detail.

24      **Q**     You'd want to know about any threats that were

25  issued to them, wouldn't you?

                    Olivo - Cross - Pantzer


1       A    Preferably.

2       Q    So, that leads me to my next point.  You also

3   suggested that Dr. Kershnar should just use the Rave app,

4   right, which will notify local police when Mr. Kershnar

5   activates it; is that correct?

6       A    I never suggested that.

7       Q    Oh.  Okay, let's turn to Paragraph 34 of your

8   report, the ninth bullet.

9            Right there, Jenna.

10           And again, this is the report you signed, right?

11      A    (No response.)

12      Q    Mr. Olivo.

13      A    Yes.

14      Q    Okay.  So I'm going to read the ninth bullet for

15  you, temporarily moving -- I'm sorry, next one, instructing

16  Kershnar to download and use the Rave guardian app, did I

17  read that correctly?

18      A    That is in that report, yes.

19      Q    Okay.  So --

20      A    I, I --

21      Q    -- you did suggest --

22      A    I apologize.  I thought you meant in terms of my

23  testimony.

24      Q    That's okay.  I understand.

25           So you did suggest that Dr. Kershnar implement

112

Olivo - Cross - Pantzer

1  usage of the Rave app to mitigate his security risk, correct?

2      A    That is one of the tools that are available, yes.

3      Q    Okay.  And, again, the app, the usage of the app by

4  Dr. Kershnar, again, that only protects him, right?

5      A    Correct.

6      Q    Okay.  And you would require, if it were -- if you

7  were Chief Isaacson and you were asking Dr. Kershnar to use

8  the Rave app, you would require him to use the app, right?

9      A    I would suggest that he use it.

10      Q    And it would be helpful if he cooperated with that

11  suggestion, right?

12      A    It would, it would enhance his personal security.

13      Q    So you're aware that Dr. Kershnar received

14  threatening communications but failed to report them to Chief

15  Isaacson, right?

16      A    I did not have knowledge of that.

17      Q    You were --

18      A    For his --

19      Q    -- here for Chief Isaacson's testimony, right?

20      A    Yes.

21      Q    You don't recall him testifying that Dr. Kershnar

22  failed to provide his threatening communications to Chief

23  Isaacson?

24      A    I don't know.  I mean, I understand that he may

25  have failed to provide them.  I don't know that I have any

Olivo - Cross - Pantzer

1   details with respect to those threats.

2       **Q**    You also suggested moving Dr. Kershnar's classes

3   and office locations to areas that are not publicly

4   disclosed, right?

5       A    That would be one way.

6       **Q**    Okay.

7       A    Yes.

8       **Q**    Once again, not to sound like a broken record,

9   that's just for the protection of Dr. Kershnar, right?

10      A    To mitigate the threat and risk to Dr. Kershnar,

11  yes.

12      **Q**    Okay.  Some people, you would agree, would have to

13  be notified of the location of Dr. Kershnar's office, right?

14      A    Oh, yes.

15      **Q**    His students would have to know where his office

16  was?

17      A    Correct.

18      **Q**    And some people would have to be notified of where

19  his classes are, right?

20      A    Correct.

21      **Q**    His students predominantly?

22      A    Correct.

23      **Q**    So that information can't be completely private?

24      A    Well, when I -- when it mentions the location that

25  is not publicly disclosed, I meant that it was not provided

Olivo - Cross - Pantzer

1    on social media or on the website, or Facebook pages, those

2    type of things.

3        Q    You also suggest additional security camera

4    monitoring; is that correct?

5        A    Correct.

6        Q    Okay.  You disagree with Chief Isaacson that

7    cameras aren't preventative?

8        A    I, I do not disagree with Chief Isaacson with

9    respect to the proactive utilization of cameras if they are

10   properly monitored.  However, it is probably not able -- one

11   person is not able to monitor 300 cameras.  However, if

12   there's an enhanced directive to monitor certain cameras,

13   that would allow it to be monitored on a consistent basis.

14       Q    Okay.  So you agree with Chief Isaacson that

15   cameras are not preventative?

16       A    They can be preventative in the right circumstance.

17       Q    And that's because you feel that cameras can be

18   used to identify weapons, right?

19       A    No, cameras can be used to identify many different

20   things in terms of threats.  Chief Isaacson, himself,

21   actually testified to looking into various technologies for

22   proactive utilization of camera systems which I agree with.

23   There are technologies out there that would allow cameras to

24   be utilized to identify vehicles that aren't supposed to be

25   there, people that aren't supposed to be in certain

Olivo - Cross - Pantzer

1    locations, weapons, all of those things.

2        **Q**    Right.  So one of the things that cameras can be

3    used for is identifying weapons, in your opinion; is that

4    correct?

5        A    If the camera or the naked eye can see it, yes, but

6    they can't identify a weapon that's concealed.

7        **Q**    So you're aware that you -- you state in your

8    report at Paragraph 38, please, Jenna, quote, "If someone

9    pulled a gun from their car and began walking toward a campus

10   building, camera systems would alert officers who would then

11   be able to respond"; is that correct?

12       **THE COURT:**  38, that's what you said.

13       **UNIDENTIFIED SPEAKER:**  38, yeah.

14       **Q**    The last sentence.

15       A    Well, the last sentence does say that but the

16   sentence before that says that there are certain

17   software-based technologies, as I just testified to, that

18   help make camera systems proactive instead of reactive.

19       **Q**    Right.  So but what if a person pulled a gun out of

20   their car and immediately began shooting, the camera couldn't

21   do anything then, right?

22       A    The camera would identify the weapon and send an

23   alert.

24       **Q**    Right.  But people would already be dead, right?

25       A    I can't say that yes or no.

116

Olivo - Cross - Pantzer

1    **Q**    But there's a lag time, right, between the time
2    that a weapon or violence is detected on a camera and the
3    time when someone, police or otherwise, can respond, there's
4    a lag time, isn't there?
5    **A**    There would be a lag time from the time a weapon is
6    identified until the police get there, yes.
7    **Q**    Right.  You're aware that SUNY Fredonia has a large
8    music school, right?
9    **A**    Oh, yes.
10   **Q**    And so what if a gun was in a cello case, the
11   camera wouldn't be able to detect it, would it?
12   **A**    No, but it wouldn't be a threat inside of a cello
13   case.
14   **Q**    It would be a threat as soon as it was pulled out
15   of the cello case, wouldn't it?
16   **A**    It would have to be in hand.
17   **Q**    Okay.
18   **A**    And once it is in hand, then the camera could
19   identify it.
20   **Q**    But then there's a lag time, right, between the
21   time that the gun is in hand and the time when someone can
22   respond to protect the situation, right?
23   **A**    Presumably, yes.
24   **Q**    And the same with a bass case or trombone case, the
25   camera wouldn't be able to detect the weapon in any of those

Olivo - Cross - Pantzer

1    items, right?

2        A    Correct, if the weapon is concealed, no, it would

3    not be able to detect that.

4        Q    And this is a college campus, right, so students

5    carry backpacks, right?

6        A    Yes.

7        Q    And if a kid carries a sawed-off shotgun in a

8    hockey bag, it's not going -- the camera's not going to stop

9    the kid from doing so, is it?

10       A    It would not stop the kid from concealing a weapon

11   in a hockey bag.

12       Q    And would you agree with Chief Isaacson that a mass

13   shooting is approximately -- an average mass shooting is

14   approximately 12 minutes long based on the data?

15       A    That sounds accurate.

16       Q    Isn't it true that in even one minute, Mr. Olivo,

17   many, many people can be killed?

18       A    That are.

19       Q    Okay.  So all that camera monitoring really is

20   going to do is allow the person monitoring the cameras to

21   witness some of the shooting, right?

22       A    No, that's not correct.

23       Q    Well, maybe it would cut a few minutes off the

24   attack, right?

25       A    (No response.)

Olivo - Cross - Pantzer

1     **Q**    But it wouldn't prevent the attack, would it?

2     A    Again, we're talking hypotheticals.  So, for

3  instance, if an active shooter were to retrieve a let's use

4  the popular AR15 from their vehicle in a parking lot and

5  start walking through the parking lot to a building and that

6  weapon was picked up on a camera system, that sent an alert

7  to the dispatcher.  That sent alert would automatically go to

8  the responding officer's patrol cars.  From my understanding

9  in talking with the former chief of police at SUNY Fredonia,

10  the average response time on SUNY Fredonia is three minutes

11  so it would mitigate that situation.

12     **Q**    Talking with the former chief of police for SUNY

13  Fredonia, who are you talking about?

14     A    Ann Burns.

15     **Q**    Who?

16     A    Ann Burns.

17     **Q**    Ann Burns?

18     A    Right.  She was the chief of police there when my

19  daughters went there.

20     **Q**    When was that?

21     A    2014, 2016.

22     **Q**    But you would agree with me that in my hypothetical

23  if the gun is pulled out of the vehicle or a backpack and the

24  shooter immediately stops shooting -- starts shooting, the

25  camera does nothing to prevent the attack, right?

Olivo - Cross - Pantzer

1     A    It would not prevent it.

2     Q    Okay.  And the same with your concept of video

3  fencing, Paragraph 39 of your report?  Video fencing is a

4  form of facial recognition technology sort of, right?

5     A    That's not correct.

6     Q    Okay.  So video fencing, I mean, you describe video

7  fencing in this paragraph 39 as creating a barrier around

8  Dr. Kershnar, right?

9     A    (No response.)

10    Q    With the fence -- with the video?

11    A    (No response.)

12    Q    So if someone walks through the very fencing area

13 that shouldn't be there, police are notified immediately,

14 right, did I summarize that concept correctly?

15    A    If there is an area -- let's call it video

16 fenced -- and an individual is within that fenced area, then

17 an alert would be sent to the dispatch center and that camera

18 that's using that fence would come up automatically and they

19 would be able to look at it and identify a person within the

20 fenced-in area.

21    Q    Is it any person within the fenced area or is it

22 certain people you've identified who shouldn't be there?

23    A    There's technology that can be wider (phonetic.)

24    Q    Okay.  So what do you recommend here?

25    A    If there's certain things, for instance, that no

Olivo - Cross - Pantzer

1    one should be next to Professor Kershnar's car, for instance,

2    you can put a video fence around his car and if somebody is

3    walking around his vehicle or let's say within 2 feet of his

4    vehicle, an alert would go to the dispatcher.

5        Q    Okay.  Well, here in Paragraph 39 you use as an

6    example, the hallway leading to Professor Kershnar's office.

7    So what would --

8        A    Well --

9        Q    -- the video fencing entail there?  Would we

10   eliminate all students from the hallway leading to Professor

11   Kershnar's office or would we just eliminate potential

12   dangerous individuals?

13       A    If I may read the entire paragraph, it says you can

14   pursue video fencing that would allow the university to

15   delineate areas where no person should be at certain times,

16   such as a hallway leading to Professor Kershnar's office.

17            If there are certain times that no one but

18   Professor Kershnar should be in that office or in that

19   hallway.  So, for instance, when somebody left this

20   threatening note on his door, that would have been -- there

21   would have been an alert sent at that time to the dispatcher.

22       Q    Assuming there was a camera there?

23       A    Assuming there was a camera there, yes.

24       Q    Okay.  The video fencing, it doesn't create an

25   actual barrier, right?

Olivo - Cross - Pantzer

1    A    Correct.  It's an invisible barrier.

2    Q    It just alerts someone when the barrier is broken?

3    A    Correct.

4    Q    The invisible barrier?

5    A    Correct.

6    Q    And if the attacker is actively attacking as they

7    break the visible barrier, again, it does nothing, right?

8    A    (No response.)

9    Q    The attack's already happening?

10   A    Right.  The attack is already in progress prior to

11   them entering the video fencing area, is that what you're

12   saying?

13   Q    Yes.

14   A    Yes.

15   Q    Okay.  You also suggested additional social media

16   monitoring.  I wrote this down specifically on your direct.

17   I do believe it's in your report, as well.  You testified on

18   direct that -- and I believe this was in response to Judge

19   Vilardo's question that additional social media monitoring

20   would allow SUNY Fredonia to, quote, monitor the chatter, is

21   that correct?

22   A    Correct.  That was concurring what was in the A1C

23   report.

24   Q    And when you said monitoring the chatter, you were

25   referring to the dozens of threats that we presented with

Olivo - Cross - Pantzer

1  Chief Isaacson's testimony on social media, Twitter,

2  otherwise, right?

3      A    No, that's not correct.

4      **Q**    Oh.  What were you referring to when you spoke

5  about the chatter?

6      A    What I was referring to chatter, I was not

7  monitoring those threats.  What I'm referring to is any

8  chatter going forward that would potentially be concerning in

9  terms of a potential threat.

10     **Q**    So similar to the chatter that we presented with

11  Chief Isaacson's testimony, just you're talking about going

12  forward --

13     A    Right.

14     **Q**    -- into the future?

15     A    Monitoring going forward.

16     **Q**    Right.  So that chatter that we presented during

17  Chief Isaacson's testimony, those threats -- and I can pull

18  them up if you'd like -- those were significant to you,

19  right?

20     A    You would have to tell me specifically which one

21  you were talking about because the ones that I reviewed were

22  not direct or imminent threats.  So if you could give me an

23  example of which one you're speaking of.

24     **Q**    So then why do you suggest additional social media

25  monitoring if you're not concerned about the chatter that we

Olivo - Cross - Pantzer

1    presented with Chief Isaacson's direct testimony?

2        A    I didn't say I was concerned about it.  I'm saying

3    that that is a tool that can be utilized as an enhancement to

4    security.

5        Q    But why utilize it?

6        A    (No response.)

7        Q    If you're only concerned with direct, imminent

8    threats, then why would we monitor the social media activity

9    that we presented -- the type of social media activity that

10   we presented with Chief Isaacson?

11       A    For the same reason we're suggesting all the other

12   security enhancements.

13       Q    So they --

14       A    It's --

15       Q    -- matter --

16       A    It's a way to enhance security.

17       Q    Okay.  Let's just pull up the exhibit.  16 in

18   evidence.

19            You understand that these are Tweets in response to

20   Professor Kershnar's appearance on the podcast that we

21   presented with Chief Isaacson's testimony, right?

22       A    Yes.

23       Q    And this is the chatter that you were talking about

24   when you answered Judge Vilardo's question about social media

25   monitoring, isn't it, this is the type of chatter you were

Olivo - Cross - Pantzer

1  talking about?

2      A    Well, it's not just this type of chatter.  It's any

3  what we call intelligence information that may lead to a

4  potential direct or imminent threat.

5      Q    Right.  But this is significant enough to you that

6  you suggest further social media monitoring, isn't it?

7      A    This is not significant to me and I'll tell --

8  because it has already been determined that there was no

9  credible, imminent or likely threat that existed at the time

10  that this was compiled.

11      Q    Okay.  So you're not concerned with this type of

12  social media activity.  When you suggested social media

13  monitoring, you were talking about only direct and imminent

14  threats, is that what your testimony is?

15      A    When I suggested social media monitoring going

16  forward such as what was suggested in the A1C report that

17  would rise to the level of what they considered a credible

18  threat.

19      Q    Okay.  I'm just trying to understand what that is

20  to you, okay.  Because you're telling me that it's not

21  this, right, it's not these Tweets that we presented with

22  Exhibit 16, that's not significant to you?

23      A    With all due respect, I'm not telling you anything.

24  I'm just suggesting that what is in the A1C report by their

25  experts is that there was no direct, credible or imminent

Olivo - Cross - Pantzer

1    threat.  They reviewed this information and in their

2    estimation and their professional opinion -- which I have no

3    other reason to not respect -- there was no credible,

4    imminent threat.  So, as a result of that, I would have to

5    concur with their findings and tailor the security protocols

6    accordingly.

7              So what I was suggesting when I said to continue to

8    monitor is exactly what they were suggesting in their report.

9    I do not disagree with the fact that they should continue to

10   monitor it until such time as they do find that credible or

11   imminent threat.

12        **Q**    So you fully credit the A1C report 100 percent?

13        A    I mean, I don't know that I would say a hundred

14   percent.  I would have to review every bit of it and tell you

15   what part I don't agree with.  But their assessment, I have

16   no reason to not believe it wasn't done professionally.

17        **MS. PANTZER:**  Let's pull up a Word document.  I'm going

18   to do a little bit of a demonstrative, if that's okay, your

19   Honor.

20        **THE COURT:**  Sure.  If the plaintiffs have a problem with

21   it, they will object.

22        **Q**    Okay.  This is going to involve math.

23        A    Oh, I need my cell phone.  I'm just kidding.

24        **Q**    All right.  So, we talked earlier about the

25   doors --

Olivo - Cross - Pantzer

1       A    Correct.

2       Q    -- and access control.  Let's just say that 50

3   buildings each have two exterior doors without key fob

4   access, okay.  That's $2,000 a door, correct?

5       A    If you're going to do every door, yes.

6       Q    Okay.  So we're at $200,000, right?

7       A    But may I stop you first just one second.  I'm not

8   suggesting that you do every door.  You mentioned earlier

9   today when we were talking about the K through 12

10  environment, you can do the same thing with the academic

11  buildings at SUNY Fredonia, you can have a single point of

12  entry and the rest of the doors be secured.  So, if, for

13  instance, a building like Fenton Hall has four exterior

14  doors, entrance doors, three of them could be locked.  The

15  fourth one could have a key fob access to it.  So I'm not

16  suggesting that you need to add this access to every single

17  door on campus --

18      Q    Okay.  Well, is --

19      A    -- to be fair.

20      Q    -- fifty doors fair?  For our little example here,

21  based on your testimony that Fenton Hall has four, you know,

22  I'm estimating 50 buildings with two entrances but you just

23  told me that there's a hall that has four.  So is 50 fair for

24  our example?

25      A    Sure.

Olivo - Cross - Pantzer

1    **Q**   Okay.  So that's $200,000.  Additionally, ongoing

2  social media monitoring and we're just going to take it by

3  one year here.  Okay.  So in one year we're at $200,000 so

4  far?

5    A   Excuse me.  50 doors would be $100,000.

6    **Q**   Is that right?

7  **UNIDENTIFIED SPEAKER:**  50 times two.

8    **Q**   Yes, okay.

9    A   Okay, sorry.

10    **Q**   I told you I was going to be in trouble.  You're in

11  trouble.  We're both in trouble here, okay.  $100,000.

12        Then we need to add ongoing social media monitoring

13  which in your report you indicated would be about $40,000 a

14  year?

15    A   No, that's not correct.

16    **Q**   That's the high end, right?

17    A   $40,000 a year would be an entire social media

18  feofence, so to speak, to do single subject monitoring in a

19  case like this with Dr. Kershnar, it would be approximately a

20  thousand to 1500 per month.

21    **Q**   Okay.  All right.  So $12,000?

22    A   That's fair.

23    **Q**   We're up to $112,000.  Okay.

24        And an armed guard for Dr. Kershnar, you indicated

25  in your report, Exhibit B to your witness summary, that a

Olivo - Cross - Pantzer

1    salaried officer is about $64,000 for the year; is that

2    correct?

3        A    Yes.

4        Q    So we'll add 64,000, is that fair?

5        A    No.

6        Q    Why not?

7        A    Because we wouldn't have a armed officer assigned

8    to him every day of the week.

9        Q    Only when he's on campus?

10       A    Only when he's on campus and so I broke it down

11   into an hourly wage for time and a half overtime which is $48

12   per hour.  So if he's on campus approximately ten hours a

13   week, that would be about $480 per week that he would be on

14   campus.

15       Q    Okay.  So 480 times 52 -- I just did the math on my

16   phone -- is $24,960; do you agree with me there?

17       A    No.  Because --

18       Q    Okay.

19       A    Because you're assuming it's a 12-month school

20   year.  It's not.

21       Q    He's only on campus --

22       A    When there's school in session.  So you'd have

23   winter break, you have --

24       Q    How --

25       A    -- summer break.

Olivo - Cross - Pantzer

1     **Q**    How many weeks should I multiply 480 by?

2     A     I have to apologize.  I don't have the answer to

3  how many weeks the school year goes, but.

4     **Q**    Let's say 25, half the year.

5     A     Okay.

6     **Q**    So we're up to $12,000.  Let's add that to our

7  total.

8     **UNIDENTIFIED SPEAKER:**  So 12 plus 12, right?

9     **MR. BOYD:**  $124,000.

10    **UNIDENTIFIED SPEAKER:**  Yeah.

11    **THE WITNESS:**  He did that in his head.  That was very

12  good.

13    **Q**    Okay.

14    **UNIDENTIFIED SPEAKER:**  12,000.

15    A    Plus 12,000, yeah, 124.

16    **Q**    $124,000.  What about the visual fencing and the

17  additional technology that you've testified could be of

18  assistance to the campus?  That's approximately $1.4 million,

19  right, to implement?

20    A    That is not correct.

21    **Q**    Okay.  How much would you say that additional

22  technology, facial recognition, weapon recognition?

23    A     Well, the, the information that you reference

24  earlier with respect to Lockport City School was an entire

25  campus overhaul of their camera systems, also, so that was a

Olivo - Cross - Pantzer

1    significant amount of that budget.

2         In this case, SUNY Fredonia does not need that.

3    They have a robust camera system, from what I understand, and

4    it's a good camera system.  All they would have to do is buy

5    software that would overlay on to their existing camera

6    system and that would be about $48,000.

7    **Q**    Okay.  Forty-eight -- plus $48,000.  Okay.  So

8    we're up to $172,000; is that correct?

9    A    Yes, that --

10   **Q**    Okay.

11   A    -- seems correct.

12   **Q**    And we included everything in one year, right, and

13   we went on the low end of certain things.  You testified that

14   further social media monitoring, more advanced social media

15   monitoring would be $40,000.  We only used the 12,000-dollar

16   figure, for example, correct?

17   A    Correct.

18   **Q**    Okay.  So -- and some of these costs, right, are

19   annual, they're on an annual basis?

20   A    Well, with the exception of the door installation

21   of the software and, you know, the readers on the doors.

22   **Q**    They're all --

23   A    The rest would be an ongoing cost.

24   **Q**    Right, okay.  So are you aware that Dr. Kershnar's

25   salary last year was only $98,000?

Olivo - Cross - Pantzer


1      A    No idea what the salary was.

2      **MS. PANTZER:**   Okay.  All set with the calculator, Jenna.

3   Thank you.

4      **Q**    All right.  And we established earlier that you're

5   associated with SN Technologies, you consult for them,

6   correct?

7      A    I was a consultant for them, yes.

8      **Q**    And you --

9      A    When they developed the AEGIS system.

10     **Q**    Right.  You gained financially from your

11  association with them?

12     A    My firm did.

13     **Q**    And that company, you've testified, already sells

14  the AEGIS, A -- am I pronouncing that correctly?

15     A    A-E-G-I-S, AEGIS, yes.

16     **Q**    That's for facial recognition in schools, right?

17     A    It is more than facial recognition but it is a

18  software security suite --

19     **Q**    That's --

20     A    -- for schools.

21     **Q**    And that's the software that you recommended when

22  we did that little exercise with the calculator?

23     A    No.

24     **Q**    Oh, what software were you recommending?

25     A    I would recommend a different technology that is

Olivo - Cross - Pantzer

1    much more robust that would be -- there's a -- there's a lot

2    of different technologies out there that could be utilized.

3    In this circumstance here, I would probably recommend a

4    technology called Spark Cognition, C-O-G-N-I-T-I-O-N.

5        Q    I'm sorry could you spell?

6        A    Spark like, you know, spark.  Cognition,

7    C-O-G-N-I-T-I-O-N.

8        Q    Is that in your report at all, Mr. Olivo, to your

9    knowledge?

10        A    The actual technology itself?

11        Q    The spark cognition that you just identified for

12    the Court.

13        A    No.

14        Q    Any reason why it's not included in your report?

15        A    It wasn't, it wasn't something that was asked for.

16        Q    Okay.  In any case what does Spark Cognition do,

17    does it do facial recognition?

18        A    So there are a lot of technologies in the

19    marketplace that do things like facial recognition, weapons

20    recognition, video fencing, what we also call video forensics

21    where you can go back through historic video and identify a

22    person or vehicle or something of that nature.  Some of these

23    technologies will integrate with license plate readers and

24    those type of things.  So there's -- there's AEGIS, SN

25    Technologies, Spark Cognition.  Those are the only two that

Olivo - Cross - Pantzer

1    do it all in one place.  The rest are Genetec, Avigilon, and

2    there's a, there are several others out there that do

3    components of that but these two technologies do it all in

4    one place.

5        Q    Okay.  So Spark Cognition is similar to the AEGIS

6    system, is that right?

7        A    It's a more robust system and it's less costly.

8        Q    But it has the facial recognition component?

9        A    It does.

10       Q    And it has the weapons detection component?

11       A    It does.

12       Q    And it also has the forensic research component?

13       A    And it has video fencing and it also has the

14   ability to launch drones on a college campus that would

15   follow an active shooter.

16       Q    And it's your testimony that software would only be

17   $48,000?

18       A    It's $4,000 for 100 cameras.

19       Q    Okay.  The facial recognition aspect, it's not

20   foolproof, right?

21       A    I'm sorry.  I don't understand the question.

22       Q    Well, it won't put -- catch every potentially

23   dangerous individual on camera, right?

24       A    The only way facial recognition works is that there

25   has to be an unwanted or identified person who would be

Olivo - Cross - Pantzer

1    placed in a database and then the facial recognition software

2    would look for that person to determine if they're on campus.

3         Q    Right.  So you have to know who the potential

4    dangerous individual is for it to work?

5         A    Correct.

6         Q    Okay.  Overall this software, this Spark Cognition,

7    AEGIS system, it's a little like spy equipment, isn't it?

8         A    No.

9         Q    Well, there are privacy implications with this

10   equipment, isn't there?

11        A    Not, not that I would agree with.

12        Q    Well, not that you would agree with but other

13   people have felt that there are privacy implications with

14   this type of software?

15        A    Would you please tell me specifically what you're

16   speaking of in terms of privacy.

17        Q    Sure.

18        **MS. PANTZER:**  Can we pull up Defendant's Exhibit 39.

19        **THE COURT:**  In evidence?

20        **MS. PANTZER:**  No, your Honor.

21        Q    Do you recognize this document, Mr. Olivo?

22        A    No.

23        Q    Okay.  Well, would it refresh your recollection if

24   I told you that it referred to the implementation of this

25   type of software at the Lockport School District and the

Olivo - Cross - Pantzer

1    privacy concerns with regard to that?

2        A    I know that there was privacy concerns made by a

3    citizen in Lockport.

4        Q    In fact, certain citizens of the school district

5    argued that the software was racist, right?

6        A    I never heard of anyone argue that it was racist.

7        Q    You never heard about that?

8        A    No.  If they did, I'm not aware of it.

9        Q    Okay.  Well, you're aware that there were concerns

10   surrounding this software to such an extent that there was a

11   moratorium on implementation of this software on K through 12

12   school districts, right?

13       A    Correct.

14       Q    And so you were aware that there were concerns with

15   regard to the software and its privacy implications in

16   schools?

17       A    I understand what the concerns were, and if I may

18   explain those and how there might be a misconception as to

19   what is in the media.

20       Q    My only question was:  You understand that there

21   were privacy implications with regard to this software?

22       A    I disagree with the terminology of "implication".

23       Q    Okay.  Well, the New York State Office of

24   Information Technology Services doesn't disagree, do they?

25       **MR. COVERT:**  Your Honor, I object.  I think we're

Olivo - Cross - Pantzer

1    getting pretty far afield here.  I don't understand where

2    this is going.

3        **THE COURT:**  I don't understand where we're going,

4    either, but I'll let her go a little bit further.

5        So overruled.

6        **Q**    I'll back up.

7        You're aware of a report published by the New York

8    State Office of Information Technology Services titled,

9    quote, "Use of Biometric Identifying Technology In Schools"?

10       **A**    From August of 2023?

11       **Q**    I believe so, yes.

12       **A**    Yes.

13       **Q**    And that report was written in response to the

14   moratorium on implementation of this software in schools,

15   correct?

16       **A**    I don't know why the report was written

17   specifically but I am aware of report.

18       **Q**    Part of the purpose of the report was to explore

19   the privacy implications at play with regard to this type of

20   software, wasn't it?

21       **A**    I understand that, yes.

22       **Q**    Okay.  And just to be clear for the Court, the

23   title, "Biometric Identifying Technology", that refers to

24   technology that can identify individuals based on physical

25   and measurable characteristics, right?

Olivo - Cross - Pantzer

1       A     That's what the report says.

2       Q     Right.  And that's the facial recognition

3   technology that we've talked about here today?

4       A     There is a difference between the technology types

5   that are referenced in the report and the way technology such

6   as AEGIS and/or Spark Cognition work.  So, I understand that

7   they are putting all of the technologies under one umbrella

8   but they don't all work the same and they're not all under

9   the same umbrella in terms of the issues that have been

10  raised.

11      Q     But the moratorium applies to AEGIS and Spark

12  Cognition, too, doesn't it?

13      A     It applies to all facial recognition technology.

14      Q     Right.  Okay.  According to CSI's website, you're

15  involved in organizations that function for the protection of

16  children from sex abuse and trafficking?

17      A     Veterans for Child Rescue?

18      Q     Yes.

19      A     Yes.

20      Q     And you serve as the New York State Director for

21  Veterans for Child Rescue?

22      A     Team leader, director, yes.

23      Q     And that's, again, an organization dedicated to the

24  investigation and recovery of victims of child sex

25  trafficking, right?

Olivo - Cross - Pantzer

1      A    Correct.

2      Q    And when you were a detective in Cheyenne, Wyoming,

3  you testified on direct that you were a child abuse and sex

4  crimes detective?

5      A    Correct.

6      Q    Okay.  And these organizations, Veterans for Child

7  Rescue, it -- those types of organizations identify and feel

8  that child sex abuse is prevalent and pervasive and needs to

9  be stopped, right?

10     A    Child sex trafficking, child sex abuse, yes.

11     Q    Okay.  And I'm just going to remind you of one of

12 the more salient comments made by Dr. Kershnar on the

13 podcast.

14     **MR. COVERT:**  Your Honor, I object.

15     **THE COURT:**  Yeah, I thought that the content of the

16 speak was not relevant.

17     **MS. PANTZER:**  Well, your Honor, this goes directly to

18 the allegation that this speech does not present a unique and

19 specific danger to the campus community.

20     On direct, Mr. Olivo testified that he doesn't feel that

21 this is a unique problem.  He doesn't feel that this presents

22 a unique danger.  I'm going to talk to him about that.  I --

23 we feel -- Chief Isaacson feels that this does present a

24 unique circumstance of danger and so I want to get into that.

25     **THE COURT:**  Okay.  I'll give you some latitude on that.

Olivo - Cross - Pantzer

1      Overruled.

2      **MR. COVERT:**  Your Honor, just, if we're going to go down

3   this path, we're going to be going down a lot of different

4   rabbit holes as to what else causes offense.

5      **THE COURT:**  And we might.  I understand that,

6   Mr. Covert.  But, look it, this is a unique -- I don't use

7   that word lightly, either -- unique case and we'll go down

8   all the rabbit holes we need to go down.

9      **Q**    All right.  So Dr. Kershnar was quoted on the

10  podcast saying:  "Imagine that an adult male wants to have

11  sex with a 12-year-old girl.  Imagine that she's a willing

12  participant.  A very standard, very widely held view is that

13  there's something deeply wrong with this and it's wrong

14  independent of being criminalized.  It's not obvious to me

15  that it's, in, fact wrong.  I think that is a mistake."

16      You would agree that statements like this would

17  create a large population of aggrieved people, right?

18      **MR. COVERT:**  I object unless there's some foundation for

19  his background to show that.

20      **THE COURT:**  Yeah, sustained.

21      **Q**    Well, based on your background with Veterans for

22  Child Rescue, based on your background as a detective in

23  child abuse and sex crimes, would you agree with me that a

24  statement like that creates a large population of aggrieved

25  people?  You --

Olivo - Cross - Pantzer

1      **MR. COVERT:**  I --

2      **Q**    You've dealt with these cases, correct?

3      **MR. COVERT:**  Again, I object.  He's dealt with

4      individual cases.

5      **THE COURT:**  Okay.  One question at a time.  There's two

6      questions there so ask one question, please.

7      **Q**    All right.  Based on your background with Veterans

8      for Child Rescue, as a New York State Director of that

9      organization, as well as a detective in child abuse and sex

10     crimes, you would agree with me that a statement like that

11     creates a large population of potentially aggrieved people?

12     A    I cannot.

13     **MR. COVERT:**  Objection, your Honor.

14     **THE COURT:**  Overruled.

15     A    I cannot agree with that because I don't have the

16     data and the metrics with which to measure that.

17     **Q**    Well, you would agree that there's a large

18     population of people who have, unfortunately, experienced or

19     been touched by child sex abuse?

20     A    I would agree with you that there are a lot of

21     victims of child sexual abuse.

22     **Q**    Okay.  Statements like this could empower abusers?

23     **MR. COVERT:**  Objection, your Honor.

24     **Q**    Couldn't they?

25     **THE COURT:**  Overruled.

Olivo - Cross - Pantzer

1      A    I don't have any direct knowledge that they would.

2      Q    You don't think saying that a 12-year-old could

3   possibly consent to sex would empower someone who seeks to

4   abuse a 12-year-old?

5      MR. COVERT:  Your Honor, I object.

6      THE COURT:  See, I think now we're getting into the

7   content of the speech and not what you said we were going to

8   get into.  And, again, you folks have told me that the

9   content of the speech doesn't matter.  Now I suppose if you

10  change your mind, you can, you can change your mind and we

11  can address these kinds of issues.

12     But right now the way this stands, it doesn't matter

13  when he said what he said or he said that abortion should be

14  legal no matter how late in the term of pregnancy or if he

15  said that, you know, the last election was not stolen.  It

16  could have been anything that he said that created the kind

17  of chatter that was created, according to you.  I didn't, you

18  know -- that was your choice.

19     So, that seems to me to be out of the case right now.

20  And so I think Mr. Covert's right, we've now crossed that

21  line from creating a reaction to the content of the speech.

22     MS. PANTZER:  Well, your Honor, again, this has been

23  made an issue because it has been contended that this

24  particular type of speech did not create a unique security

25  threat for SUNY Fredonia's campus.  It's our position that

Olivo - Cross - Pantzer

1  this content for the discrete purpose of establishing the

2  uniqueness of this situation, the content does matter, your

3  Honor.

4       **THE COURT:**  But --

5       **MR. COVERT:**  Your Honor --

6       **MS. PANTZER:**  -- we're going to distinguish --

7       **THE COURT:**  But he's not -- this gentleman has been

8  qualified as an expert with respect to the measures that can

9  be taken on a college campus or other types of schools to

10  protect from threats and risks that ear talking about here,

11  not, I mean, you even made the very point that he's not an

12  expert on -- I forget the?

13       **MS. PANTZER:**  Behavioral analysis.

14       **MR. COVERT:**  Behavioral.

15       **THE COURT:**  Behavioral analysis.

16       **MS. PANTZER:**  Yes.

17       **THE COURT:**  And now you're trying to ask questions about

18  behavioral analysis, I think.

19       **MS. PANTZER:**  Well, your Honor, he testified -- this is

20  cross, right and he testified on direct that he doesn't feel

21  that this is a unique circumstance.  He feels this is the

22  same as COVID, the mask policies after COVID.  You know, so

23  I'm going to establish that this is an incendiary issue it is

24  a big deal and it is different than the mask mandates after

25  COVID.

                        Olivo - Cross - Pantzer

1        **THE COURT:**  But I don't know that you can -- I mean, he

2   testified that, given his background, he didn't see a huge

3   difference between this and other things.  I don't know that

4   you can now get into the content of the speech to try to

5   impeach that.  You're trying to impeach it by talking about

6   or getting him to admit that this is the type of speech that

7   would create a reaction like that, and I think that's, I

8   think that is too far afield.

9        **MS. PANTZER:**  Okay, I'll move on, your Honor.  I'm just

10  going to finish my questioning as to why this presents a

11  unique situation in our opinion, okay, I'll move on from the

12  last comment I made as to empowering abusers.

13       **THE COURT:**  No, go ahead.  I'm not --

14       **MS. PANTZER:**  Okay.

15       **THE COURT:**  -- foreclosing you from doing that because I

16  do think that is an issue:  The uniqueness of this sort of

17  thing.  But I think the way you're going about it involves

18  the content of the speech.  I don't know, it's --

19       **MS. PANTZER:**  Well, the reason that empowering abusers

20  is important, your Honor, is because that goes to the

21  uniqueness of the situation.  People feel that this speech

22  has empowered pedophiles, your Honor, and that makes them

23  very, very angry.  We've seen that in the violent social

24  media posts.  So that's why it's important but I can move on.

25  Like I said --

Olivo - Cross - Pantzer

1    **THE COURT:**  Go ahead.  Go ahead.

2    **MS. PANTZER:**  -- I'm happy to move on.

3    **THE COURT:**  Go ahead.  Move on.

4    **Q**    Okay.  So you testified on direct, Mr. Olivo, that

5    you don't feel that this speech presents a unique security

6    situation for SUNY Fredonia; is that correct?

7    A    I think I testified that there are a lot of

8    circumstances and I brought up different types of topics that

9    are incendiary in nature and that specifically there are

10   things like we mentioned, abortion, mask mandates, critical

11   race theory, there's a lot of things that schools and

12   campuses deal with every day.

13   **Q**    Right.  You equated saying that 12-year-old can

14   consent to sex is similar to requiring masks in school during

15   COVID, right?

16   **MR. COVERT:**  Your Honor --

17   A    I did not say that.

18   **MR. COVERT:**  I object.

19   **THE COURT:**  I don't think he said that.

20   **MS. PANTZER:**  All right.  Well, I'll break it down.

21   **THE COURT:**  Let me ask you this.

22   Are you saying that masks and abortion and what this

23   gentleman said are all equal in terms of the risk that they

24   might cause on a college campus?

25   **THE WITNESS:**  Or any school grounds.  I mean, the

Olivo - Cross - Pantzer

1   terminology that's utilized -- whether it be any of those

2   three subjects or other things that are incendiary in

3   nature -- still would be looked at in the totality of the

4   threat environment and what threats were directly made to

5   school administrator or the person that made those

6   statements.

7       THE COURT:  But, you know, if somebody says something

8   about masks or somebody says something about abortion or

9   somebody says something about sex with kids, that they would

10  all create the same chatter or similar chatter or are you

11  saying that all three of them would create chatter?

12      THE WITNESS:  I actually had a school superintendent in

13  the Southern Tier there was threatened with death because of

14  mandating that masks be worn in the classroom.

15      THE COURT:  Yes.  But that doesn't get to my question.

16  My question is:  All three of those things might create lots

17  of chatter.

18      MS. PANTZER:  Correct.

19      THE COURT:  But are you saying that you can tell us

20  which one is going to create the most and which one's going

21  to create the least of those three things?

22      THE WITNESS:  I cannot.

23      THE COURT:  Go ahead.  Next question.

24      Q    Right.  So all three of those things that Judge

25  Vilardo just mentioned for you -- mask mandates, abortion and

Olivo - Cross - Pantzer

1   sex with children -- different levels of grievance, right,

2   among those things?

3       **MR. COVERT:**  Your Honor --

4       **Q**   You would agree with that?

5       **MR. COVERT:**  -- I would object to the last --

6       **THE COURT:**  Yeah, again, this is now getting him into

7   behavioral questions that he's not qualified to answer.

8       **MS. PANTZER:**  Okay.

9       **THE COURT:**  So that objection's sustained.

10      **Q**   You're familiar with Pizzagate, right?

11      A    Pizzagate?

12      **Q**   Yes.

13      A    Refresh my memory.

14      **Q**   The pedophilia ring --

15      A    Oh.

16      **Q**   -- allegation in the pizza shops?

17      A    Yes.

18      **Q**   You're familiar with that, okay.

19           And that created a high level of grievance among

20   the people who are upset about that, correct?

21      **MR. COVERT:**  Your Honor, I think we're just back door.

22   I object.

23      **THE COURT:**  No, no.  This is okay.

24      You can answer.  Overruled.

25      A    I don't know what the extent or the level of

Olivo - Cross - Pantzer

1   grievance that was created --

2       **Q**    You --

3       A    -- by that was.

4       **Q**    You don't know, okay.

5           What about the QAnon conspiracy theory surrounding

6   liberal education institutions and connections to pedophiles,

7   are you aware of that?

8       A    Tangentially.  I mean, I don't know the specifics

9   of it.

10      **Q**    Okay.  But you're aware that there are threats of

11  violence with regard to that issue, right?

12      A    I don't know of any specific threats of violence,

13  I'm sorry.

14      **Q**    Okay.  You testified on direct that this type of

15  situation is similar to a domestic violence situation --

16      **MR. COVERT:**  I object.

17      **Q**    -- right?

18      **MR. COVERT:**  I object.  That's not what he said.

19      **MS. PANTZER:**  He can tell me what he said.

20      **Q**    Right?

21      **THE COURT:**  Yeah, overruled.  You can answer the

22  question.

23      A    I did not testify to that.

24      **Q**    Okay.  I'm sorry.  So can you tell me what you said

25  when you were talking about the domestic violence aspect and

Olivo - Cross - Pantzer

1  how you related that to this situation?

2      A    Right.  When the judge was speaking with respect to

3  securing and mitigating the risk to Dr. Kershnar, one of the

4  examples I utilized was that every day on -- whether it be

5  SUNY Fredonia or a different college campus -- there are

6  people that have restraining orders against potential

7  attackers, people that are stalking them.  I mean, the SUNY

8  police have plenty of different stalking complaints and all

9  of those type things.  They don't remove those people from

10  campus.

11      Q    Right but they know who the potential attacker is,

12  right?

13      A    Presumably not all the time.

14      Q    Well, if it's a stalking situation, they know who

15  the stalker is, right?

16      A    Not all the time.  There are people who get stalked

17  anonymously, online forums or TikTok, Facebook or all of

18  those things.  They don't always know who their potential

19  attackers are.

20      Q    Okay.  Well, in the stalking situation that you're

21  presenting, where they don't know who the stalker is, at

22  least they know who the potential victim is, right?

23      A    Yes.  Because --

24      Q    Okay.

25      A    -- the potential victim would be the complainant.

Olivo - Cross - Pantzer

1      **Q**    Right.  And if it's a domestic violence situation,
2    they know who the potential attacker is, right?
3      A    They know who the potential attacker is because it
4    usually is a restraining order, yes.
5      **Q**    Yes, okay.  So if there was a restraining order
6    against someone, then you know who the attacker is?
7      A    You, you identified the potential threat, yes.
8      **Q**    Right.  Okay.  You retained Camelot Investigations
9    to look into whether there's been a recent reaction to this
10   lawsuit and the media articles with regard to this lawsuit,
11   right?
12     A    Yes.
13     **Q**    Okay.  And Camelot was retained to do an internet
14   scrub in part?
15     A    They were retained to do what's called an open
16   source intelligence investigation.
17     **Q**    Does that include an internet scrub?
18     A    I'm not familiar with the terminology of internet
19   scrub utilized in our, in our work, so that's a different
20   terminology that we would use.
21          An open source intelligence investigation would be
22   in conjunction with the scope of work which was similar to
23   what was provided to A1C and then the open source
24   intelligence team and the analysts would go through and do an
25   analysis of all the information that they could compile

Olivo - Cross - Pantzer

1    within that scope of work.  So that's what they were retained

2    to do:  An open source intelligence investigation and

3    specifically look for any verifiable or any known threats

4    that are out there with respect to this matter.

5        Q    Okay.

6        MS. PANTZER:  Your Honor, I just need a moment, if

7    that's okay.

8        (WHEREUPON, a discussion was held off the record.)

9        MS. PANTZER:  Jenna, could you go to Attachment 4 to

10   Mr. Olivo's report.  Within Attachment 4, it's the second

11   page, I think I want to refer to.

12       Q    All right.  So, whether or not they were retained

13   to do a, quote, internet scrub, they were -- they did, in

14   fact, according to their report, do an internet profile and

15   social media search, correct?

16       A    Correct.

17       Q    Okay.  And they found that there's no ongoing

18   threats or a danger reflected in social media, right?

19       A    Correct.

20       Q    Okay.  I'm going to show you what we've marked

21   as -- well, first, they also found that there's no trending

22   conversations or posts.

23       MS. PANTZER:  And I'll refer you to Paragraph 28 of his

24   report, Jenna, the second bullet.

25       A    Just to be clear, that's not my report.  That came

Olivo - Cross - Pantzer

1   from Camelot.

2       Q    No, no.  I'm going back to your report.

3       A    Oh, okay.  Sorry.

4       Q    Paragraph 28 of your report.

5       **UNIDENTIFIED SPEAKER:**  This bullet.

6       **MS. PANTZER:**  Yes, that's good.

7       Q    "More specifically Camelot Investigation's findings

8   include the following".  First bullet:  "No ongoing threats

9   or danger reflected in social media", right?

10      A    Yes.

11      Q    Okay.  And then second bullet?

12      A    "As well as all platforms mentioned herein during

13  the designated timeframe."

14      Q    Got it.  Second bullet:  "There's no -- there does

15  not appear to be any trending conversations or posts about

16  the potential of the subject returning to campus", correct?

17      A    Correct.

18      Q    Okay.  Third bullet:  "The -- and you're quoting

19  her report here, right?

20      A    Correct.

21      Q    "Interest in the subject had diminished to almost

22  zero."  Did I read that correctly?

23      A    Correct.

24      Q    Okay.  Now I would like to pull up what we've

25  marked as Exhibit 41.

Olivo - Cross - Pantzer

1      **THE COURT:**  This is Defendant's 41?

2      **MS. PANTZER:**  Yes, your Honor.

3      **THE COURT:**

4      **Q**    And you would agree with me, while we're getting to

5    that, you would agree with me that Twitter, or X as it's now

6    called, is social media?

7      A    Yes.  That is --

8      **Q**    Okay.

9      A    -- a platform.

10     **Q**    And these, these posts are from July of 2023 and

11   I'll just let you review those.

12     (Pause in proceedings.)

13     **MS. PANTZER:**  All right.  So, your Honor, I would offer

14   Exhibit 41 in evidence:  Twitter posts from July of 2023.

15     **MR. COVERT:**  No objection, your Honor.

16     **THE COURT:**  Received without objection.

17     **MS. PANTZER:**  Thank you, your Honor.

18     **Q**    So we'll scroll to the first page.  So, July of

19   2023, that's recent, you would agree with me, right?

20     A    Can you just show me where it says 2023.

21     **Q**    Sure.

22     **MS. PANTZER:**  Scroll down a little bit, Jenna.

23     A    Okay, right there, okay.

24     **Q**    Yeah.

25     A    Thank you.

Olivo - Cross - Pantzer

1     **Q**     Would you agree with me?

2     A     Sure.

3     **Q**     So Page 1 references Dr. Kershnar and states,

4     quote, "public hangings", right?

5     A     Correct.

6     **Q**     Okay.  Page 2:  "There's only one cure for this

7     sickness and it starts with a 5.56 round!", correct?

8     A     That's what it says.

9     **Q**     And that's referencing Dr. Kershnar as well, right?

10    A     (No response.)

11    **Q**     It's a reTweet?

12    A     Presumably, yes.

13    **Q**     Okay.  And I don't know that much about guns but I

14    think a 5.56 round is a gun --

15    A     It's an --

16    **Q**     -- thing.

17    A     -- AR15 round or an AK47 round.

18    **Q**     Okay.

19    A     Whatever you want to call it, so.

20    **Q**     Page 3.  "Build a gallows, and he can lecture us on

21    his way up the stairs", right?

22    A     Yes.

23    **Q**     Okay.  "Gallows" is something you hang someone

24    from, right?

25    A     Correct.

Olivo - Cross - Pantzer


1    **Q**    Okay.  Page 4:  "No trial, Just executions, Both of

2  them."

3          Did I read that correctly?

4    **A**    You read it correctly.  I don't know who they're

5  referencing but I know that you read it correctly.

6    **Q**    Well, they're reTweeting on a post about Stephen

7  Kershnar, right?

8    **A**    No.  Justin Trudeau.

9    **MS. PANTZER:**  Well, scroll up.

10    **A**    Justin Trudeau presumably is the other person that

11  they're talking about when it says "both of them"?

12    **Q**    Right, both of them?

13    **A**    All right.

14    **Q**    But they're referring to also executing

15  Dr. Kershnar, right?

16    **A**    Along with Justin Trudeau, yes.

17    **Q**    Right.  Okay.  Page 6.  "Gross.  Someone end him

18  please", right?

19    **A**    Yes, that's what it says.

20    **Q**    Okay.  So you would agree with me that Camelot

21  Investigations somehow didn't find these or --

22    **A**    I don't know.  I'd have to know the context in

23  which these were collected and who collected them.

24    **Q**    Well, they were collected on Twitter?

25    **A**    By who?

Olivo - Cross - Pantzer

1    **Q**    By our office.

2    A    So you got this off of Twitter directly?

3    **Q**    Correct.

4    A    Okay.

5    **Q**    But Camelot investigations didn't?

6    A    And you're not on Twitter with Wall Street Apes?

7    **Q**    What do you mean?

8    A    You don't follow Wall Street Apes on your Twitter

9    account or anything?  How did -- I guess the question would

10   be how it was found.

11       **Q**    Well, does Camelot Investigations need to follow

12   everyone in order to identify the threats?

13       A    Well, it depends on how things are captured.  So,

14   again, I'm not an expert in open source intelligence.  I'll

15   just give you my layman's opinion as to how it works.  But

16   open source intelligence is anything that is readily and

17   openly available that doesn't require a warrant, a subpoena

18   or signed release and does not require you to be a friend or

19   allowed follower of an individual.

20            So, I don't know how this was captured so it would

21   be hard for me to opine on how they -- they collected it or

22   not?  I'd have -- she would have to answer that.  I can't

23   answer that for her.

24       **Q**    All right.  Well, her commentary that there's no

25   ongoing threats or danger reflected in social media is wrong,

Olivo - Cross - Pantzer

1   right?

2       **MR. COVERT:**  Your Honor, I object.  That's not what she

3   says in relation to that time period on Page 18 of the

4   report.

5       **THE COURT:**  I'm sorry.

6       **MR. COVERT:**  At Page 18 of the report, that's not what

7   she says in relation -- in the report to the period of

8   June 2023 through September '23.  She says it's minimal and

9   that there's no direct threats.

10      **MS. PANTZER:**  Okay.  Well -- understood, your Honor.

11  I'll withdraw the question.

12      **THE COURT:**  Okay, fine.

13      **Q**    Your interpretation of her report that there's,

14  quote, "no ongoing threats or danger reflected in social

15  media" is wrong, right?

16      A    No.

17      **Q**    There's a danger reflected in the social media,

18  isn't there?

19      A    That's not as what -- you're asking me what I

20  interpreted her report to say.

21      **Q**    Right.

22      A    Correct.  And that is what is in my interpretation.

23      **Q**    Which was wrong?

24      **MR. COVERT:**  I object.  That's not --

25      A    That's not correct.

Olivo - Cross - Pantzer

1    **Q**    Okay, all right.  I'll move on.

2    **THE COURT:**  Do you understand what she's asking?

3    So, your interpretation was that there's no threat in

4    social media.  Now she's showing you these and she's saying

5    aren't these threats in social media.

6    A    Are you -- I'm sorry.  I apologize.

7    Are you asking me if my interpretation of her

8    report because I believe that was your question?

9    **Q**    Yes.

10    A    My interpretation of her report that there was no

11    ongoing threats in social media is correct, that's what she

12    said in her report.  I, I can't dispute that because I don't

13    have this information.  I didn't conduct the open source

14    intelligence investigation.

15    **Q**    Right.  So, the person you retained to conduct a

16    social media search, she missed these?

17    **MR. COVERT:**  I object.

18    **THE COURT:**  Do you know whether she missed these or not?

19    **THE WITNESS:**  Your Honor, I can't tell because I don't

20    know the methodology by which these were collected so I would

21    have to ask -- she would have to be the only one that could

22    answer that question.

23    **Q**    Okay.  We'll move on.

24    Showing you what we've marked as Exhibit 42.  These

25    are Twitter posts, Mr. Olivo, that we've gathered from

Olivo - Cross - Pantzer

1    September of 2023.  This month.  Okay.

2        **MS. PANTZER:**  Your Honor, I'm going to ask that these be

3    put into evidence, as well.

4        **MR. COVERT:**  We're at 42?

5        **MS. PANTZER:**  Yes.

6        **MR. COVERT:**  No objection.

7        **THE COURT:**  Received without objection.

8        **MS. PANTZER:**  Thank you, your Honor.

9        Okay.  So scroll all the way to the top, Jenna, so we

10   can give Mr. Olivo some context.

11       **Q**    All right.  You're familiar with WGRZ Channel 2,

12   right?

13       A    Correct.

14       **Q**    That's a local news station?

15       A    Correct.

16       **Q**    Okay.  And so the root Tweet is with regard to

17   their article that was published in regard to this lawsuit?

18       A    (No response.)

19       **Q**    With you agree with me?

20       A    Correct.

21       **MS. PANTZER:**  Okay.  So scrolling down.

22       **Q**    The reTweet responses, Page 1:  "Dude needs to be

23   taken out back behind the woodshed, philosophically speaking,

24   you know, just an exchange of ideas?"

25           Did I read that correctly?

159

Olivo - Cross - Pantzer

1    A    Yes, you did.

2    Q    Okay.

3    **MS. PANTZER:**    Scrolling down.

4    Q    "I am all for free speech, however, his comments

5    are disturbing and worthy of a solid punch in the F'ing face

6    more than once."

7        Did I read that one correctly?

8    A    Yes, you did.

9    Q    You agree that these comments intimate violence

10   towards Dr. Kershnar, right?

11   A    I agree that there's commentary that could be of a

12   disturbing nature.

13   Q    Violent?

14   A    Well, they're, they're advocating that he gets a

15   punch in the face.

16   Q    Violence, right?

17   A    Yes.

18   Q    Okay.  So --

19   **MS. PANTZER:**    Scrolling down.

20   Q    "Hey, Stephen Kershnar, come have that discussion

21   with me in person, you sick freak."

22       It's a little less violent, right?

23   A    Yes, it's also presumably from someone from Canada.

24   Q    And, again, these were missed by Camelot

25   Investigations, right?

Olivo - Cross - Pantzer

1      **MR. COVERT:**  Your Honor, I object.

2      The report at Page 18 talks about no direct threats,

3  that these are not -- and how the communications are minimal

4  and that they're getting to be less.

5      **THE COURT:**  Well, I don't know how he could know whether

6  they were missed or not.

7      **Q**    Okay.  Well, but at a minimum --

8      **THE COURT:**  So, sustained.

9      **Q**    All right.  At a minimum, you determined that there

10  was no social media threat based on the Camelot

11  Investigations report, right?

12      **A**    I took their report for what it was presented as

13  and it indicated that there was no credible, imminent known

14  threat --

15      **Q**    Right.

16      **A**    -- correct.

17      **Q**    Now that you've seen these, there is violence

18  intimated on social media recently, isn't there?

19      **A**    I don't know that I agree with that.  Your

20  terminology is, is that -- you're saying that there's

21  violence intimated on social media.  That is correct.

22  Whether or not this is a credible and imminent threat would

23  have to be vetted.

24      **Q**    Okay.  Well, at a minimum, the interest hasn't

25  diminished to zero, has it?

Olivo - Cross - Pantzer

1      A    According to these Tweets, no.

2      **THE COURT:**  Okay.  We're going to take a break now.

3  It's 3:00.  So we're going to take a break.  We'll come back

4  in about 15 minutes, quarter after 3.

5      **MS. PANTZER:**  Thank you, your Honor.

6      **MR. COVERT:**  Thank you, your Honor.

7      **THE COURT:**  Thanks.

8      (**WHEREUPON,** recess taken.)

9      (Open court:)

10     **THE CLERK:**  We are back on the record for the

11  continuation of evidentiary hearing in the case 23-CV-525,

12  Kershnar v. Kolison, et al.

13     All counsel and parties are present.

14     **THE COURT:**  Okay, I remind the witness that he's still

15  under oath.

16     And just for planning purposes, we're going to finish

17  this witness and then I want to meet with all the lawyers in

18  chambers to discuss where we're going after this, okay.

19     So, continue.

20     **MS. PANTZER:**  Yes, your Honor.

21     **THE COURT:**  I hope we finish this witness, anyway.

22     **MS. PANTZER:**  Your Honor, we are adding an additional

23  exhibit to our list.  We apologize we did not have time to

24  file.  But I would be able to hand a copy up for the Court.

25     **THE COURT:**  Has the plaintiff seen this?

Olivo - Cross - Pantzer

1      **MS. PANTZER:**  I did provide a copy to plaintiff's

2  counsel, yes.

3      **THE COURT:**  Okay.  Any problem -- well, let me take a

4  look at it and we can do whatever we do.

5      **MS. PANTZER:**  So for identification, your Honor, I think

6  this would be 61 on our list.

7      **Q**    Mr. Olivo, we were discussing the social media

8  searches that were conducted by the open source investigation

9  that you retained Camelot Investigations to perform, correct?

10     A    Correct.

11     **Q**    Okay.  I'm showing you -- and part of the issue, or

12  maybe not issue but, you know, correct me if I'm wrong but

13  part of the problem with open source intelligence is that you

14  can't find everything potentially threatening on the

15  internet, right?

16     A    It's impossible to find everything, period, whether

17  threatening or not.

18     **Q**    Right.  Are you familiar with a social media

19  website called Yik Yak?

20     A    I've heard of it, yes.

21     **Q**    I'm showing you what we've marked as Exhibit 61 for

22  identification.

23     **MR. COVERT:**  Your Honor, I do object.  We were not

24  previously provided this.  I haven't had a chance to review

25  it with Mr. Olivo.  He's not seen it, as opposed to the

Olivo - Cross - Pantzer

1  exhibits that we all exchanged.

2      **THE COURT:**  Okay.  So why don't we have our meeting

3  right now.

4      **MR. COVERT:**  Very good.

5      **THE COURT:**  Okay.  And come downstairs I will see you

6  folks in a few minutes and we'll resume at some point.

7      **MR. COVERT:**  Thank you.

8      **MS. PANTZER:**  Thank you, your Honor.

9      (**WHEREUPON,** recess taken.)

10      (Open court:)

11      **THE CLERK:**  We are back on the record for the

12  continuation of the evidentiary hearing in case number

13  23-CV-525, Kershnar v. Kolison, et al.

14      All counsel and parties are present.

15      **THE COURT:**  Okay.  I remind the witness that you're

16  still under oath.

17      And you may continue.

18      **MS. PANTZER:**  Thank you, your Honor.

19      **Q**   I don't know if we got a response to the last

20  question on the record.  Is there a way to read it back, I

21  don't even know?

22      **MR. COVERT:**  I don't think there was a response.  I

23  think I objected and then we broke.

24      **THE COURT:**  I think that that's right.

25      And are you withdrawing your objection to the exhibit?

164

Olivo - Cross - Pantzer

1    **MR. COVERT:**  We would just like to have some idea of

2    where it came from or who obtained it but she can bring that

3    foundation in and we probably won't.

4    **THE COURT:**  Okay, terrific.

5    So you can use the exhibit and then if you want to admit

6    into evidence, lay a bit of a foundation with the witness --

7    obviously he doesn't know, either -- but you can lay a

8    foundation that way, okay.

9    **MS. PANTZER:**  Thank you, your Honor.

10   **THE COURT:**  So is there a way to read back last

11   question?

12   **MR. COVERT:**  I don't think so because there's no court

13   reporter.

14   **THE CLERK:**  You know what, I would have to call the IT

15   office.

16   **MS. PANTZER:**  It's okay.  It's okay.  I can do it again

17   I'm sure.

18   **Q**    I think my question, Mr. Olivo, was whether or not

19   part of the issue with an open source intelligence

20   investigation is that certain social media or certain

21   internet threats may not be readily available to someone

22   conducting an open source investigation?

23   A    That is correct.  If it's a private setting or if

24   there's requirements for friends or access to certain things,

25   it might not be readily accessible, correct?

Olivo - Cross - Pantzer

1    **Q**    Okay.  So Exhibit 61 that we've marked for
2    identification is in front of you.
3          Again, have you heard of the website Yik Yak, the
4    social media website?
5    A    Yes.
6    **Q**    Okay.  Showing you the first page of the exhibit.
7          Do you know who Amanda Austin is, by any chance?
8    A    I do not.
9    **Q**    Okay.  Well, would you agree with me that
10   Amanda Austin sent this email to Maria Carroll on
11   September 28th, 2023?
12   A    I would just say --
13   **MR. COVERT:**  Your Honor --
14   A    -- that someone --
15   **MR. COVERT:**  -- I would object.  I think maybe if we --
16   the question can be phrased "does it appear that".
17   **THE COURT:**  Yeah.  Does it appear that this is an email
18   from someone named AmandaAustin@Fredonia.edu, to someone
19   named MariaCarroll@Fredonia.edu?
20   **THE WITNESS:**  Yes.
21   **Q**    And it was sent on September 28th, 2023, at
22   12:35 p.m., would you agree with me?
23   A    Correct.
24   **Q**    Okay.  And there's an attachment if we scroll down.
25         And I'll represent to you, Mr. Olivo, that this

Olivo - Cross - Pantzer

1    attachment is -- contains Yik Yak postings with regard to

2    Dr. Kershnar from this weekend?

3        **MR. COVERT:**  Your Honor, I'm just going to object.

4        I mean, the document says what it says.  We don't have

5    any authentication.  The date is today's date at 12:35 p.m.

6    We have no idea who posted this.

7        I do not mean to be difficult but I, I am uncomfortable

8    having him somehow authenticate or validate the document.  It

9    sort of speaks for itself as to what it might be.  But I'm

10   very hesitant to, to ask him to authenticate a document.

11       **THE COURT:**  Well, no, no.  He's not going to be asked to

12   authenticate the document and I don't think he has been asked

13   to do that.

14       So let's let her use the document and it's not admitted

15   and unless there's some authentication of it, it won't be

16   admitted but let's let her use it.

17       **MR. COVERT:**  Okay.

18       **THE COURT:**  And I can, again, this is not a jury trial

19   so.

20       Go ahead.

21       **MS. PANTZER:**  Thank you, your Honor.

22       So again, we'll scroll -- Jenna, could you just zoom a

23   little bit, yes, so that we can see the whole page.

24       **Q**    All right.  So you said -- you testified, though,

25   Mr. Olivo, that you are familiar with Yik Yak?

Olivo - Cross - Pantzer

1    A    Correct.

2    Q    Okay.  So do you recognize these posts as Yik Yak

3 posts?

4    A    They appear to be, yes.

5    Q    Okay.  And the first post indicates:  "Why is

6 Kershnar at Old Main", correct?

7    A    Correct.

8    Q    And it states that it's from 18 hours ago?

9    A    Correct.

10    Q    Okay.  And the remaining posts, do you understand

11 those, based on your familiarity with Yik Yak, to be

12 responses to the root post:  "Why is Kershnar at Old Main"?

13    A    Correct, but with respect to the timeframe if it

14 was posted on 9/21, it would have been posted a week ago

15 today so that would have been 18 hours before so it would

16 have been Wednesday evening of 9/20.

17    Q    So, do you know what -- first of all, do you know

18 what "Old Main" is?

19    A    I believe it's a bar in Fredonia.

20    Q    Right.  Okay.  So the root postings "why is

21 Kershnar at Old Main" and then the remaining posts -- if I

22 could read them to you -- "Is he for FR".

23        Do you know what "FR" means?

24    A    For real.

25    Q    Yes.  I believe so.

Olivo - Cross - Pantzer

1      A    I'm old but I hear my kids talk about this stuff
2  all the time.
3      **THE COURT:**  That's good.  I never would have gotten
4  that.
5      A    For real, yeah.
6      **Q**    I believe --
7      A    FRFR means for real for real, so.
8      **Q**    I believe that's correct.
9           And then the second response states "run, people,
10 run, no, for real why is he here.  I don't think that's
11 legal.  $50 and I'll yell at him.  What?  No way."
12          So, the reason I'm showing you these posts, would
13 you agree with me that on Yik Yak at least there's been some
14 very recent interest shown as to Dr. Kershnar and his legal
15 matter here?
16     A    On 9/20, yes.
17     **Q**    Yes.
18     **MR. COVERT:**  I object to the characterization as his
19 legal matter.
20     **MS. PANTZER:**  I'm talking about the lawsuit here.
21     **MR. COVERT:**  What was just read does not refer to a
22 lawsuit, unless I'm missing something.
23     **MS. PANTZER:**  I'll rephrase, your Honor.  It's no
24 problem.
25     **Q**    I'm just asking you that these Yik Yak posts seem

Olivo - Cross - Pantzer

1   to indicate that there has been some interest in the Kershnar

2   matter very recently?

3       A     This is as of 9/20.  An interest in Mr. -- or

4   Dr. Kershnar being in Old Main.

5       Q     Right.  9/20 is --

6       A     Eight days ago.

7       Q     Right.  So, and -- and it says "I don't think

8   that's legal".  They're probably referring to this matter,

9   right, the legal matter?

10      A     I have no --

11      **MR. COVERT:**  I object.

12      **THE COURT:**  Yeah, sustained.

13      A     -- idea.

14      **THE COURT:**  Yeah, sustained.

15      **MS. PANTZER:**  That's fine.

16      **THE COURT:**  Sustained.

17      **Q**     The next page.

18            "Can someone confirm if Stephen Kershnar is at Old

19   Main or not?"

20            Again, do you recognize that to be a Yik Yak post?

21      A     All these posts appear to be Yik Yak posts.

22      **Q**     "Why is Kershnar laughing with Perry?"

23            Now, do you know who "Perry" is?

24      A     I have no idea.

25      **Q**     "Because they're both gross, cuz they're both

Olivo - Cross - Pantzer

1   pedos."

2           Do you recognize those to be Yik Yak posts from

3   this very recently, September of 2023?

4       A    They appear to be the same trip thread of the post,

5   yes.

6       **MS. PANTZER:**  Okay, wait.  Jenna.

7       **Q**    The root post here states:  "I don't believe

8   Kershnar's at Old Main unless we see a photo pic or it didn't

9   happen.  He was so uncomfy he left."

10          Do you agree with me that those Yik Yak posts from

11  very recently with regard to Dr. Kershnar being at a bar near

12  SUNY Fredonia?

13      A    They're part of the same thread that we discussed,

14  yes.

15      **Q**    So there's some interest online with regard to

16  Kershnar recently?

17      A    Yes.

18      **MS. PANTZER:**  Okay.  Down.

19      **Q**    Then they posted a photo of Dr. Kershnar at the

20  bar, would you agree with me, on the sixth page here?

21      A    That, that appears to be him, yes.

22      **Q**    All right.  Stop.

23          "This is so rancid, like get out of Old Main LOL.

24  I'm vomiting.  OMFG, Tay Tay would be so sad.  Someone F him

25  up."

Olivo - Cross - Pantzer


1          Did I read that one correctly, that Yik Yak post?

2     A     Number five, yes.

3     Q     Yes.  Number six states:  "I hate seeing him out.

4  YTFI -- means the F -- are you hanging out a college bar for

5  a Taylor Swift night.  You're not beating the allegations any

6  time soon."

7          Number seven states:  "Someone jump him, OMG."

8          What is your knowledge of what "jump him" means?

9     A     It's street vernacular.  It would mean to

10  physically attack someone.

11     Q     And again these are Yik Yak posts from very

12  recently, this month, correct?

13     A     I believe so.

14     Q     And an open source intelligence investigation

15  wasn't able to pick these up likely because they're private

16  based on geography, isn't that correct?

17     A     Yes.

18     Q     Okay.

19     **THE COURT:**  What does that mean:  "Private based on

20  geography"?

21     **MS. PANTZER:**  Your Honor, it's our understanding that

22  Yik Yak -- Yik Yak is geographically you can only get it into

23  the post it if you're within the vicinity.

24     **THE COURT:**  I see.

25     **MS. PANTZER:**  Your Honor, just because I have at this

Olivo - Cross - Pantzer

1    point used this exhibit with the witness, I would offer this

2    into evidence, Exhibit 61.

3         **MR. COVERT:**  Again, we have no authentication, your

4    Honor.  I would defer to the Court.

5         **THE COURT:**  I'll accept it for what it's worth.

6         **MS. PANTZER:**  Thank you, your Honor.

7         **THE COURT:**  I think I understand what it is and what it

8    isn't, so.

9         **MS. PANTZER:**  Jenna, if you could just go back to the

10   July and September Tweets, July 2023, Exhibits 41 and 42 in

11   evidence.

12        **Q**    Mr. Olivo, do you remember going over these with

13   me, the July 2023 and September 2023 Tweets, that we

14   discussed?

15        A    Yes.

16        **Q**    You don't think that these Tweets contain any

17   imminent or credible threats; is that correct?

18        A    Not in my estimation.

19        **Q**    Okay.  What is an imminent or credible threat in

20   your mind?

21        A    An example would be I'm coming to your house, I'm

22   going to kill you near the picture of the gun.

23             I mean -- and I can give you a real life example.

24   We had a student in a school posted photographs of himself on

25   the first day of school getting ready for school and putting

Olivo - Cross - Pantzer

1  a 9mm in his backpack.  That is an imminent, credible,

2  realistic, timely threat.

3      Q    Okay.  Going back earlier, you've never been a

4  member of the FBI's Behavioral Analysis Unit, correct?

5      A    Correct, I have not.

6      Q    Okay.  And you had never heard of the term

7  "behavioral leakage" before Chief Isaacson's testimony,

8  right?

9      A    I have heard of the term.

10     Q    Your expert report states at Paragraph 18, quote,

11 "Nothing in Isaacson's testimony suggested the existence of

12 any specific intelligence information or facts supporting

13 Isaacson's conclusion that Kershnar's return would likely --

14 would result in likely violence or imminent threat", is that

15 true?

16     A    I don't have it in front of me but I believe that's

17 what it says, yes.

18     Q    So you're only concerned with specific direct

19 threats, is that correct?

20     A    I'm not concerned with just specific direct

21 threats.  I'm saying that if there's no credible or

22 identifiable threat, there is nothing with which you can

23 adjust your security posture to.  So my opinion is, is that

24 if there is lacking a specific imminent, likely or credible

25 threat, then there is a scenario in which the campus can be

Olivo - Cross - Pantzer

1    secured.

2        Q    Okay.  So but these Tweets and the Tweets that we

3    showed Chief Isaacson on direct, to you, those aren't

4    concerning and don't require a security increase; is that

5    correct?

6        A    Chief Isaacson did not think so and he did not

7    increase security as a result of them.

8        Q    Well, he asked Dr. Kershnar to remain off campus,

9    right?

10       A    I don't know if he did or if that was a directive

11   from HR but.

12       Q    Well, SUNY Fredonia in response to those threats

13   asked Dr. Kershnar to remain off campus --

14       A    I believe --

15       Q    -- right?

16       A    I believe the university did.

17       Q    Okay.  So --

18       **THE COURT:**  Let me ask a question.  So one of the things

19   that Mr. Isaacson said was that "howlers don't hunt and

20   hunters don't howl".

21       Do you disagree with that?

22       **THE WITNESS:**  That is a theory, your Honor, that is used

23   in threat analysis and behavioral analysis.  We -- my

24   training is more along the lines of response to that or

25   mitigation of it.

Olivo - Cross - Pantzer

1      So, with respect to "hunters don't howl and howlers

2  don't hunt", I don't agree with it specifically because I

3  don't have any knowledge of that database or how they come up

4  to that conclusion.  My knowledge and expertise is more along

5  the lines of if there is a threat identified, how do we

6  mitigate it, how do we reduce the risk.

7      **THE COURT:**  Okay.  Thank you.

8      **Q**    Okay.  Well, piggybacking off of that, you just

9  said that if there is a threat identified, your training is

10  in how you mitigate the risk, correct?

11      A    Correct.

12      **Q**    So your training doesn't have any relevance to

13  the "howlers don't hunt" analysis, is that what you're

14  testifying to?

15      A    No, that's not what I'm threat -- what I'm

16  testifying to.  If the thought process is "howlers don't

17  hunt" -- which means that people who make threats don't act

18  them out -- that's not what I'm saying.  I mean, if that's

19  Mr. Isaacson's thought process, and he believes that the

20  howler is not a threat, then that's his thought process.  But

21  if he does believe the howler is a threat, my expertise is

22  how to mitigate that threat.

23      **Q**    Okay.  We're going to address the howlers don't

24  hunt issue further in a minute but I want to get back to the

25  behavioral analysis --

Olivo - Cross - Pantzer

1    A    Okay.

2    Q    -- aspect.  Again, the behavioral leakage analysis

3  that Chief Isaacson testified to on direct, you disagree with

4  that analysis, correct?

5    A    I disagree with the conclusion that was a result of

6  that analysis.  If that's his opinion and that's his

7  analysis, I can't dispute that if that's what he came up

8  with.

9    Q    But you don't agree that behavioral leakage poses a

10  threat?

11    A    I don't agree that behavioral leakage poses a

12  threat in the imminent credible and immediate sense.

13    Q    Right because you're concerned only with direct and

14  imminent threats?

15    A    And cred --

16    Q    You're not concerned --

17    A    And credible.

18    Q    With -- and credible.  You're not concerned with

19  behavioral leakage; is that correct?

20    A    Well, credibility is a very important part of the

21  threat analysis.  So, if behavioral leakage was a problem,

22  then there should have been a vetting of those leaked

23  behaviors and the people with which they're attributed to.

24    Q    All right.  Let's talk about the vetting because

25  you testified on direct about a zero tolerance policy that

Olivo - Cross - Pantzer

1   essentially you believe that every single threat that Chief

2   Isaacson found concerning should have been reported to law

3   enforcement of some kind; is that correct?

4        A    I don't think that's what I said.  I said that in

5   my consulting experience, in my professional experience, that

6   if there's a credible, direct threat, that the recipient of

7   that threat should have a -- or let's say in this case SUNY

8   Fredonia or a school district have a zero tolerance policy,

9   that threat should be reported to law enforcement for further

10  investigation and action.

11       Q    A local law enforcement agency?

12       A    Depends on where the threat originates from.

13       Q    Well, do you think that a local law enforcement

14  agency -- let's just take this first post.

15       **MS. PANTZER:**  Jenna could you scroll down a little bit

16  from the July 2023.

17       Q    Public hangings.  Do you think a local law

18  enforcement agency has the competency and ability to track

19  down who @pendejomemes is?

20       A    So there's two parts to that.  Number one, I don't

21  believe that is a direct and imminent threat.  But if it

22  were, yes, local law enforcement does have the means to get

23  the information as to the originator of that account from

24  Twitter.

25       Q    You would agree that Chief Isaacson has more recent

Olivo - Cross - Pantzer

1    and direct law enforcement experience than you do, right?

2        A    He has more recent experience, yes.

3        Q    Okay.  So in your experience, did you testify on

4    direct that you would refer these, these Twitter threats out

5    to the FBI?

6        A    I don't believe that's what I said.

7        Q    Okay.  So you feel that local law enforcement

8    agencies, Chautauqua County Police Department should be able

9    to track down @pendejomemes on Twitter?

10       A    Local law enforcement, if that's where the threat

11   jurisdiction lies, should be notified.  And local law

12   enforcement in my experience has the ability to bring in

13   federal counterparts and other agencies and resources,

14   whether it be federal or State Police to assist them in

15   tracking down and verifying the originator of the threat --

16       Q    Okay.

17       A    -- if there is one.

18       Q    But, again, you don't feel that this "public

19   hangings" -- just taking this as an example.  We've seen many

20   Tweets like this, right?  You don't feel that this "public

21   hangings" Tweet is a credible threat?

22       A    I don't believe that's a direct threat, no.

23       Q    Okay.  So Chief Isaacson didn't need to refer it

24   out, in your opinion?

25       A    I don't think Chief Isaacson referred any of the

Olivo - Cross - Pantzer

1   alleged threats out.

2       Q    Well, you -- you testified that if it's not a

3   direct or imminent threat, it doesn't need to be referred out

4   at all, right?

5       A    No.  You're asking me if Chief Isaacson -- well --

6   Chief Isaacson didn't have this, correct?

7       Q    Right, he didn't have this.

8       A    So --

9       Q    But we've seen many like this, right?

10      A    Right.

11      Q    So, this threat -- "public hangings" by

12  pendajomemes on Twitter -- should this threat have been

13  referred out to a local law enforcement agency?

14      A    In my professional experience, no.

15      Q    And that's because it's not a credible or direct

16  threat in your opinion?

17      A    Correct.

18      Q    But it is behavioral leakage, isn't it?

19      A    That would be an opinion that I don't have the

20  qualifications to render.

21      Q    Understood.  Okay.

22           Let's go back to howlers don't hunt.  You don't

23  address this concept in your expert report, do you?

24      A    No, I do not.

25      Q    Okay.  And that's because you feel that you don't

Olivo - Cross - Pantzer

1  have the qualifications to address this issue, howlers don't
2  hunt?
3      A    We've already established that I'm not an expert in
4  behavioral analysis.  And that is a term that's used in
5  behavioral analysis oftentimes.
6      Q    Okay.  So you're not comfortable with this concept
7  of "howlers don't hunt" personally?
8      **MR. COVERT:**  Your Honor, I object to the
9  characterization.
10     **THE COURT:**  Yeah, I don't know what that means.
11     Q    Okay, I just want to --
12     **THE COURT:**  Sustained.
13     Q    I just want to make sure I understand, I'm sorry.
14         You testified that you're not an expert in
15  behavioral analysis and, so, therefore, you don't have a ton
16  of familiarity, right, with this concept of "howlers don't
17  hunt"?
18     A    I'm familiar with it but you asked me why I didn't
19  address it in my report.  That's because I'm not an expert in
20  that field.  So, addressing that conclusion or summation by
21  Chief Isaacson would not be within my bailiwick.
22     Q    Already.  You feel that the A1C report undermines
23  Chief Isaacson's conclusions; is that correct?
24     A    I wouldn't say undermine.  I think they contradict
25  each other.

Olivo - Cross - Pantzer


1    **Q**    Can you go to his report at Paragraph 25 -- 24, I'm

2   sorry.  States:  "Overall, it is my opinion that Chief

3   Isaacson's conclusions were undermined by the report of A1C

4   partners", did I read that correctly?

5    A    Correct.

6    **Q**    And as a security professional, you regularly order

7   and review the types of reports provided by A1C partners?

8    A    Correct.

9    **Q**    And in doing so, you've never disagreed with those

10  reports, right?

11   A    I don't have the expertise to disagree with those

12  reports.

13   **Q**    You're aware that A1C director, Richard Denholm

14  provided a declaration in this matter?

15   A    I am.

16   **Q**    Okay.  He's also former FBI?

17   A    I understand that.

18   **Q**    For 22 years?

19   A    I understand that.

20   **Q**    Okay.  The declaration confirms that A1C was

21  contracted by Isaacson in August of 2022?

22   A    (No response.)

23   **Q**    We can pull it up.  Would that be helpful?

24   A    No, I --

25   **MS. PANTZER:**  Jenna.

Olivo - Cross - Pantzer

1      A     I disagree with the -- okay.

2      Q     I'm sorry.  I didn't hear your response.

3      A     Okay.

4      Q     So, yes, you agree the declaration confirms that
5  A1C was contracted with by Isaacson in August of 2022,
6  correct?

7      A     Yes.

8      Q     Okay.  In September of 2022, SUNY Fredonia
9  officially retained A1C to conduct the internet research that
10 is summarized in that A1C report, correct?

11     A     I believe that's correct.

12     Q     And A1C was asked to provide a, quote, "internet
13 scrub", isn't that true?

14     MS. PANTZER:  Let's pull up the Denholm declaration,
15 please.  That's from Paragraph 9.

16     Your Honor, I feel like we've addressed the Denholm
17 declaration but I don't know if it's in evidence but I would
18 offer it.

19     MR. COVERT:  No objection.

20     THE COURT:  Received without objection.

21     MS. PANTZER:  Thank you, your Honor.  That's Exhibit 44.

22     Q     Again, Paragraph 9, Richard Denholm confirms in
23 this declaration that A1C was asked to conduct a, quote,
24 "internet scrub", right?

25     A     No, I disagree with that statement.  It says here

Olivo - Cross - Pantzer

1  that the A1C report consisted of an internet scrub of open

2  source intelligence.  What they were contracted to do would

3  be outlined in their scope of work that we previously

4  reviewed.

5      Q    Okay.  But in any case, their actual report that

6  you feel undermines Chief Isaacson's conclusions, consisted

7  of a quote, "internet scrub", is that correct?

8      MR. COVERT:  I object.  He just clarified and she's

9  misconstruing what he said.

10      THE COURT:  I'm not so sure that's correct.

11      MR. COVERT:  Well, she asked if --

12      THE COURT:  Overruled.

13      MS. PANTZER:  Thank you, your Honor.

14      Q    Do you want me to repeat the question?

15      A    I think your question was their report consisted of

16  an internet scrub?

17      Q    Right.

18      A    I believe it did.

19      Q    Okay.  And the methodology was to, quote, "identify

20  and assess" -- and I'm reading from Paragraph 10 --

21  "available information as it pertains to Professor Kershnar

22  and to identify social media accounts for Professor Kershnar

23  as they may be public facing avenues for threats to be

24  directed to him and to Fredonia at large", correct?

25      A    Yes.

Olivo - Cross - Pantzer

1    **Q**    Okay.  And the part of the A1C report that you say

2    undermines Chief Isaacson's conclusions is the part that

3    states that there was, quote, "not an immediate or imminent

4    threat to the Fredonia campus, staff, students or to

5    Professor Kershnar found"; is that right?

6    A    Correct.

7    **Q**    But Mr. Denholm's declaration rather than

8    undermines, actually confirms everything Chief Isaacson said

9    about the A1C evaluation, doesn't it?

10    A    Specifically which part?

11    **Q**    Well, we can take it item by item.

12    Paragraph 12 of the Denholm declaration states that

13    A1C was not retained by SUNY Fredonia to provide behavioral

14    analysis or overall threat assessment, right?

15    A    I believe in their scope of work they were retained

16    to conduct -- there's nothing -- there's no mention of a

17    behavioral analysis, I would agree with that.

18    **Q**    Correct.

19    A    But within their scope of work there was mention of

20    a threat assessment.

21    **Q**    Right but the -- the declaration states that A1C

22    was not retained by SUNY Fredonia to provide behavioral

23    analysis or an overall threat assessment, isn't that right?

24    A    I'm not disagreeing you with what the declaration

25    says.  What I'm disagreeing with is that in the scope of work

Olivo - Cross - Pantzer

1  that was previously presented to me, a threat assessment was

2  in that scope of work.

3     **Q**    The scope of work predates Richard Denholm's

4  declaration, right?

5     **A**    Yes, it does.

6     **Q**    He also states in the A1C -- that the A1C report

7  did not opine on the security environment that would exist if

8  Professor Kershnar returned to campus in the future, that's

9  Paragraph 14, correct?

10     **A**    Correct.

11     **Q**    Mr. Denholm's declaration also confirms the

12  behavioral leakage concept was at play, doesn't it?

13     **A**    I'm sorry?

14     **Q**    Paragraph 15.

15     **A**    15.  That's what his declaration says.

16     **Q**    Okay.  Mr. Denholm also agrees with Chief Isaacson

17  that if Kershnar were to return to campus, there would be a

18  high threat environment similar to what occurred in

19  February 2022.  That's Paragraph 19.

20     **A**    I see that in his declaration.

21     **Q**    Okay.

22     **A**    However, I would disagree with it, and the reason

23  being the report that was offered by A1C to SUNY Fredonia is

24  contradictory to this.  Chief Isaacson testified that A1C

25  does not have the expertise to render that opinion.  However,

Olivo - Cross - Pantzer

1  Mr. Denholm is rendering that opinion in this declaration so

2  I think they're contradictory.

3      Q    All right.  But you agree with the A1C report but

4  you don't agree with Richard Denholm's declaration --

5      A    I'm saying --

6      Q    -- is that the testimony?

7      A    That Chief Isaacson testified that they don't have

8  the expertise to make that conclusion.

9      Q    And doesn't Richard Denholm confirm that?

10     A    He's agreeing with the data that was provided to

11 him by Chief Isaacson.

12     Q    He agreed with Chief Isaacson that behavioral

13 leakage was an issue in this case, right?

14     A    Well, if he's making the conclusion on his own,

15 then we have to assume that he has the credentials to make

16 that conclusion.  Chief Isaacson (sic) testified that he does

17 not and only Chief Isaacson has the credentials to do that.

18 That was his testimony.  So, either Mr. Denholm has that

19 credentials or he's agreeing with Chief Isaacson's

20 assessment.  That's my opinion.

21     Q    So he agrees with Chief Isaacson's assessment?

22     A    He's reiterating what Chief Isaacson had to say.

23     Q    Okay.

24     **MS. PANTZER:**  Can I have a moment, your Honor.

25     **THE COURT:**  Sure.

Kershnar v. Kolison, et al - 23-CV-525


1       **MS. PANTZER:**  Thank you.

2       (WHEREUPON, there was a discussion held off the record.)

3       **MS. PANTZER:**  I'm all set, your Honor.

4       **THE COURT:**  You're done?

5       **MS. PANTZER:**  Yes.

6       **THE COURT:**  Okay.  Do you want to start your redirect

7   now?

8       **MR. COVERT:**  Your Honor, if we were going to come back

9   another day, I'd rather just do it all at once.

10      **THE COURT:**  Let's do that then.  We will now break for

11  the day and can we schedule a time to come back to discuss

12  where we're going with this.

13      **MR. COVERT:**  Yes, your Honor.  We certainly can -- if

14  we're just doing a conference with the Court, then we don't

15  need the witnesses here.

16      **THE COURT:**  Yes.

17      **MR. COVERT:**  We don't have to worry about their

18  scheduling.  My only major issue is I'm out of town the week

19  of October 9th.  So before or after we'll -- so next week

20  will work for me.  Then the week of October 9th, I'm out of

21  commission.  I'm out of town.  And then after that, I'm

22  available generally just between court appearances which we

23  can always work around.

24      **THE COURT:**  Okay.  So let's ask the defense.

25      **MR. BOYD:**  Your Honor, my schedule is generally fine

Kershnar v. Kolison, et al - 23-CV-525

1    next week but I think talking internally to the client may

2    take a little bit of time.

3       THE COURT:  What about the end of next week?  I'd like

4    to do it before Mr. Covert leaves but I understand what

5    you're saying, too, but I want to give you folks enough time

6    to talk with your clients.

7       So what about the end -- you think the end of next week

8    might work?

9       MR. COVERT:  Your Honor, Thursday, October 5th is wide

10   open for me.  It's a week from today, I believe.

11      MR. BOYD:  Do we want to go off the record for this?

12      THE COURT:  Yeah, let's go off the record.

13      (WHEREUPON, proceedings adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25

Kershnar v. Kolison, et al - 23-CV-525


1

2                    *          *          *

3              **CERTIFICATE OF TRANSCRIBER**

4

5         In accordance with 28, U.S.C., 753(b), I

6    certify that this is a true and correct record of proceedings

7    from the official audio recording of the

8    proceedings held in the United States District Court

9    for the Western District of New York before the

10   Honorable Lawrence J. Vilardo on September 28, 2023.

11

12

13   S/ Diane S. Martens

14   Diane S. Martens
     Transcriber
15

16

17

18

19

20

21

22

23

24

25