10:22AM

1

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

2

3

_____

4

**STEPHEN KERSHNAR,**

Case No. 1:23-CV-525

5                    Plaintiff,                    (LJV)

6    vs.                              September 13, 2023

7    **STEPHEN H. KOLISON, JR.,** in his
individual capacity and his

8    official capacity as the President
of the State University of New York

9    at Fredonia, and

10   **DAVID STARRETT,** in his individual
capacity and official capacity as

11   Executive Vice President and
Provost of the State University of

12   New York at Fredonia,

13   _____Defendants._____

14

**EVIDENTIARY HEARING - DAY 1**

15   **BEFORE THE HONORABLE LAWRENCE J. VILARDO**
**UNITED STATES DISTRICT JUDGE**

16

17   <u>**APPEARANCES:**</u>     **LIPSITZ GREEN SCIME CAMBRIA LLC**
**BY: BARRY NELSON COVERT, ESQ.**

18              42 Delaware Avenue
Suite 300

19              Buffalo, New York 14202
And

20           **FOUNDATION FOR INDIVIDUAL RIGHTS & EXPRESSION**
**BY: ADAM B. STEINBAUGH, ESQ.**

21              **KELLEY L. BREGENZER, ESQ.**
510 Walnut Street

22              Suite 1250
Philadelphia, Pennsylvania 19106

23           **BY: ROBERT CORN-REVERE, ESQ.**
**JOSHUA T. BLEISCH, ESQ.**

24              700 Pennsylvania Avenue SE
Suite 340

25              Washington, DC 20003
For the Plaintiff

```
 1                    LETITIA A. JAMES
                      NEW YORK STATE ATTORNEY GENERAL
 2                    BY: ALYSSA JORDAN PANTZER, ESQ.
                          Assistant NYS Attorney General
 3                        Health Care Bureau
                          28 Liberty Street
 4                        19th Floor
                          New York, New York 10005
 5                    BY: JENNIFER METZGER KIMURA, ESQ.
                          CHRISTOPHER LAWRENCE BOYD, ESQ.
 6                        Assistant NYS Attorneys General
                          350 Main Street
 7                        Suite 300 A
                          Buffalo, New York 14202
 8                           And
                      STATE UNIVERSITY OF NEW YORK
 9                    BY: KRISTIN KLEIN WHEATON, ESQ.
                          Office of General Counsel
10                        Western Campuses Office
                          1300 Elmwood Avenue
11                        Cleveland Hall, Room 507-A
                          Buffalo, New York 14222
12                    For the Defendant

13   PRESENT:         MEGAN COMMAROTO, Paralegal

14   COURT CLERK:     JANE D. KELLOGG

15   COURT REPORTER: ANN M. SAWYER, FCRR, RPR, CRR
                          Robert H. Jackson Courthouse
16                        2 Niagara Square
                          Buffalo, New York 14202
17                        Ann_Sawyer@nywd.uscourts.gov

18

19                    *   *   *   *   *   *   *   *

20
```

11:12AM  21          (Proceedings commenced at 11:12 a.m.)

11:12AM  22          THE CLERK:  All rise.  United States District Court

11:12AM  23   for the Western District of New York is now in session, the

11:12AM  24   Honorable Lawrence J. Vilardo presiding.

11:12AM  25          THE COURT:  Please be seated.

| | | |
|---|---|---|
| 11:12AM | 1 | THE CLERK:  23-CV-525, Kershnar versus Kolison, et al. |
| 11:12AM | 2 | Attorneys Barry N. Covert, Joshua T. Bleisch, Robert |
| 11:12AM | 3 | Corn-Revere, and Adam Steinbaugh, appearing on behalf of the |
| 11:12AM | 4 | plaintiff. |
| 11:12AM | 5 | Also present is attorney Kelley Bregenzer, who's |
| 11:13AM | 6 | pending admission pro hac vice. |
| 11:13AM | 7 | Attorneys Jennifer Metzger Kimura, Alyssa Jordan |
| 11:13AM | 8 | Pantzer, and Christopher Boyd are present on behalf of the |
| 11:13AM | 9 | New York State Attorney General's Office for the defendant. |
| 11:13AM | 10 | Also present is State University of New York |
| 11:13AM | 11 | counsel's office attorney, Kristin Klein Wheaton. |
| 11:13AM | 12 | This is the date set for an evidentiary hearing. |
| 11:13AM | 13 | THE COURT:  Okay.  Good morning, everybody. |
| 11:13AM | 14 | So, first of all, I'm granting the motion to appear |
| 11:13AM | 15 | pro hac vice, so you are now admitted.  I will sign this. |
| 11:13AM | 16 | MS. BREGENZER:  Thank you, Your Honor. |
| 11:13AM | 17 | THE COURT:  You're welcome. |
| 11:14AM | 18 | Okay.  So before we begin, I want to make sure that |
| 11:14AM | 19 | we're all on the same page, and that I understand what's going |
| 11:14AM | 20 | on today, and that everybody else agrees with what's my |
| 11:14AM | 21 | understanding of it. |
| 11:14AM | 22 | So ordinarily, because the plaintiff has the burden |
| 11:14AM | 23 | of proof on this, the plaintiff would be presenting proof in |
| 11:14AM | 24 | support of its request for a preliminary injunction.  In this |
| 11:14AM | 25 | case, the plaintiff is not going to do that because the |

11:14AM    1    plaintiff is relying on their papers for meeting their burden

11:14AM    2    of proof and, in fact, doesn't think that a hearing is

11:14AM    3    necessary.

11:14AM    4         The defense thinks a hearing is necessary.  So the

11:14AM    5    defense is going to put on proof with respect to the reasons

11:14AM    6    that security issues require the plaintiff's continued removal

11:14AM    7    from campus; is that right?

11:14AM    8         MS. PANTZER:  Yes, Your Honor.

11:15AM    9         THE COURT:  And the plaintiff agrees with that, as

11:15AM    10   well?

11:15AM    11        MR. COVERT:  Yes, Your Honor.

11:15AM    12        THE COURT:  Okay.  Are we going to start with any

11:15AM    13   opening statements before -- do you want to -- do you folks

11:15AM    14   want contemplate making an opening statement of any sort?

11:15AM    15        MR. BOYD:  Your Honor, we would defer to the Court.

11:15AM    16        I did have a few preliminaries just to go over before

11:15AM    17   we got into the substance, but I'll let Your Honor address any

11:15AM    18   other preliminaries you have.

11:15AM    19        THE COURT:  It's entirely up to the lawyers how you

11:15AM    20   want to -- you know, I swore to myself when I became a judge

11:15AM    21   that I wouldn't interfere with lawyers handling their cases.

11:15AM    22   And as much as I'd like to on a number of occasions, I've sat

11:15AM    23   on my hands for that very reason.  Because I remember when I

11:15AM    24   was a lawyer, judges screwing up my idea of how to present a

11:15AM    25   case, and I just don't want to do that.  So I let the lawyers

11:15AM   1   make those kinds of decisions.

11:15AM   2          So, if you folks don't feel the need to make an

11:15AM   3   opening statement, there's no reason for it.

11:15AM   4          Okay.  You said you had some preliminaries.

11:15AM   5          MR. BOYD:  Yes.  Yes, Your Honor.  So we had filed a

11:15AM   6   stipulated protective order that the parties had negotiated.

11:15AM   7   Our main concern was given the quickness with which we had to

11:16AM   8   complete our document review and production, we wanted a

11:16AM   9   privilege clawback under Federal Rule of Evidence 502(D), and

11:16AM   10  you need a court order to effectuate that.  So we would ask

11:16AM   11  that the Court so order that stipulated protective order.  And

11:16AM   12  that was filed --

11:16AM   13         THE COURT:  When was it filed?

11:16AM   14         MR. BOYD:  Let's see.  It was filed on the 9th, and

11:16AM   15  it's ECF number 39.

11:16AM   16         THE COURT:  Okay.  Yeah, I don't know that I have

11:16AM   17  that in front of me.  Any objection to my --

11:16AM   18         MR. COVERT:  No, Your Honor.

11:16AM   19         THE COURT:  -- just so ordering it from the bench?

11:16AM   20         MR. COVERT:  No.

11:16AM   21         THE COURT:  Okay.  So I will --

11:16AM   22         MR. COVERT:  We've reviewed it, and consented.

11:16AM   23         THE COURT:  Okay.  Let me take a quick read through

11:16AM   24  it just to make sure I'm comfortable with it.

11:16AM   25         Okay.  Yeah.  I don't see any problem with this, so I

11:17AM    1    will grant this.  I'll sign it now.  Okay.

11:17AM    2            MR. BOYD:  And then, Your Honor, I had two other

11:17AM    3    brief housekeeping matters.

11:17AM    4            So on the topic of expert disclosures, as Your Honor

11:17AM    5    is aware, we had raised by letter on August 31st that we felt

11:18AM    6    we needed more disclosure about what plaintiff's experts were

11:18AM    7    going to be testifying about.

11:18AM    8            Last night, they provided us with an expert witness

11:18AM    9    summary.  Our primary problem with the witness list they had

11:18AM   10    given us before is that there was only a four-sentence

11:18AM   11    description of what experts were going to testify about.

11:18AM   12    Their current summary also, for each expert, only had a

11:18AM   13    four-sentence disclosure as to what the expert was going to

11:18AM   14    testify about.

11:18AM   15            The summary was not signed by the experts, it was

11:18AM   16    signed by counsel.  It doesn't disclose their compensation.

11:18AM   17    We've asked for that, we still haven't received it.

11:18AM   18            Most of what the summaries are is a list of what they

11:18AM   19    relied upon, a lot of which is just our exhibit list repeated

11:18AM   20    back to us.

11:18AM   21            I will say, to his credit, I sent an email about this

11:18AM   22    last night to Mr. Steinbaugh.  He provided me with an email

11:18AM   23    with some substance as to what the experts were going to say.

11:18AM   24    It was after midnight, before 1 a.m.  But it still is not

11:19AM   25    signed by the experts, it's a statement of counsel with a very

11:19AM        1    brief summary.

11:19AM        2            So we've been doing our best to try to prepare

11:19AM        3    cross-examination for these experts, but in all fairness we've

11:19AM        4    had no opportunity until this morning.  I've been driving back

11:19AM        5    from Albany starting at 4 in the morning, I've barely been

11:19AM        6    able to look at them.  So we really have not had time to

11:19AM        7    prepare a cross-examination.

11:19AM        8            I'll also note on the topic of the exhibit list,

11:19AM        9    plaintiffs have submitted a supplemental exhibit list which

11:19AM       10    increases their exhibits from 58 to 94.  Now I understand why

11:19AM       11    they may need to add exhibits for documents that we produced

11:19AM       12    on Monday.  Understandable, they didn't have those before

11:19AM       13    Monday.

11:19AM       14            But a number of their exhibits are documents that

11:19AM       15    they produced, and I don't see why those weren't on their

11:19AM       16    original exhibit list.

11:19AM       17            THE COURT:  Okay.  We'll deal with these issues as

11:19AM       18    they come up.  So I assume the plaintiff's experts are not

11:19AM       19    going be testifying from the get-go at the start of this

11:20AM       20    proceeding.  And you can raise whatever issues you need to

11:20AM       21    raise or cross -- again, you know, the technical discovery

11:20AM       22    obligations don't apply in a hearing like this, as I

11:20AM       23    understand it, so the expert report doesn't have to be the

11:20AM       24    full-blown expert reports that you get for a trial.  So it's

11:20AM       25    different.

11:20AM   1          So, if -- if you think that your ability to

11:20AM   2   cross-examine has been compromised in some way by the

11:20AM   3   disclosure, and that you're unable to do that, raise it when

11:20AM   4   the time comes, and request the relief that you want when the

11:20AM   5   time comes.

11:20AM   6          MR. BOYD:  Okay, Your Honor, I just didn't want to

11:20AM   7   sit on my hands --

11:20AM   8          THE COURT:  No, no --

11:20AM   9          MR. BOYD:  -- now and be --

11:20AM   10          THE COURT:  -- no, and I'm not --

11:20AM   11          MR. BOYD: -- accused of sandbagging --

11:20AM   12          THE COURT:  -- and I'm not --

11:20AM   13          MR. BOYD: -- when I raise it later.

11:20AM   14          THE COURT:  -- and I'm not in any way being critical.

11:20AM   15   On the contrary, I'm glad you're teeing this up.

11:20AM   16          I'm just saying the way we will handle it --

11:20AM   17          MR. BOYD:  Okay.

11:21AM   18          THE COURT:  -- now that it is teed up is when the

11:21AM   19   time comes, you make the objection and request some relief.

11:21AM   20   Putting the hearing over for a few weeks while you prepare

11:21AM   21   your cross-examination, or something along those lines, I get

11:21AM   22   it.

11:21AM   23          MR. BOYD:  Understood, Your Honor.

11:21AM   24          THE COURT:  Okay?

11:21AM   25          MR. BOYD:  We will do that.  Thank you very much.

11:21AM    1            THE COURT:  Okay.  Anything else?

11:21AM    2            MR. BOYD:  I think that's it.  I guess I would just

11:21AM    3    ask the plaintiffs, do you want openings?

11:21AM    4            MR. COVERT:  I don't think so.

11:21AM    5            THE COURT:  Okay.  Do you have any housekeeping

11:21AM    6    matters that we need to --

11:21AM    7            MR. CORN-REVERE:  Just one point.  I understand

11:21AM    8    you've described how we're going to proceed based on the

11:21AM    9    potential objection to experts.  I just wanted the record to

11:21AM   10    be clear that what we in fact provided with the expert witness

11:21AM   11    summaries were the full CVs of the -- of the experts exhibit.

11:21AM   12            We also included a list of all of the materials that

11:21AM   13    they reviewed, as well as a summary of what they expected to

11:21AM   14    say.  Of course, because of the rebuttal witnesses, they'll be

11:21AM   15    responding to testimony that they hear in court today.  It's

11:22AM   16    not possible that we're going to list everything that they're

11:22AM   17    going to say.

11:22AM   18            And then after Mr. Boyd's email of 10:40 p.m. last

11:22AM   19    night, we did respond right around 1 a.m. with a more fulsome

11:22AM   20    discussion of the topics that our experts are going to discuss

11:22AM   21    with specific references by Bate, Bates Stamp number to the

11:22AM   22    materials that they're going to be relying on.

11:22AM   23            So, I just want the record to be clear that we're not

11:22AM   24    talking about just some four-sentence description that gives

11:22AM   25    the government no idea.

| | | |
|---|---|---|
| 11:22AM | 1 | THE COURT:  Well, when the time comes, I will take a |
| 11:22AM | 2 | look at the disclosure that was made. |
| 11:22AM | 3 | And, again, I sat where you guys are sitting for lots |
| 11:22AM | 4 | of years, a lot longer than I've been sitting in this chair. |
| 11:22AM | 5 | And so I understand what is expert disclosure, and what's |
| 11:22AM | 6 | enough and what's not enough, I think I understand it anyway, |
| 11:22AM | 7 | and I'll make a call if I have to.  But let's cross that |
| 11:23AM | 8 | bridge when we come to it. |
| 11:23AM | 9 | MR. CORN-REVERE:  Thank you, Your Honor. |
| 11:23AM | 10 | THE COURT:  Okay.  So you can begin. |
| 11:23AM | 11 | MS. PANTZER:  Thank you, Your Honor.  The defendant |
| 11:23AM | 12 | will call Chief Brent Isaacson. |
| 11:23AM | 13 | THE COURT:  Okay.  And let me say this before you |
| 11:23AM | 14 | walk out, witnesses should be excluded from the courtroom |
| 11:23AM | 15 | before they testify, right?  Once they testify, they can stay, |
| 11:23AM | 16 | but they should be sequestered before they testify. |
| 11:23AM | 17 | Yes? |
| 11:23AM | 18 | MR. COVERT:  Your Honor, we would ask that our expert |
| 11:23AM | 19 | witnesses be allowed to stay in the courtroom, because they |
| 11:23AM | 20 | are going to be rebuttal witnesses, and they need to hear what |
| 11:23AM | 21 | Mr. Isaacson or Mr. Holder are going to say so that they -- |
| 11:23AM | 22 | otherwise, we can summarize for them, it may slow things down, |
| 11:23AM | 23 | as to their opinions. |
| 11:23AM | 24 | THE COURT:  That's true.  Thoughts on that? |
| 11:23AM | 25 | MR. BOYD:  Your Honor, I -- I -- I don't have any |

11:23AM   1   objection to their --

11:23AM   2           THE COURT:  Okay.

11:23AM   3           MR. BOYD:  -- expert witnesses --

11:23AM   4           THE COURT:  Fine.

11:23AM   5           MR. BOYD:  -- staying.

11:23AM   6           THE COURT:  Fine.  Your expert witnesses can stay.

11:23AM   7           MR. COVERT:  Great.  Thank you.

11:23AM   8           THE COURT:  All set.

11:23AM   9

11:24AM  10   **B R E N T   I S A A C S O N**, having been duly called and

11:25AM  11   sworn, testified as follows:

11:25AM  12           MS. PANTZER:  May I proceed, Your Honor?

11:25AM  13           THE COURT:  You may.

11:25AM  14           MS. PANTZER:  Thank you.

11:25AM  15

11:25AM  16               **DIRECT EXAMINATION BY MS. PANTZER:**

11:25AM  17   Q. Chief Isaacson, thank you for being here today.  I want to

11:25AM  18   start by talking about your background and qualifications, so

11:25AM  19   can you briefly describe your educational background for the

11:25AM  20   Court?

11:25AM  21   A.  Sure.  I hold a mechanical engineering degree from the

11:25AM  22   University of Rochester.  I was a Navy ROTC scholarship

11:25AM  23   recipient.  I went into the nuclear Navy as a commissioned

11:25AM  24   officer.

11:25AM  25       I served in the Nuclear Navy for six years at a unit

11:25AM  1  called Naval Reactors.  That's Hyman Rickover's headquarters

11:25AM  2  for the Naval Nuclear Propulsion Program.  I was involved in

11:25AM  3  doing engineering work, research on specialty areas in

11:25AM  4  reactor engineering for those years.

11:25AM  5      I attended a six-month, full-time engineering school at

11:25AM  6  the Bettis, that's B-E-T-T-I-S, Bettis Atomic Power

11:26AM  7  Laboratory in Pittsburgh.  That's, at the time, was the

11:26AM  8  Navy's version of a master's degree in nuclear engineering.

11:26AM  9      I left the Navy in 1993.  I went to work for Westinghouse

11:26AM  10  at their science and technology center in Pittsburgh,

11:26AM  11  Pennsylvania.  I did related engineering work for three

11:26AM  12  years.

11:26AM  13      I worked for short time at the nuclear site in

11:26AM  14  West Valley, New York.

11:26AM  15      And in the summer -- actually, the fall of 1996, I was

11:26AM  16  hired as a FBI agent.  I began my training as a new agent at

11:26AM  17  the FBI Academy.  And in January of 1997, I was assigned to

11:26AM  18  the Washington, D.C. field office of the FBI.  I worked on a

11:26AM  19  squad of agents that focused on corruption in the federal

11:27AM  20  government.  That took me into a lot of public corruption

11:27AM  21  investigations in the executive branch of the federal

11:27AM  22  government.

11:27AM  23      In 1999, I transferred to the Buffalo division of the

11:27AM  24  FBI.  I was assigned to the Jamestown resident agency for

11:27AM  25  that time.

Case 1:23-cv-00525-LJV-JJM   Document 66   Filed 12/21/23   Page 13 of 166
Kershnar v Kolison - Isaacson - Pantzer/Direct - 9/13/23

13

| | | |
|---|---|---|
| 11:27AM | 1 | During my time here in Buffalo, approximately 2004 or so, |
| 11:27AM | 2 | I became, in our term of art, in the FBI's term of art, a |
| 11:27AM | 3 | coordinator for the FBI's Behavioral Analysis Unit, that's |
| 11:27AM | 4 | part of a broader FBI organization called the National Center |
| 11:27AM | 5 | For the Analysis of Violent Crime.  In that role, I was |
| 11:27AM | 6 | responsible, in addition to my investigative work, working |
| 11:27AM | 7 | with police departments around Western New York that were |
| 11:27AM | 8 | working on particularly heinous crimes, murders, child |
| 11:27AM | 9 | abductions, child sexual exploitation, those kinds of |
| 11:27AM | 10 | matters. |
| 11:27AM | 11 | After the Sandy Hook shooting in 2012, the FBI was tasked |
| 11:28AM | 12 | by the White House and congress to see if there was a way to |
| 11:28AM | 13 | prevent these horrible tragedies from happening around the |
| 11:28AM | 14 | country.  So the FBI took a lead role in assembling, really, |
| 11:28AM | 15 | the country's top minds in violence prevention and targeted |
| 11:28AM | 16 | violence, and that was all done through the Behavioral |
| 11:28AM | 17 | Analysis Unit. |
| 11:28AM | 18 | I was tasked, as the Buffalo coordinator for the |
| 11:28AM | 19 | Behavioral Analysis Unit, to go to Quantico, meet with the |
| 11:28AM | 20 | BAU, and receive some extensive, I should say, intensive |
| 11:28AM | 21 | training in threat assessment, threat mitigation plans, how |
| 11:28AM | 22 | they work, why they work. |
| 11:29AM | 23 | And then I was tasked also to go out into the community |
| 11:29AM | 24 | here in Western New York and teach law enforcement, teach K |
| 11:29AM | 25 | through 12 schools, and college administrators, college law |

Kershnar v Kolison - Isaacson - Pantzer/Direct - 9/13/23

11:29AM  1    enforcement departments, how to recognize the telltale signs

11:29AM  2    that somebody might be planning an act of targeted violence.

11:29AM  3    This particular area really interested me from a professional

11:29AM  4    standpoint.

11:29AM  5        I had -- I had begun a master's degree in psychology by

11:29AM  6    then, and I focused my academic work at the time on reading,

11:29AM  7    understanding, writing, about the research that had been done

11:29AM  8    in academia and in law enforcement on this phenomenon of

11:29AM  9    people of carry out acts of targeted violence.

11:30AM  10       I received a master's degree in 2014.  That really helped

11:30AM  11   me in this particular niche that I was interested in, in

11:30AM  12   violence prevention.  And I personally -- I redoubled my

11:30AM  13   efforts in Western New York to get that message out, that

11:30AM  14   these acts are preventable and research very clearly shows

11:30AM  15   that.

11:30AM  16       The key, from the FBI's standpoint, is teaching the

11:30AM  17   community how to recognize those telltale behaviors that

11:30AM  18   researchers have learned that people exhibit when they are

11:30AM  19   planning a violent act.

11:30AM  20       The idea is turning bystanders, people who just observe

11:30AM  21   these activities and not do anything about them or report

11:30AM  22   them, we want to turn those bystanders into upstanders,

11:31AM  23   people that say, oh, I know that behavior, was taught what

11:31AM  24   that behavior might mean, and give them the tools that they

11:31AM  25   need to recognize those behaviors, call law enforcement, call

11:31AM   1   school administrators, whatever it may be.

11:31AM   2       It -- a good corollary to that or a good analogy to that

11:31AM   3   is if you see something, say something.  We all know what a

11:31AM   4   suspicious thing might look like; an unattended bag in a

11:31AM   5   courtroom lobby, that would quickly generate some attention.

11:31AM   6       The idea of -- the FBI's idea here is to educate the

11:31AM   7   public as to what those -- those signs are.

11:31AM   8       I left the FBI in 2019.  My last day in the Bureau was

11:31AM   9   June 30th of 2019.

11:31AM  10       I had been hired to serve as the chief of the University

11:31AM  11   Police at SUNY Fredonia.  I began that job just a week after

11:32AM  12   I left the FBI.  And I was at Fredonia for four years almost

11:32AM  13   to the day, I retired from Fredonia just this last June 30.

11:32AM  14       And during my time at Fredonia, I was really trying to

11:32AM  15   leverage the training, experience, that I got at the Bureau

11:32AM  16   to educate the Fredonia campus community on this subject

11:32AM  17   matter, what do violent offenders look like before they

11:32AM  18   behave -- before they offend, rather.

11:32AM  19       And I also pushed that out to a lot of my colleagues

11:32AM  20   throughout the SUNY system.  During the COVID days of Zoom

11:32AM  21   meetings, I gave a 2-hour presentation to all of the

11:32AM  22   university chiefs of police throughout the SUNY system.  I

11:33AM  23   spoke to all of the student conduct directors across the SUNY

11:33AM  24   campuses on a Zoom meeting.

11:33AM  25       And I also took the show on the road, went to a few

| | | |
|---|---|---|
| 11:33AM | 1 | campuses clear up to Plattsburgh, in January I remember once, |
| 11:33AM | 2 | to give that -- that message to their behavioral intervention |
| 11:33AM | 3 | team. |
| 11:33AM | 4 | So I really did focus my -- my time at Fredonia sort of |
| 11:33AM | 5 | preaching that gospel. |
| 11:33AM | 6 | Q.  Thank you, Chief.  Also, I believe in your résumé, it |
| 11:33AM | 7 | stated that you developed a deep understanding of how |
| 11:33AM | 8 | offenders behave before they commit crimes.  Does that go |
| 11:33AM | 9 | back to your training in the BAU unit? |
| 11:33AM | 10 | A.  It does, and to the academic studies that I pursued. |
| 11:33AM | 11 | Would you like me to summarize? |
| 11:33AM | 12 | Q.  Can you just elaborate -- |
| 11:33AM | 13 | A.  Sure. |
| 11:33AM | 14 | Q.  -- on your understanding of violent actors behavior prior |
| 11:34AM | 15 | to committing a crime? |
| 11:34AM | 16 | A.  Sure.  Researchers, and particularly the FBI which has |
| 11:34AM | 17 | access to police investigative files that many researchers do |
| 11:34AM | 18 | not have access to, after a completed attack, typically an |
| 11:34AM | 19 | active shooting, researchers at the BAU will do very, very |
| 11:34AM | 20 | in-depth retrospective examinations of the investigative |
| 11:34AM | 21 | findings for a particular active shooting. |
| 11:34AM | 22 | That kind of knowledge, the knowledge that academic |
| 11:34AM | 23 | researchers had done, mostly particularly over the last 25 |
| 11:34AM | 24 | years or so, has led to a consensus among people that are in |
| 11:34AM | 25 | the threat assessment field in law enforcement that offenders |

11:34AM  1    progress through what we call a pathway of violence.

11:34AM  2        The research shows pretty clearly, very clearly, that

11:35AM  3    people who are motivated to commit these kinds of horrible

11:35AM  4    crimes --

11:35AM  5        I'm going to use the word "always," and I'll clarify that

11:35AM  6    in a moment.

11:35AM  7        -- they always have a deeply-held fixated grievance to

11:35AM  8    the target.  The target might be a person, the target might

11:35AM  9    be an institution.

11:35AM  10       When I was in the FBI, at a 2-week in-person training

11:35AM  11   with the Behavioral Analysis Unit, we got to talking about

11:35AM  12   were there -- have there been any cases in the FBI's research

11:35AM  13   where a grievance wasn't identified?  And there was only one,

11:35AM  14   and that was the Las Vegas shooter.

11:35AM  15       Investigators were not able to put together an idea of

11:35AM  16   what that grievance was.  He led a very, very sterile life.

11:35AM  17   A search of his home yielded no information.  There were --

11:36AM  18   he had a very introverted personality, and that was the only

11:36AM  19   case that the BAU was aware of where a grievance wasn't

11:36AM  20   identified retrospectively.  Oftentimes, the offender lets

11:36AM  21   that be very, very well-known.

11:36AM  22       So we always a grievance.  And I'll use that "always"

11:36AM  23   with the asterisk of the Las Vegas shooter.

11:36AM  24       In many offenders, they also have narcissistic

11:36AM  25   personalities.  And the term of art that the FBI uses is that

11:36AM   1   these are brittle people.  They are people that are easily

11:36AM   2   wounded, oftentimes they -- they can recount with precision

11:36AM   3   injuries to their ego that might have happened months or

11:36AM   4   years earlier, whereas most of us can get over those bumps in

11:36AM   5   life.  These personalities cannot do so.

11:37AM   6       And that sets up a psychologically painful mindset for

11:37AM   7   these soon-to-be offenders.  They're easily grieved.  They

11:37AM   8   hold on to their grievances.  They nurture those grievances.

11:37AM   9   They revisit them.

11:37AM   10      And they're very narcissistic.  They have the idea that,

11:37AM   11  why is this injustice happening?  And why is it happening to

11:37AM   12  me?  Or why is it happening to a population that I should --

11:37AM   13  that I'm a part of, or that I should protect?  That grievance

11:37AM   14  is psychologically painful.

11:37AM   15      And they progress then to the next stage, from grievance

11:37AM   16  to what we call ideation in the pathway of violence.

11:37AM   17      In this phase, the soon-to-be offender gets it in his

11:37AM   18  idea -- and it's typically a male -- gets it in his mind

11:38AM   19  that, you know what?  The solution is violence, to the

11:38AM   20  psychological pain I'm feeling, to those injustices that I

11:38AM   21  perceive.  And they start fantasizing about carrying out an

11:38AM   22  attack.

11:38AM   23      And what the research shows is that this fantasy is --

11:38AM   24  the term that the BAU uses is cyclical compensatory fantasy.

11:38AM   25  It's cyclical, it's repeating, that the person revisits this

11:38AM  1  idea of carrying out a violent attack to redress his

11:38AM  2  grievances.

11:38AM  3      It's compensatory.  In his actual life, he may be

11:38AM  4  somebody who's not succeeding socially, or succeeding

11:38AM  5  academically, or succeeding in his career.  In his fantasy,

11:39AM  6  he's compensating for those shortcomings in his actual

11:39AM  7  real-world existence.

11:39AM  8      At some point, that fantasy -- and this can go on for

11:39AM  9  months, and it often does -- this fantasy doesn't quite

11:39AM 10  satisfy the need to escape the psychological pain they feel.

11:39AM 11      We actually see -- researchers see an analogy between

11:39AM 12  this idea of fantasy in a violent -- soon-to-be violent

11:39AM 13  offender and child-pornography offenders, where

11:39AM 14  child-pornography offenders typically collect obscene

11:39AM 15  material, they consume it, it's a cycle of stimulation and

11:39AM 16  numbing, but at some point that doesn't satisfy their desire

11:39AM 17  to have sexual contact with children, and they reach out and

11:40AM 18  they commit a hands-on offense.

11:40AM 19      In much the same way, people who are considering a

11:40AM 20  violent act and fantasizing about a violent act will say, you

11:40AM 21  know what?  I'm tired of fantasizing about this, I'm really

11:40AM 22  gonna do it.  I'm really gonna do this in the real world.

11:40AM 23  And they progress to the next phase in the pathway to

11:40AM 24  violence where they conduct research and planning.

11:40AM 25      Having made this decision, I'm gonna actually do this,

11:40AM   1   they start to thinking about exactly how will I do this?  Who

11:40AM   2   is my target?  How would I approach my target?  How would I

11:40AM   3   be armed?  How will I gain tactical advantage and tactical

11:40AM   4   surprise at this?

11:40AM   5       And in this phase, this is typically where bystanders

11:40AM   6   start to see observable behavior.  This -- this could be

11:40AM   7   reflected in a person of concern reviewing media about past

11:41AM   8   school shootings, or past violent acts.  It could be

11:41AM   9   researching weaponry.

11:41AM   10      You know, I often said at Fredonia, if one of our

11:41AM   11  sophomore cello players who last year was interested in the

11:41AM   12  beauty of music and making the cello sound beautiful, and is

11:41AM   13  now interested in military weapons, that's an easy way to

11:41AM   14  illustrate what we're looking for here.  It's a step change

11:41AM   15  in behavior that is often noticed by bystanders.

11:41AM   16      As soon-to-be offenders conduct and complete this

11:41AM   17  research and planning stage, they move into the preparation

11:41AM   18  phase.  And this is where the person of concern, will start

11:41AM   19  assembling the gear, and perhaps institute some training,

11:41AM   20  self training, to carry out an attack.

11:42AM   21      If an offender is -- is a novice with firearms, they

11:42AM   22  might go take lessons, they might go to a gun range, they'll

11:42AM   23  try to teach themselves how to be proficient with firearms.

11:42AM   24  And very often, this is contextually inappropriate behavior,

11:42AM   25  given where they are in life and what they're about.

11:42AM    1    These behaviors are even more observable to bystanders.

11:42AM    2  And very often, these behaviors not -- are reported to law

11:42AM    3  enforcement.  Not often enough, unfortunately, and that's why

11:42AM    4  these attacks are not prevented.

11:42AM    5    After an offender completes the preparation, they go to

11:42AM    6  what we call the breach stage in the pathway of violence.

11:42AM    7  And that's typically where the offender is moving toward the

11:42AM    8  target, either physically or emotionally.

11:42AM    9    And very often we see in case studies that they'll

11:43AM   10  seclude themselves.  They might rent a hotel room to get

11:43AM   11  their gears, guns, and their mind right for the impending

11:43AM   12  attack.  They're -- they'll often go off the radar and we

11:43AM   13  won't know where they are.

11:43AM   14    In some cases, that breach phase might be a homicide at

11:43AM   15  home.

11:43AM   16    The Sandy Hook shooting is an excellent example, where

11:43AM   17  the offender, Adam Lanza, shot and killed his mother before

11:43AM   18  moving on to the elementary school.

11:43AM   19    And finally the last stage, which is too late, is the

11:43AM   20  attack stage of the pathway of violence.

11:43AM   21    So that's a little bit of a background, that's a little

11:43AM   22  bit of a primer on what drives the offender, or at least as

11:43AM   23  the research sees it.

11:43AM   24  Q.  Your résumé also indicates that you served as an advisor

11:43AM   25  to university law enforcement; is that correct?

11:44AM  1   A.  Yes.

11:44AM  2   Q.  And did you tell us about that?

11:44AM  3   A.  Sure.  There were several cases where, in my role as an

11:44AM  4   FBI agent and as a police chief, I assist other campuses with

11:44AM  5   persons of concern cases.  Your Honor is aware of one case, I

11:44AM  6   testified here on that matter.

11:44AM  7       The training that I've received is unique in law

11:44AM  8   enforcement.  It's extraordinarily rare.  People with this

11:44AM  9   kind of explicit, specific training in threat assessment,

11:44AM  10  threat mitigations, they are few and far between.

11:44AM  11      The FBI, this is very rough numbers, I would estimate

11:44AM  12  today if you -- if you put every FBI agent and analyst that

11:45AM  13  has this kind of training in a room, they would number about

11:45AM  14  50 to 75, spread around the country, mostly focused on the

11:45AM  15  Behavioral Analysis Unit.

11:45AM  16      None of my colleagues and fellow police chiefs in the

11:45AM  17  SUNY system have this kind of training, experience, knowledge

11:45AM  18  about threat assessments.

11:45AM  19      Sometimes, well, I should say on a few occasions, while I

11:45AM  20  was police chief, other campuses had extremely concerning

11:45AM  21  persons-of-concern cases.

11:45AM  22      I won't get too specific, Judge, but I'll just rough out

11:45AM  23  one case just to give you an idea.

11:45AM  24      A Western New York campus came to me with a long-time

11:45AM  25  employee, not an academic employee, a staff employee, who was

11:46AM    1    known to have a very narcissistic personality, wrote in the

11:46AM    2    third person himself about himself quite a lot.  And in a

11:46AM    3    matter off campus, took a shotgun to a place of business,

11:46AM    4    confronted somebody.  There was some violence that ensued.

11:46AM    5    The campus became aware of it, and moved him to an off-campus

11:46AM    6    location.

11:46AM    7        And there was a lot of interaction that I had with that

11:46AM    8    department on how to -- how to manage that person, how to

11:46AM    9    conduct threat mitigation so we could keep the campus safe,

11:46AM   10    minimize additional injuries to this person's ego, and keep

11:46AM   11    the campus safe in the long term.

11:46AM   12        That case is about three years old now.  The person is

11:46AM   13    doing okay.  There hasn't been violence.

11:47AM   14        So, you know, applying this model, this business model

11:47AM   15    that the FBI uses does work.  So that's an example.  And

11:47AM   16    Your Honor's aware of the other case when I was in the FBI.

11:47AM   17    There are several others, but those are just a few.

11:47AM   18    Q.  And just so I'm clear, your specialized knowledge in the

11:47AM   19    realm of threat assessments is what made you qualified to

11:47AM   20    serve as an advisor to other university law enforcement

11:47AM   21    groups; is that correct?

11:47AM   22    A.  That's correct.  And a way to paint or illustrate the

11:47AM   23    point is I was a SWAT agent for nine years and a sniper.  And

11:47AM   24    I taught that to other police departments.  That skill is not

11:47AM   25    particularly unique in law enforcement.  So I have never been

Kershnar v Kolison - Isaacson - Pantzer/Direct - 9/13/23

24

11:47AM    1    asked to help another police department with tactics and, you

11:47AM    2    know, high stress, dangerous arrest situations.

11:47AM    3    Q.  So can you tell the Court and tell us more about your

11:48AM    4    specialized knowledge in the realm of threat assessments

11:48AM    5    specifically?

11:48AM    6    A.  I think I've rounded it out.

11:48AM    7         What I'd like to say, though, is the -- and make clear to

11:48AM    8    the Court is the incredible effectiveness of this -- of this

11:48AM    9    effort on the FBI's part.  The FBI's business model is

11:48AM   10    that -- let me back up.

11:48AM   11         Typically, a person's behavior will raise concern at a

11:48AM   12    school or a business.  And coworkers, fellow students,

11:48AM   13    college officials, they'll become concerned about this

11:48AM   14    behavior.  And typically they reach out to their local law

11:48AM   15    enforcement department, it might be the campus police

11:48AM   16    department, it might be their local police department.  And

11:48AM   17    law enforcement will come in, do an investigation, try to

11:48AM   18    gather as much information as possible about this person of

11:49AM   19    concern.

11:49AM   20         In some cases, the concern is not alleviated by that

11:49AM   21    analysis.  This person is acting in very concerning ways,

11:49AM   22    perhaps has access to weapons, is behaving in ways that

11:49AM   23    resonate with other completed acts of targeted violence that

11:49AM   24    we've seen.

11:49AM   25         In those cases, the case will be raised to the local FBI

11:49AM   1   field office, and an agent that's doing the role that I did

11:49AM   2   as the BAU coordinator will make contact with the police

11:49AM   3   department, with the college or university or business, and

11:49AM   4   the FBI will try to round out the investigation and perhaps

11:49AM   5   do a threat assessment and see if the local office can do

11:49AM   6   some threat mitigation.

11:49AM   7       In some cases, that's not enough.  Even the local FBI

11:49AM   8   office realizes that this case is so concerning, behaviors

11:50AM   9   are so concerning, that the decision is made to bring in the

11:50AM  10   Behavioral Analysis Unit.

11:50AM  11       The BAU's model, business model is to collect as much

11:50AM  12   evidence about the matter as possible.  And then in a --

11:50AM  13   usually in a remote setting, a Zoom meeting, or a telephone

11:50AM  14   conference, assemble an ad hoc team, a multidisciplinary team

11:50AM  15   that's typically comprised of law enforcement, of school

11:50AM  16   counselors, of school administrators, mental health

11:50AM  17   professionals locally, a wide range of disciplines.  These

11:50AM  18   people have an understanding of what's going on with this

11:50AM  19   particular person of concern.  And with the BAU, a threat

11:51AM  20   assessment will be conducted, and the BAU will come up with

11:51AM  21   recommendations on how to manage this threat.

11:51AM  22       So we have a threat assessment stage, and we have a

11:51AM  23   threat mitigation stage.  What can we do to keep this

11:51AM  24   situation from escalating into a violent act.

11:51AM  25       The number of -- pardon me, the number of those kinds of

11:51AM   1   cases around the country, this is my estimate I don't have

11:51AM   2   this data from the FBI, I think it's safe to say there's been

11:51AM   3   thousands of cases that the FBI's BAU and this business model

11:51AM   4   have touched across the country.  And these are the, sort of,

11:51AM   5   the worst, of the worst, of the worst cases.  These are cases

11:51AM   6   that have bubbled up through that law enforcement chain, all

11:51AM   7   the way up to the BAU.

11:51AM   8        Not one single person that has been touched by that

11:51AM   9   business model has gone on to offend.  Not one.

11:51AM   10       So, that really gets me back to this idea of if we can

11:52AM   11   teach our community, for me it was the SUNY Fredonia campus

11:52AM   12   community, if we can teach the community what these behaviors

11:52AM   13   look like, so we can get that whole business model started,

11:52AM   14   my personal view is we would prevent many, many of these

11:52AM   15   instances from happening.

11:52AM   16   Q.  Thank you.

11:52AM   17            MS. PANTZER:  Your Honor, we would offer Chief

11:52AM   18   Isaacson as an expert in threat assessment, as well as campus

11:52AM   19   law enforcement and safety.

11:52AM   20            MR. COVERT:  Your Honor, certainly threat assessment,

11:52AM   21   I'm not sure about the campus safety, but we won't object.

11:52AM   22            THE COURT:  Okay.  Without objection, he is so

11:52AM   23   deemed.  Go ahead.

11:52AM   24            MS. PANTZER:  Thank you, Your Honor.

          25

| | | |
|---|---|---|
| 11:52AM | 1 | BY MS. PANTZER: |
| 11:52AM | 2 | Q.  Were you chief of police with SUNY Fredonia at the time |
| 11:52AM | 3 | of the Kershnar matter? |
| 11:52AM | 4 | A.  Yes. |
| 11:52AM | 5 | Q.  And how did you first become aware of the matter |
| 11:52AM | 6 | involving Dr. Kershnar? |
| 11:52AM | 7 | A.  Our police dispatcher called me and we spoke, and she |
| 11:53AM | 8 | made me aware that there was a general issue.  I don't recall |
| 11:53AM | 9 | with precision exactly who I spoke to on those first few |
| 11:53AM | 10 | minutes.  I did get online and quickly found that there was |
| 11:53AM | 11 | interest online about this controversy.  The -- I saw that |
| 11:53AM | 12 | there was a -- a tweet on Twitter that had a segment of video |
| 11:53AM | 13 | showing Professor Kershnar making his remarks, and then a |
| 11:53AM | 14 | slew of comments from the public about those. |
| 11:53AM | 15 | Am I answering your question? |
| 11:53AM | 16 | Q.  Yes, absolutely. |
| 11:53AM | 17 | A.  Okay. |
| 11:53AM | 18 | Q.  My next question was, after you learned about the |
| 11:53AM | 19 | Dr. Kershnar matter, what did you do in the immediate |
| 11:53AM | 20 | aftermath? |
| 11:53AM | 21 | A.  I believe I called Mike Metzger, who was the |
| 11:54AM | 22 | vice-president at the time that I reported to, just to make |
| 11:54AM | 23 | him aware of this. |
| 11:54AM | 24 | At that time, I was frankly just in an |
| 11:54AM | 25 | information-gathering mode.  What's going on, I don't |

Case 1:23-cv-00525-LJV-JJM    Document 66    Filed 12/21/23    Page 28 of 166
Kershnar v Kolison - Isaacson - Pantzer/Direct - 9/13/23

28

11:54AM  1   understand this, this is an extraordinarily unusual situation

11:54AM  2   to deal with.

11:54AM  3       I did take note very early on, within the first few

11:54AM  4   hours, that many -- a significant fraction of the commentary

11:54AM  5   online was highly negative and intimated that a violent,

11:54AM  6   violent redress would be appropriate to both Dr. Kershnar and

11:54AM  7   to the Fredonia administrators.  How could -- how could

11:54AM  8   Fredonia allow this professor to, you know, make these

11:54AM  9   remarks?  And how did they not know about it?  That sort of

11:55AM  10  tone.

11:55AM  11  Q.  And we're going to get into the threat assessments that

11:55AM  12  you drafted.  But on first impression to you, what made this

11:55AM  13  threat situation different than other threat situations

11:55AM  14  you've encountered?

11:55AM  15  A.  My initial impression, and it only grew with time, was

11:55AM  16  that the subject matter of Professor Kershnar's remarks were

11:55AM  17  extraordinarily aggrieving to an enormous population, in my

11:55AM  18  view.

11:55AM  19      This is -- the idea of adult-child sex is viewed by the

11:55AM  20  public as morally wrong, criminal, highly worthy of

11:55AM  21  punishment.  And that the public was interpreting

11:55AM  22  Dr. Kershnar's remarks as normalizing or justifying,

11:56AM  23  sometimes even encouraging, if you read the public commentary

11:56AM  24  on it, pedophilia, sexual exploitation of children.

11:56AM  25      I know from my own law enforcement career in the FBI -- I

11:56AM   1   worked well over a hundred child pornography cases in the

11:56AM   2   FBI.  I know from that experience that a huge percentage of

11:56AM   3   the American public was either victimized themselves as

11:56AM   4   children, or they have family -- young family members who

11:56AM   5   were victimized.  I mean, this is -- the sexual exploitation

11:56AM   6   of children is extraordinarily common.

11:56AM   7        So for my initial impression, and it only grew with time,

11:56AM   8   was that these remarks were being interpreted by the public

11:56AM   9   in a way that was extraordinarily intense in the level of

11:57AM   10  grievance, the intensity of grievance.  And the audience was

11:57AM   11  absolutely enormous, at least in the hundreds of thousands,

11:57AM   12  probably in the millions.  And by -- by just a few days

11:57AM   13  later, I believe it was Wednesday of that week, this

11:57AM   14  controversy was airing at 9 p.m. prime time on FOX News.  And

11:57AM   15  the narrative was highly negative toward the professor, but

11:57AM   16  it was also negative to SUNY Fredonia.  And the narrative

11:57AM   17  was, you know, sort of the liberal academia, they're at it

11:57AM   18  again.  This is -- this is what your children are being

11:57AM   19  exposed to.

11:57AM   20       Sitting here now, and I've reflected on this quite a bit,

11:57AM   21  I cannot imagine a more aggrieving idea that's conveyed to so

11:58AM   22  many people across the country.  So it's the intensity and

11:58AM   23  the breadth of this that made it unique in my mind.

11:58AM   24  Q.  And just to be clear, since we've not touched upon it,

11:58AM   25  did you personally have an issue with the content of the

Case 1:23-cv-00525-LJV-JJM    Document 66    Filed 12/21/23    Page 30 of 166
Kershnar v Kolison - Isaacson - Pantzer/Direct - 9/13/23

30

11:58AM    1    speech?

11:58AM    2    A.    No.

11:58AM    3    Q.    Was that a concern to you?

11:58AM    4    A.    No.   I -- I have not felt it my job, and I still don't

11:58AM    5    feel it my job, to judge the content.

11:58AM    6        My exclusive concern was, and has been from the start of

11:58AM    7    this, the reaction to that content, the public's reaction to

11:58AM    8    that content, and the potential that I see that it increases

11:58AM    9    our risk of violence.

11:58AM   10    Q.    Earlier, when we were talking about your experience and

11:59AM   11    training, you testified that on the pathway to violence,

11:59AM   12    typically people have a deeply-held fixated grievance before

11:59AM   13    the pathway to violence commences; is that right?

11:59AM   14    A.    Correct.

11:59AM   15    Q.    This group, this particular subject, do you believe that

11:59AM   16    creates a large group with that deeply-held fixated

11:59AM   17    grievance?

11:59AM   18    A.    I do.   There's -- there is a population in the country

11:59AM   19    that either has been sexually exploited themselves as

11:59AM   20    children, or they have a close relationship to a child sexual

11:59AM   21    exploitation victim.   That, in and of itself, is a deeply

11:59AM   22    wounding experience for most people.

11:59AM   23        The remarks by Dr. Kershnar, as perceived by the public,

11:59AM   24    as reflected in their comments, was extremely grieving.

12:00PM   25        My concern is that -- now we've reversed -- we've

12:00PM    1    reversed this whole equation, and let me explain that.

12:00PM    2        This -- the idea of violence prevention comes from having

12:00PM    3    a lot of people with visibility on behaviors, and our term of

12:00PM    4    art we say we have an optic on the person of concern.  In a

12:00PM    5    closed college setting, the campus community members are

12:00PM    6    observing each other's behavior all the time, and that

12:00PM    7    behavior, if it's concerning, will be reported.

12:00PM    8        Here, in this situation, all of the people that I would

12:00PM    9    be worried about as the police chief are external to the

12:00PM   10    campus.  And there are at least thousands of them, and I

12:00PM   11    would submit there's probably hundreds of thousands of them,

12:00PM   12    that are extraordinarily angry, were extraordinarily angry

12:01PM   13    when they read these comments by Dr. Kershnar.

12:01PM   14        That's -- that's the recipe.

12:01PM   15        So now we have -- we have a target for those grievances,

12:01PM   16    the SUNY Fredonia campus, Dr. Kershnar, and SUNY Fredonia's

12:01PM   17    administrators.  To my mind, based on my training and

12:01PM   18    experience, that is a dangerous recipe, because now we have

12:01PM   19    potentially at least one, potentially many more, people that

12:01PM   20    have all the right ingredients to start toward that --

12:01PM   21    starting down that pathway to violence.

12:01PM   22        And by the time we detect it on our campus, it would be

12:01PM   23    too late, because we don't have an optic, we don't have

12:01PM   24    visibility of all the behaviors that people exhibit before

12:01PM   25    they -- before they attack.

| | | |
|---|---|---|
| 12:01PM | 1 | Q.  When this situation arose, did you speak with |
| 12:02PM | 2 | Dr. Kershnar? |
| 12:02PM | 3 | A.  I did.  I spoke with him several times on the day I |
| 12:02PM | 4 | learned of it and the day after. |
| 12:02PM | 5 |     My first conversation with Dr. Kershnar was both of us |
| 12:02PM | 6 | trying to get our arms around exactly what the situation was. |
| 12:02PM | 7 | It was -- it was still quite new. |
| 12:02PM | 8 |     But certainly, toward the end of that first day, I |
| 12:02PM | 9 | believe I wrote my threat assessment February 2nd, I had -- I |
| 12:02PM | 10 | had gone through my analysis of what can we do to keep the |
| 12:02PM | 11 | campus safe in this, today, what can we do to keep the campus |
| 12:02PM | 12 | safe? |
| 12:02PM | 13 |     My recollection was that I learned from a colleague that |
| 12:02PM | 14 | Dr. Kershnar was -- his schedule would not bring him back |
| 12:03PM | 15 | onto campus for a day or two.  That gave me a little bit of |
| 12:03PM | 16 | time to collect my thoughts and come up with a -- that first |
| 12:03PM | 17 | written threat assessment that you've all seen. |
| 12:03PM | 18 |     And I had a conversation with Dr. Kershnar that, in my |
| 12:03PM | 19 | view for the safety of the campus he needs to say off campus. |
| 12:03PM | 20 | I said Dr. Kershnar, Dr. Kolison, pardon me.  I had a |
| 12:03PM | 21 | conversation with the president saying that that in my view, |
| 12:03PM | 22 | Dr. Kershnar needed to stay off campus.  The president seemed |
| 12:03PM | 23 | to me to be reluctant of that idea. |
| 12:03PM | 24 |     And that's why, when I put together my threat assessment, |
| 12:03PM | 25 | that first threat assessment, I did go into some detail about |

12:04PM 1  this whole psychology of offenders to explain to the

12:04PM 2  president and the cabinet that, you know, this was not

12:04PM 3  something that was certainly taken lightly by me, that my

12:04PM 4  recommendation fit the research, fit what my best

12:04PM 5  recommendation would be to keep the campus safe.

12:04PM 6      I was trying to convince the president and the

12:04PM 7  administration that this recommendation was based on the

12:04PM 8  facts as I knew them and the research as I understood it.

12:04PM 9  Q.  Okay.  But in addition, in the early moments right when

12:04PM 10 the situation arose, you did have a conversation with

12:04PM 11 Mr. Kershnar at some point with regard to his safety; is that

12:04PM 12 correct?

12:04PM 13 A.  Yes.

12:04PM 14 Q.  Okay.

12:04PM 15 A.  I had, I believe, two conversations with with Professor

12:04PM 16 Kershnar.  You know, during that time, he told me several

12:05PM 17 times he was not a pedophile.

12:05PM 18     I told him I -- I don't need to discuss any of that with

12:05PM 19 you.  You know, I'm -- I want to talk about the campus's

12:05PM 20 safety and your safety.  I told him I had a concern for both.

12:05PM 21     And I also told him to be mindful of anything that might

12:05PM 22 indicate that somebody was approaching him, a bad actor was

12:05PM 23 approaching him.

12:05PM 24     I explained to him if there was any sign of vandalism or

12:05PM 25 any unexplained event that might make him believe that

12:05PM    1    somebody was approaching him or his home, to either call me

12:05PM    2    personally, I gave him my cell phone number, or to call 911.

12:05PM    3    Q.  Okay.  I want to show you what we've pre-marked as

12:06PM    4    Defendant's Exhibit 4 for identification.  Do you recognize

12:06PM    5    this document?

12:06PM    6    A.  I do.  This is an email from me to Dr. Kershnar.  It's

12:06PM    7    dated February 7 at 6:09 p.m.

12:06PM    8           MS. PANTZER:  Your Honor, we would offer Defendant's

12:06PM    9    Exhibit 4 for evidence.

12:06PM    10          MR. COVERT:  No objection.

12:06PM    11          THE COURT:  Received without objection.

12:06PM    12          **(Defendant's Exhibit 4 was received in evidence.)**

12:06PM    13          BY MS. PANTZER:

12:06PM    14    Q.  The email in Defendant's Exhibit 4, Chief Isaacson, what

12:06PM    15    does it provide?

12:06PM    16    A.  I'm summarizing in writing what I had told him verbally

12:06PM    17    in those couple of conversations that we had a few days

12:06PM    18    earlier, to be observant for any persons of the unknown who

12:06PM    19    might approach him or surveil him or his home or his vehicle.

12:06PM    20      I -- I told him to be especially aware of possible

12:07PM    21    vandalism.

12:07PM    22      This is -- this is one behavior that we see in these

12:07PM    23    kinds of cases that offenders exhibit when they're getting

12:07PM    24    close to attacking, they may approach a target and vandalize

12:07PM    25    property.  I told him verbally several times, and again

| | | |
|---|---|---|
| 12:07PM | 1 | reiterated it in this email, that if he saw anything that had |
| 12:07PM | 2 | implications for campus safety, to please call me or email |
| 12:07PM | 3 | me. |
| 12:07PM | 4 | And then, finally, if he had any emergency concerns, to |
| 12:07PM | 5 | call University Police, and I gave our phone number. |
| 12:07PM | 6 | I also told him that I had spoken to my colleagues at the |
| 12:07PM | 7 | Chautauqua County Sheriff's Office and New York State Police |
| 12:07PM | 8 | explaining them -- explaining to them the situation regarding |
| 12:07PM | 9 | this matter, and asking them to step up patrols around |
| 12:08PM | 10 | Dr. Kershnar's home. |
| 12:08PM | 11 | Q.  And the first paragraph of the email, Chief Isaacson, |
| 12:08PM | 12 | could you just read that paragraph, two sentences? |
| 12:08PM | 13 | A.  I'm writing to advise you that University Police have |
| 12:08PM | 14 | received phone calls to campus offices in which the callers |
| 12:08PM | 15 | threaten or intimate violence to you and to members of our |
| 12:08PM | 16 | campus.  University Police are working with law enforcement |
| 12:08PM | 17 | partners to learn more about these calls and assess whether |
| 12:08PM | 18 | they impact on the safety of you and the campus community. |
| 12:08PM | 19 | Q.  Thank you.  So at the time, you were fielding certain |
| 12:08PM | 20 | threats, and you were working with law enforcement partners |
| 12:08PM | 21 | to the extent you deemed necessary to handle those -- |
| 12:08PM | 22 | A.  Correct. |
| 12:08PM | 23 | Q.  -- is that correct? |
| 12:08PM | 24 | A.  Yes. |
| 12:08PM | 25 | Q.  You testified a minute ago that you spoke with President |

12:08PM    1    Kolison prior to issuing your formal initial threat

12:08PM    2    assessment recommending that Dr. Kershnar be removed from

12:08PM    3    campus for a period of time; is that correct?

12:09PM    4    A.  Yes.

12:09PM    5    Q.  And I believe you testified that President Kolison

12:09PM    6    expressed some reluctance to that idea.  Could you talk more

12:09PM    7    about that?

12:09PM    8    A.  Yeah.  I don't remember the verbatim comments.  I

12:09PM    9    remember concluding the initial conversations and -- and

12:09PM   10    coming to my own conclusion that I had to justify this

12:09PM   11    recommendation to the president, that this was not something

12:09PM   12    that he was just gonna implement without understanding my

12:09PM   13    position better.

12:09PM   14    Q.  And would that be why you drafted your initial threat

12:09PM   15    assessment?

12:09PM   16    A.  Yes.

12:09PM   17    Q.  Okay.  Before we get into that, I just want to ask you,

12:09PM   18    did President Kolison also in that time period express

12:09PM   19    concern for his safety?

12:09PM   20    A.  He did, yes.

12:09PM   21         THE COURT:  For whose safety?

12:09PM   22         THE WITNESS:  For the president's.

12:09PM   23         MS. PANTZER:  For the president's safety, Your Honor.

12:09PM   24         BY MS. PANTZER:

12:09PM   25    Q.  Go on.

12:09PM   1   A.  Pardon me, yes.  The president did express concern for

12:10PM   2   his own personal safety because of this matter.

12:10PM   3   Q.  And did he make any specific requests with regard to that

12:10PM   4   concern?

12:10PM   5   A.  Yes.  We had -- we had been talking about getting a panic

12:10PM   6   button in his office repaired, and that just hadn't happened

12:10PM   7   yet.  And this matter reinvigorated conversations that I had

12:10PM   8   with other colleagues to install a hardened door in the

12:10PM   9   president's office.  It had been just a simple unlocked door

12:10PM  10   that anybody could go from outdoors right into the

12:10PM  11   president's office.

12:10PM  12   Q.  And so eventually you drafted your initial threat

12:10PM  13   assessment; is that correct?

12:10PM  14   A.  Yes.

12:10PM  15         MS. PANTZER:  Could we pull up the February 2nd, 2022

12:10PM  16   threat assessment, please?

12:10PM  17         BY MS. PANTZER:

12:10PM  18   Q.  Chief Isaacson, we're showing you what's been marked as

12:11PM  19   Exhibit B to Defendant's Exhibit 1 for the purposes of the

12:11PM  20   preliminary injunction hearing today.  Do you recognize this

12:11PM  21   document?

12:11PM  22   A.  I do.  This is a memorandum that I drafted and sent to

12:11PM  23   SUNY counsel, Seth Gilbertson, and our director of human

12:11PM  24   resources, Maria Carroll.  And it outlined my concerns and

12:11PM  25   safety implications and recommendations regarding the

| 12:11PM | 1 | Kershnar matter. |
| 12:11PM | 2 | Q.  And so you drafted this document, correct? |
| 12:11PM | 3 | A.  Yes, I did. |
| 12:11PM | 4 | MS. PANTZER:  Your Honor, we would offer the |
| 12:11PM | 5 | February 2nd, 2022, memo that Chief Isaacson just referenced |
| 12:11PM | 6 | as evidence. |
| 12:11PM | 7 | THE COURT:  Okay.  So you're offering Exhibit B to -- |
| 12:11PM | 8 | MS. PANTZER:  Defendant's Exhibit 1. |
| 12:11PM | 9 | THE COURT:  -- Defendant's Exhibit 1? |
| 12:11PM | 10 | MS. PANTZER:  Yes, Your Honor. |
| 12:11PM | 11 | MR. COVERT:  Your Honor, we're going to be using the |
| 12:11PM | 12 | entire Defendant's Exhibit 1, so if you want to move all of it |
| 12:12PM | 13 | in. |
| 12:12PM | 14 | MS. PANTZER:  That's fine with me, Your Honor. |
| 12:12PM | 15 | THE COURT:  Okay.  So Exhibit 1 is received without |
| 12:12PM | 16 | objection, including Exhibit B to Exhibit 1, obviously. |
| 12:12PM | 17 | MS. PANTZER:  Thank you, Your Honor. |
| 12:12PM | 18 | THE COURT:  So Exhibit 1 and its exhibits are |
| 12:12PM | 19 | admitted without objection. |
| 12:12PM | 20 | MR. COVERT:  Correct. |
| 12:12PM | 21 | THE COURT:  So Exhibit 1 and all its exhibits are |
| 12:12PM | 22 | admitted without objection. |
| 12:12PM | 23 | **(Defendant's Exhibit 1 was received in evidence.)** |
| 12:12PM | 24 | MR. COVERT:  Your Honor, may I have one moment?  My |
| 12:12PM | 25 | office is here to drop off a document that they created for |

12:12PM    1    me.

12:12PM    2              THE COURT:  Should we take a break?

12:12PM    3              MR. COVERT:  No, it's not a problem.  Sorry about

12:12PM    4    that, Your Honor.

12:12PM    5              THE COURT:  So you folks know where we're going

12:12PM    6    today, what I'm planning to do is going till about 1, then

12:12PM    7    take a break, I don't know if you need a lunch break, if you

12:12PM    8    need one, we'll take 45 minutes, and then come back and

12:12PM    9    continue until 5 or thereabouts.  Okay?

12:12PM   10              MS. PANTZER:  Thank you, Your Honor.

12:12PM   11              THE COURT:  Yep.

12:12PM   12              BY MS. PANTZER:

12:12PM   13    Q.  Chief Isaacson, I believe this is the first written

12:13PM   14    report where you recommended Dr. Kershnar's removal from

12:13PM   15    campus; is that correct?

12:13PM   16    A.  That is correct.

12:13PM   17    Q.  Okay.  And how did you ultimately come to this conclusion

12:13PM   18    as documented in your February 2nd, 2022, memo?

12:13PM   19    A.  I -- I had consumed as much of the social media content

12:13PM   20    as I could.  I spent several hours at a desk going through

12:13PM   21    the public reaction, at least the online social media

12:13PM   22    reaction to this.  I reflected on it.  I thought about

12:13PM   23    possible interim, less -- less intrusive or less impactful

12:13PM   24    mitigations to the concern that I see here, as I saw here.

12:13PM   25        I did think about whether there were steps that we could

12:14PM    1    take to continue Dr. Kershnar's presence on campus and what

12:14PM    2    that would look like.  Would -- would extra patrols in or

12:14PM    3    around his vicinity on campus, would that alleviate my

12:14PM    4    concern?

12:14PM    5        I did think about the idea of online classes, again, this

12:14PM    6    is sort of, well, we were just coming out of COVID at this

12:14PM    7    point, so online teaching was a new paradigm at Fredonia, and

12:14PM    8    my conclusion was that any steps sort of removing the

12:14PM    9    professor from the campus and also telling the public that he

12:15PM    10   was removed from campus, those two things were necessary in

12:15PM    11   my view, to improve the threat environment for our campus.

12:15PM    12       For reasons I explained earlier, I was very concerned

12:15PM    13   that somebody might take matters into their own hands,

12:15PM    14   vigilante justice might show itself, that -- that kind of an

12:15PM    15   idea, that was my concern.

12:15PM    16       And, so, my conclusion at the end of this very early day

12:15PM    17   in this matter was we need to keep the professor off campus.

12:15PM    18   Q.  Okay.  But why was it important that Dr. Kershnar was

12:15PM    19   removed and that the public was aware?

12:15PM    20   A.  His presence on campus in this threat environment, from

12:16PM    21   my standpoint as the chief of police, presented a -- a real

12:16PM    22   security problem.

12:16PM    23       University Police is a small agency.  I had 12 unformed

12:16PM    24   officers.  At any one time, at most, three would be on duty.

12:16PM    25   And they are typically responding to calls for service from

| 12:16PM | 1 | our students and staff. |
| 12:16PM | 2 | Taking one or two officers off patrol duties to provide |
| 12:16PM | 3 | personal protective detail for the professor would really |
| 12:16PM | 4 | reduce the ability of the department to protect the rest of |
| 12:16PM | 5 | the campus.  So the idea of having him on campus was quickly |
| 12:16PM | 6 | discounted by me. |
| 12:16PM | 7 | I thought about, what would it look like if he were off |
| 12:17PM | 8 | campus, but still having authorized contact with our |
| 12:17PM | 9 | students?  How would we tamp down the narrative that had |
| 12:17PM | 10 | quickly developed among this population on social media that |
| 12:17PM | 11 | I was seeing, this concerning population, how would that tamp |
| 12:17PM | 12 | down the -- the effect that this was having about putting a |
| 12:17PM | 13 | target on the campus and putting a target on campus |
| 12:17PM | 14 | administrators? |
| 12:17PM | 15 | So for both of those reasons, I concluded that he needed |
| 12:17PM | 16 | to be off campus, the public needed to be told he was off |
| 12:17PM | 17 | campus and, in my view, that we had -- we as a campus had to |
| 12:17PM | 18 | distance ourselves in some way from the professor's remarks |
| 12:17PM | 19 | at least as perceived by the public. |
| 12:18PM | 20 | It wasn't an ideal solution, but it was, in that short |
| 12:18PM | 21 | time, that's -- that was my best judgment, my best |
| 12:18PM | 22 | professional judgment. |
| 12:18PM | 23 | Q.  And it's fair to say at this somewhat early time in this |
| 12:18PM | 24 | situation, your investigation was ongoing; is that correct? |
| 12:18PM | 25 | A.  Yes.  And I think I should clarify what "investigation" |

12:18PM   1   means in this context.

12:18PM   2       The volume of these concerning messages on social media

12:18PM   3   was enormous.  I have one investigator to assist in my

12:18PM   4   investigation here.  These remarks were concerning, but they

12:18PM   5   weren't rising to the level of a criminal threat.

12:18PM   6       For example, making interstate threats is a federal

12:18PM   7   violation.  These comments would not -- would not rise to the

12:19PM   8   U.S. Attorney's Office charging it, that was my personal

12:19PM   9   judgment, because a specific direct threat to harm or kill

12:19PM   10  Dr. Kershnar or someone on campus hadn't been made.

12:19PM   11      These were intimated threats.  They were concerning

12:19PM   12  threats in that regard.

12:19PM   13      So, from an investigative standpoint, I didn't have the

12:19PM   14  resources, as police chief.  I could not call on my FBI

12:19PM   15  colleagues to knock on doors across the United States, first

12:19PM   16  identify these authors of these concerning messages, and then

12:19PM   17  go and knock on their door to talk to them about it.

12:19PM   18      And in particular, you know, I already explained that

12:19PM   19  these are grievance-driven crimes.  If we've already created

12:19PM   20  a grievance with this situation, the last thing I wanted to

12:20PM   21  do was send law enforcement officers, even if I could, to

12:20PM   22  knock on the doors of people who are aggrieved and say, hey,

12:20PM   23  we're from the FBI or we're from law enforcement, we want to

12:20PM   24  talk to you about the comments you made about this professor

12:20PM   25  back in Fredonia.

12:20PM  1      So, "investigation" in this context meant keeping

12:20PM  2  situational awareness as best we could with our limited

12:20PM  3  resources on this tidal wave of concerning messages that we

12:20PM  4  were seeing.

12:20PM  5  Q.  And in maintaining that situational awareness, you were

12:20PM  6  reviewing social media posts; is that correct?

12:20PM  7  A.  Correct.

12:20PM  8          MS. PANTZER:  Can you pull up Exhibit 16, please?

12:20PM  9          THE COURT:  Exhibit -- I'm sorry?

12:20PM  10          MS. PANTZER:  Exhibit 16, Your Honor.  I'm sorry

12:20PM  11  about that.

12:20PM  12          THE COURT:  That's okay, no.

12:20PM  13          BY MS. PANTZER:

12:20PM  14  Q.  Chief Isaacson, I've -- I'm showing you what we've

12:20PM  15  previously marked as Defendant's Exhibit 16.  It's a long

12:21PM  16  compilation of social media posts.  Take your time.

12:21PM  17      And as Jenna's scrolling, I'll just ask, did you review

12:21PM  18  these social media posts in conducting your investigation

12:21PM  19  into this situation?

12:21PM  20  A.  These, and many like it.  I couldn't testify that I saw

12:21PM  21  every last one of these at the time on February 2nd, but I

12:21PM  22  saw many of them and many that are similar.

12:21PM  23  Q.  It's fair to say that these are just exemplar of the many

12:21PM  24  posts that you saw, correct?

12:21PM  25  A.  That is correct.

12:21PM 1   Q.  And did you utilize these posts in making your

12:21PM 2   assessments?

12:21PM 3   A.  I did.  And now might be a good time to discuss this

12:22PM 4   phenomenon that research shows happens quite often.

12:22PM 5   Q.  Yes, let me -- let's discuss the phenomenon.

12:22PM 6        MS. PANTZER:  First, Your Honor, we would offer

12:22PM 7   Defendant's Exhibit 16 as evidence.

12:22PM 8        MR. COVERT:  Your Honor, I'll leave it to the

12:22PM 9   discretion of the Court in the sense that he stated that he

12:22PM 10  has not -- I believe he said that he's not necessarily

12:22PM 11  reviewed all these documents.

12:22PM 12       THE COURT:  Do you know -- do you know whether you've

12:22PM 13  seen all these, or is this just a cross section of documents

12:22PM 14  that are like those that you saw?

12:22PM 15       THE WITNESS:  Judge, since counsel prepared this, I

12:22PM 16  have reviewed all of these.  My testimony was that on

12:22PM 17  February 2nd when I issued the memo, I saw many of these, I

12:22PM 18  don't know if I saw every single one of these on February 2nd.

12:22PM 19       THE COURT:  Okay.  And with that understanding, I

12:22PM 20  will admit it into evidence.

12:22PM 21       MS. PANTZER:  Thank you, Your Honor.

12:22PM 22       **(Defendant's Exhibit 16 was received in evidence.)**

12:22PM 23       BY MS. PANTZER:

12:22PM 24  Q.  Chief Isaacson, I interrupted you.  I apologize.

12:22PM 25       Can you talk about the memo that you were preparing to

12:23PM   1    discuss?

12:23PM   2    A.  Sure.  The research is very clear that offenders who

12:23PM   3    complete acts of targeted violence very, very often, in fact

12:23PM   4    usually, do not make direct explicit threats to their

12:23PM   5    targets.

12:23PM   6        The Secret Service, back in the '90s, did what they

12:23PM   7    called the exceptional case survey, and they examined

12:23PM   8    assaults on public officials.  And in my view, if there were

12:23PM   9    an act of targeted violence that stemmed from this case, it

12:23PM  10    would be similar in many regards to an attack on a public

12:23PM  11    official.

12:23PM  12        The Secret Service study found that not one single

12:23PM  13    offender made a direct threat to -- to their victim or their

12:23PM  14    intended victim.

12:23PM  15        In threat assessments, we use the mnemonic "howlers don't

12:24PM  16    hunt, and hunters don't howl".  And the idea here is that

12:24PM  17    people who make explicit threats of harm to a target very

12:24PM  18    rarely carry them out except in, perhaps, domestic violence

12:24PM  19    incidents.  But in the kind of case that we're talking about

12:24PM  20    here, we don't see that.

12:24PM  21        If an offender were to make a direct threat to a target

12:24PM  22    that would bring about a predictable response from the

12:24PM  23    target, the target would avoid exposure to a potential

12:24PM  24    assailant, and it would bring about a predictable law

12:24PM  25    enforcement response.  Certainly, we see that in, for

12:24PM 1  example, bomb threats.  College campuses, businesses, receive

12:24PM 2  bomb threats all the time.  I've learned that's typically

12:25PM 3  around exam time that we receive bomb threats.

12:25PM 4      I am not aware of a case in the United States where a

12:25PM 5  bomb was phoned into a college and there was a bomb, a

12:25PM 6  functional bomb found.  And that makes sense, right?

12:25PM 7      The -- the offender making the threat is typically

12:25PM 8  relieving some psychological pressure, some animus towards

12:25PM 9  the target that he feels just in making the threat, and

12:25PM 10 there's never an intention of carrying out a threat.

12:25PM 11     The more concerning phenomenon, the other side of that

12:25PM 12 coin, is this idea that hunters don't howl.  What we see when

12:25PM 13 we look back, when researchers have looked back on completed

12:25PM 14 attacks, is that the offenders have not made that direct

12:25PM 15 threat to the target, it would compromise their ability to

12:25PM 16 carry out an attack.

12:26PM 17     What we see instead, especially for younger offenders, is

12:26PM 18 that they will tell third parties, they will make statements,

12:26PM 19 or utterances, or social media posts, or blog posts, where

12:26PM 20 they intimate that violence is imminent or appropriate or

12:26PM 21 justified.  We call that behavior a leakage.

12:26PM 22     Psychologically, researchers believe that that's because

12:26PM 23 an offender is either contemplating or has decided that

12:26PM 24 violence is justified, and they are either strongly

12:26PM 25 considering or committed to carrying out an attack.  That

12:26PM  1    typically is a big secret for an offender to keep.  They've

12:26PM  2    made a big decision to carry out one of these attacks, and

12:26PM  3    this behavior leakage is really understood a way the offender

12:27PM  4    is almost inadvertently betraying their intention.

12:27PM  5        A great example would be, you know, in a school setting,

12:27PM  6    a bullied student saying, you know, wouldn't it be great to

12:27PM  7    kill all those jocks.  You know, it's not an explicit threat.

12:27PM  8    If it were transmitted in interstate commerce, it would not

12:27PM  9    draw the attention of the FBI or the U.S. Attorney's Office.

12:27PM  10       Wouldn't it be great to kill all those jocks.

12:27PM  11       Any of these examples here, this -- this meme here, I

12:27PM  12   just want to shoot him.  You know, that kind of language,

12:27PM  13   it's not an explicit threat, but it is very similar to the

12:27PM  14   kinds of utterances that we see after completed attacks have

12:27PM  15   been made.

12:27PM  16   Q.  Right.  So, just to be clear, the exhibit that we're

12:27PM  17   showing here, Exhibit 16, the reason why this -- these items

12:28PM  18   were concerning to you is because they are evidence of

12:28PM  19   behavioral leakage; is that correct?

12:28PM  20   A.  That's right.  And frankly, these -- these would be more

12:28PM  21   concerning to me and my colleagues in the BAU, my former

12:28PM  22   colleagues in the BAU, than they would most law enforcement

12:28PM  23   officers across the country.

12:28PM  24       You know, I was -- I was -- more than once I was called

12:28PM  25   to a K through 12 school, and they had a student that was

12:28PM   1   exhibiting very concerning behaviors, a thousand yard stare,

12:28PM   2   potentially had access to weapons at home.  And a school

12:28PM   3   principal would say it's not -- it's not too bad or too

12:28PM   4   serious at this point because the student has not made a

12:28PM   5   threat, a direct threat.

12:28PM   6        You know, I would almost view that as my fault that I

12:28PM   7   haven't taught this school this material yet, and they're not

12:28PM   8   recognizing that just the opposite is true.

12:29PM   9        And in fact, when -- in threat assessments I've done with

12:29PM  10   other agencies, very often with the BAU, when we see explicit

12:29PM  11   threats, it brings our level of concern down, which is

12:29PM  12   counterintuitive to most people.

12:29PM  13   Q.  In addition to the online threats that we've looked at

12:29PM  14   with Exhibit 16, did you additionally receive any actual

12:29PM  15   on-campus threat that you can recall?

12:29PM  16   A.  There were two instances -- well, there were phone calls

12:29PM  17   that the campus received.

12:29PM  18   Q.  Right.

12:29PM  19   A.  And there was also one episode where a person unknown

12:29PM  20   taped a piece of paper to Dr. Kershnar's office on campus.

12:29PM  21   Q.  So we'll show you what's been pre-marked Defendant's

12:29PM  22   Exhibit 3 for identification.  Do you recognize this

12:30PM  23   document, Chief Isaacson?

12:30PM  24   A.  Yes, I do.  This is the cover page for an investigation

12:30PM  25   that Police Officer Huels, H-U-E-L-S, did in response to this

| | | |
|---|---|---|
| 12:30PM | 1 | note that was taped on the professor's door. |
| 12:30PM | 2 | Q.  And is this the report documenting the on-campus threat |
| 12:30PM | 3 | that you had mentioned? |
| 12:30PM | 4 | A.  Yes. |
| 12:30PM | 5 | MS. PANTZER:  Okay.  We would offer what's been |
| 12:30PM | 6 | marked as Defendant's Exhibit 3 as evidence, Your Honor. |
| 12:30PM | 7 | MR. COVERT:  Your Honor, we don't object, but it |
| 12:30PM | 8 | is -- it is more than just a single-page case detail report. |
| 12:30PM | 9 | It has additional documents behind it, as well.  But we don't |
| 12:31PM | 10 | object. |
| 12:31PM | 11 | THE COURT:  No objection. |
| 12:31PM | 12 | MR. COVERT:  No objection. |
| 12:31PM | 13 | THE COURT:  Okay.  Exhibit 3 is admitted without |
| 12:31PM | 14 | objection. |
| 12:31PM | 15 | MS. PANTZER:  Thank you, Your Honor. |
| 12:31PM | 16 | **(Defendant's Exhibit 3 was received in evidence.)** |
| 12:31PM | 17 | MS. PANTZER:  And if we could scroll down. |
| 12:31PM | 18 | BY MS. PANTZER: |
| 12:31PM | 19 | Q.  The case detail report includes certain attachments; is |
| 12:31PM | 20 | that correct, Chief Isaacson? |
| 12:31PM | 21 | A.  Yes. |
| 12:31PM | 22 | Q.  And all of the way to the bottom, I believe, is the |
| 12:31PM | 23 | actual photograph of the threat that we were describing, |
| 12:31PM | 24 | we'll scroll to the bottom.  Is this the sign that was taped |
| 12:31PM | 25 | Dr. Kershnar's office door? |

12:31PM    1   A.  It is, yes, it is.

12:31PM    2   Q.  And other than Dr. Kershnar, another faculty member

12:31PM    3   shared the office with him; is that correct?

12:31PM    4   A.  That is correct.

12:31PM    5   Q.  And he expressed concern for his safety; isn't that true?

12:31PM    6   A.  I believe that's true.  I don't have a clear recollection

12:31PM    7   of exactly what --

12:31PM    8   Q.  Well, we can scroll up to the narrative --

12:31PM    9       MR. COVERT:  Then, Your Honor, I would ask that be

12:31PM   10   stricken if he has no recollection.

12:31PM   11       MS. PANTZER:  We can scroll up to the narrative for

12:32PM   12   you.

12:32PM   13       THE COURT:  Okay, yeah, so I'll sustain -- I'll,

12:32PM   14   sustain that objection to the leading.  And so the answer is

12:32PM   15   stricken.  You can ask the next question.

12:32PM   16       BY MS. PANTZER:

12:32PM   17   Q.  Okay.  Well, I think it would refresh your recollection,

12:32PM   18   Chief Isaacson, if we could scroll all the way to the top and

12:32PM   19   identify the person who submitted the complaint.

12:32PM   20    Complainant 1 is identified on page 2 of this exhibit,

12:32PM   21   Brian, page 1 of the actual exhibit, but Brian Boisvert.

12:32PM   22   Does that refresh your recollection, Chief?

12:32PM   23   A.  It does, yes.

12:32PM   24   Q.  And do you know who Brian Boisvert was?

12:32PM   25   A.  He's an employee at SUNY Fredonia.  If I saw the

12:32PM    1    narrative on the report, I could refresh my recollection.

12:32PM    2    Q.  Okay.  We'll scroll to the narrative.

12:32PM    3    A.  That's it.

12:32PM    4         THE COURT:  Okay.  I apologize.  I forgot that I made

12:33PM    5    an appointment with two of the other judges in this building

12:33PM    6    at 12:30 because I thought that's when we would break for

12:33PM    7    lunch.  So that's what we're going to do, and I apologize for

12:33PM    8    that.  So we'll break now, and we'll come back at 1:15?  No?

12:33PM    9         MR. COVERT:  I asked my office to bring sandwiches

12:33PM   10    for us at 1:00.

12:33PM   11         MR. BOYD:  I did the same thing, I asked for a pizza

12:33PM   12    at 1.

12:33PM   13         THE COURT:  Okay.  So let's do 1:30?

12:33PM   14         MR. COVERT:  Okay.

12:33PM   15         MS. PANTZER:  Yes, Your Honor.

12:33PM   16         THE COURT:  You guys can east fast, right?

12:33PM   17         MR. COVERT:  Yes.

12:33PM   18         MS. PANTZER:  Yes.

12:33PM   19         MR. BOYD:  Sure.

12:33PM   20         THE COURT:  And if it's a little past 1:30, we'll

12:33PM   21    start a little past 1:30.  I apologize, I forgot completely

12:33PM   22    about it, but I remember now, it was at 12:30 and they are

12:33PM   23    waiting for me.  So I will be back shortly, and we'll see you

12:33PM   24    at 1:30.

12:33PM   25         MS. PANTZER:  Thank you, Your Honor.

Case 1:23-cv-00525-LJV-JJM    Document 66    Filed 12/21/23    Page 52 of 166
Kershnar v Kolison - Isaacson - Pantzer/Direct - 9/13/23

52

12:33PM    1            MR. BOYD:  Thank you, Your Honor.

12:33PM    2            THE CLERK:  All rise.

12:33PM    3            (Off the record at 12:33 p.m.)

01:32PM    4            (Back on the record at 1:32 p.m.)

01:32PM    5            THE CLERK:  All rise.

01:32PM    6            THE COURT:  Please be seated.

01:32PM    7            THE CLERK:  We are back on the record for the

01:32PM    8    continuation of an evidentiary hearing in 23-CV-525, Kershnar

01:32PM    9    versus Kolison, et al.

01:32PM   10            All counsel and parties are present.

01:32PM   11            THE COURT:  Okay.  You may continue.  And I remind

01:32PM   12    the witness that he's still under oath.

01:32PM   13            THE WITNESS:  Yes, Judge.

01:32PM   14            MS. PANTZER:  Thank you, Your Honor.

01:32PM   15            BY MS. PANTZER:

01:32PM   16    Q.  Just to wrap up that exhibit we were discussing prior to

01:33PM   17    leaving on break, again, could you please refer to the

01:33PM   18    narrative, Chief Isaacson?  And I'll ask you again, I believe

01:33PM   19    my last question was something to the effect of do you recall

01:33PM   20    whether or not the faculty member, Brian Boisvert, was

01:33PM   21    feeling unsafe as a result of this incident involving

01:33PM   22    Dr. Kershnar?

01:33PM   23    A.  Yes, I've refreshed my recollection with this report.

01:33PM   24    The faculty member was concerned, and reported that concern

01:33PM   25    to the University Police.

01:33PM  1   Q.  Your February 2nd, 2022 threat assessment indicated that

01:33PM  2   you were providing the university with a, quote, cooling-down

01:33PM  3   period.  Do you recall stating that in your threat

01:33PM  4   assessment?

01:33PM  5   A.  Yes.

01:33PM  6   Q.  What did you mean by that?

01:33PM  7   A.  I had -- my intent was to do just that.  I had no idea of

01:33PM  8   the future trajectory of this matter.  The issue on

01:33PM  9   February 2nd was what can we do today to stabilize what I

01:34PM  10  thought was an unsafe situation for the campus and for

01:34PM  11  Professor Kershnar.

01:34PM  12       That cooling-down period, in my mind at that time, was

01:34PM  13  not a determined length of time, it was something that would

01:34PM  14  be reassessed with time.

01:34PM  15  Q.  Did you have any idea how long the cooling-down period

01:34PM  16  would be?

01:34PM  17  A.   I suspected that it would be on the order of a few weeks,

01:34PM  18  perhaps a month or two, but I didn't know.  I was -- I

01:34PM  19  believed it likely at the time that with Professor Kershnar's

01:34PM  20  absence from campus, and especially after some messaging went

01:34PM  21  out to the public from campus distancing the campus from the

01:35PM  22  professor's views, I did suspect that public interest would

01:35PM  23  wane with time, and it did.

01:35PM  24  Q.  At some point, was it determined that Dr. Kershnar's

01:35PM  25  laptop would be reviewed?

01:35PM   1    A.   Yes.

01:35PM   2    Q.   And why was that?

01:35PM   3    A.   I mentioned earlier in my testimony that I had

01:35PM   4    investigated many, many child pornography cases in my FBI

01:35PM   5    career.  I found that among those who sexually exploited

01:35PM   6    children, there often is a rationale that they believe, and

01:35PM   7    is that -- that in other cultures in, you know, centuries

01:35PM   8    past, it was socially acceptable and permissible to -- for

01:35PM   9    adults have sex with children.  I would often use that as a

01:35PM   10   way to encourage a child-pornography suspect to confess.  And

01:36PM   11   very, very often, it worked.

01:36PM   12       Without examining in detail the exact rationale of

01:36PM   13   Dr. Kershnar's statements and views on this matter, I saw a

01:36PM   14   lot of similarity between his messaging and the thoughts and

01:36PM   15   beliefs of offenders that I worked with during my FBI career.

01:36PM   16   I became concerned that because of that, it was reasonable to

01:36PM   17   search the computer looking for contraband images of child

01:36PM   18   pornography.

01:36PM   19       The computer was SUNY Fredonia property.  There was no

01:36PM   20   expectation of privacy.  I requested authority from my

01:36PM   21   vice-president, and he from the president, to search the

01:37PM   22   computer, and University Police seized it.

01:37PM   23       It was brought up to the regional computer forensic

01:37PM   24   laboratory here in Buffalo, which is an FBI-run facility.

01:37PM   25   And the digital contents of the computer were examined, and

01:37PM  1   there was not any contraband material on it.

01:37PM  2   Q.  That was his work laptop, correct?

01:37PM  3   A.  It was -- we secured it from his office, and I believe it

01:37PM  4   was a desktop computer.

01:37PM  5   Q.  So who made the recommendation to review the laptop, was

01:37PM  6   that you?

01:37PM  7   A.  Yes.

01:37PM  8   Q.  And just briefly going back to the cooling-down period

01:37PM  9   concept, was the intention to reevaluate going forward as to

01:37PM  10  whether or not the threat persisted and whether or not the

01:37PM  11  cooling-down period had been effective?

01:38PM  12  A.  Yes.  On February 2nd, it absolutely was my intention.

01:38PM  13  It was -- I believed that it was an untenable situation to

01:38PM  14  keep him on campus in the immediate aftermath of this

01:38PM  15  explosion of interest, negative interest in the campus.

01:38PM  16      The cooling-down period, in my view, was gonna be of a

01:38PM  17  reasonable but undetermined length.  And over the course of

01:38PM  18  time, I came to realize that if we were to bring him back,

01:38PM  19  and the public perceived that the campus was bringing him

01:38PM  20  back voluntarily, that the -- the risk to the campus would be

01:38PM  21  even more than it was initially.

01:38PM  22      And the reason I believe that and I documented in

01:38PM  23  subsequent threat assessments was that if we were to have him

01:39PM  24  back, and it was perceived by the public to be voluntary, now

01:39PM  25  we have a multiplying effect.  Now the narrative would be

01:39PM    1    Fredonia knows about him, they know about this controversy,

01:39PM    2    they know about his beliefs, beliefs that the public

01:39PM    3    obviously held in -- with disgust.  It would be a much more

01:39PM    4    intense reaction, and I think the public would certainly view

01:39PM    5    Dr. Kershnar with even more negative attention than it had.

01:39PM    6        But even more importantly from my chair, it would be that

01:39PM    7    the campus would have an even bigger target on its back.

01:39PM    8        So we'd have all those factors about creating and

01:39PM    9    amplifying a grievance, and it would be a second trip to the

01:39PM   10    well here for those grievances.

01:40PM   11    Q.  Okay.  In addition to searching the laptop, at some point

01:40PM   12    Dr. Kershnar's emails were reviewed; is that correct?

01:40PM   13    A.  That is correct.

01:40PM   14    Q.  Okay.  I'm going to show you a compilation of exhibits at

01:40PM   15    this time.  I'd like to start with Defendant's Exhibit 15.

01:40PM   16    It's quite lengthy, 61 pages.  I'll give you one moment to

01:40PM   17    review that.

01:40PM   18        MS. PANTZER:  Jenna, if you want to keep scrolling

01:40PM   19    slowly so Chief Isaacson can orient himself.

01:40PM   20        THE WITNESS:  I'm familiar with these.

01:40PM   21        BY MS. PANTZER:

01:40PM   22    Q.  You're familiar with these emails.  And what are they?

01:41PM   23    A.  These are emails that were received by Dr. Kershnar on

01:41PM   24    his fredonia.edu account.

01:41PM   25    Q.  And in your analysis when you were conducting your threat

01:41PM  1   assessments with regard to this set of circumstances, did you

01:41PM  2   review these emails?

01:41PM  3   A.  I did.

01:41PM  4        MS. PANTZER:  Your Honor, we would offer what's been

01:41PM  5   marked as Defendant's Exhibit 15 as evidence.

01:41PM  6        MR. CORN-REVERE:  No objection.

01:41PM  7        THE COURT:  No objection?  Received without

01:41PM  8   objection.

01:41PM  9        MS. PANTZER:  Thank you, Your Honor.

01:41PM  10       **(Defendant's Exhibit 15 was received in evidence.)**

01:41PM  11       MS. PANTZER:  Jenna, if you want to scroll up to

01:41PM  12  approximately page 4.  Sorry, go down.  Stop.

01:41PM  13       BY MS. PANTZER:

01:42PM  14  Q.  Could you just read the one that we've stopped on there?

01:42PM  15  A.  The one with the timestamp of 9:54?

01:42PM  16  Q.  Yes.

01:42PM  17  A.  It's directed to Stephen Kershnar.  You disgusting pig.

01:42PM  18  Not only should be you be fired, you should be in jail.  In

01:42PM  19  what moral world is having sex with a 12-year-old okay?

01:42PM  20  Q.  Is this an email that would concern you on the pathway to

01:42PM  21  violence, Chief Isaacson?  Is this a behavioral leakage email

01:42PM  22  that you were discussing with the Court earlier?

01:42PM  23  A.  Not particularly this one.  Others intimate that violence

01:42PM  24  is okay or acceptable, you know, you deserve to be killed,

01:42PM  25  judgment day is coming, those kinds of messages.

01:43PM    1    Q.  What about this one, from Jeremy McAfee at 9:24 a.m.?

01:43PM    2    A.  This is getting closer to the mark.  Do you live locally

01:43PM    3    in Fredonia or Dunkirk?

01:43PM    4        I think a better example or exemplars are in my threat

01:43PM    5    assessment from, I believe, March.  They are probably in this

01:43PM    6    collection here.

01:43PM    7    Q.  What about this one from Dylan Tracy at 9:45, could you

01:44PM    8    read that one?

01:44PM    9            THE COURT:  What page are we on.

01:44PM   10            MS. PANTZER:  It's on page 10 of 61, Your Honor.

01:44PM   11            THE WITNESS:  Again, I think this is more toward

01:44PM   12    disgust.  The people are conveying --

01:44PM   13            BY MS. PANTZER:

01:44PM   14    Q.  Okay.  What about from Scotter --

01:44PM   15    A.  Yeah.

01:44PM   16    Q.  -- 0123.

01:44PM   17    A.  This is getting closer.

01:44PM   18    Q.  Page 11?

01:44PM   19    A.  Yes.  Sorry to interrupt.  This is getting closer to the

01:44PM   20    mark.  I hope your parents tar, feather, cut your innards

01:44PM   21    out, and drag your body through town.  I think society's

01:44PM   22    reaction would be cheers.  Nonbinary people are mentally ill.

01:45PM   23    Sorry you were touched as a child.  I hope someone, even you,

01:45PM   24    ends your life.  F off and die.

01:45PM   25    Q.  And, again, how did this compilation, this mass

01:45PM    1    collection of written threats play into your threat

01:45PM    2    assessments?

01:45PM    3    A.   They support it.  On my -- my concern, again, is with

01:45PM    4    messages to the professor, to the campus, or just in the echo

01:45PM    5    chamber of social media, that convey the idea that violence

01:45PM    6    is a -- an acceptable, even encouraged way to redress the

01:45PM    7    grievances that are created by Dr. Kershnar's remarks.  And

01:45PM    8    we saw several of those.  The memes that we saw earlier in

01:45PM    9    another exhibit are good examples.

01:45PM   10        In the subsequent threat assessment, I would find and

01:46PM   11    report on examples that are much closer to this idea of

01:46PM   12    behavioral leakage.

01:46PM   13    Q.   And we have about -- in just this exhibit, we have about

01:46PM   14    60 pages of emails with several threats on each page,

01:46PM   15    approximately four or five on each page.  And this is just a

01:46PM   16    sampling; isn't that correct?

01:46PM   17    A.   It is.  It is.  And I think it's important, too, to note

01:46PM   18    that these are people that devoted some time and energy to

01:46PM   19    message him personally.

01:46PM   20        There are many cases in the literature that aggrieved

01:46PM   21    people attack that have not messaged their victim in any way.

01:46PM   22        So all taken together, this highly aggrieving message to

01:47PM   23    a mass audience, these many, many, many examples of messages

01:47PM   24    in social media, some to the professor himself, some to

01:47PM   25    campus, that -- that violence is an acceptable way, an

01:47PM   1   appropriate way, to deal with the professor.  That was my

01:47PM   2   concern.

01:47PM   3   Q.  And taking, for example, the email from

01:47PM   4   Scotter0123@gmail.com, and even the next one, all we have is

01:47PM   5   the -- is from hzl320@protonmail.com.  Are these reportable

01:47PM   6   these report-type threats in your opinion?

01:47PM   7   A.  No.  No.  These -- these do not meet the threshold,

01:47PM   8   certainly the prosecutorial threshold of, in my experience,

01:47PM   9   the U.S. Attorney's Office or the District Attorney's Office.

01:48PM   10   That's a one off.  Prosecutors would view this as a one off

01:48PM   11   message.  It would be tough to get a conviction without a

01:48PM   12   direct explicit threat, something like I'm gonna find you and

01:48PM   13   I'm gonna shoot you.  It needs to be that explicit for

01:48PM   14   prosecutors to bring charges.

01:48PM   15          MS. PANTZER:  Can you pull up Exhibit 17 through 25

01:48PM   16   at this point?  We can take them one at a time.

01:48PM   17          BY MS. PANTZER:

01:48PM   18   Q.  Exhibit 17, do you recognize this document Chief

01:48PM   19   Isaacson?

01:48PM   20   A.  Yes.

01:48PM   21   Q.  What is it?

01:48PM   22   A.  This is an email to Dr. Kershnar from Mike Villano.

01:48PM   23   Would you like me to read it?

01:48PM   24   Q.  First, he -- let's make sure.  What is it dated?

01:48PM   25   A.  It is dated February 3rd, time stamped 12:27 a.m.  And

01:49PM    1    it's titled in the just world.

01:49PM    2    Q.  And is this one of the emails you would have reviewed in

01:49PM    3    making your threat assessment?

01:49PM    4    A.  Yes.

01:49PM    5         MS. PANTZER:  Your Honor, we would offer what's been

01:49PM    6    pre-marked as Defendant's Exhibit 17 in evidence.

01:49PM    7         MR. COVERT:  No objection.

01:49PM    8         THE COURT:  Received without objection.

01:49PM    9         MS. PANTZER:  Thank you.

01:49PM   10         **(Defendant's Exhibit 17 was received in evidence.)**

01:49PM   11         BY MS. PANTZER:

01:49PM   12    Q.  Chief Isaacson, please go ahead and read it for the

01:49PM   13    Court.

01:49PM   14    A.  Sure.  The message is:  Scumbag, you would be horse

01:49PM   15    whipped and skinned alive in public.  You're beyond revolting

01:49PM   16    dirt, and do not deserve to steal other people's oxygen.

01:49PM   17    Calling you an MF'er is an insult to dirt bags who have sex

01:49PM   18    with their mothers.  Hurry up and drop dead on your way to

01:49PM   19    hell, and pray we never meet.  And it's signed Karma.

01:49PM   20         This is an excellent example of behavioral leakage.  It's

01:49PM   21    a -- certainly a threatening message directed to a target.

01:50PM   22    It's intimating violence.  He's not saying I'm going to find

01:50PM   23    you and kill you on campus, but he's certainly conveying a

01:50PM   24    hostile intent.

01:50PM   25         And the idea that it's permissible that -- that he be

01:50PM   1   skinned alive in public or, you know, that if -- by this

01:50PM   2   author if they were to meet in person.

01:50PM   3            MS. PANTZER:  Exhibit 18.

01:50PM   4            MS. METZGER KIMURA:  I don't have Exhibit 18.

01:50PM   5            MS. PANTZER:  That's okay.  Exhibit 19.

01:50PM   6            BY MS. PANTZER:

01:50PM   7   Q.  Chief Isaacson, showing you what's been previously marked

01:50PM   8   as Exhibit 19, do you recognize this email?

01:50PM   9   A.  I do.  It's an email to Dr. Kershnar dated February 2nd

01:50PM  10   at 8:07 p.m.

01:50PM  11   Q.  Is it an email you reviewed in performing your threat

01:51PM  12   assessments?

01:51PM  13   A.  Yes.

01:51PM  14            MS. PANTZER:  Your Honor, we would offer what's been

01:51PM  15   previously marked as Exhibit 19 for evidence.

01:51PM  16            MR. COVERT:  No objection.

01:51PM  17            THE COURT:  Received without objection.

01:51PM  18            **(Defendant's Exhibit 19 was received in evidence.)**

01:51PM  19            MS. PANTZER:  Thank you.

01:51PM  20            BY MS. PANTZER:

01:51PM  21   Q.  You may read it, Chief Isaacson.

01:51PM  22   A.  Dear Mr. Kershnar, you should be hung and pissed on.

01:51PM  23   Your death is one small step toward the better safety of our

01:51PM  24   children.  It is a terrible witness to the sad state of our

01:51PM  25   society that you openly state your sick and perverted views.

01:51PM    1    Ask Jesus Christ to heal you, or spend eternity burning.

01:51PM    2    Signed with the initials CB.

01:51PM    3    Q.   Is this a concerning email?

01:51PM    4    A.   Very much so, for the same reasons.  It expresses this

01:51PM    5    idea that violence is an acceptable remedy to this person.

01:51PM    6    It's directed to the professor at his campus email address.

01:51PM    7    Q.   At this point I'm going to do a few at a time.  We'll try

01:51PM    8    to get a few in at this time.

01:52PM    9          MS. PANTZER:  Exhibit 20, please, Jenna.

01:52PM   10          MS. METZGER KIMURA:  I don't have 20, unless it's a

01:52PM   11    paper.

01:52PM   12          MS. PANTZER:  It's okay.  Exhibit 21, please.

01:52PM   13          Well, Your Honor, just quickly, there haven't been

01:52PM   14    any objections yet.  Would we be able to stipulate to these?

01:52PM   15    Great.  So we'll do --

01:52PM   16          MR. COVERT:  I nodded my head so you couldn't write

01:52PM   17    it down.  Yes, no objection.

01:52PM   18          THE COURT:  What exhibits are we talking about?

01:52PM   19          MS. PANTZER:  Your Honor, could we please stipulate

01:52PM   20    to, even though Jenna didn't have it there, but we could grab

01:52PM   21    it, but could we please stipulate to 19 -- I'm sorry, we

01:52PM   22    already did 19.  20, 21, 22, 23, 24, and 25.  They're all

01:52PM   23    emails to plaintiff similar to the ones that we've already

01:52PM   24    gone over in detail.

01:52PM   25          THE COURT:  So 20 through 25?

01:52PM   1          MS. PANTZER:  Correct.

01:53PM   2          MR. COVERT:  Just give me one moment.

01:53PM   3          No objection.

01:53PM   4          THE COURT:  Okay.  And so they are admitted without

01:53PM   5   objection.

01:53PM   6          MS. PANTZER:  Thank you.

01:53PM   7      **(Defendant's Exhibits 20-25 were received in evidence.)**

01:53PM   8          BY MS. PANTZER:

01:53PM   9   Q.  We'll just read a couple.  Chief Isaacson, could you

01:53PM  10   please read Exhibit 21 already in evidence.

01:53PM  11   A.  This is here on the screen?

01:53PM  12   Q.  Yes.

01:53PM  13   A.  It reads:  I saw your Zoom meeting.  Nice to see where

01:53PM  14   you stand.  Your viewpoints on child rape are worthy of

01:53PM  15   having your flesh peeled from your bones while you watch

01:53PM  16   kiddie porn.  You are truly a demented individual who will be

01:53PM  17   punished by God, along with your sick F'ing loser disciples

01:53PM  18   who think what you spew is okay.  Judgment day for pedophiles

01:53PM  19   is coming.

01:53PM  20   Q.  Is it concerning?

01:53PM  21   A.  It is, and for a slightly different reason.

01:53PM  22      We also see in some completed attacks, the Virginia Tech

01:53PM  23   shooter is an excellent example of this, where some of these

01:54PM  24   offenders see themselves as what we dub pseudo-warriors.

01:54PM  25      We see this in terrorism cases where offenders will take

01:54PM    1    on the grievances of others, or some just cause that they

01:54PM    2    see.

01:54PM    3        In the -- in the Virginia Tech case, the offender there

01:54PM    4    published what we call a legacy token.  He got in front of a

01:54PM    5    video camera and recorded himself in military garb screaming

01:54PM    6    at the camera, saying that he was doing this to really

01:54PM    7    justify -- or, to bring justice to all of the other people,

01:54PM    8    like him, are being mistreated in society.

01:54PM    9        Here we have an author that is essentially fantasizing

01:54PM   10    out loud about violence against the professor.  This is just

01:55PM   11    the kind of thinking that would be consistent with this

01:55PM   12    pseudo-warrior type attacker.

01:55PM   13            MS. PANTZER:  Okay.  Exhibit 22, please, Jenna.

01:55PM   14            BY MS. PANTZER:

01:55PM   15    Q.  Exhibit 23.  How about this one, Chief Isaacson?  Can you

01:55PM   16    read this for the Court, already in evidence as Exhibit 23.

01:55PM   17    A.  You are one sick MF'er.  If I ever see you, I'm going to

01:55PM   18    kill you.

01:55PM   19        That is certainly getting very concerning.  Would it be

01:55PM   20    prosecuted?  No, it's conditional.  And even in threat

01:55PM   21    assessments, we would -- we would take that into account .

01:56PM   22    Very, very concerning.

01:56PM   23    Q.  Let's do Exhibit 25.

01:56PM   24    A.  This one reads:  You need to be put down.

01:56PM   25        Again, this idea that violence is an acceptable and

01:56PM   1   appropriate recourse for addressing the professor's views.

01:56PM   2   Q.  And in addition to threats conveyed to Dr. Kershnar,

01:56PM   3   there were also emails received conveying threats to the

01:56PM   4   campus community at large; is that correct?

01:56PM   5   A.  That's correct.

01:56PM   6   Q.  All right.  I'm going to show you what's been pre-marked

01:56PM   7   as Defendant's Exhibit 6.

01:57PM   8          MS. PANTZER:  Barry, can we stipulate to that?

01:57PM   9          MR. COVERT:  Just give me one moment.

01:57PM  10          MS. PANTZER:  Numbers 6 through 13 at this point.

01:57PM  11          MR. COVERT:  No objection.

01:57PM  12          THE COURT:  Okay.  So Exhibits 6 through 13 are

01:57PM  13   admitted without objection.

01:57PM  14          MS. PANTZER:  Thank you.

01:57PM  15      **(Defendant's Exhibits 6-13 were received in evidence.)**

01:57PM  16          MS. PANTZER:  Is this Exhibit 6, Jenna, that we have

01:57PM  17   up?

01:57PM  18          MS. METZGER KIMURA:  Yes, it is.

01:57PM  19          BY MS. PANTZER:

01:57PM  20   Q.  Chief Isaacson, can you read Exhibit 6 for the Court?

01:57PM  21   A.  Sure.  This email's dated February 3rd at 8:34 a.m., and

01:57PM  22   it's titled shame.

01:57PM  23      Shame on you for keeping a professor on your staff who

01:57PM  24   condones and encourages pedophilia.  He has been spouting

01:57PM  25   this evil for years, and yet he is still allowed to teach in

01:58PM    1    the SUNY system.  Do you condone men abusing one-year-old

01:58PM    2    babies like your Professor Kershnar does?  In my opinion, you

01:58PM    3    are complicit in encouraging that sick philosophy by enabling

01:58PM    4    him to keep his job.  Shame on you.  You should -- you also

01:58PM    5    should lose your job immediately for allowing this to go on

01:58PM    6    and doing absolutely nothing about it.

01:58PM    7    Q.  So here, the email indicates complicity.  Does that

01:58PM    8    concern you?

01:58PM    9    A.  It does, and I'll expand on that a bit here.

01:58PM    10        This idea of physical threats to the professor were very

01:58PM    11    concerning to me from the get-go, and I had conversations

01:58PM    12    with the professor about that, because I was -- I was

01:58PM    13    sincerely concerned about him being hurt.

01:58PM    14        The idea, though, of protecting him on campus or

01:58PM    15    assigning him a personal protective detail while he's on

01:59PM    16    campus, while he's off campus, does little if anything to

01:59PM    17    mitigate the harm that collateral damage would cause.

01:59PM    18        There are a lot of cases in the literature, there was a

01:59PM    19    case just this May in Allen, Texas, where police officers

01:59PM    20    were just a few yards -- just across a parking lot from the

01:59PM    21    start of an active shooting where the officer is there having

01:59PM    22    an interaction with a mother and her two children, and then

01:59PM    23    bang, bang, bang, just across the parking lot, the officer

01:59PM    24    hears shots fired.

01:59PM    25        Within two minutes, two and a half, three minutes at the

01:59PM  1   most, that officer had grabbed his rifle, ran across the

01:59PM  2   parking lot, found this offender, and shot and killed him.

01:59PM  3       And in that short few minutes, during those rounds, that

02:00PM  4   time when the offender was shooting rounds into the public,

02:00PM  5   eight people were killed.

02:00PM  6       So the collateral damage that would likely occur if an

02:00PM  7   armed assault occurred on our campus is completely

02:00PM  8   unacceptable.

02:00PM  9       You know, we could put a couple police officers shoulder

02:00PM  10  to shoulder with Dr. Kershnar.  Just from a tactical

02:00PM  11  standpoint, those officers are the first target of the

02:00PM  12  offender.

02:00PM  13      It is not hard to bring a weapon onto a campus.  It is

02:00PM  14  not hard to conceal a weapon, even a long gun on campus.  An

02:00PM  15  offender could very, very quickly produce a weapon, attack

02:00PM  16  the professor, neutralize officers, and hurt or kill

02:01PM  17  surrounding students and staff.

02:01PM  18      Active shootings events are extraordinarily fast.  The

02:01PM  19  average active shooting event is about 12 minutes.  They're

02:01PM  20  very, very fast.

02:01PM  21      Law enforcement rarely stops -- I shouldn't say "rarely,"

02:01PM  22  in about a third of the cases law enforcement stops active

02:01PM  23  shooting events.  The idea protecting one person and having a

02:01PM  24  protective bubble as that person moves through the campus

02:01PM  25  doesn't do anything to remove my concerns about threats to

02:01PM   1   the campus as a whole.

02:01PM   2       Here we have in this email, getting back to the email, an

02:01PM   3   author who is attaching to campus administrators guilt by

02:01PM   4   association.  And there was a strong narrative in the social

02:01PM   5   media discussions that Fredonia knew about his views for

02:02PM   6   years.  They knew that he had a book published about

02:02PM   7   adult-child sex, and they kept him on board.  That was the

02:02PM   8   narrative in the public.

02:02PM   9       And my concern, from a threat assessment standpoint, was

02:02PM  10   that's having the effect of putting, you know, a target on

02:02PM  11   the professor, but also a target on campus.  And then that

02:02PM  12   link is inseparable in my view.

02:02PM  13           MS. PANTZER:  Let's skip ahead to Exhibit 11.  All

02:02PM  14   the way to the bottom, please.

02:02PM  15           BY MS. PANTZER:

02:02PM  16   Q.  This email, Exhibit 11, in evidence has a subject title

02:02PM  17   Steve Kershnar; is that correct?

02:03PM  18   A.  That is correct.

02:03PM  19   Q.  And is it states that -- it states that SUNY Fredonia

02:03PM  20   should be theoretically fumigated; did I read that correctly?

02:03PM  21   A.  Yes.

02:03PM  22   Q.  Is that concerning?

02:03PM  23   A.  Yes, it's the same tone, it's the same tenor, it's the

02:03PM  24   same messages as these other examples.  Attaching blame in

02:03PM  25   the eyes of a member of the public on campus administrators

02:03PM    1    for having Dr. Kershnar as a teaching professor.

02:03PM    2            MS. PANTZER:  Okay.  Can we skip to Exhibit 12.

02:03PM    3            BY MS. PANTZER:

02:03PM    4    Q.  Could you read that one for us, Chief Isaacson?  All the

02:03PM    5    way down.

02:03PM    6    A.  The message reads:  What kind of disgusting teachers are

02:03PM    7    you employing there?  Absolutely disgusting, suggesting sex

02:04PM    8    with a one-year-old is completely fine.

02:04PM    9        You people should be castrated, and that teacher should

02:04PM   10    be fired immediately.  He's most likely a pedophile himself.

02:04PM   11        Here, again, this idea that violence against the campus

02:04PM   12    administrators is acceptable.  That's the whole underlying

02:04PM   13    concern that I have.  There's a vast population out there

02:04PM   14    that became aggrieved by this.  The idea of violence against

02:04PM   15    the professor and campus resonates with them.

02:04PM   16        And from my position as the chief of police, I -- I

02:04PM   17    didn't have the law enforcement tools or the investigative

02:04PM   18    tools to protect the campus in that environment.

02:04PM   19            MS. PANTZER:  Barry, I want to play Exhibit 26 to 32,

02:05PM   20    or at least a sampling.  Will you stipulate?

02:05PM   21            MR. COVERT:  Yes, we will.

02:05PM   22            MS. PANTZER:  Thank you .

02:05PM   23            THE COURT:  So Exhibits 26 through 32 are admitted

02:05PM   24    without objection.

02:05PM   25            MR. COVERT:  Correct.

02:05PM  1          THE COURT:  And you may play whichever ones you want.

02:05PM  2          MS. PANTZER:  Thank you, Your Honor.

02:05PM  3      **(Defendant's Exhibits 26-32 were received in evidence.)**

02:05PM  4          MS. PANTZER:  Jenna, let's pull up Exhibit 27,

02:05PM  5  please.

02:05PM  6          (27 was played.)

02:05PM  7          BY MS. PANTZER:

02:06PM  8  Q.  Concerning to you, Chief Isaacson?

02:06PM  9  A.  Extremely concerning.  That touches on all of the themes

02:06PM  10  that we've discussed today.  Extremely concerning.

02:06PM  11  Q.  And other than the phone number, which we've identified

02:06PM  12  in our exhibit list, and I won't state on the record, was

02:06PM  13  there any other identity information for callers who left

02:06PM  14  voicemails like that?

02:06PM  15  A.  No, I did make a verbal request to an FBI colleague if we

02:06PM  16  had a phone number to see if those phone numbers appeared in

02:06PM  17  FBI databases, and the answer was no for the numbers we were

02:06PM  18  able to track down.

02:07PM  19          MS. PANTZER:  Jenna, can you pull up 28, please.

02:07PM  20          (28 was played.)

02:07PM  21          BY MS. PANTZER:

02:07PM  22  Q.  That last quote, Chief Isaacson, I feel like driving

02:07PM  23  there and killing him; concerning?

02:07PM  24  A.  Very concerning.  Not chargeable .  Not something that

02:07PM  25  the U.S. Attorney's Office would pursue, because it was -- it

02:07PM  1   was an expression of feelings, not an expression of intent.

02:07PM  2       The -- these -- these are just another medium to convey

02:08PM  3   the same idea, right, that there's this large population that

02:08PM  4   is very, very aggrieved with the professor's comments.

02:08PM  5           MS. PANTZER:  Exhibit 30, please.

02:08PM  6           (30 was played.)

02:09PM  7           MS. PANTZER:  I want to ask you specifically about

02:09PM  8   one quote that we heard in that voicemail that said, stated we

02:09PM  9   need to stop institutions like you.  What was the impression

02:09PM  10  it left on you?

02:09PM  11  A.  It was less concerning to me.  He doesn't -- he's

02:09PM  12  expressing his views about Dr. Kershnar's views.  In this

02:09PM  13  particular case, there's not an intimation of violence being

02:09PM  14  okay.  But I think this certainly illustrates the disgust

02:09PM  15  that was in the public, but this one isn't conveying that

02:09PM  16  violence is a way to resolve that.

02:10PM  17  Q.  You undertook a further threat assessment; is that

02:10PM  18  correct --

02:10PM  19  A.  Yes.

02:10PM  20  Q.  -- in March of 2022?

02:10PM  21  A.  That's correct.

02:10PM  22  Q.  And we already have all of the threat assessments in

02:10PM  23  evidence as part of Defendant's Exhibit 1, so we'll show you

02:10PM  24  your March 17th, 2022 threat assessment.  I believe in this

02:10PM  25  threat assessment, Chief Isaacson, you acknowledged that the

02:10PM    1    interest from the public had waned.

02:10PM    2    A.   Yes, I did.

02:11PM    3    Q.   And could you explain your conclusion?

02:11PM    4    A.   Sure.   This is --

02:11PM    5         Can you scroll back up, Jenna, please?

02:11PM    6         This is about five or six weeks after the controversy

02:11PM    7    came to light, and about -- about five weeks after it became

02:11PM    8    known in the public that Dr. Kershnar was off campus, and

02:11PM    9    there were.   There was some public relations press messaging

02:11PM    10   from the campus saying that campus disavowed his views and

02:11PM    11   disagreed with them.   I'm paraphrasing there.

02:11PM    12        As I suspected early on, that resulted in a -- a cooling

02:11PM    13   down of the passions that were surrounding this issue early

02:11PM    14   on.   And by March 17th when I authored this updated

02:12PM    15   assessment, I had time to more fully analyze and assess and

02:12PM    16   contemplate, consider the messaging that I'd seen on social

02:12PM    17   media, the message voicemails that we had seen, just really

02:12PM    18   the entire situation was much better understood by me at that

02:12PM    19   point.   And it was clear to me then, and it stays clear to me

02:12PM    20   today, but it was certainly clear to me then that bringing

02:12PM    21   him back to campus would make matters worse than they were on

02:12PM    22   February 2nd.   And that is one of the points I make in this

02:12PM    23   second assessment.

02:12PM    24   Q.   Can you explain that further?   Why would it make matters

02:12PM    25   worse?

02:12PM    1    A.  Sure.  I touched on it earlier, but the narrative in my

02:12PM    2    view -- the narrative in the public's mind would be that, can

02:13PM    3    you believe they brought him back?  They know full well

02:13PM    4    what's going on.  They can't claim ignorance anymore.  They

02:13PM    5    know he normalizes pedophilia.  The campus is complicit in

02:13PM    6    these views and supports these views.  And the campus is

02:13PM    7    giving him a platform to spread these views among our

02:13PM    8    impressionable young people.

02:13PM    9        That underlying narrative was common in the early part of

02:13PM   10    the controversy here.  If we were to bring him back, Fredonia

02:13PM   11    wouldn't have any credible messaging to the public to say,

02:13PM   12    oh, we were surprised about this, right?

02:13PM   13        I think -- I think this caught everybody on our campus,

02:13PM   14    certainly me, on February 1st and 2nd, completely by

02:13PM   15    surprise, just the intensity and the enormity of this

02:13PM   16    concern.  Bringing him back six weeks later when I -- when I

02:14PM   17    authored this memo, would have made the situation worse than

02:14PM   18    it was to start.

02:14PM   19    Q.  And I think we touched on this earlier, too, but I

02:14PM   20    believe that the quote is specifically in this threat

02:14PM   21    assessment, you state that hunters don't howl.  Could you

02:14PM   22    please explain what you mean by that?

02:14PM   23    A.  Sure.  I mentioned earlier this morning that this idea of

02:14PM   24    hunters don't howl and howlers don't hunt.

02:14PM   25        Hunters, people who actually complete acts of targeted

02:14PM  1    violence, very, very rarely issue direct unequivocal threats

02:14PM  2    to their targets.  I mentioned Secret Service exceptional

02:14PM  3    case study, which is still a landmark study in this field,

02:14PM  4    where they examined -- I believe it was 47 attacks on public

02:14PM  5    officials, completed attacks on public officials.  Not one

02:15PM  6    offender had issued a direct threat to their target.

02:15PM  7        So that's this idea of hunters don't howl.  Hunters

02:15PM  8    don't -- those who complete acts of targeted violence don't

02:15PM  9    issue direct threats to their targets before the attack.

02:15PM  10   Q.  So what does that mean here, where there has been an

02:15PM  11   allegation that there is a lack of direct threats?  How does

02:15PM  12   that play into your analysis?

02:15PM  13   A.  It's back to the idea that I mentioned earlier, that when

02:15PM  14   a high school principal says it's not too serious because we

02:15PM  15   haven't gotten a direct threat from the student.  That is

02:15PM  16   cold comfort, that is something that should never be taken as

02:15PM  17   an indication that we can reduce our level of concern.

02:15PM  18       Just the opposite is true.  Back to the idea of a bomb

02:15PM  19   threat.  If there is a direct threat, it's a near

02:15PM  20   mathematical certainty that there's not going to be a

02:16PM  21   targeted attack.  We still have to examine those, we still

02:16PM  22   have to treat them seriously and evaluate them.  But a very

02:16PM  23   good rule of thumb is people who issue direct threats,

02:16PM  24   unequivocal directed threats to their targets, don't carry

02:16PM  25   them out as a rule, as a rule of thumb.

02:16PM   1   Q.   Is that why howlers also don't hunt?

02:16PM   2   A.   That is why howlers don't hunt, that's exactly right.

02:16PM   3   Howlers, people who make direct unequivocal threats very

02:16PM   4   rarely carry them out.

02:16PM   5   Q.   You also discuss in this threat assessment, Chief

02:16PM   6   Isaacson, that offenders often do not snap, they plan.  Can

02:16PM   7   you talk about that?

02:16PM   8   A.   Sure.  It's a myth in the general public that when we

02:16PM   9   turn on our TV and we see yet another active shooting has

02:16PM  10   happened, the general public thinks, oh, that's -- some crazy

02:16PM  11   person went off the rails.  This idea of waking up one

02:17PM  12   morning and saying, you know, I'm gonna go grab a gun and

02:17PM  13   kill as many people as I can.  We don't see that in

02:17PM  14   retrospective examinations of these events.

02:17PM  15        What we do see is attackers plan.

02:17PM  16        Remember, this is a grievance-driven phenomenon that

02:17PM  17   brings offenders from a grievance, through ideation, through

02:17PM  18   preparation and planning, through research, and then finally

02:17PM  19   to an attack.  That whole process very often takes weeks or

02:17PM  20   months, sometimes years.

02:17PM  21        There are cases in the literature where an offender had a

02:17PM  22   grievance for three years.  An attacker at Case Western

02:17PM  23   University in Cleveland had a grievance against that

02:18PM  24   university for three years, and then finally offended and

02:18PM  25   shot and killed one person on campus.

02:18PM    1    Q.  Just briefly, I apologize for backtracking, but I want to

02:18PM    2    go back to the threats that we read into evidence that

02:18PM    3    Dr. Kershnar received.  Did he report those to you?

02:18PM    4    A.  No, he did not.

02:18PM    5        I -- I had authority from the president and my

02:18PM    6    vice-president to review emails that were received on

02:18PM    7    Dr. Kershnar's fredonia.edu account.  I saw a number of

02:18PM    8    emails that were very concerning to me, that were threatening

02:18PM    9    in nature, and they were authored by persons unknown and sent

02:18PM   10    to the professor.

02:18PM   11        When I talked to him, I believe I made it very clear I

02:18PM   12    was concerned about his personal safety, and I was genuinely,

02:19PM   13    and I still am.

02:19PM   14        I asked him, I would say I pleaded with him, that if

02:19PM   15    there was anything that came to his attention that indicated

02:19PM   16    that he was at risk or that the campus was at risk, to call

02:19PM   17    911, call University Police, or call me directly.  And I told

02:19PM   18    him, I gave him my phone number, I told him you can call any

02:19PM   19    time.  He did -- he never called me, he never once called me.

02:19PM   20        When I saw these concerning emails that I saw on his

02:19PM   21    Fredonia email account, I saw that he had -- he had assembled

02:19PM   22    them into a Word document, he had cut and pasted those

02:19PM   23    concerning emails into a Word document, and then he emailed

02:19PM   24    it out to a group who I believe are fellow academicians,

02:20PM   25    people that were academia.

02:20PM   1   Q.  But he didn't report them to you?

02:20PM   2   A.  He did not report them to me.  And that weighed heavily

02:20PM   3   in my considerations of how -- how can we keep him safe, and

02:20PM   4   how can we keep the campus safe, as we don't have him as a

02:20PM   5   reliable partner in that safety picture.

02:20PM   6       You know, in protective detail duties, the armed security

02:20PM   7   has to have very open and honest conversations with with the

02:20PM   8   protectee, the person who's being protected.  Otherwise, it

02:20PM   9   just doesn't work.  There has to be that understanding that,

02:20PM   10  you know, the protectee is keeping the security detail

02:21PM   11  apprised of what is going on and conveying any information

02:21PM   12  that might indicate that there's a security risk.

02:21PM   13      After seeing what Professor Kershnar had done, he had

02:21PM   14  these concerning emails.  He collected them, sent them to his

02:21PM   15  colleagues, and didn't send them to me.

02:21PM   16      It made me believe that I would not be able to rely on

02:21PM   17  him as a -- as a partner in his security and in the campus's

02:21PM   18  security if he were to be back on campus.

02:21PM   19  Q.  I think in this threat assessment, you come to the

02:21PM   20  conclusion that you feel that the only way to mitigate the

02:21PM   21  safety risk to campus is to prevent the first step in the

02:21PM   22  pathway to violence that you described for us earlier.

02:21PM   23  A.  That's exactly right.  This is a very unique case.  The

02:21PM   24  intensity of the grievances is reflected in the emails, the

02:22PM   25  social messaging.  The enormous audience, probably numbering

02:22PM  1  in hundreds of thousands or millions, and the complete lack

02:22PM  2  of visibility on the behaviors of would-be assailants until

02:22PM  3  they showed up on our campus, it really is the perfect storm

02:22PM  4  of not being able to prevent violence, not -- because we

02:22PM  5  wouldn't observe it until it's way too late.

02:22PM  6      So from my standpoint, again, thinking about that pathway

02:22PM  7  to violence, let's -- let's resolve the grievance.  Let's

02:22PM  8  prevent the grievance from being amplified and trumpeted

02:22PM  9  over, you know, the internet and traditional and social

02:22PM 10  media.

02:22PM 11  Q.  I want to ask you a little further about why there's a

02:23PM 12  lack of visibility until a would-be assailant shows up on

02:23PM 13  campus.  Can't we just continually monitor social media, the

02:23PM 14  emails?  Why isn't that enough?

02:23PM 15  A.  If we were to have him back on campus, and we were

02:23PM 16  monitoring the social media traffic, I am extremely confident

02:23PM 17  we would see a lot more of what we've talked about today: A

02:23PM 18  lot of vitriol, a lot of anger, hostility, directed at

02:23PM 19  Dr. Kershnar and the campus.

02:23PM 20      Persons of concern who would be aggrieved to the point

02:23PM 21  that they would decide that they are going to target

02:23PM 22  Professor Kershnar or the campus, they would be far removed

02:23PM 23  physically from campus.  They might be on the other side of

02:23PM 24  the country.  They might be loners.  They might be socially

02:24PM 25  disconnected.  But they're angry, they have access to

02:24PM      1    weapons, and they could plan.

02:24PM      2        And we don't have an optic on those people.  We,

02:24PM      3    Fredonia, don't.  We can't rely on law enforcement generally

02:24PM      4    to report these concerning behaviors.  We can't rely on the

02:24PM      5    public to report these concerning behaviors.

02:24PM      6        I mentioned earlier that my mission at Fredonia included

02:24PM      7    explaining what these behaviors looked like to our campus

02:24PM      8    community.  Most members of the public don't recognize these

02:24PM      9    behaviors when they see them.  They don't understand what

02:24PM     10    they are.  They're seeing something, but they don't know what

02:24PM     11    it is, so they're not saying something.  They're not

02:24PM     12    reporting these concerning behaviors to the -- to law

02:24PM     13    enforcement.

02:24PM     14        So now, from Fredonia's standpoint, from the police

02:24PM     15    department's standpoint, we have this enormous external

02:25PM     16    audience, all of whom are highly aggrieved and some of whom,

02:25PM     17    in my judgment, are aggrieved to the point where they would

02:25PM     18    consider violence against the professor or against the

02:25PM     19    campus.  My first indication would be when they showed up on

02:25PM     20    campus, that would be it.

02:25PM     21        Putting -- putting barriers between an offender --

02:25PM     22    imagine a gate around the campus or security cameras that

02:25PM     23    were monitoring every human being on campus, facial

02:25PM     24    recognition technology.  We wouldn't have information as to

02:25PM     25    whose face to put in there to be on the lookout for.

02:25PM 1     And by the time we knew somebody would be on the pathway

02:25PM 2  to violence, they would be on Stage 6, the attack phase.  We

02:25PM 3  like to catch them in the research and planning stage where

02:25PM 4  somebody's looking over their shoulder and sees them viewing

02:26PM 5  videos about Columbine that are contextually inappropriate.

02:26PM 6     Why is a 19-year-old college student who's a music major

02:26PM 7  all of a sudden interested in videos about Columbine?  That's

02:26PM 8  observable behavior that we can report, we can intercede

02:26PM 9  early on that pathway to violence.

02:26PM 10    With regard to the matter before the Court, when we first

02:26PM 11 took note of the pathway of violence, it would be far too

02:26PM 12 late.

02:26PM 13 Q.  And that's because the would-be assailant would probably

02:26PM 14 already be on campus?

02:26PM 15 A.  Absolutely.  Yeah.  It's an open campus.  The Fredonia

02:26PM 16 campus is 250 acres.  The buildings are spread out.  At any

02:26PM 17 one point, there are two, at most three, police officers on

02:26PM 18 duty, on patrol on the campus.

02:26PM 19    We would certainly -- if there were an attack on campus,

02:27PM 20 we would certainly get video of the attack.  We would be able

02:27PM 21 to watch that attack, perhaps our dispatcher would take note

02:27PM 22 of it.  There are 300 cameras, but they're not all monitored

02:27PM 23 simultaneously by a human being.  But we would almost

02:27PM 24 certainly capture video.  And maybe that would be seen by a

02:27PM 25 dispatcher, it would definitely be reviewed retrospectively.

02:27PM   1   We would have video of an attack because there are so many

02:27PM   2   cameras, but those cameras do nothing to prevent violence.

02:27PM   3   They have no effect whatsoever in preventing this phenomenon

02:27PM   4   of targeted violence.

02:27PM   5   Q.  So ultimately in your March 17, 2022 assessment, did you

02:27PM   6   find that your February 2nd, 2022 recommendation remained?

02:27PM   7   A.  Could you just say that one more time?

02:28PM   8   Q.  Sure.  Did you determine as of your March 17th, 2022,

02:28PM   9   that Dr. Kershnar should remain off campus?

02:28PM  10   A.  I did, yes.

02:28PM  11   Q.  I'm going to show you your third assessment.  It's

02:28PM  12   Exhibit E to Defendant's Exhibit 1 in evidence.  I'll give

02:28PM  13   you a minute to review this one.

02:28PM  14       What were your determinations with regard to this

02:28PM  15   assessment, Chief Isaacson?

02:28PM  16   A.  They were unchanged.  I had some more opportunity at this

02:28PM  17   point to reflect on the circumstance that we were dealing

02:29PM  18   with, with Dr. Kershnar, and I began to reflect that there's

02:29PM  19   a lot of commonalities in a potential attack against --

02:29PM  20   pardon me -- against Dr. Kershnar as we've seen in other

02:29PM  21   completed attacks.

02:29PM  22       Attackers are often motivated by political views,

02:29PM  23   antiabortion views.  We had an attacker down in Chautauqua

02:29PM  24   County last year that staged -- or, pardon me, that stormed

02:29PM  25   the stage of the amphitheater at Chautauqua Institution and

02:29PM    1    stabbed and gravely wounded Salman Rushdie.  Dylan Roof, who

02:29PM    2    killed black people at a church.  We had a -- we had the Tops

02:29PM    3    shooter here locally.  These are all issues where the

02:29PM    4    offender has a grievance.  These are all grievance-motivated

02:30PM    5    attacks.

02:30PM    6        And in some cases, the offender self-radicalizes.  Again,

02:30PM    7    we see that more often in political and terrorism cases where

02:30PM    8    people have the personality makeup that they are easily

02:30PM    9    grieved.  They will consume media on Islamic terrorism or

02:30PM    10   white supremacy issues.  So, I was rounding out my thinking

02:30PM    11   on this issue, and I wanted to include those thoughts in my

02:30PM    12   rationale and my explanation to my bosses as to why keeping

02:30PM    13   Dr. Kershnar off campus was appropriate.

02:30PM    14       I also did a little -- a little more research on this

02:30PM    15   particular idea of vigilanteism against sex offenders, or

02:31PM    16   people who are either rightly or wrongly identified as sex

02:31PM    17   offenders or child molesters, the idea there being that a

02:31PM    18   common thread -- a common theme in the narratives that I was

02:31PM    19   seeing in the social media commentary were that Dr. Kershnar

02:31PM    20   was a pedophile.

02:31PM    21       My concern was and my interest was what research is out

02:31PM    22   there that perhaps looked into this idea.  And there was a

02:31PM    23   study done in 2019, just a few years ago, which is very

02:31PM    24   recent as far as scientific research is concerned, where the

02:31PM    25   researchers looked at 279 instances of violence against sex

02:31PM 1   offenders.  And we have the sexual -- sex offender

02:31PM 2   registration laws in all of the states now based on federal

02:32PM 3   legislation.  There are a lot of examples in this study where

02:32PM 4   people who were either known or suspected to be child sex

02:32PM 5   offenders, they were targeted violently, many murdered.  And

02:32PM 6   the researchers commented that this number of 279 was likely

02:32PM 7   a vast undercount in their study that across the country

02:32PM 8   there were likely very many, many more.

02:32PM 9       It added weight to my concern that this could be viewed

02:32PM 10  and, I think, is viewed by many as a -- an aggrieving

02:32PM 11  political issue where a -- and this is the narrative, this is

02:33PM 12  not what I believe, but what I think the public believes --

02:33PM 13  we have a pedophile at a liberal arts college that has very

02:33PM 14  liberal, anti-American ideas, that it turns it into a

02:33PM 15  hotly -- it turns it into a very aggrieving political issue

02:33PM 16  in the minds of some.  That is my concern.

02:33PM 17  Q.  So, and I think we touched on this, but again, because

02:33PM 18  the subject of this situation was pedophilia, questioning the

02:33PM 19  immorality of pedophilia, did that play into your analysis

02:33PM 20  here?

02:33PM 21  A.  Yes.  The ideas that Dr. Kershnar raised, it certainly is

02:33PM 22  perceived by the public, were that there's -- there's nothing

02:33PM 23  wrong with pedophilia.  There's nothing morally wrong with

02:34PM 24  that.

02:34PM 25      To my ear, that is a brand new issue to be presented to

02:34PM   1   the American public at large by traditional and social media.

02:34PM   2   It's -- it's -- it's not issues that the country has perhaps

02:34PM   3   wrestled with for a hundred years or more.  This is a new,

02:34PM   4   hot button, shocking idea to many people.

02:34PM   5       And, you know, I'm not judging what the message is, I'm

02:34PM   6   judging what the reaction is.  And that's driving my concern

02:34PM   7   that this issue is so inflaming to so many people, it's not

02:34PM   8   something that we as a country have had a chance to digest

02:34PM   9   and get our heads around.

02:34PM  10   Q.  So, does that concept set apart this threat assessment

02:35PM  11   from other threat assessments?

02:35PM  12   A.  Yes.  And in my view, the reaction to this, and the

02:35PM  13   violent rhetoric and the violent ideations that this has

02:35PM  14   created, is exceptional and unique to this issue.

02:35PM  15   Q.  How many full-time officers does the SUNY Fredonia police

02:35PM  16   department have?

02:35PM  17   A.  It floats between eleven and twelve.

02:35PM  18   Q.  What about part time?

02:35PM  19   A.  None.

02:35PM  20   Q.  So you state in this threat assessment that there are few

02:35PM  21   tools to prevent attacks.  What do you mean by that?

02:35PM  22   A.  Few tools prevent this sort of attack.  This attack would

02:35PM  23   originate from off campus and come onto campus.  We don't

02:35PM  24   have visibility -- we don't have that optic on those

02:36PM  25   behaviors on persons of concern before they offend.

02:36PM   1       We don't have the guards, gates, and guns that we would

02:36PM   2   need to harden a target in this particular scenario to the

02:36PM   3   extent that you'd need to -- to keep everybody safe.  And if

02:36PM   4   we were to do so, it would not look like a SUNY campus, it

02:36PM   5   would looked like an armed encampment.

02:36PM   6       We would -- in my view, we would have to at least double

02:36PM   7   the complement of the number of police officers on the campus

02:36PM   8   just to provide a protective detail for Dr. Kershnar, and I

02:36PM   9   don't think that's an effective tool to keep the campus at

02:36PM  10   large safe.  Frankly, it would just start the gunfight a

02:36PM  11   little bit earlier if an armed intruder were to come on

02:36PM  12   campus that.  It does nothing to reduce the potential for

02:36PM  13   collateral damage.

02:36PM  14       And let me contrast that with the tools we have for

02:37PM  15   concerns that arise within campus.  The research shows that

02:37PM  16   for campus active shootings events, about 80 percent of them

02:37PM  17   are caused or are carried out by people who are either

02:37PM  18   current or former students or current or former employees.

02:37PM  19   And about 10 percent are caused or carried out by people who

02:37PM  20   have some connection to the campus, perhaps the offender's

02:37PM  21   girlfriend works at campus as an example.

02:37PM  22       There's 10 percent of the attacks on campuses across the

02:37PM  23   United States where the offender has no connection to the

02:37PM  24   campus, it's just a soft target.

02:37PM  25       So from a violence prevention standpoint, where do we

02:37PM    1    have good tools?  We have really good tools for dealing with

02:37PM    2    threats that originate on the campus, with students, with

02:38PM    3    employees, threats that originate on the campus.  And that

02:38PM    4    goes back to this idea that on the campus we're together all

02:38PM    5    the time.  Roommates are hanging out together.  Teachers are

02:38PM    6    having interactions with students.  Cleaning staff is getting

02:38PM    7    in dormitory rooms.

02:38PM    8        There's a lot of observation, mutual observation.  We're

02:38PM    9    not spying on each other, but we're aware of each other.

02:38PM   10    We're aware of each other's behaviors.  And especially on an

02:38PM   11    educated campus like I hope to make Fredonia, people take

02:38PM   12    note of concerning behaviors, and they report them.

02:38PM   13        On our campus at SUNY Fredonia, we -- we're very

02:38PM   14    proactive in teaching the campus what to look for, how to get

02:38PM   15    word to the right people on campus.  We have a students of

02:38PM   16    concern team, a multidisciplinary team that's very, very

02:38PM   17    similar to this Behavioral Analysis Unit model that the FBI

02:39PM   18    uses.  An interdisciplinary team that -- or, multi-

02:39PM   19    interdisciplinary team that focuses on individual students

02:39PM   20    who come to its attention.

02:39PM   21        I sit on that -- or, I sat on that team.  I would review

02:39PM   22    every single case for any indications of pre-attack

02:39PM   23    indicators, any pending violence.  And the team on Fredonia's

02:39PM   24    campus and all of the behavioral intervention teams around

02:39PM   25    the United States are extraordinarily effective in

Kershnar v Kolison - Isaacson - Pantzer/Direct - 9/13/23

88

02:39PM    1    identifying threatening concerns -- threatening behaviors,

02:39PM    2    concerning behaviors early in that pathway of violence in

02:39PM    3    designing early -- in helping interventions for students.

02:39PM    4        If we didn't have that capability, the active shooting

02:39PM    5    numbers that we see in the country would be vastly greater,

02:39PM    6    in my view.

02:39PM    7        Campuses are catching these early, because they have

02:40PM    8    visibility on that population.  We don't have visibility on

02:40PM    9    the concerning population with this matter.

02:40PM    10   Q.  Why can't we just put up more cameras?

02:40PM    11   A.  For the same reason.  The Fredonia campus has 3,000

02:40PM    12   cameras.  That's a lot of cameras.  But it's the density of

02:40PM    13   those cameras --

02:40PM    14       If I said 3,000, I misspoke.  We have 300 cameras.

02:40PM    15       That density of cameras is much less than you'd see in a

02:40PM    16   Las Vegas casino, for example.  Many of the cameras are

02:40PM    17   looking out over fields or bigger areas.  We're not making

02:40PM    18   out individual faces.  We're seeing human figures walk across

02:40PM    19   the screen, not identifying people by sight.  Some cameras,

02:40PM    20   we do have much better resolution and much better clarity.

02:41PM    21   But again, those are used most often for doing retrospective

02:41PM    22   investigations.  A bicycle gets stolen --

02:41PM    23       During my tenure, there was a couple of sexual assaults

02:41PM    24   on campus.  The cameras were used to good effect to solve

02:41PM    25   those crimes.

02:41PM   1        They are rarely used, certainly in my experience, they

02:41PM   2   are to take notice of a person who is known by authorities as

02:41PM   3   somebody who should not be on campus.

02:41PM   4   Q.  Do cameras prevent attacks like the ones that you were

02:41PM   5   worried about here?

02:41PM   6   A.  Not at all.  And that's -- that's why you can go online,

02:41PM   7   you can go on YouTube and type in active shooters, and you'll

02:41PM   8   get a lot of video of active shootings.  And that's because

02:41PM   9   there are a lot of cameras out there that are capturing these

02:41PM  10   horrible crimes, clearly they're not preventing them.

02:41PM  11   They're recording them, but they're not prevent them.

02:42PM  12   Q.  What if the cameras have facial recognition technology?

02:42PM  13   I think you touched on it briefly, but just again --

02:42PM  14   A.  Sure.  My concern there is -- that technology is actually

02:42PM  15   quite impressive if you know who you're looking for.  If

02:42PM  16   you -- if you were to get a driver's license photograph of a

02:42PM  17   person that you knew should not be on the campus, you could

02:42PM  18   enter that into the system, and it would sound an alert when

02:42PM  19   that person came on campus.

02:42PM  20        With this matter before the Court, we don't know who to

02:42PM  21   put into that system to recognize.

02:42PM  22   Q.  Can facial recognition cameras detect guns?

02:42PM  23   A.  Sometimes, yes, if they're visible.

02:42PM  24        Concealing a weapon is very, very easy.  I did it for 27

02:42PM  25   years of my plain clothes law enforcement career.  It's very

02:42PM    1    easy to conceal a firearm.

02:43PM    2        FBI agents and marshals are walking around this building

02:43PM    3    all the time armed, and you can't see the firearm.

02:43PM    4    Q.  Why not add armed guards?

02:43PM    5    A.  Well, state law makes it illegal for anybody other than

02:43PM    6    authorized university police officers to carry firearms on a

02:43PM    7    SUNY campus.

02:43PM    8        If we were to have a personal protective detail on

02:43PM    9    Professor Kershnar, that would -- that would take away from

02:43PM   10    the normal patrol functions of our officers.

02:43PM   11        Our officers are responding all the time to students who

02:43PM   12    are having suicidal ideations, who are in mental health

02:43PM   13    crises, who are having medical emergencies.  To pull them

02:43PM   14    away from those duties, sort of the bread-and-butter duties

02:44PM   15    of a police officer on today's campuses, would put all those

02:44PM   16    students at risk for all the other hazards that are out

02:44PM   17    there.

02:44PM   18    Q.  And if Dr. Kershnar was afforded armed guards, would that

02:44PM   19    protect the campus from the threat that you're concerned

02:44PM   20    about?

02:44PM   21    A.  No.  And I'm not particularly convinced it would provide

02:44PM   22    Dr. Kershnar with a whole lot of real security against the

02:44PM   23    kind of attacker that I'm worried about.  You know, in this

02:44PM   24    context, he's a public official.  There have been

02:44PM   25    assassination attempts against presidents, and they have a

02:44PM 1    Secret Service complement around them.

02:44PM 2        In the case of armed security following an individual

02:44PM 3    around a campus, there's probably a reasonable improvement in

02:44PM 4    the safety of that one individual.  I'm not convinced that

02:44PM 5    that would keep an offender who was angry at the campus at

02:45PM 6    large or was looking for Kershnar and just didn't know where

02:45PM 7    he was, having armed guards on one person doesn't do much,

02:45PM 8    doesn't do anything to protect the rest of the campus.

02:45PM 9    Q.  And you told us earlier that there's 11 to 12 officers

02:45PM 10   employed by SUNY Fredonia any time.  How many officers are on

02:45PM 11   the day shift when Dr. Kershnar would be teaching?

02:45PM 12   A.  Two or three.

02:45PM 13   Q.  What about access control, having all of the doors locked

02:45PM 14   with only key fob access?

02:45PM 15   A.  Campuses -- college campuses are much different than K

02:45PM 16   through 12 schools.  From -- strictly from a physical

02:45PM 17   security standpoint, this would be a different story if it

02:45PM 18   were a K through 12 school.  Where the students come in for

02:45PM 19   the day, there's hard barriers and locked doors to keep

02:46PM 20   intruders from coming into a K through 12 school.

02:46PM 21       College campuses are open.  The student union is open.

02:46PM 22   The academic halls are open.  It's -- it's -- it's very

02:46PM 23   difficult, in fact it's not done, to do sort of lock-down,

02:46PM 24   lock-out drills on college campuses that you can do in K

02:46PM 25   through 12 schools.  It's just a different physical layout.

02:46PM 1  Locking the doors doesn't keep the people out of doors safe.

02:46PM 2  Locking the doors doesn't keep the people in a building safe

02:46PM 3  if the offender is in there with them.

02:46PM 4      The Virginia Tech shooter locked the doors himself with

02:46PM 5  chains, locked the crash bars of the exit doors with chains

02:47PM 6  before he proceeded to fire on students inside that building.

02:47PM 7  Q.  Is it culturally important to SUNY Fredonia to remain an

02:47PM 8  open campus?

02:47PM 9  A.  Certainly.  The -- on college campuses across the

02:47PM 10 country, it's important that they are open, that students can

02:47PM 11 move about freely, that everybody can move about freely.  And

02:47PM 12 certainly from a community policing standpoint, it's -- it

02:47PM 13 would be a very difficult job to police any campus in this

02:47PM 14 country if it was a very heavy police presence.  It would

02:47PM 15 have a very different character day to day.  It would be

02:47PM 16 frightening to a lot of our students.

02:47PM 17     We have a lot of students who come to us from parts of

02:47PM 18 the country where there are not good relationships between

02:47PM 19 communities and their police departments.

02:48PM 20     During my tenure, I went to great lengths to come up with

02:48PM 21 events where we could break down those barriers, and police

02:48PM 22 officers could interact with students in a positive way

02:48PM 23 instead of a negative way.

02:48PM 24 Q.  Okay.  I want to show you your fourth threat assessment,

02:48PM 25 it's Defendant's Exhibit F to Exhibit 1 in evidence.  Do you

02:48PM  1   recognize this assessment?

02:48PM  2   A.  Yes, I do.

02:48PM  3   Q.  And what were your determinations?

02:48PM  4   A.  Can you keep scrolling down, Jenna, please?

02:49PM  5       Yes.  At this point, I had the benefit of reviewing an

02:49PM  6   intelligence product by a company called A1C.  They're a

02:49PM  7   company based in Washington, D.C.  I know one of the

02:49PM  8   principals, he's a former FBI colleague, and we hadn't spoken

02:49PM  9   in years.  And he explained to me the kind of business A1C

02:49PM  10  is, and that got me thinking that perhaps they could do an

02:49PM  11  internet scrub in a way that perhaps I wasn't able to do.

02:49PM  12  I'm not trained in scrubbing the corners of the internet for

02:49PM  13  relevant content.

02:49PM  14    I asked them to do that.  They got back to me with some

02:50PM  15  examples of concerning material they found on the internet,

02:50PM  16  and they shared that with me.

02:50PM  17    Those -- those findings supported and amplified my

02:50PM  18  concerns from earlier, that there were people out there that

02:50PM  19  were very angry with Kershnar, Dr. Kershnar, pardon me.

02:50PM  20  There was one example where his physical address on campus

02:50PM  21  was posted to an area on the -- on the dark web that is

02:50PM  22  frequented by highly anti-Semetic persons.  They were talking

02:50PM  23  in angry ways about the professor and his views.

02:50PM  24  Q.  And the -- what was your ultimate recommendation

02:50PM  25  following your completion of this threat assessment?

02:51PM   1   A.  That we maintain the status quo.  That this cooling-down

02:51PM   2   period is continuing.  I do believe that the public has

02:51PM   3   largely lost interest in this.  The public understands that

02:51PM   4   he's not on campus, that campus has disavowed his views as

02:51PM   5   not reflective of Fredonia.  And my -- my view, as expressed

02:51PM   6   here, was that we should maintain that going forward.

02:51PM   7   Q.  Well, if the public has lost interest, Chief Isaacson,

02:51PM   8   why can't Dr. Kershnar be returned to campus?

02:51PM   9   A.  For the reason I stated earlier.  I am convinced that

02:51PM  10   there would be a very intense, and I would submit a more

02:51PM  11   intense, reaction by the public if after this time has gone

02:52PM  12   by he were brought back and the public perceived that as

02:52PM  13   voluntary on SUNY Fredonia's part.

02:52PM  14       If we were to just simply say let's give it a try, let's

02:52PM  15   bring the professor back, and let's see what happens.  I'm

02:52PM  16   convinced, and I think any reasonable person would conclude,

02:52PM  17   that the reaction would be more intense, the concerns for

02:52PM  18   violence would be more severe than they were on February 1st.

02:52PM  19   Q.  So there's still a threat to the safety of the campus and

02:52PM  20   to Dr. Kershnar?

02:52PM  21   A.  If he were to come back, I believe, yes, there would be.

02:52PM  22   Q.  Okay.  I want to show you what we pre-marked as

02:52PM  23   Defendant's Exhibit 35.  Do you recognize this document?

02:53PM  24   A.  Yes, I do.

02:53PM  25           MS. PANTZER:  Barry, can you stipulate?

02:53PM    1              MR. COVERT:  If I can open my three-ring binder for

02:53PM    2    it.  Yes.

02:53PM    3              MS. PANTZER:  Thank you.

02:53PM    4              THE COURT:  This is Exhibit 35?

02:53PM    5              MS. PANTZER:  Yes, Your Honor.  I think it's

02:53PM    6    defendant's last exhibit.

02:53PM    7              THE COURT:  I think I only have 34.  Hang on.

02:53PM    8              MS. PANTZER:  I'm happy to provide the Court with a

02:53PM    9    copy.

02:53PM   10              THE COURT:  I have it.  I didn't have it tabbed.

02:53PM   11              BY MS. PANTZER:

02:53PM   12    Q.  Chief Isaacson, showing you what's been marked as

02:53PM   13    Exhibit 35 --

02:53PM   14              THE COURT:  It's received, by the way, without

02:53PM   15    objection.

02:53PM   16              MS. PANTZER:  Thank you, Your Honor.

02:53PM   17              **(Defendant's Exhibit 35 was received in evidence.)**

02:53PM   18              BY MS. PANTZER:

02:53PM   19    Q.  Why did you draft this memorandum?

02:53PM   20    A.  On January 3rd of this year, I was called by an FBI

02:54PM   21    colleague, Chad Artrip, and he told me that the FBI was

02:54PM   22    conducting an investigation.  He said that the nature of the

02:54PM   23    underlying investigation was something that he could not

02:54PM   24    disclose to me, but that during the course of the

02:54PM   25    investigation, FBI agents found that there was a threat to

02:54PM  1   the safety of Dr. Kershnar.  That threat met the FBI's

02:54PM  2   criteria for a duty to warn Professor Kershnar, and also the

02:54PM  3   campus.

02:54PM  4       So, Special Agent Artrip was notifying me, as well, that

02:54PM  5   there was a threat.

02:54PM  6       The information I got was that there was no information

02:54PM  7   regarding the credibility of the threat.  And I want to make

02:54PM  8   this distinction because it's important.

02:54PM  9       He did not say there's no credible threat.  He said

02:54PM 10   there's no information about the credibility of the threat.

02:55PM 11   And that's a distinction with an important semantic

02:55PM 12   difference.

02:55PM 13       The threat met the FBI's duty to warn criteria.  Special

02:55PM 14   Agent Artrip eventually contacted Dr. Kershnar to convey this

02:55PM 15   information, and he conveyed it to me.

02:55PM 16       Special Agent Artrip did tell me this was a sensitive

02:55PM 17   investigation.  I don't know what that means other than those

02:55PM 18   words.

02:55PM 19   Q.  And this was in January of 2023?

02:55PM 20   A.  Correct.

02:55PM 21   Q.  Just briefly, I just want to touch a little bit more on

02:55PM 22   the difference between "no credible threat" and "not being

02:55PM 23   certain whether a threat is credible."  Am I misstating that

02:56PM 24   probably?  Could you -- could you talk about that a little

02:56PM 25   further?

02:56PM   1   A.   Sure.   The information I got from the FBI was there was

02:56PM   2   no information to judge the credibility of the threat.   There

02:56PM   3   was a threat, they had no information to judge the

02:56PM   4   credibility on that threat.   They didn't know if it was a low

02:56PM   5   threat, a medium threat, a high threat, an imminent threat, a

02:56PM   6   long-term threat.   No information.   It was -- the information

02:56PM   7   was enough though that it caused the FBI to reach out to me

02:56PM   8   and to Dr. Kershnar.

02:56PM   9        Contrast that with we have a threat that's not credible.

02:56PM  10   A simple example would be that you have a person that is

02:56PM  11   physically incapable of carrying out an attack.   If somebody

02:56PM  12   were very, very old, and said to Mike Tyson, I'm gonna knock

02:57PM  13   you out, that is a threat that is not credible.   And that's

02:57PM  14   the distinction here.

02:57PM  15   Q.   Would any of these threats that we've reviewed today, is

02:57PM  16   there any way to know whether or not they'll lead to actual

02:57PM  17   violence for sure?

02:57PM  18   A.   No.   And one of the hallmarks of this field of threat

02:57PM  19   assessments and threat mitigation is we're in the business of

02:57PM  20   preventing threats, not predicting them.   I can't predict, no

02:57PM  21   one can predict, what person is going to offend and when.

02:57PM  22        What we can do is things that we know work.   We can do

02:57PM  23   things that are preventative, that we know work to prevent

02:57PM  24   violence.

02:57PM  25        I mentioned earlier those thousands of cases that the FBI

02:57PM  1  has touched where not one person's gone on to offend.  These

02:58PM  2  people that were generating very, very high levels of

02:58PM  3  concern, so much so that those got to the FBI.  We know what

02:58PM  4  to do to reduce the risk of targeted violence.

02:58PM  5      I think I lost track of your question.

02:58PM  6  Q.  That's okay.  I think you've answered it.

02:58PM  7  A.  Okay.  What -- okay, I'm sorry.

02:58PM  8          THE COURT:  Next question.

02:58PM  9          MS. PANTZER:  Thank you, Your Honor.

02:58PM  10         BY MS. PANTZER:

02:58PM  11 Q.  Chief Isaacson, if Dr. Kershnar were returned to campus,

02:58PM  12 could you tell the Court what you believe, in your

02:58PM  13 professional opinion, would follow?

02:58PM  14 A.  If he were to come back, there would be an intense and

02:58PM  15 ongoing echo chamber effect on social media, perhaps

02:58PM  16 traditional media, where more and more people would be

02:58PM  17 exposed to information that would lead them to believe that

02:59PM  18 Dr. Kershnar is a pedophile, he is physically located on

02:59PM  19 Fredonia's campus, Fredonia knows about it, and because they

02:59PM  20 know about it and because he's on campus, the campus itself

02:59PM  21 and the administrators are complicit and responsible.

02:59PM  22     That would generate a bigger tidal wave of threatening

02:59PM  23 messages than what we saw in February of 2022.

02:59PM  24     The police department there would be absolutely

02:59PM  25 overwhelmed with the volume of threats.

02:59PM  1    The campus community would be very, very concerned and

02:59PM  2    perhaps terrified.

02:59PM  3    I think there would be ancillary effects in inhouse

02:59PM  4    people viewed Fredonia and behaved, I think they're outside

02:59PM  5    of the scope of this, but it would change the character of

03:00PM  6    the university, and in my view, it would put Fredonia at

03:00PM  7    a -- at a much higher, higher, not quantifiable, but a much

03:00PM  8    higher risk of a targeted violence event occurring on the

03:00PM  9    campus.

03:00PM  10    If such an attack were to occur, it almost certainly

03:00PM  11    wouldn't happen right away.  It almost certainly would not

03:00PM  12    happen right away.  If he were to come back tomorrow, I would

03:00PM  13    expect to see that same kind of behavior that -- that the FBI

03:00PM  14    has seen in hundreds of other cases that have been studied

03:00PM  15    where that grievance builds, there's ideation about an act of

03:00PM  16    violence, there's research and planning, preparation, the

03:00PM  17    breach, and then finally the attack.  And that may be a

03:00PM  18    period of months, it might be a year or two.

03:00PM  19    All we can do is do things that we know are preventative.

03:01PM  20    In this case, because this whole equation is turned

03:01PM  21    upside down now where we're looking at an unknown anonymous

03:01PM  22    external population instead of a known identified internal

03:01PM  23    population, my former colleagues at Fredonia and colleagues

03:01PM  24    in law enforcement, they will not be able to see danger

03:01PM  25    coming until it's on the campus.

| | | |
|---|---|---|
| 03:01PM | 1 | MS. PANTZER:  I believe I'm done, Your Honor.  May I |
| 03:01PM | 2 | have a moment to consult with my colleagues? |
| 03:01PM | 3 | THE COURT:  Of course. |
| 03:01PM | 4 | MS. PANTZER:  We're done.  Thank you, Your Honor. |
| 03:01PM | 5 | THE COURT:  Cross-examination.  Who's going to do it? |
| 03:01PM | 6 | MR. COVERT:  I am, Your Honor. |
| 03:01PM | 7 | This would be a good time, I believe, for a break so |
| 03:01PM | 8 | that my paralegal can set up the computer for the exhibits. |
| 03:01PM | 9 | THE COURT:  Sure.  How long do you think you need? |
| 03:01PM | 10 | MR. COVERT:  Ten or 15 minutes to get set up. |
| 03:01PM | 11 | THE COURT:  Okay.  So let's -- it's 3:00, we'll come |
| 03:01PM | 12 | back at a little past 3.  Come back at 3:15. |
| 03:01PM | 13 | MR. COVERT:  Perfect. |
| 03:02PM | 14 | THE COURT:  We'll resume then, and we'll go, as I |
| 03:02PM | 15 | said, close to 5. |
| 03:02PM | 16 | MR. COVERT:  Thank you, Your Honor. |
| 03:02PM | 17 | THE CLERK:  All rise. |
| 03:02PM | 18 | (Off the record at 3:02 p.m. |
| 03:16PM | 19 | (Back on the record at 3:16 p.m.) |
| 03:16PM | 20 | THE CLERK:  All rise. |
| 03:16PM | 21 | THE COURT:  Please be seated. |
| 03:16PM | 22 | THE CLERK:  We are back on the record for the |
| 03:16PM | 23 | continuation of an evidentiary hearing in 23-CV-525, Kershnar |
| 03:17PM | 24 | versus Kolison, et al. |
| 03:17PM | 25 | All counsel and parties are present. |

03:17PM   1          THE COURT:  Mr. Covert, you can begin your

03:17PM   2   cross-examination.

03:17PM   3          I remind the witness that he's still under oath.

03:17PM   4          THE WITNESS:  Yes, Judge.

03:17PM   5          MR. BOYD:  Barry, just before you start --

03:17PM   6          Your Honor, our second witness is still here.  I'm

03:17PM   7   not sure if the Court is inclined to continue with that

03:17PM   8   witness later this afternoon, or if I should just release him

03:17PM   9   for the day and instruct him to come back tomorrow.  He's

03:17PM   10   happy to wait and see, but if you know we're not going to get

03:17PM   11   to him, I'd rather let him go.

03:17PM   12          THE COURT:  Thoughts?

03:17PM   13          MR. COVERT:  Your Honor, I think that we're going to

03:17PM   14   take the rest of the day.

03:17PM   15          THE COURT:  Yeah.

03:17PM   16          MR. COVERT:  I have no issue with whatever time we're

03:17PM   17   done, we're done for the day.

03:17PM   18          THE COURT:  Yeah.  Let him go.

03:17PM   19          MR. BOYD:  Okay.  I'll tell him he can go.

03:17PM   20          Your Honor, do you know what time you'd like to start

03:17PM   21   tomorrow morning?

03:17PM   22          THE COURT:  I think I have a 9:00.

03:17PM   23          THE CLERK:  Based on the calendar, 9:00, Judge, for a

03:17PM   24   plea.

03:17PM   25          THE COURT:  A plea.

03:17PM    1          MR. BOYD:  What time would you like us to have the

03:17PM    2    witness.

03:17PM    3          THE COURT:  10:00.

03:17PM    4          MR. BOYD:  10:00?

03:17PM    5          THE COURT:  Yeah.

03:17PM    6          MR. BOYD:  Fair enough.

03:18PM    7          THE COURT:  We'll start at 10:00, or as soon as my

03:18PM    8    9:00 is done, whichever is later.

03:18PM    9          MR. BOYD:  Okay.

03:18PM   10          THE COURT:  Yeah.  So 10 would be the earliest we

03:18PM   11    would start.

03:18PM   12          MR. BOYD:  Thank you, Your Honor.

03:18PM   13

03:18PM   14          **CROSS-EXAMINATION BY MR. COVERT:**

03:18PM   15    Q.  Good afternoon, Mr. Isaacson.  How are you doing?

03:18PM   16    A.  I'm good, sir.  Good afternoon.

03:18PM   17    Q.  I'm Barry Covert.

03:18PM   18       So you indicated that you were chief of security at

03:18PM   19    Fredonia for about four years; is that correct?

03:18PM   20    A.  Yes, chief of University Police.

03:18PM   21    Q.  And your prior experience was in the FBI.  And in the FBI

03:18PM   22    you -- the FBI would create what was known as 302 reports?

03:18PM   23    A.  Yes.

03:18PM   24    Q.  Correct?  And what were those?

03:18PM   25    A.  They're non-verbatim summaries of interviews.

03:18PM     1   Q.   Okay.  And roughly speaking, in the case report detail

03:18PM     2   that you were shown earlier today, was that the Fredonia

03:18PM     3   police's version of a 302 in general terms?

03:19PM     4   A.   No.  This -- this was not documented as outside of the

03:19PM     5   email -- or, the voicemails to the campus, or the note that

03:19PM     6   was placed on Dr. Kershnar's door.  Those episodes I had my

03:19PM     7   investigator take the lead on documenting those matters.  I

03:19PM     8   documented what, you know, my conclusions of my work in those

03:19PM     9   threat assessments.

03:19PM    10   Q.   And do you have any other documents that you created

03:19PM    11   dealing with the ongoing issues relating to Professor

03:19PM    12   Kershnar's situation, such as communications internally or

03:19PM    13   externally with other law enforcement agencies, any documents

03:19PM    14   like that?

03:19PM    15   A.   No.  No.  I turn everything over to counsel that I had

03:19PM    16   and produced.

03:19PM    17   Q.   So for example, after you became aware of the

03:20PM    18   controversy, if we can call it that, on February 1st and 2nd,

03:20PM    19   did you then communicate with the SUNY Fredonia admission

03:20PM    20   about the situation?

03:20PM    21   A.   I did, verbally.

03:20PM    22   Q.   Only verbally?

03:20PM    23   A.   Yes, sir.

03:20PM    24   Q.   Never through emails?

03:20PM    25   A.   I don't believe I did.  And if I did, I turned those over

03:20PM    1    to counsel.

03:20PM    2    Q.   No other communications --

03:20PM    3    A.   A lot --

03:20PM    4    Q.   -- in writing?

03:20PM    5    A.   No.

03:20PM    6    Q.   Okay.  So, shortly after this incident occurred, you were

03:20PM    7    concerned, weren't you, with the physical safety of

03:20PM    8    Dr. Kershnar --

03:20PM    9    A.   That's correct.

03:20PM    10    Q.   -- correct?

03:20PM    11          MR. COVERT:  And I'm sorry, Your Honor, we're just

03:20PM    12    getting the exhibits together today, we got them late on

03:20PM    13    Monday, so it's not going to be as smooth as we'd like.

03:20PM    14          So Plaintiff's 89, please, Megan.

03:20PM    15          BY MR. COVERT:

03:21PM    16    Q.   Now, this is an --

03:21PM    17          MR. COVERT:  If you don't mind enlarging it a little

03:21PM    18    bit, Megan.  And if you can scroll down just a little bit.

03:21PM    19          BY MR. COVERT:

03:21PM    20    Q.   Now, can you describe what this series of emails is

03:21PM    21    about?

03:21PM    22    A.   Sure.  This is very early, very early in my exposure to

03:21PM    23    this controversy, if that's the term we're using.  It was

03:21PM    24    10:23 on February 2nd.  And I had not formulated any

03:21PM    25    conclusions, I was gathering information.  And one of the

03:21PM   1   possibilities that I was considering was that if Dr. Kershnar

03:22PM   2   were on campus, I would want to have a conversation with him

03:22PM   3   about how University Police and he could work together to

03:22PM   4   keep him safe and keep the campus safe.

03:22PM   5   Q.  And what types of measures were you envisioning when you

03:22PM   6   had written this email indicating you wanted to speak with

03:22PM   7   him and have a discussion with him.  And I'm reading from the

03:22PM   8   email where he expects to be on campus and when, methods for

03:22PM   9   him to immediately advise UPD of a safety concern, methods

03:22PM  10   for UPD to advise if we become aware of a credibility threat

03:22PM  11   to his physical safety.

03:22PM  12       Were there other measures you were envisioning taking on

03:22PM  13   that day?

03:22PM  14   A.  I was to reemphasize this was very early on this, so I

03:22PM  15   hadn't really had a chance to understand the magnitude of

03:22PM  16   what was going on.  I knew it was a potential human resources

03:22PM  17   issue with an employee, and that's why I was interacting with

03:22PM  18   my colleague Maria Carroll, who is the director of HR.  I

03:23PM  19   wanted to make sure I didn't get in her lane, if there was

03:23PM  20   any employee issues.  I just didn't know.  So, my purpose in

03:23PM  21   this email was explaining to the HR director that there's

03:23PM  22   this issue going on, she may or may not have been aware of it

03:23PM  23   at that moment.

03:23PM  24       I was -- I was gathering my options, my -- my, you know,

03:23PM  25   potential courses of action, but this was --

03:23PM   1   Q.  Very early on?

03:23PM   2   A.  -- very early on.

03:23PM   3   Q.  But at this point, you were not new to SUNY Fredonia,

03:23PM   4   were you?  You had been there, my rough calculations, for

03:23PM   5   roughly two-and-a-half years?

03:23PM   6   A.  That's correct.

03:23PM   7   Q.  You were very familiar with the operations of the police

03:23PM   8   department there; is that correct?

03:23PM   9   A.  That's right.

03:23PM  10   Q.  You indicated that there were about 300 cameras on the

03:23PM  11   campus?

03:23PM  12   A.  That's right.

03:23PM  13   Q.  And I assume that there are individuals who are tasked

03:23PM  14   with watching the monitors for those cameras?

03:23PM  15   A.  Yes.  I can explain that if you'd like.

03:24PM  16   Q.  Sure.

03:24PM  17   A.  There's two large TV monitors, maybe double the size of

03:24PM  18   what we see in the courtroom.  Different officers and

03:24PM  19   dispatchers set them up differently, depending on what's

03:24PM  20   going on on campus that day.  But at any one time, a live

03:24PM  21   human being is watching on the order of 25 to 40 cameras,

03:24PM  22   depending on how they have things set up.  So not all 300

03:24PM  23   cameras have a human being watching them live.

03:24PM  24   Q.  Okay.  And, generally speaking, how many individuals are

03:24PM  25   watching the cameras at any given time, the monitors?

03:24PM    1    A.   One.

03:24PM    2    Q.   Just one.   And at that time, were there also phones set

03:24PM    3    up around the university, around the college campus, for

03:24PM    4    emergency purposes?   It's my understanding there's roughly

03:24PM    5    200, but I don't want to testify, you can certainly correct

03:24PM    6    me or tell the Court what the situation is.

03:24PM    7    A.   I forget the exact number.   There's a suite of emergency

03:25PM    8    cameras.   We call them blue light phones.   I think a lot of

03:25PM    9    SUNY campuses have them, with the blue light on top.   A user

03:25PM   10    can actually hit a button, and that immediately dials into

03:25PM   11    the University Police dispatch office.

03:25PM   12        Those are typically outdoor cameras -- pardon me, outdoor

03:25PM   13    phones.   There are emergency phones at the entrances of all

03:25PM   14    the dormitory lobbies and several through academic buildings.

03:25PM   15    Rough order magnitude, 40 or 50 emergency phones.

03:25PM   16    Q.   Can you explain how the phones are intertwined with

03:25PM   17    cameras, and how if -- my understanding is if a phone is

03:25PM   18    picked up or if there's a call made from one them, then the

03:25PM   19    cameras in the area focus upon that, and it calls the person

03:26PM   20    who's watching the monitors to then focus their attention

03:26PM   21    upon those areas, correct?

03:26PM   22    A.   Almost correct.   It's not an automated process.   That is

03:26PM   23    one of the technology adders that I was exploring before I

03:26PM   24    left.   If a blue light phone or emergency phone is activated,

03:26PM   25    the dispatchers get out a physical hard copy book, they say,

03:26PM    1   oh, that's phone number 13.  They look up on a table where

03:26PM    2   that phone is physically located, and they pull up cameras

03:26PM    3   that are geographically close to that phone.  And then they

03:26PM    4   can see realtime what's going on.  So it's a 30-second or so

03:26PM    5   process to do that.

03:26PM    6   Q.  And it's fair to describe campus security as a mosaic in

03:26PM    7   the sense that there are a lot of pieces, and you try have

03:26PM    8   the pieces all work together: The cameras, with the phones,

03:26PM    9   with the car -- two people on car patrol, with an officer

03:26PM   10   back in the station, and monitoring the phones, 911 calls.

03:27PM   11   Is it fair to state that that's just an overall comprehensive

03:27PM   12   way to monitor the campus, correct?

03:27PM   13   A.  That's correct.

03:27PM   14   Q.  And that is, in part, to keep a lot of situations under

03:27PM   15   control when it comes to student safety, staff safety,

03:27PM   16   including people from the outside of the campus coming onto

03:27PM   17   campus committing crimes, dealing drugs, violating orders of

03:27PM   18   protection, correct?

03:27PM   19   A.  Yes.

03:27PM   20   Q.  These are all issues that you are dealing with when

03:27PM   21   you're in charge of security on a daily basis, hourly basis.

03:27PM   22   So if the fact that there may be protests is something that

03:27PM   23   also may come up, correct, on campus for various reasons?

03:27PM   24   A.  Sure.  Protests occur on campus, certainly.

03:27PM   25   Q.  Describe to us then what happens when you're made aware

03:27PM  1   of a protest.  What is the normal response?

03:27PM  2   A.  In my tenure in four years, we didn't have many.  We had

03:27PM  3   one.  It was students getting together and doing a march

03:27PM  4   through the campus and through the village.  And we monitored

03:28PM  5   that with our cameras.  Typically we keep uniformed officers

03:28PM  6   away from the crowd just to -- in an effort not to inflame

03:28PM  7   tensions, especially after the George Floyd incident.

03:28PM  8   Q.  Okay.  And so this -- showing you -- bringing you back

03:28PM  9   again to the exhibit that we have just put up here --

03:28PM  10          MR. COVERT:  And I'm not seeing the number on it

03:28PM  11   again.

03:28PM  12          MR. BOYD:  89.

03:28PM  13          BY MR. COVERT:

03:28PM  14   Q.  -- 89.  Scrolling back down again, this is the standard

03:28PM  15   response which you outlined here on Exhibit 89, which is an

03:28PM  16   email that you drafted on February 2nd, 2022.  That is the

03:28PM  17   standard response, correct, to an incident where there may be

03:28PM  18   a safety concern for a professor, or student, staff on

03:28PM  19   campus?

03:29PM  20   A.  I think that mischaracterizes it, in only that -- if

03:29PM  21   there were a concern about safety to an employee, I would

03:29PM  22   want to have that conversation with that employee.

03:29PM  23      Again, in my tenure, those were very few and far between.

03:29PM  24   This turned out not to be a, you know, the idea of having him

03:29PM  25   on campus, as I became aware of the enormity and scale of

03:29PM    1    this concern, the prospect of having him on campus was

03:29PM    2    something I discounted.

03:29PM    3    Q.  Well, and I wanted to get into that in a second.

03:29PM    4    A.  Okay.

03:29PM    5    Q.  But I don't want to cut you off.

03:29PM    6    A.  Yeah, I just -- I guess I just don't want to give the

03:29PM    7    impression that there is a standard response for individual

03:30PM    8    cases.  Each case requires a tailor-made response given the

03:30PM    9    circumstances.

03:30PM   10    Q.  So pretty shortly after you issued this email on

03:30PM   11    February 2nd at 10:23 a.m., your position changed in relation

03:30PM   12    to what should occur with Dr. Kershnar, specifically whether

03:30PM   13    he should be physically on campus, correct?

03:30PM   14    A.  That's right.  At this time, I don't think I even

03:30PM   15    considered that I had the authority or that anybody had the

03:30PM   16    authority to exclude him from the campus.  I knew if anybody

03:30PM   17    did have that authority, it was at least the president.

03:30PM   18    So --

03:30PM   19    Q.  And were there communications between you and the

03:30PM   20    president then that discussed removing him from campus?

03:30PM   21    A.  No.  Not this early.  No.  My recollection is talking to

03:30PM   22    the president at least later in the -- that -- that day, on

03:30PM   23    February 2nd.

03:30PM   24    Q.  With whom did you first discuss the possibility of

03:30PM   25    removing him from campus, as opposed to taking the steps that

03:30PM    1    are set forth in exhibit -- Plaintiff's Exhibit 89?

03:31PM    2    A.  Mike Metzger, who is the VP, the vice-president that I

03:31PM    3    reported to.

03:31PM    4    Q.  And do you have emails or communications, written

03:31PM    5    communications with Mr. Metzger regarding what steps to take

03:31PM    6    in light of the controversy?

03:31PM    7    A.  No.  I had a lot of verbal conversations at -- throughout

03:31PM    8    this issue.  I did not email, I needed to get ahold of people

03:31PM    9    quickly on this, so I called them.

03:31PM    10   Q.  And what alternatives to removing Dr. Kershnar from the

03:31PM    11   campus did you discuss with Mr. Metzger or anybody else prior

03:31PM    12   to coming to a final decision?

03:31PM    13   A.  I don't recall conversations where I brainstormed other

03:31PM    14   arrangements to have the professor on campus.  Over the

03:31PM    15   course of this first day, as I became aware of the scale of

03:31PM    16   this issue, my concern grew.  And I came to the conclusion

03:32PM    17   that the only way, at least in this early -- in the early

03:32PM    18   days of this, you know, keeping it -- keeping in mind that I

03:32PM    19   knew what I knew then, early in the day I didn't know that

03:32PM    20   having Dr. Kershnar removed from campus was a possibility.

03:32PM    21       As I became more familiar with the issue that was

03:32PM    22   developing, I became more concerned.  At some point later in

03:32PM    23   the day, and I don't remember what time of day --

03:32PM    24   Q.  And we're talking about February 2nd?

03:32PM    25   A.  Yes, sir.  I concluded on my own that the only way to

03:32PM    1   keep the campus safe in light of what -- the concerns I was

03:32PM    2   developing was to have him off campus.  My recollection, and

03:32PM    3   it's not a specific recollection, is that I spoke to

03:32PM    4   Vice-President Metzger about that.  At some point --

03:33PM    5   Q.  And did he inform you that you had the power to remove

03:33PM    6   Dr. Kershnar, or who came -- who made that determination that

03:33PM    7   you even had the authority to remove a college professor from

03:33PM    8   the campus?

03:33PM    9   A.  I was never under the impression that I had that

03:33PM   10   authority.  I knew that if -- if -- if he were told -- if

03:33PM   11   Dr. Kershnar were told that he couldn't come on campus, I

03:33PM   12   would at most be the messenger conveying an order from the

03:33PM   13   president.

03:33PM   14   Q.  Okay.  And did the order to remove Dr. Kershnar from the

03:33PM   15   campus come from the president?

03:33PM   16   A.  Yes.  Yes.

03:33PM   17   Q.  And how did that come about?  Just logistically walk us

03:33PM   18   through the steps as to how.  Who discussed this with who,

03:33PM   19   what was discussed, and how did they come to the decision

03:33PM   20   that he was going to be removed from the campus?

03:33PM   21   A.  My recollection is I had preliminary discussions with

03:33PM   22   Vice-President Metzger.  He was my direct report.

03:33PM   23       As this day unfolded, I came to the conclusion that

03:34PM   24   Dr. Kershnar should remain off campus.  He was scheduled to

03:34PM   25   remain off campus for a few days.  My recommendation would

03:34PM    1    ultimately be that he should stay off campus for this

03:34PM    2    cooling-off period.

03:34PM    3    Q.  And was this your idea now, or Mr. Metzger's?

03:34PM    4    A.  Mine.

03:34PM    5    Q.  And what did Mr. Metzger respond when you floated that

03:34PM    6    idea to him?

03:34PM    7    A.  He agreed.  He deferred to my judgment.  And together, I

03:34PM    8    broached the idea that I could prepare a memo that explains

03:34PM    9    my thinking.  And I recall that he concurred that that would

03:34PM    10   be a good idea, and that's what generated this.

03:34PM    11   Q.  And were there -- and did anybody else participate in

03:34PM    12   drafting the February 2nd threat assessment memo?  Is that

03:34PM    13   what you're talking about?

03:34PM    14   A.  Yes.  Yeah, when I -- I'm sorry.

03:34PM    15   Q.  And was anybody else involved with drafting that?

03:34PM    16   A.  No.  No.  None of the memos were authored by anybody

03:34PM    17   other than me.  I was the author for those.

03:35PM    18   Q.  And then when did you approach the president, President

03:35PM    19   Kolison?

03:35PM    20   A.  I believe it was later that evening.  At -- at some

03:35PM    21   point, and there's a memo that documents my conversations

03:35PM    22   with -- with Dr. Kershnar, I conveyed the order that he was

03:35PM    23   to stay off campus.

03:35PM    24   Q.  And what did the president say about removing a teacher

03:35PM    25   off campus, a professor off campus?  Was there any discussion

03:35PM  1   of his First Amendment rights?

03:35PM  2   A.  We did not talk about anything other than safety issues.

03:35PM  3   Q.  Strictly safety issues?

03:35PM  4   A.  Yes, sir.

03:35PM  5   Q.  Did you present any alternatives to the president short

03:35PM  6   of removing Dr. Kershnar from the campus?

03:35PM  7   A.  I didn't believe there were alternates that would work,

03:35PM  8   so I did not.

03:35PM  9   Q.  Did Mr. Metzger or the president, did either of them ask

03:35PM  10  for any alternatives short of removing Dr. Kershnar from the

03:35PM  11  campus prior to your doing so on February 2nd?

03:35PM  12  A.  No.

03:35PM  13  Q.  None at all?

03:35PM  14  A.  They deferred to my recommendation.

03:35PM  15  Q.  So then --

03:36PM  16         MR. COVERT:  I would like to move Plaintiff's

03:36PM  17  Exhibit 89 into evidence, Your Honor.

03:36PM  18         MS. PANTZER:  No objection, Your Honor.

03:36PM  19         THE COURT:  Received without objection.

03:36PM  20         **(Plaintiff's Exhibit 89 was received in evidence.)**

03:36PM  21         MR. COVERT:  Megan, if you can do Plaintiff's 17.  Do

03:37PM  22  you recognize this -- can you scroll down, Megan?

03:37PM  23         BY MR. COVERT:

03:37PM  24  Q.  Do you recognize that?  That -- do you recognize that

03:37PM  25  communication?

03:37PM    1    A.  I do.  Is the date of this on --

03:37PM    2    Q.  It is on a later one.  We're trying to find it, because

03:37PM    3    it's one of the later documents we got in discovery.

03:38PM    4        MR. COVERT:  Megan, if you would try 73, please.  If

03:38PM    5    you can scroll down a little bit.

03:38PM    6        BY MR. COVERT:

03:38PM    7    Q.  Do you recognize that --

03:38PM    8    A.  Yes, thank you.

03:38PM    9    Q.  -- communication?  And what is that?

03:38PM   10    A.  That is an email from Dr. Kershnar to me and president --

03:38PM   11    I'm sorry, he copied himself.  It's just an email from

03:38PM   12    Dr. Kershnar to me.  And he's commenting -- he's responding

03:38PM   13    to a verbal telephone conversation I had with him the evening

03:38PM   14    before.

03:38PM   15    Q.  And he's also asking for details as to why he's being

03:39PM   16    ordered to stay off campus; is that correct?

03:39PM   17    A.  That's correct.

03:39PM   18    Q.  And did you give him an answer to that question?

03:39PM   19    A.  I forwarded that to our HR director for a response.

03:39PM   20    Q.  And do you know whether there was a response to that?

03:39PM   21    A.  There was.

03:39PM   22    Q.  There was.  And what was -- do you know what the response

03:39PM   23    was?

03:39PM   24    A.  I -- I -- I would be guessing.  I recall seeing an email

03:39PM   25    from HR director Maria Carroll to Dr. Kershnar.

03:39PM    1    Q.  And Dr. Kershnar, in this exhibit, 73, is also asking --

03:39PM    2            MR. COVERT:  If you can scroll down, Meg, a little

03:39PM    3    bit.

03:39PM    4            BY MR. COVERT:

03:39PM    5    Q.  -- he's also asking at number 7 to teach via Zoom or

03:39PM    6    virtually, correct?

03:39PM    7    A.  That's right.

03:39PM    8    Q.  And what was your position as to whether he could take --

03:39PM    9    he could teach virtually if he was not allowed to be back on

03:40PM    10   campus?

03:40PM    11   A.  My recommendation to the president was that he should not

03:40PM    12   be allowed to for the reasons I articulated on direct.

03:40PM    13   Q.  And what was the president's response to your suggestion

03:40PM    14   that he not be permitted to return to campus -- or, I'm

03:40PM    15   sorry, to return via Zoom?

03:40PM    16   A.  He approved my recommendation.

03:40PM    17   Q.  And did you consult with any other experts to determine

03:40PM    18   whether his teaching via Zoom would somehow cause danger to

03:40PM    19   the campus community?

03:40PM    20   A.  No.

03:40PM    21   Q.  No one else?

03:40PM    22   A.  No.

03:40PM    23   Q.  This is just your opinion that we're going by at this

03:40PM    24   point?

03:40PM    25   A.  Yes.  Um-hum.

03:40PM  1  Q.  And to this day, has he been permitted to teach via Zoom?

03:40PM  2  Or as of when you resigned on June 30th of 2023?

03:40PM  3  A.  My understanding was that he was given a pathway to teach

03:40PM  4  online.  I'm getting out of my lane a little bit as to how

03:40PM  5  that was resolved, but my understanding was that he was

03:40PM  6  required by the provost to complete some training to allow

03:41PM  7  him to teach online, and I believe he has not done that

03:41PM  8  training.

03:41PM  9  Q.  Now, there also -- there came a time in which it's fair

03:41PM  10  to say that the publicity had waned, and the threats had

03:41PM  11  significantly lessened to the campus, correct?

03:41PM  12  A.  That's correct.

03:41PM  13  Q.  Over how long of a period of time did that take for the

03:41PM  14  publicity to wane and the threats to decrease?

03:41PM  15  A.  I would say three or four weeks, five weeks.

03:41PM  16  Q.  And that's prior to your March 17th threat assessment?

03:41PM  17  A.  Yes.

03:41PM  18  Q.  So as the threats began to wane, did you consider

03:41PM  19  alternative measures that would allow Dr. Kershnar to return

03:42PM  20  to the campus and teach at the campus?

03:42PM  21  A.  As I documented in my memoranda, I came to the view that

03:42PM  22  bringing him back would make the threat environment worse

03:42PM  23  than it was on February 2nd and 3rd, that at the peak of my

03:42PM  24  level of concern, I believed if he were to come back, the

03:42PM  25  threat picture would be even more difficult.

03:42PM   1   Q.  So, initially, after right around the time of

03:42PM   2   February 2nd, there was media focus on the Fredonia campus,

03:42PM   3   correct?

03:42PM   4   A.  That's correct.

03:42PM   5   Q.  You indicated that FOX News was running stories at

03:42PM   6   9 p.m.?

03:42PM   7   A.  I saw one story.

03:42PM   8   Q.  And there was increased scrutiny on social media after

03:42PM   9   February 2nd, correct?

03:42PM  10   A.  Yes.

03:42PM  11   Q.  And that was your -- and that and the threats were your

03:43PM  12   justification for keeping him off campus, correct?

03:43PM  13   A.  Yes.  It was -- it was -- I would use the term

03:43PM  14   rationalization.  It was the evidence that I needed, or

03:43PM  15   that -- it was the evidence supported my conclusion.

03:43PM  16   Q.  And then -- and you indicated that you wanted him to be

03:43PM  17   removed from the campus for a, quote, cooling down, unquote,

03:43PM  18   period, correct?

03:43PM  19   A.  Yes.  When I made the initial assessment.

03:43PM  20   Q.  So isn't it the fact that the media scrutiny lessened and

03:43PM  21   waned, and the social media attention waned three or four

03:43PM  22   weeks later, isn't that evidence that the cooling down

03:43PM  23   occurred?

03:43PM  24   A.  Oh, absolutely it did, yes.

03:43PM  25   Q.  And then why wouldn't you then say we can bring him back

03:43PM  1   on campus and see how this goes now?

03:43PM  2   A.  Because it would, in my view, bring back a higher level

03:43PM  3   of anger, disgust, violent rhetoric, just violence

03:44PM  4   justification among the public than we saw those five or six

03:44PM  5   weeks earlier.

03:44PM  6   Q.  So let's just call this late February.  Late February,

03:44PM  7   everything's cooled down.  Were there any -- was there any

03:44PM  8   evidence of imminent danger to Dr. Kershnar or the campus at

03:44PM  9   that point?

03:44PM  10  A.  No.

03:44PM  11  Q.  Were there any identified parties that were -- had

03:44PM  12  verified threats of violence against Dr. Kershnar or the

03:44PM  13  campus that the point?

03:44PM  14  A.  There were threatening communications, but as I explained

03:44PM  15  on direct, nothing that would be prosecuted by the U.S.

03:44PM  16  Attorney's Office or District Attorney.  It wasn't that

03:44PM  17  explicit directed threat that constitutes a violation of

03:44PM  18  criminal law.

03:44PM  19  Q.  And I want to talk about that.

03:44PM  20      So in the beginning of February, until things waned down,

03:44PM  21  there were a number of threats to Dr. Kershnar, to the

03:44PM  22  campus, correct?

03:44PM  23  A.  Yes.

03:44PM  24  Q.  And you testified earlier that none of them rose, in your

03:45PM  25  mind, to the level that they could be successfully prosecuted

03:45PM    1    by the U.S. Attorney's Office; is that correct?

03:45PM    2    A.   That's right.

03:45PM    3    Q.   But you also described that the behavioral unit that you

03:45PM    4    were involved with at the FBI engages in a lot of outreaches

03:45PM    5    to individuals who they suspect could be perpetrating some

03:45PM    6    level of violence in the future, correct?

03:45PM    7    A.   Sure.

03:45PM    8    Q.   You describe the -- the -- I forgot the phrase you used

03:45PM    9    for it, but the pathway to -- the -- the four levels of --

03:45PM   10    pathway of violence, correct?

03:45PM   11    A.   Yes.

03:45PM   12    Q.   And those individuals that are reached out to by the BAU

03:45PM   13    unit, those individuals would have been referred for criminal

03:45PM   14    prosecution if they had done enough to be prosecuted,

03:45PM   15    correct?

03:45PM   16    A.   Not always.  And I think here it's worth pausing.

03:45PM   17         That -- that in many of these cases, the threat

03:46PM   18    mitigation is not criminal sanctions.  In fact, that can make

03:46PM   19    the problem a lot worse in a few ways.

03:46PM   20         Most -- most threat cases are prosecuted in state court

03:46PM   21    and the penalties are not severe typically.  People are not

03:46PM   22    going to prison for years for threatening to kill somebody

03:46PM   23    personally, face to face, or in an intrastate phone call.

03:46PM   24    That's just not what happens.  It's -- they're usually

03:46PM   25    misdemeanor offenses, maybe somebody will go to jail, but it

03:46PM  1  won't be for long.

03:46PM  2     So the idea of eliminating a threat posed by a particular

03:46PM  3  individual very often isn't mitigated by incarcerating the

03:46PM  4  person 'cuz it just doesn't last very long.  Even in

03:46PM  5  exceptional cases where there is prison time, and it's more

03:47PM  6  often on the federal side, now you have an aggrieved person,

03:47PM  7  you've put him in prison, that may not cure the grievance.

03:47PM  8  In fact, from a threat assessment standpoint, it may make it

03:47PM  9  a lot worse.

03:47PM  10    So there's that sort of individual specific effect that

03:47PM  11  that the typical threat mitigation action is connecting a

03:47PM  12  person with social services, or for a young person,

03:47PM  13  introducing a responsible adult into --

03:47PM  14  Q.  And that's what BAU does, they make these decisions --

03:47PM  15  A.  That's what they recommend.

03:47PM  16  Q.  That's what they recommend.

03:47PM  17  A.  That's -- that's part what works.  But if I can just

03:47PM  18  expand on that a little bit.  Because the idea of arresting

03:47PM  19  our way out of this problem, my judgment was that especially

03:47PM  20  in today's day and age, whenever the police show up or law

03:48PM  21  enforcement shows up, a camera gets out.  And I've thought

03:48PM  22  about it then and I've thought about it since, that a way to

03:48PM  23  make this problem worse would be to create video footage of

03:48PM  24  law enforcement officers arresting or questioning people who

03:48PM  25  were disgusted about pedophilia and how that would feedback

03:48PM    1    into this -- this social media echo chamber.

03:48PM    2    Q.  You've got those individuals that are making these

03:48PM    3    threats in February of 2022, correct?

03:48PM    4    A.  Yes.

03:48PM    5    Q.  And if you wanted -- if you were concerned that these

03:48PM    6    individuals are on their pathway of violence, right, you

03:48PM    7    would report them to the FBI, correct?  You would want

03:48PM    8    them -- some level of review.  Whether they intervene or not

03:48PM    9    is up to them, correct?

03:48PM   10    A.  No, that's not correct.  That's not how the system works.

03:48PM   11        The FBI is finite in its resources.  They got the worst

03:49PM   12    of the worst threat assessment cases, not -- not a case like

03:49PM   13    this where there are literally hundreds of people online

03:49PM   14    making threatening and concerning statements online.

03:49PM   15        The FBI's not gonna take that case and open a case on a

03:49PM   16    thousand individuals or a hundred individuals that are

03:49PM   17    issuing concerning statements online and do a full threat --

03:49PM   18    first off, identify them from their monikers on social media,

03:49PM   19    locate them, that takes federal process and subpoenas, and

03:49PM   20    then do a full-blown threat assessment on them.

03:49PM   21        My concern was that these are the people that are issuing

03:49PM   22    threats or threatening communications or concerning

03:49PM   23    communications to Dr. Kershnar and to the campus.  These are

03:50PM   24    the ones that we can see.  With the limited resources that we

03:50PM   25    have at University Police, these are the ones that we can see

Kershnar v Kolison - Isaacson - Covert/Cross - 9/13/23

03:50PM   1   and the ones that we can look at.

03:50PM   2        In my professional opinion, there's an enormous

03:50PM   3   population of people who are just as angry and aren't taking

03:50PM   4   the time or the energy to comm --

03:50PM   5   Q.  I'm not asking about them.  I'm asking about these

03:50PM   6   individuals.  We're talking about those who made threats.

03:50PM   7        Did you report any of them in February of 2022, did your

03:50PM   8   level of concern at the rhetoric or at the threats cause you

03:50PM   9   to report any of those individuals to outside law enforcement

03:50PM  10   agencies?

03:50PM  11   A.  No, but that doesn't reflect on my level of concern --

03:50PM  12   Q.  Just -- I'm just asking a question --

03:50PM  13   A.  But I want to give --

03:50PM  14   Q.  The answer is no?

03:50PM  15   A.  The answer is no.

03:50PM  16   Q.  So, none were reported whatsoever.

03:50PM  17   A.  We did get some phone numbers for phone calls into the

03:51PM  18   FBI, or pardon me, into campus, that I asked my colleague at

03:51PM  19   the FBI to run those numbers and see if any of those people

03:51PM  20   were on the Bureau file --

03:51PM  21   Q.  Were there any memos or emails that reflect your request

03:51PM  22   to the FBI to run numbers?  Because we have seen none.

03:51PM  23   A.  I did not generate any.  I don't think so.

03:51PM  24   Q.  Everything you ever do is just orally, you never

03:51PM  25   memorialize anything?

03:51PM    1          MS. PANTZER:  Objection, Your Honor.

03:51PM    2          THE COURT:  Basis?

03:51PM    3          MS. PANTZER:  That's not the testimony.

03:51PM    4          THE COURT:  Then he can say no.  Overruled.

03:51PM    5          THE WITNESS:  I documented my work in my assessments

03:51PM    6    as difficult in these threat assessments.

03:51PM    7          BY MR. COVERT:

03:51PM    8    Q.  So other than asking -- claiming that you asked some

03:51PM    9    friends to run some phone numbers, you did not report any of

03:51PM   10    these threats in February of 2022 to any outside law

03:51PM   11    enforcement agencies; that's correct?

03:51PM   12    A.  That's correct.

03:52PM   13    Q.  So none of them rose to the level of these articulated

03:52PM   14    threats to the level that you thought were worthy of law

03:52PM   15    enforcement investigation, correct?

03:52PM   16    A.  None of them rose to the level that I felt would be

03:52PM   17    prosecuted.

03:52PM   18    Q.  Now, well, that's not your decision, right?  That's

03:52PM   19    the --

03:52PM   20    A.  Correct.

03:52PM   21    Q.  -- decision of the prosecution?

03:52PM   22    A.  Yes, sir.

03:52PM   23    Q.  The U.S. Attorney's Office or the District Attorney,

03:52PM   24    right?  Many cases get investigated and are not prosecuted,

03:52PM   25    correct?

03:52PM  1    A.   That's right.

03:52PM  2    Q.   Okay.  So then the attention dissipates, the attention --

03:52PM  3    none of which was even bad enough for you to ever report any

03:52PM  4    of it to law enforcement -- dissipates, and yet you thought

03:52PM  5    that when the attention dissipated, that that was a sign that

03:52PM  6    things would get worse if Dr. Kershnar were brought back to

03:52PM  7    campus?

03:52PM  8    A.   Yes.

03:52PM  9    Q.   But things weren't even bad enough for you to report

03:52PM  10   anybody to law enforcement from February 2nd, roughly, to the

03:53PM  11   end of February, correct?

03:53PM  12   A.   My professional opinion then and now is the same, that

03:53PM  13   there is -- there was not an effective law enforcement

03:53PM  14   response to this.

03:53PM  15       Law enforcement generally doesn't have the tools to

03:53PM  16   handle a problem like this.  The FBI doesn't have the tools

03:53PM  17   to handle a problem like this.

03:53PM  18       If -- if I were to turn over this whole matter to the

03:53PM  19   FBI, I know from long experience they would not take any

03:53PM  20   affirmative investigative steps.  That's my -- that's my

03:53PM  21   professional opinion.

03:53PM  22   Q.   But you can also send it to local District Attorneys

03:53PM  23   offices, local police, town and village, cities, depending on

03:53PM  24   where that individual resides, correct?

03:53PM  25   A.   If I had -- if -- if we had gotten a direct threat that I

03:53PM 1    felt was even close to what a prosecutor would consider

03:53PM 2    bringing charges for, I would have had that conversation.

03:54PM 3    But I doubt that I would have recommended charging the person

03:54PM 4    for the reason I mentioned earlier, that -- that

03:54PM 5    incarceration in these kinds of cases is very often a bad way

03:54PM 6    to mitigate the threat.

03:54PM 7    Q.  If you report it to local police or the U.S. Attorney's

03:54PM 8    Office, or the FBI, it's not then your decision whether to

03:54PM 9    prosecute or not, correct?  It's not your recommendation as

03:54PM 10   to whether they follow through.  You report it, they

03:54PM 11   investigate it, they then decide whether they want to

03:54PM 12   prosecute it, correct?

03:54PM 13           MR. BOYD:  Objection, Your Honor.  It's asked and

03:54PM 14   answered.

03:54PM 15           THE COURT:  Overruled.

03:54PM 16           THE WITNESS:  Could you ask the question again?  I'm

03:54PM 17   sorry I lost track of it.

03:55PM 18           MR. COVERT:  Could you --

03:55PM 19           (The above-requested question was then read by the

03:55PM 20   reporter.)

03:55PM 21           THE WITNESS:  It's the prosecuting attorney's

03:55PM 22   decision to prosecute.  But I can certainly make a

03:55PM 23   recommendation on whether to prosecute.  And in this case,

03:55PM 24   even if we had a threat that met my understanding of a

03:55PM 25   criminal violation.  I would not have recommended, probably,

Kershnar v Kolison - Isaacson - Covert/Cross - 9/13/23

03:55PM    1    that the person be prosecuted, because I -- I do not think

03:55PM    2    that would have reduced the overall threat picture to this

03:56PM    3    campus.

03:56PM    4         BY MR. COVERT:

03:56PM    5    Q.  But you if you felt that any of these cases in 2022 were

03:56PM    6    worthy of being referred to local law enforcement or the

03:56PM    7    federal law enforcement agencies, it would not ultimately be

03:56PM    8    your decision, and your recommendation would really just be a

03:56PM    9    recommendation, it would be the decision of the law

03:56PM   10    enforcement or the prosecution as to whether to proceed,

03:56PM   11    correct?

03:56PM   12    A.  Certainly, it would be -- it would be -- if it was not in

03:56PM   13    our jurisdiction, and the University Police is a fully

03:56PM   14    authorized New York State Police Department, we can have that

03:56PM   15    conversation with prosecutors as normal course of business.

03:56PM   16    If it were in another jurisdiction, it would be for them

03:56PM   17    to --

03:56PM   18    Q.  It would be for them to decide?

03:56PM   19    A.  It would.

03:56PM   20         MR. COVERT:  And I'm going to move Exhibit 73 into

03:56PM   21    evidence before we move on.

03:56PM   22         MR. BOYD:  Objection.

03:56PM   23         MS. PANTZER:  Your Honor, we'd just that exhibit

03:56PM   24    wasn't entered into evidence.  But --

03:57PM   25         MR. COVERT:  That's why I'm moving it now.

03:57PM   1           THE COURT:  He's moving it now.

03:57PM   2           MR. BOYD:  Yeah.

03:57PM   3           MS. PANTZER:  I thought you said in evidence.

03:57PM   4           MR. COVERT:  Who's taking this?  Alyssa or --

03:57PM   5           MR. BOYD:  Well, look, I had a question, I guess.

03:57PM   6   You know, this is being moved in.  It's a statement by

03:57PM   7   Professor Kershnar.  I don't know if he's planning to testify.

03:57PM   8   But if he's not, I would imagine this is hearsay.

03:57PM   9           MR. COVERT:  Your Honor, we've been liberally -- this

03:57PM  10   is an informal hearing.  We've been liberally allowing

03:57PM  11   everything in.

03:57PM  12           THE COURT:  First of all, whether he comes in to

03:57PM  13   testify or not has no effect on whether it's hearsay.

03:57PM  14           Second of all, I don't think it's hearsay, because

03:57PM  15   it's not being offered for the truth of the matter asserted.

03:57PM  16           And third of all, this is a more liberal evidentiary

03:57PM  17   hearing than trial, and so for each of those reasons, your

03:57PM  18   objection is overruled.  It's admitted.

03:57PM  19           MR. COVERT:  Thank you.

03:57PM  20           **(Plaintiff's Exhibit 73 was received in evidence.)**

03:57PM  21           THE COURT:  And I agree with Mr. Covert that one of

03:57PM  22   you should be objecting and, you know, one person per witness.

03:57PM  23   I don't care if you guys switch from witness to witness, but

03:58PM  24   one person should be doing the objecting and the speaking with

03:58PM  25   respect to the witness, and I'll hold the plaintiff's side to

03:58PM  1    that, as well.

03:58PM  2              MR. BOYD:  Yeah, Your Honor.  And I apologize.  Going

03:58PM  3    forward, I'll let Ms. Pantzer, since it's her witness, she'll

03:58PM  4    be handling it.  It's sometimes hard to help myself, and I

03:58PM  5    apologize.

03:58PM  6              THE COURT:  No, I get it, I get it, I get it.

03:58PM  7              And I know, as I said earlier, sometimes I have to

03:58PM  8    make myself shut up, and it's hard to do.  So no apology

03:58PM  9    necessary.  Go ahead.

03:58PM  10             MR. COVERT:  Thank you.  73 in evidence, correct?

03:58PM  11             BY MR. COVERT:

03:58PM  12   Q.  And before we move on, and I don't want -- I don't want

03:58PM  13   to make this come off as being snarky, but you testified for

03:58PM  14   a long time earlier on how you want there to be uncovering of

03:59PM  15   individuals who are going to commit violence in the future,

03:59PM  16   and you ask the public come forward, and if they see

03:59PM  17   something, say something.  Something along those lines,

03:59PM  18   correct?

03:59PM  19   A.  Yes.

03:59PM  20   Q.  Yet you have all these threats in February of 2022, and

03:59PM  21   if you thought any of those rose to the level of even being

03:59PM  22   at the level of the lowest where you've asked the public to

03:59PM  23   come forward, don't you think you should have reported it if

03:59PM  24   you thought it was serious to law enforcement?

03:59PM  25   A.  It was reported to law enforcement.  I'm not trying to be

03:59PM  1   snarky with you, either.

03:59PM  2   Q.  But it wasn't -- you didn't send it out to local law

03:59PM  3   enforcement agencies or the U.S. Attorney's Office or the

03:59PM  4   FBI?

03:59PM  5   A.  Right, but we are the jurisdiction.

03:59PM  6   Q.  But you're worried about people that are off campus --

03:59PM  7   A.  Sure.

03:59PM  8   Q.  -- for the jurisdiction on campus.  You're getting

03:59PM  9   threats from people that are off campus?

03:59PM  10  A.  Right.

03:59PM  11  Q.  And you don't even think that they're serious enough to

03:59PM  12  be on the lowest level of a threat, so you're not even

04:00PM  13  sending it out to law enforcement, but you're kicking

04:00PM  14  Dr. Kershnar off the campus.

04:00PM  15  A.  For most of these threats, threatening communications,

04:00PM  16  concerning communications, they're on social media with a

04:00PM  17  screen name that would have to be resolved to an individual

04:00PM  18  somewhere in the United States or somewhere in the world,

04:00PM  19  perhaps.  I don't know where to send that information.

04:00PM  20  Q.  To the FBI.  Don't -- if it's see something, say

04:00PM  21  something, and -- and -- and you thought that this rose even

04:00PM  22  to the lowest level where you would expect me or someone else

04:00PM  23  to report it to the FBI or law enforcement, then clearly you

04:00PM  24  didn't think enough of any of these threats to report to any

04:00PM  25  outside agency for them to follow up, whether they can or

04:00PM    1    not.

04:00PM    2    A.  I was extremely concerned.  I documented those concerns.

04:00PM    3    My --

04:00PM    4    Q.  But your internal document --

04:01PM    5          MS. PANTZER:  Objection.  I would ask Mr. Covert to

04:01PM    6    allow the witness to finish his answer.

04:01PM    7          THE COURT:  Yeah, sustained.  He was in the middle of

04:01PM    8    his answer.

04:01PM    9          THE WITNESS:  I was very concerned about those

04:01PM    10    communications.  I documented those concerns.  I documented at

04:01PM    11    length my overall concern.  Based on my training and

04:01PM    12    experience, I was very confident that sending it to the FBI

04:01PM    13    would be ineffective.

04:01PM    14          There's -- the FBI was aware of it, of this issue.

04:01PM    15    The local FBI agent was aware of it.  There was no actionable

04:01PM    16    steps, no actionable leads that could be pursued at that time,

04:01PM    17    at any time, other than going to the effort of identifying the

04:01PM    18    individuals, the hundreds of individuals that were authoring

04:02PM    19    concerning communications.

04:02PM    20          That effort, in my view, even if we were able to

04:02PM    21    identify those people and have conversations with with them,

04:02PM    22    that is a subset of the people that I'm worried about for

04:02PM    23    Fredonia.  And -- and sending law enforcement officers out

04:02PM    24    would be, in my view, like throwing gasoline on a fire,

04:02PM    25    because now we would have a narrative that would be generated

04:02PM   1   where the -- the cops are chasing me because I'm angry with a

04:02PM   2   pedophile.  That would be the narrative.  That's what I was

04:02PM   3   concerned.

04:02PM   4       BY MR. COVERT:

04:02PM   5   Q.  You offer a lot of opinions today about public

04:02PM   6   perception.  Do you have any background in public relations?

04:02PM   7   A.  No.

04:02PM   8   Q.  Do you have any degrees in public relations?

04:02PM   9   A.  No.

04:02PM  10   Q.  Have you ever been accepted as an expert in public

04:02PM  11   relations?

04:03PM  12   A.  No.

04:03PM  13   Q.  Yet, a lot of what you testify to today, if you'll agree

04:03PM  14   with me, is your impression of the perception of the public

04:03PM  15   to the situation at Fredonia, correct?

04:03PM  16   A.  As reflected in their comments, yes, I was concerned

04:03PM  17   about the comments.

04:03PM  18   Q.  You're concerned --

04:03PM  19   A.  Um-hum.

04:03PM  20   Q.  -- and perception of strangers to -- from outside the

04:03PM  21   campus community to what's occurring on the campus community,

04:03PM  22   yet you have no background in public relations, correct?

04:03PM  23   A.  I do not have a background in public relations.

04:03PM  24   Q.  You're concerned what the perception is going to be if

04:03PM  25   Fredonia allows Dr. Kershnar back onto campus, correct?

04:03PM    1    A.   No.   No.   I was worried about the -- the threat

04:03PM    2    environment that that created for the campus.

04:03PM    3    Q.   Well, but you talk about the threat environment in the

04:03PM    4    sense that his return to campus would increase, in your

04:03PM    5    opinion, media attention, social media attention, correct?

04:03PM    6    A.   Yes.   And --

04:04PM    7    Q.   And do you have any idea how long that attention would

04:04PM    8    increase?  Have you consulted any experts in soc -- in public

04:04PM    9    relations, social media, to determine whether if he returned

04:04PM   10    to campus that attention would increase in a day, in a half a

04:04PM   11    day, in a news cycle, in two news cycles?

04:04PM   12        Did you ever consult anyone from the outside to determine

04:04PM   13    how long would the attention last before it inevitably

04:04PM   14    dissipated, like America's attention does to everything?  Did

04:04PM   15    you talk to anyone about that?

04:04PM   16    A.   No.   I had conversations with our media director who's

04:04PM   17    got professional experience up here in Buffalo at one of the

04:04PM   18    TV stations, the news director.  We had conversations about

04:04PM   19    it.  I -- I -- he and I were of the same view that there was

04:04PM   20    a lot --

04:04PM   21    Q.   I'm sorry, I'm not gonna -- I'm gonna object to your

04:05PM   22    talking about hearsay unless you want to identify this

04:05PM   23    individual, or had any communication with this -- any written

04:05PM   24    communications.

04:05PM   25    A.   Sure.   I apologize.

04:05PM    1          MS. PANTZER:  Your Honor, he's eliciting the response

04:05PM    2    to his own question about whether or not he got any PR advice.

04:05PM    3    I mean --

04:05PM    4          THE COURT:  Yeah, I think that's true.  You asked

04:05PM    5    that question, and he's giving you his answer.  You can follow

04:05PM    6    up by asking --

04:05PM    7          MR. COVERT:  Yep.

04:05PM    8          THE COURT:  -- who he talked to and those kinds of

04:05PM    9    things.

04:05PM   10          MR. COVERT:  Sure.

04:05PM   11          THE COURT:  But he can continue his answer.

04:05PM   12          MS. PANTZER:  Thank you, Your Honor.

04:05PM   13          THE WITNESS:  I recall conversations through this, I

04:05PM   14    don't remember when, but it was early on, with Jeff Woodard,

04:05PM   15    who is the SUNY Fredonia media director.  He worked at, I

04:05PM   16    believe, WGRZ as the news director.  We had several

04:05PM   17    conversations with about this.

04:05PM   18          Mr. Woodard is a media expert, or as close as I could

04:05PM   19    come to one.  We did talk about this.

04:06PM   20          My takeaway from those conversations was it was

04:06PM   21    obvious to both of us that these are concerning messages that

04:06PM   22    we're seeing in the public domain about this professor and our

04:06PM   23    campus.  And a plain reading of many of those messages is that

04:06PM   24    it's reasonable, certainly based on the training and

04:06PM   25    experience I've gone through, to believe that there -- they

04:06PM    1    may be messages from people who are willing themselves to

04:06PM    2    commit a violent act, or they may encourage somebody who

04:06PM    3    hasn't gotten on social media to do a violent act.

04:06PM    4        I believe it's clear that this is a very concerning

04:06PM    5    episode from a -- from a physical safety standpoint for the

04:06PM    6    campus.

04:06PM    7        BY MR. COVERT:

04:06PM    8    Q.  Now, at the end of February, you've indicated that the

04:07PM    9    media, social media, all of the attention has waned, the

04:07PM   10    threats have waned, correct?

04:07PM   11    A.  Yes, sir.

04:07PM   12    Q.  And you decided nevertheless it was your recommendation

04:07PM   13    to the university to not allow Dr. Kershnar back on campus,

04:07PM   14    correct?

04:07PM   15    A.  Yes.

04:07PM   16    Q.  And did you consult with any public relations experts at

04:07PM   17    that point to determine whether letting him back on campus

04:07PM   18    would inevitably cause increased media and social media

04:07PM   19    attention?

04:07PM   20    A.  Other than the conversations I just mentioned, no.

04:07PM   21    Q.  You didn't -- you had no idea at that point how long, if

04:07PM   22    there was an increase in attention, how long that would last,

04:07PM   23    correct?

04:07PM   24    A.  I don't know.

04:07PM   25    Q.  So everything you testified to earlier is very

04:07PM    1    speculative in relation to believing that the attention would

04:07PM    2    be greater than it was for the first time in this controversy

04:07PM    3    on February 2nd, correct?

04:07PM    4    A.   Yeah.   I don't know what the intensity or the duration of

04:08PM    5    that would be.

04:08PM    6    Q.   Yeah.   It's totally speculative to believe it would less

04:08PM    7    or more attention than it was in early February, correct?

04:08PM    8    A.   My -- my judgment was that it was going to be more

04:08PM    9    because there was an narrative out there that Fredonia should

04:08PM    10   have known about this guy.

04:08PM    11        You know, pardon me for this informal language.

04:08PM    12        Fredonia should have known about Professor Kershnar.

04:08PM    13   That was early February.   If he were to come back in mid

04:08PM    14   March, or tomorrow, my belief, my professional opinion, not

04:08PM    15   as a media expert but just as a law enforcement professional,

04:08PM    16   is that the social media reaction would be higher intensity,

04:08PM    17   more negative, more toward violent ideation, because the

04:08PM    18   narrative would be that Fredonia has known about this all

04:08PM    19   along and they still brought him back.   That's my concern.

04:09PM    20   Q.   But that's speculative on your part?

04:09PM    21        MS. PANTZER:   Objection, Your Honor.   Asked and

04:09PM    22   answered.

04:09PM    23        THE COURT:   Sustained.

04:09PM    24        MS. PANTZER:   Thank you.

           25

Kershnar v Kolison - Isaacson - Covert/Cross - 9/13/23

04:09PM   1          BY MR. COVERT:

04:09PM   2   Q.  So, your recommendation to not bring him back, was that

04:09PM   3   in any way questioned by Vice-President Metzger or the

04:09PM   4   president at the time?

04:09PM   5   A.  No.

04:09PM   6   Q.  There was no pushback whatsoever?

04:09PM   7   A.  No.  And my takeaway from that -- well, I don't want to

04:09PM   8   put words in their mouth.  No, I got no push -- they accepted

04:09PM   9   my recommendations.

04:09PM  10   Q.  And at some point, you started preparing the March 17th

04:09PM  11   assessment, correct?

04:09PM  12   A.  Yes.

04:09PM  13   Q.  And that assessment, when did you begin to draft that?

04:09PM  14   A.  I don't recall.

04:09PM  15   Q.  Did you utilize any resources or individuals to assist

04:10PM  16   you in coming up with the conclusions of that threat

04:10PM  17   assessment?

04:10PM  18   A.  No.

04:10PM  19   Q.  By March 17th, there was literally no attention to this

04:10PM  20   matter anymore, correct, on social media?  Media?  There were

04:10PM  21   no threats anymore.  The situation had actually subsided,

04:10PM  22   correct?

04:10PM  23   A.  It wasn't back to zero by any means, no, it was -- it was

04:10PM  24   a fraction of what it was, but there was still concerning

04:10PM  25   traffic that I was seeing online.

04:10PM   1            MR. COVERT:  Megan, if you can put 33 up, please?

04:10PM   2   Defendant's 33, I believe.

04:10PM   3            THE COURT:  Defendant's 33?

04:10PM   4            MR. COVERT:  Yes.  Oh, no, I'm sorry.  Not Defense

04:11PM   5   33.  Mr. Isaacson's affidavit, his signature.

04:11PM   6            MS. PANTZER:  It's Defendant's 1.

04:11PM   7            MR. COVERT:  Defendant's 1.  Thank you.

04:11PM   8            THE COURT:  That's in evidence, right?

04:11PM   9            MS. PANTZER:  Yes, Your Honor.

04:11PM  10            MR. COVERT:  It is in evidence, Your Honor.

04:11PM  11            Megan, if you can go to paragraph 22, please.

04:12PM  12            BY MR. COVERT:

04:12PM  13   Q.  Now, in paragraph 22, if you don't mind reading that to

04:12PM  14   yourself.

04:12PM  15       You would acknowledge that after the weeks of early

04:12PM  16   February, there was a marked improvement that occurred in the

04:12PM  17   intensity of the public attendance in the Kershnar matter,

04:12PM  18   correct?

04:12PM  19   A.  Yes.

04:12PM  20   Q.  And you noted that the quantity and quality of social

04:12PM  21   media posts had waned, correct?

04:12PM  22   A.  Correct.

04:12PM  23   Q.  And you speculated that this is the result of

04:12PM  24   Dr. Kershnar's removal from campus and discontinuation of his

04:12PM  25   contact with the students, correct?

04:12PM   1   A.  Yes.

04:12PM   2   Q.  And again, that's speculation.  You don't know whether

04:12PM   3   the public interest would have waned anyway, even if he

04:12PM   4   hadn't been removed, correct?

04:12PM   5            MS. PANTZER:  Objection, Your Honor.  I would just

04:12PM   6   object to the use of the term "speculation."  Whether or not

04:13PM   7   it's speculative is for the Court to decide as the trier of

04:13PM   8   fact, not for Chief Isaacson to testify to.

04:13PM   9            THE COURT:  Well, I think he can testify to the basis

04:13PM  10   for his statements, so overruled.

04:13PM  11            THE WITNESS:  This was my professional opinion.  I

04:13PM  12   think that accurately characterizes it.

04:13PM  13            MR. COVERT:  Paragraph 35, please.

04:13PM  14            BY MR. COVERT:

04:13PM  15   Q.  And if you can review paragraph 35.

04:13PM  16       You indicate that your recommendation of February 2nd

04:13PM  17   stands.  And when viewed strictly from a campus safety

04:13PM  18   perspective, a return of Dr. Kershnar to our campus would

04:13PM  19   pose an unacceptable risk of violence, correct?

04:13PM  20   A.  Yes.

04:13PM  21   Q.  That was your professional opinion?

04:13PM  22   A.  Yes.

04:13PM  23   Q.  Wouldn't you agree that for purposes of courthouse

04:14PM  24   safety, the most safe situation would be that no spectators

04:14PM  25   would be allowed in the courthouse, correct?

04:14PM    1    A.  I see where we're going.  Yes.  Sure.

04:14PM    2    Q.  And if we want to keep the president safe, we keep him in

04:14PM    3    the bunker at the White House, correct?

04:14PM    4    A.  Correct.

04:14PM    5    Q.  And there have recently been shootings at, unfortunately,

04:14PM    6    at concerts, outdoor concerts.  So if we want to protect

04:14PM    7    patrons of concerts, we have empty stadiums and show it all

04:14PM    8    on TV, correct?

04:14PM    9    A.  That would minimize -- that would eliminate a threat.

04:14PM    10   Q.  Did anybody at the university ever discuss with you the

04:14PM    11   First Amendment rights of Dr. Kershnar and balancing those

04:14PM    12   with the campus safety perspective?

04:14PM    13   A.  I had conversations with counsel on those points, but I

04:14PM    14   think that's --

04:14PM    15          MS. PANTZER:  Your Honor, that's privileged

04:14PM    16   information.

04:14PM    17          THE WITNESS:  Yeah.

04:14PM    18          THE COURT:  He hasn't been asked for it yet.

04:14PM    19          MR. COVERT:  Yeah, I did not.

04:14PM    20          BY MR. COVERT:

04:14PM    21   Q.  Did your conversations with your boss, Mr. Metzger, the

04:15PM    22   vice-president, did he ever discuss with you balancing campus

04:15PM    23   safety with Dr. Kershnar's First Amendment right to express

04:15PM    24   himself?

04:15PM    25   A.  I had conversations with -- with -- I, well, now I'm not

04:15PM    1    sure of the date.  At some point I became aware of this

04:15PM    2    litigation, and I clearly knew then there was a First

04:15PM    3    Amendment question before the Court.

04:15PM    4        I did not have substantive conversations with -- with

04:15PM    5    either my vice-president or President Kolison about final

04:15PM    6    agreement issues.

04:15PM    7    Q.  Okay.  Now at some point, you apparently came to the

04:15PM    8    conclusion that it would be in SUNY Fredonia's best interest

04:15PM    9    to have a judge force Fredonia to allow Dr. Kershnar back on

04:16PM   10    campus as opposed to take any other mitigating measures to

04:16PM   11    allowing him to return; is that correct?

04:16PM   12    A.  That is correct, but I can explain why I feel that way if

04:16PM   13    you'd like.

04:16PM   14            MR. COVERT:  Well, let's go to paragraph 33.  I'm

04:16PM   15    sorry.  No, Meg, keep scrolling.  I apologize, it's page 33.

04:16PM   16    My fault.  Keep scrolling.  You're on the right page.

04:17PM   17            MR. CORN-REVERE:  This is from Exhibit 33.

04:17PM   18            MR. COVERT:  No, this is from, Megan, if you can

04:17PM   19    scroll down just a little bit to as a thought experiment.

04:17PM   20            Can you make that at the top of the page?

04:17PM   21            Don't worry, you're doing fine.

04:17PM   22            BY MR. COVERT:

04:17PM   23    Q.  And this is from your report, correct, your threat

04:17PM   24    assessment?

04:17PM   25    A.  Yes, sir.

04:17PM   1   Q.  And if I can read it.

04:17PM   2       As a thought experiment, it is worth considering a

04:17PM   3   scenario where Kershnar were to return to campus perhaps

04:17PM   4   after litigation where his return became inevitable.  It is

04:17PM   5   reasonable to conclude that the public would immediately

04:17PM   6   become aware of his return, and the narrative would very

04:17PM   7   quickly develop that the campus was somehow complicit in his

04:17PM   8   return.  We saw this in early February.  A major theme of the

04:17PM   9   public narrative was that SUNY Fredonia was aware of and

04:17PM  10   supportive of Kershnar's views on child sexual exploitation,

04:18PM  11   notwithstanding President Kolison's message to the contrary.

04:18PM  12   Kershnar's hypothetical future to return to campus and his

04:18PM  13   normal teaching duties would drive a narrative that our

04:18PM  14   campus, now fully aware of Dr. Kershnar's statements

04:18PM  15   normalizing child sex exploitation, has nevertheless allowed

04:18PM  16   his return.

04:18PM  17       Absent a purposeful and effective messaging campaign to

04:18PM  18   the contrary, the fact that his return may have been mandated

04:18PM  19   by a court after litigation will have little effect on

04:18PM  20   reducing the anger and grievances developed by the public

04:18PM  21   towards our campus.

04:18PM  22       Accordingly, our campus should be working now to develop

04:18PM  23   contingency plans which include a messaging campaign that

04:18PM  24   explains to the public that Kershnar's return is not of our

04:18PM  25   making, that we argued in court for his permanent removal

04:18PM    1   from our campus, and that his return is a result of losing

04:18PM    2   hard-fault litigation.  Correct, sir?

04:18PM    3   A.  Yes.

04:18PM    4   Q.  There is no discussion of mitigating or steps that are

04:18PM    5   short of losing litigation to return Dr. Kershnar to the

04:19PM    6   campus anywhere in this threat assessment, are there?

04:19PM    7   A.  My view all along has been that there is not a halfway

04:19PM    8   point between his full return and where we are now that

04:19PM    9   doesn't significantly increase the risk to the campus.

04:19PM   10   That's my opinion.

04:19PM   11   Q.  But you -- your position was you wanted SUNY Fredonia to

04:19PM   12   force -- to have a judge force them to have Dr. Kershnar

04:19PM   13   returned for public relations purposes, correct?

04:19PM   14   A.  For threat mitigation purposes, not for --

04:19PM   15   Q.  You keep referring to the public here and the public

04:19PM   16   perception, correct?

04:19PM   17   A.  That's exactly right.  I'm concerned about a member of

04:19PM   18   the public coming onto campus and committing an act of

04:19PM   19   targeted violence because of this controversy.  I've

04:19PM   20   testified about that point.

04:19PM   21       My point, and as part of my memo, is that if -- if the

04:20PM   22   Court were to rule that he is to be returned to campus,

04:20PM   23   campus would obviously obey that order, he would come back.

04:20PM   24       From my standpoint, I think you all understand that that

04:20PM   25   would significantly increase the risk of physical violence on

04:20PM    1    campus, a targeted attack.

04:20PM    2        The -- the only way at that point, in my view, to

04:20PM    3    mitigate that would be to try to explain to the public that

04:20PM    4    it is not SUNY Fredonia who is welcoming the professor back

04:20PM    5    fully aware of his views and we're bringing him back because

04:20PM    6    we want to bring him back.  That would -- that would connect

04:21PM    7    Fredonia and Dr. Kershnar's views in the minds of the public.

04:21PM    8    We saw that reflected in the social media commentary on all

04:21PM    9    these messages that we've been talking about.

04:21PM    10       I don't think it would do a lot of good, frankly, but it

04:21PM    11   would be something to move the needle a little bit toward

04:21PM    12   safety if there was a messaging campaign that explained to

04:21PM    13   the public that we don't want him back on campus, we don't

04:21PM    14   agree with his views, but we were ordered to bring him back

04:21PM    15   anyway.

04:21PM    16   Q.  So your position was you wanted Fredonia to continue to

04:21PM    17   condemn Dr. Kershnar's First Amendment protected views

04:21PM    18   publicly?

04:21PM    19   A.  I wanted -- I think it -- it would be appropriate and

04:21PM    20   desirable for the campus to try to distance itself as an

04:21PM    21   entity from his views.

04:22PM    22   Q.  When you issued this March 17th threat assessment, did --

04:22PM    23   who did it go to?

04:22PM    24   A.  You'll have to page up.

04:22PM    25   Q.  I think if we do page up, I do believe it's the human

04:22PM    1    resources and the counsel's office?

04:22PM    2    A.  Yes, that sounds right.

04:22PM    3    Q.  Do you know whether this was shared -- this assessment

04:22PM    4    was shared with anyone else in the SUNY administration, other

04:22PM    5    than counsel's office?  I'm not asking you to violate any

04:22PM    6    privilege.

04:22PM    7    A.  My understanding, and I don't know how I have this

04:22PM    8    understanding, is that it was read by the president and --

04:22PM    9    and my vice-president.

04:22PM   10    Q.  And did the president or vice-president ever contact you

04:22PM   11    and communicate their disagreement with your recommendation

04:22PM   12    that only through litigation could Dr. Kershnar be returned

04:23PM   13    to campus?

04:23PM   14    A.  I'll go with my earlier answer, that they concurred with

04:23PM   15    my recommendations, and I -- we did not have a substantive

04:23PM   16    discussion.

04:23PM   17         MR. COVERT:  Megan, if you can go to the end of

04:23PM   18    page 37.  If you can scroll down and make that the top of the

04:23PM   19    page.

04:23PM   20         BY MR. COVERT:

04:23PM   21    Q.  So as opposed to a thought experiment earlier that

04:23PM   22    preceded that paragraph, here you concretely indicate your

04:23PM   23    recommendation that Fredonia allow litigation to cause his

04:23PM   24    return, correct?

04:23PM   25    A.  Yes.

04:23PM    1    Q.   Reading -- I'll be reading from this document:

04:24PM    2         If Kershnar's return becomes inevitable, it should be

04:24PM    3    preceded by an intense messaging campaign by campus and SUNY

04:24PM    4    that Kershnar's return is over our strong, but unfortunately

04:24PM    5    unsuccessful, legal efforts to keep him away from our campus

04:24PM    6    and our students.

04:24PM    7         The intent of this messaging campaign should

04:24PM    8    unequivocally inform the public that SUNY Fredonia in no way

04:24PM    9    supports Kershnar views, but that we have been ordered by a

04:24PM   10    judge over our strong objections to let him return, correct?

04:24PM   11    A.   Yes.

04:24PM   12    Q.   So, again, you and, apparently by acquiescing to this,

04:24PM   13    the president and the vice-president are willing to distance

04:24PM   14    yourself from Dr. Kershnar's First Amendment protected

04:24PM   15    speech, and condemn that speech in order to enhance SUNY

04:24PM   16    Fredonia's public relations position?

04:24PM   17    A.   It would be an effort, and I don't think it would be

04:25PM   18    particularly effective, but it would be an effort to distance

04:25PM   19    the campus from Dr. Kershnar's view, and potentially reduce

04:25PM   20    the grievance that some would feel toward the campus, and

04:25PM   21    that some might act on to carry out a violent attack.

04:25PM   22         I'm trying to reduce, with this effort if it were to come

04:25PM   23    to pass, the grievances for those who might be on that

04:25PM   24    pathway to violence.  That's my sole intent here.

04:25PM   25    Q.   Now, as of March 17, 2022, were there -- was there any

04:25PM    1   known imminent threat of danger to Dr. Kershnar or the SUNY

04:26PM    2   campus?

04:26PM    3   A.  Not that I am aware of, where we identified an individual

04:26PM    4   that he is on that pathway of violence and heading our way,

04:26PM    5   we just didn't have visibility on people outside the campus.

04:26PM    6   Q.  So there was no imminent threat that you were aware of to

04:26PM    7   the campus?

04:26PM    8        MS. PANTZER:  Objection, asked and answered.

04:26PM    9        THE COURT:  Sustained.

04:26PM   10        BY MR. COVERT:

04:26PM   11   Q.  Had any outside law enforcement agencies, prior to

04:26PM   12   March 17th, 2022, informed you that there was any imminent

04:26PM   13   threat to Dr. Kershnar or the campus?

04:26PM   14   A.  No.

04:26PM   15   Q.  Between February 2nd and March 17th, 2022, had you

04:26PM   16   reported any conduct related to threats to any outside law

04:26PM   17   enforcement agency?

04:26PM   18   A.  I don't recall the timing other than I had those

04:27PM   19   conversations with -- with my FBI colleague.

04:27PM   20       I spoke to the undersheriff of Chautauqua County -- or,

04:27PM   21   pardon me, the captain of patrol for Chautauqua County, Rick

04:27PM   22   Telford.  And I spoke to a captain of the State Police, Eric

04:27PM   23   Baylon.  I explained to them both what was going on, and

04:27PM   24   that's when I asked them to step up patrols around

04:27PM   25   Dr. Kershnar's home.  Those are --

04:27PM     1    Q.  When did you ask them to step up patrols?

04:27PM     2    A.  It was in the days after February 2nd.

04:27PM     3    Q.  Okay.  Not closer to March 17th?

04:27PM     4    A.  Right.  In fact, the email we talked about earlier on

04:27PM     5    February 7, I believe, that memorializes my earlier

04:27PM     6    conversation with Professor Kershnar to watch his

04:27PM     7    surroundings, and then I also indicated to him that I had

04:27PM     8    notified the other agencies of the issue.

04:28PM     9         MR. COVERT:  Megan, if you can go back to up to the

04:28PM    10    passage up at page 33.

04:28PM    11         BY MR. COVERT:

04:28PM    12    Q.  There's a reference about four lines from the bottom of

04:28PM    13    the paragraph that I read, the thought experiment paragraph,

04:28PM    14    where you indicate that the campus should be working now to

04:28PM    15    develop contingency plans which include a messaging campaign.

04:28PM    16         What efforts were made to develop those contingency

04:28PM    17    plans?

04:28PM    18    A.  Frankly, not many.  I -- I don't recall having

04:28PM    19    conversations, at least that I was aware of, I was not aware

04:28PM    20    of any conversations, because the status quo appeared to

04:28PM    21    be -- it appeared to -- that it was going to stay the status

04:29PM    22    quo for an indeterminate amount of time.

04:29PM    23         MR. COVERT:  Megan, if you can return to page 37, 38,

04:29PM    24    top of page 37, actually.  38, actually.  Okay.  Right there.

           25

04:29PM    1          BY MR. COVERT:

04:29PM    2     Q.  The last paragraph on that page states:  If he were to

04:29PM    3     return, strong safeguards would need to be put in place to

04:29PM    4     assure the personal safety of Kershnar and those near to him.

04:29PM    5          Kershnar should be ordered to be fully cooperative with

04:29PM    6     the University Police in conveying any information he

04:29PM    7     receives which could impact the safety of the campus.

04:30PM    8          Those are your words, correct?

04:30PM    9     A.  Yes.

04:30PM   10     Q.  So you don't deny in that passage that safeguards could

04:30PM   11     be put in place to protect Dr. Kershnar or the university,

04:30PM   12     you just indicate that they have to be strong, correct?

04:30PM   13     A.  Yes.  And to fill out that thought, my opinion then and

04:30PM   14     now is that those safeguards would not be effective.

04:30PM   15     Q.  Well, then, wouldn't your recommendation be that he can't

04:30PM   16     be allowed back under any circumstances, and he needs to be

04:30PM   17     fired or removed?

04:30PM   18     A.  That was my recommendation, that he not --

04:30PM   19     Q.  That's not your recommendation here in this threat

04:30PM   20     assessment.  You indicate in the threat assessment that if he

04:30PM   21     were to return, that there should be strong safeguards put in

04:30PM   22     place, not that there are no such safeguards that are

04:30PM   23     possible.

04:30PM   24     A.  This contemplates that a court orders his return, or

04:30PM   25     there's some other legal process that would bring him back,

04:30PM    1   not that we would bring him back willingly because of the --

04:30PM    2   of the threat concern.

04:30PM    3   Q.  Okay.  So then after this report is issued, there's

04:31PM    4   another threat assessment on August 14 of 2022, correct?

04:31PM    5   A.  That sounds right, yes.

04:31PM    6   Q.  You testified earlier for the defense that this was an

04:31PM    7   ongoing reassessment process.

04:31PM    8       What were you reassessing if you weren't going to let him

04:31PM    9   back on campus unless a judge forced the university to -- and

04:31PM   10   then the university would have to have a strong publicity

04:31PM   11   campaign, what were you reassessing.

04:31PM   12   A.  In retrospect, maybe not the best use of the word

04:31PM   13   "reassess."

04:31PM   14       The -- I was periodically monitoring the social media

04:31PM   15   traffic.  And that periodic review just reinforced my belief

04:32PM   16   that there was not an interim measure, interim process that

04:32PM   17   we could put in place outside of his absence from campus that

04:32PM   18   would not inflame the threat picture.

04:32PM   19   Q.  So you continued to monitor through -- let's pick a date,

04:32PM   20   August 14th, because you issued a threat assessment on that

04:32PM   21   date, you continued to monitor after March 17th through

04:32PM   22   August 14th social media, correct?

04:32PM   23   A.  Yes.

04:32PM   24   Q.  And it's fair to say that the social media attention had

04:32PM   25   largely dissipated, it had waned way back in February,

04:32PM   1   correct?

04:32PM   2   A.   That's right.

04:32PM   3   Q.   So you monitor it from March 17th through August 14th,

04:32PM   4   you find that it continues to not have any attention or

04:32PM   5   minimal attention, there -- were there any imminent threats

04:33PM   6   that came to your attention from that time between March 17th

04:33PM   7   and August 14th?

04:33PM   8   A.   No.

04:33PM   9   Q.   So there's no social media attention, there's no imminent

04:33PM   10  threats, you're reassessing on August 14th.  What leads you

04:33PM   11  to believe that based upon no imminent threats and no social

04:33PM   12  media attention, you can't possibly bring him back onto

04:33PM   13  campus?

04:33PM   14  A.   I'll reiterate earlier points.

04:33PM   15       The social media interest was not zero, but it was less

04:33PM   16  than it was at the peak in early February.

04:33PM   17       My professional opinion was, and is today, that if he

04:33PM   18  were to come back, and it were perceived by the public that

04:33PM   19  Fredonia is bringing him back voluntarily, that the threat

04:34PM   20  picture would be worse than it was on -- in early

04:34PM   21  February '22.

04:34PM   22  Q.   And you testified that your views before March 17th on

04:34PM   23  that issue were speculative, and you would agree that your

04:34PM   24  view or your opinion in relation to the time period between

04:34PM   25  March 17th and August 14th, 2022, is similarly purely

04:34PM    1    speculative?

04:34PM    2            MS. PANTZER:  Objection.

04:34PM    3            THE COURT:  To the word speculative?

04:34PM    4            MS. PANTZER:  Yes, Your Honor.  And the fact that I

04:34PM    5    don't believe that that was the testimony.  I don't think he

04:34PM    6    agreed that his threat assessments were, quote, speculative.

04:34PM    7            MR. COVERT:  No, that's not what I asked him, and

04:34PM    8    that's not what I'm representing he said before.

04:34PM    9            THE COURT:  Okay.  So I'm going to sustain the

04:34PM   10    objection to the form of the question.  You can -- you can ask

04:34PM   11    again, please.

04:34PM   12            BY MR. COVERT:

04:34PM   13    Q.  I'm not asking you whether your threat assessment of

04:34PM   14    August 14th is speculative.  Is your belief, though, that

04:34PM   15    based upon what you had seen occur from March 17th through

04:35PM   16    August 14th, which consists of minimal social media

04:35PM   17    attention, and no imminent danger, is your opinion that

04:35PM   18    bringing him back to campus would cause even greater media

04:35PM   19    scrutiny than February of 2022, is that speculation?

04:35PM   20    A.  It's my professional opinion, I don't know that there's

04:35PM   21    no danger.  My -- my testimony earlier is, was, that my

04:35PM   22    concern about this matter is when we see the danger and

04:35PM   23    recognize it for what it is, it will be too late.

04:35PM   24    Q.  What factors that you saw, between March 17th and

04:35PM   25    August 14th of 2022, would lead you to believe, what

04:36PM  1    specifically did you see that would lead you to believe that

04:36PM  2    if you brought him back onto campus, that the situation would

04:36PM  3    be even more dangerous than it was in February of 2022?

04:36PM  4    A.  By March of 2022, I had come to the conclusion, based on

04:36PM  5    my professional experience and training, that if he were to

04:36PM  6    come back, the threat picture would be worse than it was in

04:36PM  7    early February.

04:36PM  8        That conclusion hasn't changed from March of 2022 until

04:36PM  9    this very moment.  That's what I believe sitting here today.

04:36PM  10   Q.  Well, I'm asking you from the time period of March 17th

04:36PM  11   of 2022 and August 14th of 2022 -

04:36PM  12   A.  Right.

04:36PM  13   Q.  -- can you point to anything that happened during that

04:36PM  14   time period that would lead -- that you could point to,

04:36PM  15   that -- as support for your opinion on August 14th that

04:36PM  16   bringing him back would be -- would create a situation that

04:37PM  17   was even more dangerous than back in February of 2022?

04:37PM  18       Can you point to anything solid?

04:37PM  19   A.  My conclusion, my opinion, that if he were to come back

04:37PM  20   and it were perceived to be voluntary, that the public and

04:37PM  21   potentially violent actors would attach blame to the campus,

04:37PM  22   six weeks after or six months after the campus became aware

04:37PM  23   of this controversy.

04:37PM  24       So my concern has been that if he were to come back and

04:37PM  25   the public and potential bad actors in the public, the

04:37PM    1    violent actors in the public, were to conclude that Fredonia

04:37PM    2    is welcoming him back in full awareness of his views, that

04:37PM    3    grievances that would drive potential violence toward the

04:37PM    4    campus would be inflamed.

04:37PM    5            THE COURT:  Did anything happen between March and

04:38PM    6    August to strengthen that opinion?

04:38PM    7            THE WITNESS:  No, Judge.

04:38PM    8            MR. COVERT:  Thank you, Your Honor.

04:38PM    9            BY MR. COVERT:

04:38PM   10    Q.  Now, the next updated threat assessment was in October

04:38PM   11    of -- October 31st of 2022, correct?

04:38PM   12    A.  Yes, that sounds right.

04:38PM   13    Q.  And in the meantime, SUNY Fredonia had engaged a company

04:38PM   14    called A1C, which you testified to earlier, to conduct a

04:38PM   15    social media scrub and to provide their own threat

04:38PM   16    assessment, correct?

04:38PM   17    A.  Yes.

04:38PM   18    Q.  Now, you've testified very consistently that since at

04:38PM   19    least before March 17th, through the engagement of AC1C

04:38PM   20    (sic), that -- you were -- your opinion was Dr. Kershnar was

04:38PM   21    never gonna come back onto campus, correct, unless he was

04:38PM   22    forced to by a judge?

04:39PM   23    A.  My rec -- I knew my recommendation was not gonna change.

04:39PM   24    Q.  And your recommendation had been abided by by the

04:39PM   25    administration throughout?

04:39PM   1   A.   Yes.

04:39PM   2   Q.   Yet the -- you recommended that they spend money on an

04:39PM   3   outside company to conduct a new threat assessment based upon

04:39PM   4   social media at that point?

04:39PM   5   A.   Yes.

04:39PM   6   Q.   What was the purpose of that if you were never gonna

04:39PM   7   change your -- if your recommendation was not gonna change?

04:39PM   8   Did someone ask you at the university to do this?

04:39PM   9   A.   No.   No.   It was an opportunity.

04:39PM  10        I mentioned earlier that one of the principals at that

04:39PM  11   company is a former FBI colleague.   And he explained to me

04:39PM  12   what the capabilities they have were to do an internet scrub.

04:39PM  13   That seemed to resonate well with this very matter, and I

04:39PM  14   asked them to do that.   That's -- I don't know if I'm

04:40PM  15   answering your question.

04:40PM  16   Q.   You are.   And who did you contact at the university to

04:40PM  17   get authorization do this?   Who did you discuss that with?

04:40PM  18   A.   I believe it was Mike Metzger, my vice-president at the

04:40PM  19   time.

04:40PM  20   Q.   Are -- now you did, in your affidavit, reference passages

04:40PM  21   from the A1C report that were supportive of your earlier

04:40PM  22   recommendation that Dr. Kershnar be remain banned from the

04:40PM  23   campus, correct?

04:40PM  24   A.   Yes.

04:40PM  25   Q.   You left out, though, various passages.

04:40PM  1          MR. COVERT:  And, Meg, if you can go to Defendant's

04:40PM  2  Exhibit 33.

04:40PM  3          BY MR. COVERT:

04:40PM  4  Q.  You left out numerous passages though in your affidavit

04:41PM  5  to the Court where the AC1C actually found that was no

04:41PM  6  threat, immediate or imminent, to Dr. Kershnar, the campus,

04:41PM  7  staff, or students, correct?

04:41PM  8  A.  I think the language here is important.

04:41PM  9          MS. PANTZER:  Your Honor, I would just object so that

04:41PM  10  Chief Isaacson be allowed to review the portion of the report

04:41PM  11  that Mr. Covert's referencing right now.

04:41PM  12          THE COURT:  If he needs to review it to answer the

04:41PM  13  question, he can say that, but he has not indicated that.

04:41PM  14          So I think if he can answer the question without

04:41PM  15  reviewing it, he can answer the question without reviewing it.

04:41PM  16          Read the question back, please, Ann.

04:42PM  17          (The above-requested question was then read by the

04:42PM  18  reporter.)

04:42PM  19          THE WITNESS:  Yes, there is language in the A1C

04:42PM  20  report that I think you paraphrased.

04:42PM  21          I had a conversation with Richard Denholm, the former

04:42PM  22  agent that was the principal, and -- after seeing the report.

04:42PM  23  And I asked him, does any of your staff have training in

04:42PM  24  threat assessments?

04:42PM  25          And the answer was, no, they're very good at doing

04:42PM  1   internet scrubs and collecting the data, but they have not had

04:42PM  2   the kind of training to make a substantive judgment in the

04:42PM  3   context of this manner.

04:42PM  4            So, I do --

04:42PM  5            MR. COVERT:  Meg, if you can scroll down to the

04:42PM  6   second paragraph?

04:42PM  7            So, you're essentially saying --

04:43PM  8            If you can just focus in a little bit.

04:43PM  9            BY MR. COVERT:

04:43PM 10   Q.  So you're essentially saying that you personally engaged

04:43PM 11   on behalf of Fredonia an agency to conduct a scrubbing and

04:43PM 12   threat assessment that was not qualified to do so?

04:43PM 13   A.  That mischaracterizes it.  I -- I engaged them to do an

04:43PM 14   internet scrub.  They came back with the internet scrub data,

04:43PM 15   and then commentary on that data.

04:43PM 16       When I had a conversation with Mr. Denholm, I asked him,

04:43PM 17   are your employees, are your analysts trained in threat

04:43PM 18   assessments to know how to judge the quality of these posts?

04:43PM 19   And the answer was no.

04:43PM 20            MR. COVERT:  First of all, I'd like to move the

04:43PM 21   exhibit into evidence, because I've been very good at not

04:43PM 22   moving it right away and forgetting to do so.

04:44PM 23            MS. PANTZER:  We have no objection, Your Honor.

04:44PM 24            THE COURT:  Okay.  It's received without objection.

04:44PM 25            MR. COVERT:  Thank you.

04:44PM   1          THE COURT:  I guess it's Defendant's Exhibit 33.

04:44PM   2      **(Defendant's Exhibit 33 was received in evidence.)**

04:44PM   3          BY MR. COVERT:

04:44PM   4  Q.  So in the first paragraph there under the title executive

04:44PM   5  summary, they apparently believe that they were engaged to

04:44PM   6  conduct an initial threat assessment, correct?

04:44PM   7      They state -- A1C Partners LLC conducted an initial

04:44PM   8  threat assessment for the State University of New York at

04:44PM   9  Fredonia, correct?

04:44PM  10  A.  That's what it says, yes.

04:44PM  11  Q.  And now you're indicating that they weren't qualified to

04:44PM  12  do so?

04:44PM  13  A.  No, sir.  What I'm saying is that they -- they provided

04:44PM  14  the product they did.  I reviewed it.  And in my view, they

04:44PM  15  were not aware of the concepts that we talked about today:

04:44PM  16  The howlers don't hunt, the hunters don't howl; the cold

04:45PM  17  comfort that we should take in the world of threat

04:45PM  18  assessments if there's not a direct threat.  None of that is

04:45PM  19  reflected in the narrative that they produced.

04:45PM  20      They produced data that was, you know, interesting to me,

04:45PM  21  and -- and I think helped, held my consideration of this

04:45PM  22  issue and my recommendations to my management.  But -- but

04:45PM  23  their narrative, their commentary on what they discovered on

04:45PM  24  the internet scrub, I don't put any stock in.

04:45PM  25      And I asked what kind of training they have in threat

04:45PM   1   assessments, threat mitigation, and they didn't have any.

04:45PM   2   Q.  So it's fair to say that they did not seemingly support

04:45PM   3   your prior views, and when you received the report you

04:45PM   4   decided to discount it.  Except for the parts that were

04:45PM   5   supportive of your views, those you did send to the Court.

04:45PM   6   A.  Yes.  With -- with the understanding that the --

04:46PM   7   Q.  A little disingenuous?

04:46PM   8   A.  No.  No.

04:46PM   9          MS. PANTZER:  Your Honor, objection to the

04:46PM  10   argumentative nature of that last comment.  But additionally,

04:46PM  11   I believe Chief Isaacson wasn't finished with his last answer.

04:46PM  12          THE COURT:  Well, if you're going to object to the

04:46PM  13   question then --

04:46PM  14          MS. PANTZER:  No, I objected to the last comment that

04:46PM  15   said a little disingenuous, which is not a question.  I would

04:46PM  16   like Chief Isaacson to be able to finish his --

04:46PM  17          THE COURT:  Oh, yeah, right.  Yes, I'm sorry.

04:46PM  18          MS. PANTZER:  Okay.  I would just like Chief Isaacson

04:46PM  19   to be able to finish his response to the question prior to the

04:46PM  20   argumentative comments.

04:46PM  21          THE COURT:  Yeah.  He said yes, with the

04:46PM  22   understanding.

04:46PM  23          MS. PANTZER:  Yes.

04:46PM  24          THE COURT:  So why don't you finish that.  Although I

04:46PM  25   did think a little disingenuous was meant as a question.

04:46PM    1          MR. COVERT:  Correct.

04:46PM    2          THE COURT:  But that's okay.  So the objection to

04:46PM    3    that question is sustained so far as it interrupted the

04:46PM    4    answer.  You can now answer.

04:46PM    5          THE WITNESS:  Right.  I would -- I would like to make

04:46PM    6    it clear to the Court that there's nothing disingenuous with

04:47PM    7    my affidavit to the Court.

04:47PM    8          THE COURT:  That's not the question.  That's not the

04:47PM    9    question.

04:47PM   10          THE WITNESS:  But I want to explain that in my

04:47PM   11    affidavit to the Court, it is -- it very clearly shows that I

04:47PM   12    am summarizing the threat assessments that I provided to my --

04:47PM   13    my management.  Each section of my affidavit has a header that

04:47PM   14    says below is a summary of my February 2nd memorandum,

04:47PM   15    whatever those four memoranda are dated.

04:47PM   16          So the affidavit to the Court was meant simply as a

04:47PM   17    way to bring all those threat assessments that I made to SUNY

04:47PM   18    Fredonia administrators, and package it in a way that was

04:47PM   19    easily digestible to the Court.

04:48PM   20          I hope that makes that clear.

04:48PM   21          MR. COVERT:  Meg, can you go back to Defendant's

04:48PM   22    Exhibit 1, page 17, page 45.

04:48PM   23          BY MR. COVERT:

04:48PM   24    Q.  And I'll let you read this if you'd like to.  This is the

04:48PM   25    updated -- October 31st updated threat assessment where it

04:48PM     1   starts at paragraph 44.

04:48PM     2           MR. COVERT:  And, Meg, if you can keep scrolling

04:48PM     3   down.

04:48PM     4           BY MR. COVERT:

04:48PM     5   Q.  It ends at paragraph 49.

04:48PM     6           THE COURT:  Do you want him to read that to himself?

04:49PM     7           MR. COVERT:  Yes, please.

04:49PM     8           THE WITNESS:  Thank you, Your Honor.

04:49PM     9           BY MR. COVERT:

04:49PM    10   Q.  If it's easier, I can pull it out of my three-ring

04:49PM    11   binder.

04:49PM    12   A.  That will be okay.

04:49PM    13   Q.  Do you want this?

04:49PM    14   A.  Sure.

04:49PM    15   Q.  Handing pages 17 through 20.  Have you read it?

04:49PM    16   A.  Yes, sir.

04:50PM    17   Q.  Is it fair to state that the passages in paragraphs 44

04:50PM    18   through 49 of Exhibit 1, Defendant's Exhibit 1, which is

04:50PM    19   under the title October 31st, 2022 updated threat assessment,

04:50PM    20   that those are all passages that reflect portions of the A1C

04:50PM    21   report that you believe are supportive of your interpretation

04:50PM    22   of the threat assessment?

04:50PM    23   A.  Yes.

04:50PM    24   Q.  And do not offer any of the passages that A1C included in

04:50PM    25   their report in Exhibit 33 that are seemingly not supportive

04:50PM  1  of your threat assessment where they actually find that based

04:51PM  2  upon their social media scrub that there is no existence of

04:51PM  3  an imminent or immediate threat to Dr. Kershnar, Fredonia

04:51PM  4  campus, staff or students?

04:51PM  5  A.  Yes.

04:51PM  6       MR. COVERT:  So, Megan, if you can go then to

04:51PM  7  paragraph -- I'm sorry, Exhibit 33, and then down to the third

04:51PM  8  paragraph.  Or second paragraph.

04:51PM  9       BY MR. COVERT:

04:51PM  10  Q.  So in the second paragraph where begin at, Exhibit 33

04:51PM  11  under the executive summary, it indicates that A1C performed

04:51PM  12  key word searches designed to surface potential direct and

04:51PM  13  indirect threats to the Fredonia campus, staff members, and

04:51PM  14  students, specifically directed towards Dr. Kershnar,

04:51PM  15  correct?

04:51PM  16  A.  Yes.

04:51PM  17  Q.  Going to the next paragraph, I believe the third

04:51PM  18  sentence.  I'm reading from the report:

04:51PM  19       The majority of the online discussion activity occurred

04:52PM  20  during February 2022.  While the comments should be seriously

04:52PM  21  considered as part of the enterprise wide physical security

04:52PM  22  and safety planning process at Fredonia and the SUNY system,

04:52PM  23  the comments do not suggest the existence of an immediate or

04:52PM  24  imminent threat to the Fredonia campus, staff, students, or

04:52PM  25  Professor Kershnar, correct?

04:52PM    1    A.  Correct.

04:52PM    2    Q.  And the next paragraph indicates that some of the samples

04:52PM    3    of what they captured is attached, and the paragraph after

04:52PM    4    that indicates that considering the subject matter on which

04:52PM    5    Professor Kershnar offered observations, as well as the

04:52PM    6    direct and indirect comments posted online regarding SUNY

04:52PM    7    Fredonia and Professor Kershnar, A1C recommends persistent

04:53PM    8    evaluation of online activity be conducted over the near

04:53PM    9    term, correct?

04:53PM   10    A.  Yes.

04:53PM   11    Q.  So their scrub does not even indicate that we need to

04:53PM   12    have long-term social media monitoring in this case.  Theirs

04:53PM   13    strictly indicates that we just need to do this for the near

04:53PM   14    term, correct?

04:53PM   15    A.  That's what it says, correct.

04:53PM   16    Q.  And you did not include that in your affidavit to the

04:53PM   17    Court, correct?

04:53PM   18    A.  No, my understanding was all of this material would be

04:53PM   19    presented to the Court.

04:53PM   20    Q.  This was not attached to your affidavit.

04:53PM   21    A.  No.

04:53PM   22         MR. COVERT:  Your Honor, this might be a good time to

04:53PM   23    break, if that's okay.

04:53PM   24         THE COURT:  You're not done?

04:53PM   25         MR. COVERT:  No.  Oh, no.

04:53PM    1        THE COURT:  Okay.  We will break for the day, and we

04:53PM    2    will continue at 10:00 tomorrow morning.

04:53PM    3        MR. COVERT:  10:00, Your Honor?

04:53PM    4        THE COURT:  And we'll go as normal lunch break

04:53PM    5    tomorrow, and go the full day, and then --

04:53PM    6        MR. COVERT:  I think we'll be done tomorrow.  I think

04:53PM    7    we may be going the full day, but I would anticipate another

04:53PM    8    hour, hour and a half.  Then they have another witness, I

04:54PM    9    believe.  I won't speak for them as to how long that is.

04:54PM   10        But then we have our experts.  And unless they are

04:54PM   11    gonna ask for more time on that front.

04:54PM   12        THE COURT:  We'll see what we can -- go ahead.

04:54PM   13        MR. BOYD:  Yeah, Your Honor, I was gonna ask if

04:54PM   14    Mr. Covert expects about another hour, and then we have

04:54PM   15    redirect, just for our second witness, would it make more

04:54PM   16    sense -- do you want him before lunch or after lunch, just for

04:54PM   17    scheduling purposes.

04:54PM   18        THE COURT:  What's your thought?

04:54PM   19        MR. COVERT:  I wouldn't mind breaking and coming back

04:54PM   20    after lunch.  It's really up to the Court.

04:54PM   21        MR. BOYD:  So it might be an early lunch, but.

04:54PM   22        THE COURT:  Yeah, maybe we'll do an early lunch at

04:54PM   23    11:30 instead of noon.  But yeah, let's go that route so your

04:54PM   24    witness -- so we don't inconvenience him any more than we have

04:54PM   25    to.

Case 1:23-cv-00525-LJV-JJM    Document 66    Filed 12/21/23    Page 165 of 166
Kershnar v Kolison - Isaacson - Covert/Cross - 9/13/23

165

04:54PM 1          MR. BOYD:  Okay.  What time would you like our second

04:54PM 2    witness here, Your Honor?

04:54PM 3          THE COURT:  So let's say 12:30.

04:54PM 4          MR. BOYD:  Thank you.

04:54PM 5          THE COURT:  Okay?  Anything else anybody wants to put

04:54PM 6    on the record before we close for the day?

04:54PM 7          From defense?

04:55PM 8          MS. PANTZER:  No, Your Honor.

04:55PM 9          THE COURT:  From the plaintiff?

04:55PM 10         MR. COVERT:  No, Your Honor.

04:55PM 11         THE COURT:  Okay.  See you folks tomorrow morning.

04:55PM 12   Thank you.

13              **(Defendants' Exhibit 33 was received in evidence.)**

14                  (Proceeding concluded at 4:55 p.m.)

15                  *   *   *   *   *   *   *

16

17                     **CERTIFICATE OF REPORTER**

18

19              In accordance with 28, U.S.C., 753(b), I

20    certify that these original notes are a true and correct

21    record of proceedings in the United States District Court for

22    the Western District of New York on September 13, 2023.

23

24                     s/ Ann M. Sawyer
                       Ann M. Sawyer, FCRR, RPR, CRR
25                     Official Court Reporter
                       U.S.D.C., W.D.N.Y.

1

2

**KERSHNAR v KOLISON et al - 23-cv-525**
**September 13, 2023**
**Evidentiary Hearing - Day 1**

3

4

5    **B R E N T   I S A A C S O N**      11

6      DIRECT EXAMINATION BY MS. PANTZER:    11

7      CROSS-EXAMINATION BY MR. COVERT:    102

8

9    Defendant's Exhibit 4    34

10    Defendant's Exhibit 1    38

11    Defendant's Exhibit 16    44

12    Defendant's Exhibit 3    49

13    Defendant's Exhibit 15    57

14    Defendant's Exhibit 17    61

15    Defendant's Exhibit 19    62

16    Defendant's Exhibits 20-25    64

17    Defendant's Exhibits 6-13    66

18    Defendant's Exhibits 26-32    71

19    Defendant's Exhibit 35    95

20    Plaintiff's Exhibit 89    114

21    Plaintiff's Exhibit 73    128

22    Defendant's Exhibit 33    158

23    Defendant's Exhibit 33    165

24

25