24-1241-cv
*Leroy v. Livingston Manor Central School District*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2024
Argued: March 19, 2025
Decided: October 30, 2025

No. 24-1241

_____

CASE LEROY,

*Plaintiff-Appellant,*

— v. —

LIVINGSTON MANOR CENTRAL SCHOOL DISTRICT,
JOHN P. EVANS, in his capacity as Superintendent of
Schools of Livingston Manor Central School District,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Southern District of New York
No. 7:21-cv-6008, Nelson S. Román, *Judge*

_____

Before:        PARKER, ROBINSON, and PÉREZ, *Circuit Judges*.

Case Leroy, a high school senior in a New York public school, took a picture
with his friends and posted it on social media while outside of his school campus

and after school hours.  He thought his post, which showed a picture of his friend kneeling on his neck with the caption "Cops got another," was a joke, but he quickly realized others viewed it as racist because it evoked memories of the notorious murder of George Floyd.  He removed his post after a few minutes, but not before another student took a screenshot, which was reposted on other social media platforms.  After public outcry, in-school discussions, an assembly, a student demonstration, and a school investigation, the school superintendent suspended Leroy and barred him from participating in non-academic extracurricular activities for the remainder of the school year.

Leroy sued, alleging that the school's disciplinary actions violated the First Amendment.  The district court granted the school's motion for summary judgment, concluding that the school did not violate Leroy's First Amendment rights because his off-campus speech caused substantial disruption in school.

We disagree.  Accordingly, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings.

Judge Pérez concurs in the judgment in a separate opinion.

———————————————————

FOR APPELLANT: JEROME T. DORFMAN, Law Offices of Jerome T. Dorfman, Parksville, NY; ADAM EZRA SCHULMAN, Hamilton Lincoln Law Institute, Washington, D.C.

AMICUS CURIAE ARGUING FOR APPELLANT: EUGENE VOLOKH, Hoover Institution, Stanford University, Stanford, CA.

FOR APPELLEES: STEVEN C. STERN, CHELSEA WEISBORD, MARK A. RADI, Solokoff Stern LLP, Carle Place, New York.

BARRINGTON D. PARKER, *Circuit Judge*:

Case Leroy, a high school senior in a New York public school, appeals from a judgment of the United States District Court for the Southern District of New York (Roman, J.). Leroy was disciplined by his school after he took a picture with his friends and posted it on social media while outside of his school campus and after school hours. He thought his post, which showed a picture of his friend kneeling on his neck with the caption "Cops got another," was a joke, but he quickly realized others viewed it as an insensitive comment on the murder of George Floyd. He removed his post after a few minutes, but not before another student took a screenshot, which she reposted on other social media platforms. The photograph then took on a life of its own. After public outcry, in-school discussions, student demonstrations and a school investigation, the school superintendent suspended Leroy and barred him from participating in various school activities for the remainder of the school year.

Leroy then sued in state court, alleging that the school's disciplinary actions violated the First Amendment. The defendants removed the case to federal court and, following discovery, moved for summary judgment. The district court granted the motion, concluding that the defendants had not violated Leroy's First

Amendment rights because his off-campus speech caused substantial disruption in school.

On appeal, Leroy contends that the district court erred because any disruption that occurred did not deprive his off-campus speech of First Amendment protection.  In analyzing this contention, we consider (i) the nature of Leroy's speech, (ii) where, when, and how he spoke, and (iii) the school's interests in regulating that speech, in light of the features of off-campus speech identified by the Supreme Court that "diminish the strength of the unique educational characteristics that might call for special First Amendment leeway," *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180 (2021).  We conclude that the school's disciplinary actions violated the First Amendment.  Accordingly, we **REVERSE** the judgment of the district court and remand for further proceedings.

## BACKGROUND

On April 19, 2021, Case Leroy—then a senior at Livingston Manor High School, in the Livingston Manor Central School District (the "District"), took a picture in the parking lot of a dance studio with a group of friends.  In the picture, Leroy is lying on the ground next to a car, and another student is kneeling on the

pavement beside him.  The student has his knee on Leroy's neck and is giving a "thumbs up" and smiling.

The context of the picture is significant:  The day Leroy and his friends took and posted the picture, a jury had just begun to deliberate in the highly publicized trial of Derek Chauvin, a Minnesota police officer, for the murder of George Floyd. The picture is undeniably reminiscent of footage of Chauvin next to a police car kneeling on George Floyd's neck, killing him.  The other students involved in the picture—the student who took the picture (Student B) and the student posing with his knee on Leroy's neck (Student A)—both acknowledge this resemblance, and Student A testified the resemblance was intentional.

Leroy, however, testified that he was not aware of the resemblance until later.  In fact, he says he was not involved in the decision to stage and take this photo at all.  He testified that another friend told him that he heard a scraping sound under his car; Leroy went to look underneath the car to see what was causing the sound, and while he was lying next to the car, Student A came over and knelt on his neck for the picture.

Student B, who took the picture, sent it to the others via Snapchat, a social media and messaging app on which users can send a message directly to one or

more of their "friends" or can post a story that is visible to all of their "friends" for twenty-four hours.  Leroy and his friends all posted the picture to their Snapchat stories.  Leroy posted it while still in the parking lot outside the dance studio, adding the caption "Cops got another."  Student A posted the same picture with the Black Lives Matter logo and the caption "Another one down."  Within minutes, Leroy's phone started "blowing up" with messages, including what he describes as "threat messages."  App'x 116.  Leroy testified that he then looked at Student A's post with the Black Lives Matter logo and understood the resemblance to the George Floyd case.  Leroy immediately took down his post.  He also asked Student A to do the same, telling him that it "wasn't right."  App'x 113.  In total, Leroy's post was visible for about seven minutes.

As with many ill-advised social media posts, the story does not end there. During the brief period in which Leroy's Snapchat friends could view his post, another LMHS student took a screenshot of the post and re-posted it on Facebook and other platforms.  Someone then re-posted the image along with commentary suggesting that the image belied the claim that Livingston Manor had "surpassed its dark history of being a Sundown Town with its own KKK Chapter."  App'x 332, 357.  That post with commentary was itself re-posted, this time with a caption

urging people to reach out to the school and providing contact information. Many people did reach out to the school to complain about the pictures. In total, school officials received twenty-three emails about the pictures, some identifying the students in the pictures, some labeling the behavior racist, some stating that it would make students feel unsafe, and many urging the school to take disciplinary action and hold the students accountable for their conduct.

Appellant John P. Evans, the District's Superintendent, and Shirlee Davis, the school's principal, asked Leroy and the other students involved not to come to school the next day, which Evans said was "for their own safety." App'x 473–74 ¶ 9. The school also asked the students who had been involved and their parents to meet with Evans and Davis, who questioned them about the posts.

The posts were a heated topic of conversation throughout the school. Staff and teachers held in-class discussions with students. The school planned an assembly for students in grades 7 to 12 to address the posts, scheduling the assembly at the same time as a planned student demonstration. After the assembly, the high school guidance counselor, Christian Towsley, and Evans supervised the demonstration, in which participating students knelt for nine minutes to symbolize the time Derek Chauvin held his knee on George Floyd's

neck.  After the demonstration ended, Towsley supervised a follow-up discussion about the photos, racism, insensitivity, and George Floyd.  Law enforcement officers were on school grounds throughout the day.

The response to the posts extended beyond the April 20 activities.  Evans released an official statement to the school community, posted on the District's website, in which he stated that the District was investigating the matter.  On April 21, News12 carried a story about the posts.  And the next month, the District held two days of training regarding implicit bias.

The District also launched an investigation into the posts, beginning with the student interviews on April 20.  On April 21, 2021, Leroy was suspended from school for five days—the maximum amount of time the school could suspend him under state law without holding a hearing.  The same day, the District hired Bethany Centrone, legal counsel for Capital Region BOCES, to investigate the matter.  She issued a report two days later concluding that there was sufficient evidence to determine that the students involved with the posts engaged in behaviors that violated the District's Code of Conduct and recommended that the students be referred to a Superintendent's hearing to determine if additional discipline was warranted.

Based on that recommendation, Evans charged Leroy with violations of the District's Code of Conduct for "posting racially offensive material on social media on or about March 25, 2021 and April 19, 2021 which resulted in a substantial disruption to the school environment." App'x 456. The District held a hearing on April 27, 2021, at which Leroy testified under oath, as did Evans.

When asked about disruption, Evans testified about the "emails and communications sent to both the superintendent and the principal from students, from staff, from people both inside of the community and outside of the community." App'x 278. He also discussed the "ongoing discussion among students throughout pretty much 7 to 12" the following day that was "kind of a buzz up the building," and the planned student demonstration and the assembly the school held "[k]ind of as a counter measure to that." *Id.* Evans testified that the assembly was "about a 15 to 20-minute conversation," after which he "then sent students back to class," and that "[s]everal students stayed after," and "spen[t] a few minutes in the gym afterwards for their protest I guess." App'x 279.

The next day, the hearing officer, Kate Reid, issued Findings of Fact and Recommendations calling for Leroy's suspension through May 21 with the option to return earlier if he signed a student contract agreeing to the proposed

suspension.  In particular, Reid found that Leroy had violated two provisions of the Code of Conduct that prohibited "[e]ngaging in any willful act which disrupts the normal operation of the school community" and "[e]ngag[ing] in off-campus misconduct that interferes with, or can reasonably be expected to substantially disrupt the educational process in the school or at a school function."  App'x 461.

Evans suspended Leroy through May 21, 2021, and barred him from participating in all extracurricular activities for the remainder of the school year. Leroy was prohibited from playing football and baseball, going on the senior class trip, and attending the senior breakfast, the senior prom and graduation.  Leroy returned to school on May 10, 2021, after he signed a contract of conduct that included assurances he would "participate in any recommended Restorative Justice, Diversity, Equity and Inclusivity training opportunities offered or coordinated by the district."  App'x 468.  Leroy appealed Evans' decision to the Board, which affirmed the decision.

Leroy then sued the District and Superintendent Evans ("Defendants") in state court.  After the New York State Supreme Court granted him limited injunctive relief, Leroy was allowed to attend his high school graduation. Defendants then removed the case to the Southern District of New York.

Following discovery, Leroy moved for partial summary judgment and Defendants cross-moved for summary judgment in full. The district court granted Defendants' motion and denied Leroy's motion. The district court concluded that Defendants' disciplinary actions did not violate the First Amendment because the speech fell "outside of the First Amendment's ordinary protection" due to the "substantial disruption" Leroy's posts had caused. *Leroy v. Livingston Manor Central School District*, 2024 WL 1484254, at *10 (S.D.N.Y. April 5, 2024). The district court entered a final judgment and Leroy appealed.

## DISCUSSION

It is well-settled that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," but that those rights are "applied in light of the special characteristics of the school environment." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506 (1969). Nor does the school environment toggle on and off based on a school campus's geographical boundaries; rather "the school's regulatory interests remain significant in some off-campus circumstances." *Mahanoy*, 594 U.S. at 188. The boundaries of those off-campus circumstances are not always clear. Here,

however, we conclude that Leroy's off-campus speech fell outside the bounds of the school's regulatory authority.

## I.   The *Tinker* and *Mahanoy* Standard

Two Supreme Court opinions guide our analysis.  In 1969, in *Tinker v. Des Moines Independent Community School District*, the Supreme Court addressed "the area where students in the exercise of First Amendment rights collide with the rules of school authorities."  393 U.S. at 507.  There, several students planned to wear black armbands to school in an effort to "publicize their objections to the hostilities in Vietnam and their support for a truce."  *Id.* at 504.  The school, after learning of the plan, created a targeted policy:  They would ask any student wearing an armband to school to remove the armband, and if the student refused, they would be suspended from school until they returned without the armband.  *Id.*  The students wore black armbands to school as planned and were suspended.  *Id.*

The Supreme Court rejected the school's efforts to suppress the students' expression, holding that students retain their rights to free speech and expression even in school.  *Id.* at 506.  However, the Court noted, those rights are "applied in light of the special characteristics of the school environment," and are therefore subject to some limitations within the school context.  *Id.*  The Court reasoned that

"conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is . . . not immunized by the constitutional guarantee of free speech." *Id.* at 513.

In *Mahanoy Area School District v. B.L.*, the Supreme Court applied this framework to off-campus speech. There, a student—referred to as B.L.—who was upset at not making the varsity cheerleading team posted an image on her Snapchat story showing her and a friend "with middle fingers raised," with the caption: "Fuck school fuck softball fuck cheer fuck everything." *Mahanoy*, 594 U.S. at 185. She posted a second blank image with the caption "Love how me and [another student] get told we need a year of jv before we make varsity but tha[t] doesn't matter to anyone else?" *Id.* Another student took pictures of the posts and shared them, "and the images spread." *Id.* "[S]everal cheerleaders and other students approached the cheerleading coaches 'visibly upset' about B.L.'s posts," and "[q]uestions about the posts persisted during an Algebra class taught by one of the two coaches." *Id.* The coaches suspended B.L from the junior varsity cheerleading squad, finding that she had violated team and school rules by using profanity in connection with a school extracurricular activity. *Id.*

Asked to consider "whether *Tinker* . . . applies to student speech that occurs off campus," the Supreme Court held that "we do not believe that the special characteristics that give schools additional license to regulate student speech always disappear when a school regulates speech that takes place off campus." *Mahanoy*, 594 U.S. at 187–88. The Court declined to create a general rule about what constitutes off-campus speech and when a school can regulate that speech. *Id*. at 189. Instead, the Court "mention[ed] three features of off-campus speech that often, even if not always, distinguish schools' efforts to regulate that speech from their efforts to regulate on-campus speech," and "diminish the strength of the unique educational characteristics that might call for special First Amendment leeway." *Id*.

**First**, the Court noted that "a school, in relation to off-campus speech, will rarely stand *in loco parentis*," because "[g]eographically speaking, off-campus speech will normally fall within the zone of parental, rather than school-related, responsibility." *Id*. **Second**, "from the student speaker's perspective, regulations of off-campus speech, when coupled with regulations of on-campus speech, include all the speech a student utters during the full 24-hour day." *Id*. Thus, "courts must be more skeptical of a school's efforts to regulate off-campus speech,

for doing so may mean the student cannot engage in that kind of speech at all."
*Id*. at 189–90. ***Third***, "the school itself has an interest in protecting a student's
unpopular expression, especially when the expression takes place off campus." *Id*.
This is because "America's public schools are the nurseries of democracy," which
relies upon the "marketplace of ideas." *Id*. at 190.

The Court concluded that given the different circumstances in which
questions about regulation of off-campus speech might arise, "we can, as a general
matter, say little more than this:  Taken together, these three features of much off-
campus speech mean that the leeway the First Amendment grants to schools in
light of their special characteristics is diminished.  We leave for future cases to
decide where, when, and how these features mean the speaker's off-campus
location will make the critical difference." *Id*.

*Mahanoy* itself, the Supreme Court said, could provide one such example.
*Id*.  To decide whether that suspension violated B.L.'s First Amendment rights, the
Supreme Court considered three factors—(1) the nature of the speech; (2) when,
where, and how the student spoke; and (3) the school's interest in regulating the
speech—and concluded that the school's regulation of B.L.'s speech was improper.
*Id*. at 190–93.  Ultimately, the Court concluded:  "It might be tempting to dismiss

13

B.L.'s words as unworthy of the robust First Amendment protections discussed herein.  But sometimes it is necessary to protect the superfluous in order to preserve the necessary."  *Id.* at 193.

## II.    The District's Regulation Of Leroy's Speech

We use the same considerations to assess the District's regulation of Leroy's speech.  *First*, consider the nature of Leroy's speech.  As in *Mahanoy*, Leroy's speech "did not involve features that would place it outside the First Amendment's ordinary protection," because it did not amount to fighting words or to true threats and was not obscene under the Court's jurisprudence.  *Id.* at 191. While several students expressed the view that Leroy's post made them feel unsafe, his speech did not rise to the level of a "true threat" that would fall outside the scope of First Amendment protections.  Indeed, Leroy's post contained no threat at all, let alone a "'serious expression' conveying that a speaker means to 'commit an act of unlawful violence.'"  *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003) (alteration omitted)).  On the contrary, his speech was "the kind of pure speech to which, were [he] an adult, the First Amendment would provide strong protection."  *Mahanoy*, 594 U.S. at 191.

This is merely the starting point for our analysis.  Of course, if student speech on- or off-campus did constitute a "true threat," we would easily conclude

that a school could regulate or punish that speech without any need for extensive analysis under *Tinker* or *Mahanoy*, because that speech would fall outside the realm of First Amendment protection.  But this does not mean that schools can **only** regulate speech that, by virtue of the true threat doctrine or some other doctrine, already lacks First Amendment protection.  *Tinker* and *Mahanoy* make clear that because of the "the special characteristics of the school environment," *Tinker*, 393 U.S. at 506, the category of speech (both on-campus and off-campus) that a school can regulate is broader than the category of speech that lacks First Amendment protection writ large.[1]  Because we determine that Leroy's speech would be protected speech outside of the school environment, we proceed to assess the circumstances of that speech and its connection to the school.

**Second**, we consider "when, where, and how" Leroy spoke.  This, too, is virtually identical to the speech in *Mahanoy*.  Like B.L.'s posts, Leroy's post "appeared outside of school hours from a location outside the school," he "did not identify the school in [his] posts or target any member of the school community with vulgar or abusive language," and he "transmitted [his] speech through a

---

[1] Thus, just because speech does not constitute a "true threat" does not preclude a school from regulating that same speech.  As discussed *infra*, schools may indeed have legitimate interests in regulating student speech that does not rise to the level of a "true threat" as we have defined it in the adult context but that nonetheless makes other students feel threatened or unsafe.

personal cellphone, to an audience consisting of [his] private circle of Snapchat friends." *Id.* "These features of [his] speech, while risking transmission to the school itself, nonetheless . . . diminish the school's interest in punishing [Leroy's] utterance." *Id.*

The District argues that "[s]ocial media has changed the boundaries of the schoolhouse gates." Appellee Br. at 43. We are cognizant that speech on social media is inherently different than private speech. A post on social media speaks to a much larger audience than a remark to a private or limited audience. It therefore carries both a greater risk of transmission to the school environment— and greater power to disrupt the school environment, including by harming other students. But we cannot accept the contention that in today's world, a social media post made off-campus is equivalent to speech on campus. That is because *Mahanoy* explicitly addresses social media and maintained a distinction between on- and off-campus speech, treating the social media posts at issue there as off-campus speech. *See Mahanoy*, 594 U.S. at 189 (holding that three features of off-campus speech "diminish the strength of the unique educational characteristics that might call for special First Amendment leeway"). For better or worse, social media is a primary method of communication for students today, and allowing schools to

regulate all speech on social media as though it were on-campus speech risks preventing students from "engag[ing] in that kind of speech at all." *Id.* at 190.  The fact that social media "risk[s] transmission to the school itself," *id.* at 191, does not automatically bring it within the bounds of the school's regulatory authority. True, the mass audience of a social media post, and the accompanying consequences of such speech, may strengthen a school's legitimate interests in regulating that speech.  But we must still be "more skeptical of a school's efforts to regulate" it when it occurs off-campus.  *See id.* at 189–90.

The circumstances of Leroy's speech also lacked any meaningful connection to the school.  Leroy's audience of Snapchat "friends" included many students at the school, but that reflects the reality that students' social circles are largely composed of friends they make in school.  Again, *Mahanoy* teaches us that the fact that off-campus speech is directed, in part, to those friends is insufficient to establish the required connection between the speech and the school environment. There, B.L. spoke to an audience of Snapchat "friends" that included many other students.  And her post *was* about school—she complained about cheer, a school activity, wrote "fuck school," mentioned another student who also did not make the varsity cheer squad, and referred to other students who had made the squad.

*Id.* at 185.  Here, Leroy's off-campus Snapchat post was significantly less related to school than the posts that fell outside the bounds of school regulation in *Mahanoy*.

*Third*, we consider the school's stated interest in regulating Leroy's speech. Three different interests are at play, two of which mirror those considered in *Mahanoy*.  The record demonstrates that the school's decision to punish Leroy was motivated, at least in part, by the fact that "the perception of those images, what it depicts, is racist in nature," and the hope that "from this experience . . . [Leroy] has learned some valuable lessons that will serve him better down the road."  App'x 287.  In his summary judgment declaration, Evans opined that "the District has a significant interest in addressing racially offensive student speech and conduct." *Id.* at 478.  In his letter to Leroy, Evans emphasized that the hearing officer's ultimate recommendation was intended to be "sufficient to ensure that [Leroy] understands the seriousness of his actions" and "sufficient to deter other students from engaging in similarly insensitive conduct." *Id.* at 464.

But as in *Mahanoy*, the strength of the school's interest in preventing certain kinds of speech—there, vulgarity, and here, racially insensitive speech—"is weakened considerably by the fact that [Leroy] spoke outside the school on [his] own time."  594 U.S. at 192.  Also, as in *Mahanoy*, Leroy "spoke under

18

circumstances where the school did not stand *in loco parentis*," and "the school has presented no evidence of any general effort to [prevent such speech] outside the classroom." *Id*. These facts convince us that Livingston Manor's interest in teaching racial sensitivity is not sufficient to overcome Leroy's interest in free expression off-campus.

Moreover, the District had other means at its disposal to teach these values to its students, and it utilized many of them. Teachers led classroom discussions about the posts and the issues they raised. The District held an assembly about the same issues, facilitated a student demonstration, and led discussions for interested students. These steps demonstrate that penalizing speech is not the only way schools can foster important values. Often it will not be the most effective way to do so. And, most importantly for our purposes, the other methods at the District's disposal do not restrict speech.

Next, the district court's opinion and the District's brief here rely heavily on the District's interest in preventing disruption. *See Leroy*, 2024 WL 1484254, at *7–8. They assert that *Tinker* means a school can regulate any speech, on or off campus, that creates a substantial disruption or that the school reasonably believes will create such a disruption. *Id.* But this interest was also considered and rejected

19

in *Mahanoy*, under similar circumstances.  There, the Court found "no evidence in the record of the sort of 'substantial disruption' of a school activity or a threatened harm to the rights of others that might justify the school's action."  *Mahanoy*, 594 U.S. at 192.  Instead, "discussion of the matter took, at most, 5 to 10 minutes of an Algebra class 'for just a couple of days,'" and "some members of the cheerleading team were 'upset.'"  *Id.*  The Court concluded that "the alleged disturbance here does not meet *Tinker*'s demanding standard."  *Id.* at 193.

Here, too, the degree of in-school disruption does not justify restricting Leroy's speech.  The record reflects discussions about the posts in and out of class, leading to a fifteen-to-twenty-minute school-wide assembly and a nine-minute demonstration by several students.  We believe that this level of disruption did not give the school the authority to punish off-campus, otherwise protected speech that is only indirectly related to the school environment.  *See Tinker*, 393 U.S. at 508 ("[T]o justify prohibition of a particular expression of opinion, [a school] must be able to show that its action was caused by something more than the mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."); *Mahanoy*, 594 U.S. at 193 (same).

Nor does the **kind** of disruption relied upon by the school justify regulation of Leroy's speech. The disruption at issue was not due to Leroy's speech alone, but was also driven by the independent decisionmaking of others, including fellow students, parents, and the District, in responding to Leroy's speech.[2] *Tinker* suggests that the more relevant question is "disorder or disturbance **on the part of the petitioners**"—that is, disturbance on the part of the speakers themselves. 393 U.S. at 508 (emphasis added). This distinction is in line with the First Amendment principles the Supreme Court sought to uphold in *Tinker*:

> Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, and

---

[2] The concurrence takes issue with this distinction, arguing that "if the speech does cause a significant reaction, and specifically if it makes students fear for their safety and thereby disrupts learning, *and* the speaker recklessly provoked just that response, he can hardly complain that he is being punished for someone else's reaction." Concurrence at 29–30. We do not disagree. But we believe the critical distinction between that case and this one lies not in the nature or cause of any disruption, but in the need to protect students' safety. Suppose a student posts a highly controversial political view on social media—support for an unpopular candidate, for example—knowing that it risks upsetting some of his classmates and provoking a strong reaction. We would not hold that the speaker could be penalized for the speech because he "recklessly provoked" that response. Speech that makes students feel unsafe is entirely different. As set forth below, protecting the safety of the entire school community is an important, independent school interest that may justify regulation of even off-campus speech—and perhaps even speech that does not cause an immediate in-school disturbance. For this reason, it is an interest we believe should be analyzed separate and apart from the minutes of school disruption caused by the speech. Indeed, *Tinker* makes clear that these are separate categories where First Amendment protections may fall away in the school context: "But conduct by the student, in class or out of it, which for any reason . . . materially disrupts classwork *or* involves substantial disorder *or* invasion of the rights of others is, of course, not immunized by the constitutional guarantee of free speech." *Tinker*, 393 U.S. at 513. Regardless, the concurrence does not suggest that Leroy recklessly provoked an in-school disturbance. As discussed below, the record reflects the opposite.

> our history says that it is this sort of hazardous freedom—this kind of
> openness—that is the basis of our national strength and of the
> independence and vigor of Americans who grow up in and live in this
> relatively permissive, often disputatious, society.

*Id.* at 508–09. Tying a student speaker's constitutional right to free expression solely to the reaction that speech garners from upset or angry listeners cannot be squared with those principles. The disturbance in school the day after Leroy's posts does not justify regulating his speech.

Finally, this appeal raises a third school interest not present in *Mahanoy*: a school's interest in protecting members of the student body from offensive speech. *Tinker* recognized that in the school context, some speech may lose constitutional protection where it involves "invasion of the rights of others." 393 U.S. at 513. In this case, several students emailed teachers and the administration to report that Leroy's speech made them feel unsafe or uncomfortable. They reported that "posts like these can make students feel unsafe in their own school," App'x 295,"[a]ll POC students at LMCS are harmed and may even feel unsafe by the behavior demonstrated by these two students," *id.* at 307, "[t]he post had made me feel like it came from a place of hatred and makes me feel unsafe because at the end of the day these are people['s] lives and should not be treated as a running

joke," *id*. at 313, and that they did  not "feel comfortable being around classmates who happ[ily] make light of murder," *id*. at 344.

Leroy's speech therefore implicates the first feature of off-campus speech discussed in *Mahanoy* in a manner that B.L.'s speech did not.  As the Supreme Court explained, "a school, in relation to off-campus speech, will rarely stand *in loco parentis*," because off campus, the students' "actual parents" can "protect, guide, and discipline them."  *Mahanoy*, 594 U.S. at 189.  But when student speech off campus makes students feel unsafe on campus, schools may have an important parental role to play with respect to that speech.  It still may not be the school's job to "guide" and "discipline" students for their off-campus actions, but it certainly falls to the school to "protect" the school community by ensuring that students feel safe at school.

We, however, are required to balance this consideration with the other two features of off-campus speech emphasized by *Mahanoy*.  The Court noted that "the school itself has an interest in protecting a student's unpopular expression, especially when the expression takes place off campus."  *Id*. at 190.  And "from the student speaker's perspective, regulations of off-campus speech, when coupled with regulations of on-campus speech, include all the speech a student utters

during the full 24-hour day." *Id.* at 189. If schools can regulate off-campus expression because it upsets other students, they are effectively authorized to prohibit students from expressing unpopular views—in or out of school.

This conundrum requires us to draw a line between speech that is deeply offensive to other students—even reasonably so—and speech that threatens their sense of security. Schools can and must protect the school community from threats—including those that are not explicit or overt enough to rise to the level of "true threats"—that make students fear for their safety. We do not disagree with the concurrence's recognition of schools' critical responsibility to provide students the opportunity to "learn without fear." Concurrence at 10; *see generally* Concurrence at 8–13. But schools cannot—and should not—protect the school community from hearing viewpoints with which they disagree or engaging in discourse with those who have offended them. We readily acknowledge that doing so will at times be difficult. As *Mahanoy* emphasized, "schools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Id.* at 190. The ability to engage in civil discourse with those with whom we disagree is an essential feature of a liberal education.

Teaching students that they can and should be sheltered from speech that offends them is not.  At bottom, schools may sometimes restrict or penalize off-campus speech because it is threatening, but they cannot do so because it is offensive.

The line between the two will not always be clear, and getting it right is important.  Drawing the line too broadly carries significant dangers; courts cannot simply dismiss student expressions of fear as mere offense.  On the other  hand, drawing the line too close to the latter category carries a serious risk of chilling students' expression of unpopular opinions or any speech at all on sufficiently controversial topics.  After all, as much as we may hope that students will be attuned to the sensitivities of their classmates, they may not always know how their speech will be perceived by others.  Here, for example, crediting Leroy's testimony, he did not understand the offensive implications of his post.  And as soon as he did, he took it down and urged his friends to do the same.  If schools can punish such speech even when it occurs off-campus, we see a real risk of deterring students from coming anywhere near controversial topics.  We are called on to avoid such a chilling effect, even when doing so "shield[s] some otherwise proscribable" speech.  *Counterman*, 600 U.S. at 75.  The risk of chilling students' constitutionally protected speech counsels caution, particularly when it comes to

off-campus speech.  In so stating, we do not suggest "that student feelings can be dismissed as mere offense, not fear."  Concurrence at 14.  Rather, we acknowledge the significant and competing considerations that must inform a school's decisionmaking.

Although we recognize that adopting a bright line test here would aid schools in making these difficult determinations in future cases, we do not believe we can or should set out an exhaustive list or a broad rule about what speech falls on the "protected" side of the line as opposed to the "proscribable" side of the line. *See Mahanoy*, 594 U.S. at 189.  Our responsibility is to decide the case before us, and we do not presume to envision, much less account for, every other complex scenario schools may face.

Here, we conclude that the interest in protecting students on campus does not justify the District's response to Leroy's speech for two primary reasons.[3] **First**, the record is devoid of any indication that protecting students' sense of security was the District's interest in punishing Leroy.  To the contrary, the hearing

---

[3] We do not suggest that these are the only relevant considerations.  For example, we agree with the concurrence that "the broader context of the school community is particularly important to how a student would perceive the speech," and that "if there had been a recent pattern of harassment against a school's small Black student population, then a student might reasonably be more likely to see a given incident as another act in that pattern."  Concurrence at 15.

officer's recommendation was based on the desire to "impose a penalty that is sufficient to ensure that [Leroy] understands the seriousness of his actions and that is sufficient to deter other students from engaging in similarly insensitive conduct." App'x 462.  Evans' Affidavit below explained that he "believe[s] the District has a significant interest in addressing racially offensive student speech and conduct." *Id.* at 478.  These statements express a desire to punish the speech because it was viewed as offensive—not because it was viewed as threatening or because it made other students fear for their safety.

**Second**, the record is clear that Leroy did not intend to threaten, bully, or harass any other students.  It is undisputed that Leroy removed the picture from his Snapchat story within minutes, as soon as he learned how people were reacting to it.  *Id.* at 95–97, 112–19, 215–18, 553–54.  It follows that Leroy did not want to provoke that reaction.[4]

In sum—balancing (i) the nature of Leroy's speech; (ii) when, where, and how he spoke; and (iii) the school's interests in teaching racial sensitivity, in preventing disruption in school, and in protecting the school community—we

---

[4] The concurrence would insert a finding of intent as a prerequisite to regulating student speech off-campus that makes other students feel unsafe.  We decline to engage with that proposal because we need not adopt such a rule to resolve this case and because we are mindful of the Supreme Court's reluctance to adopt any bright line rules in *Mahanoy*.

conclude that the school's interests here do not justify the regulation of Leroy's speech, which otherwise would be protected by the First Amendment.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings.