UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

STEPHEN KERSHNAR,

        Plaintiff,

    v.                                23-CV-525-LJV
                                            DECISION & ORDER

STEPHEN H. KOLISON, JR. et al.,

        Defendants.

_____

On June 12, 2023, the plaintiff, Stephen Kershnar, commenced this action against Stephen H. Kolison, Jr., the President of the State University of New York at Fredonia ("SUNY Fredonia"), and David Starrett, the SUNY Fredonia Vice President and Provost. Docket Item 1. Kershnar, a philosophy professor at SUNY Fredonia, alleges that the defendants violated his First Amendment rights by "banish[ing] him from the classroom, from the [SUNY Fredonia] campus, and from any contact with the 'campus community'" due to public outcry over certain comments that he made on two podcasts. *See id.* ¶¶ 1, 4.

On the same day he filed the complaint, Kershnar also moved for a preliminary injunction returning him to the SUNY Fredonia campus, allowing him to continue to teach, and protecting him from "disciplinary action . . . arising from his commentary on matters of public concern." Docket Item 3 at 1. About two weeks later, the defendants opposed the motion for a preliminary injunction and moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). Docket Item 13. Kershnar then responded to the motion to dismiss, Docket Item 15, and the defendants replied, Docket

Item 16.  At the Court's direction, *see* Docket Item 87, the parties submitted additional briefing on the motion to dismiss, *see* Docket Items 88, 89, 90, and 91.

After an evidentiary hearing over three days on the motion for a preliminary injunction, *see* Docket Items 50, 51, and 64, both sides asked for time to try to negotiate an amicable resolution.  Now that the attempt to resolve the case amicably has failed, the Court addresses the pending motion to dismiss.[1]  And for the reasons that follow, the defendants' motion to dismiss is denied.

### BACKGROUND[2]

Kershnar is a "public intellectual," speaker, and author who has taught philosophy at SUNY Fredonia since 1998.  Docket Item 1 ¶¶ 11, 22.  He was initially hired as an Assistant Professor, *id.* ¶ 35; was promoted to "full professor" in 2005, *id.* ¶ 36; and was made Chair of the Department of Philosophy from 2013 to 2019, *id.* ¶ 39.

After he was hired at SUNY Fredonia, Kershnar's academic career flourished. He taught a variety of undergraduate philosophy courses—from introductory courses to advanced courses exploring more emotionally charged topics such as sexual ethics. *See id.* ¶ 23.  In the classroom, "[Kershnar] is known for promoting unpopular or

---

[1] Kershnar's motion for a preliminary injunction is still pending, and the Court has scheduled the continuation of the evidentiary hearing on that motion.  *See* Docket Item 87.

[2] The following facts are taken primarily from the complaint, Docket Item 1.  On a motion to dismiss under Rule 12(b)(6), courts "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

previously ignored positions" and thereby "lead[ing] those who disagree with him to sharpen their own views." *Id.* ¶ 38.

In fact, Kershnar has been formally honored for his "unique and effective style of teaching." *See id.* ¶¶ 37-38, 40-41. In 2011, for example, he was given the Chancellor's Award of Excellence in Scholarship and Creative Activities, which "recognizes superior professional achievement throughout the State University of New York system." *Id.* ¶ 37. Three years later, the SUNY Board of Trustees named Kershnar a SUNY Distinguished Teaching Professor, "SUNY's highest academic honor." *Id.* ¶ 40.

Kershnar's professional activities are not limited to the classroom. Outside his teaching and research obligations as a professor, he routinely "publishes books, makes speaking appearances, engages in public debates, and publishes columns on a range of public concerns." *Id.* ¶¶ 22, 24. Like his teaching, Kershnar's books, articles, and speaking engagements explore controversial positions on topics that include gratitude to veterans, abortion, slavery, torture, the duty to tip, and adult-child sex, *see id.* ¶¶ 24-26, with the goal of "question[ing] the core assumptions society makes about the role of morality and law," *see id.* ¶ 2.

Among the many topics he studies, Kershnar is especially interested in the "moral and legal issues implicated by sexual conduct [between] adolescents and children." *See id.* ¶ 47. His scholarship questions "whether, as a moral matter, adult-child sex is always wrong, and why we should criminalize it" even though he believes that "as a legal matter, [it] should always be criminalized." *See id.* ¶ 49. "Kershnar argues that it is important that the arguments favoring criminalization of [adult-child sex]

be scrutinized so that they are defensible, [because] 'if incorrect reasons are given recognition in support of morally legitimate laws,' like those against [adult-child sex], 'then th[o]se reasons may . . . be used to support morally illegitimate' laws." *Id.* ¶ 50 (emphasis omitted).

Kershnar elaborated on these views during two podcast appearances. *See id.* ¶¶ 54-55, 59-62, 68; *see also* Docket Item 13-1 at 9-10. In December 2020, he appeared on an episode of *Unregistered*—a podcast hosted by an Occidental College professor—to discuss "the traditional philosophical justifications of age[-]of[-]consent laws in the United States." Docket Item 1 ¶¶ 54-55, 59. During that episode, he said that "it[ i]s not obvious to [him] why" adult-child sex is always "unlawful because . . . humans are designed by evolution to begin reproduction below the age of 18." *Id.* ¶ 61.

A little more than a year later, on January 30, 2022, Kershnar appeared on *Brain in a Vat*, a podcast described as "thought experiments and conversations with philosophers." *Id.* ¶¶ 62, 64 (internal alteration omitted). During that appearance, Kershnar said:

> Imagine that an adult male wants to have sex with a 12-year-old girl. Imagine that she's a willing participant. A very standard, very widely held view is that there's something deeply wrong about this, and it's wrong independent of being criminalized. It's not obvious to me that it is in fact wrong.

*Id.* ¶ 68. Similarly, in response to a question about "whether. . . [,] in an attempt to find a threshold of consent," a one-year-old could ever consent to sexual activity with an adult, Kershnar said:

> The notion that it's wrong even with a [one]-year-old is not quite obvious to me. There are reports in some cultures of grandmas fellating the baby boys[] to calm them down when they're colicky. Now, I don't know if this is true, but this is sort of widely reported as occurring in at least one culture[,] and . . . the grandmas believe that this actually works. If it were to be

4

true . . . [,] it's hard to see what would be wrong with it.  So . . . , I don't think there is a blanket period beyond which this is permissible.

*See* Docket Item 13-1 at 9-10 (internal alterations omitted).  After Kershnar's appearance on that podcast, the hosts said:

Kershnar believes that one of the tasks of an ethicist is to scrutinize the moral justifications for societal taboos.  It is insufficient to merely *assert* that a kind of behavior is wrong—we ought to try to understand *why* it is wrong.

Docket Item 1 ¶ 69.

Kershnar says that neither of the podcast appearances "were . . . part of his official duties" as a SUNY Fredonia professor.  *See id.* ¶ 70.  He recorded both podcast episodes "outside . . . his regular working hours," and he prepared for both episodes "at home on his own time."  *See id.* ¶¶ 57-58, 65-66.  SUNY Fredonia has never been involved in any way with Kershnar's public appearances or podcasts, nor has it required him to engage in any such activities.  *See id.* ¶¶ 30-33.

On February 1, 2022—two days after the *Brain in a Vat* episode aired— Kershnar's appearances went viral on Twitter,[3] initiating an investigation and his removal from campus.[4]  *Id.* ¶¶ 73-77, 79-80, 85-88, 94-95.  A few hours after video clips

---

[3] "Twitter, Inc., has since been merged into X Corp., a subsidiary of X Holdings Corp."  *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 479 n.3 (2023).  Because the platform was still named Twitter, Inc., when the events described here transpired, the Court will refer to it as "Twitter."

[4] The defendants say that a video of Kershnar's podcast appearance was posted "on the day it aired"—January 30, 2022.  Docket Item 13-1 at 9-10; Docket Item 1 at ¶ 62.  But Kershnar says that it was posted two days later—on February 1, 2022.  Docket Item 1 at ¶ 73.  For the purposes of this decision and order, the Court accepts the facts in Kershnar's complaint as true and therefore assumes that the video was posted on February 1, 2022.

of the appearances were shared, SUNY Fredonia "tweeted" a message from President

Kolison stating:

> SUNY Fredonia is aware of a video posted online involving one of its
> professors.  The views expressed by the professor are reprehensible and
> do not represent the values of SUNY Fredonia in any way, shape[,] or form.
> They are solely the professor's views.  The matter is being reviewed.

*Id.* ¶ 79.  Two days later, on February 3, 2022, SUNY Fredonia Chief of Police Brent

Isaacson "ordered Kershnar not to come to the SUNY Fredonia campus."  *Id.* ¶¶ 80, 85-

86.  Chief Isaacson invoked "concerns about security, but declined to describe the

nature, extent, or source of those concerns."  *Id.* ¶ 87.

That same day, Kershnar's office was searched, and his computer was seized for

"analysis."  *Id.* ¶¶ 94-95.  SUNY Fredonia's Human Resources Director, Maria Carroll,

also sent Kershnar a letter "direct[ing]" that he "'not . . . be on college property[] or have

contact with the campus community' without her permission."  *Id.* ¶ 98.  The letter told

Kershnar that he was "to perform an alternate work assignment from an alternate

location."  *Id.* ¶ 96.  Although the reason for those restrictions purportedly was campus

safety, "SUNY Fredonia was 'not able to compile the list of specific [safety] threats at

th[at] time due to the volume involved,'" and Carroll could not tell Kershnar how long the

directives would last.  *See id.* ¶¶ 99-100.

Later that day, the SUNY Fredonia Twitter account published another message

from Kolison.  *Id.* ¶ 101.  In that message, Kolison "reiterate[d his] earlier statement that

[he] view[ed] the content of the video as absolutely abhorrent" and "stress[ed] . . . that

the independent viewpoints of [Kershnar] are in no way representative of the values of

the SUNY Fredonia campus."  *Id.*

Kershnar was scheduled to teach three classes during the fall 2022 semester. *Id.* ¶ 115.  But on August 24, 2022—two days after the semester began—Starrett "sent Kershnar a letter continuing [his] banishment from campus and classes."  *Id.* ¶¶ 116-17. As a result, the three classes were cancelled.  *See id.* ¶¶ 121-22.

Kershnar received another letter—dated November 1, 2022—extending his ban on teaching to the spring 2023 semester.  *Id.* ¶¶ 127-28.  That letter repeated that Kershnar would not be allowed to teach "due to ongoing concerns regarding [his] safety and the safety of others on campus should [he] return to the campus."  *Id.* ¶ 128. "Instead of teaching," Kershnar was to survey other universities' philosophy curricula "to consider what courses should be offered at SUNY Fredonia" and to "complete [the] training required . . . to teach online so that he could develop course materials for other instructors to teach two [online p]hilosophy courses."  *Id.* ¶¶ 130-31.

About a year-and-a-half after all that began, Kershner filed this lawsuit.  *See id.* Now, more than four years after the start of his suspension, Kershnar remains banned from teaching at SUNY Fredonia or being on the school's campus, as well as from communicating with members of the SUNY Fredonia community.  *See* Docket Item 87 (suggesting that Kershnar is still pursuing his motion for a preliminary injunction returning him to the SUNY Fredonia campus, allowing him to continue to teach, and protecting him from "disciplinary action . . . arising from his commentary on matters of public concern," Docket Item 3 at 1).  He "has declined speaking engagements on subjects that may be controversial out of concern that his remarks will [spark further] investigation into his January 2022 remarks."  Docket Item 1 ¶ 167.

## DISCUSSION

The complaint includes four causes of action.  The first three request injunctive and declaratory relief in connection with the different ways that Kershnar alleges his First Amendment rights were violated: "[c]ontent and [v]iewpoint [d]iscrimination," *id.* at 33-37; "[r]etaliation," *id.* at 37-39;[5] and "[p]rior [r]estraint," *id.* at 40-42.  The fourth seeks damages, including punitive damages, against Kolison individually for "[d]irect and [r]etaliatory [i]nfringment[] of [f]reedom of [s]peech."  *Id.* at 42-44.

The defendants argue that Kershnar has failed to state a claim for several reasons.  Docket Item 13-1 at 8.  First, they say that Kershnar's speech is not entitled to First Amendment protection under the Supreme Court's decision in *Pickering v. Board of Education* because it "was not made as a private citizen on a 'matter of public concern.'"  *Id.* (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1986)).  "[E]ven if [Kershnar]'s speech was on a matter of public concern," the defendants say, "his interests are outweighed by SUNY Fredonia's interest in the safety, security, and efficient operations of the [u]niversity."  *Id.*  And the defendants say that because Kershnar's claim fails under *Pickering*, he also "has no claim based upon prior restraint." *Id.* at 27.

The defendants argue that Kershnar's retaliation claim fails because he has not "suffered an adverse employment action by being asked to remain off campus"—that is,

---

[5] What Kershnar calls "content and viewpoint discrimination" is really the same as what he calls "retaliation": both causes of action seek relief because of some punishment allegedly imposed as a result of Kershnar's speech.  But because both sides address these claims separately in their briefing and raise distinct arguments with respect to each, the Court will use the same organizational structure here.

he still is employed and receiving a paycheck. *Id.* at 25. And even if that were not true, the defendants say, Kershnar's retaliation claim still would fail because his speech was not the motivating factor for their actions. *See id.* at 25-26. Finally, the defendants say that "Kolison is entitled to qualified immunity as to [Kershnar]'s claim for money damages." *Id.* at 9, 29-30.

## I.    LEGAL PRINCIPLES

### A.    Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

### B.    Section 1983 Claims

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. Cnty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation

of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985)).

## II. ANALYSIS

### A. Content and Viewpoint Discrimination

"Over time . . . , the Supreme Court . . . assembled a two-pronged test"—colloquially, the *Pickering* test—"to determine whether the First Amendment insulates a public employee from an alleged retaliatory act by [his or her] employer." *Heim v. Daniel*, 81 F.4th 212, 223-24 (2d Cir. 2023). "[F]irst, a court must determine whether the speech which led to an employee's discipline relates to a matter of public concern[. I]f so, the [court must then] balance . . . free speech concerns . . . against efficient public service to ascertain to which the scale tips." *Melzer v. Bd. of Educ. of City Sch. Dist. of N.Y.C.*, 336 F.3d 185, 193 (2d Cir. 2003) (citing *Rankin v. McPherson*, 483 U.S. 378, 384, 388 (1987)).

In 2006, *Garcetti v. Ceballos*, 547 U.S. 410 (2006), "narrowed" that test. *See Heim*, 81 F.4th at 224 (citing *Weintraub v. Bd. of Educ. of City Sch. Dist. of N.Y.C.*, 593 F.3d 196, 201 (2d Cir. 2010)). In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their *official duties*, [they] are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421 (emphasis added). But the Court left open the question of whether that same analysis applies to university professors like Kershnar who arguably are entitled to heightened academic freedom. *See id.* at 425 (acknowledging that "[t]here is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional

10

interests that are not fully accounted for by th[e] Court's customary employee-speech jurisprudence").

The Second Circuit has since answered that question. In *Heim*, it held that claims "founded on" a public university professor's teaching and academic writing must be evaluated "outside of *Garcetti*'s 'official duties' framework." 81 F.4th at 228. The court explained that "professors at public universities are paid[—]if perhaps not exclusively, then predominantly[—]to speak, and to speak freely, guided by their own professional expertise, on subjects within their academic disciplines." *Id.* at 226-27. In fact, "their universit[ies'] 'governmental function' is to provide them a forum to do so." *Id.* at 227 (citing *Garcetti*, 547 U.S. at 419) (internal alteration omitted). And because "*Garcetti*'s bar on First Amendment protection for any 'official-duty' speech would . . . exil[e] all public[ ]university faculty scholarship and instruction from the shelter of the First Amendment," it cannot apply to university professors, as it would offend "the Supreme Court's long-professed, 'deep commitment to safeguarding academic freedom' as 'a special concern of the First Amendment.'" *See id.* (internal alternations omitted).

"[I]n *Garcetti*'s absence, we are left with the line of authority extending from *Pickering*." *Id.* at 228. This Court therefore will apply *Pickering* to Kershnar's claims without addressing whether Kershnar was speaking as part of his "official duties" as a SUNY Fredonia professor.

### 1. Public Concern

The first prong of the *Pickering* test asks whether the relevant speech addresses a "'matter[] of public concern' as opposed to . . . only [a] matter[] of personal concern."

*Melzer*, 336 F.3d at 193 (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)).  That inquiry incorporates "the content, form, and context of a given statement, as revealed by the whole record."  *Connick*, 461 U.S. at 147-48.  A statement's "inappropriate or controversial" nature, however, is irrelevant.  *Rankin*, 483 U.S. at 387.

Second Circuit caselaw suggests that the debate about the moral and philosophical justifications for criminalizing adult-child sex is a matter of public concern.  In *Melzer*, the Second Circuit applied the *Pickering* balancing test to a high school teacher's association with a group that advocated normalizing sexual activity between men and boys.  *See* 336 F.3d at 193-200.  Although the court did not definitively resolve the public concern issue in that case, it said that the speech at issue "support[ed]" changes in "attitudes and laws regarding [the] age of consent" and that "[a]dvocacy for a change in public perception and law, a fundamental component of democracy, is certainly a matter of public concern, regardless of the underlying subject matter."  *See id.* at 196.  And it noted in dicta that "even if [it] were somehow to parse [the plaintiff]'s activity into the public concern test, most of it would likely pass."  *Id.*  The court elected not to apply the test because it would be "awkward" given the "hybrid speech/associational nature of the rights involved."  *Id.*  But that is not the case here where Kershnar's statements—not activities or associations—are precisely what is at issue.

Indeed, the defendants concede that "[d]iscuss[ing] . . . what the law should be" is a matter of public concern.  *See* Docket Item 13-1 at 21.  But they say that Kershnar's statements—such as asking the podcast audience to imagine that an adult wants to have sex with a 12-year-old—went "beyond" the topic of age-of-consent laws and

morality.  *See id.*  The defendants also say that Kershnar's mention of "grandmothers fellating the baby boys" was "graphic[]" and therefore "not of value and concern to the public at the time of publication."  *See id.*  In support of this point, the defendants compare Kershnar's statements to those in another Second Circuit case, *Vega v. Miller*, 273 F.3d 460 (2d Cir. 2001), where a "legitimate pedagogical" exercise went "too far once 'sexually explicit words' were being uttered in the classroom."  Docket Item 16 at 4-5 (quoting *Vega*, 273 F.3d at 467).

In *Vega*, a "free-association exercise" designed to reduce the use of repetitive words in "college-level essays" turned into a free-for-all, "with all but one of the students yelling and two standing on chairs" shouting "vulgarit[ies]" while the professor "wrote many of the words on the blackboard."  *Vega*, 273 F.3d at 462-63.  The defendants say that just as the classroom speech in *Vega* went "too far," Kershnar's podcast speech went too far.  Docket item 16 at 4-5.  And for that reason, the defendants say, Kershnar's speech was not entitled to First Amendment protection.  *See id.*

This Court disagrees.  First, *Vega* did not hold that the speech was not entitled to First Amendment protection; rather, it held that the individual defendants were entitled to qualified immunity because in 1994 the law was unsettled about whether a professor could be disciplined for "not exercising professional judgment to terminate" classroom vulgarity.  *See Vega*, 273 F.3d at 468.  Moreover, as Kershnar correctly notes, *see* Docket Item 15 at 20, his statements involved "hypotheticals in 'a philosophical thought experiment'" about age-of-consent laws and the moral justifications for them—a far cry from a classroom exercise where students shouted out "vulgar, sexually explicit words and phrases, many of which the professor wr[ote] on the blackboard," *see Vega*, 273

F.3d at 467.  And while Kershnar's specific examples—such as "grandmothers fellating . . . baby boys," *see* Docket Item 13-1 at 21—were graphic, they were made not gratuitously but precisely in the context of a broader discussion of age-of-consent laws. In fact, at least one of Kershnar's "graphic" statements was made in response to a question about finding a threshold age of consent for sexual activity between adults and children, *see id.* at 9-10, which "is certainly a matter of public concern."  *See Melzer*, 336 F.3d at 196.  *Vega* is therefore distinguishable both legally and factually.

In sum, Kershnar's statements were made in the broader context of a philosophical discussion about adult-child sex and the age of consent, which the Second Circuit has suggested is a matter of public concern.  And for that reason, Kershnar spoke on a matter of public concern during his *Unregistered* and *Brain in a Vat* appearances.

### 2.    Adequate Justification

The second part of the *Pickering* test requires the court to balance the government's interest in preventing disruption and promoting efficiency against the employee's freedom of speech.  *See Pickering*, 391 U.S. at 568; *see also Melzer*, 336 F.3d at 192-93.  That balance "allows the government a degree of control over its employees to permit it to provide services to the public efficiently and effectively . . . , but ensures that public employers do not use their authority to silence discourse 'not because it hampers public functions but simply because superiors disagree with the content of the employees' speech.'"  *Melzer*, 336 F.3d at 192-93 (quoting *Rankin*, 483 U.S. at 384 (internal citations and alterations omitted)).  Moreover, "the government bears the burden of justifying its adverse employment action."  *Piscottano v. Murphy*,

511 F.3d 247, 271 (2d Cir. 2007).  "Any actual disruption that has already occurred is of course a persuasive argument for the government that it has met its burden, but even a showing of probable future disruption may satisfy the balancing test, so long as such a prediction is reasonable."  *Melzer*, 336 F.3d at 197.

The defendants argue that they have met their burden of showing that they banned Kershnar from entering the SUNY Fredonia campus or communicating with the SUNY Fredonia community because they reasonably predicted that those activities would cause danger and disruption.  *See* Docket Item 13-1 at 21-24.  In making that prediction, the defendants say, they reasonably relied on Chief Isaacson's four assessments issued between February 2, 2022—three days after Kershnar's comments went viral, *see* Docket Item 1 ¶¶ 73-77—and October 31, 2022.  *See* Docket Item 13-1 at 22; *see also* Docket Item 13-3 ¶¶ 13, 21, 37, 44 (describing Chief Isaacson's assessments).  Those assessments, which "remained unchanged" until Chief Isaacson's retirement, were based primarily on threats circling the dark web, threatening social media comments, emails "expressing disgust and revulsion at Kershnar's messages," the subject matter of the allegations against Kershnar, and the typical behavior of attackers.  *See* Docket Item 13-3 ¶¶ 13-49, 52; *see also* Docket Item 13-1 at 22-23.  Based on all that, the defendants say, their decision to ban Kershnar from campus and issue a no-contact order was "eminently reasonable."[6]  *See* Docket Item 13-1 at 23.

---

[6] The defendants also argue that "[i]n addition to the threats of violence[,] . . . the SUNY Fredonia campus was predictably disrupted in other ways by [Kershnar]'s speech[: a]lumni threatened to pull and withhold financial support, students threatened to disenroll, and parents threatened to disallow their children from attending SUNY Fredonia."  Docket Item 13-1 at 23; *see* Docket Item 13-2 at 24, 27.

But as Kershnar observes, the defendants have repeatedly failed to identify credible threats against Kershnar or to provide any evidence that the risk of danger continued after February 2022.  According to Kershnar, law enforcement—namely the Fredonia Village Police Department, the New York State Police, and the Chautauqua County Sheriff's Office—"had no records concerning Kershnar or communications with SUNY Fredonia" from January 2022 until either January or April 2023.  *See* Docket Item 1 ¶¶ 140-42.  Moreover, Chief Isaacson's assessments cited violent comments directed at Kershnar, *see* Docket Item 13-3 ¶¶ 13-49, but his conclusions were based on nothing more than a theory: that because SUNY Fredonia cannot monitor the "aggrieved" off-campus population's pre-attack behaviors, eliminating the reasons for the violent comments is the "first step" toward stopping "the pathway of violence."  *See id.* ¶¶ 28-29, 31, 39-43, 45-48.  And Charles Holder, the Interim Chief of Police after Isaacson retired, did not make his own findings about whether the threat of violence continued after he began his service but instead based his opinion on Isaacson's prior findings and Holder's "experience in law enforcement."  *See* Docket Item 13-4 ¶ 6.

---

But the letters Kershnar received about the decision to ban him from campus and from contact with the SUNY Fredonia community mention preventing danger as their only justification.  *See* Docket Item 1 ¶¶ 96, 98-99, 117-18, 127-28.  Moreover, Chief Isaacson based his recommendations only "on preserving the physical safety of the SUNY Fredonia campus and Kershnar himself."  Docket Item 13-3 ¶ 53.

So even though "efficiency" and the "disruption of operations" may in some instances justify a public employer's interference with its employee's First Amendment rights, *see Piscottano*, 511, F.3d at 271, the Court need not entertain those justifications here.  There is little—if any—evidence in the record that the defendants were concerned with disruptions unrelated to "physical safety" when they banned Kershnar from entering campus or communicating with members of the SUNY Fredonia community.  And even if there were such evidence, the Court would not consider it on a motion to dismiss.

Finally, and most important, the defendants' argument is based on facts and evidence, not on the sufficiency of Kershnar's pleading. While those facts and that evidence might ultimately support a motion for summary judgment, they are of little value on a motion to dismiss, which requires a defendant to show that the plaintiff's claims are not facially plausible. *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Kershnar has sufficiently alleged that the defendants did not adequately justify the adverse actions that they took against him, and the defendants' motion to dismiss therefore lacks merit.

### B.    Retaliation

"To make out a prima facie case of First Amendment retaliation, a plaintiff must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 82 (2d Cir. 2022) (citation and internal quotation marks omitted). The first prong of that test overlaps with the *Pickering* analysis, and this Court already has found that Kershnar's speech is protected. So the question is whether Kershnar has adequately pleaded the remaining two factors. And he has.

#### 1.    Adverse Action

On the issue of whether Kershnar suffered any adverse action, the defendants note that he continues to receive his full salary and that he was given the opportunity to develop online courses. Docket Item 13-1 at 25. They also say that not re-assigning Kershnar to teach in-person or online classes was a decision made by the provost in his sole discretion. *Id.* Kershnar responds that the order preventing him from stepping on

campus, the no-contact order, and the initiation of an investigation based on his protected speech were adverse actions. *See* Docket Item 1 ¶ 216; Docket Item 15 at 21-25.

Kershnar has the better argument: even though he is still being paid, the inability to communicate with students and faculty and to teach in-person classes undoubtedly are adverse actions, as those activities go to the heart of a university professor's work. To start, not being able to teach or communicate with students and colleagues almost certainly reduces a professor's job and promotion prospects, not to mention the adverse effect on professional standing and self-satisfaction. Moreover, Kershnar says that he was asked to complete online training only so that he could review SUNY Fredonia's course offerings, establish curriculum for other professors, or teach asynchronous classes himself, Docket Item 1 ¶¶ 130-31; *see* Docket Item 15 at 23-24 n.9. So the question was never whether Kershnar took the necessary steps to put himself in a position to teach live in-person or online classes—it already had been decided that he would not be able to do that. *See* Docket Item 1 ¶¶ 130-31; *see also* Docket Item 15 at 23 n.9. Kershnar therefore has sufficiently pleaded that he suffered adverse action.

### 2.    Causal Connection

Kershnar also has sufficiently alleged a causal connection between the protected speech and the adverse action. "To demonstrate a causal connection[,] 'a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action.'" *Smith v. Cnty. Of Suffolk*, 776 F.3d 114, 118 (2nd Cir. 2015) (quoting *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 167 (2d Cir. 2006)). And that causal link can be established "either directly through a showing of

18

retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Id.* (citing *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004) (internal citation omitted)).

Kershnar has established a causal link between his statements on the podcast and the adverse actions taken against him both by virtue of the temporal connection and by pleading a retaliatory animus. Just two days after Kershnar appeared on the *Brain in a Vat* podcast and hours after a clip from the podcast went viral, Kolison, the SUNY Fredonia President, called Kershnar's comments "reprehensible," *see* Docket Item 1 ¶¶ 62, 73-77, 79; two days later, Kolison called Kershnar's statements "absolutely abhorrent," *id.* ¶ 101, and Kershnar was "ordered . . . not to come to the SUNY Fredonia campus," *id.* ¶ 86. That same day, the school sent Kershnar a letter "direct[ing]" that he "'not [] be on college property[] or have contact with the campus community' without . . . permission," and instructing him to "perform an alternate work assignment from an alternate location." *Id.* ¶¶ 96, 98. And those bans continue to this day.

The temporal connection between Kershnar's statements and his being banned from teaching and from campus—just a few days—would be enough to establish a causal connection. The statements by the university president condemning what Kershnar said as "reprehensible" and "absolutely abhorrent" seal the deal. Kershnar certainly has pleaded a causal connection between his words and the adverse action taken against him.

In sum, Kershnar has plausibly alleged that he was subject to adverse action as a result of his protected speech. He therefore has adequately pleaded a retaliation claim.

### C.    Prior Restraint

Kershnar alleges that the order barring him from contacting anyone in the SUNY Fredonia community without permission is an unconstitutional prior restraint on his speech. *Id.* ¶¶ 230-33. He alleges prior restraint both "as an independent cause of action and as [an] adverse action[] under the retaliation and content/viewpoint discrimination causes of action." Docket Item 15 at 26 n.10.

As the defendants note, Docket Item 13-1 at 26, the *Pickering* test applies to "'particularized' . . . instead of 'generally applicable'" restrictions on speech. *Marinoff v. City Coll. of N.Y.*, 357 F. Supp. 2d 672, 687 (S.D.N.Y. 2005); *see also Latino Officers Assoc., N.Y., Inc. v. City of New York*, 196 F.3d 458, 464 (2d Cir. 1999). But there is no question that Kershnar's claims arise out of particularized orders that restricted only his speech. Moreover, this Court already has addressed the defendants' prior restraint on Kershnar's speech—barring him from contact with the SUNY Fredonia community and from teaching in-person classes—in the context of his other claims. *See supra* II.A-B. Therefore, and for the reasons stated above, Kershnar has sufficiently pleaded prior restraint as an independent cause of action, and the defendants' motion to dismiss that claim is denied.

### D.    Qualified Immunity for Damages

In addition to his request for declaratory and injunctive relief, Kershnar also seeks compensatory and punitive damages from Kolison individually. *See* Docket Item

1 at 42-44.  The defendants argue that Kershnar's claims for damages should be dismissed because Kolison is qualifiedly immune from liability.  *See* Docket item 13-1 at 29-30.

Under qualified immunity, "[g]overnment officials are 'shielded from liability for civil damages [for] conduct [that] does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Vega*, 273 F.3d at 466 (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999))).  But on a motion to dismiss, "a defendant asserting a qualified immunity defense . . . 'faces a formidable hurdle . . .  and is usually not successful.'"  *Barnett v. Mount Vernon Police Dept.*, 523 F. App'x. 811, 813 (2d Cir. 2013) (summary order) (quoting *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191-92 (2d Cir. 2006)).  That is because a plaintiff opposing a motion to dismiss "is entitled to all reasonable inferences from the facts alleged," including those that defeat the qualified immunity defense. *See Hyman v. Abrams*, 630 F. App'x. 40, 42 (2d Cir. 2015) (summary order) (quoting *McKenna v. Wright*, 386 F.3d 432, 36 (2d Cir. 2004)).  Therefore, a district court may grant a motion to dismiss based on qualified immunity only in a rare case where the "defense is based on facts appearing on the face of the complaint."  *See McKenna*, 386 F.3d at 436.  This is not that case.

The defendants say that Kolison's decisions and actions did not violate Kershnar's clearly established rights because the Supreme Court's decision in *Garcetti* created uncertainty about whether Kershnar's speech "on a topic of his academic research at SUNY Fredonia" might have been part of his official duties and therefore not protected under the First Amendment.  *See* Docket Item 13-1 at 30; *see also* Docket

Item 16 at 12-13.  More specifically, when Kershnar was first banned from teaching and being on campus, the law was unclear about whether *Garcetti*'s "official duties" test, *see Garcetti*, 547 U.S. at 425, applied to university professors because *Heim* had not yet been decided, *see Heim*, 81 F.4th at 227-28 (holding that claims "founded on" a public university professor's teaching and academic writing must be evaluated "outside of *Garcetti's* 'official duties' framework" (citation omitted)).  But that uncertainty does not give rise to Kolison's qualified immunity for two reasons.

First, at this stage, the Court must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund*, 843 F.3d at 566; *see also Hyman*, 630 F. App'x. at 42 (quoting *McKenna*, 386 F.3d at 435-36).  Kershnar alleges that his speech had nothing to do with his "official duties" as a SUNY Fredonia professor:  He says that he recorded and prepared for both podcasts at home, with his own equipment, and outside his normal working hours, *see* Docket Item 1 ¶¶ 57-58, 65-67; that SUNY Fredonia did not require, direct, or facilitate any of his outside speaking, *see id*. ¶¶ 30-33; and that, in fact, SUNY distinguishes its professors' teaching and research responsibilities from their role as citizens, *id*. ¶ 34.  Accepting those allegations as true, there is at least a question of fact about whether Kershnar's speech was part of his official duties and therefore about whether Kolison would be entitled to qualified immunity even if *Garcetti* applied to university professors.[7]

---

[7] To the extent that the defendants suggest that Kolison is entitled to qualified immunity under *Vega*, that argument lacks merit as well.  First, *Vega* was decided on a motion for summary judgment, not a motion to dismiss.  *See Vega*, 273 F.3d at 466.  Second, *Vega* is far different factually, as addressed above.  *See supra* II.A.1.  So while there might have been some question about the legality of the administrators' actions in

Second, Kershnar has been banned from teaching and from campus under Kolison's watch long after *Heim* was decided. So even if Kolison might have been entitled to qualified immunity under *Garcetti*, he certainly has not been since *Heim* held that *Garcetti* does not apply to university professors.

In sum, this is not the rare case where the complaint includes facts that would give rise to a qualified immunity defense. On the contrary, questions of fact preclude dismissal at this stage. The defendants' motion to dismiss Kershnar's damages claims therefore is denied.

## CONCLUSION

The defendants' arguments on their motion to dismiss are based largely on their assertions, not on the facts alleged in the complaint accepted as true. And even if this were a motion for summary judgment, the defendants' assertions would do little more than raise factual questions about the reasons why Kershnar was banned from campus and from teaching. For those reasons and for the reasons stated above, the defendants' motion to dismiss is DENIED.

---

*Vega*, there is no such question here—at least based on the allegations in the complaint accepted as true.

SO ORDERED.

Dated:    March 6, 2026
          Buffalo, New York


                              _/s/ Lawrence J. Vilardo_____
                              LAWRENCE J. VILARDO
                              UNITED STATES DISTRICT JUDGE