**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

STEPHEN KERSHNAR,

     *Plaintiff,*

     v.

STEPHEN H. KOLISON, JR~~,~~., in his individual capacity ~~and his official capacity~~ as the President of the State University of New York at Fredonia, ~~and~~

DAVID STARRETT, in his individual ~~capacity and official~~ capacity as Executive Vice President and Provost of the State University of New York at Fredonia, and

JUDITH HOROWITZ, in her individual capacity as Interim Provost and Vice President for Academic Affairs of the State University of New York at Fredonia,

     *Defendants.*

Case No.: 1:23-cv-525-LJV-JJM

~~VERIFIED~~AMENDED **COMPLAINT FOR CIVIL-RIGHTS VIOLATIONS**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1.      Stephen Kershnar is a renowned philosopher whose meditations on what morality means were long celebrated by SUNY Fredonia, where he ~~is~~served as a Distinguished Teaching Professor—the SUNY system's highest academic rank.~~ ~~ But when Professor Kershnar discussed challenging questions regarding the moral analysis of sexual conduct involving minors on ~~a~~ philosophy ~~podcast~~podcasts, his decades of scholarly research on this topic ~~was~~were met with a barrage of angry ~~Tweets~~social media posts and demands that he be terminated. Within hours, SUNY Fredonia ~~president~~President Stephen Kolison~~ gave in to the Twitter mob, and~~,

ignoring Kershnar's First Amendment rights, banished him from the classroom, ~~from the~~ campus, and ~~from~~ any contact with the "campus community."

2.    Over the course of his long career as a public intellectual, Professor Stephen Kershnar has become renowned for his thoughts on the philosophical underpinnings of morality and law. ~~As~~<u>Whether as</u> an author, a public speaker, a columnist, ~~and~~<u>or a</u> Distinguished Teaching Professor of philosophy at SUNY Fredonia, Kershnar uses a traditional philosophical method of Socratic inquiry, staking out provocative positions to question the core assumptions society makes about the role of morality and law.

3.    SUNY Fredonia celebrated Professor Kershnar's scholarly examination of our society's moral commitments on a host of challenging issues, including abortion, slavery, and torture. In recognition of his stature in the field, the SUNY system named him SUNY Distinguished Teaching Professor, "SUNY's highest academic honor," and awarded Kershnar the "Chancellor's Award ~~of~~<u>for</u> Excellence in Teaching," noting his "superior professional achievement." Boasting about its award-winning professor, SUNY Fredonia issued a press release lauding Kershnar for his iron-sharpens-iron approach:

> Dr. Kershnar has established a reputation as one of the most prolific authors on campus, having published four books and written dozens of articles for highly selective journals and book chapters and also presented in numerous conferences and philosophical forums. His works cover a wide spectrum, including politics, ethics, religion, law and sports. He is known for promoting unpopular or previously ignored positions that often leads those who disagree with him to sharpen their own views when reacting to his reasoning.

4.      SUNY Fredonia was proud of Professor Kershnar's willingness to stake out unpopular positions—including his thought-provoking explorations of the moral status of adult-child sex, including when and why it should be criminalized. Proud, that is, until minute-long clips of his commentary on the subject, excerpted—without any context—from hours-long philosophy podcasts unrelated to the university, went viral on Twitter.

5.      Within hours, SUNY Fredonia President Kolison publicly denounced Kershnar andKershnar's views. In short order, Kolison assured angry social media users that Kershnar would "not have contact with students" while university officials mounted an investigation. Kolison directedinvestigated. At Kolison's direction, campus police to barbarred Kershnar from campus, to searchsearched his office, and to seizeseized his computer, and sendsent it to an unknown third partya forensics laboratory for "analysis.". When that analysis found nothing of concern, Kolison kept that vindication secret—and continued Kershnar's exile.

6.      Four hundred and ninety-one days later (and counting),For the next four years, and long after the social-media tempest subsided, Kershnar remainsremained exiled from the classroom on President Kolison's orders. He periodically receivesreceived an emailed letter from the university's provost, David Starrett,provosts barring him from campus or teaching, allegedly "due to ongoing concerns regarding your safety and the safety of others on campus should you return to the campus."

3

7.    Until Kershnar was forced to file this action, SUNY Fredonia ~~has never said what~~ did not identify the ~~alleged~~asserted threats to ~~Professor Kershnar's~~ his safety ~~are (,~~ and its daily crime log ~~reflects~~reflected no reported ~~threats at all), what measures~~ threat plausibly related to Kershnar. Nor did the university explain what its ~~purported~~publicly announced "investigation" entailed.

8.    Instead, the university repeatedly banned Kershnar from teaching and banished him from campus even after an independent security assessment it commissioned found no risk to the campus, staff, students, or ~~whether the~~ Kershnar.

9.    After issuing public statements vilifying Kershnar and promising an investigation ~~ever concluded. If it is still ongoing, SUNY Fredonia's~~, the university remained silent when its unfounded investigation ~~has now outlasted the Warren Commission's investigation into the assassination~~came up empty.

~~7.~~10.    Worse still, SUNY Fredonia shifted its justifications for Kershnar's ban to include additional protected speech, including his public commentary about antisemitism, moral questions about God and evil, and even freedom of ~~JFK, the U.S. Senate inquiry into the sinking of the *Titanic*, the Iran hostage crisis, and the federal government's investigation into the *Challenger* disaster.~~ speech itself.

~~8.~~11.    SUNY Fredonia's investigation and claimed safety concerns were mere pretexts to mothball a professor whose questions earned the ire of state legislators, donors, the public, and the university's president.

~~9.~~12.    Meanwhile, SUNY Fredonia ~~continues~~continued to offer the classes Professor Kershnar normally ~~teaches but is~~taught while struggling to find ~~an~~

4

~~instructor to teach~~instructors for them. And although the pandemic showed the university ~~is~~was perfectly capable of online teaching, SUNY Fredonia flatly refused Kershnar's offer to teach online, where any legitimate safety concerns would be nonexistent.

13.    After SUNY Fredonia shelved its star philosophy professor, student interest in its Philosophy program dwindled. Citing the decline in student interest—caused in part by its own conduct against Kershnar—SUNY Fredonia shuttered the Philosophy department and notified Kershnar his appointment would end on August 31, 2026.

~~10.~~14. Stephen Kershnar ~~files~~brings this lawsuit for damages to ~~compel SUNY Fredonia to reject~~remedy SUNY Fredonia's unconstitutional embrace of the heckler's veto—anathema to academia's special role in questioning the unquestionable ~~by restoring the First Amendment's protection on this public university campus~~.

## **PARTIES**

### *Professor Kershnar*

~~11.~~15. Plaintiff Stephen Kershnar, a former Distinguished Teaching Professor at SUNY Fredonia, earned his undergraduate degree at Cornell University, his Juris Doctor degree at the University of Pennsylvania, and his Ph.D. in Philosophy from the University of Nebraska, Lincoln. In 1998, Kershnar joined the faculty of SUNY Fredonia, which awarded him tenure in 2002.

~~12.~~16. Kershnar's academic record at SUNY Fredonia ~~is~~was sterling. In the classroom, his teaching earned him the SUNY Chancellor's Award for Excellence in

Teaching (in 2002) and ~~the~~ appointment _to the rank_ of Distinguished Teaching Professor—the SUNY System's highest academic honor and rank.

~~13.~~17. Outside of the classroom, Kershnar is a prolific writer. He has published ten books, over one hundred articles and book chapters, and frequently gives presentations on complex philosophical questions in public appearances.

~~14.~~18. Despite this long record of distinguished scholarship, SUNY Fredonia's president ~~and~~, provost ~~have~~, _and law enforcement officials_ exiled Distinguished Teaching Professor Kershnar from the classroom, banned him from campus, and ~~forbidden~~forbade him from speaking to members of the campus community on any subject.

### *The Defendants*

~~15.~~19. Defendant Stephen Kolison is the President of the State University of New York at Fredonia, a governmental entity under the laws of the State of New York. As President, Kolison is the chief administrative officer of SUNY Fredonia, responsible for supervising the university's professional and nonacademic staff. President Kolison issued a directive barring Kershnar from the classroom, from campus, and from communicating with the community. ~~President~~ Kolison is ~~being~~ sued in his individual ~~and official capacities.~~ _capacity._

20.    Defendant David Starrett ~~is~~was the Executive Vice President and Provost of SUNY Fredonia. In this role, Starrett ~~is~~was delegated the powers, duties_,_ and responsibilities assigned to him by President Kolison. Starrett ~~has~~ repeatedly enforced President Kolison's directive barring Kershnar from campus. ~~Provost~~ Starrett is sued in his individual _capacity._

16.21. Defendant Judith Horowitz served as SUNY Fredonia's Interim Provost and official capacities Vice President for Academic Affairs. In that role, Horowitz was delegated the powers, duties, and responsibilities assigned to her by President Kolison. Horowitz repeatedly enforced President Kolison's directive barring Kershnar from campus. Horowitz is sued in her individual capacity.

17.22. At all times relevant to the actions in the Complaint, Defendants acted under color of state law.

## JURISDICTION AND VENUE

18.23.    This action arises under the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202. Thus, this Court has subject matter jurisdiction over these federal causes of action under 28 U.S.C. §§ 1331 and 1343.

19.24.    This Court has personal jurisdiction over all defendants Defendants because they reside each resides in the State of New York or committed the challenged conduct in New York and has sufficient contacts with the State.

20.25.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because at least one defendant resides in this district, and all defendants are residents of the State of New York.

21.26.    Venue is also proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred and continue to occur in the Western District of New York.

## FACTUAL ALLEGATIONS

***Professor Stephen Kershnar's long history of provocative philosophical inquiry and teaching.***

22.27. Kershnar is a public intellectual. He not only ~~teaches~~taught philosophy at SUNY Fredonia, but publishes books, makes speaking appearances, engages in public debates, and publishes columns on a range of public concerns.

23.28. At SUNY Fredonia, Kershnar ~~has~~ taught a range of undergraduate courses, including:

> a)   "Introduction to Philosophy" as recently as Fall 2021;
>
> b)   "Justice, Law, and Economics" as recently as Fall 2021;
>
> c)   "[Special Topics]: People: Key Issues" as recently as Fall 2020, including online;
>
> d)   Capstone seminars (a senior thesis course); and
>
> e)   "Sex and Love," a course he taught during Spring 2022 until Defendants removed him from teaching. This course covered "sexual ethics" and invited students to consider "[w]hat kinds of sexual activity are morally permissible under what sort of circumstances?"

24.29. Outside of the classroom, Kershnar has frequently written or spoken on matters of public concern; he has published books, engaged in public debates, and published a newspaper column.

25.30. Kershnar has published ten books, including:

> a)   *For Torture: A Rights-Based Defense*, Lexington Books (2011);
>
> b)   *Gratitude Toward Veterans: Why Americans Should Not Be Very Grateful to Veterans*, Lexington Books (2014);
>
> c)   *Pedophilia and Adult-Child Sex: A Philosophical Analysis*, Lexington Books (2015);

8

d)    *Does the Pro-Life Worldview Make Sense? Abortion, Hell, and Violence Against Abortion Doctors*, Routledge (2017);

e)    *Total Collapse: The Case Against Responsibility and Morality*, Springer Verlag (2018); and

f)    *Desert Collapses: Why No One Deserves Anything*, Routledge (2021).

26.31. Kershnar has also published dozens of scholarly articles on a wide range of topics, including:

a)    *Objections to the Systematic Imposition of Punitive Torture*, 13 INT'L J. OF APPLIED PHIL. 47, 47–56 (1999);

b)    *The Moral Status of Harmless Adult-Child Sex*, 15 PUBLIC AFFAIRS QUARTERLY 111, 111–132 (2001);

c)    *The inheritance-based claim to reparations*, 8 LEGAL THEORY 243, 243–267 (2002);

d)    *A Liberal Argument for Slavery*, 34 J. OF SOCIAL PHIL. 510, 510–536 (2003);

e)    *Respect for Persons and the Harsh Treatment of Criminals*, 18 INT'L J. OF APPLIED PHIL. 103, 103–121 (2004);

f)    *A Promissory Theory of the Duty to Tip*, 119 BUS. & SOC'Y REV. 2, 247–76 (2014); and

g)    *The Paradox of Consent*, 33 INT'L J. OF APPLIED PHIL. 305, 305–318 (2019).

27.32. Under the State University of New York Policies of the Board of Trustees, the "professional obligation of an employee" is that which is consistent with their "academic rank or professional title" and "shall include teaching, research, University service, and other duties and responsibilities required of the employee[.]"

28.33. Kershnar's professional title iswas Distinguished Teaching Professor.

29.34. Professor Kershnar doesdid not manage or supervise SUNY Fredonia employees, nor iswas he responsible for establishing SUNY Fredonia policy.

30.35. SUNY Fredonia doesdid not require Kershnar to conduct off-campus speaking engagements or podcasts.

31.36. SUNY Fredonia has never directed Kershnar to appear on any podcast or other broadcast.

32.37. SUNY Fredonia has never facilitated Kershnar's appearances on any podcast or other broadcast.

33.38. SUNY Fredonia has never publicized Kershnar's appearances on any podcast or other broadcast.

34.39. SUNY policy differentiates between "inquiry, teaching and research" (in which faculty have "full freedom, within the law") and faculty members' "role as citizens," (in which they "have the same freedoms as other citizens.").

*SUNY Fredonia and the SUNY system praise, reward, and promote Kershnar for his provocative philosophical inquiry.*

35.40. Professor Kershnar joined SUNY Fredonia's Department of Philosophy as an Assistant Professor in 1998.

36.41. In 2005, SUNY Fredonia promoted Kershnar to full professor.

37.42. On June 3, 2011, SUNY Fredonia issued a press release announcing that Professor Kershnar had been bestowed withit was bestowing the Chancellor's Award offor Excellence in Scholarship and Creative Activities, a "statewide honor that recognizes superior professional achievement throughout the State University of New York system." on Professor Kershnar.

10

38.43. The June 3, 2011, press release highlighted Kershnar's "prolific" work and the important role his pedagogical approach plays in the university's sifting-and-winnowing of ideas:

> His works cover a wide spectrum, including politics, ethics, religion, law and sports. He is known for promoting unpopular or previously ignored positions that often leads those who disagree with him to sharpen their own views when reacting to his reasoning.

39.44. In 2013, SUNY Fredonia promoted Kershnar to Chair of the Department of Philosophy, a position he held until 2019.

40.45. In a June 12, 2014, press release, SUNY Fredonia announced that Kershnar was one of only nineteen professors in the university system selected by the SUNY Board of Trustees to be named SUNY Distinguished Teaching Professor, "SUNY's highest academic honor."

41.46. The 2014 press release again touted Kershnar's Socratic approach to philosophy:

> Dr. Kershnar is renowned on campus for his unique and effective style of teaching that combines the Socratic method of questioning employed by law school professors with a philosophical technique of vigorously defending conflicting conclusions.

42.47. Kershnar's Socratic approach iswas in keeping with SUNY policy, which is to "maintain and encourage full freedom, within the law, of inquiry, teaching and research," including the right of faculty to, "without limitation, discuss their own subject in the classroom."

11

43.48. SUNY policy also recognizes the rights of faculty "as citizens" to hold the same expressive freedoms as "other citizens" in their speech outside of the classroom.

44.49. Students, too, understood that Kershnar's approach in the classroom iswas to raise challenging arguments in order to fully explore philosophical concepts.

45.50. One student told the campus newspaper that in the three courses he had taken with Kershnar, "it was almost impossible to tell what he actually believed and what he didn't."

46.51. SUNY's press releases lauding Professor Kershnar's provocative inquiries are consistent with its online biography of Kershnar, which states that he "focuses on applied ethics" and has "written one hundred articles and book chapters on such diverse topics as abortion, adult-child sex, hell, most valuable player, pornography, punishment, sexual fantasies, slavery, and torture."

### Kershnar questions the moral status of adult-child sex.

47.52. For decades, Professor Kershnar has written and spoken extensively on the moral and legal issues implicated by sexual conduct involving adolescents and children.

48.53. For example, before SUNY Fredonia awarded him tenure, Kershnar's article, entitled *The Moral Status of Harmless Adult-Child Sex,* was published by Public Affairs Quarterly in 2001.

49.54. Kershnar argues that as a legal matter, adult-child sex should always be criminalized. He analyzes whether, as a moral matter, adult-child sex is always wrong, and why we should criminalize it. In analyzing the moral issues, he discusses consent, exploitation, harm, rights, and viciousness.

12

50. 55. Kershnar argues that it is important that the arguments favoring criminalization of child sexual abuse be scrutinized so that they are defensible, writing that "if incorrect reasons are given recognition in support of morally legitimate laws," like those against child sexual abuse, "then these reasons may then be used to support morally *illegitimate*" laws.

51. 56. Kershnar expounded on these arguments in his 2015 book, *Pedophilia and Adult-Child Sex: A Philosophical Analysis*.

52. 57. SUNY Fredonia's online biography of Kershnar references these works.

53. 58. The legal and moral status of sexuality as it pertains to adolescents is a matter of profound public concern, driving debates over such topics as teenage sexuality, birth control, which books are appropriate in school settings, and child sex abuse in the Catholic Church and elsewhere. *See, e.g.*, *Roth v. United States*, 354 U.S. 476, 487 (1957) ("Sex is . . . one of the vital problems of human interest and public concern.")  .").

**Kershnar appears on philosophy podcasts to debate philosophy.**

54. 59. On December 5, 2020, Kershnar appeared on a two-hour episode of the *Unregistered* podcast.

55. 60. *Unregistered* is a podcast hosted by author and Occidental College professor Thaddeus Russell, promoted as featuring interviews with "people who break the rules of conventional discourse and expand the realm of the possible."

56. 61. *Unregistered* has no affiliation with SUNY Fredonia.

57. 62. Kershnar's appearance on *Unregistered* was recorded outside of his regular working hours.

58.63. Kershnar prepared for the *Unregistered* podcast, as he does for similar discussions, at home on his own time.

59.64. During the *Unregistered* podcast, Kershnar provided an analysis of the traditional philosophical justifications of age of consent laws in the United States.

60.65. During the *Unregistered* podcast, Kershnar stated that he became interested in researching and writing about the morality of adult-child sex and "whether or not an act is wrong because it's harmful." after he read some studies that suggested that some sexual conduct involving minors is not always harmful.

61.66. Kershnar commented that "it's not obvious to me why" all instances of adult-child sex are unlawful because, among other things, humans are designed by evolution to begin reproduction below the age of 18.

62.67. On January 30, 2022, Kershnar appeared on the *Brain in a Vat* podcast.

63.68. *Brain in a Vat* is a podcast promoted as a "philosophy smorgasbord," with its hosts—Mark Oppenheimer, a South African civil-rights barrister, and Dr. Jason Werbeloff, an author who holds a Ph.D. in philosophy—interviewing "experts about ethics, aesthetics, and epistemology."

64.69. *Brain in a Vat* is described as "[t]hought experiments and conversations with philosophers."

65.70. Kershnar's appearance on *Brain in a Vat* was recorded outside of his regular working hours.

66.71. Kershnar prepared for the *Brain in a Vat* podcast, as he does for similar discussions, at home on his own time.

14

67.72. Kershnar's appearance on *Brain in a Vat* was recorded at home using his own computer.

68.73. During the *Brain in a Vat* podcast, Kershnar stated:

> Imagine that an adult male wants to have sex with a 12-year-old girl. Imagine that she's a willing participant. A very standard, very widely held view is that there's something deeply wrong about this, and it's wrong independent of being criminalized. It's not obvious to me that it is in fact wrong.

69.74. After the *Brain in a Vat* podcast, its hosts described Kershnar's approach:

> Kershnar believes that one of the tasks of an ethicist is to scrutinize the moral justifications for societal taboos. It is insufficient to merely *assert* that a kind of behavior is wrong—we ought to try to understand *why* it is wrong.

70.75. Kershnar's appearances on the podcasts were not part of his official duties.

71.76. Kershnar did not list the podcast appearances in his annual report concerning his research, publications, and academic presentations.

72.77. Kershnar did not distribute links to the podcasts to the broader campus community.

***As viral Twitter clips lead to calls for Kershnar's termination and arrest, President, Kolison denounces and suspends Kershnar, allegedly pending an "investigation."***

73.78. On February 1, 2022, a Twitter account shared a 28-second video clip from Kershnar's *Brain in a Vat* appearance, captioned: "SUNY Fredonia Professor

15

questions the widely held sociteal [*sic*] belief that it's deeply wrong for an adult man to want to have sex year [*sic*] with a 12-year-old girl."

74.79. Within six minutes, the video clip was also shared by a popular Twitter user, "Libs of Tik Tok," which then had some 500,000 Twitter followers.

75.80. "Libs of Tik Tok" then tagged President Kolison's Twitter account, tweeting: "Hi @DrKolison, it appears you have a problem at your university."

76.81. After "Libs of Tik Tok" shared it, the video clip garnered some 1.5 million views.

77.82. The "Libs of Tik Tok" account shared eight additional video clips—each between eighteen seconds and two minutes long—of Kershnar's appearances on *Brain in a Vat* and *Unregistered*, condemning Kershnar's comments as "truly horrifying."

16

78.83. The "Libs of Tik Tok" account also shared screenshots about Kershnar's published works regarding whether veterans are owed gratitude, discrimination in the workplace, and slavery. For example:



79.84. About three hours after the video was first posted, SUNY Fredonia tweeted athis "message from SUNY Fredonia President Stephen H. Kolison":

> SUNY Fredonia is aware of a video posted online involving one of its professors. The views expressed by the professor are reprehensible and do not represent the values of SUNY Fredonia in any way, shape or form. They are solely the professor's views. The matter is being reviewed.

80.85. That evening, a dispatcher in SUNY Fredonia's police department spoke to Chief of University Police Brent Isaacson and told two members of the public that the university's police were aware of the video and were conducting an investigation.

81.86. Over the next twenty-four hours, the out-of-context clips of Kershnar's commentaries continued to generate negative media coverage for SUNY Fredonia, with articles and broadcasts from Fox News, radio station WBLK, online conservative media outlets, and local TV news stations WIVB, WKBW, and WGRZ.

82.87. In a primetime broadcast on the evening of February 2, 2022, a Fox News host denounced Kershnar, a libertarian conservative, as part of a "new movement forming . . . to normalize one of the most depraved and sickening acts a human can commit: pedophilia. It starts, as most bad ideas do, in the minds of university professors."

83.88. On his broadcast the same day, conspiracy theorist Alex Jones showed a photograph of Kershnar, comparing his "greedy, hateful, selfish look" to Jeffrey Epstein.

84.89. In a letter to SUNY Chancellor Deborah Stanley, six members of the New York State Assembly—each serving on the Assembly's Higher Education Committee—wrote that Kershnar's speech was "appalling" and called for his "immediate removal . . . and the reporting of your former employee to the New York State Police[.]"

18

***President Kolison removes Kershnar from campus and bars him from speaking to the campus community.***

90.    On February 2, 2022, SUNY Fredonia Chief of University Police Isaacson sent a memo, styled as a "threat assessment," to Human Resources Director Maria Carroll and SUNY Senior Counsel Seth Gilbertson, urging "that Kershnar be removed from our campus and that his professional contact with our students be discontinued for a time to be determined."

91.    Chief Isaacson asserted that Kershnar should be banned from campus because his speech was "deeply offensive" to "a massive population of Americans" and his removal "for a time to be determined" would "provide a needed 'cooling down' period for any persons who may otherwise feel compelled to confront Kershnar on our campus."

92.    Isaacson claimed that "people outside of our campus . . . understand that" Kershnar is "an advocate of child sexual exploitation [who] works here."

93.    Isaacson urged that Kershnar be banned from campus not because of any "explicit, articulated threats," but rather because of an unknown, undefined "pool of people outside of our campus" who had "not commented" and "remained silent" about Kershnar's speech.

~~85.~~94. On the morning of February 3, 2022, Kershnar spoke by phone with ~~SUNY Fredonia's Chief of University Police~~Chief Isaacson at Isaacson's request.

~~86.~~95. Chief Isaacson, at President Kolison's direction, ordered Kershnar not to come to the SUNY Fredonia campus.

19

87.96. Chief Isaacson told Kershnar that he had concerns about security, but declined to describe the nature, extent, or source of those concerns. Kershnar asked Chief Isaacson for specific information about any threats concerning Kershnar or his students, but Isaacson offered no information regarding any threats or any other safety concerns.

88.97. Instead, Chief Isaacson told Kershnar he was barred from campus until further notice.

89.98. In an email following their conversation, Kershnar explained to Chief Isaacson that removing him from the classroom was "an instance of a heckler's veto," requested that SUNY Fredonia use the "least restrictive" means of addressing any safety concerns, and inquired about the length of his removal from campus.

90.99. Kershnar asked Chief Isaacson to permit him to teach "today's classes and any future classes" via Zoom.

91.100.    Kershnar asked Chief Isaacson for the "rationale for the order" barring him from campus.

92.101.    Chief Isaacson did not respond to Kershnar's email.

93.102.    Chief Isaacson never provided Kershnar with any information about specific threats.

94.103.    On the morning of February 3, 2022, at the direction of President Kolison, campus police and university staff—including Chief Isaacson, along with a lieutenant of the SUNY Fredonia Police, and several information technology staff members—searched Professor Kershnar's office.

95.104.    At the direction of President Kolison and Chief Isaacson, the campus police seized Kershnar's desktop computer for "analysis" by an unidentified third party. ."

96.105.    On February 3, 2022, at the direction of President Kolison, SUNY Fredonia's Director of Human Resources, Maria Carroll, sent Kershnar a letter stating that "[e]ffective immediately and until further notice, pursuant to Article 19.11(c) of" the university's collective bargaining agreement, Kershnar was "to perform an alternate work assignment from an alternate location."

97.106.    Article 19.11(c) authorizes), the provision invoked by SUNY Fredonia, authorized President Kolison to reassign faculty pending potential disciplinary action.

98.107.    H.R. Director Carroll's letter directed Kershnar "not to be on college property, or have contact with the campus community" without her permission.

99.108.    In a February 3, 2022, email, H.R. Director Carroll told Kershnar that SUNY Fredonia was "not able to compile the list of specific threats at this time due to the volume involved, but we remain concerned for your safety and that of the campus community."

100.109.    H.R. Director Carroll also told Kershnar that the "duration of the directive and alternate assignment is unknown, because the safety concerns . . . . . . . remain ongoing."

21

101.110.    In the afternoon of February 3, 2022, SUNY Fredonia tweeted a second "message to the SUNY Fredonia Community from President Stephen H. Kolison, Jr.":

> I am writing to provide you with an update on the matter involving one of our professors interviewed in a widely shared video podcast. We will continue to investigate this situation. In the meantime, effective immediately and until further notice, the professor is being assigned to duties that do not include his physical presence on campus and will not have contact with students while the investigation is ongoing.
>
> Please allow me to reiterate my earlier statement that I view the content of the video as absolutely abhorrent. I cannot stress strongly enough that the independent viewpoints of this individual professor are in no way representative of the values of the SUNY Fredonia campus.
>
> I appreciate your patience as we make every effort to resolve this matter as expeditiously as possible.

102.111.    President Kolison's decision to remove Kershnar from teaching, to separate Kershnar from students, tocampus, direct campus police to seize and search Kershnar's computer, and to announce an investigation into Kershnar (and to announce that Kershnar would be kept away from students) was motivated by his disapproval of Kershnar's viewpoint.

103.112.    When President Kolison separated Kershnar from the campus community, he had no basis to believe that Kershnar was a danger to any member of the campus community.

22

104.113.    When President Kolison separated Kershnar from the campus community, no student, faculty member, or staff member had, to Kershnar's knowledge, reported that Kershnar had engaged in misconduct.

***President Kolison ignores admonitory letters from academic freedom groups and faculty members.***

105.114.    On February 3, 2022, the Foundation for Individual Rights in Expression (FIRE),[1] now counsel for Kershnar, sent President Kolison a letter explaining that Kershnar's extramural statements were protected by the First Amendment and SUNY Fredonia's commitment to academic freedom.

106.115.    On the same day, the Academic Freedom Alliance, a coalition of faculty members from across the ideological spectrum committed to upholding the principles of academic freedom, sent a letter to President Kolison.

107.116.    The Academic Freedom Alliance's letter cautioned that Kershnar's extramural speech was protected expression and that the university's responsibility is to "shelter" its faculty from harassment "and not add to it."

108.117.    On February 4, 2022, some 158 university professors from around the world and across disciplines sent President Kolison a joint letter warning that the "philosophical enterprise" and the "scholarly enterprise broadly" require the "freedom to ask uncomfortable questions and explore unpopular arguments," and that if Kershnar's "ideas are wrong, then we all benefit from seeing those errors exposed through intellectual engagement."

---

[1] Formerly known as the Foundation of Individual Rights in Education, FIRE expanded its mission in June 2022 beyond campus to protect the First Amendment rights of all Americans.

109.118.    The February 4, 2022, letter warned:

> The tradition of Western philosophy famously begins with the example of Socrates being silenced and put to death for asking questions and pursuing arguments that his fellow citizens found discomforting.

110.119.    President Kolison did not respond to the faculty members' letter.

111.120.    On March 3, 2022, SUNY Fredonia, through SUNY's Office of General Counsel, sent a letter to FIRE concerning SUNY Fredonia's "handling of the public attention on Dr. Kershnar's views," acknowledging that Kershnar's speech "enjoys protection under the First Amendment" and stating that SUNY Fredonia "will not violate his rights."

112.121.    Despite these admonitory letters, President Kolison never assured Kershnar he was not subject to discipline for his statements outside the classroom.

122. Instead of resolving the matter "expeditiously," SUNY Fredonia deliberately decided to permanently exile Kershnar from the campus community.

***Kershnar's removal from teaching, banishment from campus, and prohibition on communicating with the campus community*** *continues for sixteen months and counting* ***continue for years***.

113.    SUNY Fredonia did not, as President Kolison had committed, resolve the matter "expeditiously." Sixteen months later At Kolison's direction, Kershnar remains remained barred from the classroom, banished from campus, and prohibited from communicating communication with the "campus community" at Kolison's direction.

24

114.123.   To the extent for more than four years, until he was retrenched by SUNY Fredonia has resolved the matter at all, President Kolison has resolved to indefinitely exile Kershnar from the campus community. , effective August 31, 2026.

124.   On or about March 17, 2022, Chief Isaacson sent a second "threat assessment" memorandum that continued to recommend Kershnar's exclusion, speculating that if Kershnar returned after litigation, SUNY Fredonia would face "public narrative" and "messaging" problems.

125.   Isaacson's second memorandum admitted: "When considered from a campus safety perspective, the growing public disinterest in the Kershnar matter reduces the likelihood of an offender coming on our campus to settle a grievance held against Kershnar."

126.   Isaacson recommended Kershnar's continued banishment from campus because "[i]f he were to return to our campus, the public's disgust would extend to this campus, and we would again be viewed by many members of the public as sympathetic to Kershnar's views."

127.   On or about August 14, 2022, Chief Isaacson sent a third "threat assessment" memorandum recommending Kershnar's continued banishment, even though "the public's attention to the Kershnar matter has waned, at least as reflected in the relative paucity of recent social media posts about him."

128.   Isaacson speculated that "Kershnar's return to campus would immediately generate an enormous amount of negative attention to our campus" through "social and traditional media outlets," with "the prevalent narrative being

that SUNY Fredonia is endorsing Kershnar's stated opinions which normalize adult sexual contact with young children."

115.129.    Kershnar had been scheduled to teach three courses during the Fall 2022 semester, including Introduction to Philosophy (PHIL-115), Crime and Punishment (PHIL-303), and Metaphysics (PHIL-351).

116.130.    The first day of classes for the Fall 2022 semester at SUNY Fredonia began on August 22, 2022.

117.131.    On August 24, 2022, Provost Starrett sent Kershnar a letter continuing Kershnar's banishment from campus and classesthe classroom.

118.132.    The August 24, 2022, letter stated that Kershnar's removal from "teaching or service obligations" for the semester was "due to ongoing concerns regarding your safety and the safety of others on campus should you return to the campus."

119.133.    When students enrolled in these courses showed up for their first day of Kershnar's classes, they found a sign—falsely attributed to the "Philosophy Department"—affixed to the classroom door informing them that the class had been cancelled.

120.134.    Defendants did not make the decision to renew Kershnar's suspension from teaching until August 24, 2022, after classes had already started.

121.135.    SUNY Fredonia's administration did not inform the Philosophy Department of the classes'its cancellation of Kershnar's classes until ten minutes before the classes were scheduled to begin.

26

122.136.    Just before midnight on August 26, 2022 ~~(after the beginning of the fall semester),~~. SUNY Fredonia's administration emailed students notifying them ~~that~~ their classes were "being cancelled," recognizing ~~that~~ this was "more than a minor inconvenience and requires you to rethink the composition of your fall schedule," and apologizing for the "last-minute notices you have found on the classroom's doors."

123.137.    President Kolison told the campus newspaper that Kershnar's classes were canceled because "we are having difficulties in ~~. . .~~ . . . finding adequate instructors to cover" those classes.

124.138.    At President Kolison's direction, Provost Starrett likewise barred Kershnar from teaching the following semester for the same reasons.

125.139.    On September 9, 2022, Provost Starrett sent a letter to Kershnar stating that the University "has not made a final decision as to whether you will be assigned to teach classes for the Spring semester" due to asserted "ongoing concerns regarding your safety and the safety of others on campus should you return to the campus."

126.140.    Provost Starrett's September 9, 2022, letter said the University expected to make a decision about Kershnar's teaching duties "prior to the opening of enrollment for the Spring semester" on October 31, 2022.

141.    On or about October 31, 2022, Chief Isaacson wrote a fourth "threat assessment" memorandum again recommending Kershnar's continued banishment from teaching and from campus.

142.   In this memo, Isaacson referenced a September 20, 2022, report "from A1C Partners, LLC, a company with a cadre of experienced senior executive former federal law enforcement officials and a staff of trained intelligence analysts."

143.   Isaacson asserted that "A1C has investigative tools to search the internet, social media platforms, and the 'dark web' for information on a given topic, and they were tasked with identifying additional internet traffic regarding the Kershnar controversy."

144.   According to Isaacson, the A1C report "support[ed] and magnif[ied] [his] concern that a reinstatement of Kershnar would inevitably lead to an explosion of extreme rhetoric among many persons around the country, some of whom will feel justified, even compelled, to violently target Kershnar and/or our campus."

145.   To the contrary, the September 20, 2022, A1C report concluded, with emphasis added, that:

> A1C research also disclosed comments posted to online discussion boards/forums advocating generalized and/or specific acts of violence directed toward Professor Kershnar. The majority of this online discussion activity occurred during February 2022. While the comments should be seriously considered as part of the enterprise-wide physical security and safety planning process at Fredonia and the SUNY system, the comments **do not suggest the existence of an immediate or imminent threat to the Fredonia campus, staff, students, or Professor Kershnar**.

146.   Accordingly, A1C recommended "persistent evaluation of online activity . . . over the near term."

147.    Although Isaacson's memorandum stated that A1C uncovered "no direct threat," it did not disclose A1C's express conclusion that the "comments," including those in February 2022, did "not suggest the existence of an immediate or imminent threat to the Fredonia campus, staff, students, or Professor Kershnar." Isaacson's memorandum also omitted A1C's recommendation that the university continue to monitor online activity.

~~127.~~148.    On November 1, 2022, Provost Starrett sent a letter to Kershnar barring Kershnar from teaching courses in the Spring 2023 semester.

~~128.~~149.    Provost Starrett's November 1, 2022, letter again stated that Kershnar would not be permitted to teach classes "due to ongoing concerns regarding your safety and the safety of others on campus should you return to the campus."

~~129.~~150.    Provost Starrett's November 1, 2022, letter did not identify any basis for the asserted "ongoing concerns regarding your safety[.]"

~~130.~~151.    Instead of teaching, Kershnar was instructed to conduct off-campus research consisting of a review of the philosophy curricula at each of SUNY's 64 regional campuses and at least twelve other public universities, purportedly in order to consider what courses should be offered at SUNY Fredonia.

~~131.~~152.    Kershnar ~~has~~was also ~~been~~ instructed to complete training required for instructors to teach online so that he could develop course materials for *other* instructors to teach two Philosophy courses (PHIL 115-04: Introduction to Philosophy; and PHIL 364-01: Justice, Law, and Economics) in an online format.

***Kershnar's removal from teaching ~~does~~did not serve any disciplinary or investigative need ~~or investigation~~.***

132.153.    On information and belief, Defendants' choice to remove Kershnar from teaching iswas not because they arewere contemplating disciplinary action against him.

133.154.    While the university's collective bargaining agreement authorizesauthorized temporary reassignment in anticipation of disciplinary action where the faculty member's "continued presence on the job represents a potential danger to persons . . . or would severely interfere with its operations," the university must serve a notice of discipline within ten days of the reassignment.

134.155.    SUNY Fredonia has never served Kershnar with a notice of discipline.

135.156.    Defendants' letters havethen abandoned the pretense of reassignment pending an investigation.

136.157.    Unlike the February 3, 2022, letter removing Kershnar from campus, the August 24, 2022, September 9, 2022, and November 1, 2022, letters did not invoke the collective bargaining agreement provision concerning contemplation of disciplinary action.

137.158.    As authority, the August 24, 2022, September 9, 2022, and November 1, 2022, letters invoked a provision of the SUNY Policies of the Board of Trustees. That provision requires that the "professional obligation[s] of" a faculty member, consistent with their "rank or professional title shall include teaching, research, University service, and other duties and responsibilities required of the" faculty member.

***Law enforcement and SUNY Fredonia records do not reflect ~~reports of~~credible threats of violence.***

~~138.~~159.     SUNY Fredonia's assertions that public safety ~~compels~~compelled Kershnar's ostracism are not supported by its own records or those of law enforcement agencies.

~~139.~~160.     On January 4, 2023, ~~Kershnar received an email from~~ an agent of the Federal Bureau of Investigation ~~informing Kershnar~~telephoned Kershnar. In a January 5, 2023, email memorializing the call, the agent stated that the FBI was "aware of information which identified you as a potential target of criminal activity, to include the possibility of violence," but that the FBI was "not aware of any specific credible threat to you[.]"

~~140.~~161.     On January 9, 2023, the Fredonia Village Police Department responded to a request under New York's Freedom of Information Law (FOIL), stating that it had no records concerning Kershnar or communications with SUNY Fredonia since January 30, 2022.

~~141.~~162.     On January 9, 2023, the New York State Police responded to a FOIL request, stating that it had no records concerning Kershnar or communications with SUNY Fredonia since January 30, 2022.

~~142.~~163.     On April 27, 2023, the Chautauqua County Sheriff's Office responded to a FOIL request, stating that it had no records concerning Kershnar or communications with SUNY Fredonia since January 30, 2022.

~~143.~~164.     The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, also known as the Clery Act, requires public

31

universities to maintain a daily log of reports of any crime reported to campus police. 34 ~~CFR~~C.F.R. § 668.46(f)(1).

~~144.~~165.    In the month after January 30, 2022 (when the *Brain in a Vat* episode featuring Kershnar was posted online), SUNY Fredonia's daily crime log does not reflect any reported threats.

~~145.~~166.    During that period, SUNY Fredonia's daily crime log lists two reports of harassment, both listed as "[c]losed by investigation."

~~146.~~167.    SUNY Fredonia's daily crime log does not list any reports of threats of violence plausibly related to Kershnar.

~~147.~~168.    The daily crime log lists only one reported threat at any time after January 30, 2022.

~~148.~~169.    That threat, reported on November 2, 2022, was unrelated to Kershnar.

~~149.~~170.    Around noon on November 2, 2022, a student posted anonymously on social media, threatening to shoot others in an academic building on campus.

~~150.~~171.    In response to the November 2, 2022, threat, SUNY Fredonia's campus police increased their presence on campus, conducted an investigation, determined the threat was not credible, identified the anonymous student, (including through use of a subpoena or other discovery), and arrested him that evening.

~~151.~~172.    Despite the November 2, 2022, threat of violence, SUNY Fredonia did not cancel any classes that afternoon.

32

*Public attention to Kershnar's comments ~~has~~ waned and ~~cannot~~did not justify ~~his continued~~repeated decisions to exile him from the academic community.*

~~152.~~173.     Although Kershnar initially received emails and other messages condemning him, those emails ~~have~~ slowed to a trickle as the controversy faded from public attention.

~~153.~~174.     Google data on the rate of searches for "Kershnar" (in blue) and "SUNY Fredonia" (in red) show that searches for "Kershnar" and "SUNY Fredonia" have dropped precipitously since the initial controversy over his comments. ~~Google Trends,~~ *Results for* "Kershnar" *and* "SUNY Fredonia," Google Trends, https://bit.ly/~~3HNFpus~~kershnarinterest:



175.   Even when national and local media outlets reported on Kershnar's lawsuit and this Court's orders, those reports did not trigger a renewed wave of hostile public comments about Kershnar.

154.176.   It ~~is~~was not reasonably likely that public opposition to Kershnar's speech ~~will~~would cause disruption ~~16~~months and years after the controversy.

**SUNY Fredonia's ~~sixteen month~~lengthy investigation yields no charges or disciplinary action.**

155.177.   On February 3, 2022, President Kolison publicly announced that Kershnar would be barred from "contact with students while [an] investigation is ongoing."

178.   ~~During~~President Kolison's February 3, 2022, statement was issued as part of a strategy adopted by SUNY Fredonia at Kershnar's expense. That strategy rested on mollifying public anger by conveying to the public that the university suspected Kershnar was a pedophile and a danger to young students and that the university would conduct an investigation into him.

179.   At President Kolison's direction, SUNY campus police searched Kershnar's campus office and seized his computer on or about February 3, 2022.

180.   Chief Isaacson and the SUNY Fredonia police provided the hard drive and other electronic information to the Federal Bureau of Investigation and Western New York Regional Computer Forensic Laboratory for analysis.

181.    On or about March 8, 2022, the Computer Analysis Response Team of the Western New York Regional Computer Forensic Laboratory provided a report of its examination of the electronic materials provided by SUNY Fredonia (the "RCFL Report").

182.    The RCFL Report conveyed that the forensic laboratory had conducted an examination of the electronic data for any "[s]exually explicit images, or movies involving children" or "email[ed] items related to sexually explicit images, or movies involving children."

183.    The RCFL Report concluded there were no such results.

184.    The RCFL Report was sent to SUNY Fredonia on March 8, 2022.

156.185.    Five months later, during an August 29, 2022, appearance before the SUNY Fredonia University Senate, a philosophy professor asked President Kolison whether his publicly- announced investigation into Kershnar was still ongoing.

157.186.    President Kolison refused to answer the philosophy professor's question, citing the need for privacy and due process., implying the investigation had not concluded.

187.    On information and belief, President Kolison knew the investigation found no evidence of impropriety on Kershnar's part.

158.188.    During the same meeting, Provost Starrett confirmed that SUNY Fredonia had been considering whether to allow Kershnar to resume teaching as late as Wednesday, August 24, 2022—two days into the Fall 2022 semester.

159.189.    During the meeting, Provost Starrett refused to state whether safety concerns were involved in the decision to continue Kershnar's suspension.

160.190.    Although SUNY Fredonia's February 3, 2022, letter suspending Kershnar cited the potential for disciplinary action, its subsequent letters reassigning him have only cited safety considerations.

161.191.    SUNY Fredonia has never notified Kershnar of the institution of formal disciplinary measures.

162.192.    In respondingresponse to FOIL requests, the New York State Police, Chautauqua County Sheriff's DepartmentOffice, and Fredonia Village Police Department have each stated they havethat it had no records concerning Kershnar since the controversy.

163.193.    Although FOIL permits a law enforcement agency to deny access to records that, if disclosed, would interfere with an investigation, none of these agencies (*i.e.*, the New York State Police, Chautauqua County Sheriff's Department, and Fredonia Village Police Department) stated that they were denying access to any responsive record.

164.194.    On this information and belief, noSUNY Fredonia did not report a threat concerning Kershnar or threats concerning Kershnar has been made to the New York State Police, Chautauqua County Sheriff's Department, or Fredonia Village Police Department.

165.195.    Save for traffic infractions, Kershnar has never been cited, charged, or arrested by any law enforcement agency.

196.    SUNY Fredonia did not notify Kershnar of the conclusion of its investigation.

197.    SUNY Fredonia never publicly disclosed that its investigation into Kershnar had concluded without evidence of wrongdoing.

***Kershnar turns down ~~public~~ speaking engagements and _refrains from_ communication with ~~campus~~_the_ community due to ~~ongoing~~ investigation~~,~~ _and_ prior restraint.***

~~166.~~198.    President Kolison's public announcement that SUNY Fredonia was investigating Kershnar's extramural speech and the actions he took consistent with that announcement ~~have~~ chilled Kershnar's speech.

~~167.~~199.    Kershnar ~~has~~ declined speaking engagements on subjects that may be controversial out of concern that his remarks ~~will~~would contribute to—or renew—the investigation into his January 2022 remarks.

~~168.~~200.    Kershnar did not respond to media inquiries about the *Brain in a Vat* controversy out of concern that his arguments were under investigation by SUNY Fredonia.

~~169.~~201.    Kershnar also did not personally respond to media inquiries from *The Leader*, SUNY Fredonia's campus newspaper, because SUNY Fredonia prohibited him from communicating with the university community.

~~170.~~202.    SUNY Fredonia's directive against communicating with the university community also prevented Kershnar from responding to faculty resolutions and emails, including those on an email discussion list open to all SUNY Fredonia faculty (including Kershnar~~),~~) criticizing Kershnar and his argument.

171.203.    Because President Kolison announced Kershnar was under investigation, but hasdid not informedinform him as to the conclusion of that investigation in the sixteen months since it was initiated, Kershnar has beenwas unable to defend himself against an onslaught of public condemnation—including that by President Kolison.

***Kershnar is ablewas available to teach courses offered by SUNY Fredonia in the Fall of 2023 that dodid not have an assigned instructor.***

172.204.    Registration for the Fall 2023 semester began on April 3, 2023.

173.205.    In the Fall 2023 semester, SUNY Fredonia is offeringoffered—but doeshad not haveassigned a faculty member assigned to teach—several sections of Philosophy courses, all of which that Kershnar hashad recently taught (see ¶ 23),, including::

    a)    Introduction to Philosophy;

    b)    Justice, Law, and Economics; and

    c)    [Special Topics]: People: Key Issues, also offered as a Capstone Seminar.

174.206.    On April 3, 2023, Kershnar's department chair informed faculty that the administration hashad determined that Kershnar won'twould not be teaching any courses in the Fall 2023 semester and hashad instead been askingasked faculty whether to reassign Kershnar's classes.

175.207.    As of the date of this Kershnar's first Complaint, June 12, 2023, the classes continued to be offered for registration.

***Despite waning public attention, unreliable threat assessments, and adverse legal findings, Defendants repeatedly renewed Kershnar's bans.***

38

208.   SUNY Fredonia, through Defendants, repeatedly renewed Kershnar's bans from teaching and campus even as internal and outside assessments concluded that public interest had waned and there was no evidence of a credible threat of violence.

209.   In September 2022, for instance, SUNY Fredonia commissioned the security consulting group A1C Partners to conduct an independent threat assessment based on online intelligence.

210.   The A1C Partners report confirmed that the discussion about Kershnar had waned after February 2022, was unable to identify any direct threats of violence demonstrating an intent to harm Kershnar or SUNY Fredonia, and concluded that the online comments did "not suggest the existence of an immediate or imminent threat to the Fredonia campus, staff, students, or Professor Kershnar."

211.   A1C Partners recommended monitoring "online activity . . . over the near term" as part of physical security and safety planning.

212.   Defendants disregarded these findings and recommendation, even as Chief Isaacson's own assessments concluded the public interest in the matter "waned."

213.   Chief Isaacson, without evidence, credited the public statement announcing Kershnar's removal as driving the wane in public interest.

214.   SUNY Fredonia never removed Kershnar's office address from his public profile on the university's website.

39

215. SUNY Fredonia never removed Kershnar's office address from his entry on the university's public-facing online directory.

216. Defendants' security memoranda were pretexts to repeatedly renew Kershnar's ban from campus due to opposition—by Defendants, the public, students, donors, and others—to Kershnar's views.

217. With respect to Kershnar, Defendants' security memoranda were, in some (if not all) instances, completed only after Defendants had decided to renew Kershnar's ban.

218. For example, on March 22, 2024, Provost Starrett sent Kershnar a letter again barring him from teaching due to asserted "ongoing concerns" for safety, but no threat assessment memorandum had been completed since Chief Isaacson's fourth memo, dated October 31, 2022—over sixteen months earlier.

219. In or about mid-September 2023, Gordon Carpenter assumed the role of Chief of University Police at SUNY Fredonia.

220. Chief Carpenter did not complete his first assessment memorandum until April 9, 2024, after Starrett's March 22, 2024, letter.

221. On January 10, 2025, Provost Starrett again sent Kershnar a letter barring him from teaching due to asserted "ongoing concerns" for safety.

222. However, Chief Carpenter did not complete his memorandum for this period until January 16, 2025.

223. The threat assessment memoranda did not provide a reasonable basis to predict a likelihood of disruption or violence.

40

224. Chief Carpenter's memoranda were not reliable because they contained numerous factual errors, were based on outdated information, predicted only that disruption was theoretically possible—as opposed to predicting that disruption was likely to occur—and/or were based on matters irrelevant to safety considerations.

225. In his first memo, dated April 9, 2024, Chief Carpenter conceded there was "no known direct threat from individuals/students on our campus." And it claimed only that "there is evidence that students are not happy and appear at some point to be 'highly stressed' due to Kershnar's rhetoric" based on an online petition published two years earlier, and that the FBI had—in October 2023—warned that Kershnar had, at some point, been the subject of threats.

226. Chief Carpenter's second memorandum, dated August 20, 2024, baselessly cited the "social climate" accompanying protests over Israel as "an added factor to the hate directed towards Kershnar."

227. Chief Carpenter's August 20, 2024, memorandum was not reliable because, among other things, it did not identify any credible threats and did not explain a specific connection between general campus protests over Israel and any risk to Kershnar.

228. Chief Carpenter's third memorandum, dated January 16, 2025, posited that returning Kershnar to campus "[c]ould" be a "risk to him (physical or emotional well-being)[.]"

41

229.    Chief Carpenter's January 16, 2025, memorandum was unreliable because, among other things, it inaccurately characterized social media commentary about Kershnar, including:

a)    Reversing the order of comments so that a photograph of ammunition appeared to be posted in response to a Kershnar-related comment, when the screenshot shows that the ammunition post came first and had no relationship to Kershnar; and

b)    Presenting laudatory comments about Kershnar as instead evidence of "hate and hostility against Kershnar."

230.    Of the four social-media threads discussed in Carpenter's January 16, 2025, memorandum, only one contained a solitary, potentially hostile comment about Kershnar.

231.    Carpenter's fourth memo, dated June 12, 2025, stated that "no immediate threat" was identified in connection with a March 2025 voicemail criticizing Kershnar; elsewhere, the memorandum catalogued hostile online comments.

232.    The June 12 memorandum nevertheless faulted Kershnar for discussing "High-Risk Topics" in public.

233.    These "High-Risk Topics" were "risky ideas" unrelated to the *Brain in a Vat* and *Unregistered* podcast discussions from 2020 and 2022.

234.    For example, the asserted "High-Risk Topics" justifying Kershnar's continued banishment included "antisemitism" and academic freedom, because, when discussed publicly, they purportedly "carry heightened security risks."

42

235.   Carpenter recognized that Kershnar's speech "may fall under the protections of free speech and academic inquiry," but nevertheless recommended Kershnar's continued exclusion because his protected speech "includes ideologically sensitive material that warrants careful scrutiny."

236.   Carpenter also speculated that student "stress and anxiety" "could increase demand on support services," that faculty and staff could experience "discomfort," and "that those effects could undermine campus morale."

237.   On July 15, 2025, Provost Judith Horowitz sent Kershnar a letter again removing him from teaching, again invoking the boilerplate language that the university was motivated by asserted "ongoing concerns" for safety.

238.   Chief Carpenter provided a fifth memorandum on or about December 17, 2025.

239.   Chief Carpenter's December 2025 memorandum again faulted Kershnar for offering public commentary that risked the public perception of "tacit institutional endorsement of dangerous views" that "undermines SUNY Fredonia's core commitments" to "ethical scholarship" and "academic integrity."

240.   Chief Carpenter noted to university leadership that Kershnar "continues to engage in provocative scholarship on topics such as abortion, pornography, punishment, sexual fantasies, slavery, torture, and cultural appropriation," which "contribute[s] to an elevated threat level by attracting both opposition and support, thereby increasing the risk of conflict or violence[.]"

43

241. Chief Carpenter highlighted as an example a social media post sharing—supportively—a link to a blog post discussing whether "God truly deserves praise."

242. As with earlier memoranda, Chief Carpenter's December 2025 memorandum was not reliable because it relied on inaccurate statements about public comments about Kershnar, such as:

a)     Presenting a series of comments posted in 2022 and 2023 as current risk evidence without noting the age of the underlying clips; and

b)     Quoting English translations of a Spanish-language thread without noting that the text was translated or that the users were located outside of the United States, including Spain and El Salvador.

243. Chief Carpenter's December 2025 memorandum, unlike earlier memoranda, added a new "factor" indicating a "High Risk" of violence: "Dehumanization and Harass[ing]" speech about the professor, including "slurs, dehumanizing language, and religious/ethnic targeting[.]"

244. Chief Carpenter's memorandum asserted that use of "historical … tropes" about Jews "indicate[s] ideologically charged hate" and that "[d]ehumanization and identity-based vilification lower the threshold for violence by portraying the target as less than human[.]"

245. Chief Carpenter's December 2025 memorandum relied on the antisemitic nature of comments about Kershnar to justify renewing his exclusion from teaching.

246. On January 16, 2026, Provost Horowitz ratified Carpenter's recommendation, again issuing a letter citing the asserted "ongoing concerns" for safety identified by Carpenter.

247. Chief Carpenter's memoranda revealed that university police were surveilling *Kershnar*'s public commentary, which Defendants Horowitz and Kolison then used as a basis to renew Kershnar's exile.

248. The pretextual nature of Defendants' conduct is evident in comparing SUNY's responses to similar faculty controversies, as SUNY did not respond in a similar manner to other faculty members whose speech yielded hostile public responses, including, but not limited to:

a) Prof. Anna Hayward, a Stony Brook University professor whose comments about an injured police officer led to negative "headlines in the New York Post and other publications, along with threatening emails and phone calls." In contrast to Defendants' banishment of Kershnar, SUNY officials simply explained that Hayward's comments reflected her own views and took steps to "increase security for her on and off campus and the campus as a whole."

b) Prof. Theodore Everett, a SUNY Geneseo philosophy professor who planned a lecture about sexual assault—entitled "Against 'Sexual' 'Assault' 'Awareness,'" complete with scare quotes— during the university's Sexual Assault Awareness Week. That planned lecture was met by a condemnatory petition with over a thousand signatures and online comments suggesting that the professor should be sexually assaulted. While SUNY Fredonia barred Kershnar after his remarks, SUNY Geneseo allowed its philosophy professor's speech to proceed as planned.

c) Prof. Simona Sharoni, a SUNY Plattsburgh professor whose comments about Israel and Palestine drew a "slew of online threats," many "sexist" in nature or threatening "rape and physical violence," via Twitter and through her university and personal email accounts. Instead of removing Sharoni from

45

campus (as SUNY Fredonia did), SUNY Plattsburgh issued a statement reiterating its commitment to freedom of speech.

**INJURIES TO PLAINTIFF**

176.249.    Kershnar, a Distinguished Teaching Professor, ~~has been~~was constructively and then formally terminated ~~as a teacher~~ because President Kolison personally ~~objects~~objected to Kershnar's expression. Kershnar—whose title ~~is~~was Distinguished *Teaching* Professor—~~has been~~was exiled from the classroom for ~~sixteen months~~four years after Kolison publicly announced an "investigation" into Kershnar.

177.250.    Plaintiff Kershnar ~~has been and continues to be~~was injured because President Kolison, Provost Starrett, and Provost ~~Starrett are effectuating~~Horowitz objected to Kershnar's views and/or effectuated a social-media heckler's veto, allowing momentary public and political reactions to dictate who may teach at a public university.

178.251.    Defendants' repeated assertions that Kershnar's exile ~~is~~was mandated by safety concerns ~~are~~were purely pretextual. Although SUNY Fredonia claims it received threats, its police incident reports ~~are~~were barren of reports of threats, it ~~has~~did not ~~reported~~report them to local law enforcement, ~~and~~ the FBI ~~says~~said it ~~is~~was unaware of any specific threats to Kershnar~~. While SUNY Fredonia claims it was motivated by concern for Kershnar's safety, it refuses~~, and the private company the university commissioned to ~~tell him anything specific about any purported~~locate evidence of credible threats~~.~~ came up empty.

46

179.252.    Kershnar has, sinceSince the first day he was removed from campus, beenKershnar was ready and able to teach his classes online, thus obviating any alleged potential threat, but SUNY Fredonia has refused to considerimplement this narrower measure.

180.253.    Yet, insteadInstead of allowing Kershnar to teach online—let alone in a classroom, where he belongs—Defendants are requiringrequired him to design online teaching modules, adding insult to injury.

181.254.    In addition to being expressly prohibited from teaching on campus, Kershnar has curtailed his extramural speech—his public speaking appearances and publications—because of concern that his speech willwould be used against him. President Kolison's sixteen monthlengthy investigation into Kershnar has placed him under a cloud, and to the extent that SUNY Fredonia secretly concluded the "investigation" has been secretly concluded without informing Kershnar of its conclusion, he iswas reasonably concerned that further speech by him willwould trigger a new investigation or disciplinary action.

182.255.    Defendants' ongoing directive prohibiting Kershnar from communicating with the "campus community" has preventedinhibited him from responding to President Kolison's repeated public condemnations.

183.256.    The directive has also frustrated Kershnar's ability to respond to faculty members' criticism of his views, including faculty members' discussion of his views on a community listserv and two faculty resolutions that affirmed his expressive freedom while criticizing his expression.

184.257.    President Kolison, by raising the specter of disciplinary actionssanctions and law enforcement action for advancing an argument and by prohibiting Kershnar from speaking to a "community," has intentionally sidelined Kershnar from participating in a debate about his own views.

258.    In announcing that Kershnar would be banned from campus and kept from contact with students, President Kolison gave official imprimatur to false speculation that Kershnar's philosophical exchange of ideas was instead indicative of support for child sex abuse.

259.    In addition to this reputational harm, Defendants' conduct has caused Kershnar emotional harm, including stress and anxiety.

260.    Defendants' conduct has impaired Kershnar's ability to continue teaching at any institution, caused lost income and earning capacity, destroyed the SUNY Fredonia Philosophy department's ability to attract student interest, and will impede his ability to obtain future academic employment.

261.    Defendants' conduct barring Kershnar from being physically present on SUNY Fredonia's campus restrained his liberty to access his place of employment as well as the spaces SUNY Fredonia generally holds open for academic discourse, public discussions, and public use and enjoyment.

**FIRST CAUSE OF ACTION**
**First Amendment Violation (~~Injunctive and Declaratory Relief~~Damages)**
**Freedom of Speech — Content and Viewpoint Discrimination**
**(42 U.S.C. § 1983)**
**(Against ~~President~~Defendants Kolison ~~and Provost~~, Starrett, and Horowitz**
**in their ~~official~~individual capacities only)**

~~185.~~262.     Plaintiff Kershnar re-alleges and re-incorporates paragraphs 1–~~184~~261 as though fully set forth here.

~~186.~~263.     In his appearances on the *Unregistered* and *Brain in a Vat* podcasts, Kershnar spoke as a private citizen.

~~187.~~264.     Kershnar's comments on *Unregistered* and *Brain in a Vat* addressed matters of public concern.

265.   In making public comments about antisemitism, academic freedom, and God, Kershnar spoke as a private citizen.

266.   Kershnar's public comments about antisemitism, academic freedom, and God addressed matters of public concern.

~~188.~~267.     Kershnar's interest in speaking as a private citizen on matters of public concern ~~outweighs the public university's interests in advancing content- or viewpoint discrimination~~outweighed any legitimate interest in regulating his extramural speech.

~~189.~~268.     Kershnar's interest in speaking as a private citizen on matters of public concern ~~outweighs~~outweighed the public university's interests in imposing a heckler's veto.

49

190.269.    Defendants suspended Kershnar from teaching his classes, from entering the Fredonia campus, and from communicating with the university community, because of President Kolison'sDefendants' opposition to Kershnar's message, or because of public, student, and donor reactions to Kershnar's message, or both.

191.270.    Frustrating a faculty member's classroom teaching in the absence of a legitimate educational interest violates the First Amendment. *Levin v. Harleston*, 966 F.2d 85, 88 (2d. Cir. 1992).

192.271.    Neither reasonNone of the interests cited or invoked by Defendants serves a legitimate educational interest.

193.272.    Kershnar's speech did not materially disrupt SUNY Fredonia's operations.

194.273.    On each successive date that Defendants decided to prevent Kershnar from teaching (including February 1–3, 2022, August 24, 2022, September 9, 2022, November 1, 2022, and when Defendants decided not to permit Kershnar to teach during the Fall 2023 semester), it was not reasonable to predict future disruption from Kershnar's speech.

195.274.    SUNY Fredonia's invocation of safety iswas predicated on speech by outsiders—that is, people with little or no relationship to SUNY Fredonia—and imposesimposed a heckler's veto. *Melzer v. Bd. of Educ.*, 336 F.3d 185, 199 (2d Cir. 2003).

~~196.~~275.    ~~Public~~A restriction that turns on listeners' reaction to speech is never ~~a~~ content-neutral ~~basis for regulation~~. *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992). A heckler's veto is a viewpoint-based limitation on expression and is impermissible under the First Amendment.

~~197.~~276.    On each successive date that Defendants decided to prevent Kershnar from teaching ~~(including February 1–3, 2022, August 24, 2022, September 9, 2022, November 1, 2022, and when Defendants decided not to permit Kershnar to teach during the Fall 2023 semester),~~. any potential disruption was outweighed by the value of Kershnar's speech.

~~198.~~277.    The "essentiality of freedom" of public university faculty "to inquire, to study and to evaluate" is "self-evident," particularly "in the social sciences, where few, if any, principles are accepted as absolutes." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

~~199.~~278.    Viewpoint discrimination is antithetical to the public university's interest in freedom of inquiry unfettered by the "pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

~~200.~~279.    The First Amendment prohibits government officials from discriminating against speech "based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–30 (1995) (action taken against a speaker because of "its message" is viewpoint discrimination). Viewpoint discrimination is an "egregious

form of content discrimination" and is "presumptively unconstitutional." *Rosenberger*, 515 U.S. at 829–30.

201.280.    ~~President Kolison's decision~~Defendants' repeated decisions to remove Kershnar from the classroom ~~is~~were the product of viewpoint discrimination and ~~is~~were in retaliation for Kershnar's speech.

202.281.    President Kolison's directive to remove Kershnar from the classroom and otherwise to limit his speech was motivated by President Kolison's opposition to Kershnar's viewpoint, which Kolison labeled in public statements as "absolutely abhorrent," "reprehensible," and inconsistent with "the values of the SUNY Fredonia campus."

203.282.    Even if SUNY Fredonia had any legitimate safety concerns, its suspension of Professor Kershnar was imposed reflexively~~,~~ and without regard to measures that would address any safety interest without burdening Kershnar's expression.

204.283.    On information and belief, the narrower measures ignored or rejected by Defendants include, but are not limited to:

a)    Permitting Kershnar to teach remotely;

b)    Increasing police presence in the immediate vicinity;

c)    Soliciting backup from external law enforcement agencies;

d)    Reporting threats to external law enforcement; and

e)    Seeking the arrest or prosecution of persons, if any, who made threats of violence.

52

284.    ~~Executive Vice President and Provost~~ Defendants Starrett and Horowitz engaged in unconstitutional viewpoint discrimination by advancing and enforcing ~~President Kolison's~~ the viewpoint-driven decision to remove Kershnar.

~~205.~~285.    Defendants Starrett and Horowitz took affirmative steps to enforce this directive~~.~~ even after the United States Court of Appeals for the Second Circuit held on August 30, 2023, that the First Amendment applies to a public university faculty member's academic expression. *Heim v. Daniel*, 81 F.4th 212, 227–28 (2d Cir. 2023).

286.    Defendant Kolison did not rescind his directive following the decision in *Heim v. Daniel.*

~~206.~~287.    SUNY Fredonia ~~is offering~~offered the classes Kershnar ~~teaches~~taught to undergraduate students in at least the Fall 2023 semester.

288. On information and belief, SUNY Fredonia ~~has no faculty member~~continued to offer classes Kershnar taught to undergraduate students in successive semesters.

~~207.~~289.    Kershnar was available to teach these ~~courses~~classes and, as a Distinguished Teaching Professor, would have taught one or more of these classes but for Defendants' conduct.

~~208.~~290.    Kershnar ~~has been~~was summarily excluded from teaching these courses solely because of SUNY Fredonia's opposition to his protected extramural expression.

291. Defendants' actions caused Kershnar to suffer injuries. *See, e.g., supra* ¶¶ 249–61.

292. It was clearly established that public employees retain a First Amendment right to freedom of expression and may not face retaliation for its exercise. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 572–75 (1968).

~~209. Kershnar is likely to succeed on the merits of his claims.~~

~~210. There is substantial public interest in ensuring Defendants cease engaging in viewpoint based restriction and censorship of speech on New York's college campuses, where "the vigilant protection of constitutional freedoms is nowhere more vital[.]" *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).~~

~~211. Kershnar has no adequate legal, administrative, or other remedy by which to prevent or minimize the immediate, irreparable, and ongoing harm to his First Amendment rights from Defendants' unconstitutional viewpoint discrimination.~~

293. ~~Absent preliminary and permanent injunctive relief enjoining Defendants from removing Kershnar from teaching due to his protected expression, the~~It was clearly established that a public university official may not burden a philosophy professor's ability to teach in the classroom due to his protected extramural expression. *Levin*, 966 F.2d at 88.

294. ~~will continue~~It would have been apparent to a reasonable public university president or other official that he may not remove a professor from

teaching due to objections to the professor's views. *Id.*; *Keyishian,* 385 U.S. at 599–604.

212.295.    ~~violate~~Due to opposition to Kershnar's expression, Defendants deliberately violated Kershnar's First Amendment rights.

~~213.~~ It was clearly established that an official acting under the color of state law cannot censor or restrict speech based on "its message" or the viewpoint expressed. *Rosenberger,* 515 U.S. at 828–30; *R.A.V. v. St. Paul,* 505 U.S. 377, 391–92 (1992~~Because a justiciable controversy exists over Defendants' viewpoint based discrimination against Kershnar's protected expression, Kershnar also seeks declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.~~

296.    ); *see also Heim*, 81 F.4th at 233.

297.    Kershnar is entitled to compensatory and nominal damages against Defendants in their individual capacities for violating Kershnar's clearly established First Amendment rights.

298.    Defendants' deliberate violation of the Constitution was malicious, oppressive, and in reckless and callous disregard of Kershnar's well-established rights.

299.    Kershnar is therefore entitled to punitive damages against Defendants in their individual capacities.

300.    Accordingly, punitive damages against Defendants are appropriate and necessary to punish Defendants for violating Kershnar's First Amendment rights and to deter similar violations in the future.

**SECOND CAUSE OF ACTION**
**First Amendment Violation (Injunctive and Declaratory ReliefDamages)**
**Freedom of Speech— — Retaliation**
**(42 U.S.C. § 1983)**
**(Against PresidentDefendant Kolison and Provost Starrett**
**in their official capacitieshis individual capacity only)**

214.301.    Plaintiff Kershnar re-alleges and re-incorporates paragraphs 1–184261, 262–90, and 292–96 as though fully set forth here.

215.    Kershnar engaged in extramural expression protected by the First and Fourteenth Amendments. Kershnar engaged in extramural expression protected by the First and Fourteenth Amendments. *See* ¶¶ 186–205, which are re-alleged and re-incorporated as though fully set forth here.

302.    Defendants*See supra* ¶¶ 263–68, 271–76, 282–83.

216.303.    Defendant Kolison took adverse action against Kershnar, including:

    a)    Barring Kershnar from campus for sixteen monthsfour years;

    b)    Prohibiting Kershnar from communicating with the campus community without basis;

    c)    Removing Kershnar, a distinguished lecturer, from teaching;

    d)    Publicly announcing an investigation into Kershnar's protected expression;

    e)    Initiating an investigation into Kershnar's protected expression, implying the threat of disciplinary action;

f) Assigning Kershnar, a Distinguished Teaching Professor, to menial research about what courses should be offered, ~~while struggling~~even as SUNY Fredonia struggled to find an instructor for ~~the~~his courses ~~it presently offers~~;

g) Directing law enforcement officers to search ~~his~~Kershnar's office; and

h) Directing law enforcement officers to seize and search ~~his~~Kershnar's computer.

~~217.~~304.    In total, the actions taken or ratified by President Kolison ~~and Provost Starrett carry~~also carried an implicit—if not explicit—threat of disciplinary action against Kershnar for protected expression.

~~218.~~305.    President Kolison ~~has~~had the authority to bring disciplinary charges against Kershnar.

306.    Chiefs Isaacson and Carpenter worked with President Kolison to paper over Kershnar's banishment from teaching and from campus with letters styled as "threat assessments" claiming—baselessly—that Kershnar's return to campus posed a safety risk.

~~219.~~307.    The February 3, 2022, suspension letter, issued at President Kolison's direction, ~~commensurate~~ and contemporaneously with his public statement ~~announcing Kershnar's suspension pending an investigation~~that Kershnar would have no student contact, invoked President Kolison's authority to ~~initiate disciplinary action against~~reassign faculty in contemplation of discipline.

~~220.~~308.    President Kolison ~~and Provost Starrett have~~ never ~~withdrawn~~withdrew or disclaimed the implicit threat of disciplinary action.

221.309.    President Kolison's and Provost Starrett's actions directly deprived Kershnar of his First Amendment rights.

222.310.    Defendants'Kolison's adverse action wasactions were in response to Kershnar's protected speech.

223.311.    Kershnar's message was theextramural remarks were a motivating factor in President Kolison's decisiondecisions to take retaliatory action against Kershnarhim. President Kolison immediately suspended Professor Kershnar and subjected him to a protracted banishment and investigation because of his extramuralthose remarks on a mattermatters of public importanceconcern.

224.312.    The responses by President Kolison's Kolison (and Provost Starrett's responseuniversity officials acting at his direction) to Kershnar's expression are sufficient to deter a person of ordinary firmness from continuing to engage in expressive activity.

225.    Defendants'Defendant Kolison's actions have, in fact, chilled Kershnar's speech.

226.313.    Kershnar has no adequate legal, administrative, or and injured him in other remedy by which to prevent or minimize the immediate, irreparable, and ongoing harm to his First Amendment rights from Defendants' retaliatory conduct. ways. See, e.g., supra ¶¶ 249–61.

314.    Absent preliminaryDue to his personal opposition to Kershnar's expression, Defendant Kolison deliberately violated Kershnar's First Amendment rights.

227.315.   Kershnar is entitled to compensatory and ~~permanent injunctive relief enjoining Defendants from retaliating~~nominal damages against ~~Kershnar due to~~ Defendant Kolison in his ~~protected expression, the public university will continue to violate~~individual capacity for violating Kershnar's clearly established First Amendment rights.

~~228.   Because a justiciable controversy exists over Defendants' retaliation against Kershnar's protected expression, Kershnar also seeks declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.~~

316.   Defendant Kolison's deliberate violation of the Constitution was malicious, oppressive, and in reckless and callous disregard of Kershnar's well-established rights.

317.   Kershnar is therefore entitled to punitive damages against Defendant Kolison in his individual capacity.

318.   Accordingly, punitive damages against Defendant Kolison are appropriate and necessary to punish Defendant Kolison for violating Kershnar's First Amendment rights and to deter similar violations in the future.

**THIRD CAUSE OF ACTION**
**First Amendment Violation (~~Injunctive and Declaratory Relief~~Damages)**
**Freedom of Speech~~— ~~— Prior Restraint**
**(42 U.S.C. § 1983)**
**(Against ~~President~~ Kolison ~~and Provost Starrett~~**
**in ~~their~~his individual ~~capacities~~capacity only)**

229.319.   Plaintiff Kershnar re-alleges and re-incorporates paragraphs 1–~~184~~261, 262–90, and 292–96 as though fully set forth here.

59

230.320.    ~~Defendants issued~~President Kolison ordered the issuance of a written directive prohibiting Kershnar from having any "contact with the campus community" without the advance permission of a designated official.

231.321.    ~~Defendants'~~Defendant Kolison's directive ~~is~~was a prior restraint on Kershnar's speech.

232.322.    "[P]rior restraints on speech . . . are the most serious and the least tolerable infringement on First Amendment rights," *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

233.323.    Prior restraints are presumptively unconstitutional. *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).

234.324.    ~~Defendants'~~Defendant Kolison's directive ~~reaches~~reached Kershnar's speech as a private citizen.

235.325.    ~~Defendants'~~Defendant Kolison's directive ~~bars~~barred Kershnar from speaking to any member of a broad audience, including any faculty member, staff member, student, alumnus, or other "member of the campus community."

236.326.    ~~Defendants'~~Defendant Kolison's directive ~~is~~was not limited in time~~, ending~~; it was set to end only when ~~Defendants give~~SUNY Fredonia gave Kershnar "further notice."

237.    ~~Defendants' directive has been in place for sixteen months.~~

327.    The duration of Defendant Kolison's directive (*i.e.*, when "further notice" would be issued) was not bound by objective, definite, and neutral criteria.

238.328.    Defendants' directive ~~remains~~was in place for over four years.

60

329.   ~~Defendants'~~Defendants took no steps to fully rescind the directive ~~is~~even after this Court's March 6, 2026, denial of the motion to dismiss Kershnar's prior restraint claim.

~~239.~~330.   Defendants' directive was not limited in subject matter, restraining Kershnar's speech even if it ~~addresses~~addressed matters of public concern.

~~240.~~331.   Kershnar ~~desires~~desired and ~~has~~had a strong interest in continuing to speak on matters of public concern, including defending, explaining, or elaborating on the comments he made in public debates.

~~241.~~332.   The members of the public who make up the Fredonia "community" ~~have~~had a constitutionally recognized interest in having the opportunity to hear from a faculty member whose provocative views ~~have~~had caused controversy, even if they ultimately ~~disagree~~disagreed with him.

~~242.~~333.   Defendants' directive ~~has~~ prevented Kershnar from responding to criticisms of his remarks by colleagues, including on email discussion lists open to SUNY Fredonia faculty.

~~243.~~334.   Defendants' directive ~~has~~ also inhibited Kershnar's ability to respond to inquiries from SUNY Fredonia's student newspaper, *The Leader*.

~~244.~~335.   SUNY Fredonia ~~has~~had no interest sufficient to justify restraining a tenured faculty member from speaking on any subject to any member of a community of thousands for ~~sixteen months~~four years.

~~245.   Kershnar is likely to succeed on the merits of his claims.~~

246. Kershnar has no adequate legal, administrative, or other remedy by which to prevent or minimize the immediate, irreparable, and ongoing harm to his First Amendment rights from Defendants' prior restraint.

247. Absent preliminary and permanent injunctive relief enjoining Defendants from enforcing theirThe prior restraint on Kershnar's speech, the public university will continue to violate Kershnar's First Amendment rights.

248. Because a justiciable controversy exists over Defendants' imposition of a prior restraint on Kershnar's protected speech, Kershnar also seeks declaratory relief against Defendants. A declaratory judgment will further resolve and clarify the parties' legal relationship.

**FOURTH CAUSE OF ACTION**
**First Amendment Violation (Damages)**
**Direct and Retaliatory Infringements of Freedom of Speech**
**(42 U.S.C. § 1983)**
**(Against President Kolison in his individual capacity only)**

249. Plaintiff Kershnar re-alleges and re-incorporates paragraphs 1–184 as though fully set forth here.

250.336. Kershnar engaged in extramural expression protected by the First and Fourteenth Amendments. caused him to suffer injuries. *See* ¶¶ 186–205, which are re-alleged and re-incorporated as though fully set forth here, *e.g., supra* ¶¶ 249–61.

251.1. It is clearly established that public employees retain a First Amendment right to freedom of expression and may not face retaliation for its exercise. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 572–75 (1968).

62

252.   Due to objections to Kershnar's views, President Kolison removed Kershnar from teaching. *See* ¶¶ 190, 194–195, 197, and 201–202, which are re-alleged and re-incorporated as though fully set forth here.

253.1. It is clearly established that a public university administrator may not burden a philosophy professor's ability to teach in the classroom due to his protected extramural expression. *Levin*, 966 F.2d at 88.

254.1. It would have been apparent to a reasonable public university president that he may not remove a professor from teaching due to objections to the professor's views. *Id.*; *Keyishian*, 385 U.S. at 599–604.

337.   official that he may not impose a prior restraint on a professor because of objections to the professor's views or in retaliation for the professor's expression.

255.   Due to his personal opposition to Kershnar's expression, PresidentDefendant Kolison deliberately violated Kershnar's First Amendment rights. *See* ¶¶ 190–204, which are re-alleged and re-incorporated as though fully set forth here.

256.338.   It is clearly established that an official acting under the color of state law cannot censor or restrict speech based on "its message" or the viewpoint expressed. *Rosenberger*, 515 U.S. at 828–30; *R.A.V. v. St. Paul*, 505 U.S. 377, 391–92 (1992).

257.339.   Kershnar is entitled to compensatory and nominal damages against PresidentDefendant Kolison in his individual capacity for violating Kershnar's clearly established First Amendment rights.

258.340. PresidentDefendant Kolison's deliberate violation of the Constitution was and remains malicious, oppressive, and in reckless and callous disregard of Kershnar's well-established rights.

259.341. Kershnar is therefore entitled to punitive damages against PresidentDefendant Kolison in his individual capacity.

260.342. Accordingly, punitive damages against PresidentDefendant Kolison are appropriate and necessary to punish PresidentDefendant Kolison for violating Kershnar's First Amendment rights and to deter similar violations in the future.

## JURY DEMAND

Under Fed. R. Civ. P. 38, Kershnar demands a jury trial on all issues triable to a jury.

## PRAYER FOR RELIEF

Kershnar respectfully requests that the Court enter judgment against all Defendants and issue the following forms of relief:

1. Declare that Kershnar's extramural statements are protected by the First Amendment to the United States Constitution;

2. Declare that Defendants violated the First Amendment in removing Kershnar from the classroom due to his extramural statements;

3. Enter preliminary and permanent injunctions enjoining Defendants and their employees, agents, servants, officers, and persons in concert with Defendants,

~~from barring Kershnar from teaching, entering campus, communicating with members of the university community, or otherwise engaging in speech on matters of public interest and concern;~~

~~4.~~1.    Award Kershnar nominal, compensatory, and punitive damages against Defendants Kolison, Starrett, and Horowitz in ~~his~~their individual ~~capacity~~capacities;

~~5.~~2.    Award Kershnar his attorneys' fees under 42 U.S.C. § 1988;

~~6.~~3.    Award Kershnar his costs; and

~~7.~~4.    Award such other relief as the Court may deem just and proper.

Dated: ~~June 12, 2023~~July 31, 2026

Respectfully submitted,

~~/s/                    Barry                    N. Covert                    ~~/s/
_____.
Robert Corn-Revere*
DC Bar No. 375415
FOUNDATION FOR INDIVIDUAL RIGHTS
   & EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
(215) 717-3473
bob.corn-revere@fire.org

Adam B. Steinbaugh*
CA Bar No. 304829
Cary Davis*
PA Bar No. 338042
FOUNDATION FOR INDIVIDUAL RIGHTS
   & EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
(215) 717-3473
adam@fire.org
cary.davis@fire.org

65

Barry N. Covert, Esq.
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue – Suite 120
Buffalo, New York 14202
Phone: (716) 849-1333
Email: bcovert@lglaw.com

Adam B. Steinbaugh*
CA Bar No. 304829
FOUNDATION FOR INDIVIDUAL RIGHTS
   & EXPRESSION
510 Walnut St.; Ste. 1250
Philadelphia, PA 19106
Tel:      (215) 717-3473
Fax:      (267) 573-3073
Email:  adam@thefire.org

Joshua T. Bleisch*
IN Bar No. 35859-53
FOUNDATION FOR INDIVIDUAL RIGHTS
   & EXPRESSION
700 Pennsylvania Avenue SE
Suite Email: bcovert@lglaw.com


*Admitted 340
Washington, DC 20003
Tel:      (215) 717-3473
Fax:      (267) 573-3073
Email:  josh.bleisch@thefire.org

*Applications for admission
pro hac vice admission forthcoming.

Counsel for Plaintiff

66

**VERIFICATION OF STEPHEN KERSHNAR**

Pursuant to 28 U.S.C. § 1746, I, STEPHEN KERSHNAR, declare as follows:

1.      I am the Plaintiff in the present case and a citizen of the United States of America.

2.      I have read the foregoing Verified Complaint for Civil Rights Violations.

3.      I have personal knowledge of the factual allegations in paragraphs 1–14, 22–79, 81–85, 87–93, 9–101, 104–109, 112–118, 125–139, 144–147, 152, 155, 160–162, 165–172, 175–177, and 179-184 of the Verified Complaint and know them to be true.

4.      I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed on June 8, 2023.


_____

_____

_____   Stephen Kershnar