**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEPHEN KERSHNAR,<br>*Plaintiff*,<br>v.<br>STEPHEN H. KOLISON, JR., *et al*.,<br>*Defendants*. | Case No.: 1:23-cv-00525-LJV-JJM |

# PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

Defendants' opposition (Dkt. No. 118 ("Opp.")) to Plaintiff Kershnar's timely motion for leave to amend (Dkt. No. 116–1 ("Mot.")) fails to establish futility or prejudice for three reasons. First, contrary to Defendants' theory, officials who repeatedly enforce an unlawful directive are direct participants even if a superior originated that order. Second, Defendants' claims of undue delay ignore newly discovered facts, recent developments, and the posture of this case—and, in any event, Defendants identify no substantial prejudice. Third, Defendants' causation arguments turn on factual disputes that cannot establish futility.

Above all, the proposed first Amended Complaint builds on meritorious theories at an early stage of the litigation, and the Court should grant Plaintiff leave to amend.

## I. Amendment as to Defendants Starrett and Horowitz is not futile because both directly participated in Kershnar's removal.

Defendants' argument that Starrett and Horowitz are not proper defendants because they only conveyed President Kolison's decisions (Opp. at 7–8) misrepresents the Proposed First Amended Complaint ("PFAC") and misapprehends the law. A fair reading of the PFAC shows the direct involvement of Provosts Starrett and Horowitz in the repeated decisions to remove Plaintiff. *See, e.g.*, PFAC ¶¶ 18 (Kolison *and* provosts exiled Plaintiff); 20–21 (provosts delegated

authority); 188–89 (Starrett explaining that "SUNY Fredonia," not Kolison, was "considering" Plaintiff's role); 131–32, 138–40, 148–52, 218, 221, 237 (letters explaining decisions by SUNY Fredonia to renew Plaintiff's removal); 250 (Kolison *and* the provosts objected to Plaintiff's views or effectuated community objections—a "heckler's veto"). Contrary to Defendants' creative hypothetical (Opp. at 7, claiming that had they not sent the letters, "Plaintiff still would have remained barred … by Kolison's order"), each of the four letters reflected separate decisions to renew Plaintiff's exile. PFAC ¶¶ 20–21, 218, 221, 237, 246.

That the provosts were exercising authority Kolison delegated to them does not make Kolison the sole decisionmaker. Instead, the PFAC alleges Provost Horowitz—not Kolison—"ratified" a police chief's recommendations to remove Plaintiff due to his speech. *Id.* ¶¶ 239–241, 246. That supports an inference that Horowitz personally participated in the decisions. And that is consistent with Kolison's opposition, which denies making those decisions (Opp. at 8 & n. 4), and with Kolison's written interrogatories, which say there was "not a singular decision maker" and that all "actions" after February 2022 are attributable to "members of my cabinet that handle such matters," acting under authority he "delegated" to them. Ex. A at 6. Indeed, Defendants "say that not re-assigning Kershnar to teach in-person or online classes was a decision made by the *provost* in his sole discretion." Am. Decision & Order (Dkt. No. 104) at 17 (emphasis added); *see* Defs.' Mem. in Supp. of Mot. to Dismiss (Dkt. No. 13-1) at 20, 23.

Worse, Starrett and Horowitz kept making these decisions even after the Second Circuit's intervening decision in *Heim* hollowed out Defendants' justification that the Circuit had not yet resolved the scope of faculty members' First Amendment rights. *See* Am. Decision & Order (Dkt. No. 104) at 21–23 (explaining that *Heim v. Daniel*, 81 F.4th 212 (2d Cir. 2023) undermined qualified immunity claims). That development, along with Defendants' post-Complaint assertion

that Starrett exercised "discretion" to remove Plaintiff, supports adding individual-capacity damages claims. *See* Defs.' Mem. in Supp. of Mot. to Dismiss (Dkt. No. 13-1) at 20.

Moreover, those acts show both personal involvement and but-for causation. Defendants' argument, and the cases they cite, ask whether an official's superior position in a chain of command can alone establish liability for a subordinate's acts.[1] This case presents the opposite question: whether a subordinate may be liable for carrying out a superior's unconstitutional command.

And on that question, "just following orders" is no defense. The longstanding "general tort rule," applicable to Section 1983 actions, is "that an agent is not relieved of liability merely because he acted at the command of the principal." *Raysor v. Port Auth. of N.Y. & N.J.*, 768 F.2d 34, 38 (2d Cir. 1985); *see also Sorensen v. City of New York*, 42 F. App'x 507, 510–11 (2d Cir. 2002) (denying qualified immunity for individual officers who argued they were "simply low-level employees following orders").

That is why "personal involvement" exists where "the defendant participated directly," including where he "authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally." *See Franklin v. City of Buffalo*, No. 1:18-CV-719 (CCR), 2026 WL 1506125, at *30 (W.D.N.Y. May 29, 2026), *appeal filed sub nom.*, *Black Love Resists v. City of Buffalo*, No. 26-1763 (2d Cir. June 30, 2026) (quoting *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014); *Hawthorne by Hawthorne v. Cnty. of Putnam*, 492 F. Supp. 3d 281, 293 (S.D.N.Y. 2020)). Here, Starrett and Horowitz personally participated in the challenged

[1] *See, e.g.*, Opp. at 6–8 (citing *Peck v. County of Onondaga*, No. 5:21-CV-651 (DNH/ML), 2021 WL 3710546, at *11, *17 (N.D.N.Y. Aug. 20, 2021) (supervisor's mere "inaction" did not establish the affirmative "adverse action" necessary for discrimination claims); *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (supervisory liability requires more than knowledge)). Defendants' remaining cases involve persons uninvolved in making or carrying out decisions. *E.g.*, *Mule v. Dep't of Educ. of City of N.Y.*, 797 F. Supp. 3d 9, 43 (E.D.N.Y. 2025) (employee filed discrimination claim and cooperated with investigation).

deprivations by considering—or purportedly considering—the police chiefs' assessments, acting on their recommendations, and issuing decisions that renewed Kershnar's exclusion for additional semesters. PFAC ¶¶ 20–21, 217–22, 237, 244–45. Those affirmative acts plausibly establish both personal involvement and but-for causation as to each renewed period of exclusion. PFAC ¶¶ 271, 274, 278, 282–89. These are questions of fact better left to a factfinder. *See One Barberry Real Est. Holding, LLC v. Maturo*, 698 F. Supp. 3d 252, 319 (D. Conn. 2023) (noting "[p]ersonal involvement is a question of fact" and finding direct personal involvement where zoning enforcement officer issued cease-and-desist order at superior's direction).

## II. Plaintiff's timely amendment is not the result of undue delay, and Defendants will bear no meaningful prejudice from amendment.

Defendants' argument that the Court should deny leave to amend due to delay starts the clock too early, overstating the certainty of the future of Philosophy programming. Amending when Defendants suggest Kershnar should have would have resulted in premature assertion of contingent, unripe damages claims that later factual developments—which explain the present timing of the proposed amendment—served to solidify. And even if Plaintiff's timely motion *were* the product of delay, "delay alone" is "insufficient to deny" leave to amend "in the absence of bad faith or prejudice to the opposing party," *Nat'l Rifle Ass'n of Am. v. Cuomo*, 480 F. Supp. 3d 404, 413 (N.D.N.Y. 2020), and Defendants do not identify any bad faith or dilatory motive—nor could they, as the timing of Plaintiff's motion is responsive to the evolution of the facts of this case.

The thrust of Defendants' argument is that Plaintiff was aware his university intended to end the Philosophy major and minor in December 2023 (six months after he filed the operative Complaint),[2] so an August 2026 amendment raising his August 2026 retrenchment must reflect

[2] Defendants also aver that the "official end dates of the impacted programs was [*sic*] announced shortly thereafter in March 2024," Opp. at 5, but provide no citation for the claim.

delay. Opp. at 5. That argument strains the facts to stretch the length of purported delay. True, SUNY Fredonia "announced that it was *planning*" program cuts in December 2023. Opp. at 5 (emphasis added). But "planning" does not mean Kershnar's individual retrenchment was a *fait accompli*; instead, it remained speculative at that juncture.[3] So, too, were the futures of the Philosophy minor and department still in flux—Defendants' claim that it had announced the termination of both the Philosophy major and minor in December 2023 (Opp. at 3) is false.

Ending the option to have Philosophy as a major would not mean—as the university publicly confirmed in March 2024—the end of the Philosophy Department or Philosophy classes. As SUNY Fredonia's website explains, discontinuation of "certain programs" did not mean the end of all courses in these programs, and the university pledged to "continue to offer classes" in these areas, as planned cuts to the majors "does not mean that we will not offer courses in those disciplines."[4] Nor did the end of the Philosophy major mean the Philosophy Department would be shuttered—to the contrary, the university reassured its community that departments were *not* being eliminated, "just the majors/degree programs," and these "uncertainties" meant the university could not "predict" which positions might be "impacted."[5] President Kolison himself reassured the

---

[3] The plan to wind down the Philosophy major was itself not solidified until sometime later. As of March 2024, SUNY Fredonia had not yet received "approval" from the "SUNY System Administration" to proceed with its proposal. SUNY Fredonia, *Program Deactivation Review Process (PDRP) Timeline*, https://www.fredonia.edu/about/offices/president/roadmap-financial-sustainability/timeline.

[4] *See* "Will SUNY Fredonia Students still be able to take courses in impacted areas?" and "How do you plan on continuing to be a viable liberal arts institution?," SUNY Fredonia, *Roadmap to Financial Sustainability: Questions and Answers* (rev. Mar. 4, 2024), https://www.fredonia.edu/about/offices/president/roadmap-financial-stability/questions-answers.

[5] *Id.* at "Are departments being eliminated? Will all classes in the area of the discontinued programs be eliminated?" and "Will positions be eliminated?"

campus that "courses in many of these areas will still be available to SUNY Fredonia students even after the major is no longer offered."[6]

The future of SUNY Fredonia's Philosophy courses remained clouded for some time. Defendants oddly point to a 2025 student newspaper article reporting that Defendant Provost Starrett had told "a lie" when, in a March 2024 email, he told the university community it "will keep" certain minors, including the Philosophy minor, after the elimination of corresponding majors. Opp. at 10 & n.9.[7] "Now … it has been announced that nine minors," including Philosophy, "have been cut."[8] That the university community was still uncertain as to the fate of the Philosophy minor at that late date only underscores why earlier amendment would have been premature.

Had Plaintiff prematurely asserted damages in anticipation of retrenchment, the claim would have been contingent and unripe. *See, e.g.*, *Coffran v. Bd. of Trs. of N.Y.C. Pension Fund*, 46 F.3d 3, 4–5 (2d Cir. 1995) (per curiam) (medical board's recommendation that tenured police sergeant be involuntarily retired was unripe because it rested on "contingent future events that may not occur as anticipated, or indeed may not occur at all" (citation omitted)). SUNY Fredonia did not notify Kershnar of his retrenchment until a March 2025 letter from Kolison, attached as Exhibit B, stating that his "appointment will be terminated [on] August 31, 2026"—ten days from now.

---

[6] Stephen H. Kolison, *2023 Roadmap to Financial Sustainability presentation*, SUNY Fredonia, https://www.fredonia.edu/about/offices/president/roadmap-financial-sustainability/2023-presentation.

[7] *See* Abigail Jacobson, *Nine Minors to Be Removed from Fredonia Curriculum*, The Leader (Mar. 22, 2025), https://fredonialeader.org/news/2025/03/22/nine-minors-to-be-removed-from-fredonia-curriculum. Defendants' opposition misrepresents the timeline, asserting that the university announced plans to end both the "philosophy major and minor" in December 2023. Opp. at 3.

[8] Jacobson, *supra* note 7.

And while Defendants' delay argument is limited to Plaintiff's "retrenchment-related claims" and not the damages claims against Defendants Starrett and Horowitz (*see* Opp. at 2, 5), Plaintiff's discovery of recent developments—including material Defendants did not provide until ordered to do so on March 6 and 12, 2026—also explains the timing of his amended complaint. Mot. at 3; Dkt. Nos. 82, 83, 94, 98. That, too, indicates the amendment is responsive to factual developments, not driven by dilatory motive. And as Defendants' authority explains, "delay is routinely justified" where a party can point to "discovered new facts and a basis for new allegations" learned during the case. *Stephenson v. Dow Chem. Co. (In re Agent Orange Prod. Liab. Litig.)*, 220 F.R.D. 22, 25 (E.D.N.Y. 2004); *see* Opp. at 5 (citing *Stephenson*, 220 F.R.D. at 24); *see* Mot. at 7–8 (detailing newly discovered evidence).

The progress and posture of this case also show the timing of Plaintiff's proposed amendment is not borne of bad faith. This Court denied Defendants' Rule 12(b)(6) motion only five months ago. Dkt. No. 93. The Court's April 9, 2026, Case Management Order is of even more recent vintage. Dkt. No. 106. Until mid-April, the parties were focused on (a) the preliminary injunction motion and (b) settlement negotiations, which led to a "lengthy stay" of the preliminary injunction proceedings "so that settlement negotiations could be pursued." *See* Am. Decision & Order (Dkt. No. 104) at 2; Dkt. Nos. 74, 75, 77, 109; *see State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.*, 246 F.R.D. 143, 147 (E.D.N.Y. 2007) ("ongoing settlement negotiations" were among the "persuasive reasons for delay").

Finally, Defendants identify only one potential prejudice: "Plaintiff will presumably seek to take discovery on the retrenchment related claims." Opp. at 5. That hardly shows amendment will force Defendants "to expend significant additional resources to conduct discovery" or "significantly delay the resolution of the dispute." *Hines v. City of Albany*, 542 F. Supp. 2d 218,

223 (N.D.N.Y. 2008) (citation omitted). Discovery only recently began. No depositions are scheduled. The *only* written discovery has consisted of one request for production[9] and one set of interrogatories—which already sought "every basis" for retrenchment. Ex. A at 9–10. Defendants cannot claim prejudice from questions they are already answering.

**III. Defendants' causation theories present factual questions, not futility.**

Defendants try to recast Plaintiff's allegations as a claim that his removal alone "*caused* the elimination of" the Philosophy Department, in order to argue his claim necessarily fails because his "retrenchment is wholly divorced from his alleged protected speech." Opp. at 9. But that affirmative *Mt. Healthy* defense turns on disputed facts about motive and causation that cannot be resolved here. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 286 (1977) (defense requires "attempting to prove to a trier of fact" that "quite apart from" the protected speech, the employer would have made the same decision).

Defendants' framing—that Plaintiff alleges his speech alone caused his department's elimination—also misunderstands the law. Protected speech need not be the only or even a "predominating" factor; it need only be a "substantial" factor. *Gierlinger v. Gleason*, 160 F.3d 858, 868 (2d Cir. 1998). The PFAC alleges that Defendants repeatedly removed Kershnar from teaching, ultimately forcing his termination, because of opposition by administrators and community members to his speech. PFAC ¶¶ 123–28, 269. It also alleges Defendants' conduct diminished the Department's ability to attract students, contributing to its closure. *Id.* ¶¶ 13, 260.

---

[9] While the parties exchanged records in connection with the "narrowly focused" (Opp. at 3) preliminary injunction motion, Defendants have not produced a single document in merits discovery.

Evaluating whether speech played a role in the resulting harm, and whether Defendants can succeed on an affirmative defense that they would have taken the same action in the absence of the protected speech, are questions of fact better left to the ultimate factfinder. For example, in *Morris*, the Second Circuit remanded a summary judgment-stage case in which a town had abolished its police department, allegedly because of officers' protected speech. *Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999), *abrogated on other grounds by Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012). The court noted the "causal connection may be difficult to prove because the defendants doubtless will maintain that the Department was abolished for fiscal reasons." *Id.* But that did not make summary judgment an appropriate tool to resolve motivation questions. *Id*. And if that is the case, a Rule 15 motion offers an even less appropriate vehicle for resolving that issue. *See also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91–92 (2d Cir. 2002), *abrogated in part on other grounds by Knick v. Twp. of Scott*, 588 U.S. 180, 185 (2019) (issues of fact relating to motive "cannot properly be determined on a motion to dismiss").

And Defendants' proffered evidence—not drawn from the Amended Complaint[10]—would not merit even summary judgment. Defendants reference enrollment data they say can be found *somewhere* in a Department of Education database. Opp. at 10. But they provide no evidence officials relied on that data or information about what criteria the university used, nor why SUNY Fredonia stopped offering philosophy courses (not just a major or minor) entirely. And they point to a student newspaper report that fewer students enrolled in programs the university had already

[10] Defendants invoke a summary-judgment futility standard, Opp. at 4 & n. 2, but their cases involve amendments at summary judgment or on otherwise developed records. The ordinary rule applied by courts in the Second Circuit asks whether amendment survives Rule 12(b)(6), "without resorting to any outside evidence." *Mahar v. U.S. Xpress Enters., Inc.*, No. 1:06-CV-1297 (GLS/RFT), 2009 WL 2227583, at *1 (N.D.N.Y. July 21, 2009).

discontinued. *Id.* At best, such data may suggest declining student interest *after* the university's cuts; it does not establish that enrollment data *alone* drove the retrenchment decisions.

Finally, Defendants attack a claim the PFAC does not plead. It does not assert a separate claim that Defendants shuttered the Department to retaliate against Kershnar. Rather, the PFAC alleges that the earlier retaliatory exclusion from teaching contributed to declining student interest and the Department's closure, adding to Plaintiff's existing damages. PFAC ¶¶ 13, 260. Whether that allegation of a causal chain is proven is a factual question, not a basis for futility.

**CONCLUSION**

The Court should grant Plaintiff's motion for leave to amend his complaint.

Dated: August 21, 2026

Respectfully submitted,

/s/ Adam Steinbaugh

Adam Steinbaugh (CA Bar No. 304829)*
Cary Davis (PA Bar No. 338042)*
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
510 Walnut St., Ste. 900
Philadelphia, PA 19106
Tel: (215) 717-3473
Email: adam@fire.org
Email: cary.davis@fire.org

Robert Corn-Revere*
DC Bar No. 375415
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE, Ste. 340
Washington, DC 20003
Tel: (215) 717-3473
Email: bob.corn-revere@fire.org

Barry N. Covert, Esq.
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue – Suite 120
Buffalo, New York 14202
Email: bcovert@lglaw.com

* Admitted *pro hac vice.*

*Counsel for Plaintiff*